**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | |
|---|---|
| PANTECH CORPORATION and PANTECH WIRELESS, LLC | |
| Plaintiffs, | Case No. 5:22-cv-00069-RWS |
| v. | **JURY TRIAL DEMANDED** |
| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD., | |
| Defendant. | |

**ONEPLUS'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................1

II.   CONSTRUCTION OF THE DISPUTED CLAIM TERMS FROM THE GROUP ONE
      PATENTS ......................................................................................................1

      A.    Disputed claim term from the '247 patent ............................................1

      1.    "processor … configured to cause the WTRU to: transmit …; receive …; and
            determine whether to retransmit" ('247 patent, claim 1).........................2

      B.    Disputed claim terms from the '954 patent............................................6

      1.    "eNB" ('954 patent, Claims 1, 4, 6, and 9)............................................6

      2.    "wherein the processor, when executing program instructions stored in the
            memory, is configured to: cause the apparatus to receive a Radio Resource
            Control (RRC) message…cause the apparatus to receive information indicating a
            random access preamble…cause the apparatus to transmit the random access
            preamble... cause the apparatus to receive a random access response… cause the
            apparatus to apply each TA value" ('954 Patent, Claim 6) ......................7

      C.    Disputed claim term from the '493 patent ............................................8

      1.    "when the RRC message indicates that a single control bit in the bitmap is
            associated with the WTRU, control an uplink transmission of the WTRU using
            the obtained single control bit; and when the RRC message indicates that multiple
            control bits in the bitmap are associated with the WTRU, control an uplink
            transmission of the WTRU using the obtained multiple control bits" ('493 patent
            Claims 1 and 3) .........................................................................................8

      D.    Disputed claim terms from the '839 patent............................................10

      1.    "*li*'" ('839 patent claims 1 and 4) .........................................................10

      2.    "a processor configured to determine [indexes of resource element groups in
            which the PHICH is transmitted,] and decode the PHICH mapped to at least one
            OFDM symbols according to the determined indexes" ('839 patent claim 9) ......11

      3.    "at least one OFDM symbols… in OFDM symbol… in the OFDM symbol ... in
            OFDM symbol ... in OFDM symbol ... in the OFDM symbol ... in the OFDM
            symbol" ('839 patent claims 1 and 9) .....................................................13

III.  CONSTRUCTION OF THE DISPUTED CLAIM TERMS FROM THE GROUP TWO
      PATENTS ......................................................................................................15

      A.    Disputed claim terms from the '490 patent............................................15

1.    "displaying the selected contents sequentially on a display of the mobile terminal" / "a display to display the selected contents sequentially in the message form" ('490 patent claims 1 and 5)...............................................................................15

2.    "message form" ('490 patent claims 1 and 5).........................................................17

B.    Disputed claim terms from the '710 patent............................................................18

1.    "picture" ('710 patent claims 1, 2, 6, and 19) & "images" ('710 patent claims 1, 12, 13, 15, and 19) ................................................................................................18

2.    "action detector to detect a specific action from the images captured by the camera" ('710 patent claim 1)..............................................................................19

"picture controller configured to control the picture displayed on the display in association with the location on the display if the specific action is detected by the action detector" ('710 patent claim 1) ...................................................................19

C.    Disputed claim terms from the '052 patent............................................................21

1.    "application selection gesture" ('052 patent claims 1 and 10) & "target application control gesture" ('052 patent claims 1 and 10)......................................................21

2.    "gesture identifying unit" ('052 patent claims 10 and 18)....................................25

D.    Disputed claim terms from the '654 patent............................................................26

1.    "processing unit to generate a second object based on the first object, and to display the second object in an untouched region" ('654 patent claim 1).............26

"control unit to execute an operation corresponding to the second object if the second object is selected" ('654 patent claim 1)....................................................26

2.    "wherein the control unit removes the display of the second object if the second object is not selected within a reference period of time/ removing the display of the second object if the second object is not selected within a reference period of time" ('654 patent claims 1 and 12)......................................................................28

3.    "controls the interface to restrict a selection of the first object while the second object is selected" ('654 patent claim 10)............................................................29

IV.    CONCLUSION......................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008) ............................................................................. 5, 8

*Atmel Corp. v. Info. Storage Devices*,
   198 F.3d 1374 (Fed. Cir. Dec. 28, 1999) ..................................................... 12, 21, 26, 27

*Dyfan, LLC v. Target Corp.*,
   28 F.4th 1360 (Fed. Cir. 2022) .................................................................................. 4

*Free Stream Media Corp. v. Alphonso Inc.*,
   2017 WL 1165578 (E.D. Tex. March 29, 2017).......................................................... 4

*HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270 (Fed. Cir. 2012) ..................... 5

*MTD Prods. Inc. v. Iancu*,
   933 F.3d 1336 (Fed. Cir. 2019) ................................................................................ 3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ................................................................................... 9, 10, 30

*Noah Sys., Inc. v. Intuit, Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012) ............................................................................. 5, 8

*Novo Indus., L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 (Fed. Cir. 2003) .......................................................................... 14, 15

*O2 Micro International, Ltd. v. Beyond Innovation Technology Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) .............................................................................. 28

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...................................................................... 6, 23, 29

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013) .............................................................................. 22

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002 (Fed. Cir. 2021).................... 3

*Renishaw PLC v. Marposs Societa' per Asioni*,
   158 F.3d 1243 (Fed. Cir. Sept. 16, 1998) .................................................................. 7

*Stmicroelectronics, Inc. v. Motorola, Inc.*,
   327 F. Supp. 2d 687 (E.D. Tex. July 19, 2004) ...................................................... 14, 15

*SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*,
    2016 WL 55118 (E.D. Tex. Jan. 5, 2016) .................................................. 4

*Twin Peaks Software Inc. v. IBM Corporation*,
    690 Fed. Appx. 656 (Fed. Cir. May 26, 2017) ..................................... 13, 21, 26, 27

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    308 F.3d 1167 (Fed. Cir. 2002) .................................................. 18

*VDPP LLC v. Vizio, Inc.*,
    2022 WL 885771 (Fed. Cir. March 25, 2022) ....................................... 12

*Velocity Patent LLC v. FCA US LLC*,
    2018 WL 421416 (N.D. Ill. Sept. 4, 2018) ..................................... 3, 21, 25

*Wasica Finance GmbH v. Continental Automotive Systems, Inc.*,
    853 F.3d 1272, 1288 (Fed. Cir. 2017) ..................................... 15, 17, 29

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) .................................................. 2, 5

**Statutes**

35 U.S.C. § 112(6)/(f) ..................................................... 2, 7, 11, 19, 24, 26

35 U.S.C. § 112, ¶ 6 ..................................................... 3, 4, 19, 24

Defendant OnePlus Technology (Shenzhen) Co., Ltd. ("OnePlus") respectfully submits this responsive brief in support of its proposed constructions of disputed claim terms in U.S. Patent Nos. 10,869,247 (the "'247 patent") (Dkt. 1, Ex. 6), 11,012,954 (the "'954 patent") (Dkt. 1, Ex. 4), 11,172,493 (the "'493 patent") (Dkt. 1, Ex. 2), 9,548,839 (the "'839 patent") (Dkt. 1, Ex. 1), 10,162,490 (the "'490 patent") (Dkt. 1, Ex. 8), 8,587,710 (the "'710 patent") (Dkt. 1, Ex. 3), 8,893,052 (the "'052 patent") (Dkt. 1, Ex. 5), and 9,063,654 (the "'654 patent") (Dkt. 1, Ex. 7) (collectively the "asserted patents").

## I.    INTRODUCTION

Pantech Corporation and Pantech Wireless, LLC (collectively "Pantech") assert 50 claims from the above listed eight patents. The '247, '954, '493, and '839 patents ("Group One Patents") are allegedly Standard Essential Patents (SEPs) for telecommunications technology. The '490, '710, '052, and '654 patents ("Group Two Patents") are software patents directed to human interactions with mobile phones.

Across all eight patents, many claims recite generic nonce terms with limited to no corresponding description in the specification, and further without algorithmic details. Additionally, for several terms of the Group Two Patents, it is apparent that Pantech intends to stretch the "plain and ordinary" meaning far beyond what was originally intended by the patentee. OnePlus proposes construing such terms not to unduly limit their scope, but rather to give each term its proper meaning consistent with and required by the intrinsic record.

## II.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS FROM THE GROUP ONE PATENTS

### A.    Disputed claim term from the '247 patent

The '247 patent is an alleged SEP with asserted claims directed to supporting a decision on whether to retransmit a data block based on received uplink scheduling information.

1

1.      **"processor … configured to cause the WTRU to: transmit …; receive …; and determine whether to retransmit" ('247 patent, claim 1)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Means plus function claim limitation under 35 U.S.C. § 112 ¶6/(f) **Function**: transmit, using a hybrid automatic repeat request (H-ARQ) process, a data block to a base station; receive uplink scheduling information from the base station, wherein the uplink scheduling information includes a H-ARQ process identification for the H-ARQ process; and determine whether to retransmit the data block based on the received uplink scheduling information and not based on whether the WTRU has received a negative acknowledgement (NACK) from the base station. **Structure**: None (Indefinite) | Plain and ordinary (not governed by 35 U.S.C. § 112(6)/(f)) |

(a)  **"Processor ... Configured To" Is A Means-Plus-Function Term**

The phrase "processor ... configured to..." is a means-plus-function limitation because it both lacks "sufficiently definite structure" and it simply recites a multiplicity of "function[s] without reciting sufficient structure for performing [those] function[s]." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). In claim 1 of the '247 patent, the language surrounding the phrase "processor ... configured to" is purely functional. For example, the claimed "processor" performs functions including causing a WTRU to: (1) transmit, using a hybrid automatic repeat request (H-ARQ) process, a data block to a base station; (2) receive uplink scheduling information from the base station, wherein the uplink scheduling information includes a H-ARQ process identification for the H-ARQ process; and (3) determine whether to retransmit the data block based on the received uplink scheduling information and not based on whether the WTRU has received a negative acknowledgement (NACK) from the base station. These limitation are carried out by software; the hardware must be programmed in a specific way to accomplish these functions. But the claim provides no information regarding how a generic "processor" performs these functions. It merely states the functional end results without explaining how they are achieved.

Nor does the claim specify how the "processor" is connected to other components in the claims. Claim 1 specifies that the claimed wireless transmit/receive unit (WTRU) includes "at least one transceiver" (*id.*), but the claim does not specify how the "processor" is connected to the "at least one transceiver." Instead, it merely indicates that the "processor" and the "at least one transceiver" are "configured to cause the WTRU to..." perform the above mentioned function. *Id.* Because the claim language merely sets forth what the "processor" is "configured" to do, § 112 ¶ 6 applies. *See MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019) ("mechanical control assembly" with some structural connotation still considered to be a means-plus-function limitation where other claim language on what it was "configured to" do was functional).

The specification of the '247 patent confirms that the phrase "processor ... configured to" is used as a generic placeholder in the claims. Indeed, the specification and drawings of the '247 patent are entirely silent regarding the term "processor." Because neither claim 1 of the '247 patent nor the specification or drawings describes how the "processor" performs the above recited functions, the term "processor" becomes a black box to be construed as a means-plus-function term. *See Velocity Patent LLC v. FCA US LLC*, 2018 WL 4214161, at *8 (N.D. Ill. Sept. 4, 2018) (holding that a claimed processor which did not describe the input and how the input affected the output was a means-plus-function term); *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1007 (Fed. Cir. 2021) ("The processor and transceiver amount to nothing more than a general-purpose computer.").

Accordingly, the phrase "processor ... configured to" is a generic placeholder and should be construed as a means-plus-function limitation.

**(b) Pantech's Construction Is Inconsistent With The Intrinsic Record**

Pantech contends that a "processor" has an understood meaning because it is "a known class of structures." (Dkt. 37, Opening Br. at 2-4.) The cases cited by Pantech are distinguishable from the present case. In *Dyfan, LLC v. Target Corp.*, the Federal Circuit did hold that "[c]laim terms 'need not connote a single, specific structure,' and may instead 'describe a class of structures' and still recite 'sufficiently definite structure' to not invoke § 112 ¶ 6." 28 F.4th 1360, 1366 (Fed. Cir. 2022). However, in *Dyfan, LLC*, the term "processor" was not at issue; rather the case addressed the terms "code"/"application" and "system." *Id.* at 1364. Accordingly, *Dyfan* is silent with respect to the term "processor."

Further, *Free Stream Media Corp. v. Alphonso Inc.* is also distinguishable because both the claims and the specification provided description of the structure of the processor and how it is configured. 2017 WL 1165578, at *28 (E.D. Tex. March 29, 2017). In the present case, claim 1 of the '247 patent merely recites the "processor" and the "at least one transceiver" are configured to cause the WTRU to perform the function. However, at no point does the claim recite how the processor and at least one transceiver are related or how they are situated with respect to the WTRU to cause it to perform the recited functions. Moreover, the specification and drawings of the '247 patent are entirely silent with respect to the term "processor" and therefore provide no description of the needed structure to perform the recited functions.

Additionally, *SyncPoint Imaging, LLC v. Nintendo of Am. Inc.* is distinguishable because in that case the patent claims specified the objectives and operations of the term processor. 2016 WL 55118, at *20 (E.D. Tex. Jan. 5, 2016). Claim 1 of the '247 patent merely recites the term "processor" and the "at least one transceiver" are configured to cause a "WTRU" to perform the above recited functions. Claim 1 does not specify any sort of objective or operation of the processor; rather, the term "processor" in claim 1 of the '247 patent is merely a generic computer

nonce type term recited for performing the functions and therefore appropriately construed as a means-plus-function term.

### (c) Identification Of Function And Corresponding Structure

Because the claimed "processor" is a means-plus-function claim term, the construction must identify the claimed functions of the processor and the corresponding structure in the specification for those functions. *See Williamson*, 792 F.3d at 1351. To simplify the issues Pantech and OnePlus agree on the above recited function from claim 1 of the '247 patent.

Having identified the function, the next step is to identity the structure from the specification that performs that function. Pantech contends that the structure for performing the claimed function is a "processor." However, Pantech is wrong as a matter of law. Because "processor ... configured to" limitation is read as a generic computer nonce term, the '247 patent must disclose an algorithm adequate to perform the claimed function. *See Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). No such algorithm is disclosed in the specification of the '247 patent. *See HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1280 (Fed. Cir. 2012) ("[patentee] had to do more than parrot the recited function; it had to describe a means for achieving a particular outcome, not merely the outcome itself.").

Moreover, Pantech's reliance on the declaration of Dr. Vojcic that a person of ordinary skill would understand how to implement the functions on any specified hardware capable of performing the function, such as a Digital Signal Processor, is improper. The patentee cannot "simply ... state or later argue that persons of ordinary skill in the art would know what structures to use to accomplish the claimed function"; rather, the specification must disclose corresponding structure. *See Aristocrat Techs.*, 521 F.3d at 1337; *see also Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012).

Because the specification does not disclose an algorithm to perform the recited function described in claim 1, the limitation is indefinite.

### B.    Disputed claim terms from the '954 patent

The '954 patent is an alleged SEP having claims directed to methods and apparatuses for uplink synchronization using uplink timing groups in a set of component carriers (CCs).

### 1.    "eNB" ('954 patent, Claims 1, 4, 6, and 9)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Plain and ordinary meaning | base station |

A patent claim is construed by giving the words of the claim their ordinary meaning as used in the field of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). The plain and ordinary meaning of eNB is "evolved node B" ('954 Pat. at 1:37-38), and a person of ordinary skill in the art would understand that the relationship between "eNB" and "base station" is that of species to genus. Indeed, the term "Node-B" appears elsewhere in the '954 patent specification (*id.* at 4:16), demonstrating that the patentee was well aware of the difference between a 4G base station (an eNB) versus a 3G base station (a Node-B).

Pantech, in an attempt to broaden the recited species to cover the genus, tries to conflate species with genus by pointing to a portion of the specification which says "[h]ereinafter… a base station may be referred to as an eNB." (Opening Br. at 5 (citing Ex. B at 8:27-28)). However, it is clear from the context that the base station indeed may be referred to as an eNB thereinafter because what is described thereinafter is a process applicable to a 4G network. (*See* '954 Pat. at 8:27-61, Fig. 4.) That does not mean that base station and eNB are synonymous.

In any event, the patentee deliberately chose the species term "eNB" in the claim language instead of using the broader genus term "base station," and the claims must therefore be construed accordingly. *See Renishaw PLC v. Marposs Societa' per Asioni*, 158 F.3d 1243, 1248

(Fed. Cir. Sept. 16, 1998) ("the resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property").

> **2.** **"wherein the processor, when executing program instructions stored in the memory, is configured to: cause the apparatus to receive a Radio Resource Control (RRC) message…cause the apparatus to receive information indicating a random access preamble…cause the apparatus to transmit the random access preamble... cause the apparatus to receive a random access response… cause the apparatus to apply each TA value" ('954 Patent, Claim 6)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Means plus function claim limitation under 35 U.S.C. § 112 ¶6/(f)<br><br>**Function**: cause the apparatus to receive a Radio Resource Control (RRC) message through a primary Component Carrier (CC), wherein the primary CC belongs to a first uplink (UL) timing group, the RRC message comprises information related to a second UL timing group, which has been set by an evolved Node B (eNB), the second UL timing group includes a secondary CC; cause the apparatus to receive information indicating a random access preamble; cause the apparatus to transmit the random access preamble according to a non-contention selection, through CC one or more UL CCs, each of the one or more UL CCs transmitting the random access preamble being set as a delegate CC for a respective second UL timing group; cause the apparatus to receive a random access response through the primary CC, the random access response includes a Timing Advanced (TA) value for the secondary CC for the respective second UL timing group, wherein each TA value is transmitted from the eNB for the respective second UL timing group based on the transmitted random access preamble associated with the delegate CC of the respective second UL timing group; and cause the apparatus to apply each TA value to the secondary CC for the respective second UL timing group.<br><br>**Structure:** None (Indefinite) | Plain and ordinary meaning<br><br>(not governed by 35 U.S.C. § 112(6)/(f)) |

Asserted claim 6 of the '954 patent recites a "processor ... configured to..." as a generic placeholder for a general purpose computer in the claims, and the specification of the '954 patent contains no such corresponding structural support for the stated function because a processor executing a relevant algorithm is never mentioned in the specification. Therefore, the arguments from Section II(A)(1) above are equally applicable here.

With respect to this claim in particular, Pantech attempts to cure the lack of disclosure regarding a "processor" by focusing on the disclosure of a "controller 1110." (Opening Br. at 7 (citing '954 Pat. at FIG. 11; 26:38-43)). Specifically, Pantech relies on a teaching that "the controller 1110 may control all component elements." (*Id.* (citing '954 Pat. at 26:38-39.) However, this is not a complete quotation. Rather, the complete quotation references FIG. 11 and states, "the controller 1110 may control all component elements, ***and*** a few component elements may independently operate" ((emphasis added) *id.* at 26:38-40). As such, the specification does not relate "controller 1110" to the claimed "processor," and it also does not recite structure adequate to show the entire function listed above is coordinated by the "controller 1110" alone. See *id*.

Moreover, Pantech's reliance on the declaration of Dr. Vojcic that a person of ordinary skill would understand how to implement the functions on any specified hardware capable of performing the function, such as a DSP or ARM, is improper for the reasons discussed above in Section II(A)(1). *See Aristocrat Techs.*, 521 F.3d at 1337; *see also Noah Sys.*, 675 F.3d at 1317.

Because the specification does not disclose algorithms to perform the recited function described in claim 6, the limitation is indefinite.

### C.    Disputed claim term from the '493 patent

The '493 patent is an alleged SEP having claims for status reporting, resource allocation, scheduling, and signaling for grouping real time services (RTS) in a telecommunications system.

**1.    "when the RRC message indicates that a single control bit in the bitmap is associated with the WTRU, control an uplink transmission of the WTRU using the obtained single control bit; and when the RRC message indicates that multiple control bits in the bitmap are associated with the WTRU,**

**control an uplink transmission of the WTRU using the obtained multiple
control bits" ('493 patent Claims 1 and 3)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning |

A patent claim is definite as long as the "claims, viewed in light of the specification and

prosecution history, inform those skilled in the art about the scope of the invention with reasonable

certainty." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 910 (2014). Claims 1 and 3 are

indefinite because they require performance of alternative scenarios in a single claim, contrary to

the teachings in the specification. With respect to single and multi-bit control, the '493

specification teaches:

> In order to signal the dynamic or semi-static resource scheduling as
> described above, explicit signaling is preferable. Thus, the following
> methods are applied. In a first method, single bit signaling is replaced
> with multiple bit signaling in the bitmap per WTRU to achieve the
> randomness of resource allocation.

('493 Pat. at 8:41-46.) As such, the specification teaches two alternative embodiments that are not

used together, unlike the language of claims 1 and 3. Claims 1 and 3 require both scenarios be

performed because it states "when the RRC message indicates that a single control bit in the

bitmap is associated with the WTRU... ***and*** when the RRC message indicates that multiple control

bits in the bitmap are associated with the WTRU..." (emphasis added). In this scenario, one of

ordinary skill in the art would not understand how the claimed RRC message can indicate both a

single control bit in the bitmap associated with the WTRU ***and*** indicate multiple control bits

associated with the WTRU because these are clearly contrary situations. No help would be found

by turning to the specification because the specification also teaches these as being alternatives.

Therefore, claims 1 and 3 are indefinite.

### D. Disputed claim terms from the '839 patent

The '839 patent is an alleged SEP relating to "a mapping method for frequency and OFDM symbol regions of a signal transmitted on downlink in a cellular OFDM wireless packet communication system." '839 Pat. at 7:18-22.

### 1. "$l'_i$" ('839 patent claims 1 and 4)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Indefinite<br><br>Alternatively:<br><br>$$l'_i = \begin{cases} 0 & \text{normal } PHICH \text{ duration, all subframes} \\ i & \text{extended } PHICH \text{ duration,} \\ & \text{non-} MBSFN \text{ subframes} \\ (\lfloor m'/2 \rfloor + i + 1) \bmod 2 & \text{extended } PHICH \text{ duration,} \\ & MBSFN \text{ subframes} \end{cases}$$ | Plain and ordinary meaning |

A patent claim is definite as long as the "claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. 898 at 910. Claims 1 and 4 recite a parameter $l'_i$ with no definition of the parameter. Instead, claims 1 and 4 just reference $l'_i$ as an "index," but neither claims 1 or 4 provide any explanation of what the index refers to. Turning to the specification, however, it can be seen that $l'_i$ is "an index of an OFDM symbol in which the i-th repetition of a PHICH group is transmitted." ('839 Pat. at 5:12-13.) The specification further teaches that $l'_i$ "may be expressed by" the following Equation 1:

$$l'_i = \begin{cases} 0 & \text{normal } PHICH \text{ duration, all subframes} \\ i & \text{extended } PHICH \text{ duration,} \\ & \text{non-} MBSFN \text{ subframes} \\ (\lfloor m'/2 \rfloor + i + 1) \bmod 2 & \text{extended } PHICH \text{ duration,} \\ & MBSFN \text{ subframes} \end{cases}$$

(*Id.* at 5:20-31.) Although the use of the language "may" in the specification appears to leave open the possibility for other definitions, the specification does not actually provide any range or definition for the parameter $l'_i$ other than that found in Equation 1 provided above. Without such a definition, one of ordinary skill in the art would not be informed of the scope of claims 1 and 4 with reasonable certainty because they would have to guess as to the range of parameter $l'_i$. Therefore, claims 1 and 4 are indefinite, and if not indefinite, should be construed in accordance with the only possible definition given in the specification.

Pantech contends that other definitions of $l'_i$ are provided at 6:21-31 and Figs. 8-10. (Dkt. 37, Opening Br. at 11.) However, these contentions are contradicted by the specification: (1) col. 6:21-31 merely describes where a PHICH group is started and is not a definition for $l'_i$; and (2) in stark contrast to Dr. Vojcic's assertion that Figs. 8-10 "provide additional examples that do not implicate Equation 1," the '839 specification expressly explains that "FIGS. 8 to 10 illustratively show Equation 1." ('839 Pat. at 5:38.)

> 2. "a processor configured to determine [indexes of resource element groups in which the PHICH is transmitted,] and decode the PHICH mapped to at least one OFDM symbols according to the determined indexes" ('839 patent claim 9)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Means plus function claim limitation under 35 U.S.C. § 112 ¶6/(f)<br><br>**Function:** determine indexes of resource element groups in which the PHICH is transmitted, and decode the PHICH mapped to at least one OFDM symbols according to the determined indexes<br><br>**Structure:** None (Indefinite) | Plain and ordinary meaning (not governed by 35 U.S.C. § 112(6)/(f)) (wherein "at least one OFDM symbols" is understood as "at least one OFDM symbol") |

Claim 9 recites a "processor configured to..." as a generic placeholder for a general purpose computer in the claims, and the '839 specification contains no algorithmic support.

Accordingly, for the reasons discussed above in Sections II(A)(1) and II(B)(2), claim 9 of the '839 is an indefinite means-plus-function term.

For this term, Pantech again contends that a "processor" should not be construed as a means-plus-function limitation because it connotes structure to a skilled artisan. (Dkt. 37, Opening Br. at 12 (citing *VDPP LLC v. Vizio, Inc.*, 2022 WL 885771, at *3 (Fed. Cir. March 25, 2022).) However, *VDPP LLC v. Vizio, Inc.* is inapposite because the disputed patent in that case included actual description of the claimed "processor" and "storage" in the specification. *See* 2022 WL 885771, at *3 ("the district court overlooked intrinsic evidence showing that the terms 'processor' and 'storage' do connote structure to a skilled artisan." (citation omitted)). That is not the case here, which recites software functions without any corresponding algorithm.

Further, Pantech contends that the functional claim language of claim 9 describing how the processor is configured amounts to "the processor's configuration." (Dkt. 37, Opening Br. at 12-13.) Notably, however, Pantech's own expert characterizes these details which allegedly establish the processor's configuration are actually in fact referring to the software "functions" of the processor. (*Id.*)

Finally, Pantech attempts to side-step the lack of disclosure regarding a "processor" by pointing to *implicit* structure. (*Id.* at 13-14 (citing *Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1383 (Fed. Cir. Dec. 28, 1999).) However, in *Atmel*, the structure at issue was a "high voltage generating means," and the specification specifically references that such structure is based on ""[k]nown [c]ircuit techniques ... used to implement high-voltage circuit." 198 F.3d at 1382. In contrast, the stated software function in the present case includes no algorithmic support for how it would be implemented in the claimed "processor." Rather, the specification is entirely silent as to the term "processor" and the function (i.e., determine indexes ..., and decode the

PHICH ...) are not fundamental functions performed by all "processors." As such, an algorithm must be disclosed for how a processor would perform these functions for appropriate structure. *See Twin Peaks Software Inc. v. IBM Corporation*, 690 Fed. Appx. 656, 661 (Fed. Cir. May 26, 2017) (negatively treating its prior *Atmel* decision relied on by Pantech). Specifically, in *Twin Peaks Software*, the Federal Circuit held that there must be "some structure" in the specification which corresponds to the means in the claims, and "the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification." *Id.*

Because the specification does not disclose algorithms to perform the recited function on the claimed "processor" recited in claim 9, the claim is indefinite.

### 3. "at least one OFDM symbols… in OFDM symbol… in the OFDM symbol ... in OFDM symbol ... in OFDM symbol ... in the OFDM symbol ... in the OFDM symbol" ('839 patent claims 1 and 9)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning (wherein "at least one OFDM symbols" is understood as "at least one OFDM symbol") |

Taking claim 1 as an example, the claim language is just simply a mess:

> mapping the PHICH to ***at least one OFDM symbols*** according to the determined indexes,

> wherein said indexes are determined according to ratio $n'_{l'\,i}/n'_0$ or ratio $n'_{l'\,i}/n'_i$ ***in OFDM symbol***, having index $l'_i$,

> $n'_{l'\,i}$ is the number of available resource element groups ***in the OFDM symbol***, having index $l'_i$, $n'_0$ is the number of available resource element groups ***in OFDM symbol***, having index 0, of a sub-frame, $n'_1$ is the number of available resource element groups ***in OFDM symbol***, having index 1, of the sub-frame,

> available resource element groups ***in the OFDM symbol***, having index $l'_i$, are resource element groups which can be used for PHICH transmission in the OFDM symbol, having index $l'_i$.

(Emphasis added). Although Pantech attempts to characterize the issue here as simply needing a correction of "symbols" to "symbol" (Dkt. 37, Opening Br. at 14), that does not fix the unintelligibility of the claim language. It is not clear whether any or all of the 5 instances of OFDM symbols subsequently recited in this claim are meant to refer back to the "at least one OFDM symbols," and three of these further instances of OFDM symbols are inexplicably introduced without either definite or indefinite articles at all (i.e., "in OFDM symbol"). Accordingly, claim 1, as well as claim 9 which suffers from similar issues, are indefinite.

Further, "[a] district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1356 (Fed. Cir. 2003). And as observed by this Court, "the 'no reasonable debate' standard is difficult to overcome." *Stmicroelectronics, Inc. v. Motorola, Inc.*, 327 F. Supp. 2d 687, 702-03 (E.D. Tex. July 19, 2004). It requires that 'where more than one proposed correction is consistent with the specification, a correction is 'not subject to reasonable debate' only where the specification makes one correction clearly correct." *Id.*

Here, the '839 specification describes multiple instances of "map[ping] the PHICH to at least one OFDM symbols according to the determined indexes" where different numbers of OFDM symbols for mapping the PHICH. *See, e.g.*, '839 Pat. at 4:34-39 ("If the PHICH is transmitted through one OFDM symbol, the PHICH repeating three times should be evenly distributed over a frequency bandwidth of one OFDM symbol. If the PHICH is transmitted through three OFDM symbols, each repetition is mapped to a corresponding OFDM symbol."); *see also* Figs. 2-11 and 3:66-4:10 (depicting and describing different mappings with different

quantities of OFDM symbols). Pantech's requested correction should thus be rejected. *See Novo*, 350 F.3d at 1356; *Stmicroelectronics*, 327 F. Supp. 2d at 702-03.

## III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS FROM THE GROUP TWO PATENTS

### A.    Disputed claim terms from the '490 patent

The '490 patent is directed to multimedia messaging service (MMS) messages. While an MMS message is being transmitted, the mobile terminal performing the transmission displays parts of the MMS message as they are being transmitted. *See* '490 Pat. at 6:5-53.

### 1.    "displaying the selected contents sequentially on a display of the mobile terminal" / "a display to display the selected contents sequentially in the message form" ('490 patent claims 1 and 5)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| displaying, in sequence, portions of the selected contents on a display of the mobile terminal prior to subsequent portions of the selected contents / a display to display, in sequence, portions of the selected contents prior to subsequent portions of the selected contents | Plain and ordinary meaning |

The dispute here centers on what is meant by the word "sequentially." A plain and ordinary construction of "sequentially" cannot suffice because such a construction would effectively eliminate this limitation from the claim, as any selected contents displayed on a display can be characterized as being displayed "sequentially" (e.g., a left-to-right sequence, a top-to-bottom sequence, etc.). *See Wasica Finance GmbH v. Continental Automotive Systems, Inc.*, 853 F.3d 1272, 1288, n. 10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

The specification repeatedly explains what "sequentially" means in the context of this patent and claim limitation. In no less than four places it repeats, "[w]hen instructed to transmit the MMS message, the controller 11… *sequentially* reads the MMS message in the order of the

HTTP header, the HTML body, and the attached media file." '490 Pat. at col. 4:1-5 (emphasis added); *see also id.* at cols. 4:21-23, 5:24-27, 5:67-6:2. The controller then displays, in this same sequence and together with a progress bar, these respective portions of the MMS message in accordance with the portion that is being transmitted, such that certain portions are displayed before others according to the sequence. *Id.* at 6:5-53, Figs. 5A-5D (showing display of header (5A), followed by display of text (5B), followed by display of first part of image (5C), followed by display of second part of image (5D)):



*See also id.* at Fig. 4 (flowchart depicting a sequence of displaying header (S207), followed by displaying text (S211), followed by displaying media file (S215)).

The patentee also relied on this construction to obtain the patent. In responding to a rejection from the USPTO, the claims were distinguished over the cited art by an argument that "**displaying the selected contents <u>sequentially</u>**" along with "**displaying a transmission progress**" provides the advantage that "a contents sender can exactly see transmission status of the contents with his mobile terminal." (Ex. A, '490 File History (FH), Resp. dated Jun. 21, 2018 at pp. 6-7 (emphasis in original).) This is consistent with the '490 patent specification, which summarizes the invention as "a method for displaying transmission status of a multimedia messaging service (MMS) message in which the content of a currently transmitted MMS message is displayed so that a user can check the transmission status of the MMS message *and the part of the message currently being transmitted*." ('490 Pat. at 1:55-61 (emphasis added)).

16

In sum, the word "sequentially" was the basis for allowance of the '490 patent and must therefore be given a meaningful construction, as offered by OnePlus.

2.    **"message form" ('490 patent claims 1 and 5)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| form compatible with a messaging service | Plain and ordinary meaning |

Claim 1 specifically recites that a sending request is received "in a message form" and that the selected contents are transmitted sequentially "in the message form." Similarly, claim 5 specifically recites that a sending request for the selected contents is received via a user interface "in a message form" and that the selected contents are displayed sequentially via a display "in the message form." Accordingly, the words "message form" must have meaning. *Wasica Finance*, 853 F.3d at 1288, n. 10.

The words "message" or "messaging" appear over 100 times in the specification, and in all of these 100+ appearances, are exclusively recited in connection with a "multimedia messaging service (MMS) message." *See, e.g.*, '490 Pat. at Title, Abstract, 1:21-30, 1:56-62. The specification thus clearly establishes an association between the described "messages" with a "messaging service," as the only messages described in the specification are "multimedia messaging service (MMS)" messages. *Id.* at 1:21-30, 1:32-36, 1:55-2:27, 3:7-6:56. The term "message form," which does not appear in the specification, is otherwise amorphous, and Plaintiff should not be allowed to construe this term at trial as applying to any form of any "message" whatsoever.

Notably, OnePlus is not overly limiting this term with its construction. As construed by OnePlus, the term would mean a form compatible with a messaging service, and would thus apply to forms used for MMS messages, SMS messages, and others. OnePlus's construction

should thus be adopted to give meaning to this claim limitation in a manner that is consistent with the understanding of a person of ordinary skill in the art in view of the specification.

**B.    Disputed claim terms from the '710 patent**

The '710 patent is directed to gesture-based control using image data captured by a camera. In particular, for a mobile terminal having a camera, the camera detects a specific user action (a movement toward or away, a movement left or right, a wink, a lip shape, a face inclination, or a face rotation), and in response thereto, the mobile terminal controls a displayed picture (enlarges or reduces the size of an entire or partial area of a picture, a layer of a picture, or an object in a picture). *See* '710 Pat. at 4:4-6:27.

**1.    "picture" ('710 patent claims 1, 2, 6, and 19) & "images" ('710 patent claims 1, 12, 13, 15, and 19)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| picture: a displayable file such as a JPG, PHOTOSHOP, or HTML file | picture: plain and ordinary meaning |
| images: camera data independent of the picture | images: plain and ordinary meaning |

Although "picture" and "image" would ordinarily be synonymous and easily understood in the context of mobile terminals, these two terms are deliberately used in different ways and attributed different meanings in the context of the asserted claims such that both these terms warrant construction. *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1177-78 (Fed. Cir. 2002) (the presumption for a claim term's ordinary meaning is overcome "if a different meaning is clearly and deliberately set forth in the intrinsic evidence"). That is, the asserted claims expressly require "images" to be *captured by a camera* and the basis for *detecting an action*, whereas a "picture" must be *displayed on a display* and *controlled based on the detected action*. *See* '710 Pat. at claims 1 and 19.

The claims, specification, and file history are extremely consistent in how they use the word "images" versus how they use the word "picture." The "picture" is always the file that is displayed and controlled (*see, e.g.*, *id.* at 2:58-3:22, 4:57-5:15), and the "images" are always referenced as something other than such picture—that is, the data captured by the camera used for detecting a user action (*see, e.g.*, *id.* at 2:29-35, 2:40-64, 2:65-3:32, 4:10-17, 4:57-61, 5:9-15). *See also id.* at claims 1 and 19; (Ex. B, '710 FH, Reponses dated March 11, 2013 and December 18, 2012). Further, contrary to Pantech's assertions (*see* Dkt. 37, Opening Br. at 18), the '710 specification does provide lexicography for "picture," as it identifies three specific examples of displayable file types that are intended to be covered by "picture." '710 Pat. at col. 4:66-67 ("a single-layered picture, such as a JPG file"), col. 5:2-3 ("a multi-layered picture, such as a PHOTOSHOP® file"), col. 5:6-8 ("a tree-structured picture… such as an HTML file").

The intrinsic record thus demonstrates that the patentee undeniably intended "picture" and "images" to have special meanings, and these terms should be construed accordingly.

**2.    "action detector to detect a specific action from the images captured by the camera" ('710 patent claim 1)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Means plus function claim limitation under 35 U.S.C. § 112 ¶6/(f)<br>**Function:** ... to detect variations in feature points included in images showing variations in motion or expression and captured by the camera<br>**Structure:** None (Indefinite) | Governed by 35 U.S.C. § 112(6)<br>**Function**: detecting a specific action from the images captured by the camera<br>**Structure**: processor configured to detect actions of a user, object, animal, subject of the image, or the like in images captured by a camera |

**"picture controller configured to control the picture displayed on the display in association with the location on the display if the specific action is detected by the action detector" ('710 patent claim 1)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Means plus function claim limitation under 35 U.S.C. § 112 ¶6/(f) | Governed by 35 U.S.C. § 112(6) |

| **Function:** configured to control the picture displayed on the display to center the picture at the location on the display if the specific action is detected by the action detector<br><br>**Structure:** None (Indefinite) | **Function**: controlling the picture displaying on the display in association with the location on the display<br><br>**Structure**: processor configured to vary coordinates, colors, and brightness of individual pixels belonging to the picture to change color effects, white balances and the like on the display |
| --- | --- |

The parties agree that these are means-plus-function terms but disagree as to the corresponding functions. While Pantech and its expert argue that OnePlus's proposed functions are inaccurately adapted from the specification (Dkt. 37, Opening Br. at 20-21), Pantech's proposed functions are merely statements of an outcome and not actual functions at all. OnePlus's proposed functions, on the other hand, draw from the only places the '710 patent (including both the claims and the specification) describes an actual function performed by the "action detector" (*see* '710 Pat. at 2:40-44) and an actual function performed by the "picture controller" in relation to the claimed "location on the display" (*see id.* at 3:33-42). Further, the terms "action detector" and "picture controller" are not terms which imply structure to one of ordinary skill in and of themselves. Accordingly, the respective functions corresponding to these means-plus-function terms are the ones proposed by OnePlus.

The specification is entirely silent as to structure of the "action detector" and the "picture controller," as well as with respect to algorithms for performing the functions associated therewith. Indeed, the specification describes both the "action detector" and "picture controller" in purely functional terms: "[t]he action detector 110 receives images of a user captured by a camera 200 and detects a specific action from the images of the user. The specific action may be detected by analyzing variations of feature points included in the images of the user to thus recognize variations in motion or expression" (*id.* at 2:40-44); and "the picture controller 120 may enlarge or reduce the size of the picture and center the picture at the specific location where

the user's touch has occurred on the touch screen 300. That is, if the user touches a specific

location on the touch screen 300 ... the picture controller 120 enlarges or reduces a picture

centering on the specific location where the user's touch has occurred" (*id.* at 3:33-42).

Because these are nothing more than functional statements without any description of

corresponding algorithms, they fail to impart structure to the claimed "action detector" and

"picture controller." *See Velocity Patent*, 2018 WL 4214161 at *8.

Pantech again mistakenly turns to *Atmel* for the principle of an implicit disclosure of a

"processor." (Dkt. 37, Opening Br. at 21, 23.) However, as discussed above with respect to *Twin

Peaks*, there must be "some structure" in the specification *which corresponds to* the means in the

claims, and it is not sufficient to simply point to "the understanding of one skilled in the art." 690

Fed. Appx. at 661. Accordingly, claims 10 and 18 are indefinite because the specification lacks

such structure for the claimed "action detector" and "picture controller."

### C.    Disputed claim terms from the '052 patent

According to claims 1 and 10 of the '052 patent, a mobile terminal determines a first

application as a target application based on an "application selection gesture," and the first

application is controlled to perform a command event based on a "target application control

gesture." In claim 18, a single contact signal corresponding to a gesture is used to both determine

a target application and to control the target application to perform a command event.

### 1.    "application selection gesture" ('052 patent claims 1 and 10) & "target application control gesture" ('052 patent claims 1 and 10)

| OnePlus's Proposed Constructions | Pantech's Proposed Constructions |
|---|---|
|  |  |

| application selection gesture: a gesture for specifically selecting the first application<br><br>[gesture: "a sort of image identified when a contact signal is generated on a display screen of a mobile terminal, and may be an image coinciding with an outline, shape, or path followed by a pointer generating the contact signal on the display screen" (see '052 Patent, 4:5-8).] | Plain and ordinary meaning |
|---|---|
| target application control gesture: a gesture for specifically identifying a command event for a target application<br><br>[gesture: see above] | Plain and ordinary meaning |

Construing these two terms is necessary because both "application selection gesture" and "target application control gesture" are phrases that appear only in the claims and not in the specification, and neither term is a term of art having an established meaning to a person of ordinary skill in the art. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1361 (Fed. Cir. 2013) ("If, however, the claim term does not have an ordinary meaning, and its meaning is not clear from a plain reading of the claim, 'we turn to the remaining intrinsic evidence, including the written description, to aid in our construction of that term.'").

Contrary to Pantech's assertions (*see* Dkt. 37, Opening Br. at 23-24), the specification and file history do in fact contain lexicography and disclaimer. First, the specification provides very clear and unambiguous lexicography for "gesture":

> In general, 'gesture' may designate an action or movement that a user may make with a part of the user's body to express emotion or information as defined in dictionaries. ***However, in the present specification, 'gesture' refers to a sort of image identified when a contact signal is generated on a display screen of a mobile terminal, and may be an image coinciding with an outline, shape, or path followed by a pointer generating the contact signal on the display screen.***

'052 Pat. at col. 4:1-8 (emphasis added). Accordingly, this lexicography, which is expressly explained as being different from the plain and ordinary definition of a gesture, should be adopted as part of the construction of "application selection gesture" and "target application

control gesture." *See Phillips*, 415 F.3d at 1316 (the inventors' lexicography governs when the specification reveals "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess").

Second, these two terms were the subject of much discussion during the prosecution of the '052 patent, resulting in corresponding disclaimers. *See id.* at 1317 ("the prosecution history can often inform the meaning of the claim language by demonstrating… whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."). The original claims of the application leading to the '052 patent did not include either of these terms; "application selection gesture" was first added during prosecution alongside arguments that the cited art did not teach "determining a target application from among the plurality of executed applications" based on the such application selection gesture (Ex. C, '052 FH, Resp. dated Jan. 4, 2012 at pp. 3, 10-13), and "target application control gesture" was later added during prosecution with arguments that the cited art did not disclose "identifying a **target application control gesture** corresponding to a contact signal" (Ex. D, '052 FH, Resp. dated Aug. 20, 2013, at pp. 2, 10 (emphasis in original)). To distinguish over cited prior art, the applicant emphasized that "selection of user interface buttons… cannot be characterized as 'application selection gesture' or 'target application control gesture' recited in claim 1." (*Id.* at p. 11.) The applicant further insisted, repeatedly, that the "application selection gesture" and the "target application control gesture" cannot correspond to the "same touch" and are thus different and distinct touches. (*See* Exs. E and F, '052 FH, Resp. dated Dec. 20, 2013, at p. 11, and Resp. dated Jan. 22, 2014, at pp. 13-14.)

In sum, the specification clearly defines what a "gesture" is, and the prosecution history contains disavowals as to what the "application selection gesture" and "target application control

gesture" are not. As argued by the applicant, these two gestures must correspond to different and distinct touches and do not cover a basic selection of a user interface button. Indeed, looking to Figure 7 of the '052 patent, the specification's explanations of these gestures is in line with the foregoing definition and disavowals - i.e., a first specific "sort of image" (the user drawing a triangle) corresponds to specifically selecting a first application (music player), and a second "sort of image" (the user drawing a right arrow) corresponds to specifically identifying a command event for that application (select next music).

FIG. 7
&lt;EVENT TABLE&gt;

| APPLICATION | IDENTIFICATION INFORMATION | COMMAND EVENT | | GESTURE |
|---|---|---|---|---|
| MUSIC PLAYER | △ | START REPRODUCTION | ▶ | ◎ |
| | | STOP REPRODUCTION | ⏸ | ◎ |
| | | SELECT NEXT MUSIC | ⏭ | ▷ |
| | | SELECT PREVIOUS MUSIC | ⏮ | ◁ |
| | | INCREASE REPRODUCTION SOUND | | △ |
| | | REDUCE REPRODUCTION SOUND | | ▽ |
| HOLD APPLICATION | ☐ | CANCEL HOLD | | ◪ |
| | | ⋮ | | |

*See also, e.g.*, '052 Pat. at 10:37-42 ("the application executing unit 110 may determine, from the gesture '◎', that the target application to be controlled is the 'message transmission/reception program' for email"), Fig. 9 (depicting drawn images in the shapes of right and left arrows corresponding respectively to "select next music" and "select previous music" command events).

Accordingly, "application selection gesture" should be construed as "a gesture for specifically selecting the first application" and "target application control gesture" should be construed as "a gesture for specifically identifying a command event for a target application," with "gesture" being construed according to its lexicographic definition from the specification.

### 2.    "gesture identifying unit" ('052 patent claims 10 and 18)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Construed under 35 U.S.C. § 112 ¶6/(f) | Governed by 35 U.S.C. § 112(6) |
| **Function:** identify a target application control gesture corresponding to a contact signal, the contact signal being generated on a display screen in which a control interface of a target application is not displayed | **Function**: identifying a target application control gesture |
| **Structure:** None (Indefinite) | **Structure**: a processor with software configured to identify a gesture in accordance with a contact signal input to the display screen. |

The parties agree that this is a means-plus-function term but disagree to the corresponding function. Pantech criticizes OnePlus's proposed function as allegedly expanding the function beyond a plain reading of the claim. (Dkt. 37, Opening Br. at 24.) However, OnePlus's proposed function comes directly from the express language of claims 10 and 18. Accordingly, it is OnePlus's proposed function, rather than Pantech's, that comports with the plain reading of the claim.

The specification of the '052 patent is entirely silent as to structure of the gesture identifying unit and an algorithm for performing the above stated function. Indeed, the specification, when discussing the "gesture identifying unit," describes it in purely functional terms: "the gesture identifying unit 120 may identify a gesture in accordance with a contact signal," "the gesture identifying unit 120 may analyze an outline, shape, or path along which a pointer contacts the display screen 170," "[t]he gesture identifying unit 120 then may identify, in the event table 160, a gesture corresponding to the analyzed shape within an allowable range," and "[t]he gesture identifying unit 120 may analyze the shape as one or more characters using a character recognition module." '052 Pat. at 7:26-40. These functional statements, in combination with the lack of any description of corresponding algorithms, are insufficient to provide structure with respect to the claimed "gesture identifying unit." *Velocity Patent*, 2018 WL 4214161 at *8.

25

As above, Pantech's mistaken effort to rely on *Atmel* with respect to implicit structure fails here as well. (*See* Dkt. 37, Opening Br. at 25.) There must be "some structure" in the specification *which corresponds to* the means in the claims, and it is not sufficient to simply point to the understanding of one skilled in the art based on conclusory assertions from its expert. *Twin Peaks*, 690 Fed. Appx. at 661. Accordingly, claims 10 and 18 are indefinite.

### D.    Disputed claim terms from the '654 patent

Independent claims 1 and 12 of the '654 patent recite displaying a second object in response to a touch input on a first object, and executing an operation based on the second object being selected or removing display of the second object if it is not selected within a time period. Dependent claim 10 further recites that the selection of the first object is restricted while the second object is selected.

#### 1.    "processing unit to generate a second object based on the first object, and to display the second object in an untouched region" ('654 patent claim 1)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Construed under 35 U.S.C. § 112 ¶6/(f)<br>**Function:** generate a second object based on the first object, and to display the second object in an untouched region<br>**Structure:** None (Indefinite) | Plain and ordinary meaning<br>(not governed by 35 U.S.C. § 112(6)/(f)) |

#### "control unit to execute an operation corresponding to the second object if the second object is selected" ('654 patent claim 1)

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Construed under 35 U.S.C. § 112 ¶6/(f)<br>**Function:** execute an operation corresponding to the second object if the second object is selected ... removes the display of the second object if the second object is not selected within a reference period of time<br>**Structure:** None (Indefinite) | Plain and ordinary meaning<br>(not governed by 35 U.S.C. § 112(6)/(f)) |

Claim 1 recites a "processing unit to..." and "a control unit to…" as generic placeholders for general purpose computers in the claims, and the specification of the '654 patent contains no corresponding structural support for the stated functions because a processing unit and a control unit executing relevant algorithms are never mentioned in the specification. Rather, the specification merely sets forth functional recitations of outcomes achieved by the "processing unit" and the "control unit." *See* '654 Pat. at 3:60-5:30, 5:31-52. Thus, for the reasons discussed above in Sections II(A)(1), II(B)(2), and II(D)(2), "processing unit" and "control unit" are means-plus-function limitations lacking the required disclosure of corresponding structure, and claim 1 of the '654 patent is therefore indefinite.

The parties agree as to the functions for these units. Where the parties disagree is whether there is sufficient structure associated with the function. In particular, Pantech again attempts to avoid the lack of disclosure regarding a "processing unit" by focusing on the concept of implicit structure and citing to *Atmel* (Dkt. 37, Opening Br. at 26-28), which was criticized by the Federal Circuit in its *Twin Peaks* decision. Pantech also offers supporting testimony from Dr. Vojcic, but this testimony actually serves to prove OnePlus's point. Because there is no actual structure in the '654 specification which ties the functional language to any specific algorithm, the best that Dr. Vojcic could do was to vaguely suggest that "appropriate software" could enable the claimed "processing unit" and "control unit" to perform their respective functions. (*Id.* at 27-28.) This is precisely the type of argument that was rejected in *Twin Peaks*. 690 Fed. Appx. at 661 ("the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification.").

Because the specification does not disclose algorithms to perform the recited functions associated with the "processing unit" "and "control unit" of claim 1, the claim is indefinite.

2.     **"wherein the control unit removes the display of the second object if the second object is not selected within a reference period of time/ removing the display of the second object if the second object is not selected within a reference period of time" ('654 patent claims 1 and 12)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| wherein the control unit selectively removes the display of the second object if the second object is not selected within a reference period of time for displaying the second object/ selectively removing the display of the second object if the second object is not selected within a reference period of time for displaying the second object | Plain and ordinary meaning |

Although Pantech accuses OnePlus of adding limitations and purports to advocate for a "plain and ordinary meaning" construction of this term (*see* Dkt. 37, Opening Br. at 29), it is actually OnePlus, not Pantech, whose construction of this term comports with the plain and ordinary meaning in light of the specification. The claim language inherently indicates that the display of the second object is selectively removed and that the reference period of time relates to the display of the second object, whereas Pantech, through seeking its "plain and ordinary meaning" construction, is actually intending to read this claim limitation so broadly as to render this limitation meaningless. (*See* Ex. G, Pantech's Preliminary Infringement Contentions, App'x 9, at 37-46) (alleging that this limitation is satisfied based on a mobile terminal's screen being shut off after an arbitrary period of time unrelated to display of the purported second object). Construction of this term is thus warranted to clarify that the plain and ordinary meaning is not as expansive as Pantech makes it out to be. *O2 Micro International, Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) (suggesting that a term should be construed "when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute").

The sum total of the discussion of this limitation in the '654 specification is as follows:

> Also, if a second object is not selected within a reference time period
> after the second object is displayed, the control unit 105 may remove

> the display of the second object and may return to an idle state for a
> selection or touch of a first object.

'654 Pat. at col. 5:49-52. Even this paltry description demonstrates that the reference time period

is associated with *selective* removal of the second object so as to return the display to a state in

which a displayed first object may be selected or touched. Turning off the display entirely after

an arbitrary amount of time, unrelated to display of the second object, was neither contemplated

under the claim language nor this supporting portion of the specification.

Further, this limitation was given great import during prosecution, as the allowance of all

claims of the '654 patent was based solely thereon. (*See* Ex. H, '654 FH, Resp. dated Jan. 22,

2015, at pp. 2, 8.) Allowing for an interpretation of this limitation that is so broad as to cover a

"sleep mode" for a display would fly in the face of the intrinsic record. *See Wasica Finance*, 853

F.3d at 1288, n. 10; *Phillips*, 415 F.3d at 1317.

Accordingly, OnePlus's construction, which clarifies the plain and ordinary meaning of

this disputed limitation, should be adopted.

3.      **"controls the interface to restrict a selection of the first object while the second object is selected" ('654 patent claim 10)**

| OnePlus's Proposed Construction | Pantech's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning |

At no point does the specification of the '654 patent describe controlling any interface to

restrict a selection of a first object while a second object is selected. The closest the specification

comes is vaguely mentioning that a selection of a first object is restricted "while a second object

*is being displayed*" (emphasis added). '654 Pat. at col. 5:46-48.

Although the specification does describe a variety of scenarios where a second object is

displayed on a touchscreen because a touch input on a first object to a touch screen device (*id.* at

6:16-52; 6:53-7:5; 7:6-48; 7:49-8:10; and 8:11-45), none of these scenarios involves restricting

the selection of the first object while the second object is selected. Accordingly, claim 10 is indefinite because, when read in view of the specification, a person having ordinary skill in the art would not be informed of the scope of the invention with reasonable certainty. *See Nautilus, Inc.*, 572 U.S. at 910.

## IV.    CONCLUSION

For the above reasons, OnePlus requests that the Court adopt its proposed constructions.

Dated: May 24, 2023                           Respectfully Submitted,

                                                  */s/ G. Blake Thompson*
                                                  **G. Blake Thompson**
                                                  State Bar No. 24042033
                                                  Blake@TheMannFirm.com
                                                  **J. Mark Mann**
                                                  State Bar No. 12926150
                                                  Mark@TheMannFirm.com
                                                  MANN | TINDEL | THOMPSON
                                                  112 E. Line Street, Suite 304
                                                  Tyler, Texas 75702
                                                  Telephone (903) 657-8540
                                                  Facsimile (903) 657-6003

                                                  LEYDIG, VOIT & MAYER, LTD.
                                                  David M. Airan (lead counsel)
                                                  Leonard Z. Hua
                                                  Christopher J. Gass
                                                  Two Prudential Plaza
                                                  180 N. Stetson Ave., Suite 4900
                                                  Chicago, IL 60601
                                                  (312) 616-5600
                                                  dairan@leydig.com
                                                  lhua@leydig.com
                                                  cgass@leydig.com

                                                  *Attorneys for Defendant*
                                                  *OnePlus Technology (Shenzhen) Co., Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 24, 2023, a true and correct copy of the foregoing document was served on all attorneys of record who have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

<div align="right">

*/s/ G. Blake Thompson*
**G. Blake Thompson**

</div>