# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                     TEXARKANA DIVISION

 4   PANTECH CORPORATION AND       )(
     PANTECH WIRELESS, LLC,        )(   CIVIL ACTION NO.
 5        PLAINTIFFS,              )(   5:22-CV-69-RWS
                                   )(
 6   VS.                           )(   TEXARKANA, TEXAS
                                   )(
 7   ONEPLUS TECHNOLOGY (SHENZHEN))(
     COMPANY LIMITED,              )(   OCTOBER 15, 2024
 8        DEFENDANT.               )(   8:28 A.M.

 9

10                 JURY TRIAL TRANSCRIPT

11        BEFORE THE HONORABLE ROBERT W. SCHROEDER III

12              UNITED STATES DISTRICT JUDGE

13

14   FOR THE PLAINTIFFS:     Mr. James A. (Tripp) Fussell, III
                             Ms. Tiffany A. Miller
15                           Ms. Courtney Krawice
                             Mayer Brown, LLP
16                           1999 K Street, NW
                             Washington, DC 20006
17
                             Mr. Geoffrey P. Culbertson
18                           Mr. Kelly Tidwell
                             Patton Tidwell & Culbertson, LLP
19                           2800 Texas Boulevard
                             Texarkana, TX 75503
20
                             Mr. Graham (Gray) M. Buccigross
21                           Mayer Brown, LLP
                             Two Palo Alto Square
22                           3000 El Camino Real
                             Suite 300
23                           Palo Alto, CA 94306

24

25
```

```
 1   FOR THE DEFENDANT:        Mr. David M. Airan
                               Mr. Wesley O. Mueller
 2                             Mr. Paul J. Filbin
                               Mr. Christopher J. Gass
 3                             Mr. Michael J. Schubert
                               Mr. James W. Sanner
 4                             Leydig Voit & Mayer, Ltd.
                               Two Prudential Plaza
 5                             180 North Stetson
                               Suite 4900
 6                             Chicago, IL 60601

 7                             Mr. Kevin Collins
                               Mr. Justin Burnam
 8                             Mr. Matthew Kudzin
                               Covington & Burling LLP
 9                             One CityCenter
                               850 Tenth Street NW
10                             Washington, DC 20001

11                             Mr. G. Blake Thompson
                               Mann Tindel & Thompson
12                             112 E. Line Street
                               Suite 304
13                             Tyler, TX 75702

14
     COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
15                             Official Court Reporter
                               Honorable Robert W. Schroeder III
16                             United States District Judge
                               Eastern District of Texas
17                             Texarkana Division
                               500 North State Line Avenue
18                             Texarkana, TX 75501
                               shelly_holmes@txed.uscourts.gov
19

20   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
21

22

23

24

25
```

|  |  |  |
|---|---|---|
|  | 1 | P R O C E E D I N G S |
| 08:09:49 | 2 | (Venire panel out.) |
| 08:09:49 | 3 | COURT SECURITY OFFICER:  All rise. |
| 08:09:50 | 4 | THE COURT:  Ms. Combs, please call the case. |
| 08:28:39 | 5 | COURTROOM DEPUTY:  Cause No. 5:22-CV-69, Pantech |
| 08:28:42 | 6 | Corporation, et al., versus OnePlus Technology. |
| 08:28:45 | 7 | THE COURT:  Announcements for the record. |
| 08:28:46 | 8 | MR. CULBERTSON:  Good morning, Your Honor. |
| 08:28:52 | 9 | THE COURT:  Good morning. |
| 08:28:53 | 10 | MR. CULBERTSON:  Geoff Culbertson for the |
| 08:28:55 | 11 | Plaintiff.  This morning, we have Courtney Krawice, Tiffany |
| 08:28:58 | 12 | Miller, Tripp Fussell, and Kelly Tidwell.  And we're ready |
| 08:29:02 | 13 | to proceed. |
| 08:29:03 | 14 | THE COURT:  All right. |
| 08:29:05 | 15 | MR. CULBERTSON:  Thank you. |
| 08:29:08 | 16 | MR. THOMPSON:  Good morning, Your Honor. |
| 08:29:09 | 17 | THE COURT:  Good morning. |
| 08:29:10 | 18 | MR. THOMPSON:  Blake Thompson here for OnePlus. |
| 08:29:12 | 19 | With me today is David Aaron, Paul Filbin, Mike Schubert, |
| 08:29:20 | 20 | James Sanner, and over here we have Matthew Kudzin, Justin |
| 08:29:21 | 21 | Burnam, and Kevin Collins in the back.  And we're ready to |
| 08:29:30 | 22 | proceed. |
| 08:29:30 | 23 | THE COURT:  All right.  Good morning and welcome |
| 08:29:30 | 24 | to everyone. |
| 08:29:31 | 25 | We have a number of things to go over before we |

| | | |
|---|---|---|
| 08:29:33 | 1 | have the panel brought down. |
| 08:29:34 | 2 | The first thing is there were objections to |
| 08:29:38 | 3 | deposition designations that were filed.  We have reviewed |
| 08:29:43 | 4 | all of those and should, within the next hour, have an |
| 08:29:49 | 5 | order out on those.  So we will -- that will make rulings |
| 08:29:55 | 6 | on all of the objections to deposition designations. |
| 08:29:58 | 7 | I think the thing that makes the most sense is for |
| 08:30:02 | 8 | us to deal with the overnight disputes that go to |
| 08:30:07 | 9 | objections to voir dire and openings. |
| 08:30:14 | 10 | And so whoever wants to go -- go forward on the |
| 08:30:21 | 11 | objections to the voir dire slides may do so. |
| 08:30:25 | 12 | MR. THOMPSON:  Your Honor, we don't have any voir |
| 08:30:30 | 13 | dire slides, so I think I'll just do our objections to |
| 08:30:33 | 14 | the -- to Pantech's, if that's all right with you. |
| 08:30:35 | 15 | THE COURT:  That's fine. |
| 08:30:36 | 16 | MR. THOMPSON:  We have objected to No. 7 of -- and |
| 08:30:41 | 17 | we're trying to pull these up, but we may have some |
| 08:30:44 | 18 | technical difficulties -- No. 7 or the 7th slide of |
| 08:30:48 | 19 | Pantech's deck.  And basically -- I don't know if you have |
| 08:30:50 | 20 | it in front of you. |
| 08:30:51 | 21 | THE COURT:  I do have it in front of me. |
| 08:30:54 | 22 | MR. THOMPSON:  Okay.  Our objection to this is it |
| 08:30:55 | 23 | was my understanding that the Court, once we seat this |
| 08:30:58 | 24 | jury, or whenever you deem appropriate, is going to |
| 08:31:00 | 25 | instruct the jury about the previous proceedings so far as |

08:31:05  1   these patents are infringed or valid or whatever has been

08:31:08  2   agreed to.

08:31:09  3           And I didn't think it's appropriate for Pantech or

08:31:11  4   us or anyone else to sort of end-run that and start off

08:31:15  5   trying to, you know, tell the jury what they're going to be

08:31:18  6   instructed.

08:31:20  7           THE COURT:  So was there an offer made to

08:31:25  8   review -- to remove the word "validly"?

08:31:31  9           MR. THOMPSON:  I think that was one of the -- one

08:31:33  10  of out -- that it didn't match up with what you were going

08:31:35  11  to say.  But the overall objection is we don't think it's

08:31:39  12  proper for Pantech to do this in the voir dire, that that's

08:31:41  13  for you or however you want to handle it, obviously, once

08:31:43  14  the jury panel has been seated.

08:31:46  15          THE COURT:  All right.  Let me hear from the

08:31:48  16  Plaintiff.

08:31:49  17          MR. CULBERTSON:  Your Honor, Geoff Culbertson.

08:31:54  18          The answer is, yes, there was an offer to remove

08:31:57  19  the word "validly," if that causes concern.  This -- it's

08:32:02  20  not my intention to instruct the jury.  My intention is to

08:32:05  21  inquire about the prospective jurors' ability to follow an

08:32:11  22  instruction like this and to see if they have any

08:32:14  23  reservations about awarding damages based on the

08:32:17  24  determination of infringement that's already been made.

08:32:19  25          THE COURT:  Okay.

08:32:20    1          MR. CULBERTSON:  And I think that's a fair topic

08:32:22    2   of questioning.

08:32:22    3          THE COURT:  I'll overrule the objection.  I will

08:32:25    4   ask the Plaintiffs to remove the word "validly" to align

08:32:29    5   more closely with what the instructions will be.

08:32:32    6          MR. CULBERTSON:  Thank you, Your Honor.

08:32:33    7          MR. THOMPSON:  Your Honor, the other objection we

08:32:35    8   have is to the next two slides which is the forest and then

08:32:38    9   the trees being clear-cut.

08:32:41   10          I mean, this is clearly an infringement slide to

08:32:43   11   show that we took something, you know, then didn't pay for

08:32:45   12   it.  I mean, that's not the subject of this case; this case

08:32:48   13   is for the damages for what's already been determined.  And

08:32:49   14   the only reason to use this is basically to start trying to

08:32:54   15   inflame the jury that we took something that we shouldn't

08:32:56   16   have, and that's not what we're here on.

08:32:58   17          So this is highly prejudicial, and that's our

08:32:59   18   objection to both of those final slides.

08:33:03   19          MR. CULBERTSON:  Your Honor, Geoff Culbertson.

08:33:08   20          I think the Court has seen my voir dire based on

08:33:13   21   these slides.  It's about damages.  It's about inquiring

08:33:17   22   about the jury's ability and thoughts about awarding full

08:33:20   23   value.  It's not about willfulness.  It's not about

08:33:24   24   infringement.  You know, the determination of infringement

08:33:29   25   has been made.

08:33:31    1        What I asked -- and, again, I think the Court has

08:33:34    2   heard these questions before, is, you know, how do -- how

08:33:37    3   do folks feel about if they're -- what should be awarded in

08:33:42    4   the instance where their property has been taken?  And it's

08:33:46    5   about value.  It's about, what do you award?  How do you

08:33:49    6   feel about those things?  It does not go to willfulness.

08:33:52    7        THE COURT:  So long as it's limited to them being

08:33:56    8   compensated for, you know, every tree that was cut down, so

08:34:02    9   to speak, and we don't talk about whether things were done

08:34:05   10   by accident or on purpose --

08:34:13   11        MR. CULBERTSON:  Okay.

08:34:14   12        THE COURT:  -- I think introducing the idea of

08:34:19   13   accident also introduces the idea of intentional, and so

08:34:22   14   I'll ask you to stay away from anything about what the

08:34:24   15   motivation was or whether it was, you know, purely an

08:34:27   16   accident.

08:34:28   17        MR. CULBERTSON:  Understood.  Thank you,

08:34:32   18   Your Honor.

08:34:32   19        MR. THOMPSON:  That's the only objections we have

08:34:40   20   to the voir dire.

08:34:40   21        THE COURT:  Okay.  Openings?

08:34:54   22        MR. FUSSELL:  Your Honor, Tripp Fussell on behalf

08:34:56   23   of the Plaintiffs.

08:34:57   24        I believe we have one -- one objection to the

08:35:00   25   opening slide of the Defendants, which is DDX-015.4.

08:35:10    1          THE COURT:  I have it.

08:35:12    2          MR. FUSSELL:  Okay.  I'm sorry.

08:35:13    3          The issue that we have, Your Honor, is that the

08:35:15    4   sales figure that they're trying to pull to be

08:35:18    5   representative of OnePlus they've extracted from

08:35:24    6   Dr. Putnam's report, and the problem that we have there is

08:35:27    7   that's misleading and will be confusing to the jury.

08:35:31    8          It's not representative of the total accused sales

08:35:35    9   that the parties have stipulated to and agreed to, and we

08:35:39   10   believe that this number would be confusing to the jury in

08:35:41   11   that respect.

08:35:41   12          In addition, Your Honor, this is a number that was

08:35:44   13   pulled from Dr. Putnam's report, which is only relevant to

08:35:49   14   the accused products in this case rather than the overall

08:35:53   15   sales that are representative for Samsung and Apple here.

08:35:59   16   And we don't believe that -- that that shows a relevant

08:36:03   17   comparison between the two and will be misleading to the

08:36:06   18   jury.

08:36:07   19          THE COURT:  Thank you.

08:36:08   20          MR. THOMPSON:  So, Your Honor, the 592, which is

08:36:14   21   what I think we have now -- there was some back-and-forth,

08:36:17   22   and I guess that's the only objection that we have now is

08:36:19   23   the number which was 642 has now been modified to 592,

08:36:25   24   which is in Dr. Putnam's report.

08:36:28   25          I mean, the reality is this, these -- all of this

| | | |
|---|---|---|
| 08:36:29 | 1 | information are from the experts.  This 75 billion for |
| 08:36:34 | 2 | ██████████████████████████.  27 billion is the |
| 08:36:37 | 3 | ████████████████████.  And 592 is what will be the |
| 08:36:41 | 4 | licensed or, you know, we now owe royalty for as far as |
| 08:36:44 | 5 | sales for OnePlus.  So it's an apples-to-apples comparison. |
| 08:36:48 | 6 | And so that's -- and it's all in the expert's report. |
| 08:36:50 | 7 | Now, if they -- we're just previewing the experts. |
| 08:36:52 | 8 | If they want to explain it away or Dr. Putnam wants to put |
| 08:36:55 | 9 | his own spin on it, just like Dr. Lopez, that's fine, but |
| 08:36:59 | 10 | this information is all contained in the expert reports. |
| 08:37:07 | 11 | THE COURT:  Mr. Fussell. |
| 08:37:08 | 12 | MR. FUSSELL:  Again, Your Honor, the problem is, |
| 08:37:11 | 13 | is that the way that Dr. -- Dr. Putnam pulled together |
| 08:37:15 | 14 | those numbers was to address only the accused products as |
| 08:37:19 | 15 | it related to IDC.  So it's -- it's an inaccurate |
| 08:37:22 | 16 | comparison, and, again, it would be misleading to the jury |
| 08:37:26 | 17 | given the stipulation that the parties have. |
| 08:37:27 | 18 | THE COURT:  So exactly what -- what is the -- |
| 08:37:30 | 19 | looking at the slide, can you tell me what it is the |
| 08:37:33 | 20 | Plaintiff objects to? |
| 08:37:34 | 21 | MR. FUSSELL:  Yes.  Well, there are two specific |
| 08:37:37 | 22 | things.  The number -- in the slide that you have, |
| 08:37:41 | 23 | Your Honor, there's the ██████████ number for OnePlus |
| 08:37:46 | 24 | sales. |
| 08:37:46 | 25 | THE COURT:  Okay. |

| | | |
|---|---|---|
| 08:37:47 | 1 | MR. FUSSELL:  Now, as Mr. Thompson indicated, they |
| 08:37:51 | 2 | had proposed using a different number.  I think they |
| 08:37:53 | 3 | recognized that that number that they had originally put in |
| 08:37:56 | 4 | there was inaccurate and wasn't pulled directly from |
| 08:37:58 | 5 | Dr. Putnam's report.  They propose a different number now. |
| 08:38:02 | 6 | The problem with the number as it's pulled -- |
| 08:38:04 | 7 | pulled from -- |
| 08:38:04 | 8 | THE COURT:  What is the number they've proposed? |
| 08:38:06 | 9 | MR. FUSSELL:  I believe it's 560 -- |
| 08:38:08 | 10 | MR. THOMPSON:  ██ Your Honor. |
| 08:38:10 | 11 | MR. FUSSELL:  Well, there were a couple numbers. |
| 08:38:14 | 12 | There was ██ and then there was also a 690 something. |
| 08:38:17 | 13 | THE COURT:  Let's talk about the ██ |
| 08:38:18 | 14 | MR. FUSSELL:  Okay. |
| 08:38:19 | 15 | THE COURT:  What's wrong with the ██ |
| 08:38:21 | 16 | MR. FUSSELL:  The ██ Your Honor, is -- what |
| 08:38:23 | 17 | Dr. Putnam did was when he pulled the IDC data, he only |
| 08:38:26 | 18 | pulled the sales for the accused products over a specific |
| 08:38:29 | 19 | time period and, therefore, that -- we don't know if that |
| 08:38:34 | 20 | number is accurate or reflects total sales which they're |
| 08:38:37 | 21 | trying to represent in this slide.  The total sales -- this |
| 08:38:40 | 22 | slide is representing total sales for OnePlus for the year |
| 08:38:42 | 23 | of 2022, which is the number that they have for Samsung and |
| 08:38:46 | 24 | Apple here. |
| 08:38:51 | 25 | Well, what -- the problem is they didn't |

| | |
|---|---|
| 08:38:53 | 1 |
| 08:38:55 | 2 |
| 08:38:58 | 3 |
| 08:39:02 | 4 |
| 08:39:04 | 5 |
| 08:39:10 | 6 |
| 08:39:13 | 7 |
| 08:39:17 | 8 |
| 08:39:19 | 9 |
| 08:39:22 | 10 |
| 08:39:24 | 11 |
| 08:39:27 | 12 |
| 08:39:33 | 13 |
| 08:39:34 | 14 |
| 08:39:36 | 15 |
| 08:39:42 | 16 |
| 08:39:46 | 17 |
| 08:39:51 | 18 |
| 08:39:59 | 19 |
| 08:40:00 | 20 |
| 08:40:02 | 21 |
| 08:40:05 | 22 |
| 08:40:06 | 23 |
| 08:40:06 | 24 |
| 08:40:11 | 25 |

1  actually -- it's OnePlus, they know what their sales are

2  for 2022.  But the problem is we have the stipulation where

3  their sales data is not coming in, reason IDC data.

4       THE COURT:  So I understood in your response to

5  this objection that you complained about the ▮ number,

6  and that it should be ▮  And the Defendants have offered

7  to change the slide to reflect that -- that concern.

8       Is that not right?

9       MR. FUSSELL:  No, we -- we did -- that's what they

10  offered as a compromise.

11       But we still object based on the data and how it

12  was -- how it was -- how it was computated (sic) by

13  Dr. Putnam in his -- in his exhibits.

14       There was also a secondary objection, which I

15  think I might have gotten past, but the -- but the

16  representation here on this slide is a calculated effective

17  rate for Pantech, Inc., in the Samsung and Apple columns.

18  And then the proposal of this .65 percent is actually the

19  Pantech Corp rate.

20       So it's additionally confusing and misleading with

21  respect to the two different agreements that are at issue.

22       THE COURT:  Understood.

23       MR. FUSSELL:  Yes, sir.

24       THE COURT:  I -- Mr. Thompson?

25       MR. THOMPSON:  Yeah, I would just say,

| | | |
|---|---|---|
| 08:40:12 | 1 | Your Honor -- I mean, we put the 592.  That's what they |
| 08:40:14 | 2 | told us was the right number.  We agreed to that.  And I |
| 08:40:17 | 3 | think that should take care of it.  That's the -- that's -- |
| 08:40:20 | 4 | their expert's calculation of the sales that are subject |
| 08:40:24 | 5 | to -- what will now be subject to payment because we've had |
| 08:40:27 | 6 | a finding of infringement, and that compares directly to |
| 08:40:30 | 7 | what ███████████████████████. |
| 08:40:32 | 8 |         As far as the Pantech, Inc., we added Pantech, |
| 08:40:35 | 9 | Inc., to the calculated effective rate in those first two |
| 08:40:38 | 10 | columns.  And I'll add Pantech Corp proposed rate to the |
| 08:40:41 | 11 | last column, if that's all we're talking about, to make |
| 08:40:46 | 12 | sure there's no confusion. |
| 08:40:47 | 13 |         THE COURT:  Would that resolve it, Mr. Fussell? |
| 08:40:55 | 14 |         MR. FUSSELL:  Well, I think if -- maybe we can |
| 08:40:58 | 15 | work -- work this out.  If it was -- was Pantech, Inc.'s |
| 08:41:02 | 16 | calculated rate versus the calculated effective rate, would |
| 08:41:07 | 17 | that -- you be amenable to that? |
| 08:41:11 | 18 |         MR. THOMPSON:  Just to say Pantech, Inc.'s |
| 08:41:13 | 19 | calculated rate. |
| 08:41:14 | 20 |         THE COURT:  Mr. Thompson, go to the podium, |
| 08:41:16 | 21 | please. |
| 08:41:16 | 22 |         MR. THOMPSON:  Sorry. |
| 08:41:16 | 23 |         MR. FUSSELL:  Pantech, Inc.'s ████████████ |
| 08:41:19 | 24 | ██████████████████████████████████████████. |
| 08:41:22 | 25 |         MR. THOMPSON:  Yeah -- I mean, that wording is |

| | | |
|---|---|---|
| 08:41:24 | 1 | fine with me, Your Honor.  If that corrects it, that's |
| 08:41:30 | 2 | fine. |
| 08:41:31 | 3 | THE COURT:  All right.  Next objection. |
| 08:41:32 | 4 | MR. FUSSELL:  Your Honor, the Plaintiff had no |
| 08:41:37 | 5 | further objections to their opening slides. |
| 08:41:39 | 6 | THE COURT:  Okay.  Defendant's objections? |
| 08:41:42 | 7 | MR. THOMPSON:  Your Honor, I believe the objection |
| 08:41:45 | 8 | to Slide 11 has been resolved, and that may have been |
| 08:41:50 | 9 | resolved before the filing.  So I don't want to confuse |
| 08:41:53 | 10 | you. |
| 08:41:53 | 11 | THE COURT:  Hold on.  Which one, 11? |
| 08:41:56 | 12 | MR. THOMPSON:  Yes. |
| 08:41:56 | 13 | THE COURT:  Okay. |
| 08:41:56 | 14 | MR. THOMPSON:  It says:  Top 50 global brand.  I |
| 08:42:00 | 15 | think there was some redaction. |
| 08:42:01 | 16 | THE COURT:  Has that been -- has the word "China" |
| 08:42:03 | 17 | been removed? |
| 08:42:04 | 18 | MR. THOMPSON:  It has been, Your Honor, and |
| 08:42:06 | 19 | that's -- I'm thinking two -- or a couple of places, and |
| 08:42:08 | 20 | we're fine with the agreement between the parties.  That's |
| 08:42:11 | 21 | been resolved. |
| 08:42:11 | 22 | THE COURT:  Okay. |
| 08:42:12 | 23 | MR. THOMPSON:  I believe the second one is the |
| 08:42:13 | 24 | page -- the next slide is 12, which just says that |
| 08:42:15 | 25 | basically in Quarter 3, 2021, OnePlus grew 500 percent year |

08:42:22      1    over year.

08:42:22      2         This is irrelevant, Your Honor.  I don't know what

08:42:24      3    this is being used to show, other than, I guess, the

08:42:27      4    company's growing.  But it seems irrelevant and misleading

08:42:31      5    to what we're doing in this case.

08:42:36      6         MR. FUSSELL:  Your Honor, first note that this

08:42:40      7    does not -- we don't believe that this violates the MIL

08:42:43      8    No. 14 because we're not showing the size of the company or

08:42:46      9    any of -- any of that.  It's just talking about their

08:42:49     10    growth.

08:42:50     11         And it should come as no surprise, this slide was

08:42:53     12    used in the opening in the first trial.  And it's just to

08:42:56     13    represent that a -- a connection between their growth and

08:42:59     14    their adoption of the standards in the 5G technology.  It

08:43:03     15    goes directly to damages.  And that's all that -- all that

08:43:07     16    this is representative of and --

08:43:09     17         THE COURT:  I'll overrule the objection.

08:43:12     18         MR. THOMPSON:  Thank you, Your Honor.

08:43:13     19         The last -- the next slide, I believe, is 21.  I'm

08:43:17     20    hoping I have this right.

08:43:19     21         And, generally, the only issue we have with this

08:43:21     22    slide is this is a particular slide that was used in the

08:43:24     23    first trial to talk about this idea of holdout.  And, you

08:43:28     24    know, assuming that we're not going to get into that in any

08:43:31     25    way --

08:43:31    1          THE COURT:  We're not getting into that in any

08:43:34    2    way.

08:43:35    3          MR. THOMPSON:  Okay.  Then that resolves that,

08:43:37    4    Your Honor.

08:43:37    5          The last objection is 22.  And, you know, our

08:43:43    6    only -- the real objection to this is, Your Honor, that

08:43:45    7    it's misleading.

08:43:46    8          So the way this is portrayed, it looks as though

08:43:52    9    Pantech -- or OnePlus has sold $1.2 billion of phones

08:43:55   10    subject to the '839, a separate 889 million subject to --

08:43:59   11    it looks as though we've had sales of like 2 and a half

08:44:02   12    billion dollars, when the actual sales base is just the top

08:44:05   13    number.

08:44:05   14          And these other patents -- there's just various

08:44:08   15    subsets of that based on when they were issued, and so it

08:44:11   16    just -- it's misleading to the jury to think that we've

08:44:14   17    sold this many -- had this much sales.

08:44:18   18          THE COURT:  All right.  Mr. Fussell, that seems

08:44:20   19    like a legitimate objection.  Can that be fixed?

08:44:23   20          MR. FUSSELL:  I would just like to say that I

08:44:26   21    believe that was a misrepresentation, Your Honor.  The

08:44:29   22    numbers on the slide are the stipulated number of sales at

08:44:32   23    issue for each of the patents.  It's not -- we didn't

08:44:37   24    add -- that top number is not representative of all the --

08:44:40   25    all the sales.  The individual numbers are actually the

| | | |
|---|---|---|
| 08:44:44 | 1 | exact numbers that they have stipulated to for each of the |
| 08:44:47 | 2 | sales of each of the patents.  So it's -- if you did add it |
| 08:44:52 | 3 | all up, it would be 2.2 million -- |
| 08:44:55 | 4 | THE COURT:  So, Mr. Thompson, I don't understand |
| 08:44:57 | 5 | your objection. |
| 08:44:58 | 6 | MR. THOMPSON:  Well, I don't either, Your Honor. |
| 08:45:01 | 7 | My understanding was that the top number was the total |
| 08:45:03 | 8 | sales of accused devices, and these were -- these were just |
| 08:45:06 | 9 | subsets depending on when the patent was issued or not; is |
| 08:45:10 | 10 | that correct?  When notice was given, I'm sorry.  When |
| 08:45:13 | 11 | notice was given.  So, basically, you know, '247 notice was |
| 08:45:18 | 12 | at a different time, so it's a portion of that. |
| 08:45:21 | 13 | THE COURT:  So are all of these separate sales |
| 08:45:23 | 14 | without any overlap between the patents? |
| 08:45:24 | 15 | MR. THOMPSON:  That is not -- no, they are not. |
| 08:45:26 | 16 | There's overlap -- that's my problem, there's overlap. |
| 08:45:32 | 17 | THE COURT:  So, Mr. Fussell, which is it? |
| 08:45:36 | 18 | MR. FUSSELL:  That's incorrect.  The sales for the |
| 08:45:36 | 19 | '839 -- |
| 08:45:34 | 20 | THE COURT:  So if we add all of these up, we add |
| 08:45:36 | 21 | that -- |
| 08:45:36 | 22 | MR. FUSSELL:  The total sales at issue that they |
| 08:45:38 | 23 | have stipulated to, when you add them all up for all the |
| 08:45:41 | 24 | patents, is roughly $2 billion. |
| 08:45:44 | 25 | THE COURT:  All right.  And so -- |

| | |
|---|---|
| 08:45:46 | 1 |
| 08:45:48 | 2 |
| 08:45:52 | 3 |
| 08:45:54 | 4 |
| 08:45:57 | 5 |
| 08:45:57 | 6 |
| 08:46:00 | 7 |
| 08:46:03 | 8 |
| 08:46:06 | 9 |

08:45:46    1          MR. FUSSELL:  That's been stipulated to, so I'm

08:45:48    2    not sure -- there wasn't -- that first number is the '839

08:45:52    3    number.

08:45:54    4          MR. THOMPSON:  Mr. Filbin has more knowledge about

08:45:57    5    this.  I don't want there to be --

08:45:57    6          THE COURT:  Maybe somebody on the Plaintiff's side

08:46:00    7    has more knowledge -- can address it as well.  I think

08:46:03    8    there's some overlap here, Mr. Fussell.  It doesn't really

08:46:06    9    add up.

08:46:08   10          MR. FUSSELL:  Maybe we can meet and confer and --

08:46:11   11          THE COURT:  Let me suggest --

08:46:12   12          MR. FUSSELL:  If we're mistaken, then I would

08:46:14   13    obviously not object, and if they're mistaken, I would

08:46:17   14    assume they wouldn't object.

08:46:18   15          THE COURT:  Great.  Let's try to do that.  If

08:46:21   16    there are different sales based on different periods of

08:46:24   17    time for different patents, then I think that needs to be

08:46:28   18    clear.

08:46:32   19          MR. THOMPSON:  That's all the objection we have.

08:46:33   20          THE COURT:  Okay.  There are some objections to

08:46:40   21    demonstratives to be used I guess with the first witness.

08:46:46   22          Do you all want to handle those now?

08:46:50   23          MR. AIRAN:  Yes, Your Honor.  David Airan on

08:46:54   24    behalf of the Defendant, OnePlus.

08:46:55   25          We can handle that now.  This relates to also the

| | | |
|---|---|---|
| 08:46:59 | 1 | briefing at 407, Docket 407.  So it's Mr. Jung. |
| 08:47:05 | 2 | THE COURT:  Well, actually, how about we just do |
| 08:47:08 | 3 | 407 first. |
| 08:47:10 | 4 | MR. AIRAN:  Sure. |
| 08:47:11 | 5 | THE COURT:  These were, I guess, the Friday |
| 08:47:13 | 6 | disputes. |
| 08:47:14 | 7 | MR. AIRAN:  Correct. |
| 08:47:14 | 8 | THE COURT:  And then maybe if we deal with that |
| 08:47:16 | 9 | first, it'll resolve some of these objections. |
| 08:47:18 | 10 | MR. AIRAN:  I think it will, Your Honor. |
| 08:47:20 | 11 | THE COURT:  Okay. |
| 08:47:20 | 12 | MR. AIRAN:  So the -- you want to take them just |
| 08:47:23 | 13 | an issue of Docket 407? |
| 08:47:25 | 14 | THE COURT:  Yeah.  I think the first issue is the |
| 08:47:27 | 15 | stipulation. |
| 08:47:28 | 16 | MR. AIRAN:  Right.  And so we stipulated to the |
| 08:47:30 | 17 | notice periods and sales, and, again, this relates to that |
| 08:47:33 | 18 | last issue that you just had in front of you. |
| 08:47:35 | 19 | But the dispute here comes down to whether Pantech |
| 08:47:40 | 20 | is going to put into the record and argue these notice |
| 08:47:43 | 21 | dates and notice of infringement, et cetera, which we |
| 08:47:45 | 22 | believe is unnecessary here. |
| 08:47:47 | 23 | We're talking about -- we've reached a stipulation |
| 08:47:50 | 24 | on licensable sales, so the date of notice of infringement |
| 08:47:53 | 25 | is completely irrelevant.  That's not at issue here.  We've |

08:47:57   1   agreed on sales.  That's what we talked about the last time

08:47:59   2   we were here.  We agree on the base.  We agree on the

08:48:02   3   dates.  So the rest of this is really unnecessary.

08:48:04   4           THE COURT:  All right.

08:48:05   5           MR. AIRAN:  Thank you.

08:48:05   6           THE COURT:  Let me hear from the Plaintiff.

08:48:07   7           MR. FUSSELL:  Yes, Your Honor.  The concern that

08:48:13   8   we have here is that the jury will be instructed that

08:48:17   9   damages begin when the Plaintiff has provided notice of

08:48:21  10   its -- notice of infringement of its patents.  And,

08:48:28  11   therefore, we think we should be entitled to tell them that

08:48:30  12   when notice was given in order so that there is no

08:48:33  13   confusion and that they don't sit back there and think,

08:48:36  14   well, they said notice must be given.  I didn't hear them

08:48:39  15   say anything about notice.  There was just the sales

08:48:41  16   number.  And we think it could lead to confusion, and we

08:48:44  17   don't think it's prejudicial in any way, and it obviously

08:48:47  18   goes directly to damages at issue.

08:48:49  19           THE COURT:  I think you all should be able to work

08:48:51  20   out a stipulation on this and some agreed language that

08:48:56  21   deals with this.  I just -- I think you all haven't really

08:49:00  22   tried very hard to get this resolved.  There's really not

08:49:04  23   much of a dispute here.  It's just about how the -- it's

08:49:08  24   phrased.  And given the confusion about the last issue, it

08:49:15  25   just seems like you all ought to sit down and work out

| | | |
|---|---|---|
| 08:49:19 | 1 | something that will work for both sides. |
| 08:49:21 | 2 | MR. FUSSELL:  Yes, Your Honor. |
| 08:49:28 | 3 | THE COURT:  All right.  The next issue, objections |
| 08:49:30 | 4 | to Mr. Jung's trial testimony about pre-suit negotiations. |
| 08:49:35 | 5 | MR. AIRAN:  Sure.  So, Your Honor, most of this |
| 08:49:38 | 6 | stems from PX-37, which is also repeated throughout |
| 08:49:41 | 7 | Mr. Jung's demonstrative exhibit, and that is a 408 |
| 08:49:45 | 8 | communication that includes a lot of hearsay within |
| 08:49:48 | 9 | hearsay.  And it really sets up Mr. Jung as an expert or |
| 08:49:50 | 10 | purported expert in the field of licensing.  It involves a |
| 08:49:54 | 11 | tremendous amount of hearsay and assumptions. |
| 08:49:57 | 12 | For example, when Mr. Jung made his proposal, |
| 08:50:01 | 13 | their offer to settle this case, they did this complex |
| 08:50:04 | 14 | calculation involving the number of patents that they own, |
| 08:50:09 | 15 | the number of patents that are truly essential, the royalty |
| 08:50:12 | 16 | stack, et cetera.  And all this data was pulled from |
| 08:50:16 | 17 | various sources, and it's not consistent even within |
| 08:50:18 | 18 | itself. |
| 08:50:18 | 19 | For example, he cites Unwired Planet, which is a |
| 08:50:22 | 20 | United Kingdom case involving United Kingdom law and United |
| 08:50:25 | 21 | Kingdom patents.  And he says, that's the number of truly |
| 08:50:28 | 22 | essential patents.  It's 800.  Then they take a different |
| 08:50:32 | 23 | source, creative something -- Cyber Creative, or something |
| 08:50:36 | 24 | like that, to say, well, they said in 2013 that Pantech had |
| 08:50:40 | 25 | 22 patent families or something. |

08:50:41    1          So then they conflate these two different numbers,

08:50:45    2    and then they multiply that by what they call the royalty

08:50:47    3    stack or the total royalty burden, and that's yet from a

08:50:50    4    third source.

08:50:51    5          And so they concoct this -- this magical number

08:50:55    6    that then they say, look, this is our -- this is our

08:50:57    7    proposal for the royalty stack for a standard essential

08:51:00    8    patent.  And it's really a Frankenstein.  It's kludged

08:51:04    9    together from various different sources.

08:51:05   10          So we objected to that.  We said we object to

08:51:09   11    Mr. Jung coming on the stand pretending to be an expert and

08:51:11   12    offering this very detailed calculation and saying, look,

08:51:14   13    this depends on court cases, this depends on reputable

08:51:19   14    sources, and that's what they're doing in the Mr. Jung

08:51:21   15    demonstratives as well.  So this is expert testimony.

08:51:23   16          The case that they've cited, the case that we've

08:51:26   17    cited, says this type of expert testimony should not be

08:51:28   18    allowed from a lay witness.  If this was something that we

08:51:31   19    were going to do with an expert, we would have Dauberted

08:51:33   20    this.  It's really bad.

08:51:34   21          THE COURT:  Right.  Has this -- has any of this

08:51:37   22    been disclosed as an expert opinion?

08:51:39   23          MR. AIRAN:  No, it has not.  In fact, their expert

08:51:42   24    doesn't adopt a stack analysis at all.  So this is -- he

08:51:44   25    just says that it's consistent with the market.  So there's

08:51:48  1   no stack analysis.  There's no SEP analysis done by

08:51:51  2   Mr. Putnam.

08:51:52  3        And so this is -- this is really a fundamental

08:51:54  4   objection we have.  And when we saw their deck last night,

08:51:56  5   it's very clear to us that they're going to put Mr. Jung up

08:51:59  6   as some type of licensing expert who did this based on

08:52:03  7   serious consideration and reputable sources.  None of

08:52:05  8   that's true.  None of that's been tested.  And it's all

08:52:08  9   hearsay.  It's hearsay within hearsay, and it should not be

08:52:10  10  allowed.

08:52:11  11       Thank you, Your Honor.

08:52:12  12       THE COURT:  Okay.

08:52:12  13       MR. FUSSELL:  Your Honor, I believe you may recall

08:52:18  14  from the first trial, Mr. Jung did go through Exhibit 37.

08:52:23  15  He went through it at a relatively high level and just

08:52:26  16  provided his background and understanding of how Pantech

08:52:30  17  came up with its standard royalty rate.

08:52:33  18       That is the only way that we intend to use that

08:52:35  19  here.  And we do not believe, first of all, that this is

08:52:39  20  408 because we have removed the offer and removed the offer

08:52:44  21  from -- that was included in the exhibit so this -- the

08:52:47  22  only thing that would be presented would be just the -- the

08:52:51  23  evidence that supports how -- how Pantech came up with its

08:52:55  24  standard royalty rate.

08:52:55  25       THE COURT:  So I would say at an extremely high

| | | |
|---|---|---|
| 08:52:58 | 1 | level, I'm okay with that.  You know, I think we'll -- |
| 08:53:04 | 2 | we'll see, you know, how high level it gets.  But if it |
| 08:53:08 | 3 | veers over into expert testimony, that would not be |
| 08:53:12 | 4 | appropriate. |
| 08:53:12 | 5 | MR. FUSSELL:  I understand. |
| 08:53:15 | 6 | THE COURT:  And I'll rely on, you know, the |
| 08:53:18 | 7 | Defendant to object to that.  But getting into the details |
| 08:53:21 | 8 | at all, Mr. Fussell, would be very problematic. |
| 08:53:25 | 9 | MR. FUSSELL:  Understood.  Thank you, Your Honor. |
| 08:53:27 | 10 | MR. AIRAN:  Your Honor, possibly for guidance for |
| 08:53:32 | 11 | them when they're preparing their deck -- their revised |
| 08:53:35 | 12 | deck for Mr. Jung -- if we could have up, please, Slide |
| 08:53:39 | 13 | 3-7? |
| 08:53:40 | 14 | So this is an example of what I'm talking about |
| 08:53:43 | 15 | here, Your Honor, where they talk about legal opinions from |
| 08:53:47 | 16 | international SEP cases. |
| 08:53:48 | 17 | See that -- you can see that's the second row on |
| 08:53:50 | 18 | that table.  And this -- this is really propagated |
| 08:53:53 | 19 | throughout their -- their deck for Mr. Jung.  This is what |
| 08:53:57 | 20 | they're going to do with him.  They're going to walk him |
| 08:54:00 | 21 | through this, and this is completely objectionable.  These |
| 08:54:02 | 22 | are not -- these are not reputable sources for this, and we |
| 08:54:06 | 23 | didn't get a chance to go out and talk to them.  They |
| 08:54:08 | 24 | didn't put up an expert to backstop any of this.  So we |
| 08:54:12 | 25 | think all of that ought to come out. |

08:54:14    1          THE COURT:  I agree with that.  I agree with that,

08:54:16    2    Mr. Fussell -- or, Mr. Culbertson, whoever is addressing

08:54:20    3    that.  If we're going to talk about the individual slides,

08:54:23    4    this slide is a definite problem.

08:54:24    5          MR. CULBERTSON:  Your Honor, since -- since he's

08:54:26    6    my witness, I would like to address it if you don't mind.

08:54:28    7          THE COURT:  Please.

08:54:29    8          MR. CULBERTSON:  I want to start with he's not

08:54:30    9    offering any opinions.  He's offering the facts that

08:54:34   10    Pantech -- how Pantech created the rate that it has offered

08:54:37   11    to the industry.  And what you see here is the analysis

08:54:44   12    that they went through or -- and how they determined what

08:54:47   13    the rate is, and it's what they included in the

08:54:50   14    presentations that they made to every single smartphone

08:54:54   15    manufacturer with whom they presented their portfolio.

08:54:58   16          He's not -- you know, they're welcome to

08:55:01   17    cross-examine him, they will, they did it before, that they

08:55:03   18    think these sources are wrong, that they think that these

08:55:06   19    sources -- that there are other sources out there.  He's

08:55:09   20    not here to say they're all right.  He's just saying here's

08:55:12   21    what we did.  We had to have some basis for the rate that

08:55:15   22    we're presenting to these folks, and this is how they went

08:55:17   23    about it.

08:55:18   24          And, you know, I'm hearing hearsay within hearsay.

08:55:21   25    This is a business record, Your Honor.  The parties have

08:55:24    1   stipulated that the documents that are produced by the

08:55:27    2   parties are business records.  The hearsay that's within

08:55:30    3   that, most of those are market reports.  They're excepted

08:55:34    4   from hearsay under 803(17).

08:55:38    5            But I'm not offering those market reports for

08:55:41    6   their truth.  I am offering them through Mr. Jung so he can

08:55:46    7   say here's the process we went through to develop our rate.

08:55:48    8            THE COURT:  Do you have a full slide deck that I

08:55:51    9   can look at?

08:55:52   10            MR. CULBERTSON:  I do, Your Honor.  Just one

08:55:54   11   moment.

08:56:16   12            THE COURT:  Okay.  So let's just look through

08:56:18   13   them, and I don't know how to do this.

08:56:19   14            But, Mr. Airan, you all lodged a number of

08:56:22   15   objections.  I think the only way to do this is just

08:56:26   16   slide-by-slide.  There was 3-3 through 3-9; is that right?

08:56:34   17            MR. AIRAN:  And there's additional objections, as

08:56:36   18   well.  And, Your Honor, if I could just address just one

08:56:38   19   thing Mr. Culbertson said first.

08:56:40   20            If we can have Slide 14, please?

08:56:45   21            So this is -- this is one we did not object to,

08:56:47   22   14.  And we said you can use this.  That was our

08:56:50   23   compromise.

08:56:50   24            So if you want to talk about the fact that they

08:56:52   25   did some type of stack calculation and it resulted in a

08:56:56    1    0.17 rate, and then they discounted that down to 0.5,

08:57:01    2    that's a very high level.  That's what he testified to at

08:57:04    3    the last trial.  And we didn't object to that.  That's

08:57:06    4    fine, if he keeps it at this level of generality.

08:57:10    5         What we're objecting to is the next level down

08:57:12    6    where he talks about the sources, et cetera.  And we've

08:57:15    7    cited some case law on that point, where it's -- this is

08:57:19    8    the type of testimony from a lay witness that is

08:57:19    9    inappropriate expert testimony.  That's the AVM case and

08:57:23   10    the Acceleration Bay case.  They actually cited AVM --

08:57:23   11    that's in -- in the docket, 407.  We cited Acceleration

08:57:23   12    Bay.

08:57:29   13         But that's the type of -- this is the type of

08:57:31   14    expert testimony that's not admissible.  So I'm happy to go

08:57:34   15    through that -- these one-by-one, but --

08:57:37   16              THE COURT:  I think that's the only way to do it.

08:57:39   17              MR. AIRAN:  So 3-4 I guess is the first one.

08:57:46   18              THE COURT:  Give me just a minute.  Okay.

08:57:54   19              MR. AIRAN:  So this is one that they wanted to

08:57:55   20    treat together as a package.  We would be okay with the

08:58:00   21    box, and really 3-4, our objection there would have been

08:58:03   22    also to the rest of the world, but this does not have the

08:58:06   23    same kind of concerns that we have for the other slides.

08:58:08   24              THE COURT:  All right.  All right.

08:58:10   25              MR. AIRAN:  Slide 3-5, we have a problem with

08:58:13   1   that.  Again, they're trying to explain court decisions

08:58:18   2   from international SEP cases.  So they're going to get up

08:58:21   3   and tell the jury that other courts have decided this is

08:58:24   4   the correct rate.  That's inappropriate.

08:58:27   5          THE COURT:  Mr. Culbertson, exactly how would you

08:58:29   6   use that information?

08:58:31   7          MR. CULBERTSON:  He is not going to say that any

08:58:37   8   individual court has determined the correct number.  He is

08:58:40   9   going to say that we've used a data point which comes from

08:58:43   10  international case law that there are a certain number of

08:58:46   11  truly essential SEPs.  It was a data point that they used

08:58:49   12  in their -- in their development of their rate.

08:58:51   13         THE COURT:  At that high level, I -- I will

08:58:54   14  overrule the objection.

08:58:56   15         MR. CULBERTSON:  Thank you.

08:58:56   16         THE COURT:  To that slide.

08:58:58   17         MR. AIRAN:  Your Honor, on this -- there's no

08:59:00   18  reason for a slide to reemphasize that.  He can say that on

08:59:03   19  the stand without putting up a slide that says that.  He

08:59:06   20  can say that we relied on various sources.

08:59:08   21         THE COURT:  Well, let's keep going.  Because I

08:59:10   22  think I'm probably going to agree with you, Mr. Airan, on

08:59:12   23  some of these.

08:59:13   24         MR. AIRAN:  Okay.

08:59:14   25         THE COURT:  But on that one, I disagree.

08:59:15    1          MR. AIRAN:  So on -- on Slide 3-6, that's
08:59:19    2    generally acceptable to us.  We're okay with that one.
08:59:22    3          Slide 3-7, we had up earlier, we're objecting to
08:59:28    4    that one.
08:59:29    5          THE COURT:  And tell me exactly what 3-7 is the
08:59:33    6    problem.
08:59:33    7          MR. AIRAN:  So, again, this is the methodology
08:59:35    8    that they used.  It's seriously flawed.  It's cherry-picked
08:59:39    9    data.  When you look at the number of truly essential SEPs,
08:59:42   10    that comes from a different source that this Cyber
08:59:46   11    Creative, when you look at -- that's the numerator.
08:59:48   12          When you look at the denominator, 800 total truly
08:59:51   13    essential SEPs, that was from a court decision in 2015,
08:59:55   14    years prior to them acquiring the patent.  It involves U.K.
08:59:58   15    patents, U.K. analysis, U.K. law.  That's not a proper
09:00:02   16    denominator.
09:00:03   17          When you look at the 27 percent royalty stack,
09:00:06   18    that comes from yet another source, a magazine article, and
09:00:09   19    they're saying that should be the number.  What's
09:00:11   20    interesting about that is the Unwired Planet is the source
09:00:14   21    of the denominator there in that fraction, but then they
09:00:17   22    walk away from Unwired Planet when they create the royalty
09:00:21   23    stack.  So that's another problem.
09:00:23   24          So this whole methodology is a mess.  They're
09:00:26   25    going to get up there and say, look, this is a great

09:00:28    1    methodology.  And if you look at some of the case law that
09:00:30    2    we cited, for example, in one of the cases, a lay witness
09:00:33    3    has said 15.5 percent is a reasonable starting point based
09:00:36    4    on my analysis, based on my years as a licensing
09:00:39    5    professional.  And the court said you can't do that, you
09:00:41    6    can't come in and just say because of my experience, I'm
09:00:44    7    going to put that number out.
09:00:45    8         And that's essentially what happened here.  In our
09:00:47    9    view, they ginned up this artificially high royalty rate,
09:00:52   10    and then they put it out to prospective licensees.
09:00:55   11         THE COURT:  All right.  Mr. Culbertson?
09:00:57   12         MR. CULBERTSON:  Again, Your Honor, these are the
09:01:04   13    facts that Pantech went through to create the rate that
09:01:08   14    they offered to the industry.  The 21 Pantech truly
09:01:11   15    essential SEPs that you see in the numerator there, that's
09:01:14   16    actually through their own evaluation.
09:01:17   17         He looked -- they saw third-party -- publicly
09:01:21   18    available third-party research that said they had 22
09:01:23   19    families at the time that this was developed.  The 800
09:01:26   20    truly essential SEPs does come from Unwired Planet.  He's
09:01:31   21    not going to say the name of that case, he's not going to
09:01:33   22    say it was correct, but he is going to say it was a data
09:01:36   23    point from which they drew to create this rate.
09:01:39   24         Again, the 27 percent royalty stack comes from
09:01:43   25    publicly available market reports.  They may have other

| | | |
|---|---|---|
| 09:01:46 | 1 | ones, and I'm sure they do, and they'll cross-examine him |
| 09:01:50 | 2 | about that. |
| 09:01:51 | 3 | But it gives him a basis to say I didn't just pick |
| 09:01:54 | 4 | 15 percent out of the air, which was the problem in the |
| 09:01:57 | 5 | case he's citing.  This is what we went through.  This is |
| 09:01:59 | 6 | how we justify our rate when we're communicating with |
| 09:02:04 | 7 | potential licensees, and that's how we get there. |
| 09:02:05 | 8 | And it's important that the jury understand that |
| 09:02:07 | 9 | it didn't come from thin air, that it did come from |
| 09:02:10 | 10 | third-party data, from published research. |
| 09:02:14 | 11 | THE COURT:  So we'll deal with the questions, and |
| 09:02:18 | 12 | during the direct examination, question-by-question, but I |
| 09:02:21 | 13 | will sustain the objection to the slide. |
| 09:02:24 | 14 | MR. CULBERTSON:  Sustain the objection? |
| 09:02:25 | 15 | THE COURT:  Correct. |
| 09:02:26 | 16 | MR. CULBERTSON:  Okay.  So -- sorry, which one are |
| 09:02:29 | 17 | we looking at, Your Honor? |
| 09:02:35 | 18 | THE COURT:  3-7. |
| 09:02:38 | 19 | MR. CULBERTSON:  7 is out; is that correct? |
| 09:02:39 | 20 | THE COURT:  Correct. |
| 09:02:41 | 21 | MR. CULBERTSON:  Thank you. |
| 09:02:41 | 22 | MR. AIRAN:  So 8, I think we can agree to that. |
| 09:02:45 | 23 | 9 is the same objections. |
| 09:02:47 | 24 | THE COURT:  Mr. Culbertson, anything further on 9? |
| 09:02:55 | 25 | MR. CULBERTSON:  So 9 would be -- if the objection |

09:03:03    1    is hearsay within hearsay, this is a market report, which

09:03:06    2    is an exception under 803(17), and, again, the document

09:03:11    3    itself is a business record, which is excepted from the

09:03:13    4    rule.

09:03:13    5          Here's why this slide is important.  One of the

09:03:17    6    factors that they concluded was checking their rate against

09:03:19    7    the published rates of other SEP holders.  They identified

09:03:24    8    here Alcatel and Nortel with whom they are similarly

09:03:27    9    situated in terms of a number of SEPs that they are

09:03:30   10    reported to own.

09:03:30   11          They looked at the rates that Alcatel and Nortel

09:03:34   12    were -- were asking for their portfolios, and they

09:03:38   13    determined that their rate, which they discounted to

09:03:41   14    .5 percent, was a reasonable one based on comparison to

09:03:44   15    these similarly situated SEP holders.

09:03:47   16          This is based on third-party research from Cyber

09:03:51   17    Creative Institute, Your Honor.  It's -- it's exactly the

09:03:55   18    opposite of what they're saying it is.  It didn't come from

09:03:58   19    thin air.  They may not like the source.  They may have

09:04:03   20    other sources, but that's a reason to cross-examine the

09:04:05   21    witness.

09:04:08   22          MR. AIRAN:  This is actually worse than coming

09:04:10   23    from thin air.  This is a 2013 survey.  If you look at it,

09:04:13   24    on their own document, it's a 2013 survey.  They didn't get

09:04:16   25    the patents for seven or eight years after this.  The

09:04:19    1   market had changed by then.  This is a grievously flawed

09:04:19    2   methodology.

09:04:19    3        What they're doing is they're cherry picking data

09:04:27    4   that they can say, look, we have 22 of the 800 essential

09:04:28    5   patents here.  And the methodology by which they did this,

09:04:32    6   if they put this in front of you through any damages

09:04:34    7   expert -- and no damages expert would touch this with a

09:04:37    8   10-foot pole.  That's why their damages expert doesn't

09:04:41    9   touch it.  But if they put this in front of you, this would

09:04:43   10   have been Dauberted.  There's no way this is coming in.

09:04:45   11        THE COURT:  Is your expert using this slide or any

09:04:46   12   of this data?

09:04:48   13        MR. CULBERTSON:  Our expert has his own

09:04:50   14   methodology.  These are the facts that Pantech used to

09:04:55   15   develop their rate.  And that's why it's important,

09:04:57   16   Your Honor, that they didn't pick it out of thin air.  They

09:04:57   17   developed a rate that they thought was appropriate, and it

09:04:59   18   turns out it's been accepted --

09:05:01   19        THE COURT:  Well, I think when you talk about all

09:05:03   20   of that at a very high level, you're demonstrating to the

09:05:06   21   jury that it's not picked out of thin air.  But I think

09:05:09   22   this -- this slide is problematic.  We'll handle the

09:05:12   23   questioning on a question-by-question basis.  But I'll

09:05:15   24   sustain the objection --

09:05:17   25        MR. CULBERTSON:  Okay.  Thank you.

| | | |
|---|---|---|
| 09:05:19 | 1 | THE COURT:  -- to this slide. |
| 09:05:21 | 2 | MR. AIRAN:  Next slide is Slide 10.  We're okay |
| 09:05:25 | 3 | with that one. |
| 09:05:25 | 4 | Slide 11, I think we've covered that one already. |
| 09:05:29 | 5 | That seems very similar to the prior one. |
| 09:05:31 | 6 | Slide 12, we're okay with that. |
| 09:05:34 | 7 | Slide 13, I think we've already covered. |
| 09:05:36 | 8 | Slide 14 was not an objection. |
| 09:05:41 | 9 | Did we object to 15?  Slide 15, we did not object. |
| 09:05:43 | 10 | 16, we did not object. |
| 09:05:47 | 11 | 17, we did object to.  And this relates to the |
| 09:05:54 | 12 | infrastructure providers, Your Honor.  We think that's |
| 09:05:56 | 13 | completely irrelevant here. |
| 09:05:57 | 14 | As you know, exhaustion was an issue in the last |
| 09:06:02 | 15 | case, whether or not Nokia and Siemens -- or Ericsson, I'm |
| 09:06:07 | 16 | sorry -- Nokia and Ericsson base stations and their license |
| 09:06:09 | 17 | to those companies exhausted their patent rights.  They |
| 09:06:13 | 18 | argued, and they actually won that issue with the jury, |
| 09:06:15 | 19 | that it's not exhausted. |
| 09:06:16 | 20 | And their -- the principal argument they made |
| 09:06:19 | 21 | there is it's different claims, different technology.  And |
| 09:06:22 | 22 | so why are we talking about that here? |
| 09:06:24 | 23 | THE COURT:  What's the relevance, Mr. Culbertson? |
| 09:06:26 | 24 | MR. CULBERTSON:  The relevance is that Nokia and |
| 09:06:28 | 25 | Ericsson have recognized the value in the portfolio and |

| | | |
|---|---|---|
| 09:06:32 | 1 | agreed to take licenses.  Because you're going to hear from |
| 09:06:34 | 2 | the other side, just like you did in the first trial, that |
| 09:06:36 | 3 | all we do is pick on small companies.  All we do is force |
| 09:06:41 | 4 | licenses with small companies who can't afford to litigate |
| 09:06:44 | 5 | against us. |
| 09:06:44 | 6 | THE COURT:  Yeah. |
| 09:06:45 | 7 | MR. CULBERTSON:  And here you have two companies |
| 09:06:47 | 8 | that have recognized the value of the portfolio and engaged |
| 09:06:50 | 9 | in licenses. |
| 09:06:50 | 10 | THE COURT:  I'll sustain the objection to that. |
| 09:06:52 | 11 | MR. CULBERTSON:  Thank you. |
| 09:06:53 | 12 | MR. AIRAN:  That's all we have, Your Honor. |
| 09:06:55 | 13 | THE COURT:  Okay.  Mr. Culbertson, I'll hand you |
| 09:07:00 | 14 | back your slide deck. |
| 09:07:02 | 15 | MR. CULBERTSON:  Thank you. |
| 09:07:03 | 16 | THE COURT:  All right.  Our panel is ready to come |
| 09:07:07 | 17 | down.  Is there anything that must be addressed before we |
| 09:07:10 | 18 | begin voir dire? |
| 09:07:15 | 19 | MR. FILBIN:  Pending objections to Dr. Putnam's |
| 09:07:18 | 20 | demonstrative. |
| 09:07:18 | 21 | THE COURT:  That would not be necessary for |
| 09:07:21 | 22 | handling before voir dire, I don't think. |
| 09:07:24 | 23 | Does anybody disagree with that?  Anything about |
| 09:07:28 | 24 | that going to come up during voir dire? |
| 09:07:30 | 25 | MR. THOMPSON:  No, Your Honor. |

| | | |
|---|---|---|
| 09:07:32 | 1 | THE COURT:  Anything else we need to address |
| 09:07:33 | 2 | before we have the jury brought down? |
| 09:07:35 | 3 | MR. THOMPSON:  Not from Defendant's standpoint. |
| 09:07:37 | 4 | THE COURT:  From the Plaintiff? |
| 09:07:38 | 5 | MR. FUSSELL:  No, Your Honor. |
| 09:07:39 | 6 | THE COURT:  All right.  We'll take a short recess. |
| 09:07:41 | 7 | We'll have the jurors brought into the courtroom, and we'll |
| 09:07:44 | 8 | begin voir dire. |
| 09:07:46 | 9 | COURT SECURITY OFFICER:  All rise. |
| 09:08:10 | 10 | (Recess.) |
| 09:08:11 | 11 | COURT SECURITY OFFICER:  All rise. |
| 09:20:48 | 12 | THE COURT:  Please be seated. |
| 09:20:49 | 13 | Ms. Combs, if you would, call the case for us. |
| 09:20:52 | 14 | COURTROOM DEPUTY:  Cause No. 5:22-CV-69, Pantech |
| 09:20:56 | 15 | Corporation, et al., versus OnePlus Technology. |
| 09:20:59 | 16 | THE COURT:  Are the Plaintiffs ready to proceed? |
| 09:21:02 | 17 | MR. CULBERTSON:  Ready to proceed, Your Honor. |
| 09:21:03 | 18 | THE COURT:  Is the Defendant ready to proceed? |
| 09:21:05 | 19 | MR. THOMPSON:  Yes, Your Honor. |
| 09:21:06 | 20 | THE COURT:  All right.  Good morning, ladies and |
| 09:21:11 | 21 | gentlemen of the jury panel.  I want to thank you for being |
| 09:21:12 | 22 | here and welcome you to jury service in the United States |
| 09:21:18 | 23 | District Court for the Eastern District of Texas. |
| 09:21:19 | 24 | I'm Judge Trey Schroeder.  You've already met some |
| 09:21:25 | 25 | of our court personnel, downstairs and upstairs, but I want |

09:21:30    1    to introduce to you all the members of my courtroom staff.

09:21:33    2         My courtroom deputy seated directly in front of me

09:21:38    3    is Ms. Shedera Combs.

09:21:40    4         Our court reporter to my left is Ms. Shelly

09:21:44    5    Holmes.

09:21:45    6         My law clerks seated over to my right are Haley

09:21:53    7    Ostrin, Joseph Hillman, and Bao Chau.

09:21:57    8         Our Court Security Officer this morning is

09:22:01    9    Mr. Jessie Grigsby.  Throughout the course of the trial, I

09:22:04   10    think Mr. Grigsby will be with us in the mornings, and then

09:22:07   11    in the afternoons, we'll have Jared Goecke as our CSO.

09:22:14   12         As I said, my name is Trey Schroeder.  I'm a

09:22:18   13    United States District Judge for the Eastern District of

09:22:19   14    Texas.  I live here in Texarkana where I was born and grew

09:22:23   15    up.  I practiced law for about 15 years.  I've been on the

09:22:26   16    bench nine years.

09:22:28   17         I want to tell you just a little bit about myself.

09:22:32   18    I went to college in Missouri and then in Arkansas.  I

09:22:39   19    graduated from law school in Washington D.C.  Before I went

09:22:41   20    into private practice, I worked for the Government for a

09:22:45   21    couple of years in Washington, and then I clerked for a

09:22:48   22    federal appellate judge for a couple of years, as well.

09:22:55   23         I'm married, I have two daughters who have

09:22:58   24    graduated from college, and I'm proud to say they are both

09:23:02   25    gainfully employed.  My wife is a lawyer, too, but she

09:23:05    1   doesn't practice anymore.

09:23:07    2          And I'm telling you all of these things about

09:23:09    3   myself because in just a few minutes, I'm going to ask each

09:23:13    4   of you to tell us a little bit about yourselves, and I

09:23:17    5   think you are as entitled to know as much about me as we're

09:23:21    6   all about to learn about you.

09:23:24    7          We're here today to begin the trial of a civil

09:23:26    8   case, and I want to first thank you for your service here.

09:23:30    9   You're playing a pivotal role in our system of justice, and

09:23:37   10   I hope that you will consider it an honor to serve your

09:23:41   11   country in this important role because that's what it is.

09:23:43   12          By asking you to be here to potentially serve as a

09:23:46   13   juror in this matter, we're asking you to be away from your

09:23:49   14   jobs, your families, your other responsibilities.

09:23:54   15          For those of you who have children at home, I know

09:23:57   16   how hectic your lives are, and the same goes for those of

09:24:00   17   you who may be a caregiver for a family member or a friend.

09:24:04   18          By asking you to be here, we are creating a

09:24:06   19   significant intrusion into your lives, but the reason we do

09:24:10   20   that is that we have important work that will not get done

09:24:18   21   without a jury.

09:24:21   22          I've tried more than 60 cases as a Judge, and I

09:24:24   23   believe that your experience as a juror, if you are

09:24:26   24   selected to serve, will depend in large part on what your

09:24:29   25   initial frame of mind is.

09:24:30  1        So with that said, let me tell you a little bit

09:24:32  2   about the role of the jury in our system of Government.

09:24:38  3        Our Constitution begins with the words "we the

09:24:41  4   people," and in its most inclusive form, the Constitution

09:24:45  5   invites the people to join in the creation and the

09:24:49  6   maintenance of Government.

09:24:50  7        These words recognize that the power of the

09:24:55  8   Government comes from the people.  And just as the right to

09:24:58  9   vote ensures the people's ultimate control in the

09:25:01  10   legislative and executive branches, the jury trial is meant

09:25:06  11   to ensure their control in the judiciary.

09:25:13  12        Jury service is an exercise of responsible

09:25:16  13   citizenship by all members of the community, and our

09:25:20  14   constitutional jury system really envisions a duty of

09:25:25  15   participation in the machinery of justice.  It's an

09:25:31  16   opportunity for you as an ordinary citizen to help

09:25:37  17   administer justice, an opportunity that's been recognized

09:25:41  18   as one of the principal justifications for retaining the

09:25:44  19   jury system under our Constitution.

09:25:46  20        No doubt many of your parents served on juries,

09:25:50  21   probably some of your grandparents did, as well.  The

09:25:53  22   tradition of jury trials in this country stretches back

09:25:56  23   many generations from today, all the way back indeed to

09:26:04  24   1776.

09:26:04  25        So, yes, I do understand at some level, it may be

| | | |
|---|---|---|
| 09:26:08 | 1 | an inconvenience for you, but I hope you will understand |
| 09:26:10 | 2 | that it is more than that. |
| 09:26:15 | 3 | I firmly believe that jury service is one of the |
| 09:26:17 | 4 | highest forms of public service you can render to your |
| 09:26:20 | 5 | country.  Of course, the highest form of public service |
| 09:26:23 | 6 | centers around those young men and women who serve in our |
| 09:26:28 | 7 | Armed Forces and who put their lives on the line every day |
| 09:26:31 | 8 | to guarantee for all of us the rights and the freedoms we |
| 09:26:35 | 9 | enjoy as Americans. |
| 09:26:36 | 10 | So by being here today and by participating as you |
| 09:26:41 | 11 | are, you are serving your country like they are.  Jury |
| 09:26:48 | 12 | service is our chance perhaps not to pay the debt that we |
| 09:26:53 | 13 | owe to our country but at least to acknowledge it and to |
| 09:26:56 | 14 | recognize it. |
| 09:26:57 | 15 | So I hope that you will think about your time here |
| 09:26:59 | 16 | today serving on this panel and on the jury, if you're |
| 09:27:02 | 17 | selected to serve, perhaps in a little different light, as |
| 09:27:09 | 18 | an opportunity for you to seek to do justice between these |
| 09:27:12 | 19 | two parties. |
| 09:27:14 | 20 | I want to tell you a little bit about what this |
| 09:27:16 | 21 | case involves.  It has been determined that certain |
| 09:27:21 | 22 | products of the -- of the Defendant, OnePlus Technology |
| 09:27:29 | 23 | (Shenzhen) Company Limited infringe the Plaintiffs Pantech |
| 09:27:34 | 24 | Corporation and Pantech Wireless LLC's asserted patents in |
| 09:27:38 | 25 | this case. |

09:27:39   1          The parties disagree about the amount of damages,

09:27:42   2   and the only issue you will be asked to resolve in this

09:27:47   3   case is the amount of damages.

09:27:52   4          The Plaintiffs contend that as a result of the

09:27:55   5   Defendant's infringement that Pantech is entitled to

09:27:59   6   monetary damages.

09:28:02   7          The Defendant contends that the Plaintiff, at

09:28:05   8   most, would be entitled to no more than a reasonable

09:28:10   9   royalty, which in the case of the patents involved here

09:28:14   10   should not exceed a fair, reasonable, and

09:28:18   11   non-discriminatory royalty rate.

09:28:20   12          I and the parties will have more to say about what

09:28:23   13   the case involves, but for now, that's a basic statement

09:28:29   14   about the case.

09:28:30   15          I anticipate that the presentation of evidence,

09:28:35   16   which will begin this afternoon, will take about two days.

09:28:42   17   We will begin the trial this afternoon.  The parties will

09:28:45   18   present evidence to you beginning today and throughout

09:28:49   19   tomorrow, and the presentation of evidence will either

09:28:52   20   conclude at the end of the day tomorrow or first thing on

09:28:56   21   Thursday morning.

09:28:57   22          So, most likely, the deliberations in this case on

09:29:03   23   the jury's verdict will begin sometime Thursday, October

09:29:08   24   17th.  That's the day after tomorrow.

09:29:11   25          So, obviously, those of you selected to serve as

09:29:14  1  our jurors will need to be available today, tomorrow, and

09:29:18  2  Thursday.  If any of you have any prepaid vacations planned

09:29:25  3  that you've already bought non-refundable tickets for or

09:29:28  4  you have a surgery scheduled or anything like that that is

09:29:33  5  serious enough to make it very difficult for you to serve

09:29:36  6  as a juror, then I need for you to identify yourself.

09:29:42  7  We'll talk about the reasons later on, but if any of you

09:29:45  8  have those type of reasons that would make it very

09:29:49  9  difficult for you to serve as a juror, if you would,

09:29:52  10  please, raise your hand for me.

09:29:53  11          Anyone?

09:29:58  12          Let's see, Ms. Hall?  Okay.  Juror No. 3,

09:30:06  13  Ms. Hall.

09:30:07  14          Okay.  Anybody in the second section?

09:30:19  15          And then Juror No. -- is it Mr. Stovall?

09:30:26  16          POTENTIAL JUROR:  Yes.

09:30:27  17          THE COURT:  Okay.  Anyone else?

09:30:28  18          All right.  Very well.  We will visit with you,

09:30:32  19  Ms. Hall, and you, Mr. Stovall, a little bit later.

09:30:35  20          All right.  I want to give you an overview of what

09:30:39  21  is going to happen over the next three days.  Right now,

09:30:44  22  we're beginning the first stage of the trial -- what we

09:30:47  23  call "voir dire" -- and that's where the Court and the

09:30:51  24  attorneys will ask questions of you to help us evaluate you

09:30:55  25  as a potential juror.

09:30:57  1        I want you to understand that as the lawyers talk

09:31:00  2   to you this morning, they're not seeking to pry into your

09:31:04  3   private affairs.  They are entitled to ask you certain

09:31:08  4   questions to secure a fair and impartial jury.

09:31:12  5        I don't know if it will happen today, but it

09:31:14  6   sometimes does, and that is when someone is asked a

09:31:18  7   question they're not totally comfortable discussing in

09:31:21  8   front of all of the other panel members.

09:31:25  9        So if you have any hesitancy at all about

09:31:27  10  answering a question from either me or one of the

09:31:31  11  attorneys, just tell us that.  Tell me that, and I'll give

09:31:34  12  you an opportunity to answer the question later on outside

09:31:38  13  the presence of all of the panel members.

09:31:40  14       The most important thing this morning is that you

09:31:44  15  give full, complete, and truthful answers to the questions

09:31:47  16  that are asked.  There really are no wrong answers as long

09:31:51  17  as your response is full, complete, and truthful.

09:31:54  18       After all of the questions have been asked by

09:32:02  19  the -- by me and by the attorneys, each side will be

09:32:05  20  allowed to strike a certain number of jurors, and then the

09:32:10  21  first eight panel members will become our eight jurors.

09:32:16  22       After the jury is selected this morning, I'm going

09:32:20  23  to provide some instructions to you.  And following that,

09:32:23  24  the attorneys will begin by making some opening statements.

09:32:31  25  And following that, the parties will begin their

09:32:36    1   presentation of evidence.

09:32:36    2          At the close of all of the evidence, I will

09:32:38    3   instruct you on the law that you are to follow in your

09:32:41    4   deliberations.  And after those instructions, the parties

09:32:46    5   will present their closing arguments to you.

09:32:50    6          And then after that, you'll go back to the jury

09:32:52    7   room for the last time to begin your deliberations.

09:32:55    8          All right.  The purpose of voir dire is to enable

09:33:04    9   the Court to determine whether any prospective juror should

09:33:08   10   be excused from jury service for what is called "cause" or

09:33:16   11   by the attorneys by way of what's called a "peremptory

09:33:21   12   challenge," which are challenges for which no reason need

09:33:24   13   be given.

09:33:24   14          "Voir dire" is an old French phrase, and means to

09:33:30   15   speak the truth, and I know that you will speak the truth

09:33:32   16   as you answer the questions that the parties and I ask you.

09:33:36   17   So, please, listen carefully to the questions and don't be

09:33:39   18   timid about speaking up if they apply to you.

09:33:42   19          Now, I am going to ask each of you to give us a

09:33:48   20   little basic information about yourself.

09:33:51   21          We'll start with Mr. Bowman.  If you would,

09:33:55   22   please, come to the microphone there.

09:33:58   23          Do you have a sheet of paper with you that has the

09:34:05   24   questions I want you to answer for me, Mr. Bowman?  If you

09:34:08   25   want to just go through those, that'll be fine.

| | | |
|---|---|---|
| 09:34:12 | 1 | POTENTIAL JUROR:  My name is Tyler Bowman.  I live |
| 09:34:16 | 2 | in Hooks, Texas.  Miranda Fields is my wife.  I have one |
| 09:34:22 | 3 | child and another one on the way. |
| 09:34:23 | 4 | I work at Goodyear.  I'm an electrician there. |
| 09:34:30 | 5 | I've worked there for four years now. |
| 09:34:34 | 6 | High school degree.  I have a college degree. |
| 09:34:37 | 7 | Associate's degree in law enforcement. |
| 09:34:38 | 8 | My wife doesn't work.  She actually is a |
| 09:34:44 | 9 | stay-at-home mom.  She did work at TEXAR Bank for about a |
| 09:34:48 | 10 | year. |
| 09:34:50 | 11 | I have been on a jury service in 2014, I believe. |
| 09:34:56 | 12 | It was a criminal case.  And, yes, we did reach a verdict. |
| 09:35:00 | 13 | THE COURT:  All right.  Thank you, Mr. Bowman. |
| 09:35:03 | 14 | Ms. Morris? |
| 09:35:05 | 15 | POTENTIAL JUROR:  Donna Morris.  I live in Hooks, |
| 09:35:11 | 16 | Texas.  My husband's name is Michael Morris.  I have -- we |
| 09:35:16 | 17 | have one daughter and two grandchildren, and I have one on |
| 09:35:22 | 18 | way I just found out. |
| 09:35:23 | 19 | And my husband worked at Red River Army Depot. |
| 09:35:25 | 20 | He's retired there after 49 years, I think. |
| 09:35:31 | 21 | I have a high school diploma.  I don't work.  I'm |
| 09:35:36 | 22 | a housewife.  Draw Social Security. |
| 09:35:40 | 23 | I've worked -- I was on a federal case probably 16 |
| 09:35:44 | 24 | years ago, and they did reach -- we did reach a verdict in |
| 09:35:48 | 25 | that case. |

| | | |
|---|---|---|
| 09:35:49 | 1 | THE COURT:  All right.  Thank you. |
| 09:35:51 | 2 | Ms. Hall? |
| 09:35:53 | 3 | POTENTIAL JUROR:  Good morning. |
| 09:36:02 | 4 | THE COURT:  Good morning. |
| 09:36:03 | 5 | POTENTIAL JUROR:  My name is Paula Hall, and I |
| 09:36:05 | 6 | live in Wake Village, Texas.  My spouse is Roger Hall.  We |
| 09:36:10 | 7 | have three children. |
| 09:36:11 | 8 | I'm a homemaker for about 30 years now.  And my |
| 09:36:16 | 9 | educational background is graduate school completion. |
| 09:36:20 | 10 | My husband is the CEO at Collom & Carney.  It's a |
| 09:36:27 | 11 | clinic here in Texarkana.  He's worked there for 28 years. |
| 09:36:33 | 12 | And I have no prior jury service. |
| 09:36:35 | 13 | THE COURT:  All right.  Thank you. |
| 09:36:37 | 14 | Mr. Griffin? |
| 09:36:40 | 15 | POTENTIAL JUROR:  My name is Edward Griffin.  I'm |
| 09:36:45 | 16 | not married.  I have one child.  I graduated from Hooks |
| 09:36:50 | 17 | High School where I also worked for 15 years.  That's about |
| 09:36:57 | 18 | it. |
| 09:37:04 | 19 | THE COURT:  Have you -- have you -- |
| 09:37:07 | 20 | POTENTIAL JUROR:  Never been on a jury trial. |
| 09:37:09 | 21 | THE COURT:  Never been on jury service? |
| 09:37:11 | 22 | POTENTIAL JUROR:  No. |
| 09:37:11 | 23 | THE COURT:  Okay.  All right.  And are you |
| 09:37:16 | 24 | employed? |
| 09:37:16 | 25 | POTENTIAL JUROR:  Hooks ISD. |

| | | |
|---|---|---|
| 09:37:19 | 1 | THE COURT:  Okay.  All right. |
| 09:37:22 | 2 | All right.  Mr. Lewis? |
| 09:37:24 | 3 | POTENTIAL JUROR:  My name is Randy Lewis.  I live |
| 09:37:35 | 4 | in Mt. Pleasant, Texas.  I don't have a spouse.  I have one |
| 09:37:39 | 5 | child. |
| 09:37:41 | 6 | I'm unemployed at the moment, but I used to drive |
| 09:37:45 | 7 | a tow truck.  I've worked there for four years. |
| 09:37:50 | 8 | Have a high school diploma. |
| 09:37:53 | 9 | No significant others.  And I haven't done any |
| 09:37:59 | 10 | prior jury service. |
| 09:38:00 | 11 | THE COURT:  You have not had any? |
| 09:38:01 | 12 | POTENTIAL JUROR:  No. |
| 09:38:02 | 13 | THE COURT:  Okay.  Thank you. |
| 09:38:04 | 14 | Mr. Blair? |
| 09:38:07 | 15 | POTENTIAL JUROR:  My name is Dylan Blair, and I |
| 09:38:12 | 16 | live in Mt. Vernon, Texas.  I'm not married, don't have |
| 09:38:16 | 17 | children. |
| 09:38:17 | 18 | I work at STARRY Counseling as a licensed master |
| 09:38:21 | 19 | social worker and clinical counselor for children and |
| 09:38:21 | 20 | families.  I have a master's degree.  I've worked there for |
| 09:38:25 | 21 | two and a half years. |
| 09:38:26 | 22 | And I have not had any prior jury service. |
| 09:38:28 | 23 | THE COURT:  All right.  Thank you, sir. |
| 09:38:29 | 24 | POTENTIAL JUROR:  Thank you. |
| 09:38:30 | 25 | THE COURT:  Ms. Petersen? |

| | | |
|---|---|---|
| 09:38:35 | 1 | POTENTIAL JUROR:  My name is Amanda -- my name is |
| 09:38:42 | 2 | Amanda Petersen.  Widowed 2005.  Three adult children. |
| 09:38:46 | 3 | I work at Lowe's Warehouse in Mt. Vernon.  I've |
| 09:38:51 | 4 | been there almost four years. |
| 09:38:52 | 5 | High school diploma. |
| 09:38:55 | 6 | And I've never served on a jury. |
| 09:38:57 | 7 | THE COURT:  All right.  Ms. Allen? |
| 09:39:00 | 8 | POTENTIAL JUROR:  My name is Kathy Allen.  I live |
| 09:39:08 | 9 | in Texarkana, Texas.  My significant other's name is Danny |
| 09:39:14 | 10 | Rackley.  I have three sons. |
| 09:39:18 | 11 | I previously worked at Family Medical Group here |
| 09:39:21 | 12 | in Texarkana.  I retired.  I worked there for a little over |
| 09:39:24 | 13 | a year.  I have a high school diploma, and I'm certified in |
| 09:39:32 | 14 | respiratory therapy. |
| 09:39:34 | 15 | My significant other worked at Cooper Tire, what |
| 09:39:36 | 16 | is now Goodyear.  He was in management.  He worked there |
| 09:39:40 | 17 | for over 30 years.  He's retired now. |
| 09:39:43 | 18 | I have served on a criminal case, a murder trial, |
| 09:39:47 | 19 | and we did come to a verdict. |
| 09:39:49 | 20 | THE COURT:  All right.  Thank you, Ms. Allen. |
| 09:39:51 | 21 | Ms. Thomas? |
| 09:39:55 | 22 | POTENTIAL JUROR:  My name is Joanna Thomas.  I |
| 09:39:59 | 23 | live in Texarkana, Texas.  My husband's name is Ryan |
| 09:40:02 | 24 | Thomas.  We do not have any children. |
| 09:40:04 | 25 | I work at Sam's Club as a cake decorator.  I've |

| | | |
|---|---|---|
| 09:40:08 | 1 | worked there for about a year and a half.  I have a |
| 09:40:10 | 2 | bachelor's degree. |
| 09:40:11 | 3 | My husband works at a vinyl installation company. |
| 09:40:17 | 4 | He's a vinyl installer.  He's worked there for about two |
| 09:40:22 | 5 | years. |
| 09:40:22 | 6 | And I do not have any prior jury service. |
| 09:40:25 | 7 | THE COURT:  All right.  Thank you. |
| 09:40:26 | 8 | Mr. Gonzalez? |
| 09:40:27 | 9 | POTENTIAL JUROR:  My name is Nathan Gonzalez.  I |
| 09:40:32 | 10 | live in Mt. Pleasant, Texas.  My wife, Leslie, we have two |
| 09:40:37 | 11 | kids, one on the way. |
| 09:40:39 | 12 | I work at Load Trail in Sumner, Texas, as a |
| 09:40:43 | 13 | welder.  My educational background is associate's degree in |
| 09:40:47 | 14 | culinary arts and nutrition. |
| 09:40:51 | 15 | My wife is a stay-at-home mother. |
| 09:40:53 | 16 | And I do not have any prior jury service. |
| 09:40:56 | 17 | THE COURT:  All right.  Thank you, Mr. Gonzalez. |
| 09:40:58 | 18 | Mr. Salinas? |
| 09:41:01 | 19 | POTENTIAL JUROR:  My name is Mario Salinas.  I |
| 09:41:06 | 20 | live in DeKalb with my wife Brenn.  We have four children |
| 09:41:12 | 21 | together. |
| 09:41:13 | 22 | I've been working at the Red River Army Depot for |
| 09:41:15 | 23 | 17 years. |
| 09:41:15 | 24 | My wife is a teacher at New Boston.  She's been |
| 09:41:20 | 25 | there for about a year. |

| | | |
|---|---|---|
| 09:41:21 | 1 | And I have no jury service. |
| 09:41:23 | 2 | THE COURT:  All right.  Thank you. |
| 09:41:24 | 3 | Ms. Bolton? |
| 09:41:26 | 4 | POTENTIAL JUROR:  My name is Elizabeth Bolton. |
| 09:41:35 | 5 | My -- Thomas -- my husband is Thomas Bolton, sorry.  I have |
| 09:41:38 | 6 | three children. |
| 09:41:38 | 7 | I work at McKee's Restaurant for the last 27 |
| 09:41:42 | 8 | years.  I have some college. |
| 09:41:45 | 9 | Thomas works at the egg farm in Bogata.  He's |
| 09:41:50 | 10 | worked there about six weeks. |
| 09:41:52 | 11 | And I have no prior jury service. |
| 09:41:54 | 12 | THE COURT:  All right.  And tell us where you |
| 09:41:55 | 13 | live.  You live in Paris -- |
| 09:41:57 | 14 | POTENTIAL JUROR:  I live in Detroit, Texas. |
| 09:41:59 | 15 | THE COURT:  Detroit, okay.  Thank you, Ms. Bolton. |
| 09:42:02 | 16 | POTENTIAL JUROR:  Thank you. |
| 09:42:03 | 17 | THE COURT:  Uh-huh. |
| 09:42:03 | 18 | Ms. Henderson? |
| 09:42:04 | 19 | POTENTIAL JUROR:  Good morning. |
| 09:42:05 | 20 | THE COURT:  Good morning. |
| 09:42:06 | 21 | POTENTIAL JUROR:  My name is Amanda Henderson. |
| 09:42:08 | 22 | THE COURT:  Can you pull that microphone down to |
| 09:42:09 | 23 | you a little bit? |
| 09:42:10 | 24 | POTENTIAL JUROR:  Yes. |
| 09:42:11 | 25 | THE COURT:  There you go. |

09:42:11   1          POTENTIAL JUROR:  My name is Amanda Henderson.  I

09:42:14   2   live in Maud, Texas.  My husband's name is Alex Henderson.

09:42:19   3   We have three children.  They're grown.

09:42:20   4          I work in New Boston Independent School District

09:42:23   5   with special needs kids.  I've worked there for six years

09:42:27   6   full time, but I also worked as a sub for seven years.  I

09:42:30   7   have a high school diploma.

09:42:32   8          My husband works at Dot's Rentals where you rent

09:42:37   9   equipment.  He has worked there for eight or nine years.

09:42:39   10          And no prior jury.

09:42:41   11          THE COURT:  Thank you, ma'am.

09:42:44   12          Mr. Hayes?  Hello.

09:42:54   13          POTENTIAL JUROR:  Hey.  My name is Tyrone Hayes.

09:42:56   14   I don't have a spouse.  I don't have any children.

09:42:59   15          I work at a feed store.  I worked there for two

09:43:04   16   years.  Graduated high school.  Certified -- got my

09:43:09   17   certification in welding.

09:43:12   18          And I don't have prior jury service.

09:43:15   19          THE COURT:  All right.  Thank you.

09:43:17   20          Ms. Gabbie?

09:43:19   21          POTENTIAL JUROR:  My name is Shelley Gabbie, and

09:43:28   22   I'm from Texarkana, Texas.  My spouse is Mark Gabbie.  We

09:43:33   23   have two children.

09:43:36   24          Place of employment, I'm now retired, but we -- I

09:43:40   25   was a receptionist at our family medical clinic that my

09:43:47    1    husband and I had.  How long -- I worked there 14 years.  I

09:43:53    2    have a bachelor's degree.

09:43:55    3          My husband is now with Christus Trinity Clinic as

09:44:05    4    a physician, and he's been there for six years.  And I've

09:44:09    5    had no -- I've only had Grand Jury --

09:44:12    6          THE COURT:  Service.

09:44:13    7          POTENTIAL JUROR:  -- service.

09:44:15    8          THE COURT:  Thank you, Ms. Gabbie.

09:44:16    9          Mr. Bennett?

09:44:22   10          POTENTIAL JUROR:  My name is Ryan Bennett.  My

09:44:31   11    wife's name is Deirdre Bennett.  We have zero children and

09:44:35   12    one on the way.

09:44:36   13          I work at Goodyear in the information technology.

09:44:40   14    Been there eight years.  Got an associate's degree.

09:44:42   15          My wife works at Bank OZK and is a business --

09:44:46   16    business initiative specialist.  She's been there 10 years.

09:44:51   17    And I have no prior jury service.

09:44:52   18          THE COURT:  All right.  Thank you.

09:44:56   19          Ms. Baker?

09:44:57   20          POTENTIAL JUROR:  Good morning.

09:45:03   21          THE COURT:  Good morning.

09:45:03   22          POTENTIAL JUROR:  My name is Comelia Baker.  I

09:45:06   23    live in Hooks, Texas.  My husband's name is Wayne Baker.  I

09:45:09   24    have two sons.

09:45:11   25          The place of employment is Department of Veterans

| | | |
|---|---|---|
| 09:45:14 | 1 | Affairs.  I've worked there almost 16 years.  I have two |
| 09:45:20 | 2 | degrees, behavioral health and a social worker. |
| 09:45:25 | 3 | My spouse, he worked at -- he's retired military, |
| 09:45:28 | 4 | 24 years.  He worked at Department of Defense eight years. |
| 09:45:36 | 5 | And prior jury service, yes.  Where, New Boston, |
| 09:45:42 | 6 | Texas, two months ago.  And did they reach a verdict?  Yes. |
| 09:45:45 | 7 | THE COURT:  All right.  Thank you, ma'am. |
| 09:45:51 | 8 | Ms. Hennek -- was that close enough? |
| 09:45:58 | 9 | POTENTIAL JUROR:  My name is Joyce Hennek, and I |
| 09:46:00 | 10 | live in Mt. Pleasant.  My husband's name is David Hennek. |
| 09:46:04 | 11 | We have three children. |
| 09:46:06 | 12 | I am not currently employed.  I stay at home and |
| 09:46:10 | 13 | homeschool my kids, but I was a classroom teacher for 20 |
| 09:46:14 | 14 | years, an elementary teacher.  And -- and my background, I |
| 09:46:19 | 15 | do have a master's degree. |
| 09:46:20 | 16 | My husband works in IT as a data analyst at Titus |
| 09:46:30 | 17 | Regional Medical Center, and he has a master's degree also. |
| 09:46:32 | 18 | He's worked there for three years. |
| 09:46:34 | 19 | And I have no prior jury service. |
| 09:46:40 | 20 | THE COURT:  Thank you, Ms. Hennek. |
| 09:46:44 | 21 | Ms. Barrett.  Ms. Barrett, you can go to this |
| 09:46:48 | 22 | microphone over here if you want. |
| 09:46:50 | 23 | POTENTIAL JUROR:  Good morning. |
| 09:46:50 | 24 | THE COURT:  Good morning. |
| 09:46:51 | 25 | POTENTIAL JUROR:  My name is Ashley Barrett.  I |

09:46:54  1  live in DeKalb, Texas.  My husband's name is Cody Barrett.

09:46:59  2  We have one child.

09:47:01  3       I work for NAF Accounting Services at Red River

09:47:02  4  Army Depot.  I've been there for 13 years.  I have a high

09:47:06  5  school diploma and an associate degree.

09:47:07  6       My husband works at Red River Army Depot.  He is

09:47:10  7  an equipment specialist.  He has been there for 21 years.

09:47:15  8       And I have no prior jury service.

09:47:17  9       THE COURT:  All right.  Thank you, Ms. Barrett.

09:47:18  10      Mr. Stovall.

09:47:26  11      POTENTIAL JUROR:  My name is Roy Stovall.  I'm

09:47:28  12  from Mt. Pleasant.  I have -- my wife's name is Jennifer.

09:47:31  13  We have four children.

09:47:34  14      I own Jones Insurance Agency in Mt. Pleasant.

09:47:37  15  I've been there six years.

09:47:39  16      My wife works for Mt. Pleasant ISD as an assistant

09:47:43  17  principal.  She's been there about six years.

09:47:45  18      And I have no prior jury service.

09:47:47  19      THE COURT:  All right.  Thank you.

09:47:48  20      Mr. Ewing?

09:47:54  21      POTENTIAL JUROR:  My name is James Ewing.  I live

09:48:00  22  in Bagwell, Texas.  My wife of 27 years, her name is Mary.

09:48:07  23  We have eight kids.

09:48:10  24      My place of employment, I'm a truck driver, haul

09:48:16  25  logs.  Been there since September 3rd of this year.  I have

09:48:20   1   zero education.

09:48:22   2           My wife works at Detroit High School, and she just

09:48:28   3   started for the very first time in 27 years.  Prior to

09:48:32   4   that, she was an at-home housewife.

09:48:36   5           And I have no jury service.

09:48:39   6           THE COURT:  All right.  Thank you, Mr. Ewing.

09:48:42   7           Ms. Turnage?

09:48:45   8           POTENTIAL JUROR:  My name is Shana Turnage.  I

09:48:53   9   live in Texarkana, Texas.  My spouse's name is Josh

09:48:57   10  Turnage.  We have two children.

09:48:58   11          I work at Texas Parole as a parole officer.  Been

09:49:04   12  there 12 years.  Have a bachelor's degree.

09:49:07   13          My husband works at Texarkana Machine and

09:49:10   14  Shipping.  He's worked there probably about three years.

09:49:12   15          And no prior jury service.

09:49:14   16          THE COURT:  All right.  Thank you.

09:49:14   17          Ms. Clark?

09:49:16   18          POTENTIAL JUROR:  Good morning.  My name is Janet

09:49:27   19  Clark.  I live in Mt. Pleasant, Texas.  My spouse is Otis

09:49:32   20  Clark.  I have three children.

09:49:35   21          I am retired, but I worked at a nursing home as

09:49:39   22  business officer manager.  I worked there for four or five

09:49:42   23  years.  High school educational background.

09:49:47   24          My spouse is captain of Mt. Pleasant Fire

09:49:54   25  Department.  He's been there 27 years.  And I've had no

| | | |
|---|---|---|
| 09:49:57 | 1 | prior jury service. |
| 09:49:58 | 2 | THE COURT:  All right.  Thank you, Ms. Clark. |
| 09:49:59 | 3 | Mr. Epperson? |
| 09:50:01 | 4 | POTENTIAL JUROR:  Hello. |
| 09:50:08 | 5 | THE COURT:  Good morning. |
| 09:50:09 | 6 | POTENTIAL JUROR:  My name is Steve Epperson.  I |
| 09:50:11 | 7 | live in Texarkana, Texas.  I'm not married.  I have a |
| 09:50:13 | 8 | girlfriend, Sarah Lawler. |
| 09:50:16 | 9 | I work at Sterno.  I've been there for five years. |
| 09:50:22 | 10 | I'm the quality manager there.  I have a Bachelor of |
| 09:50:26 | 11 | Science degree in biology. |
| 09:50:29 | 12 | Sarah worked for the City of Little Rock, |
| 09:50:32 | 13 | Arkansas, at the police department. |
| 09:50:37 | 14 | I've had prior jury service -- was 20-plus years |
| 09:50:42 | 15 | ago.  It was a civil trial. |
| 09:50:43 | 16 | THE COURT:  All right.  Thank you, sir. |
| 09:50:51 | 17 | Ms. Davis -- or Ms. Davies, I guess.  Ms. Davies. |
| 09:50:56 | 18 | POTENTIAL JUROR:  Hello. |
| 09:50:56 | 19 | THE COURT:  Hello. |
| 09:50:57 | 20 | POTENTIAL JUROR:  My name is Monica Davies.  I |
| 09:50:59 | 21 | live in Texarkana.  My husband is Robert.  I have two adult |
| 09:51:04 | 22 | children.  My son lives in Spain, and my daughter in |
| 09:51:07 | 23 | Fort Worth. |
| 09:51:11 | 24 | I work sometimes as a freelance translator, but at |
| 09:51:18 | 25 | this stage of my life, I only accept work that I like, |

09:51:23   1   which is good.

09:51:24   2            THE COURT:  Good for you.

09:51:25   3            POTENTIAL JUROR:  So I've been working on this

09:51:28   4   field for over 20 years.  All my education was made in

09:51:37   5   Lima, Peru, where I'm from.  And I have a degree in

09:51:42   6   humanities, especially in Spanish literature.

09:51:48   7            My husband is a Vietnam veteran and has been an

09:51:55   8   interpreter all his life.  He's still working in different

09:51:59   9   projects all the time.

09:52:02   10            And I don't have any prior jury service.

09:52:05   11            THE COURT:  All right.  Thank you, Ms. Davies.

09:52:09   12            Ms. Ables.

09:52:15   13            POTENTIAL JUROR:  Hi.

09:52:15   14            THE COURT:  Hi.

09:52:16   15            POTENTIAL JUROR:  I'm Amanda Ables.  I live in

09:52:19   16   Texarkana, Texas.  My husband is James Kowzic.  We have

09:52:23   17   three children.  Excuse me.

09:52:24   18            I am a realtor at Better Homes and Gardens Real

09:52:28   19   Estate.  I have been there for six years.  I have an

09:52:33   20   associate's degree in performing arts, but I just finished

09:52:36   21   the education for my broker's license.

09:52:39   22            My husband works at Texas Freedom CBD as a

09:52:43   23   manufacturer, and he's been for about three years.

09:52:46   24            And I've been called several times but never

09:52:48   25   chosen for jury service.

| | | |
|---|---|---|
| 09:52:49 | 1 | THE COURT:  All right.  Thank you, Ms. Ables. |
| 09:52:52 | 2 | POTENTIAL JUROR:  Thank you. |
| 09:52:52 | 3 | THE COURT:  Ms. McDonald? |
| 09:52:55 | 4 | POTENTIAL JUROR:  My name is Theresa McDonald.  My |
| 09:53:06 | 5 | spouse's name is Charles McDonald.  I have one son. |
| 09:53:08 | 6 | I'm retired from Texarkana College.  I was a |
| 09:53:12 | 7 | professor, computer technology and information systems.  I |
| 09:53:15 | 8 | worked there 37 years.  I have a Ph.D. |
| 09:53:19 | 9 | My spouse is retired.  He worked at Texas |
| 09:53:23 | 10 | A&M-Texarkana.  He taught management information systems. |
| 09:53:28 | 11 | He worked there, I believe, 30 years. |
| 09:53:31 | 12 | And no prior jury service. |
| 09:53:34 | 13 | THE COURT:  All right.  Thank you, Ms. McDonald. |
| 09:53:35 | 14 | Mr. Webb? |
| 09:53:42 | 15 | POTENTIAL JUROR:  My name is Daniel Webb.  I live |
| 09:53:45 | 16 | in Talco, Texas.  My wife's name is Kirsten Webb.  We have |
| 09:53:50 | 17 | three kids. |
| 09:53:52 | 18 | I'm a machine control technician for Four Point |
| 09:53:55 | 19 | Solutions.  I've worked there for almost three years.  Went |
| 09:53:59 | 20 | to Rivercrest High School. |
| 09:54:01 | 21 | My wife is a sales rep for Sweet Shop USA in Mt. |
| 09:54:06 | 22 | Pleasant.  She's worked there for probably almost three |
| 09:54:08 | 23 | years. |
| 09:54:09 | 24 | And I have no prior jury service. |
| 09:54:12 | 25 | THE COURT:  All right.  Thank you very much. |

| | | |
|---|---|---|
| 09:54:14 | 1 | Okay.  Ladies and gentlemen of the panel, I'm now |
| 09:54:19 | 2 | going to ask the parties to introduce themselves and the |
| 09:54:26 | 3 | attorneys to introduce themselves, and we're going to start |
| 09:54:29 | 4 | with the Plaintiffs. |
| 09:54:32 | 5 | And what I will ask Mr. Culbertson to do is to |
| 09:54:37 | 6 | introduce himself, introduce the other members of his team |
| 09:54:42 | 7 | who are seated here at the table with him, and then to |
| 09:54:47 | 8 | introduce or identify any of the witnesses who will be |
| 09:54:51 | 9 | testifying during the Plaintiffs' case.  And then after |
| 09:54:55 | 10 | Mr. Culbertson has done that, I'll ask the Defendants to do |
| 09:54:58 | 11 | that. |
| 09:54:58 | 12 | And what you all should have in mind, ladies and |
| 09:55:02 | 13 | gentlemen, as the attorneys are addressing you is the |
| 09:55:05 | 14 | people who are identified or introduced to you, do you know |
| 09:55:10 | 15 | any of them in any way, any kind of social connection or |
| 09:55:14 | 16 | business connection, or do you know them from the community |
| 09:55:18 | 17 | or go to church with them. |
| 09:55:21 | 18 | I'm really just interested in knowing whether you |
| 09:55:23 | 19 | know any of the attorneys who are here in the courtroom and |
| 09:55:26 | 20 | whether you know any of the witnesses who are going to be |
| 09:55:30 | 21 | testifying in this case. |
| 09:55:31 | 22 | Mr. Culbertson? |
| 09:55:32 | 23 | MR. CULBERTSON:  Thank you, Your Honor. |
| 09:55:36 | 24 | Good morning.  My name is Geoff Culbertson, and |
| 09:55:43 | 25 | I'm very proud to represent Pantech Corporation and Pantech |

| | | |
|---|---|---|
| 09:55:47 | 1 | Wireless. |
| 09:55:47 | 2 | And I want to introduce you to our corporate |
| 09:55:51 | 3 | representative, vice president of Pantech Corporation, |
| 09:55:55 | 4 | Dr. Yang-Won Jung.  You'll hear from Mr. Jung during the |
| 09:55:59 | 5 | course of this case. |
| 09:56:00 | 6 | And we have a team of lawyers representing us -- |
| 09:56:04 | 7 | or trying the case.  Mr. Tidwell is my partner here.  We |
| 09:56:09 | 8 | practice law here in Texarkana together. |
| 09:56:12 | 9 | And then I have a group of colleagues from |
| 09:56:15 | 10 | Washington D.C., Tripp Fussell, this is Tiffany Miller, and |
| 09:56:24 | 11 | Courtney Krawice. |
| 09:56:27 | 12 | And the other witnesses that you'll hear from from |
| 09:56:32 | 13 | our side will be Dr. Todor Cooklev on some technical |
| 09:56:38 | 14 | matters; Mr. Charles Mauro, also a technical expert; |
| 09:56:43 | 15 | Dr. Jonathan Putnam, who is an economist that will be |
| 09:56:46 | 16 | helping us out here; and then you'll -- I believe you'll |
| 09:56:49 | 17 | probably hear some deposition testimony that will be read |
| 09:56:53 | 18 | to you from a gentleman by the name of B.J. Kim from a |
| 09:56:57 | 19 | company called Pantech Incorporated. |
| 09:57:02 | 20 | And we very much look forward to presenting our |
| 09:57:05 | 21 | case to you.  Thank you. |
| 09:57:06 | 22 | THE COURT:  Thank you, Mr. Culbertson. |
| 09:57:07 | 23 | MR. CULBERTSON:  Thank you. |
| 09:57:07 | 24 | THE COURT:  All right.  Does anybody on the panel |
| 09:57:09 | 25 | know Mr. Culbertson or any of the other attorneys who are |

09:57:15    1    seated at the counsel table with him who are representing

09:57:18    2    the Plaintiffs in this case?

09:57:20    3             Does anybody know any of those attorneys,

09:57:24    4    Mr. Culbertson or Mr. Tidwell or any of the other

09:57:29    5    attorneys?

09:57:30    6             All right.  Oh, yes, ma'am, Ms. Hall?  Ms. Hall,

09:57:36    7    could I get you to go to the microphone, please?

09:57:40    8             POTENTIAL JUROR:  I just know Mr. Tidwell by

09:57:45    9    reputation.

09:57:45   10             THE COURT:  All right.  And what would be his

09:57:47   11    reputation?

09:57:48   12             POTENTIAL JUROR:  I believe his son and my son

09:57:52   13    played basketball together in junior high.

09:57:55   14             THE COURT:  Okay.  Good enough.

09:57:57   15             POTENTIAL JUROR:  If you'd remember that.

09:57:59   16             MR. TIDWELL:  I do.

09:58:00   17             THE COURT:  Anything about that cause you to start

09:58:03   18    out this case leaning one side or the other?

09:58:05   19             POTENTIAL JUROR:  No, not at all.

09:58:06   20             THE COURT:  All right.  Thank you, Ms. Hall.

09:58:07   21             All right.  Anybody else know anyone else, anyone

09:58:11   22    at all?

09:58:12   23             How about the witnesses who were identified by

09:58:19   24    Mr. Culbertson?  Does anybody know any of them?

09:58:22   25             All right.  I take it by your silence you do not.

| | | |
|---|---|---|
| 09:58:24 | 1 | Okay.  Mr. Thompson. |
| 09:58:26 | 2 | MR. THOMPSON:  Good morning.  My name is Blake |
| 09:58:30 | 3 | Thompson, and I'm one of the lawyers representing the |
| 09:58:32 | 4 | Defendant, OnePlus Technology. |
| 09:58:34 | 5 | With us is -- on behalf of OnePlus is |
| 09:58:38 | 6 | Mr. Christopher Vick.  Also, other lawyers on this case are |
| 09:58:44 | 7 | Mr. David Airan and Kevin Collins.  And also assisting us |
| 09:58:48 | 8 | today with this jury selection is Ms. Tara Trask and Mike |
| 09:58:52 | 9 | Collins. |
| 09:58:53 | 10 | The witnesses that we anticipate calling for our |
| 09:58:57 | 11 | case to the technical witnesses are Mr. Omid Kia and |
| 09:59:01 | 12 | Apostolos Kakaes, and then we have an economist named Mario |
| 09:59:08 | 13 | Lopez. |
| 09:59:08 | 14 | THE COURT:  All right.  Thank you, Mr. Thompson. |
| 09:59:09 | 15 | All right.  Ladies and gentlemen of the panel, |
| 09:59:13 | 16 | does anyone know Mr. Thompson or any of the other attorneys |
| 09:59:17 | 17 | who are here seated with him at counsel table? |
| 09:59:20 | 18 | Does anyone know them in any way, ever been |
| 09:59:23 | 19 | represented by them, or any member of their firm, know them |
| 09:59:27 | 20 | from church or in the community? |
| 09:59:29 | 21 | All right.  How about any of the witnesses that |
| 09:59:31 | 22 | Mr. Thompson identified, does anyone know any of those |
| 09:59:35 | 23 | witnesses or have any relationship at all with any of them? |
| 09:59:39 | 24 | All right.  I take it by your silence you do -- |
| 09:59:42 | 25 | you do not. |

| | | |
|---|---|---|
| 09:59:43 | 1 | All right.  I introduced myself earlier, and I |
| 09:59:53 | 2 | introduced the members of my staff.  I don't think that I |
| 09:59:58 | 3 | recognize anybody, but let me just ask you:  Does anyone |
| 10:00:03 | 4 | out there know me or know any of the members of my staff? |
| 10:00:07 | 5 | Ms. Ables?  Would you go to the -- you look |
| 10:00:13 | 6 | awfully familiar, Ms. Ables. |
| 10:00:14 | 7 | POTENTIAL JUROR:  We just did Leadership |
| 10:00:16 | 8 | Texarkana, and you presented to one of our class. |
| 10:00:18 | 9 | THE COURT:  That's right.  Okay.  Very good.  I |
| 10:00:20 | 10 | hope I wasn't too -- |
| 10:00:21 | 11 | POTENTIAL JUROR:  You did well. |
| 10:00:22 | 12 | THE COURT:  -- I hope I wasn't too boring. |
| 10:00:25 | 13 | All right.  Anybody else know me or know any of |
| 10:00:28 | 14 | the members of my staff that I introduced? |
| 10:00:30 | 15 | Okay.  Great.  Thanks. |
| 10:00:32 | 16 | All right.  I asked you all to tell us -- when you |
| 10:00:38 | 17 | came up and made your introductions, to tell us a little |
| 10:00:41 | 18 | bit about yourself, to answer the question about prior jury |
| 10:00:45 | 19 | service.  And we're not going to go into that in any detail |
| 10:00:50 | 20 | at all, but I just have a -- sort of a very broad, very |
| 10:00:55 | 21 | general catch-all question about any of you who have |
| 10:00:59 | 22 | previously served as a juror, either in a civil case or a |
| 10:01:03 | 23 | criminal case in federal court or state court or a grand |
| 10:01:10 | 24 | jury for that matter. |
| 10:01:13 | 25 | Of those of you who have served on a jury before, |

| | | |
|---|---|---|
| 10:01:16 | 1 | is there anything about that experience that you had that |
| 10:01:23 | 2 | might -- that we would want to know about in terms of your |
| 10:01:27 | 3 | ability to serve as a juror in this case and be fair and |
| 10:01:32 | 4 | impartial to both sides?  Is there anything about your |
| 10:01:36 | 5 | prior jury experience that would cause you to have any |
| 10:01:42 | 6 | difficulty at all being fair and impartial to both sides in |
| 10:01:47 | 7 | this case?  Anything about your prior jury service that |
| 10:01:51 | 8 | might be a problem? |
| 10:01:53 | 9 | Okay.  I take it by your silence, it's not. |
| 10:01:56 | 10 | I'm going to ask you a question now about any |
| 10:02:01 | 11 | previous experience that you might have had or a close |
| 10:02:06 | 12 | friend or family member might have had in our judicial |
| 10:02:10 | 13 | system. |
| 10:02:11 | 14 | And so I've got a number of different categories, |
| 10:02:14 | 15 | and I'm going to go through those. |
| 10:02:18 | 16 | So I want to know if you've ever been involved in |
| 10:02:21 | 17 | any court, federal court, state court, municipal court, |
| 10:02:25 | 18 | county court, in a criminal matter or a civil matter that |
| 10:02:28 | 19 | involved you, a member of your family, or a close friend as |
| 10:02:33 | 20 | one of four categories, a Plaintiff, a Defendant, a |
| 10:02:38 | 21 | witness, or a victim. |
| 10:02:42 | 22 | And so what I'll ask you to do is if you fall into |
| 10:02:46 | 23 | any of those categories, just come up and tell us just a |
| 10:02:50 | 24 | little bit about it.  You don't have to go into any great |
| 10:02:52 | 25 | detail.  And if later on the attorneys want to ask you some |

| | | |
|---|---|---|
| 10:02:56 | 1 | further questions about that, they may do so. |
| 10:02:58 | 2 | So you, a member of your family, or a close friend |
| 10:03:04 | 3 | involved in a criminal matter or a civil matter where you |
| 10:03:07 | 4 | were a Plaintiff -- you or they were a Plaintiff, a |
| 10:03:12 | 5 | Defendant, a witness, or a victim. |
| 10:03:18 | 6 | All right.  We'll start in the first section over |
| 10:03:22 | 7 | here. |
| 10:03:22 | 8 | Ms. Hall, if you would, come to the microphone, |
| 10:03:25 | 9 | please? |
| 10:03:25 | 10 | POTENTIAL JUROR:  Yes, I've testified as an expert |
| 10:03:28 | 11 | witness in several cases -- |
| 10:03:29 | 12 | THE COURT:  Okay. |
| 10:03:30 | 13 | POTENTIAL JUROR:  -- related to my work. |
| 10:03:32 | 14 | THE COURT:  All right.  Tell me a little bit about |
| 10:03:34 | 15 | what -- like federal court, state court, what? |
| 10:03:37 | 16 | POTENTIAL JUROR:  I believe -- it's so long ago. |
| 10:03:40 | 17 | I believe it was state court or just a local court, family |
| 10:03:44 | 18 | court. |
| 10:03:45 | 19 | THE COURT:  Okay.  And were you called by one of |
| 10:03:49 | 20 | the parties, by the Plaintiff or the Defendant, or was it |
| 10:03:53 | 21 | in a criminal -- |
| 10:03:54 | 22 | POTENTIAL JUROR:  Yes, by one of the parties. |
| 10:03:55 | 23 | THE COURT:  Okay.  And did you do that just -- |
| 10:03:59 | 24 | just on the side, so to speak, or was -- |
| 10:04:01 | 25 | POTENTIAL JUROR:  It was related to my work. |

10:04:03    1              THE COURT:  Related to work in a particular case?

10:04:06    2              POTENTIAL JUROR:  Yes.

10:04:06    3              THE COURT:  Okay.  Anything about serving as an

10:04:08    4    expert witness in previous cases that would cause you to

10:04:14    5    view anything about this case in perhaps a little different

10:04:21    6    light?

10:04:21    7              POTENTIAL JUROR:  No.

10:04:21    8              THE COURT:  And would you start out with a firm

10:04:24    9    view that you could be fair and impartial to both sides in

10:04:27   10    the case?

10:04:28   11              POTENTIAL JUROR:  Yes.

10:04:29   12              THE COURT:  Okay.  Thank you, Ms. Hall.

10:04:30   13              Anyone else in the first section?

10:04:35   14              Yes, ma'am, on the back row, Ms. Petersen?

10:04:38   15              POTENTIAL JUROR:  I had a family member steal my

10:04:49   16    firearms, and I reported it.  They pleaded guilty, so it

10:04:53   17    never did go to trial or anything, and they paid

10:04:56   18    restitution and such.

10:04:58   19              THE COURT:  Okay.  How long ago was that?

10:04:59   20              POTENTIAL JUROR:  Maybe 10 years.

10:05:02   21              THE COURT:  Okay.  So you were a victim of a

10:05:04   22    crime?

10:05:05   23              POTENTIAL JUROR:  Yeah.

10:05:05   24              THE COURT:  Is there anything about your

10:05:09   25    experience with all of that that leads you to have a

| | | |
|---|---|---|
| 10:05:14 | 1 | certain view about our judicial system?  Good or bad? |
| 10:05:18 | 2 | POTENTIAL JUROR:  No.  I -- no, it was handled |
| 10:05:22 | 3 | well. |
| 10:05:22 | 4 | THE COURT:  All right.  You thought it worked like |
| 10:05:23 | 5 | it was supposed to? |
| 10:05:24 | 6 | POTENTIAL JUROR:  Yes. |
| 10:05:25 | 7 | THE COURT:  All right.  Thank you, ma'am. |
| 10:05:27 | 8 | Anyone else in the first section? |
| 10:05:29 | 9 | Yes, ma'am, Ms. Allen? |
| 10:05:31 | 10 | POTENTIAL JUROR:  My deceased husband and I were |
| 10:05:37 | 11 | in a lawsuit.  We were the Plaintiffs.  A tanker truck ran |
| 10:05:43 | 12 | over my husband in a car wreck, and we -- we were -- we |
| 10:05:49 | 13 | sued them, and there was a settlement. |
| 10:05:53 | 14 | THE COURT:  Where was that case filed? |
| 10:05:54 | 15 | POTENTIAL JUROR:  It was here in Miller County, I |
| 10:05:59 | 16 | guess. |
| 10:05:59 | 17 | THE COURT:  In state court in Miller County? |
| 10:06:02 | 18 | POTENTIAL JUROR:  Uh-huh. |
| 10:06:02 | 19 | THE COURT:  How long ago was that, ma'am? |
| 10:06:05 | 20 | POTENTIAL JUROR:  In '99. |
| 10:06:07 | 21 | THE COURT:  25 years ago? |
| 10:06:08 | 22 | POTENTIAL JUROR:  Uh-huh. |
| 10:06:09 | 23 | THE COURT:  Is there anything about that |
| 10:06:10 | 24 | experience that leads you to have any kind of opinions |
| 10:06:12 | 25 | about our judicial system such that you might start out |

| | | |
|---|---|---|
| 10:06:15 | 1 | this case being -- you know, having a view about one side |
| 10:06:22 | 2 | or the another? |
| 10:06:23 | 3 | POTENTIAL JUROR:  No, sir. |
| 10:06:23 | 4 | THE COURT:  And do you feel like you could be fair |
| 10:06:26 | 5 | to both sides throughout the course of the trial and listen |
| 10:06:31 | 6 | to all of the evidence and follow my instructions on the |
| 10:06:34 | 7 | law without regard to whatever experience you've previously |
| 10:06:37 | 8 | had? |
| 10:06:38 | 9 | POTENTIAL JUROR:  Yes, sir. |
| 10:06:38 | 10 | THE COURT:  Okay.  All right.  Thank you very |
| 10:06:45 | 11 | much, Ms. Allen. |
| 10:06:46 | 12 | Anyone else in the first section? |
| 10:06:48 | 13 | Second section? |
| 10:06:49 | 14 | Yes, ma'am.  Ms. Bolton? |
| 10:06:51 | 15 | POTENTIAL JUROR:  Yes.  My sister was a victim |
| 10:06:56 | 16 | of -- she was abducted and raped, and there's that. |
| 10:07:01 | 17 | And then at my job we were robbed, and my |
| 10:07:04 | 18 | statements helped, you know, catch the guy. |
| 10:07:08 | 19 | THE COURT:  All right.  So -- |
| 10:07:10 | 20 | POTENTIAL JUROR:  Basically. |
| 10:07:10 | 21 | THE COURT:  I'm sorry to hear about both of |
| 10:07:13 | 22 | those -- |
| 10:07:14 | 23 | POTENTIAL JUROR:  Thank you. |
| 10:07:15 | 24 | THE COURT:  -- incidents.  When -- when was the |
| 10:07:18 | 25 | first one involving your sister? |

| | | |
|---|---|---|
| 10:07:20 | 1 | POTENTIAL JUROR:  That was -- I'm horrible with |
| 10:07:23 | 2 | dates.  It was early maybe 2006, 2007 -- |
| 10:07:29 | 3 | THE COURT:  Okay. |
| 10:07:29 | 4 | POTENTIAL JUROR:  -- maybe.  Around that time. |
| 10:07:31 | 5 | THE COURT:  All right.  And where did that happen, |
| 10:07:33 | 6 | ma'am? |
| 10:07:33 | 7 | POTENTIAL JUROR:  Paris, Texas. |
| 10:07:40 | 8 | THE COURT:  All right.  And was someone arrested? |
| 10:07:43 | 9 | POTENTIAL JUROR:  Yes, he was convicted. |
| 10:07:45 | 10 | THE COURT:  And convicted.  All right.  And were |
| 10:07:46 | 11 | you in -- other than, of course, providing, you know, love |
| 10:07:48 | 12 | and support and comfort to your sister, were you a witness |
| 10:07:51 | 13 | or anything in that case? |
| 10:07:51 | 14 | POTENTIAL JUROR:  No, I just got to be there every |
| 10:07:52 | 15 | day and see everything, but, no, I was not a witness. |
| 10:07:55 | 16 | THE COURT:  And was there a trial? |
| 10:07:56 | 17 | POTENTIAL JUROR:  Yes. |
| 10:07:57 | 18 | THE COURT:  There was a trial. |
| 10:07:58 | 19 | POTENTIAL JUROR:  Yes, a long one. |
| 10:07:59 | 20 | THE COURT:  Okay. |
| 10:08:00 | 21 | POTENTIAL JUROR:  But everything came out great. |
| 10:08:01 | 22 | THE COURT:  All right.  And then the second |
| 10:08:02 | 23 | place -- remind me where you work. |
| 10:08:04 | 24 | POTENTIAL JUROR:  McKee's Restaurant in Paris. |
| 10:08:08 | 25 | THE COURT:  And the restaurant was robbed? |

| | | |
|---|---|---|
| 10:08:11 | 1 | POTENTIAL JUROR:  By an employee, by him and his |
| 10:08:13 | 2 | cousin.  And I wasn't there, but it was my statement who |
| 10:08:16 | 3 | identified the cousin -- |
| 10:08:18 | 4 | THE COURT:  All right. |
| 10:08:18 | 5 | POTENTIAL JUROR:  -- that helped him. |
| 10:08:20 | 6 | THE COURT:  So was it like an armed robbery? |
| 10:08:24 | 7 | POTENTIAL JUROR:  Yes, yes. |
| 10:08:24 | 8 | THE COURT:  Okay.  How long ago was that? |
| 10:08:26 | 9 | POTENTIAL JUROR:  Oh, Lord, that was over 15 |
| 10:08:28 | 10 | years.  I mean, it's been awhile. |
| 10:08:29 | 11 | THE COURT:  And did you have to testify or |
| 10:08:30 | 12 | anything? |
| 10:08:31 | 13 | POTENTIAL JUROR:  No, it never got that far. |
| 10:08:32 | 14 | THE COURT:  But you provided a statement to the |
| 10:08:35 | 15 | law enforcement officers? |
| 10:08:36 | 16 | POTENTIAL JUROR:  Yes.  And they told me -- it was |
| 10:08:38 | 17 | right before Gary Young took office; it was like the year |
| 10:08:41 | 18 | before Gary Young took office. |
| 10:08:41 | 19 | THE COURT:  Okay. |
| 10:08:44 | 20 | POTENTIAL JUROR:  And the DA at the time told me |
| 10:08:48 | 21 | it was my statement that made the man confess, so -- |
| 10:08:48 | 22 | THE COURT:  All right.  So is there anything about |
| 10:08:51 | 23 | either of those experiences that would cause you to |
| 10:08:54 | 24 | struggle to be fair and impartial to both sides? |
| 10:08:59 | 25 | POTENTIAL JUROR:  No, sir. |

| | | |
|---|---|---|
| 10:08:59 | 1 | THE COURT:  You feel like you could put all of |
| 10:09:02 | 2 | those experiences aside -- |
| 10:09:03 | 3 | POTENTIAL JUROR:  Yeah, definitely. |
| 10:09:04 | 4 | THE COURT:  Okay.  All right.  Fair enough. |
| 10:09:06 | 5 | POTENTIAL JUROR:  Thank you. |
| 10:09:06 | 6 | THE COURT:  Thank you very much. |
| 10:09:09 | 7 | Anyone else in the second section? |
| 10:09:12 | 8 | Ms. Gabbie? |
| 10:09:13 | 9 | POTENTIAL JUROR:  My husband and some of his |
| 10:09:21 | 10 | partners at different times have been -- malpractice. |
| 10:09:26 | 11 | THE COURT:  All right. |
| 10:09:26 | 12 | POTENTIAL JUROR:  And his most recent one was |
| 10:09:31 | 13 | probably in 2017, but he was dropped from that case. |
| 10:09:36 | 14 | THE COURT:  Okay.  And your husband is -- is he in |
| 10:09:40 | 15 | family practice? |
| 10:09:40 | 16 | POTENTIAL JUROR:  Yes. |
| 10:09:41 | 17 | THE COURT:  All right.  And he's still currently |
| 10:09:43 | 18 | practicing, correct? |
| 10:09:44 | 19 | POTENTIAL JUROR:  Yes. |
| 10:09:44 | 20 | THE COURT:  But with the Trinity organization? |
| 10:09:47 | 21 | POTENTIAL JUROR:  Yes. |
| 10:09:47 | 22 | THE COURT:  All right.  And so how many times do |
| 10:09:50 | 23 | you think over the years your husband's been a Defendant in |
| 10:09:53 | 24 | a medical malpractice case? |
| 10:09:55 | 25 | POTENTIAL JUROR:  Two for him, yes. |

| | | |
|---|---|---|
| 10:09:59 | 1 | THE COURT:  Okay. |
| 10:09:59 | 2 | POTENTIAL JUROR:  And then close friends. |
| 10:10:01 | 3 | THE COURT:  Okay. |
| 10:10:03 | 4 | POTENTIAL JUROR:  Or partners. |
| 10:10:04 | 5 | THE COURT:  All right.  In other words, he's |
| 10:10:06 | 6 | individually been a Defendant a couple of times, and |
| 10:10:09 | 7 | then -- and then his partners have been Defendants on other |
| 10:10:13 | 8 | occasions? |
| 10:10:13 | 9 | POTENTIAL JUROR:  Off and on, different ones. |
| 10:10:15 | 10 | He's been with large clinics before. |
| 10:10:17 | 11 | THE COURT:  All right.  So does that lead you to |
| 10:10:19 | 12 | have any particular view about our judicial system? |
| 10:10:22 | 13 | POTENTIAL JUROR:  I don't -- huh-uh. |
| 10:10:25 | 14 | THE COURT:  Okay.  And do you feel like you -- |
| 10:10:28 | 15 | I'm sorry? |
| 10:10:28 | 16 | POTENTIAL JUROR:  Nothing. |
| 10:10:30 | 17 | THE COURT:  Well, I mean, I guess I just want to |
| 10:10:32 | 18 | know what your -- what your experience has been and whether |
| 10:10:35 | 19 | it might color your ability to be fair to both sides in |
| 10:10:38 | 20 | this case. |
| 10:10:39 | 21 | POTENTIAL JUROR:  I don't think it would be |
| 10:10:42 | 22 | anything with this case. |
| 10:10:43 | 23 | THE COURT:  Okay.  All right.  You may have |
| 10:10:46 | 24 | opinions.  In other words, if we were here today on a |
| 10:10:48 | 25 | medical negligence case, but perhaps not in a patent |

| | | |
|---|---|---|
| 10:10:53 | 1 | damages case? |
| 10:10:54 | 2 | POTENTIAL JUROR:  Correct. |
| 10:10:55 | 3 | THE COURT:  Okay.  All right.  Thank you, |
| 10:10:57 | 4 | Ms. Gabbie. |
| 10:10:57 | 5 | Anyone else in the second section? |
| 10:11:00 | 6 | Third section?  Anyone at all, third section? |
| 10:11:05 | 7 | Fourth section? |
| 10:11:07 | 8 | Yes, ma'am, Ms. McDonald? |
| 10:11:09 | 9 | POTENTIAL JUROR:  It's been so long ago, I can't |
| 10:11:13 | 10 | remember.  I think it was '88, maybe '89, Plaintiff, my |
| 10:11:19 | 11 | husband and I.  A local company with -- |
| 10:11:25 | 12 | THE COURT:  Can you speak up for me a little bit? |
| 10:11:27 | 13 | I'm having -- |
| 10:11:29 | 14 | POTENTIAL JUROR:  Hang on.  I think it was '88 or |
| 10:11:32 | 15 | '89, we were a Plaintiff, my husband and I, against a local |
| 10:11:36 | 16 | company for damages to our house with some kind of |
| 10:11:45 | 17 | chemical. |
| 10:11:46 | 18 | THE COURT:  Okay. |
| 10:11:47 | 19 | POTENTIAL JUROR:  And there was a settlement that |
| 10:11:50 | 20 | we can't talk about. |
| 10:11:51 | 21 | THE COURT:  Okay.  Was there a lawsuit that was |
| 10:11:55 | 22 | filed? |
| 10:11:55 | 23 | POTENTIAL JUROR:  Yes. |
| 10:11:56 | 24 | THE COURT:  Okay.  Where was that case filed? |
| 10:11:58 | 25 | POTENTIAL JUROR:  In Bowie County. |

| | | |
|---|---|---|
| 10:12:01 | 1 | THE COURT:  Okay.  And you all resolved it outside |
| 10:12:04 | 2 | of court?  In other words, you never went to trial? |
| 10:12:09 | 3 | POTENTIAL JUROR:  Correct. |
| 10:12:11 | 4 | THE COURT:  All right.  And is there anything |
| 10:12:14 | 5 | about that experience that might influence or affect your |
| 10:12:18 | 6 | ability to sit as a fair and impartial juror in this case? |
| 10:12:21 | 7 | POTENTIAL JUROR:  You know, I can hardly remember |
| 10:12:24 | 8 | it. |
| 10:12:25 | 9 | THE COURT:  Okay.  All right.  So it seems |
| 10:12:28 | 10 | doubtful that it would affect you? |
| 10:12:30 | 11 | POTENTIAL JUROR:  Right. |
| 10:12:31 | 12 | THE COURT:  All right. |
| 10:12:31 | 13 | POTENTIAL JUROR:  And then my son had a lawsuit -- |
| 10:12:37 | 14 | I think it was in Dallas County.  He lived here.  I think |
| 10:12:41 | 15 | he might have been 18 or 19.  So he's in his 40s now.  And |
| 10:12:47 | 16 | he was a Plaintiff against a local company there about a |
| 10:12:54 | 17 | motor for his vehicle. |
| 10:12:56 | 18 | THE COURT:  Okay.  And same question about that. |
| 10:12:59 | 19 | Is there anything about his experience that would affect |
| 10:13:02 | 20 | your ability to be a fair and impartial juror in this case? |
| 10:13:06 | 21 | POTENTIAL JUROR:  No, because I totally forgot |
| 10:13:08 | 22 | about it until he brought it up the other day. |
| 10:13:10 | 23 | THE COURT:  All right.  Thank you, Ms. McDonald. |
| 10:13:12 | 24 | POTENTIAL JUROR:  Okay. |
| 10:13:12 | 25 | THE COURT:  Anybody else? |

| | | |
|---|---|---|
| 10:13:14 | 1 | Ms. Ables? |
| 10:13:15 | 2 | POTENTIAL JUROR:  Yes.  My father was a homicide |
| 10:13:23 | 3 | victim. |
| 10:13:24 | 4 | THE COURT:  I'm sorry to hear that. |
| 10:13:27 | 5 | POTENTIAL JUROR:  That was in 2005. |
| 10:13:28 | 6 | THE COURT:  Okay. |
| 10:13:28 | 7 | POTENTIAL JUROR:  In Miller County. |
| 10:13:30 | 8 | THE COURT:  Okay.  I remember that.  All right. |
| 10:13:32 | 9 | Karen Ables is your aunt, right? |
| 10:13:34 | 10 | POTENTIAL JUROR:  My aunt, yes. |
| 10:13:35 | 11 | THE COURT:  Yeah.  All right.  I'm so sorry about |
| 10:13:38 | 12 | that.  So that was hard for you, I'm sure, and your family. |
| 10:13:41 | 13 | POTENTIAL JUROR:  Yes. |
| 10:13:42 | 14 | THE COURT:  This is a civil case. |
| 10:13:44 | 15 | POTENTIAL JUROR:  It wouldn't affect this case. |
| 10:13:46 | 16 | THE COURT:  Yeah, would it -- |
| 10:13:48 | 17 | POTENTIAL JUROR:  If it were criminal, it might be |
| 10:13:50 | 18 | a different conversation. |
| 10:13:51 | 19 | THE COURT:  It would be a tougher call, in other |
| 10:13:53 | 20 | words, if we were here on a criminal matter? |
| 10:13:55 | 21 | POTENTIAL JUROR:  Yes. |
| 10:13:55 | 22 | THE COURT:  But in a patent damages case, you feel |
| 10:13:57 | 23 | sure it's not going to affect your ability? |
| 10:14:00 | 24 | POTENTIAL JUROR:  No, no. |
| 10:14:02 | 25 | THE COURT:  All right.  Thank you, Ms. Ables. |

10:14:05    1            All right.  Anyone else?

10:14:07    2            Yes, ma'am, Ms. McDonald, again?  That's all

10:14:11    3    right.  Come on.

10:14:11    4            POTENTIAL JUROR:  This was real long ago.

10:14:18    5    Probably 1981 or '2, my son's daughter was killed by his

10:14:27    6    ex-wife's boyfriend here in Texarkana.

10:14:33    7            THE COURT:  All right.  So would that be your

10:14:34    8    granddaughter?

10:14:35    9            POTENTIAL JUROR:  It would be my niece, my -- I'm

10:14:39   10    sorry, my brother's daughter.

10:14:40   11            THE COURT:  Okay.  Your niece -- your niece was --

10:14:44   12            POTENTIAL JUROR:  Killed.

10:14:45   13            THE COURT:  -- was the victim of a crime?  All

10:14:48   14    right.

10:14:48   15            POTENTIAL JUROR:  It didn't go to court.

10:14:50   16            THE COURT:  All right.

10:14:52   17            POTENTIAL JUROR:  It settled out.  Right before

10:14:53   18    they went to court, they settled.

10:14:55   19            THE COURT:  All right.  And so that means someone

10:14:57   20    pled guilty?

10:14:57   21            POTENTIAL JUROR:  Yes.

10:14:58   22            THE COURT:  All right.  Is there anything about

10:14:59   23    that experience that would cause you to be fair -- affect

10:15:03   24    your ability to be fair and impartial in this case?

10:15:06   25            POTENTIAL JUROR:  No.

10:15:06    1          THE COURT:  All right.  Thank you, Ms. McDonald.

10:15:08    2          Okay.  Very good.  Thank you all for those

10:15:15    3    answers.

10:15:15    4          I have just a couple more things I want to say,

10:15:19    5    and then we're going to take a break, and then the

10:15:22    6    attorneys will have an opportunity to ask questions of you

10:15:26    7    all.

10:15:27    8          All right.  Next question is a very broad, very

10:15:32    9    general question.

10:15:33   10          If you are selected to serve as a juror in this

10:15:37   11    case, will each of you be able to render a verdict that is

10:15:41   12    based solely on the evidence that's presented here at the

10:15:46   13    trial and in the context of the law as I give it to you in

10:15:50   14    my instructions, disregarding any other ideas or notions or

10:15:56   15    beliefs about the law that you may have encountered -- you

10:16:01   16    yourself may have encountered in reaching your verdict?

10:16:04   17          Is there anyone who has any concern about their

10:16:08   18    ability to put any ideas about the law, any notions or

10:16:12   19    beliefs about the law aside and follow the instructions

10:16:17   20    that I give you on the law based upon the evidence that's

10:16:23   21    presented here in the courtroom?

10:16:25   22          Does anyone have any concerns about their ability

10:16:28   23    to do that?

10:16:29   24          All right.  I take it by your silence, you do not.

10:16:32   25          One of the things that I am going to ask you to do

| | | |
|---|---|---|
| 10:16:37 | 1 | if you are selected to serve as a juror in this case is not |
| 10:16:42 | 2 | to discuss the case with anyone, including among |
| 10:16:49 | 3 | yourselves, until all of the evidence has been presented |
| 10:16:50 | 4 | and I've instructed you on the law. |
| 10:16:52 | 5 | So you can't talk about it with each other on |
| 10:16:57 | 6 | breaks or in the morning or in the evening.  You can't talk |
| 10:17:01 | 7 | to family members or friends about it.  You may not have |
| 10:17:04 | 8 | any communications with anyone about the case while it's |
| 10:17:08 | 9 | going on. |
| 10:17:09 | 10 | Now, once it's over with, I'll tell you -- I'll |
| 10:17:13 | 11 | give the jury instructions at the end of the case, you're |
| 10:17:15 | 12 | welcome to talk to anybody about it or nobody about it. |
| 10:17:18 | 13 | It'll be up to you at that point.  But while the case is |
| 10:17:21 | 14 | being presented and before you begin your deliberations, |
| 10:17:25 | 15 | I'm going to ask you not to talk to anybody at all about |
| 10:17:30 | 16 | the testimony or what you've heard or seen in the |
| 10:17:34 | 17 | courtroom. |
| 10:17:34 | 18 | So no face-to-face discussions with anyone, no |
| 10:17:38 | 19 | texting, no emailing, no blogging, no messaging or |
| 10:17:43 | 20 | comments, no posting anything on any social media website |
| 10:17:48 | 21 | or app, like Twitter or Facebook or Instagram or Snapchat |
| 10:17:53 | 22 | or anything else.  And that's a very, very important rule |
| 10:17:57 | 23 | that I'm going to ask you to follow throughout the course |
| 10:18:00 | 24 | of the trial. |
| 10:18:01 | 25 | And by the same token, if anyone feels like they |

10:18:06    1    would have any trouble following that -- that rule, you

10:18:14    2    can't let yourself become a member of the jury in this

10:18:18    3    case.

10:18:19    4            So is there anyone here who feels like they would

10:18:21    5    have any problem at all following my instructions about

10:18:25    6    your conduct in this case?

10:18:29    7            All right.  I take it by your silence, you don't.

10:18:32    8            Another thing that I will ask you to do throughout

10:18:35    9    the course of the trial is to refrain from conducting any

10:18:39   10    type of independent or personal research or investigation

10:18:44   11    into any matter related to the case.

10:18:47   12            So you can't use your cell phone or your tablet or

10:18:50   13    a computer or any other device at all to do any kind of

10:18:55   14    research or investigation into the case, the attorneys, the

10:18:58   15    parties, the law, anything at all.  You may not do any type

10:19:05   16    of independent research or investigation.

10:19:08   17            So you can't go home and google the parties or the

10:19:11   18    case or the attorneys or read anything about patent damages

10:19:17   19    or anything of the like.

10:19:19   20            By the same token, you have to ignore any

10:19:22   21    information that you accidentally come across if you're

10:19:26   22    browsing the Internet or on your social media feeds.  And

10:19:30   23    that's important because you have to base your decisions in

10:19:35   24    the jury room on what you see and hear in the courtroom,

10:19:40   25    the evidence that has been determined to be admissible and

| | |
|---|---|
| 10:19:44 | 1 |
| 10:19:49 | 2 |
| 10:19:51 | 3 |
| 10:19:54 | 4 |
| 10:19:57 | 5 |
| 10:19:59 | 6 |
| 10:20:01 | 7 |
| 10:20:05 | 8 |
| 10:20:07 | 9 |
| 10:20:10 | 10 |

1  the law that I've instructed you that you must follow in

2  your deliberations.

3        So same thing about that.  If you feel you cannot

4  do that, then you can't let yourself become a member of the

5  jury.

6        Is there anybody here who would have any trouble

7  at all following my instructions about doing no independent

8  research or investigation?

9        All right.  I take it by your silence, you don't.

10       Is there any reason anyone here has that they can

11  think of that you would not be able to sit on this jury and

12  render a fair verdict based on the evidence presented to

13  you and in the context of the law that I give it to you?

14       All right.  Last thing I want to talk about is

15  what's called the burden of proof.

16       The parties may ask you questions about it.  In

17  this case, the jury is going to be called upon to apply a

18  burden of proof that's known as preponderance of the

19  evidence.

20       And I need to instruct you that when a party has

21  the burden of proof on any claim or affirmative defense by

22  a preponderance of the evidence, it means that you, the

23  jury, must be persuaded by the credible or believable

24  evidence that the claim or affirmative defense is more

25  probably true than not true.  And sometimes we talk about

| | | |
|---|---|---|
| 10:21:17 | 1 | this as being the greater weight and degree of the credible |
| 10:21:20 | 2 | testimony. |
| 10:21:20 | 3 | So at the close of the case, I will submit some |
| 10:21:25 | 4 | questions to you, and you must answer those questions by |
| 10:21:28 | 5 | applying this burden of proof that's called preponderance |
| 10:21:32 | 6 | of the evidence. |
| 10:21:34 | 7 | This is not a burden of proof to be confused with |
| 10:21:42 | 8 | beyond a reasonable doubt.  That's a burden that's applied |
| 10:21:44 | 9 | in criminal cases.  And beyond a reasonable doubt does not |
| 10:21:49 | 10 | apply in this case or any other civil case.  So you should |
| 10:21:54 | 11 | not confuse preponderance of the evidence with beyond a |
| 10:22:01 | 12 | reasonable doubt. |
| 10:22:01 | 13 | Preponderance of the evidence can be imagined by |
| 10:22:07 | 14 | considering a set of scales, and if those scales tip in |
| 10:22:13 | 15 | favor of one side or the other with the greater weight and |
| 10:22:17 | 16 | degree of credible testimony, then that represents |
| 10:22:24 | 17 | preponderance of the evidence. |
| 10:22:24 | 18 | So I wanted to explain a little bit about that to |
| 10:22:29 | 19 | you in case the parties want to ask you about your |
| 10:22:31 | 20 | willingness to apply that burden of proof in this case to |
| 10:22:36 | 21 | the evidence that you hear during the trial. |
| 10:22:39 | 22 | I think we've been going a little more than an |
| 10:22:43 | 23 | hour, so now is a good time for us to break.  We've got |
| 10:22:47 | 24 | water bottles we'll provide you.  We also have snacks. |
| 10:22:54 | 25 | You're welcome to help yourself to those.  We'll take a |

| | | |
|---|---|---|
| 10:22:57 | 1 | recess of about 10 minutes, and then we'll get back into |
| 10:23:01 | 2 | the courtroom, and the parties will do their portion of the |
| 10:23:02 | 3 | voir dire. |
| 10:23:03 | 4 | COURT SECURITY OFFICER:  All rise. |
| 10:31:41 | 5 | (Recess.) |
| 10:36:20 | 6 | COURT SECURITY OFFICER:  Please be seated. |
| 10:37:31 | 7 | All right.  At this time, ladies and gentlemen of |
| 10:37:37 | 8 | the panel, the -- counsel for the Plaintiffs will have an |
| 10:37:42 | 9 | opportunity to ask some questions.  Again, there really are |
| 10:37:47 | 10 | no wrong answers throughout this process as long as your |
| 10:37:50 | 11 | answer is a truthful response to what is asked.  That's the |
| 10:37:55 | 12 | right answer. |
| 10:37:56 | 13 | As I mentioned earlier, they are not here to pry |
| 10:38:00 | 14 | unduly into your private affairs.  They're here for the |
| 10:38:04 | 15 | purpose of gathering information in order to select a fair |
| 10:38:10 | 16 | and impartial jury. |
| 10:38:12 | 17 | As I said earlier, if you have any hesitancy at |
| 10:38:16 | 18 | all about answering a question in front of everybody else, |
| 10:38:20 | 19 | just raise your hand and let us know that, and we'll give |
| 10:38:23 | 20 | you an opportunity later on to provide a response to the |
| 10:38:29 | 21 | question. |
| 10:38:29 | 22 | All right.  At this time, the counsel for the |
| 10:38:32 | 23 | Plaintiffs may voir dire the jury. |
| 10:38:33 | 24 | MR. CULBERTSON:  Thank you, Your Honor.  May it |
| 10:38:39 | 25 | please the Court. |

| | | |
|---|---|---|
| 10:38:39 | 1 | Hello again.  Once more, my name is Geoff |
| 10:38:46 | 2 | Culbertson.  I've practiced law here in Texarkana since |
| 10:38:50 | 3 | 2005.  Before that, I went to Baylor Law School with my |
| 10:38:57 | 4 | friend, Mr. Thompson over here. |
| 10:38:59 | 5 | And I'm married to Maggie for 24 years.  We have |
| 10:39:01 | 6 | three kids, two in college, and one in high school. |
| 10:39:05 | 7 | I have never served on a jury.  For some reason, I |
| 10:39:11 | 8 | just don't get picked.  I don't know why.  So I'm envious |
| 10:39:15 | 9 | for those of you that will get picked. |
| 10:39:17 | 10 | I'm very proud to represent our clients, Pantech |
| 10:39:21 | 11 | Corp and Pantech Wireless.  And I want to begin by thanking |
| 10:39:24 | 12 | you all for being here.  Some of you came a very long |
| 10:39:29 | 13 | distance this morning, and I know every single one of you |
| 10:39:31 | 14 | had other things to do today.  This case is important, and |
| 10:39:34 | 15 | we appreciate your help in getting it resolved. |
| 10:39:38 | 16 | So I told you a bit about me.  And let me ask you |
| 10:39:42 | 17 | this as a first question, if you are considering hiring me |
| 10:39:46 | 18 | as your lawyer, raise your hand if you'd want to know more |
| 10:39:49 | 19 | about me.  Right?  I mean, that's reasonable, right?  You |
| 10:39:56 | 20 | want to make sure you're hiring the right lawyer. |
| 10:39:58 | 21 | And so if we turn that around here, we want to |
| 10:40:02 | 22 | make sure we're selecting the right jury, and that's why |
| 10:40:05 | 23 | I'm going to ask some questions of you today.  I'm going to |
| 10:40:09 | 24 | follow up on the questionnaires that you guys filled out. |
| 10:40:12 | 25 | Can everyone hear me okay? |

10:40:15   1          Ms. Gabbie, I see you struggling.  How about I get

10:40:20   2    a little closer to the microphone.  Is that okay?  Is that

10:40:23   3    better.

10:40:23   4          I'm going to follow up on the questionnaires that

10:40:26   5    you guys filled out.  We appreciate you doing that.  That

10:40:28   6    helps us move a bit quicker.  I'm going to also delve into

10:40:34   7    some other questions.

10:40:35   8          So when I say "the right jury," all I mean by that

10:40:36   9    is we want to get a fair jury, someone that can be

10:40:38   10   impartial.  And every single one of us believes we can be

10:40:42   11   fair, and probably 99 percent of the time we can be fair.

10:40:47   12   But sometimes just based on some experience in our life or

10:40:50   13   some belief that we may have, we may not be able to be

10:40:54   14   entirely fair.

10:40:55   15         And so in the courtroom, we talk about that in

10:40:59   16   terms of biases or prejudices.  And those are really heavy

10:41:02   17   words when we're outside of the courtroom, but in here, all

10:41:05   18   it means is, are you leaning in one direction?

10:41:09   19         So before you hear any evidence or regardless of

10:41:13   20   the evidence or regardless of the instructions from the

10:41:15   21   Court, are you leaning in favor of one party or the other?

10:41:20   22         And if you are, now is the time to talk about it

10:41:23   23   because this is our only opportunity to have this kind of

10:41:27   24   discussion.

10:41:29   25         Will you pull up our slides, please?

10:41:42   1          The Court told you already this case is about

10:41:50   2   damages.  I expect the Court will instruct you at some

10:41:54   3   point that a patent holder is entitled to damages when

10:41:57   4   someone infringes his patent.  And I think it'll be

10:41:59   5   something like this.

10:42:02   6          So the jury that's seated here is going to be

10:42:05   7   asked to determine the damages that OnePlus is required to

10:42:09   8   pay for infringing Pantech's patents.  And the patents here

10:42:15   9   relate to technology for smartphones.

10:42:18  10          One of them, on the right, the '654, improves the

10:42:22  11   way that we interact with the phone, literally the way that

10:42:25  12   we interact with the screen, the user interface technology.

10:42:30  13          The other three improve the 4G and 5G networks

10:42:34  14   that the phones operate on.  So some of you may be aware

10:42:37  15   that the networks operate and use standardized technology,

10:42:42  16   and the standardized technology is important so that

10:42:44  17   different devices from different manufacturers can all

10:42:48  18   communicate together on the network.  And so if the devices

10:42:52  19   are compliant with the standards, then everything works --

10:42:56  20   works well.

10:42:57  21          Three of these patents, the '247, the '954, and

10:43:01  22   the '839, are essential -- they are standard essential

10:43:06  23   patents to the 4G and 5G cellular standards.

10:43:12  24          So since this case is about damages, the first

10:43:18  25   question I want to ask is -- let's see -- if the Court

10:43:25   1   instructs you that it's been determined that certain

10:43:28   2   OnePlus phones infringe the patents in this case and that

10:43:33   3   Pantech is entitled to recover damages, do you have any

10:43:37   4   reservations following that instruction?

10:43:41   5           In the first section, do you have any reservations

10:43:44   6   saying, look, if you haven't proved infringement to me, I

10:43:49   7   can't award damages?  Does anyone think that?  Is everyone

10:43:54   8   comfortable following the Court's instruction that the

10:43:55   9   patents are infringed and that Pantech is entitled to

10:43:59  10   damages, it's just a question of how much?

10:44:02  11           Is anyone concerned with that?

10:44:07  12           How about in the second section here, would anyone

10:44:09  13   have trouble following that instruction?

10:44:11  14           And in the third section, anyone?

10:44:13  15           And how about over here on the far right, is

10:44:16  16   anyone troubled by the idea that -- and thinks, look, if

10:44:19  17   you're going to ask me to award damages, you've got to

10:44:22  18   prove to me that the patents are infringed.

10:44:26  19           Okay.  Thank you.

10:44:30  20           Has anyone heard of OnePlus before today?

10:44:38  21           Anyone heard of a parent company called OPPO,

10:44:43  22   O-P-P-O?

10:44:46  23           I assume since I'm not seeing hands, no one owns

10:44:49  24   any OnePlus -- OnePlus products; is that right?  No hands.

10:44:53  25           Anyone here been to China?

| | | |
|---|---|---|
| 10:44:56 | 1 | Anyone here been to Korea? |
| 10:44:58 | 2 | You all saw the patent video today and some of you |
| 10:45:08 | 3 | probably already knew this, some of you may have learned it |
| 10:45:11 | 4 | today, but patent -- a patent is a property right, and I'm |
| 10:45:21 | 5 | wondering if anybody has any difficulty with the idea that |
| 10:45:24 | 6 | a patent does provide a property right?  Does anybody think |
| 10:45:30 | 7 | or anyone have any ideas that, oh, I don't believe in the |
| 10:45:33 | 8 | patent system or think that intellectual property deserves |
| 10:45:36 | 9 | protection? |
| 10:45:36 | 10 | I'm not seeing any hands. |
| 10:45:40 | 11 | Ms. Thomas, you would mind if I speak with you? |
| 10:45:53 | 12 | Yes, ma'am. |
| 10:45:53 | 13 | How are you? |
| 10:45:56 | 14 | POTENTIAL JUROR:  I'm fine. |
| 10:45:57 | 15 | MR. CULBERTSON:  Good.  Good. |
| 10:45:59 | 16 | I think I recall reading in your questionnaire |
| 10:46:03 | 17 | that you had either little or maybe zero faith in the |
| 10:46:09 | 18 | Government; is that right? |
| 10:46:11 | 19 | POTENTIAL JUROR:  Not in the Government, in the |
| 10:46:13 | 20 | justice system in general speaking. |
| 10:46:17 | 21 | MR. CULBERTSON:  I'm sorry, can you aim the mic to |
| 10:46:19 | 22 | you?  Thank you. |
| 10:46:19 | 23 | POTENTIAL JUROR:  Not particularly in the |
| 10:46:21 | 24 | Government in particular, but somewhat in the justice |
| 10:46:22 | 25 | system, yes. |

| | | |
|---|---|---|
| 10:46:22 | 1 | MR. CULBERTSON:  The justice system?  Can you |
| 10:46:24 | 2 | share with us what it is that -- |
| 10:46:25 | 3 | POTENTIAL JUROR:  I -- just from observing |
| 10:46:28 | 4 | different things, I am one of those who very heavily backs |
| 10:46:33 | 5 | the blue but doesn't necessarily like what I see in the |
| 10:46:38 | 6 | justice system. |
| 10:46:38 | 7 | MR. CULBERTSON:  You say you back the blue; is |
| 10:46:41 | 8 | that what I heard? |
| 10:46:42 | 9 | POTENTIAL JUROR:  Uh-huh. |
| 10:46:43 | 10 | MR. CULBERTSON:  Okay.  Does that affect how you |
| 10:46:45 | 11 | view the parties here today?  So my client, Pantech, |
| 10:46:49 | 12 | brought this lawsuit, right, for -- to recover damages on |
| 10:46:52 | 13 | these patents.  Does that -- does your -- your view about |
| 10:46:55 | 14 | the justice system affect how the parties start off in your |
| 10:46:59 | 15 | mind? |
| 10:47:00 | 16 | POTENTIAL JUROR:  In this sort of case, no. |
| 10:47:05 | 17 | MR. CULBERTSON:  Okay.  You may be talking about |
| 10:47:06 | 18 | in a criminal context? |
| 10:47:07 | 19 | POTENTIAL JUROR:  More so, yes, sir. |
| 10:47:09 | 20 | MR. CULBERTSON:  Okay.  Understood.  Understood. |
| 10:47:13 | 21 | Do you have any concerns about the idea that a |
| 10:47:16 | 22 | patent is a property right that can be sold or transferred |
| 10:47:23 | 23 | or assigned just like a piece of real property? |
| 10:47:26 | 24 | POTENTIAL JUROR:  No, sir.  In fact, I'd be pretty |
| 10:47:29 | 25 | strict on it in my own mind. |

| | | |
|---|---|---|
| 10:47:32 | 1 | MR. CULBERTSON:  I'm sorry? |
| 10:47:33 | 2 | POTENTIAL JUROR:  I'd be pretty strict on it in my |
| 10:47:36 | 3 | own mind. |
| 10:47:37 | 4 | MR. CULBERTSON:  Can you tell me what you mean by |
| 10:47:40 | 5 | that? |
| 10:47:40 | 6 | POTENTIAL JUROR:  If someone has a patent, then |
| 10:47:42 | 7 | they deserve everything coming to them because of the |
| 10:47:43 | 8 | patent.  It's their property.  I don't know how else to |
| 10:47:45 | 9 | explain that. |
| 10:47:46 | 10 | MR. CULBERTSON:  Okay.  Okay.  I understand. |
| 10:47:47 | 11 | Thank you.  I appreciate that. |
| 10:47:52 | 12 | So what you probably learned in the video is that |
| 10:47:55 | 13 | like a fence that can keep people out of your pasture or |
| 10:47:58 | 14 | your field or your home, a patent is a property right that |
| 10:48:01 | 15 | allows the owner to exclude others from using the invention |
| 10:48:05 | 16 | in the United States. |
| 10:48:08 | 17 | Is there anyone -- Mr. Griffin, may I speak with |
| 10:48:12 | 18 | you? |
| 10:48:17 | 19 | Does that concept of a patent being a property |
| 10:48:19 | 20 | right cause you any -- any concern, or do you have any |
| 10:48:23 | 21 | problem with that issue? |
| 10:48:23 | 22 | POTENTIAL JUROR:  No. |
| 10:48:24 | 23 | MR. CULBERTSON:  Okay.  What -- what you'll learn |
| 10:48:28 | 24 | in this case is that Pantech acquired these patents from |
| 10:48:33 | 25 | others.  So they were invented by other companies, they |

10:48:39  1    traded hands, and Pantech ultimately bought them.

10:48:42  2          Do you feel like because Pantech bought the

10:48:45  3    patents from someone else and didn't get them directly from

10:48:48  4    the Patent Office that they should have any fewer rights or

10:48:53  5    they're entitled to less damages?

10:48:54  6          POTENTIAL JUROR:  No.  They owned them when they

10:48:57  7    bought them.

10:48:57  8          MR. CULBERTSON:  Okay.  Thank you, Mr. Griffin.  I

10:49:02  9    appreciate it.

10:49:03  10          Does anyone disagree?  Does anyone think that

10:49:06  11    because Pantech purchased the patents and they didn't get

10:49:09  12    them directly from the Patent Office, that they should

10:49:13  13    somehow or for some reason have fewer rights or be entitled

10:49:19  14    to less damages for that reason?

10:49:23  15          Thank you.

10:49:24  16          Mr. Bowman, may I speak with you?

10:49:39  17          Do I understand correctly you work with Goodyear?

10:49:43  18          POTENTIAL JUROR:  Yes.

10:49:44  19          MR. CULBERTSON:  Okay.  Do you know if Goodyear

10:49:45  20    has intellectual property?

10:49:46  21          POTENTIAL JUROR:  They -- I don't know if -- I'm

10:49:48  22    sure they own a few things.

10:49:50  23          MR. CULBERTSON:  Okay.  Do you have any direct

10:49:52  24    experience with that?

10:49:53  25          POTENTIAL JUROR:  Experience with some of their

| | |
|---|---|
| 10:49:54 | 1 |
| 10:49:58 | 2 |
| 10:49:59 | 3 |
| 10:50:01 | 4 |
| 10:50:04 | 5 |
| 10:50:06 | 6 |
| 10:50:09 | 7 |
| 10:50:09 | 8 |
| 10:50:12 | 9 |
| 10:50:13 | 10 |
| 10:50:19 | 11 |
| 10:50:24 | 12 |
| 10:50:26 | 13 |
| 10:50:27 | 14 |
| 10:50:28 | 15 |
| 10:50:30 | 16 |
| 10:50:30 | 17 |
| 10:50:32 | 18 |
| 10:50:35 | 19 |
| 10:50:39 | 20 |
| 10:50:40 | 21 |
| 10:50:42 | 22 |
| 10:50:52 | 23 |
| 10:50:54 | 24 |
| 10:51:04 | 25 |

1  programs they have there, but we just have it on our

2  equipment, that's it.

3         MR. CULBERTSON:  Any experience with the efforts

4  that Goodyear takes to protect its intellectual property?

5         POTENTIAL JUROR:  I'm sure they do.

6         MR. CULBERTSON:  Okay.  Do you have any -- how do

7  you feel about that?

8         POTENTIAL JUROR:  I mean, if it's their property,

9  I mean, fight for it.

10         MR. CULBERTSON:  If someone is using that property

11  without permission, do you think Goodyear is in its rights

12  to go sue for damages for that?

13         POTENTIAL JUROR:  I mean, sure.

14         MR. CULBERTSON:  Okay.  Anything about that cause

15  you concern at all?

16         POTENTIAL JUROR:  No.

17         MR. CULBERTSON:  Do you know of any other way that

18  a company can protect its intellectual property?

19         POTENTIAL JUROR:  I mean, if it's their property,

20  do everything you can to protect it.

21         MR. CULBERTSON:  Okay.  Thank you, sir.  I

22  appreciate it.

23         Mr. Bennett, may I speak with you?

24         Are you also with Goodyear?

25         POTENTIAL JUROR:  Yes.

| | | |
|---|---|---|
| 10:51:05 | 1 | MR. CULBERTSON:  Do you know Mr. Bowman? |
| 10:51:06 | 2 | POTENTIAL JUROR:  No. |
| 10:51:07 | 3 | MR. CULBERTSON:  Okay.  Do you have any experience |
| 10:51:09 | 4 | or knowledge about intellectual property that Goodyear may |
| 10:51:12 | 5 | have? |
| 10:51:14 | 6 | POTENTIAL JUROR:  Yes. |
| 10:51:14 | 7 | MR. CULBERTSON:  Okay.  Can you tell us about |
| 10:51:15 | 8 | that, not disclose any secrets, but does Goodyear have |
| 10:51:22 | 9 | patents, for example? |
| 10:51:23 | 10 | POTENTIAL JUROR:  Yes. |
| 10:51:23 | 11 | MR. CULBERTSON:  Does Goodyear have trade secrets, |
| 10:51:23 | 12 | for example? |
| 10:51:23 | 13 | POTENTIAL JUROR:  Yes. |
| 10:51:27 | 14 | MR. CULBERTSON:  Does Goodyear take efforts to |
| 10:51:30 | 15 | protect that?  Does Goodyear make efforts to protect its |
| 10:51:30 | 16 | intellectual property? |
| 10:51:31 | 17 | POTENTIAL JUROR:  Yes. |
| 10:51:31 | 18 | MR. CULBERTSON:  Okay.  And can you -- do you have |
| 10:51:34 | 19 | any experience with how they go about protecting their |
| 10:51:37 | 20 | intellectual property? |
| 10:51:38 | 21 | POTENTIAL JUROR:  User agreements, contracts. |
| 10:51:43 | 22 | MR. CULBERTSON:  Okay.  And what happens if |
| 10:51:46 | 23 | someone is using Goodyear's intellectual property without |
| 10:51:50 | 24 | permission? |
| 10:51:52 | 25 | POTENTIAL JUROR:  I don't have an answer. |

92

| | | |
|---|---|---|
| 10:51:57 | 1 | MR. CULBERTSON:  Okay.  Would you have any problem |
| 10:51:58 | 2 | if Goodyear were to pursue a lawsuit in that instance? |
| 10:52:04 | 3 | POTENTIAL JUROR:  No. |
| 10:52:05 | 4 | MR. CULBERTSON:  Okay.  Do you know of any other |
| 10:52:06 | 5 | way that Goodyear can enforce its intellectual property |
| 10:52:09 | 6 | rights? |
| 10:52:10 | 7 | POTENTIAL JUROR:  No. |
| 10:52:10 | 8 | MR. CULBERTSON:  Okay.  All right.  Thank you, |
| 10:52:12 | 9 | sir.  I appreciate it. |
| 10:52:39 | 10 | Ms. Petersen, may I speak with you? |
| 10:52:50 | 11 | How are you? |
| 10:52:51 | 12 | POTENTIAL JUROR:  Good. |
| 10:52:52 | 13 | MR. CULBERTSON:  Good.  Thank you for coming up. |
| 10:52:54 | 14 | I think I read that you may have some strong |
| 10:52:58 | 15 | feelings about foreign companies. |
| 10:53:00 | 16 | POTENTIAL JUROR:  Oh, not -- more towards land.  I |
| 10:53:07 | 17 | don't think they should own land here. |
| 10:53:08 | 18 | MR. CULBERTSON:  Okay.  Do you have any issue with |
| 10:53:11 | 19 | foreign companies owning United States patents? |
| 10:53:13 | 20 | POTENTIAL JUROR:  No. |
| 10:53:14 | 21 | MR. CULBERTSON:  Okay.  And so you wouldn't have |
| 10:53:18 | 22 | any issue with the fact that Pantech as a Korean company is |
| 10:53:23 | 23 | protecting its United States intellectual property rights? |
| 10:53:27 | 24 | POTENTIAL JUROR:  That's intellectual property. |
| 10:53:29 | 25 | It's -- it has every right to protect it. |

10:53:32     1            MR. CULBERTSON:   Okay.   Okay.   Thank you.   I

10:53:35     2    appreciate that.

10:53:36     3            Does anyone feel differently?   Does anyone feel

10:53:45     4    like overseas companies or inventors should not be allowed

10:53:50     5    to have or obtain United States patents?

10:53:58     6            Not seeing any hands.

10:53:59     7            Ms. Davies, may I speak with you?

10:54:14     8            I think I -- I read in your questionnaire that you

10:54:18     9    said that Chinese or Korean companies, or both, were

10:54:25    10    competent, competitive, and that we needed to tread

10:54:28    11    carefully when dealing with them.   Is that right?

10:54:31    12            POTENTIAL JUROR:   Yes.

10:54:31    13            MR. CULBERTSON:   Can you -- can you tell us what

10:54:33    14    you mean by that?

10:54:34    15            POTENTIAL JUROR:   I mean you have to be very

10:54:38    16    careful in the sense that they can be astute or cunning or

10:54:46    17    something like that.

10:54:47    18            MR. CULBERTSON:   Okay.   Do you have that feeling

10:54:49    19    about both Korean and Chinese companies?

10:54:53    20            POTENTIAL JUROR:   Anybody.

10:54:53    21            MR. CULBERTSON:   Okay.   Any -- any company or any

10:54:56    22    foreign company?

10:54:57    23            POTENTIAL JUROR:   No.   What can I say to that?   I

10:55:05    24    think you shouldn't treat anybody thinking that they are

10:55:09    25    less than you or with innocence or something like that.

10:55:13    1    You have to know what they are about.

10:55:18    2            MR. CULBERTSON:  Okay.

10:55:19    3            POTENTIAL JUROR:  And I am not being prejudice

10:55:21    4    about that.

10:55:23    5            MR. CULBERTSON:  Understood.  Thank you.

10:55:24    6            Would you have any difficulty treating these

10:55:28    7    companies fairly, one being from Korea and the other being

10:55:32    8    from China?

10:55:33    9            POTENTIAL JUROR:  No.

10:55:34    10           MR. CULBERTSON:  Okay.  Thank you, Ms. Davies, I

10:55:37    11   appreciate -- oh, actually, before I let you go, can I ask

10:55:39    12   you one more question?

10:55:41    13           POTENTIAL JUROR:  Yes.

10:55:41    14           MR. CULBERTSON:  I think maybe your husband is a

10:55:42    15   patent holder?

10:55:43    16           POTENTIAL JUROR:  Yes.

10:55:44    17           MR. CULBERTSON:  Is that correct?

10:55:45    18           POTENTIAL JUROR:  Yes.

10:55:45    19           MR. CULBERTSON:  Four patents; is that right?

10:55:47    20           POTENTIAL JUROR:  Yes.  I had to ask him how many

10:55:50    21   he has because he's always inventing something.

10:55:52    22           MR. CULBERTSON:  And does he still own them?

10:55:54    23           POTENTIAL JUROR:  Some of them, yes.  I think four

10:55:58    24   he still owns.

10:56:00    25           MR. CULBERTSON:  Okay.

| | | |
|---|---|---|
| 10:56:00 | 1 | POTENTIAL JUROR:  Some others are expired. |
| 10:56:02 | 2 | MR. CULBERTSON:  Okay. |
| 10:56:03 | 3 | POTENTIAL JUROR:  Yes. |
| 10:56:03 | 4 | MR. CULBERTSON:  Did he ever sell his patents or |
| 10:56:05 | 5 | license them? |
| 10:56:06 | 6 | POTENTIAL JUROR:  Yes, yes, he does. |
| 10:56:08 | 7 | MR. CULBERTSON:  Okay.  And so, in your |
| 10:56:14 | 8 | experience, is there anything wrong with licensing your |
| 10:56:18 | 9 | patents to monetize them? |
| 10:56:19 | 10 | POTENTIAL JUROR:  No, of course not. |
| 10:56:22 | 11 | MR. CULBERTSON:  Okay.  Okay.  And what would he |
| 10:56:23 | 12 | do if somebody was using his patent without permission? |
| 10:56:26 | 13 | POTENTIAL JUROR:  Yeah, he wouldn't be happy about |
| 10:56:30 | 14 | that, and take all the measurements that you need to take. |
| 10:56:35 | 15 | MR. CULBERTSON:  Okay.  Do you know of anything |
| 10:56:38 | 16 | other than pursuing a legal action that -- to fix that |
| 10:56:42 | 17 | situation? |
| 10:56:43 | 18 | POTENTIAL JUROR:  Yeah, I don't think so.  I mean, |
| 10:56:45 | 19 | you can settle. |
| 10:56:45 | 20 | MR. CULBERTSON:  Uh-huh. |
| 10:56:47 | 21 | POTENTIAL JUROR:  But something needs to be done. |
| 10:56:49 | 22 | MR. CULBERTSON:  Okay.  Thank you very much. |
| 10:56:51 | 23 | Appreciate that. |
| 10:56:52 | 24 | Your Honor, I didn't ask.  May I have a |
| 10:56:59 | 25 | five-minute warning? |

| | | |
|---|---|---|
| 10:57:00 | 1 | THE COURT:  Yes. |
| 10:57:00 | 2 | MR. CULBERTSON:  And can you tell me where I am |
| 10:57:03 | 3 | right now? |
| 10:57:03 | 4 | THE COURT:  11 minutes, 11:45. |
| 10:57:06 | 5 | MR. CULBERTSON:  Thank you very much. |
| 10:57:07 | 6 | We're on the clock here.  I'm going to try to move |
| 10:57:11 | 7 | a bit quicker, folks. |
| 10:57:18 | 8 | You met Dr. Jung this morning.  He'll be our first |
| 10:57:23 | 9 | witness.  He understands English, he speaks English, but he |
| 10:57:28 | 10 | has a heavy accent, and so we're going to use an |
| 10:57:33 | 11 | interpreter to help us today. |
| 10:57:35 | 12 | And so my question is, does anyone have concerns |
| 10:57:39 | 13 | about crediting testimony that comes through an interpreter |
| 10:57:39 | 14 | any different than from a witness that is speaking to you |
| 10:57:47 | 15 | in English?  That bother anybody at all?  Anyone think, |
| 10:57:47 | 16 | well, if I'm going to believe you, you better -- you better |
| 10:57:50 | 17 | say it to me in English? |
| 10:57:52 | 18 | Okay.  Ms. Allen, can I speak with you? |
| 10:58:09 | 19 | How are you? |
| 10:58:14 | 20 | POTENTIAL JUROR:  I'm good.  How are you? |
| 10:58:17 | 21 | MR. CULBERTSON:  I'm good.  Thank you. |
| 10:58:18 | 22 | I read in your questionnaire that, like a lot of |
| 10:58:21 | 23 | people, you prefer made in the USA. |
| 10:58:24 | 24 | POTENTIAL JUROR:  If possible. |
| 10:58:25 | 25 | MR. CULBERTSON:  Okay.  Could I get you to get a |

| | | |
|---|---|---|
| 10:58:28 | 1 | little closer? |
| 10:58:29 | 2 | POTENTIAL JUROR:  If possible. |
| 10:58:29 | 3 | MR. CULBERTSON:  Okay.  How does that view, which |
| 10:58:33 | 4 | a lot of people have, affect you as you learn today that |
| 10:58:38 | 5 | we've got a Korean company suing a Chinese company for |
| 10:58:41 | 6 | patent infringement damages? |
| 10:58:43 | 7 | POTENTIAL JUROR:  It doesn't. |
| 10:58:43 | 8 | MR. CULBERTSON:  Okay.  Any reason why you |
| 10:58:45 | 9 | couldn't be fair to these companies? |
| 10:58:47 | 10 | POTENTIAL JUROR:  No. |
| 10:58:48 | 11 | MR. CULBERTSON:  Okay.  Do you consider yourself a |
| 10:58:52 | 12 | big-picture person or detail-oriented? |
| 10:58:55 | 13 | POTENTIAL JUROR:  I try to look at both of them. |
| 10:58:58 | 14 | MR. CULBERTSON:  Yeah.  Are you tech -- are you |
| 10:59:01 | 15 | savvy with technology? |
| 10:59:03 | 16 | POTENTIAL JUROR:  Some.  Just with the programs |
| 10:59:06 | 17 | I've used where I work -- you know, other than, you know, |
| 10:59:10 | 18 | your phone, playing on your phone, Facebook, stuff like |
| 10:59:13 | 19 | that. |
| 10:59:14 | 20 | MR. CULBERTSON:  What type of phone do you have? |
| 10:59:16 | 21 | POTENTIAL JUROR:  I have a smartphone. |
| 10:59:18 | 22 | MR. CULBERTSON:  Which manufacturer?  Do you know? |
| 10:59:21 | 23 | POTENTIAL JUROR:  Samsung. |
| 10:59:22 | 24 | MR. CULBERTSON:  Samsung. |
| 10:59:23 | 25 | POTENTIAL JUROR:  Uh-huh. |

| | | |
|---|---|---|
| 10:59:24 | 1 | MR. CULBERTSON:  Okay.  Got you. |
| 10:59:25 | 2 | Anything -- as you're sitting there -- I usually |
| 10:59:28 | 3 | ask it at the end, but I may ask it now.  As you're sitting |
| 10:59:32 | 4 | there, are you thinking, I wish he'd ask this question, |
| 10:59:35 | 5 | he'd like to know this about me? |
| 10:59:38 | 6 | POTENTIAL JUROR:  No. |
| 10:59:38 | 7 | MR. CULBERTSON:  No?  Okay.  Great.  Thank you |
| 10:59:41 | 8 | very much.  I appreciate it. |
| 10:59:42 | 9 | So a lot of you indicated that you think there's |
| 10:59:48 | 10 | too many lawsuits or that damages are too high.  And I will |
| 10:59:52 | 11 | tell you that in some respects, I agree with you, there are |
| 10:59:59 | 12 | too many lawsuits. |
| 11:00:00 | 13 | What I'd like you to do is I'm going to ask the |
| 11:00:03 | 14 | first section here, did anybody have a patent infringement |
| 11:00:08 | 15 | suit in mind when they thought there were too many lawsuits |
| 11:00:11 | 16 | or damages were too high?  Were y'all thinking more about |
| 11:00:16 | 17 | personal injury lawsuits? |
| 11:00:21 | 18 | Raise your hand if you were thinking about a |
| 11:00:23 | 19 | personal injury lawsuit when you -- when you gave that |
| 11:00:25 | 20 | answer. |
| 11:00:26 | 21 | Handful of you, right? |
| 11:00:30 | 22 | Ms. Bolton, can I speak with you? |
| 11:00:38 | 23 | Hi. |
| 11:00:42 | 24 | POTENTIAL JUROR:  Hi. |
| 11:00:43 | 25 | MR. CULBERTSON:  How are you today? |

| | | |
|---|---|---|
| 11:00:44 | 1 | POTENTIAL JUROR:  I'm good.  How are you? |
| 11:00:46 | 2 | MR. CULBERTSON:  I'm good.  Thank you. |
| 11:00:48 | 3 | I think I read that you thought that the number of |
| 11:00:51 | 4 | lawsuits was too high? |
| 11:00:52 | 5 | POTENTIAL JUROR:  Yes, I was thinking of the |
| 11:00:55 | 6 | personal. |
| 11:00:55 | 7 | MR. CULBERTSON:  I'm sorry? |
| 11:00:55 | 8 | POTENTIAL JUROR:  The personal. |
| 11:00:55 | 9 | MR. CULBERTSON:  The personal-injury type -- |
| 11:00:57 | 10 | POTENTIAL JUROR:  That's what I was thinking. |
| 11:00:59 | 11 | MR. CULBERTSON:  Okay.  Is that a view -- do I |
| 11:01:01 | 12 | need to be concerned at all as the party that brought this |
| 11:01:04 | 13 | lawsuit -- |
| 11:01:04 | 14 | POTENTIAL JUROR:  No. |
| 11:01:05 | 15 | MR. CULBERTSON:  -- about that view? |
| 11:01:06 | 16 | POTENTIAL JUROR:  No. |
| 11:01:07 | 17 | MR. CULBERTSON:  Okay.  Thank you very much. |
| 11:01:07 | 18 | In the second section here, does anybody's view |
| 11:01:10 | 19 | that there are too many lawsuits, if you have that view, |
| 11:01:12 | 20 | does that carry over into a patent infringement context? |
| 11:01:16 | 21 | Raise your hand if you were thinking about personal |
| 11:01:20 | 22 | injury-type lawsuits, if you gave that answer that there |
| 11:01:22 | 23 | were maybe too many lawsuits. |
| 11:01:26 | 24 | Okay.  Thank you. |
| 11:01:27 | 25 | Ms. Gabbie, can I speak with you? |

| | | |
|---|---|---|
| 11:01:49 | 1 | How are you today? |
| 11:01:50 | 2 | POTENTIAL JUROR:  Fine.  Thank you. |
| 11:01:52 | 3 | MR. CULBERTSON:  Are you able to hear me back |
| 11:01:53 | 4 | there? |
| 11:01:54 | 5 | POTENTIAL JUROR:  It's hard. |
| 11:01:55 | 6 | MR. CULBERTSON:  It's hard.  Okay.  I think I read |
| 11:02:00 | 7 | in your questionnaire you thought there were too many |
| 11:02:04 | 8 | lawsuits and damages were too large.  Does that go back to |
| 11:02:07 | 9 | the -- maybe the medical malpractice and personal injury |
| 11:02:10 | 10 | context? |
| 11:02:11 | 11 | POTENTIAL JUROR:  Uh-huh, yes. |
| 11:02:12 | 12 | MR. CULBERTSON:  Yes.  Do you have any concerns -- |
| 11:02:15 | 13 | or should I have any concerns as the -- representing the |
| 11:02:20 | 14 | Pantech, the patentee here, about your views of lawsuits? |
| 11:02:24 | 15 | POTENTIAL JUROR:  No. |
| 11:02:25 | 16 | MR. CULBERTSON:  Okay.  Any reason why you |
| 11:02:26 | 17 | couldn't be fair? |
| 11:02:27 | 18 | POTENTIAL JUROR:  I can be fair. |
| 11:02:28 | 19 | MR. CULBERTSON:  Okay.  All right.  Thank you very |
| 11:02:30 | 20 | much.  I appreciate that. |
| 11:02:31 | 21 | Mr. Stovall, can I speak with you? |
| 11:02:43 | 22 | How are you today? |
| 11:02:53 | 23 | POTENTIAL JUROR:  Good. |
| 11:02:53 | 24 | MR. CULBERTSON:  Okay.  I think I saw that you had |
| 11:02:56 | 25 | that view, too, that there were too many -- too many |

11:02:59    1    lawsuits.

11:03:00    2            POTENTIAL JUROR:  Yes.

11:03:00    3            MR. CULBERTSON:  And as I understand it, you're in

11:03:02    4    the insurance --

11:03:03    5            POTENTIAL JUROR:  Yes.

11:03:04    6            MR. CULBERTSON:  -- industry.  Is that where that

11:03:07    7    view comes from?

11:03:07    8            POTENTIAL JUROR:  Yes.

11:03:08    9            MR. CULBERTSON:  Okay.  Were you thinking mainly

11:03:09   10    about personal injury work?

11:03:11   11            POTENTIAL JUROR:  Both.

11:03:12   12            MR. CULBERTSON:  Beyond that, okay.  In general,

11:03:13   13    you think there are too many lawsuits.

11:03:15   14            Does that affect your view of the case as you walk

11:03:19   15    in, just knowing that, you know, I feel like there are too

11:03:22   16    many lawsuits and...

11:03:24   17            POTENTIAL JUROR:  Probably, yeah.

11:03:24   18            MR. CULBERTSON:  Okay.  Does it make you lean

11:03:26   19    towards the Defendant just naturally before --

11:03:29   20            POTENTIAL JUROR:  I wouldn't say it makes me lean

11:03:33   21    one way or another, but I think there are.

11:03:35   22            MR. CULBERTSON:  Okay.  And that's something

11:03:36   23    that's in your mind that would be difficult to get out?

11:03:38   24            POTENTIAL JUROR:  Yes.

11:03:39   25            MR. CULBERTSON:  Okay.  And is it a belief you've

| | | |
|---|---|---|
| 11:03:42 | 1 | held for a very long time? |
| 11:03:43 | 2 | POTENTIAL JUROR:  Uh-huh. |
| 11:03:44 | 3 | MR. CULBERTSON:  Okay.  And would it stick with |
| 11:03:46 | 4 | you despite the instructions from the Court or what the |
| 11:03:48 | 5 | evidence is? |
| 11:03:49 | 6 | POTENTIAL JUROR:  No. |
| 11:03:50 | 7 | MR. CULBERTSON:  Okay.  You could be fair? |
| 11:03:52 | 8 | POTENTIAL JUROR:  I could be fair. |
| 11:03:53 | 9 | MR. CULBERTSON:  Thank you.  I appreciate that. |
| 11:03:58 | 10 | THE COURT:  Mr. Culbertson, you have five minutes |
| 11:03:59 | 11 | remaining. |
| 11:04:00 | 12 | MR. CULBERTSON:  Thank you, Your Honor. |
| 11:04:01 | 13 | Ms. Barrett, may I speak with you? |
| 11:04:12 | 14 | I think I read in your questionnaire that you had |
| 11:04:16 | 15 | zero trust in Government; is that right? |
| 11:04:19 | 16 | POTENTIAL JUROR:  Yes, sir. |
| 11:04:20 | 17 | MR. CULBERTSON:  And where does that feeling come |
| 11:04:22 | 18 | from? |
| 11:04:23 | 19 | POTENTIAL JUROR:  I just don't feel like a lot of |
| 11:04:25 | 20 | the representatives represent the people like they did in |
| 11:04:28 | 21 | the past. |
| 11:04:28 | 22 | MR. CULBERTSON:  Okay.  So you're talking about |
| 11:04:30 | 23 | our elected representatives? |
| 11:04:32 | 24 | POTENTIAL JUROR:  Yes. |
| 11:04:32 | 25 | MR. CULBERTSON:  Okay.  Does that feeling affect |

| 11:04:34 | 1 | your views of the Patent and Trademark Office or the work |
| 11:04:37 | 2 | that they do? |
| 11:04:38 | 3 | POTENTIAL JUROR:  No, sir. |
| 11:04:40 | 4 | MR. CULBERTSON:  Okay.  Have faith in the work |
| 11:04:42 | 5 | that they do at the Patent Office? |
| 11:04:43 | 6 | POTENTIAL JUROR:  Yes, sir. |
| 11:04:44 | 7 | MR. CULBERTSON:  Okay.  Thank you very much. |
| 11:04:46 | 8 | POTENTIAL JUROR:  Uh-huh. |
| 11:04:46 | 9 | MR. CULBERTSON:  Judge Schroeder talked with you a |
| 11:04:52 | 10 | little bit about the burden of proof, and I want to touch |
| 11:04:57 | 11 | on that, and he talked about tipping the scales in favor. |
| 11:05:00 | 12 | And what that means is the preponderance of evidence is |
| 11:05:03 | 13 | just tipping them ever so slightly. |
| 11:05:06 | 14 | If you think about on a football field, it means |
| 11:05:10 | 15 | that our burden is to drive the ball just across the |
| 11:05:14 | 16 | 50-yard line into their territory.  Sometimes I talk with |
| 11:05:19 | 17 | teachers that it means that a failing grade, right, a 51, |
| 11:05:23 | 18 | is actually a hundred.  And that's our burden.  Some people |
| 11:05:29 | 19 | have a problem with that. |
| 11:05:30 | 20 | Does anyone think, look, if I'm going to be asked |
| 11:05:33 | 21 | to award damages, I'm going to need you to prove it to me |
| 11:05:37 | 22 | by more than a preponderance of the evidence?  Anyone at |
| 11:05:40 | 23 | all have a concern with that? |
| 11:05:41 | 24 | Ms. Hennek, may I speak with you? |
| 11:05:48 | 25 | You're a teacher or a former teacher? |

11:05:52  1          POTENTIAL JUROR:  Yes.

11:05:52  2          MR. CULBERTSON:  Okay.  So a 51 would get me a big

11:05:55  3    F, right?

11:05:56  4          POTENTIAL JUROR:  Yes, it would.

11:05:57  5          MR. CULBERTSON:  Do you have any problem with the

11:05:58  6    concept that a 51 means that Pantech actually carries its

11:06:03  7    burden in this case?

11:06:04  8          POTENTIAL JUROR:  Meaning like a pass/fail, either

11:06:06  9    you fail or you pass, is that kind of what you're --

11:06:11  10         MR. CULBERTSON:  Well, we have a burden to prove

11:06:12  11   our case by a preponderance of the evidence; we just have

11:06:14  12   to tip the scales ever so slightly.  And sometimes I think

11:06:17  13   about that as being just more than 50 percent of the

11:06:20  14   evidence being in our favor.

11:06:22  15         POTENTIAL JUROR:  So you squeak it by.

11:06:24  16         MR. CULBERTSON:  That's right.

11:06:24  17         POTENTIAL JUROR:  If you squeak it by, you got by.

11:06:26  18         MR. CULBERTSON:  Okay.  And would you be willing

11:06:28  19   to award the full value of damages even if we've only

11:06:32  20   convinced you by that much that we're entitled to damages?

11:06:35  21         POTENTIAL JUROR:  Possibly.

11:06:35  22         MR. CULBERTSON:  Okay.  Well, possibly makes me

11:06:39  23   wonder.  Does that give you some concern?

11:06:40  24         POTENTIAL JUROR:  Yeah.

11:06:41  25         MR. CULBERTSON:  Okay.  And -- and do you think

| | | |
|---|---|---|
| 11:06:46 | 1 | that if for you to be able to award the full measure of |
| 11:06:51 | 2 | damages, I'd have to prove it by more than a preponderance |
| 11:06:53 | 3 | of the evidence? |
| 11:06:54 | 4 | POTENTIAL JUROR:  I guess I never realized that |
| 11:06:58 | 5 | that's how it works in a civil case, so I just need to |
| 11:07:01 | 6 | process that that's what we're looking for and not -- |
| 11:07:05 | 7 | MR. CULBERTSON:  Okay. |
| 11:07:06 | 8 | POTENTIAL JUROR:  -- the full -- |
| 11:07:07 | 9 | MR. CULBERTSON:  Do you think if that's the |
| 11:07:09 | 10 | instruction with the Judge, that you would struggle with |
| 11:07:11 | 11 | that concept just as you are right now with me? |
| 11:07:14 | 12 | POTENTIAL JUROR:  I think I could come to grips |
| 11:07:16 | 13 | with that concept. |
| 11:07:17 | 14 | MR. CULBERTSON:  Okay.  Thank you very much. |
| 11:07:18 | 15 | POTENTIAL JUROR:  Uh-huh. |
| 11:07:19 | 16 | MR. CULBERTSON:  And so that's our burden to prove |
| 11:07:22 | 17 | damages, ladies and gentlemen. |
| 11:07:23 | 18 | And I like to think about damages in a patent case |
| 11:07:27 | 19 | like this.  If you imagine -- and maybe you don't have to |
| 11:07:31 | 20 | imagine, maybe some of you have this -- you own some |
| 11:07:33 | 21 | property, right, and it's been in your family for a long |
| 11:07:36 | 22 | time, and, you know, maybe you use it to hunt, maybe you |
| 11:07:40 | 23 | hike out there, maybe you just go hang out, maybe you're |
| 11:07:43 | 24 | hanging on to it to do something with in the future, but |
| 11:07:47 | 25 | it's green, and it's pretty, and it's yours, and you like |

| | | |
|---|---|---|
| 11:07:50 | 1 | it.  And you make the mistake of going on vacation, and you |
| 11:07:53 | 2 | come back, and it looks like this.  It's gone.  Someone's |
| 11:07:58 | 3 | clear-cut it. |
| 11:07:59 | 4 | And so you find out who it is, and you say, hey, |
| 11:08:04 | 5 | you took all my trees, right?  And they say, oh, well, how |
| 11:08:09 | 6 | about we pay you for 20 percent of those trees?  Who is |
| 11:08:13 | 7 | going to think that's okay? |
| 11:08:15 | 8 | Well, okay, 50 percent, is it okay if we pay you |
| 11:08:21 | 9 | for 50 percent of those trees?  Is that okay?  Who |
| 11:08:25 | 10 | thinks -- is there anyone that thinks that you should be |
| 11:08:27 | 11 | awarded anything less or be paid anything less than a |
| 11:08:33 | 12 | hundred percent of the trees that are gone?  Does everybody |
| 11:08:35 | 13 | agree that if that happens, you should get a hundred |
| 11:08:39 | 14 | percent of what's been taken from you? |
| 11:08:41 | 15 | And I know we're all agreeing here, but if anyone |
| 11:08:47 | 16 | is disagreeing with that, could you raise your hand and let |
| 11:08:50 | 17 | me know? |
| 11:08:51 | 18 | Okay.  Thank you very much. |
| 11:08:52 | 19 | THE COURT:  Mr. Culbertson, your time is expired. |
| 11:08:54 | 20 | MR. CULBERTSON:  Okay.  Thank you, Your Honor. |
| 11:08:55 | 21 | Ladies and gentlemen, thank you.  I look forward |
| 11:08:57 | 22 | to putting on our case. |
| 11:09:02 | 23 | THE COURT:  All right.  Mr. Thompson, I'll now |
| 11:09:03 | 24 | allow the Defendant to voir dire the jury. |
| 11:09:07 | 25 | MR. THOMPSON:  Your Honor, can I have a |

| | | |
|---|---|---|
| 11:09:09 | 1 | five-minute warning? |
| 11:09:10 | 2 | THE COURT:  You may. |
| 11:09:11 | 3 | MR. THOMPSON:  May it please the Court. |
| 11:09:12 | 4 | Good morning again.  My name is Blake Thompson, |
| 11:09:18 | 5 | and can you hear me -- can everyone hear me? |
| 11:09:20 | 6 | Ms. Gabbie, can you hear me? |
| 11:09:22 | 7 | POTENTIAL JUROR:  Yes. |
| 11:09:23 | 8 | MR. THOMPSON:  All right.  I'm going to do my |
| 11:09:25 | 9 | best.  My voice is a little unique, some people say.  So, |
| 11:09:26 | 10 | hopefully, you can hear me. |
| 11:09:27 | 11 | I'll just tell you all a little bit about myself |
| 11:09:29 | 12 | because that's what Mr. Culbertson has done and the Judge, |
| 11:09:33 | 13 | and you all are -- been so kind to give us information |
| 11:09:36 | 14 | about yourselves, that's probably only fair. |
| 11:09:37 | 15 | I live in Tyler.  I grew up in a town of Overton, |
| 11:09:43 | 16 | which is in East Texas, if you all know where that is.  I'm |
| 11:09:49 | 17 | married, and I have one son.  He's in fourth grade.  I got |
| 11:09:53 | 18 | a little late start in life. |
| 11:09:56 | 19 | I went to UT Tyler and got my bachelor's degree, |
| 11:09:58 | 20 | and then I went to Baylor Law School, and that's where I |
| 11:10:02 | 21 | was in school with Mr. Culbertson and ultimately graduated. |
| 11:10:04 | 22 | I've been working in East Texas ever since. |
| 11:10:07 | 23 | And this has been touched on by the Court and by |
| 11:10:10 | 24 | Mr. Culbertson, but there are no right or wrong answers |
| 11:10:13 | 25 | here, but we all have biases, feelings, experiences, that |

```
11:10:18    1    includes all of us up here, all of you that we've gotten
11:10:21    2    from where we work, where we grow up, what we do, that sort
11:10:25    3    of thing.
11:10:28    4         And sometimes those opinions, biases, feelings,
11:10:31    5    experiences, can lead us to view things in one light or the
11:10:36    6    other that might mean we lean in favor of one side or the
11:10:38    7    other in this case just to start out.
11:10:40    8         That would be true for me.  If there was a case
11:10:43    9    about, you know, child abuse, I would have a hard time
11:10:46   10    probably being on that case personally.
11:10:49   11         And so the only -- the point of all of this is
11:10:52   12    really just to find out if you all might have some
11:10:55   13    particular experience or belief that, you know, would
11:10:59   14    prevent you from being a fair and impartial juror on this
11:11:02   15    particular case.
11:11:03   16         And there's nothing wrong with that.  The law
11:11:05   17    recognizes that.  That's why we have this process.  But
11:11:08   18    that's what we're trying to do so that we can ultimately
11:11:11   19    seat the eight of you that can be fair and impartial to
11:11:14   20    both sides.  Okay?
11:11:15   21         Now, there is no question that OnePlus owes
11:11:22   22    Pantech for using their patents.  We're not disputing that.
11:11:25   23    That is not a dispute here today.  That's not a dispute
11:11:27   24    that you will hear if you're ultimately put on this jury.
11:11:31   25         The dispute is over the amount of money that we
```

11:11:34   1   believe we owe, OnePlus.  And it's going to be our position

11:11:38   2   that because some of these, as you heard Mr. Culbertson

11:11:42   3   describe, some of these patents are standard essential

11:11:44   4   patents, and that Pantech is required and obligated to give

11:11:48   5   OnePlus what's called a fair -- a FRAND license, a fair,

11:11:54   6   reasonable, and non-discriminatory license, and that's the

11:11:55   7   evidence you're going to hear in the case, and that's

11:11:57   8   ultimately the decision you're going to make on how much

11:12:00   9   money is owed.

11:12:01   10        Now, having said that, knowing that OnePlus admits

11:12:05   11   that we use Pantech's patents, is there any one of you that

11:12:09   12   think if OnePlus is using Pantech's patents, then they

11:12:13   13   should just pay Pantech whatever Pantech thinks that's --

11:12:17   14   that's worth?  Is there anyone here that thinks that we

11:12:20   15   don't have the right to dispute what is owed?  Anyone?

11:12:25   16        No one has a problem with that?

11:12:29   17        Okay.  Yes, yes, Mrs. Ables?

11:12:35   18        POTENTIAL JUROR:  Just going into it without

11:12:38   19   hearing anything, my natural inclination is that they

11:12:42   20   should be paid.

11:12:43   21        MR. THOMPSON:  Okay.  So -- and that's fair.  So

11:12:45   22   it's your -- your opinion that if -- if -- since OnePlus

11:12:49   23   uses Pantech's patents, whatever Pantech feels is fair,

11:12:52   24   that's what we should pay?

11:12:54   25        POTENTIAL JUROR:  Yes, especially if it was done

| | | |
|---|---|---|
| 11:12:56 | 1 | without permission. |
| 11:12:56 | 2 | MR. THOMPSON:  All right.  And knowing that, |
| 11:12:58 | 3 | knowing what that case -- that this is what this case is |
| 11:13:00 | 4 | about, would you then start out basically leaning towards |
| 11:13:05 | 5 | Pantech listening to the evidence knowing that OnePlus |
| 11:13:07 | 6 | admits that we use their patents? |
| 11:13:09 | 7 | POTENTIAL JUROR:  I would really do my best to not |
| 11:13:11 | 8 | lean towards one or the other without hearing any evidence. |
| 11:13:14 | 9 | MR. THOMPSON:  Okay.  I understand.  And I |
| 11:13:15 | 10 | appreciate you trying to do your best.  But do you think |
| 11:13:18 | 11 | that would be in the back of your mind the whole time? |
| 11:13:20 | 12 | POTENTIAL JUROR:  It might be.  I mean, to be |
| 11:13:22 | 13 | honest, to be absolutely honest. |
| 11:13:23 | 14 | MR. THOMPSON:  All right.  I appreciate you. |
| 11:13:24 | 15 | Thank you very much. |
| 11:13:24 | 16 | Is there anyone else that feels the same way as |
| 11:13:27 | 17 | Mrs. Ables about this?  If you do, starting over here, |
| 11:13:30 | 18 | please raise your hand in Group 1.  Anyone feel like -- |
| 11:13:34 | 19 | feel the way Ms. Ables feels?  Nothing wrong with it.  We |
| 11:13:38 | 20 | just need to know.  You're certainly entitled to that |
| 11:13:41 | 21 | opinion.  Anyone in Group 1?  All right.  I see no hands. |
| 11:13:43 | 22 | What about this second -- yes, ma'am.  We'll start |
| 11:13:45 | 23 | on the third row.  Mrs. Henderson? |
| 11:13:48 | 24 | POTENTIAL JUROR:  Yes. |
| 11:13:49 | 25 | MR. THOMPSON:  Can you come up? |

11:13:55   1          POTENTIAL JUROR:  So all I'm saying is I do think

11:13:58   2   that some people are going to go higher because it's theirs

11:14:01   3   and they own it and I get that, but I'm just saying that if

11:14:04   4   it's mine and you come over and you use it and you tell me

11:14:08   5   what you want to pay me versus me telling you what I want,

11:14:13   6   it's on, period.

11:14:14   7          MR. THOMPSON:  Yes, ma'am.  That's fair enough.

11:14:16   8          POTENTIAL JUROR:  So I get that.  But I do

11:14:20   9   understand that people are -- if they own it, they're going

11:14:22  10   to go for the highest number, but you do have to be

11:14:25  11   reasonable.

11:14:25  12          MR. THOMPSON:  Yes, ma'am.  If you'll wait just a

11:14:27  13   second.  Having that opinion, do you think it would be --

11:14:30  14   if you were selected on this jury, you would already sort

11:14:33  15   of start out believing that -- what the -- the number

11:14:37  16   Pantech wants, since it's their patents, is the right -- is

11:14:40  17   the right number and you would --

11:14:41  18          POTENTIAL JUROR:  I said that that is -- I

11:14:42  19   wouldn't be saying that that is the right number because

11:14:45  20   when you own something and you ask for it, you want that

11:14:49  21   number.  You're going to want that number.  Even if it's

11:14:51  22   ridiculously high, you're going to want that number.  I can

11:14:55  23   be reasonable, you know what I'm saying?  But like she

11:14:57  24   said, I need to see stuff.  I need to investigate more

11:15:02  25   on --

11:15:02    1          MR. THOMPSON:  Sure.  Fair enough.  So if OnePlus

11:15:04    2   puts on evidence of a different number that you think is

11:15:07    3   reasonable --

11:15:07    4          POTENTIAL JUROR:  Right.

11:15:08    5          MR. THOMPSON:  -- would you have a problem

11:15:11    6   awarding that number?

11:15:12    7          POTENTIAL JUROR:  I wouldn't have a problem

11:15:14    8   awarding that number.

11:15:15    9          MR. THOMPSON:  Thank you very much.  I appreciate

11:15:16   10   you.

11:15:16   11          Who else in the second row raised their hand?

11:15:20   12          Ms. Gabbie, you don't -- okay.  Thank you.

11:15:23   13          Anyone else in the third row, anyone feel like

11:15:26   14   Mrs. Ables or Ms. Henderson on this issue?

11:15:29   15          Okay.  I see no hands.

11:15:31   16          Anyone else besides Ms. Ables in the fourth group?

11:15:35   17   Okay.  Thank you.

11:15:35   18          Now, I want to -- Mr. Culbertson thanked you, too.

11:15:40   19   I want to thank you for filling out these questionnaires

11:15:42   20   because that helps us a lot, and that -- it limits the

11:15:44   21   questions that we're going to ask to each of you, so I

11:15:47   22   appreciate that.  But I am going to need to pick on a few

11:15:51   23   of you.  That's just part of my job.

11:15:53   24          Mrs. Allen, can I talk with you a minute?  And I

11:15:56   25   promise that we did not get together and say we were all

| | | |
|---|---|---|
| 11:15:59 | 1 | going to question you, because I know Mr. Culbertson -- |
| 11:16:02 | 2 | POTENTIAL JUROR:  Sure. |
| 11:16:03 | 3 | MR. THOMPSON:  Now, Ms. Allen, I know you |
| 11:16:05 | 4 | explained that you had been in a lawsuit, you and your |
| 11:16:07 | 5 | husband.  Can you tell me who represented -- what law firm |
| 11:16:10 | 6 | represented you in that lawsuit? |
| 11:16:11 | 7 | POTENTIAL JUROR:  I really can't think of their |
| 11:16:14 | 8 | name.  They're here in Texarkana.  But I can't think -- |
| 11:16:17 | 9 | it's been so long ago. |
| 11:16:18 | 10 | MR. THOMPSON:  Okay. |
| 11:16:20 | 11 | POTENTIAL JUROR:  It's just someone Cooper Tire |
| 11:16:22 | 12 | recommended to us. |
| 11:16:24 | 13 | MR. THOMPSON:  Through your husband's job. |
| 11:16:25 | 14 | POTENTIAL JUROR:  Yes, uh-huh. |
| 11:16:26 | 15 | MR. THOMPSON:  Okay.  Okay.  And I know we asked |
| 11:16:27 | 16 | you a little bit about -- |
| 11:16:28 | 17 | POTENTIAL JUROR:  I think his last name was James |
| 11:16:30 | 18 | maybe. |
| 11:16:30 | 19 | MR. THOMPSON:  Mr. James? |
| 11:16:31 | 20 | POTENTIAL JUROR:  I think so. |
| 11:16:32 | 21 | MR. THOMPSON:  Okay.  And was that lawsuit |
| 11:16:33 | 22 | resolved favorably, in your mind? |
| 11:16:36 | 23 | POTENTIAL JUROR:  Pretty much, yes. |
| 11:16:41 | 24 | MR. THOMPSON:  Okay.  You were okay with the |
| 11:16:42 | 25 | outcome? |

| | | |
|---|---|---|
| 11:16:43 | 1 | POTENTIAL JUROR:  Yeah. |
| 11:16:43 | 2 | MR. THOMPSON:  Okay.  Let me ask you this.  In |
| 11:16:46 | 3 | your household, are you the person who takes care of the |
| 11:16:48 | 4 | finances and pays the bills, or is that some other person? |
| 11:16:52 | 5 | POTENTIAL JUROR:  No.  My partner does most of it. |
| 11:16:55 | 6 | I mean, we have separate bank accounts.  I take care of |
| 11:16:58 | 7 | what I owe, and he -- |
| 11:16:58 | 8 | MR. THOMPSON:  Well, and the reason I'm ask -- |
| 11:17:00 | 9 | POTENTIAL JUROR:  -- but he takes care of the |
| 11:17:01 | 10 | household incomes and stuff -- |
| 11:17:03 | 11 | MR. THOMPSON:  Okay. |
| 11:17:05 | 12 | POTENTIAL JUROR:  -- household bills and stuff. |
| 11:17:06 | 13 | MR. THOMPSON:  So you're not the person that's |
| 11:17:08 | 14 | doing that day-to-day paying the bills and looking at the |
| 11:17:10 | 15 | finances and that sort of thing? |
| 11:17:11 | 16 | POTENTIAL JUROR:  Huh-uh. |
| 11:17:12 | 17 | MR. THOMPSON:  Okay.  Thank you very much.  I |
| 11:17:13 | 18 | appreciate you. |
| 11:17:14 | 19 | POTENTIAL JUROR:  Okay. |
| 11:17:16 | 20 | MR. THOMPSON:  Ms. Baker?  Yes, ma'am. |
| 11:17:19 | 21 | You thought I wasn't going to ask you anything. |
| 11:17:22 | 22 | POTENTIAL JUROR:  No.  What do you want to ask me? |
| 11:17:25 | 23 | That's all I can do. |
| 11:17:26 | 24 | MR. THOMPSON:  Ms. Baker, I think on your |
| 11:17:27 | 25 | questionnaire and when you got up and gave us a little bit |

| | | |
|---|---|---|
| 11:17:31 | 1 | of information about yourself, you work in legal |
| 11:17:33 | 2 | administration at Veterans Affairs; is that right? |
| 11:17:36 | 3 | POTENTIAL JUROR:  Yes. |
| 11:17:37 | 4 | MR. THOMPSON:  Can you tell me what that entails, |
| 11:17:39 | 5 | what you job is? |
| 11:17:39 | 6 | POTENTIAL JUROR:  I can just tell you a little bit |
| 11:17:39 | 7 | because some of it, you know, is confidential. |
| 11:17:40 | 8 | MR. THOMPSON:  Yeah, just the non -- |
| 11:17:42 | 9 | POTENTIAL JUROR:  We mainly work with veterans |
| 11:17:45 | 10 | with, you know, benefits and claims on certain areas of it. |
| 11:17:48 | 11 | I just can just say so much on what we do to, you know, |
| 11:17:52 | 12 | some of the legal matters. |
| 11:17:54 | 13 | MR. THOMPSON:  Are you basically just assisting |
| 11:17:55 | 14 | veterans with the claim process and things like that? |
| 11:17:58 | 15 | POTENTIAL JUROR:  Yes, and benefits and claims, |
| 11:18:01 | 16 | correspondence to files, their money-wise, and different |
| 11:18:05 | 17 | things like that. |
| 11:18:08 | 18 | MR. THOMPSON:  Okay.  And I'm going to ask you the |
| 11:18:09 | 19 | same question that I just asked Mrs. Allen.  At your |
| 11:18:12 | 20 | household, are you the person that takes care of the |
| 11:18:15 | 21 | finances, or is there someone else? |
| 11:18:16 | 22 | POTENTIAL JUROR:  It's me. |
| 11:18:17 | 23 | MR. THOMPSON:  Okay.  You're in charge of that? |
| 11:18:18 | 24 | POTENTIAL JUROR:  That's correct. |
| 11:18:19 | 25 | MR. THOMPSON:  Okay.  Thank you very much. |

| | | |
|---|---|---|
| 11:18:21 | 1 | Mr. Bennett? |
| 11:18:29 | 2 | Good morning, Mr. Bennett. |
| 11:18:36 | 3 | POTENTIAL JUROR:  Good morning. |
| 11:18:37 | 4 | MR. THOMPSON:  I believe on your questionnaire you |
| 11:18:39 | 5 | indicated that you have maybe zero trust or trust problems |
| 11:18:44 | 6 | with Chinese and Korean companies; is that right? |
| 11:18:47 | 7 | POTENTIAL JUROR:  That's right. |
| 11:18:47 | 8 | MR. THOMPSON:  All right.  And can you explain to |
| 11:18:49 | 9 | me sort of your feeling for that? |
| 11:18:51 | 10 | POTENTIAL JUROR:  I don't think the Chinese should |
| 11:18:53 | 11 | have our information, transmissions, or -- |
| 11:19:01 | 12 | MR. THOMPSON:  Do you think that that's -- knowing |
| 11:19:03 | 13 | that my -- OnePlus, my client, is their base, their |
| 11:19:06 | 14 | ultimate headquarters is in China, would that cause you to |
| 11:19:11 | 15 | perhaps punish my client if you were on the jury?  Would |
| 11:19:13 | 16 | you have a negative view of them? |
| 11:19:16 | 17 | POTENTIAL JUROR:  I don't like that idea. |
| 11:19:18 | 18 | MR. THOMPSON:  Okay.  So you don't like the idea |
| 11:19:19 | 19 | of a Chinese company being here in the United States in a |
| 11:19:22 | 20 | courtroom like this? |
| 11:19:23 | 21 | POTENTIAL JUROR:  Not dealing with communications. |
| 11:19:25 | 22 | MR. THOMPSON:  Okay.  All right.  And what do you |
| 11:19:26 | 23 | mean by communication?  Like emails and things like that? |
| 11:19:29 | 24 | POTENTIAL JUROR:  Correct. |
| 11:19:30 | 25 | MR. THOMPSON:  Okay.  So if you were chosen for |

| | |
|---|---|
| 11:19:31 | 1 |
| 11:19:35 | 2 |
| 11:19:39 | 3 |
| 11:19:40 | 4 |
| 11:19:42 | 5 |
| 11:19:42 | 6 |
| 11:19:44 | 7 |
| 11:19:47 | 8 |
| 11:19:51 | 9 |
| 11:19:52 | 10 |
| 11:19:53 | 11 |
| 11:19:56 | 12 |
| 11:19:57 | 13 |
| 11:19:57 | 14 |
| 11:19:59 | 15 |
| 11:19:59 | 16 |
| 11:20:05 | 17 |
| 11:20:09 | 18 |
| 11:20:12 | 19 |
| 11:20:15 | 20 |
| 11:20:18 | 21 |
| 11:20:19 | 22 |
| 11:20:22 | 23 |
| 11:20:24 | 24 |
| 11:20:25 | 25 |

1  this jury, would you sort of start out probably against

2  OnePlus because we're a Chinese company and probably lean

3  toward Pantech?

4          POTENTIAL JUROR:  It would be hard to make a

5  decision.

6          MR. THOMPSON:  Okay.  In the back of your mind,

7  you would always be thinking about the fact that my -- my

8  client, OnePlus, is based in China; is that right?

9          POTENTIAL JUROR:  Yeah.

10          MR. THOMPSON:  And the trust issues that you have

11  would stay in your mind as far as trust of Chinese

12  businesses?

13          POTENTIAL JUROR:  Yes.

14          MR. THOMPSON:  Okay.  Thank you very much.  I

15  appreciate you.

16          Now, does anyone else have the same view as

17  Mr. Bennett as far as trust of Chinese -- Chinese-based

18  companies?  Anyone in Group 1?  If you do, raise your hand.

19  Perfectly fine to have that, we just need to know.  I need

20  to know because I'm obviously representing OnePlus.

21          No hands?

22          What about Group 2, anyone else have that problem?

23          Group 3?

24          4?

25          Okay.  I see no other hands.  Thank you.

| | | |
|---|---|---|
| 11:20:27 | 1 | Mr. Blair, this is like Price is Right.  We call |
| 11:20:33 | 2 | your name, come running down. |
| 11:20:34 | 3 | How are you, Mr. Blair? |
| 11:20:37 | 4 | POTENTIAL JUROR:  Good, how are you? |
| 11:20:39 | 5 | MR. THOMPSON:  Good, good.  I know you told us |
| 11:20:40 | 6 | that you're a counselor. |
| 11:20:41 | 7 | POTENTIAL JUROR:  Yes. |
| 11:20:41 | 8 | MR. THOMPSON:  Can you tell me a little more about |
| 11:20:43 | 9 | that, what type of -- do you have some particular type of |
| 11:20:43 | 10 | counseling? |
| 11:20:46 | 11 | POTENTIAL JUROR:  So we're part of FACE program in |
| 11:20:47 | 12 | Texas.  So we provide free counseling to children and |
| 11:20:52 | 13 | families in 31 counties over the State of Texas. |
| 11:20:52 | 14 | MR. THOMPSON:  And who do you work for doing that? |
| 11:20:54 | 15 | POTENTIAL JUROR:  It's called STARRY Counseling. |
| 11:20:55 | 16 | MR. THOMPSON:  And how long have you been doing |
| 11:20:57 | 17 | counseling? |
| 11:20:58 | 18 | POTENTIAL JUROR:  Two and a half years. |
| 11:20:59 | 19 | MR. THOMPSON:  And always in this particular field |
| 11:21:01 | 20 | like you are now? |
| 11:21:02 | 21 | POTENTIAL JUROR:  Yes, uh-huh. |
| 11:21:03 | 22 | MR. THOMPSON:  Okay.  Thank you very much.  I |
| 11:21:04 | 23 | appreciate you. |
| 11:21:04 | 24 | POTENTIAL JUROR:  Thank you. |
| 11:21:07 | 25 | MR. THOMPSON:  Ms. Bolton? |

```
11:21:16    1              How are you, Ms. Bolton?

11:21:18    2              POTENTIAL JUROR:  I'm good.  How are you?

11:21:19    3              MR. THOMPSON:  I'm good.  I'm good.

11:21:21    4              I believe on your questionnaire, you indicated

11:21:23    5    that maybe you or someone close to you worked for a lawyer

11:21:25    6    or a law firm?

11:21:26    7              POTENTIAL JUROR:  No, my sister, she worked for

11:21:31    8    the DA in Paris.

            9              MR. THOMPSON:  Your sister worked for the DA in

           10    Paris?

           11              POTENTIAL JUROR:  She did, she no longer does.

           12              MR. THOMPSON:  Okay.  Do you know what she did for

           13    the DA's office?

           14              POTENTIAL JUROR:  She's a crimes victims

11:21:37   15    coordinator.

11:21:37   16              MR. THOMPSON:  Okay.  All right.  So no other

11:21:39   17    family members that work for lawyers or law firms?

11:21:41   18              POTENTIAL JUROR:  No, sir.

11:21:42   19              MR. THOMPSON:  I'm going to ask you the question I

11:21:43   20    didn't ask these last two.  In your household, are you the

11:21:47   21    person who takes care of the finances?

11:21:49   22              POTENTIAL JUROR:  Yes, I am.

11:21:50   23              MR. THOMPSON:  Thank you very much.

11:21:51   24              Ms. Hall, again, I promise that we didn't -- we're

11:22:00   25    not trying to gang up on you, Ms. Hall.  I know you've had
```

| | | |
|---|---|---|
| 11:22:03 | 1 | to speak a few times. |
| 11:22:05 | 2 | POTENTIAL JUROR:  That's all right. |
| 11:22:06 | 3 | MR. THOMPSON:  How are you? |
| 11:22:08 | 4 | POTENTIAL JUROR:  I'm fine, thank you. |
| 11:22:09 | 5 | MR. THOMPSON:  Good, thank you.  I know you told |
| 11:22:11 | 6 | us that you had testified as an expert many years ago in |
| 11:22:14 | 7 | court. |
| 11:22:14 | 8 | POTENTIAL JUROR:  Yes. |
| 11:22:14 | 9 | MR. THOMPSON:  And I think you said that was |
| 11:22:16 | 10 | based -- because of your work. |
| 11:22:17 | 11 | POTENTIAL JUROR:  Yes. |
| 11:22:18 | 12 | MR. THOMPSON:  Can you tell me what kind of work |
| 11:22:19 | 13 | you were doing then? |
| 11:22:21 | 14 | POTENTIAL JUROR:  I was a licensed professional |
| 11:22:24 | 15 | counselor in private practice, and I worked with abuse |
| 11:22:26 | 16 | victims. |
| 11:22:27 | 17 | MR. THOMPSON:  Okay.  And so you were testifying |
| 11:22:28 | 18 | in that particular capacity? |
| 11:22:30 | 19 | POTENTIAL JUROR:  Yes, uh-huh. |
| 11:22:31 | 20 | MR. THOMPSON:  Okay.  I know you also said that |
| 11:22:34 | 21 | you know Mr. Tidwell sort of by reputation.  Your son and |
| 11:22:38 | 22 | his son played basketball or something? |
| 11:22:41 | 23 | POTENTIAL JUROR:  Yes. |
| 11:22:41 | 24 | MR. THOMPSON:  Okay. |
| 11:22:41 | 25 | POTENTIAL JUROR:  I think our daughters knew each |

| | | |
|---|---|---|
| 11:22:43 | 1 | other also in high school but... |
| 11:22:44 | 2 | MR. THOMPSON:  Okay.  Would you consider |
| 11:22:46 | 3 | Mr. Tidwell a friend? |
| 11:22:47 | 4 | POTENTIAL JUROR:  No, not really, more like an |
| 11:22:47 | 5 | acquaintance. |
| 11:22:47 | 6 | MR. THOMPSON:  Okay.  And have you ever been to |
| 11:22:53 | 7 | his house or socialized with him in any way? |
| 11:22:53 | 8 | POTENTIAL JUROR:  I think I did one time just to |
| 11:22:55 | 9 | pick up my daughter but -- for a party or something, but -- |
| 11:22:58 | 10 | MR. THOMPSON:  Okay.  Your daughter -- |
| 11:22:58 | 11 | POTENTIAL JUROR:  We didn't really socialize, no. |
| 11:22:59 | 12 | MR. THOMPSON:  Okay.  So just your kids -- your |
| 11:23:00 | 13 | daughter and your son were friends with his children? |
| 11:23:02 | 14 | POTENTIAL JUROR:  Yes. |
| 11:23:07 | 15 | MR. THOMPSON:  Okay.  Knowing Mr. Tidwell and |
| 11:23:08 | 16 | having been around his kids a lot, do you think that would |
| 11:23:08 | 17 | be in the back of your mind if you're put on this jury, |
| 11:23:11 | 18 | that you would already sort of lean his way just because |
| 11:23:15 | 19 | you know his kids and all? |
| 11:23:16 | 20 | POTENTIAL JUROR:  No, not at all. |
| 11:23:17 | 21 | MR. THOMPSON:  You would be able to put that |
| 11:23:18 | 22 | aside? |
| 11:23:19 | 23 | POTENTIAL JUROR:  Yes. |
| 11:23:19 | 24 | MR. THOMPSON:  And you would be able to find, if |
| 11:23:20 | 25 | necessary, if the evidence showed, something different than |

| | | |
|---|---|---|
| 11:23:23 | 1 | what Mr. Tidwell may be advocating? |
| 11:23:26 | 2 | POTENTIAL JUROR:  Yes. |
| 11:23:26 | 3 | MR. THOMPSON:  Okay.  And let me ask you the same |
| 11:23:27 | 4 | question.  Are you the person at your household that |
| 11:23:31 | 5 | handles the finances? |
| 11:23:33 | 6 | POTENTIAL JUROR:  No, I'm not. |
| 11:23:34 | 7 | MR. THOMPSON:  Okay.  Well, good for you.  Good |
| 11:23:36 | 8 | for you.  Thank you very much. |
| 11:23:37 | 9 | Ms. Hennek. |
| 11:23:44 | 10 | Ms. Hennek, I know we've already talked to you |
| 11:23:48 | 11 | some, but I was curious.  You were a teacher at one point; |
| 11:23:52 | 12 | is that right? |
| 11:23:52 | 13 | POTENTIAL JUROR:  Yes. |
| 11:23:53 | 14 | MR. THOMPSON:  And what did you teach? |
| 11:23:55 | 15 | POTENTIAL JUROR:  I taught elementary school, |
| 11:23:56 | 16 | basically kindergarten through fourth grade - different |
| 11:23:56 | 17 | grade levels. |
| 11:23:57 | 18 | MR. THOMPSON:  And how long did you do that? |
| 11:23:58 | 19 | POTENTIAL JUROR:  20 years. |
| 11:24:00 | 20 | MR. THOMPSON:  Okay.  Where -- where did you -- |
| 11:24:00 | 21 | did you teach at different schools or the same school? |
| 11:24:03 | 22 | POTENTIAL JUROR:  It was the same school, and it |
| 11:24:04 | 23 | was in Arizona before we moved to Texas. |
| 11:24:06 | 24 | MR. THOMPSON:  Okay.  Okay.  And I'm going to ask |
| 11:24:07 | 25 | you the same question.  In your household, are you the |

| | | |
|---|---|---|
| 11:24:09 | 1 | person that takes care of the finances, or is that your |
| 11:24:12 | 2 | spouse or someone else? |
| 11:24:13 | 3 | POTENTIAL JUROR:  Yes, I pay the bills and -- |
| 11:24:15 | 4 | MR. THOMPSON:  Okay.  Thank you very much. |
| 11:24:29 | 5 | Mr. Stovall, how are you doing? |
| 11:24:33 | 6 | POTENTIAL JUROR:  I'm good. |
| 11:24:34 | 7 | MR. THOMPSON:  Good.  I had a question.  I think |
| 11:24:36 | 8 | on your -- on your questionnaire you indicated that you or |
| 11:24:41 | 9 | someone close to you work for a law firm; is that right? |
| 11:24:43 | 10 | POTENTIAL JUROR:  My best friend is a lawyer. |
| 11:24:45 | 11 | MR. THOMPSON:  Okay.  Who is that? |
| 11:24:46 | 12 | POTENTIAL JUROR:  Casey Cross. |
| 11:24:49 | 13 | MR. THOMPSON:  And where does he -- is his office |
| 11:24:50 | 14 | here or somewhere else? |
| 11:24:52 | 15 | POTENTIAL JUROR:  It's in Mt. Pleasant. |
| 11:24:53 | 16 | MR. THOMPSON:  Okay.  Do you know what kind of |
| 11:24:54 | 17 | work -- what kind of law he practices? |
| 11:24:56 | 18 | POTENTIAL JUROR:  Title law.  He used to be |
| 11:25:00 | 19 | family, but he does that no longer. |
| 11:25:02 | 20 | MR. THOMPSON:  Okay.  Anything about that affect |
| 11:25:04 | 21 | your ability to serve on this jury? |
| 11:25:06 | 22 | POTENTIAL JUROR:  Not at all. |
| 11:25:07 | 23 | MR. THOMPSON:  Okay.  And you own your own |
| 11:25:09 | 24 | business; is that right? |
| 11:25:11 | 25 | POTENTIAL JUROR:  Correct. |

| 11:25:12 | 1 | MR. THOMPSON:  And what kind -- it's an insurance |
| 11:25:13 | 2 | business? |
| 11:25:14 | 3 | POTENTIAL JUROR:  Yes, sir. |
| 11:25:15 | 4 | MR. THOMPSON:  Are you selling property and |
| 11:25:16 | 5 | casualty insurance or life and health or what? |
| 11:25:19 | 6 | POTENTIAL JUROR:  Both. |
| 11:25:19 | 7 | MR. THOMPSON:  Okay.  And I'll ask you the same |
| 11:25:20 | 8 | question I've asked these others.  At your household, are |
| 11:25:22 | 9 | you the person that takes care of the finances? |
| 11:25:24 | 10 | POTENTIAL JUROR:  Yes. |
| 11:25:24 | 11 | MR. THOMPSON:  You are?  Okay.  Thank you very |
| 11:25:26 | 12 | much.  Appreciate you. |
| 11:25:27 | 13 | Ms. Thomas?  Hi, Ms. Thomas. |
| 11:25:40 | 14 | POTENTIAL JUROR:  Hello. |
| 11:25:42 | 15 | MR. THOMPSON:  I believe on your questionnaire, |
| 11:25:43 | 16 | you have a bachelor's degree in education -- is it in |
| 11:25:47 | 17 | education? |
| 11:25:48 | 18 | POTENTIAL JUROR:  Early childhood education, yes, |
| 11:25:50 | 19 | sir. |
| 11:25:50 | 20 | MR. THOMPSON:  Okay.  Did you ever teach? |
| 11:25:51 | 21 | POTENTIAL JUROR:  Yes, sir. |
| 11:25:51 | 22 | MR. THOMPSON:  How long ago was that? |
| 11:25:52 | 23 | POTENTIAL JUROR:  I stopped four years ago. |
| 11:25:54 | 24 | MR. THOMPSON:  And how long were you a teacher? |
| 11:25:57 | 25 | POTENTIAL JUROR:  Eight years. |

11:25:57    1          MR. THOMPSON:  And what did you teach?

11:25:59    2          POTENTIAL JUROR:  Kindergarten.

11:26:01    3          MR. THOMPSON:  The whole time you taught

11:26:01    4  kindergarten?

11:26:01    5          POTENTIAL JUROR:  With the exception of one year.

11:26:01    6  My last year I taught second grade.  But, otherwise, yes,

11:26:05    7  kindergarten.

11:26:05    8          MR. THOMPSON:  Okay.  And where did you teach at?

11:26:07    9          POTENTIAL JUROR:  A small school in Forrest City,

11:26:09   10  Arkansas.

11:26:10   11          MR. THOMPSON:  In Arkansas?

11:26:10   12          POTENTIAL JUROR:  Uh-huh.

11:26:11   13          MR. THOMPSON:  Okay.  And I'll ask you the same

11:26:11   14  question.  In your household, are you the person who pays

11:26:16   15  the bills and takes care of the finances?

11:26:16   16          POTENTIAL JUROR:  Currently, it's evenly split.

11:26:19   17          MR. THOMPSON:  Okay.  All right.  Thank you very

11:26:20   18  much.  Appreciate you.

11:26:21   19          Now, I know we asked -- the Court asked you if --

11:26:31   20  and you got up here and you got to answer these -- the

11:26:34   21  various questions about whether or not you'd been on a

11:26:36   22  jury.  And I was trying to write down and make sure I knew

11:26:40   23  sort of the information about that and what kind of jury

11:26:42   24  you were on.

11:26:43   25          But were -- any of you happen to serve or have

11:26:46    1    jury duty on a patent case like this?  Anyone?

11:26:51    2            Okay.  Has any -- have any of your spouses ever

11:26:54    3    been called for a jury duty on a patent case like this?  No

11:27:00    4    one?  I don't see any hands.  Okay.

11:27:02    5            So I'm going to ask you one last question, and

11:27:09    6    then I'm going to sit down, which is good.  See, when you

11:27:11    7    come second, everyone else asked a lot of the questions

11:27:14    8    that you have to ask.

11:27:15    9            But you've been asked a lot of questions.  You've

11:27:17   10    gotten up here and gotten to sort of tell us a little bit

11:27:20   11    about yourselves.  But sitting here now knowing, which you

11:27:23   12    know very little about this case, but you know something,

11:27:26   13    is there any of you that feel like there may be a reason

11:27:29   14    that you would not be a good juror on this case, but we

11:27:33   15    didn't call you or we didn't ask a question or whatever to

11:27:37   16    get you to do that?  So is there -- and it can be any

11:27:41   17    reason, any particular reason, any reason is fine that you

11:27:43   18    feel like you would not be a good juror on this particular

11:27:47   19    case?

11:27:47   20            I'm going to start with the first group.  Anyone

11:27:50   21    there?

11:27:51   22            Okay.  Second group, anyone, just raise your hand.

11:27:54   23            All right.  Ms. Gabbie.

11:27:57   24            POTENTIAL JUROR:  Privately.

11:27:58   25            MR. THOMPSON:  Privately.  Okay.  Yes, ma'am, we

| | | |
|---|---|---|
| 11:28:00 | 1 | can talk with you in private, Ms. Gabbie. |
| 11:28:02 | 2 | Okay.  Anyone else in the second group? |
| 11:28:05 | 3 | Okay.  What about the third group, anyone feel |
| 11:28:08 | 4 | like there's a reason that you just might not be the right |
| 11:28:11 | 5 | juror for this case? |
| 11:28:13 | 6 | Okay.  What about the last group, anyone? |
| 11:28:16 | 7 | Okay.  Well, thank you very much.  And we look |
| 11:28:18 | 8 | forward to presenting our case to the eight of you that are |
| 11:28:21 | 9 | chosen.  Thank you. |
| 11:28:24 | 10 | THE COURT:  Thank you, Mr. Thompson. |
| 11:28:25 | 11 | Mr. Thompson and Mr. Culbertson, if you would |
| 11:28:28 | 12 | please approach. |
| 11:28:29 | 13 | (Bench conference.) |
| 11:28:49 | 14 | THE COURT:  All right.  So I've got Ms. Hall had a |
| 11:28:54 | 15 | hardship possibility. |
| 11:28:56 | 16 | Mr. Stovall had a hardship possibility. |
| 11:28:59 | 17 | Ms. Gabbie asked to talk to us outside the |
| 11:29:03 | 18 | presence. |
| 11:29:03 | 19 | Anyone else you all want to talk to or any cause |
| 11:29:10 | 20 | challenges? |
| 11:29:10 | 21 | MR. THOMPSON:  I have one cause to Mr. Bennett |
| 11:29:14 | 22 | about the Chinese -- |
| 11:29:16 | 23 | THE COURT:  I think Mr. Bennett is probably going |
| 11:29:19 | 24 | to -- he's given all that -- |
| 11:29:21 | 25 | MR. CULBERTSON:  I agree. |

| | | |
|---|---|---|
| 11:29:22 | 1 | THE COURT:  All right. |
| 11:29:22 | 2 | MR. CULBERTSON:  And we don't have any. |
| 11:29:23 | 3 | THE COURT:  And that's the only one y'all have |
| 11:29:26 | 4 | got? |
| 11:29:26 | 5 | MR. THOMPSON:  Yes, sir. |
| 11:29:26 | 6 | THE COURT:  So I'm going to have the three of them |
| 11:29:28 | 7 | wait.  And I'm going to let everybody else go just for a |
| 11:29:32 | 8 | few minutes. |
| 11:29:33 | 9 | MR. CULBERTSON:  Sure.  Thank you. |
| 11:29:35 | 10 | MR. THOMPSON:  Thank you. |
| 11:29:35 | 11 | (Bench conference concluded.) |
| 11:29:36 | 12 | THE COURT:  All right.  Thank you, ladies and |
| 11:29:41 | 13 | gentlemen of the panel.  We're moving along well this |
| 11:29:43 | 14 | morning. |
| 11:29:44 | 15 | I'm going to ask Ms. Hall, if you would wait for |
| 11:29:47 | 16 | us, we want to visit with you about your hardship that you |
| 11:29:51 | 17 | indicated you had this morning. |
| 11:29:55 | 18 | Mr. Stovall, same with you, if you would wait in |
| 11:29:59 | 19 | the courtroom. |
| 11:29:59 | 20 | And then, Ms. Gabbie, if you would wait as well. |
| 11:30:04 | 21 | I'm going to go ahead and ask you all to -- |
| 11:30:07 | 22 | everybody else to step outside of the courtroom.  This next |
| 11:30:10 | 23 | phase will take about 20 minutes, somewhere in that |
| 11:30:15 | 24 | neighborhood.  It shouldn't be too much longer than that, |
| 11:30:18 | 25 | but I fully expect by 12:00 o'clock, we will have you all |

| | | |
|---|---|---|
| 11:30:21 | 1 | back into the courtroom.  We will have a jury selected at |
| 11:30:24 | 2 | that point, and those of you who have not been selected |
| 11:30:28 | 3 | will be free to go and get about your day. |
| 11:30:31 | 4 | So if you all would hang on for just a little |
| 11:30:34 | 5 | while longer, we'll get you back into the courtroom. |
| 11:30:37 | 6 | In the meantime, don't talk about anything you've |
| 11:30:40 | 7 | seen or heard in the courtroom.  Don't do any research or |
| 11:30:43 | 8 | investigation about anything that you've heard or any |
| 11:30:46 | 9 | knowledge you may have about the case based on what the |
| 11:30:49 | 10 | lawyers have said. |
| 11:30:51 | 11 | And, finally, don't post anything about your |
| 11:30:52 | 12 | involvement as a potential juror in this case on any social |
| 11:30:59 | 13 | media website or app. |
| 11:31:00 | 14 | So, Ms. Hall, Ms. Gabbie, and Mr. Stovall, if you |
| 11:31:05 | 15 | would wait in the courtroom, and we will let you all go for |
| 11:31:10 | 16 | now and hopefully get you back into the courtroom about |
| 11:31:13 | 17 | 12:00 o'clock. |
| 11:31:15 | 18 | COURT SECURITY OFFICER:  All rise. |
| 11:31:16 | 19 | (Venire panel out.) |
| 11:32:03 | 20 | THE COURT:  All right.  Please be seated. |
| 11:32:04 | 21 | Ms. Hall, we'll just start with you, if you'd come |
| 11:32:09 | 22 | up to the microphone.  Is it something we can talk about in |
| 11:32:13 | 23 | front of everybody? |
| 11:32:14 | 24 | POTENTIAL JUROR:  It's fine. |
| 11:32:15 | 25 | THE COURT:  Okay.  Mr. Tidwell, can you sit down, |

11:32:18    1    please?

11:32:18    2          POTENTIAL JUROR:  My father passed away last

11:32:20    3    Friday morning and he's --

11:32:21    4          THE COURT:  I'm sorry to hear that.

11:32:22    5          POTENTIAL JUROR:  Thank you.  His burial will be

11:32:25    6    on Saturday morning in Navarro County.

11:32:27    7          THE COURT:  Yes, ma'am.

11:32:28    8          POTENTIAL JUROR:  And my question -- my concern

11:32:29    9    was that if at any point the trial extended beyond Friday,

11:32:35   10    I would not be able to attend -- to complete my service.

11:32:40   11          THE COURT:  It will absolutely not extend beyond

11:32:44   12    Friday.  I think almost certainly we will be finished on

11:32:48   13    Thursday, but really the other question I've got is whether

11:32:54   14    in light of that having happened just a few days ago, are

11:32:58   15    you -- I mean, do you have the presence of mind to feel

11:33:02   16    like you're being, you know, dealing with something else

11:33:09   17    that you shouldn't really be dealing with this week?

11:33:11   18          POTENTIAL JUROR:  I'm actually fine.  I appreciate

11:33:13   19    that.  It was a rather long and drawn-out illness, and said

11:33:18   20    goodbyes many times before --

11:33:19   21          THE COURT:  Okay.  All right.

11:33:20   22          POTENTIAL JUROR:  -- he actually passed.  So I'll

11:33:22   23    be fine.

11:33:23   24          THE COURT:  Okay.  You would feel okay?

11:33:26   25          POTENTIAL JUROR:  Yes, uh-huh.

| | | |
|---|---|---|
| 11:33:28 | 1 | THE COURT:  Okay.  All right.  Any questions from |
| 11:33:29 | 2 | the Plaintiffs? |
| 11:33:30 | 3 | MR. CULBERTSON:  No, Your Honor. |
| 11:33:31 | 4 | THE COURT:  Any questions from Defendant? |
| 11:33:33 | 5 | MR. THOMPSON:  No, Your Honor. |
| 11:33:34 | 6 | THE COURT:  Okay.  All right.  For sure, we'll -- |
| 11:33:39 | 7 | for sure, we'll be done by Friday.  Unless something |
| 11:33:42 | 8 | happened, we almost certainly will be done by Thursday. |
| 11:33:46 | 9 | POTENTIAL JUROR:  Okay.  Thank you. |
| 11:33:47 | 10 | THE COURT:  All right.  Thank you. |
| 11:33:49 | 11 | Let's see, we'll take you next, Mr. Stovall. |
| 11:33:59 | 12 | Ms. Hall, you can go ahead and take your break now |
| 11:33:59 | 13 | if you would like. |
| 11:33:59 | 14 | (Potential juror excused from courtroom.) |
| 11:34:03 | 15 | THE COURT:  Yes, sir? |
| 11:34:03 | 16 | POTENTIAL JUROR:  If it's going to be over Friday, |
| 11:34:03 | 17 | I'm okay.  But my son has a college visit in Florida Friday |
| 11:34:03 | 18 | that I have to leave for. |
| 11:34:03 | 19 | THE COURT:  Okay. |
| 11:34:08 | 20 | POTENTIAL JUROR:  I've already had to reschedule |
| 11:34:11 | 21 | once. |
| 11:34:11 | 22 | THE COURT:  Okay.  Would you be leaving on Friday? |
| 11:34:14 | 23 | POTENTIAL JUROR:  I would be leaving early Friday |
| 11:34:16 | 24 | morning. |
| 11:34:16 | 25 | THE COURT:  Okay.  I think this case will be |

| | | |
|---|---|---|
| 11:34:18 | 1 | finished on Thursday. |
| 11:34:19 | 2 | POTENTIAL JUROR:  Okay. |
| 11:34:19 | 3 | THE COURT:  Any questions, Mr. Culbertson? |
| 11:34:22 | 4 | MR. CULBERTSON:  No, Your Honor.  Thank you. |
| 11:34:23 | 5 | THE COURT:  Mr. Thompson? |
| 11:34:24 | 6 | MR. THOMPSON:  No, Your Honor. |
| 11:34:24 | 7 | THE COURT:  All right.  Thank you, Mr. Stovall. |
| 11:34:28 | 8 | (Potential juror excused from courtroom.) |
| 11:34:28 | 9 | THE COURT:  Ms. Gabbie, if you would come up to |
| 11:34:31 | 10 | the microphone, please. |
| 11:34:38 | 11 | Ms. Gabbie, all the other panel members are out |
| 11:34:42 | 12 | now, and everybody else here in the courtroom really is |
| 11:34:44 | 13 | entitled to be here in the courtroom.  Is it something you |
| 11:34:46 | 14 | feel comfortable talking about from there? |
| 11:34:50 | 15 | POTENTIAL JUROR:  I'll try. |
| 11:34:51 | 16 | THE COURT:  All right.  Would you pull the |
| 11:34:53 | 17 | microphone toward you a little bit? |
| 11:34:55 | 18 | POTENTIAL JUROR:  I didn't realize how bad it was |
| 11:34:58 | 19 | until today.  I have problems with short-term memory -- |
| 11:35:03 | 20 | THE COURT:  Okay. |
| 11:35:04 | 21 | POTENTIAL JUROR:  -- since COVID. |
| 11:35:06 | 22 | THE COURT:  Yes, ma'am. |
| 11:35:06 | 23 | POTENTIAL JUROR:  And I'm over my head. |
| 11:35:13 | 24 | THE COURT:  Okay.  Do you feel like this -- |
| 11:35:15 | 25 | POTENTIAL JUROR:  I even forgot the question that |

| | | |
|---|---|---|
| 11:35:17 | 1 | I had raised my hand -- |
| 11:35:17 | 2 | THE COURT:  Okay. |
| 11:35:18 | 3 | POTENTIAL JUROR:  -- earlier. |
| 11:35:18 | 4 | THE COURT:  Okay.  You had -- you had COVID |
| 11:35:24 | 5 | recently or sometime ago? |
| 11:35:25 | 6 | POTENTIAL JUROR:  No, this was back in 2000 or -- |
| 11:35:30 | 7 | what, 2020, I mean. |
| 11:35:31 | 8 | THE COURT:  Okay.  Early then. |
| 11:35:32 | 9 | POTENTIAL JUROR:  But I've had -- I mean, I've |
| 11:35:35 | 10 | noticed, but I'm really noticing -- |
| 11:35:39 | 11 | THE COURT:  All right. |
| 11:35:40 | 12 | POTENTIAL JUROR:  -- now. |
| 11:35:42 | 13 | THE COURT:  And you feel like your short-term |
| 11:35:45 | 14 | memory has really been affected? |
| 11:35:47 | 15 | POTENTIAL JUROR:  Yes. |
| 11:35:47 | 16 | THE COURT:  Okay. |
| 11:35:48 | 17 | POTENTIAL JUROR:  This gentleman here, he was |
| 11:35:51 | 18 | asking if we knew any of the witnesses.  One -- when he |
| 11:35:54 | 19 | said one name, I was, like, oh, that guy's dead.  And then |
| 11:36:01 | 20 | I forgot.  I couldn't even remember his name. |
| 11:36:04 | 21 | THE COURT:  Yes, ma'am. |
| 11:36:07 | 22 | POTENTIAL JUROR:  Anyway... |
| 11:36:09 | 23 | THE COURT:  Okay.  Do you -- do you feel like -- |
| 11:36:11 | 24 | and I will tell you, in the grand scheme of things, this |
| 11:36:16 | 25 | case is a fairly straightforward case.  It's really only |

| | | |
|---|---|---|
| 11:36:20 | 1 | about damages.  It's about what -- |
| 11:36:23 | 2 | POTENTIAL JUROR:  I wonder if I'll be able to |
| 11:36:26 | 3 | remember what went on the day before -- |
| 11:36:30 | 4 | THE COURT:  Understood. |
| 11:36:32 | 5 | POTENTIAL JUROR:  -- or the day before. |
| 11:36:34 | 6 | THE COURT:  Okay.  I understand.  I understand |
| 11:36:35 | 7 | that -- I understand that perfectly well. |
| 11:36:38 | 8 | Mr. Culbertson, any questions for you? |
| 11:36:39 | 9 | MR. CULBERTSON:  No, Your Honor.  Thank you. |
| 11:36:41 | 10 | THE COURT:  Mr. Thompson? |
| 11:36:42 | 11 | MR. THOMPSON:  No, Your Honor. |
| 11:36:45 | 12 | POTENTIAL JUROR:  When I -- I didn't even remember |
| 11:36:47 | 13 | filling out the questionnaires, and I thought -- when I got |
| 11:36:49 | 14 | this, I thought, okay, I can do this. |
| 11:36:51 | 15 | THE COURT:  Okay. |
| 11:36:52 | 16 | POTENTIAL JUROR:  I can do it.  I can do it. |
| 11:36:54 | 17 | But -- |
| 11:36:55 | 18 | THE COURT:  Well, I understand.  It affects |
| 11:36:57 | 19 | different people in very different ways.  And I appreciate |
| 11:37:00 | 20 | you bringing that to my attention.  I'm going to visit with |
| 11:37:03 | 21 | the attorneys after you've gone off to start your break, |
| 11:37:06 | 22 | and we'll get you back into the courtroom as quickly as we |
| 11:37:09 | 23 | can. |
| 11:37:11 | 24 | Thank you, ma'am. |
| 11:37:17 | 25 | POTENTIAL JUROR:  Uh-huh. |

| | | |
|---|---|---|
| 11:37:19 | 1 | (Potential juror excused from courtroom.) |
| 11:37:19 | 2 | THE COURT:  All right.  Anybody have any objection |
| 11:37:32 | 3 | to releasing Ms. Gabbie? |
| 11:37:34 | 4 | MR. CULBERTSON:  No objection, Your Honor. |
| 11:37:36 | 5 | MR. THOMPSON:  Ms. Gabbie?  No. |
| 11:37:37 | 6 | THE COURT:  All right.  We'll release Ms. Gabbie. |
| 11:37:40 | 7 | She was Juror No. 15. |
| 11:37:41 | 8 | Let's see, I think that -- with respect to |
| 11:37:56 | 9 | Ms. Hall, I think Ms. Hall is good.  She didn't really -- |
| 11:38:02 | 10 | when she first started talking, I felt like for sure she |
| 11:38:06 | 11 | was going to ask to be completely released, but she was |
| 11:38:11 | 12 | definitely not doing that.  But I'm open to your thoughts. |
| 11:38:13 | 13 | MR. THOMPSON:  Your Honor, I guess my biggest |
| 11:38:14 | 14 | concern is -- I mean, number one, I feel bad for her if her |
| 11:38:17 | 15 | father just died and the funeral is coming up, but I'm |
| 11:38:20 | 16 | hoping that she's not just saying she's okay because, you |
| 11:38:22 | 17 | know, she wants everyone to feel like she's okay, you know, |
| 11:38:25 | 18 | even though her father -- I don't know.  It just worries me |
| 11:38:28 | 19 | that her father dies on Friday, we're having a trial in |
| 11:38:32 | 20 | between that and the funeral.  That would be hard for me. |
| 11:38:34 | 21 | I mean, obviously, we're different people, but that |
| 11:38:36 | 22 | concerns me. |
| 11:38:38 | 23 | MR. CULBERTSON:  Your Honor, I understand the |
| 11:38:41 | 24 | concern, but her answers were real clear.  She said she's |
| 11:38:44 | 25 | fine and ready to serve, and there's not a scheduling issue |

| | | |
|---|---|---|
| 11:38:48 | 1 | or wasn't -- |
| 11:38:49 | 2 | THE COURT:  They were real clear, but I question |
| 11:38:53 | 3 | her ability to do that. |
| 11:38:54 | 4 | MR. CULBERTSON:  Right. |
| 11:38:55 | 5 | THE COURT:  I mean, we're just talking about three |
| 11:39:01 | 6 | days ago.  I think I'm going to release her. |
| 11:39:03 | 7 | MR. CULBERTSON:  Okay.  Thank you, Your Honor. |
| 11:39:04 | 8 | THE COURT:  All right.  So that gets us through |
| 11:39:10 | 9 | 16; is that right? |
| 11:39:29 | 10 | MR. THOMPSON:  That's what I have, Your Honor. |
| 11:39:45 | 11 | MR. CULBERTSON:  That gets us to 17, doesn't it? |
| 11:39:48 | 12 | THE COURT:  17? |
| 11:39:49 | 13 | MR. THOMPSON:  That's right.  I was -- I forgot |
| 11:39:51 | 14 | about Mr. Bennett. |
| 11:39:53 | 15 | THE COURT:  All right.  We agree.  Okay.  You all |
| 11:40:07 | 16 | have 15 minutes to make your strikes and get them back to |
| 11:40:10 | 17 | us. |
| 11:40:10 | 18 | MR. THOMPSON:  Okay. |
| 11:40:11 | 19 | THE COURT:  Three peremptory strikes per side. |
| 11:40:32 | 20 | Oh, wait.  For the record, the reason we got |
| 11:40:34 | 21 | through 17 is that there was a motion -- or a motion that |
| 11:40:39 | 22 | was I guess previewed at the bench.  I don't think there's |
| 11:40:41 | 23 | going to be objection to it with respect to Mr. Bennett. |
| 11:40:44 | 24 | Let's put that on the record. |
| 11:40:45 | 25 | MR. THOMPSON:  That's right, Your Honor.  The |

| | | |
|---|---|---|
| 11:40:47 | 1 | Defendant moves to dismiss Mr. Bennett for cause based on |
| 11:40:47 | 2 | his answers regarding trust of China and the elaborations |
| 11:40:52 | 3 | he had. |
| 11:40:52 | 4 | THE COURT:  Any objection to that? |
| 11:40:53 | 5 | MR. CULBERTSON:  No objection. |
| 11:40:54 | 6 | THE COURT:  All right.  We'll strike Mr. Bennett |
| 11:40:56 | 7 | for cause, which puts us through the strike zone of |
| 11:41:00 | 8 | Juror No. 17. |
| 11:41:02 | 9 | All right.  Thank you all. |
| 11:43:28 | 10 | (Recess.) |
| 11:56:12 | 11 | COURT SECURITY OFFICER:  All rise. |
| 11:56:15 | 12 | THE COURT:  Please be seated. |
| 11:56:23 | 13 | All right.  All right.  We have a jury. |
| 11:56:31 | 14 | Ms. Combs, if you would call the names of the |
| 11:56:34 | 15 | jurors. |
| 11:56:37 | 16 | COURTROOM DEPUTY:  No. 4, Edward Griffin; No. 6, |
| 11:56:42 | 17 | Dylan Blair; No. 7, Amanda Petersen; No. 9, Joanna Thomas; |
| 11:56:50 | 18 | No. 10, Nathan Gonzalez; No. 11, Mario Salinas; No. 13, |
| 11:56:58 | 19 | Amanda Henderson; No. 14, Tyrone Hayes. |
| 11:57:02 | 20 | THE COURT:  Is the jury good for the Plaintiff? |
| 11:57:14 | 21 | MR. FUSSELL:  Yes, Your Honor. |
| 11:57:15 | 22 | THE COURT:  Is the jury good for the Defendant? |
| 11:57:16 | 23 | MR. THOMPSON:  Yes, Your Honor. |
| 11:57:17 | 24 | THE COURT:  Okay.  Good. |
| 11:57:18 | 25 | Mr. Grigsby, if you would have the panel brought |

| | | |
|---|---|---|
| 11:57:22 | 1 | in. |
| 11:57:22 | 2 | COURT SECURITY OFFICER:  All rise. |
| 11:57:28 | 3 | (Venire panel in.) |
| 11:57:30 | 4 | THE COURT:  All right.  Please be seated. |
| 11:58:06 | 5 | Okay.  Welcome back, ladies and gentlemen of the |
| 11:58:12 | 6 | panel.  I've done a pretty good job of keeping my promise |
| 11:58:16 | 7 | this morning.  So that -- that is due in part to the -- or |
| 11:58:24 | 8 | that's due to the attorneys working well together and |
| 11:58:28 | 9 | moving the process along.  So I appreciate their efforts in |
| 11:58:32 | 10 | that regard. |
| 11:58:32 | 11 | We have a jury selected. |
| 11:58:35 | 12 | At this time, Ms. Combs is going to read off the |
| 11:58:38 | 13 | names of the jurors, and if your name is called, I would |
| 11:58:42 | 14 | ask that you come forward and take a seat in the jury box |
| 11:58:47 | 15 | and just stagger yourselves so that there's a chair between |
| 11:58:52 | 16 | each of you. |
| 11:58:52 | 17 | Ms. Combs, if you would call the names of the |
| 11:58:55 | 18 | jurors who have been selected. |
| 11:58:58 | 19 | COURTROOM DEPUTY:  Edward Griffin, Dylan Blair, |
| 11:59:07 | 20 | Amanda Petersen, Joanna Thomas, Nathan Gonzalez, Mario |
| 11:59:30 | 21 | Salinas, Amanda Henderson, Tyrone Hayes. |
| 11:59:36 | 22 | THE COURT:  You can just take a seat. |
| 11:59:51 | 23 | Mr. Grigsby, will get you -- yeah, that's fine, |
| 11:59:54 | 24 | that's just fine for now. |
| 11:59:55 | 25 | All right.  All right.  Very good. |

11:59:57   1          All right.  Ladies and gentlemen of the panel, I

12:00:01   2   am going to release the rest of you at this time, and I do

12:00:05   3   so with the thanks of the Court.  It's been a long morning.

12:00:10   4          As I explained earlier today, you all have

12:00:12   5   performed a great public service by being here today, and I

12:00:15   6   would simply say to you that the next time you are about to

12:00:21   7   appear for jury service, I hope you come with the same

12:00:25   8   positive and constructive attitude that you've shown today.

12:00:29   9          So I appreciate, again, your time this morning and

12:00:32   10  your service, and I wish you the best.

12:00:37   11         I'll excuse you at this time.  If for any reason

12:00:39   12  you need a written excuse from your employer or you have

12:00:43   13  any questions, you can stop at the clerk's office on the

12:00:45   14  way out.

12:00:46   15         So thank you all very much, and you're excused.

12:00:52   16         (Venire panel out.)

12:00:55   17         THE COURT:  Okay.  Please be seated.

12:01:27   18         Ladies and gentlemen of the jury, if you would

12:01:31   19  please stand at this time, and Ms. Combs will swear you in.

12:01:35   20         (Jurors sworn.)

12:01:39   21         THE COURT:  All right.  Please be seated.

12:01:52   22         All right.  It has been a long morning, and I'm

12:01:57   23  going to release you at this time.  I'm going to give you

12:02:00   24  just a couple of very basic ground rules that I want to ask

12:02:03   25  you to follow, and then when we come back from lunch, I'll

| | | |
|---|---|---|
| 12:02:09 | 1 | give you instructions in greater detail about what to |
| 12:02:12 | 2 | expect throughout the course of the next couple of days. |
| 12:02:15 | 3 | I think we will finish on Thursday, this case, so |
| 12:02:20 | 4 | we will begin this afternoon with the preliminary |
| 12:02:24 | 5 | instructions that I have for you. |
| 12:02:27 | 6 | Then the parties will present their opening |
| 12:02:29 | 7 | statements to you, which is their description of what they |
| 12:02:33 | 8 | expect the evidence to -- to show.  It's not evidence. |
| 12:02:40 | 9 | It's just the parties' impressions about what the case is |
| 12:02:44 | 10 | going to be about. |
| 12:02:45 | 11 | After that, we will begin with the presentation of |
| 12:02:48 | 12 | evidence.  That will probably take us through the end of |
| 12:02:52 | 13 | the day tomorrow, possibly early on Thursday morning.  But |
| 12:02:58 | 14 | I think the case will be submitted to you by Thursday.  So |
| 12:03:05 | 15 | that's what I expect for that. |
| 12:03:10 | 16 | We will provide lunch for you today and tomorrow |
| 12:03:13 | 17 | and Thursday.  You don't have to eat lunch here if you |
| 12:03:18 | 18 | don't want to.  You're free to go do your own thing if you |
| 12:03:21 | 19 | want to do that, but it does make it convenient for you, |
| 12:03:25 | 20 | and your lunch is here and upstairs in the jury room. |
| 12:03:29 | 21 | As I said, I just have a couple of ground rules I |
| 12:03:34 | 22 | want to go over with you, and then I'll talk about this in |
| 12:03:37 | 23 | more detail when we come back this afternoon. |
| 12:03:39 | 24 | The first is when the jury retires at the end of |
| 12:03:43 | 25 | the case to begin its deliberations, it will decide the |

| | | |
|---|---|---|
| 12:03:47 | 1 | case based on two things and only two things, and that is |
| 12:03:52 | 2 | the evidence that has been presented from the witness stand |
| 12:03:56 | 3 | in the form of documents and other witness testimony which |
| 12:04:02 | 4 | may be presented to you by a deposition transcript that was |
| 12:04:07 | 5 | taken at a time prior to this and nothing else. |
| 12:04:14 | 6 | So no discussions you've had with each other or |
| 12:04:17 | 7 | anyone else, nothing you've read or anything like that |
| 12:04:20 | 8 | should inform that decision-making process once |
| 12:04:26 | 9 | deliberations begin. |
| 12:04:27 | 10 | So it's critically important that you not have any |
| 12:04:30 | 11 | conversation with anyone about this case until you begin |
| 12:04:35 | 12 | your deliberations at the end of the case. |
| 12:04:38 | 13 | By the same token, it's very important for you not |
| 12:04:41 | 14 | to do any independent research or investigation.  Don't go |
| 12:04:45 | 15 | home and google the lawyers or the parties or any of the |
| 12:04:49 | 16 | witnesses or anything about the law at the end of the day. |
| 12:04:53 | 17 | Don't use your phone or your iPad to do any kind of |
| 12:04:58 | 18 | Internet search for anything like that. |
| 12:05:00 | 19 | And then, finally, I'll ask you as a juror not to |
| 12:05:05 | 20 | post anything about your involvement in this case on any |
| 12:05:10 | 21 | social media website or app. |
| 12:05:13 | 22 | So those are the three big things.  I'll go into |
| 12:05:17 | 23 | more detail about them after lunch. |
| 12:05:19 | 24 | We have a little bit of work to do in the |
| 12:05:22 | 25 | courtroom here, the attorneys and I, after -- well, before |

| | | |
|---|---|---|
| 12:05:26 | 1 | we begin the afternoon.  So I'm going to give you a little |
| 12:05:29 | 2 | longer lunch today. |
| 12:05:32 | 3 | I expect that if all goes well, we will be ready |
| 12:05:36 | 4 | to get you back into the courtroom at 1:30.  That gives you |
| 12:05:40 | 5 | an hour and a half, so you all can eat lunch, run an |
| 12:05:46 | 6 | errand, get outside, get some fresh air.  It's beautiful |
| 12:05:51 | 7 | weather we're having.  So it is my plan to have you back |
| 12:05:55 | 8 | ready to go at 1:30. |
| 12:05:56 | 9 | I think that's all I have for now.  Mr. Grigsby is |
| 12:06:00 | 10 | going to escort you upstairs to the jury room.  And as I |
| 12:06:02 | 11 | said, I'll have more instructions for you this afternoon. |
| 12:06:05 | 12 | Thank you. |
| 12:06:06 | 13 | COURT SECURITY OFFICER:  All rise. |
| 12:06:08 | 14 | (Jury out.) |
| 12:06:09 | 15 | THE COURT:  Okay.  Be seated. |
| 12:06:52 | 16 | I know that we have an issue -- some other issues |
| 12:06:59 | 17 | that needed to be raised.  I don't -- Mr. Filbin was going |
| 12:07:04 | 18 | to address that, but what I was going to suggest is we take |
| 12:07:06 | 19 | a break now and come back at 1:15.  That should -- would 15 |
| 12:07:11 | 20 | minutes be an adequate amount of time for us to cover what |
| 12:07:14 | 21 | we need to before we start? |
| 12:07:18 | 22 | MR. AIRAN:  It should be, Your Honor, but it |
| 12:07:21 | 23 | involves, I think, Dr. Putnam who is a damages expert so |
| 12:07:23 | 24 | that might be a little bit longer. |
| 12:07:25 | 25 | THE COURT:  Okay. |

| | | |
|---|---|---|
| 12:07:26 | 1 | MR. AIRAN:  I'm not sure if we're going to get to |
| 12:07:28 | 2 | Dr. Putnam today, but we'll certainly try -- |
| 12:07:31 | 3 | THE COURT:  Let's plan for 1:15 among us, and then |
| 12:07:34 | 4 | we'll have the jury with us at 1:30. |
| 12:07:36 | 5 | Does that sound okay with the Plaintiff? |
| 12:07:38 | 6 | MR. CULBERTSON:  Yes, Your Honor. |
| 12:07:39 | 7 | THE COURT:  All right.  See you at 1:15. |
| 12:07:41 | 8 | COURT SECURITY OFFICER:  All rise. |
| 12:07:43 | 9 | (Recess.) |
| 01:04:06 | 10 | (Jury out.) |
| 01:04:06 | 11 | COURT SECURITY OFFICER:  All rise. |
| 01:04:09 | 12 | THE COURT:  Please be seated. |
| 01:13:40 | 13 | Okay.  Mr. Filbin? |
| 01:13:46 | 14 | MR. FILBIN:  Yes, Your Honor. |
| 01:13:59 | 15 | Your Honor, so this is OnePlus's objections to |
| 01:14:02 | 16 | Dr. Putnam's demonstrative. |
| 01:14:06 | 17 | The first objection really involves multiple |
| 01:14:10 | 18 | slides.  It's Slides 2, 7, 8, and 28. |
| 01:14:17 | 19 | THE COURT:  Do you happen to have a clean copy of |
| 01:14:25 | 20 | them? |
| 01:14:26 | 21 | MR. FILBIN:  Yes. |
| 01:15:07 | 22 | THE COURT:  If you want to just put them on the |
| 01:15:09 | 23 | screen, that's fine, too. |
| 01:15:14 | 24 | MR. FILBIN:  Okay.  Go to Slide 2. |
| 01:15:20 | 25 | Sorry about that, Your Honor. |

01:15:26   1          THE COURT:  All right.  So tell me, again, which

01:15:29   2   slides this objection relates to.

01:15:31   3          MR. FILBIN:  Yes, Your Honor.  It's Slides 2, 7,

01:15:37   4   8, and 28.

01:15:42   5          THE COURT:  Okay.

01:15:43   6          MR. FILBIN:  So if we -- yeah, let's just start at

01:15:48   7   Slide 2.  It just -- it's a theme that carries out --

01:15:51   8   perpetuates through the four slides.

01:15:54   9          So if we could go to Slide 2.

01:15:56  10          At the top, you'll see the headline:  Patent (sic)

01:15:59  11   damages before adding certainty premium for validity and

01:16:04  12   infringement.

01:16:04  13          And there's two problems with that headline.  It's

01:16:08  14   the "adding certainty premium," and then the second

01:16:10  15   component "for validity and infringement."

01:16:12  16          The "adding certainty" component is just

01:16:16  17   Dr. Putnam's multiplier in a new clothing.  That's not --

01:16:25  18   that's contrary to MIL 14 and your Daubert order and is

01:16:30  19   different from what his opinion was, which -- which was

01:16:37  20   stricken, as far as removing litigation risk and

01:16:40  21   uncertainty.  He's allowed to talk about adding back in --

01:16:49  22   or accounting for discounts but not -- not adding in

01:16:54  23   certainty premium.

01:16:55  24          THE COURT:  So I don't know what a certainty

01:16:56  25   premium is.

01:17:00    1            MR. FILBIN:  It's a new -- nor do we.  It's a

01:17:02    2    new -- it's a new item.  It's not disclosed in his

01:17:03    3    report --

01:17:04    4            THE COURT:  Never been disclosed before?

01:17:06    5            MR. FILBIN:  -- in that manner.  No, sir.  No,

01:17:09    6    Your Honor.

01:17:09    7            And then the second component, of course, is just

01:17:11    8    the validity and infringement aspect of it which we say

01:17:13    9    violates MIL 14.

01:17:14    10           THE COURT:  Okay.  All right.

01:17:16    11           MR. FILBIN:  And MIL 9.

01:17:17    12           THE COURT:  All right.  Do you want to -- are we

01:17:20    13   going to just talk about these one at a time or --

01:17:24    14           MR. FILBIN:  I'm happy to go through the rest of

01:17:26    15   them.

01:17:26    16           THE COURT:  Let's just do it one at a time.

01:17:28    17           Are you addressing it?

01:17:31    18           MR. TIDWELL:  I am, Your Honor.

01:17:32    19           THE COURT:  All right.

01:17:33    20           MR. TIDWELL:  May I be heard?

01:17:36    21           THE COURT:  Yes.

01:17:38    22           MR. TIDWELL:  The Court's order, Docket 178,

01:17:42    23   Page 36 of 44.  It's the multiplier the Court allowed

01:17:51    24   Mr. Putnam -- Dr. Putnam to testify that the royalty rate

01:17:53    25   can be adjusted up or down.

```
01:17:54   1              As the Court recalls, he has a statistical
01:17:58   2    multiplier.  The Court didn't allow that.
01:18:00   3              THE COURT:  Right.
01:18:02   4              MR. TIDWELL:  And so what's in this slide when you
01:18:04   5    say "certainty premium" is just the counter of you can
01:18:09   6    remove the discounts.  There's nothing new here.
01:18:12   7              THE COURT:  So that -- and so what is that number?
01:18:16   8              MR. TIDWELL:  He doesn't have a -- just as the
01:18:19   9    Court had ordered, he's -- his testimony is the jury is
01:18:22   10   allowed to add that back in --
01:18:26   11             THE COURT:  Right.
01:18:28   12             MR. TIDWELL:  -- because --
01:18:30   13             THE COURT:  And so where do you get that number?
01:18:32   14             MR. TIDWELL:  From the factual witnesses about
01:18:34   15   what the program rate was.
01:18:35   16             THE COURT:  And are you going to propose this
01:18:37   17   number yourself?
01:18:38   18             MR. TIDWELL:  I believe it will come -- Dr. Putnam
01:18:41   19   will not.  I believe it will come from the program rate
01:18:45   20   that was discounted by the fact witness.
01:18:48   21             THE COURT:  And what --
01:18:49   22             MR. TIDWELL:  And then at the close, we are happy
01:18:52   23   to tell the Court this is what we think that is, and if
01:18:55   24   there's an issue before we say it, how's that?
01:19:01   25             THE COURT:  I'm not sure that's good enough.  Was
```

01:19:03   1   it -- is this an opinion that was disclosed?

01:19:06   2          MR. TIDWELL:  It is -- it is an opinion that is

01:19:07   3   disclosed by Dr. Putnam.  The Court struck part of that

01:19:12   4   opinion --

01:19:12   5          THE COURT:  No, I recall that.

01:19:15   6          MR. TIDWELL:  -- and said that he can testify that

01:19:18   7   those uncertainties can be removed.

01:19:20   8          THE COURT:  Okay.

01:19:20   9          MR. TIDWELL:  And that's as far as he's going to

01:19:22  10   go.

01:19:22  11          THE COURT:  And so why are you not prepared to

01:19:25  12   tell me what that number is now?

01:19:27  13          MR. TIDWELL:  Because I believe -- here's what I

01:19:28  14   think it is.  I believe the testimony will come from the

01:19:34  15   stand that the program rate is .70.  They reduced that to

01:19:41  16   .50 for SEPs, and that there's an early adopter that went

01:19:46  17   from .25 for NEPs to .15 for NEPs.  But that is not an

01:19:56  18   opinion Dr. Putnam will render.  I believe the fact --

01:19:59  19          THE COURT:  Is any witness going to render an

01:20:01  20   opinion about that from this witness stand in the

01:20:04  21   Plaintiffs' case?

01:20:05  22          MR. TIDWELL:  I believe so.

01:20:06  23          THE COURT:  Who?

01:20:07  24          MR. TIDWELL:  I believe Dr. Yang-Won Jung has

01:20:11  25   testimony about what their program rate is.

01:20:13  1           THE COURT:  Yeah, sure.  But, I mean, who's going

01:20:16  2   to tie that number to what the Plaintiffs are asking for in

01:20:19  3   this case?  Are we just going to -- is it just going to be

01:20:21  4   the wild, wild west when we get to closing?

01:20:26  5           MR. TIDWELL:  When we get to closing, this is the

01:20:27  6   way I would envision it, Dr. Jung testified this is their

01:20:32  7   rate.  They reduced it by this amount.  That should be

01:20:35  8   added to Dr. Putnam's number.

01:20:36  9           THE COURT:  And that opinion was disclosed by

01:20:39  10  which expert, and can you point me to -- may I finish?

01:20:45  11          MR. TIDWELL:  I'm sorry, yes.

01:20:46  12          THE COURT:  Has any expert for the Plaintiff

01:20:48  13  disclosed that as a theory of damages in the case?

01:20:51  14          MR. TIDWELL:  No, for -- for the numbers.

01:20:55  15          THE COURT:  Well, that's what you're going to be

01:20:57  16  asking the jury for, right?

01:20:59  17          MR. TIDWELL:  So our problem -- our problem is

01:21:01  18  this --

01:21:02  19          THE COURT:  Correct?

01:21:03  20          MR. TIDWELL:  Yes.

01:21:04  21          The problem is this.  Dr. Putnam says what he

01:21:11  22  said.  The Court struck his multiplier.

01:21:14  23          THE COURT:  Right.

01:21:15  24          MR. TIDWELL:  And so now the Plaintiff is relying

01:21:17  25  upon factual testimony as to the program rate and then

01:21:22   1   tying that together in closing.  That's the --

01:21:25   2        THE COURT:  If that's never been disclosed before,

01:21:27   3   I don't think that's -- I don't think you're going to be

01:21:30   4   able to do that.  I mean, this is not trial by ambush,

01:21:38   5   Mr. Tidwell.

01:21:40   6        MR. TIDWELL:  Can I respond to that?

01:21:41   7        THE COURT:  Of course.

01:21:41   8        MR. TIDWELL:  The program rate has been disclosed.

01:21:45   9   That is not an ambush.

01:21:47   10        THE COURT:  Well, it sounds like the rest of it is

01:21:50   11   an ambush.  If these are theories that have not been

01:21:53   12   disclosed before and we're hearing it for the first time

01:21:58   13   here today, I mean, I'll let Mr. Filbin speak for this, but

01:22:03   14   if it's in an interrogatory response or somewhere else --

01:22:09   15   let's hear from Mr. Filbin.

01:22:10   16        MR. TIDWELL:  Before he's heard, I believe it is

01:22:15   17   Interrogatory -- is it 10 -- where this was all disclosed.

01:22:21   18        THE COURT:  Mr. Jung's evidence, all of that was

01:22:25   19   disclosed.  Well, you can put it up after I hear from

01:22:27   20   Mr. Filbin.

01:22:27   21        MR. FILBIN:  Thank you, Your Honor.

01:22:36   22        Can we display Slide 7, please?

01:22:40   23        And, of course, we're talking about Dr. Putnam's

01:22:43   24   demonstrative here, and none of that is in Dr. Putnam's

01:22:46   25   report, and that's who would be presenting this

01:22:48   1   demonstrative with his testimony.

01:22:49   2         THE COURT:  No, I understand we've gotten --

01:22:51   3         MR. FILBIN:  And you can see here at Slide 7 it

01:22:56   4   sets up how the testimony is going to present.  In Step 5

01:23:00   5   is their add in the certainty premium, as if that is an

01:23:04   6   automatic application of some proxy for the stricken

01:23:09   7   multiplier that we don't know about, and it's simply

01:23:14   8   untethered right now to the facts of the case that I've

01:23:17   9   heard that Mr. -- Mr. Jung may be competent to present.

01:23:27   10        THE COURT:  Anything else?

01:23:29   11        MR. FILBIN:  No, Your Honor.

01:23:30   12        THE COURT:  Okay.

01:23:31   13        MR. FILBIN:  Oh, I mean, there's -- there's more

01:23:33   14   issues.

01:23:33   15        THE COURT:  Anything -- yeah, well, let's go to

01:23:35   16   the next one.

01:23:37   17        MR. FILBIN:  Okay.  Slide 6, the dispute has been

01:23:41   18   resolved.

01:23:45   19        THE COURT:  7?

01:23:46   20        MR. FILBIN:  7, 8, and 28 are all implicated by

01:23:51   21   the one we just discussed.

01:23:52   22        Slide --

01:23:54   23        THE COURT:  Well, you need to tell me exactly

01:23:56   24   what's wrong with 7, 8 and 28.

01:24:00   25        MR. FILBIN:  Oh, sure, Your Honor.

01:24:01    1          Can you present Slide 7, please?

01:24:10    2          It's the same issue that we just discussed, it's

01:24:13    3   the add in the certainty premium and then coupled with

01:24:16    4   validity and infringement.

01:24:24    5          Your Honor, may I approach?

01:24:24    6          THE COURT:  I can see it now.

01:24:25    7          MR. FILBIN:  All right.  Thank you, Your Honor.

01:24:26    8          THE COURT:  How about 8?

01:24:28    9          MR. FILBIN:  8 is -- the last row, of course,

01:24:31   10   again, it's just parroted again.

01:24:33   11          THE COURT:  Okay.

01:24:35   12          MR. FILBIN:  Certainty premium, patents determined

01:24:38   13   to be valid and infringed.

01:24:39   14          And then Slide 28, please.

01:24:41   15          The headline, same place, Pantech damages before

01:24:48   16   adding certainty premium for validity and infringement,

01:24:51   17   again, making it seem like it's going to be an automatic

01:24:57   18   application.

01:25:00   19          So that's -- those are the slides that are

01:25:04   20   implicated by the first issue.

01:25:05   21          THE COURT:  Okay.

01:25:06   22          MR. FILBIN:  Shall I present to the second issue?

01:25:09   23          THE COURT:  I'd like you to respond to the issue

01:25:12   24   that came up with Mr. Tidwell, if you're prepared to do

01:25:15   25   that.

01:25:16   1        MR. FILBIN:  Which is?

01:25:17   2        THE COURT:  Where the damages number is going to

01:25:21   3   come through -- from in closing?

01:25:23   4        MR. FILBIN:  That's the problem.  That's exactly

01:25:24   5   the problem.

01:25:25   6        THE COURT:  Help me out, Mr. Filbin.

01:25:26   7        MR. FILBIN:  Yes, Your Honor.  That's exactly the

01:25:28   8   problem.  We don't know what that number might be.  It's

01:25:30   9   subject only to the creativity of Mr. Tidwell at closing.

01:25:35   10  We don't have it in a -- we don't have it in a report.

01:25:37   11       THE COURT:  Has it been disclosed in an

01:25:39   12  interrogatory response or anywhere like that?

01:25:40   13       MR. FILBIN:  No, there's no -- there's no --

01:25:42   14  there's no increase.  The -- the number, once you remove --

01:25:46   15  or once you add a certainty premium for validity and

01:25:49   16  infringement, that's not a disclosed theory that I know of.

01:25:52   17       THE COURT:  All right.  Mr. Tidwell?

01:25:55   18       MR. TIDWELL:  Someone's going to need to get

01:26:08   19  Interrogatory 10 on the -- can you go to the bottom of 35?

01:26:52   20  Go to the next -- read over into 36.

01:26:55   21       Your Honor, may I proceed?

01:26:56   22       THE COURT:  Yes.

01:26:58   23       MR. TIDWELL:  The top of 36, this is what I said,

01:27:02   24  the .709, considering non-infringement and invalidity

01:27:08   25  risks, Pantech reduced the rate to .5, and including an

01:27:14  1    additional .25 for the non-LTE patents.

01:27:19  2         So that's been disclosed, and people have

01:27:23  3    talked -- testified about the rate, but it is not an

01:27:29  4    opinion by Dr. Putnam because he used the statistical

01:27:33  5    multiplier and that got struck.

01:27:34  6         THE COURT:  Right.  So I think at the end of the

01:27:36  7    day, what I need to know -- and I don't have to know it

01:27:39  8    right now -- but I need to know what -- what that math

01:27:43  9    looks like before we get to that point.  So --

01:27:46  10        MR. TIDWELL:  I think that's fair.

01:27:48  11        THE COURT:  Yeah.

01:27:49  12        MR. TIDWELL:  I think we will get that to you.  I

01:27:51  13   think our intention is to preview to you what we're going

01:27:56  14   to argue and close so that you don't think it's the wild,

01:28:00  15   wild west.

01:28:01  16        THE COURT:  Right.  Good.

01:28:03  17        Okay.  With respect to the -- with respect to the

01:28:12  18   slides, I think the question is, do you have any further

01:28:18  19   response you want to make about that?

01:28:20  20        MR. TIDWELL:  If -- I don't, other than that's

01:28:25  21   what he testified to.  If the Court's offended by that

01:28:30  22   language, we can say:  Before removing the discounts.

01:28:34  23        THE COURT:  I'm not -- I'm not offended by the

01:28:36  24   language, necessarily, but I -- it raises something that

01:28:39  25   I'm not sure is really necessary.  So I'd take it off the

01:28:44   1    slide.  I'd be more comfortable with that.  And we'll

01:28:47   2    handle it question-by-question when we get to the

01:28:50   3    examination.

01:28:51   4          MR. TIDWELL:  Can I get a clarification?

01:28:53   5          THE COURT:  Yes.

01:28:54   6          MR. TIDWELL:  Can the number say this is the

01:28:56   7    number before removing the discounts so that the jury knows

01:29:03   8    that there's another step that Dr. Putnam is not doing?

01:29:06   9          THE COURT:  Right.  I think you all could work out

01:29:10  10    that kind of language.

01:29:11  11          Mr. Filbin, you got any suggestions?

01:29:14  12          MR. FILBIN:  Your Honor, my suggestion would be

01:29:21  13    that it's not in Dr. Putnam's testimony since he can't

01:29:24  14    testify to it.

01:29:25  15          THE COURT:  Okay.  I misunderstood that.

01:29:27  16          Is that correct, Mr. Tidwell?  If he can't put the

01:29:32  17    number on it and tell us what the number is, how are we

01:29:35  18    going to let him testify about it?

01:29:37  19          MR. TIDWELL:  Just as he did in the first trial,

01:29:39  20    he says:  Look, when -- when you're negotiating, you don't

01:29:47  21    know if a patent is valid and you don't know if the product

01:29:50  22    is infringed, and, therefore, you have that -- you have

01:29:54  23    that reduction because of uncertainty for risk.

01:29:58  24          And all he's -- just as he said in the last trial,

01:30:02  25    once it's determined that it -- the patents are valid and

01:30:10   1   the products infringe, that discount no longer applies.

01:30:15   2   That's the extent of his testimony.

01:30:16   3        THE COURT:  Well, I mean, I think my concern is

01:30:18   4   that you -- you talk about what -- on these slides, you

01:30:22   5   talk about what the adjustment is, and he didn't talk

01:30:24   6   about, you know, how it's to be adjusted.  And he hasn't

01:30:27   7   adopted that number.

01:30:29   8        So, I mean, I'm going to let you -- I'm

01:30:33   9   going to -- I'm going to require you to stick to what he

01:30:36  10   disclosed in his report, and you finesse that however best

01:30:41  11   you can.

01:30:41  12        MR. TIDWELL:  And as issued by the Court's order

01:30:44  13   that clarified what he can and can't do; is that fair?

01:30:49  14        THE COURT:  Let's see how -- I'm not sure I

01:30:53  15   understand what you --

01:30:54  16        MR. TIDWELL:  The Court's order struck the

01:30:56  17   multiplier.

01:30:56  18        THE COURT:  Correct.

01:30:57  19        MR. TIDWELL:  But then the Court said:  He will be

01:30:59  20   allowed to testify about removal of these discounts.

01:31:03  21        THE COURT:  Right.  Yeah, I think that's fine.

01:31:05  22   But it troubles me a little bit that nobody -- we're here

01:31:08  23   on the first day of trial and nobody can tell me what that

01:31:11  24   number is, and he's not going to say what that number is,

01:31:13  25   and you can't tell me as you stand here today what that

01:31:16      1    number is.  That's a problem.

01:31:17      2         MR. TIDWELL:  I thought I did, but I admit that it

01:31:21      3    was a bit fuzzy, partly because I thought we were going to

01:31:27      4    talk about what the slide is.  But I believe it is, as I

01:31:31      5    said, 70 reduced to .5, and then the first adopter reduces

01:31:36      6    the NEP from .25 to .15.  I believe that's been testified

01:31:43      7    to.

01:31:44      8         THE COURT:  All right.  Okay.

01:31:47      9         MR. AIRAN:  Your Honor, I know the jury is coming

01:31:49     10    in.  I have one issue I would like to raise on the

01:31:52     11    testimony of Mr. Jung.

01:31:55     12         Based on your rulings today, it's my understanding

01:31:59     13    they're going to continue to try to use PX-37 which is that

01:32:02     14    same proposal.  And so we've taken all of that out of the

01:32:05     15    demonstratives.  I don't think it would be appropriate to

01:32:08     16    publish to the jury.  So we're going to object to PX-37

01:32:09     17    coming in as evidence in that form.

01:32:11     18         So I don't know what their response is.  We

01:32:13     19    provided them with -- that we were going to make this

01:32:17     20    objection.  I don't know if they have --

01:32:18     21         THE COURT:  Sure.  Who is putting that witness on?

01:32:21     22         MR. CULBERTSON:  I'm putting him on, Your Honor.

01:32:25     23    It wasn't clear to us if we had a ruling on the

01:32:28     24    admissibility of PX-37.

01:32:29     25         THE COURT:  I don't think it's been offered yet.

| | | |
|---|---|---|
| 01:32:31 | 1 | I mean, there were parts of 37 that were incredibly |
| 01:32:35 | 2 | troublesome to me.  But I don't -- I haven't ruled about |
| 01:32:39 | 3 | whether it is admitted or not. |
| 01:32:41 | 4 | MR. CULBERTSON:  Okay. |
| 01:32:42 | 5 | THE COURT:  I don't think you all have made that |
| 01:32:44 | 6 | argument.  I mean, you may have, but I haven't ruled on it. |
| 01:32:49 | 7 | MR. CULBERTSON:  Understood.  Understood. |
| 01:32:50 | 8 | THE COURT:  So... |
| 01:32:51 | 9 | MR. CULBERTSON:  You've -- you've -- at this point |
| 01:32:55 | 10 | this morning, you said certain slides which are excerpts of |
| 01:32:58 | 11 | 37 are acceptable, and you've said certain slides are not. |
| 01:33:02 | 12 | THE COURT:  That's what I've done so far. |
| 01:33:03 | 13 | MR. CULBERTSON:  And so I think some guidance |
| 01:33:08 | 14 | and -- are we able to use those slides and say they come |
| 01:33:11 | 15 | from a presentation?  It tends to be a bit artificial if we |
| 01:33:17 | 16 | say they come from nowhere.  I'm okay not admitting the -- |
| 01:33:22 | 17 | the exhibit itself, or we could do it in redacted form for |
| 01:33:27 | 18 | just those slides that you've -- |
| 01:33:29 | 19 | THE COURT:  Have trouble with? |
| 01:33:30 | 20 | MR. CULBERTSON:  Yeah, correct. |
| 01:33:32 | 21 | THE COURT:  Mr. Airan. |
| 01:33:33 | 22 | MR. AIRAN:  Yes, I'm okay with a redaction, a |
| 01:33:36 | 23 | suitable redaction.  What I'd ask is they not publish to |
| 01:33:40 | 24 | the jury those parts that are objected to. |
| 01:33:41 | 25 | THE COURT:  Oh, well, I don't think they would. |

| | | |
|---|---|---|
| 01:33:43 | 1 | MR. CULBERTSON:  Right.  And we won't. |
| 01:33:45 | 2 | MR. AIRAN:  Okay. |
| 01:33:46 | 3 | MR. CULBERTSON:  I'm going to use what you've seen |
| 01:33:48 | 4 | in the slides.  We'll need some time to properly redact the |
| 01:33:51 | 5 | document before we send it back to the jury. |
| 01:33:53 | 6 | THE COURT:  Sure.  Sure. |
| 01:33:55 | 7 | MR. AIRAN:  That's acceptable. |
| 01:33:56 | 8 | THE COURT:  So as long as both sides are paying |
| 01:33:59 | 9 | attention to the testimony and everybody is preserving |
| 01:34:02 | 10 | their record, we should be okay. |
| 01:34:03 | 11 | MR. CULBERTSON:  Your Honor, I have one issue I'd |
| 01:34:05 | 12 | like to raise if you can indulge me. |
| 01:34:07 | 13 | During voir dire, it was twice said that -- at |
| 01:34:11 | 14 | least twice said that OnePlus admits that it infringes the |
| 01:34:15 | 15 | patents, and all we're here to do is decide the amount. |
| 01:34:18 | 16 | We are here to decide the amount.  At no point |
| 01:34:23 | 17 | have they admitted infringement, and they have now left the |
| 01:34:26 | 18 | entire panel with the impression that the only dispute that |
| 01:34:29 | 19 | these parties have ever had is whether -- the amount that |
| 01:34:33 | 20 | is owed for this infringement. |
| 01:34:35 | 21 | I don't know what the correction is. |
| 01:34:37 | 22 | THE COURT:  That is -- that is the only dispute at |
| 01:34:40 | 23 | this point. |
| 01:34:41 | 24 | MR. CULBERTSON:  It is the only dispute, but they |
| 01:34:43 | 25 | certainly never admitted infringement. |

| | | |
|---|---|---|
| 01:34:44 | 1 | THE COURT:  All right.  So -- |
| 01:34:46 | 2 | MR. CULBERTSON:  The impression they've created is |
| 01:34:48 | 3 | that, is like, oh, you know what, we're using your patents, |
| 01:34:50 | 4 | let's go figure out what that value is. |
| 01:34:52 | 5 | THE COURT:  All right. |
| 01:34:53 | 6 | MR. CULBERTSON:  And I raise it now because I |
| 01:34:54 | 7 | don't want -- I don't think it should be said again in |
| 01:34:56 | 8 | opening. |
| 01:34:56 | 9 | THE COURT:  I agree. |
| 01:34:59 | 10 | MR. CULBERTSON:  The preliminary instructions may |
| 01:35:02 | 11 | be enough. |
| 01:35:02 | 12 | THE COURT:  Yeah. |
| 01:35:02 | 13 | MR. CULBERTSON:  But I -- it's an important -- |
| 01:35:06 | 14 | it's an important misimpression that has been made. |
| 01:35:10 | 15 | THE COURT:  Are you doing opening? |
| 01:35:12 | 16 | MR. THOMPSON:  I am. |
| 01:35:13 | 17 | THE COURT:  Do you understand the objection?  It's |
| 01:35:15 | 18 | a legitimate objection.  I'm not going to issue any kind of |
| 01:35:17 | 19 | instruction at this point.  I don't think that the jury |
| 01:35:20 | 20 | caught that, but if it gets repeated, I will definitely |
| 01:35:23 | 21 | consider doing it. |
| 01:35:25 | 22 | MR. CULBERTSON:  Thank you, Your Honor. |
| 01:35:27 | 23 | THE COURT:  All right. |
| 01:35:29 | 24 | MR. FILBIN:  Your Honor, just -- we went off of |
| 01:35:33 | 25 | Putnam.  There's a couple more issues on Putnam. |

| | | |
|---|---|---|
| 01:35:36 | 1 | THE COURT:  Well, the jury is waiting now.  If you |
| 01:35:39 | 2 | want it to eat into your time, I'm more than happy to do |
| 01:35:43 | 3 | that. |
| 01:35:43 | 4 | MR. FILBIN:  No, Your Honor. |
| 01:35:46 | 5 | THE COURT:  Just keep talking, Mr. Filbin. |
| 01:35:48 | 6 | All right.  Let's have the jury brought down. |
| 01:38:32 | 7 | COURT SECURITY OFFICER:  Please rise for the jury. |
| 01:38:38 | 8 | (Jury in.) |
| 01:38:38 | 9 | THE COURT:  Please be seated. |
| 01:39:05 | 10 | Okay.  Ladies and gentlemen, welcome back.  I hope |
| 01:39:11 | 11 | you enjoyed your lunch.  We're starting fairly close to |
| 01:39:14 | 12 | 1:30, so that's good. |
| 01:39:18 | 13 | You've now been sworn as the jury to try the case, |
| 01:39:21 | 14 | and I'm going to go over some instructions with you. |
| 01:39:25 | 15 | As the jury, you'll decide disputed questions of |
| 01:39:28 | 16 | fact, and I will, as the Judge, decide questions of law and |
| 01:39:33 | 17 | procedure. |
| 01:39:34 | 18 | From time to time throughout the course of the |
| 01:39:35 | 19 | next couple of days, I will instruct you on the rules of |
| 01:39:39 | 20 | law that you must follow in making your decision. |
| 01:39:43 | 21 | I'm going to say a few words about your conduct as |
| 01:39:46 | 22 | jurors.  The Constitution guarantees the right to trial by |
| 01:39:52 | 23 | an impartial jury, and that means that you, as the jury, |
| 01:39:56 | 24 | must decide the case based on the evidence that's presented |
| 01:40:01 | 25 | and the law that's given to you here in the courtroom, and |

01:40:05    1    I want to walk through a few examples about what that

01:40:07    2    means.

01:40:07    3            First, as I told you before we broke, please don't

01:40:11    4    discuss the case with anyone, including members of your

01:40:14    5    family, your friends, people involved in the trial, even

01:40:18    6    your fellow jurors during the course of the trial, nor

01:40:22    7    should anybody discuss the case with you.  If anybody

01:40:25    8    should try to talk to you about the case or approach you

01:40:28    9    about the case, please inform me immediately.

01:40:31    10            Once deliberations begin, you will be allowed to

01:40:37    11   discuss the case and the evidence you've seen and the law

01:40:41    12   that I've given to you with your fellow jurors, but you

01:40:44    13   should continue not to discuss the case with anyone else

01:40:47    14   until you have reached a verdict, and the case has come to

01:40:51    15   an end.

01:40:52    16            And, remember, these instructions are about all

01:40:54    17   kinds of communications.  So no in-person conversations, no

01:40:59    18   phone calls, no emails, no texts, no tweeting, no status

01:41:04    19   updates about the case or the fact that you're serving as a

01:41:09    20   jury -- as a juror.

01:41:11    21            Please don't post pictures or any kind of updates

01:41:13    22   or videos about the case, and that includes information

01:41:17    23   about parties, witnesses, participants, claims, evidence,

01:41:21    24   or anything else related to the case.

01:41:24    25            Second, don't conduct any independent

01:41:27  1  investigation or research into the case, the legal matters

01:41:35  2  or issues, the attorneys, any of the parties involved in

01:41:37  3  the case.

01:41:37  4      Don't learn anything about the case from any

01:41:40  5  outside source, such as a newspaper article or something on

01:41:48  6  the radio or television or something that is on the

01:41:51  7  Internet.

01:41:51  8      Again, the reason for this is very important.  It

01:41:55  9  would violate your oath as a juror because you would be

01:41:58  10  considering something other than the evidence that's been

01:42:01  11  presented in the case, and it could result in a mistrial.

01:42:06  12      Third, if for any reason you need to communicate

01:42:08  13  with me, just give a note to one of the Court Security

01:42:12  14  Officers, Mr. Grigsby in the morning and Mr. Goecke in the

01:42:17  15  afternoon.

01:42:17  16      Fourth, don't make up your mind about what the

01:42:21  17  verdict should be until the very end of the case after

01:42:23  18  you've heard all of the evidence, you've heard my

01:42:26  19  instructions on the law, and you've heard the parties'

01:42:29  20  closing arguments.  You should keep an open mind until

01:42:33  21  then.

01:42:34  22      I'm going to remind you about these rules

01:42:37  23  throughout the course of the next couple of days, not

01:42:40  24  because I have any concern about your ability to follow

01:42:43  25  them.  I don't.  But I do want to emphasize how important

| | | |
|---|---|---|
| 01:42:48 | 1 | it is that you follow the rules.  And I'll ask you to |
| 01:42:55 | 2 | forgive me for reminding you about those throughout the |
| 01:43:00 | 3 | trial. |
| 01:43:00 | 4 | As the jury, it's going to be your role and your |
| 01:43:03 | 5 | duty to decide disputed questions of fact.  I will decide |
| 01:43:07 | 6 | questions of law and procedure.  I'm giving you |
| 01:43:09 | 7 | instructions now about your conduct and about the law that |
| 01:43:12 | 8 | you must follow, and I will do that again at the end of the |
| 01:43:17 | 9 | trial. |
| 01:43:18 | 10 | After I finish the instructions, the parties will |
| 01:43:22 | 11 | present what we call opening statements.  They are intended |
| 01:43:25 | 12 | to assist you on -- in understanding what the parties |
| 01:43:31 | 13 | expect the evidence to be.  What they say in their opening |
| 01:43:36 | 14 | statements, indeed what they say at any time during the |
| 01:43:40 | 15 | course of the trial, is not evidence. |
| 01:43:45 | 16 | The opening statement is just a description of |
| 01:43:48 | 17 | what they expect the evidence to show. |
| 01:43:50 | 18 | What you should base your decision on is the |
| 01:43:54 | 19 | evidence that you'll hear from the witness stand and by |
| 01:43:59 | 20 | deposition testimony and the exhibits that I admit into |
| 01:44:02 | 21 | evidence.  And you will rely on this evidence in making |
| 01:44:05 | 22 | your decision as to what the verdict should be. |
| 01:44:08 | 23 | I want to tell you a little bit about the case. |
| 01:44:12 | 24 | It's a patent damages case.  The party who brings |
| 01:44:16 | 25 | a lawsuit is called the Plaintiff, or in this case, the |

01:44:21  1   Plaintiffs.  And they are Pantech Corporation and Pantech

01:44:26  2   Wireless LLC.  And we will refer to them as the Plaintiffs

01:44:29  3   or Pantech.

01:44:30  4         The party against whom the suit is brought is

01:44:34  5   called the Defendant, and in this case the Defendant is

01:44:37  6   OnePlus Technology (Shenzhen) Company Limited.  And we will

01:44:42  7   refer to them as the Defendant or OnePlus.

01:44:44  8         After they have presented their main cases, what

01:44:50  9   we call their case-in-chief, they may be presented to --

01:44:55  10  permitted to present what's called rebuttal evidence.

01:44:58  11        And after all of the evidence is in, I will

01:45:01  12  instruct you on the law, and I will give you detailed

01:45:05  13  instructions orally, as I am doing now, and written

01:45:11  14  instructions, as well, so that you will have them to take

01:45:14  15  with you to the jury room once you begin deliberations.

01:45:17  16        After I've given you those final instructions at

01:45:20  17  the end of the case, you'll hear the parties' closing

01:45:25  18  arguments.

01:45:25  19        And then after those closing arguments, you will

01:45:27  20  return to the jury room to begin your deliberations on all

01:45:30  21  of the evidence, consider my instructions on the law, and

01:45:34  22  reach a unanimous verdict as to the questions that will be

01:45:39  23  sent out on the verdict -- or set out on the verdict form

01:45:43  24  for you.

01:45:44  25        It's important for you during the course of the

01:45:47   1   trial to keep an open mind.  Don't decide any fact until

01:45:52   2   you've heard all of the evidence and I have instructed you

01:45:59   3   on the law and you've heard the parties' closing arguments.

01:46:02   4        You should pay close attention to the evidence.

01:46:05   5   Don't let bias or sympathy or prejudice play any part in

01:46:09   6   your evaluation of the evidence.  A corporation and all

01:46:13   7   other persons are equal before the law and must be treated

01:46:17   8   as equals in a court of justice.

01:46:20   9        You all should have notebooks there in the jury

01:46:23   10  room with you.  Feel free to take notes throughout the

01:46:26   11  course of the trial if you wish to do so.  And if you do, I

01:46:32   12  would encourage you not to get so focused on your

01:46:35   13  note-taking that you become distracted or miss part of the

01:46:38   14  testimony.  Your notes are really only aids to your memory,

01:46:43   15  and if later on your memory differs from what your notes

01:46:46   16  are, you should rely on your memory and not what you wrote

01:46:50   17  down.

01:46:51   18       If you don't take notes, you should rely on your

01:46:55   19  own independent recollection of what the testimony was, and

01:46:59   20  you should not be unduly influenced by the notes of other

01:47:04   21  jurors.

01:47:04   22       A juror's notes are not entitled to any greater

01:47:08   23  weight than the recollection each individual juror has

01:47:11   24  about what the testimony was.

01:47:13   25       One thing that is a source of confusion, sometimes

01:47:18   1   our court reporter, Ms. Holmes, is making stenographic

01:47:22   2   notes of everything that's said, but a typewritten

01:47:25   3   transcript will not be available for your use during

01:47:30   4   deliberations.

01:47:32   5        On the other hand, all of the exhibits that are

01:47:34   6   admitted into evidence will be available for your

01:47:39   7   examination and review during your deliberations.

01:47:42   8        I want to tell you a little bit about the parties

01:47:45   9   and the nature of the case.  As I said, it's a patent

01:47:48  10   damages case, and it involves a dispute that's related to

01:47:53  11   four U.S. patents, and I want to explain to you a little

01:47:57  12   bit about what a patent is and how you get one.

01:47:59  13        Our Constitution gives Congress the power to enact

01:48:03  14   laws to promote the progress of science and useful arts by

01:48:08  15   securing for a limited term to inventors the exclusive

01:48:11  16   rights of their respective discoveries.

01:48:15  17        And pursuant to that power, Congress has enacted

01:48:18  18   patent laws, and patents are granted or issued by the

01:48:22  19   Patent and Trademark Office, and you'll hear the parties

01:48:24  20   refer to that office as the PTO, or the Patent and

01:48:28  21   Trademark Office.

01:48:28  22        That's an agency of the Federal Government.

01:48:32  23        And a patent has a life for a limited amount of

01:48:35  24   time, and once it expires, the invention becomes part of

01:48:39  25   the public domain, and that means anyone is free to use it.

01:48:42  1    A patent owner at that point may no longer exclude

01:48:45  2    anyone from making use of the invention that is claimed in

01:48:51  3    the patent.  Everyone has a right to use existing knowledge

01:48:54  4    and principles, and a patent cannot remove from the public

01:48:58  5    the ability to use what was known or obvious before the

01:49:01  6    invention was made or patent protection was sought.

01:49:05  7          To be entitled to patent protection, an invention

01:49:08  8    must be new, useful, and non-obvious.

01:49:12  9          A valid U.S. patent gives the patent owner the

01:49:15  10   right to prevent others from making, using, offering to

01:49:18  11   sell, or selling the patented invention within the U.S. or

01:49:22  12   from importing the invention into the U.S. without the

01:49:26  13   patent holder's permission.

01:49:28  14         The patent owner possesses this right for up to 20

01:49:31  15   years from the date the application was filed.  A violation

01:49:36  16   of those patent rights is what we call infringement, and

01:49:39  17   the patent owner may try to enforce a patent against

01:49:43  18   persons believed to be infringers by a lawsuit filed in

01:49:47  19   federal court.

01:49:48  20         I want to talk about the patents involved in this

01:49:51  21   case.  There are four.  They are Patent Nos. 10,869,247,

01:49:58  22   and it'll be referred to as the '247.  There is the

01:50:03  23   9,063,654, which will be referred to as the '654.  There is

01:50:06  24   the 11,012,954, which will be referred to as the '954.  And

01:50:13  25   there is the 9,548,839, which will be referred to as the

| | | |
|---|---|---|
| 01:50:18 | 1 | '839. |
| 01:50:18 | 2 | The patents may also be referred to collectively |
| 01:50:22 | 3 | as the Pantech patents.  They may be referred to as the |
| 01:50:27 | 4 | asserted patents or the patents at issue or the |
| 01:50:30 | 5 | patents-in-suit.  Those are just a short way to refer to |
| 01:50:33 | 6 | them collectively. |
| 01:50:34 | 7 | Now, it has been determined that certain OnePlus |
| 01:50:40 | 8 | products infringe Claim 1 of the '247 patent, Claims 6 and |
| 01:50:45 | 9 | 9 of the '954 patent, Claim 9 and 11 of the '839 patent, |
| 01:50:51 | 10 | and Claims 1, 6, and 10 of the '654 patent. |
| 01:50:54 | 11 | Pantech is entitled to damages for this |
| 01:50:58 | 12 | infringement, and the parties disagree about what the |
| 01:51:02 | 13 | amount of those damages is or should be. |
| 01:51:05 | 14 | The amount of damages for the infringement by |
| 01:51:09 | 15 | OnePlus is the only issue you will decide in this case. |
| 01:51:13 | 16 | I'm going to give you a summary of the parties' |
| 01:51:15 | 17 | positions. |
| 01:51:16 | 18 | Pantech contends that it is entitled to money |
| 01:51:19 | 19 | damages that would compensate it for OnePlus's |
| 01:51:24 | 20 | infringement.  OnePlus contends that Pantech is only |
| 01:51:27 | 21 | entitled to a reasonable royalty, which in the case of the |
| 01:51:32 | 22 | '247, '839, and '954 patents should not exceed what is |
| 01:51:37 | 23 | called a fair, reasonable, and non-discriminatory royalty |
| 01:51:42 | 24 | rate.  It's also referred to as a FRAND rate. |
| 01:51:45 | 25 | Your job as a juror is going to be to decide money |

01:51:52    1    damages to be awarded to the Plaintiff to compensate it for

01:51:55    2    the infringement.

01:51:56    3         Now, what is evidence?  Evidence that you consider

01:52:01    4    in deciding what the facts are consists of the sworn

01:52:04    5    testimony from the witness stand, which is right over here

01:52:07    6    to my left, exhibits that are admitted into evidence, and

01:52:12    7    any sworn statement that is presented to you by videotape

01:52:19    8    or that is read to you by the attorneys, and then, finally,

01:52:24    9    any facts that the parties have stipulated or agreed to.

01:52:29   10         You're going to see some exhibits, and some of

01:52:33   11    those will have information that's been blacked out.  We

01:52:39   12    call that redactions, and documents are frequently

01:52:44   13    redact -- redacted, and that's because they're just not

01:52:48   14    relevant to the determination that you're going to be asked

01:52:51   15    to make, and they would be distracting to you if they were

01:52:54   16    not redacted.

01:52:55   17         So you should just ignore those redactions.  Pay

01:52:59   18    no mind to them at all.  And don't speculate about what

01:53:03   19    information has been redacted.  Just focus on the rest of

01:53:07   20    the document.

01:53:07   21         I want to talk to you about what is not evidence.

01:53:11   22    The following things are not evidence, and you should not

01:53:15   23    consider them to be evidence in terms of deciding anything

01:53:19   24    at all about this case.

01:53:21   25         Other than a stipulated fact, any statement or

01:53:29  1   argument that an attorney makes is not evidence, and you

01:53:33  2   must not consider them as evidence.

01:53:37  3       Any questions that the attorney asks or an

01:53:42  4   objection that the opposing attorney makes, none of that is

01:53:47  5   evidence.  Any testimony that for whatever reason I

01:53:52  6   ignore -- I instruct you to ignore or to disregard, you

01:53:56  7   should ignore or disregard.  That testimony is not

01:54:01  8   evidence.  Anything that you see or hear when you're not in

01:54:04  9   the courtroom is not evidence and must be ignored.

01:54:09  10      Generally speaking, there's two types of evidence.

01:54:11  11  There's what we call direct evidence, which is testimony of

01:54:14  12  an eyewitness, and the other is something called indirect

01:54:17  13  or circumstantial evidence, and that's evidence that proves

01:54:21  14  a fact from which you can logically conclude that another

01:54:24  15  fact exists.

01:54:26  16      As a general rule, the law makes no distinction

01:54:29  17  between direct and circumstantial evidence.  It just

01:54:34  18  requires that you determine the facts from all of the

01:54:36  19  evidence, whether it is direct, circumstantial, or any

01:54:40  20  combination of the two.

01:54:41  21      In deciding the facts in the case, you may have to

01:54:49  22  decide which testimony to believe and which not to believe.

01:54:53  23  And you may believe everything a witness says, you may

01:54:56  24  believe part of it, and you may believe none of it.

01:55:00  25      In considering the testimony of a witness, you

01:55:02    1    must first take into account the opportunity and the

01:55:06    2    ability of the witness to see or hear or to know the things

01:55:10    3    that he or she testifies to.

01:55:13    4         Second, you must take into account the witness's

01:55:17    5    memory and how good it is or it is not.

01:55:21    6         Third, the witness's manner in testifying.

01:55:26    7         Fourth, the witness's interest in the outcome of

01:55:29    8    the case or any bias or prejudice that he or she may have.

01:55:34    9         Fifth, is there other evidence that contradicts

01:55:39   10    that witness's testimony.

01:55:41   11         Sixth, the reasonableness of that witness's

01:55:46   12    testimony in light of the other evidence that you see or

01:55:49   13    hear.

01:55:49   14         And, finally, any other factor that you believe

01:55:54   15    bears on credibility -- on the credibility of the witness.

01:55:58   16         The weight of the evidence as to a certain fact

01:56:02   17    does not necessarily depend on the number of witnesses who

01:56:08   18    testify.  You must consider only the evidence in the case,

01:56:11   19    but you may be permitted to draw such reasonable inferences

01:56:14   20    from the testimony and the exhibits that you feel are

01:56:17   21    justified in the light of common experience.

01:56:20   22         You may make deductions and reach conclusions that

01:56:24   23    evidence and common sense lead you to make in light of the

01:56:28   24    testimony and the other evidence.

01:56:30   25         The testimony of a single witness may be

01:56:33    1    sufficient to prove any fact, even if a greater number of

01:56:36    2    witnesses have testified to the contrary, if after

01:56:41    3    considering all of the evidence you believe that single

01:56:44    4    witness.

01:56:45    5          When knowledge of a technical subject matter may

01:56:48    6    be helpful to the jury, a person who has special training

01:56:51    7    or experience in that field is called an expert witness.

01:56:55    8          An expert witness is permitted to state his or her

01:56:58    9    opinion on those technical matters.  However, you are not

01:57:01   10    required to accept that opinion.  As with any other

01:57:05   11    witness, it is up to you as a juror to decide whether to

01:57:09   12    accept it or not.

01:57:10   13          And, as I said, during trial, certain testimony

01:57:15   14    will be presented to you in the form of -- of prior sworn

01:57:21   15    testimony, and that's what happens when a witness testifies

01:57:25   16    who for some -- has previously testified who for one reason

01:57:29   17    or another cannot be here in the courtroom to testify, and

01:57:34   18    the testimony is presented to you in that form either by

01:57:38   19    video or by having the attorneys read the testimony to you.

01:57:42   20          It is testimony given under oath, just like all

01:57:47   21    testimony, and it should be and is entitled to the very

01:57:51   22    same consideration by you, insofar as possible, as if the

01:57:56   23    witness had been present here in the courtroom testifying

01:57:59   24    from the witness stand.

01:58:00   25          And you may judge that testimony as to its

01:58:05    1    credibility and weight and otherwise consider it just the

01:58:08    2    same as you would if the testimony had occurred here in the

01:58:13    3    courtroom.

01:58:13    4         It is the duty of the attorneys to advocate for

01:58:16    5    their clients and their client's position, and it is their

01:58:22    6    duty to object when the other side offers testimony or

01:58:24    7    evidence that the attorney believes is not properly

01:58:26    8    admissible.

01:58:28    9         And by allowing testimony or other evidence to be

01:58:31    10   introduced over the objection of an attorney, I do not,

01:58:36    11   unless I tell you otherwise, indicate any opinion at all

01:58:39    12   about the weight or the effect of what the evidence is.

01:58:42    13        The jury is the sole credibility of all of the

01:58:48    14   witnesses and the weight and the effect of all of the

01:58:51    15   testimony.

01:58:51    16        If I sustain an objection to a question that has

01:58:55    17   been asked, you just disregard the question entirely, and

01:58:59    18   don't draw any inference from the wording of it or

01:59:02    19   speculate about what the witness might have said or would

01:59:05    20   have said if he or she had been permitted to answer the

01:59:10    21   question.

01:59:10    22        Now, we talked about the burden of proof in -- in

01:59:16    23   the morning.  The attorneys asked you about it.  It is the

01:59:22    24   standard by which facts have to be proven.  You all are

01:59:27    25   familiar with proof beyond a reasonable doubt.  You've

01:59:30  1    heard that on television, I'm sure.  That's the highest
01:59:35  2    burden of proof, and it's used only in criminal cases.  It
01:59:39  3    does not apply in this case.
01:59:41  4         In a patent case like this that addresses only the
01:59:44  5    question of damages, the relevant proof is what we call the
01:59:47  6    preponderance of the evidence, and it just means that you
01:59:49  7    must be persuaded by the evidence that the claim or defense
01:59:51  8    is more likely true than not true.  And you should base
01:59:54  9    your decision on all of the evidence, regardless of which
01:59:58  10   party presented it.
01:59:59  11        In this case, Pantech has the burden of proving
02:00:02  12   its damages by a preponderance of the evidence.
02:00:06  13        Now, I have given the parties a very limited
02:00:10  14   amount of time.  I fully expect we will conclude this trial
02:00:14  15   on Thursday, the day after tomorrow.  It is an amount of
02:00:18  16   time that I think gives them an opportunity to adequately
02:00:24  17   present their case.  There are strict timelines.  They will
02:00:28  18   not be wasting your time.  I will not be wasting your time.
02:00:32  19        I'm going to ask you to be here tomorrow morning a
02:00:37  20   little bit before 9:00 o'clock so that you can get into the
02:00:40  21   building, get up to the jury room, get situated and
02:00:45  22   settled, and then we'll get you down here and plan to start
02:00:47  23   at 9:00 o'clock in the morning.
02:00:49  24        We will go somewhere until the middle morning and
02:00:52  25   take a break.  Somewhere around noon we will break for

02:00:57  1   lunch and come back.  And then go until 3:00 o'clock or so

02:01:06  2   in the afternoon, somewhere in that neighborhood, and we'll

02:01:08  3   take an afternoon break.

02:01:09  4        As you know, we're providing lunch for you every

02:01:12  5   day.  Again, if you don't want to participate in that,

02:01:16  6   that's not a problem.  Just let us know that, and we can

02:01:19  7   accommodate that.  And if any of you have any dietary

02:01:23  8   restrictions, please just let us know, and we will do our

02:01:26  9   best to accommodate that as well.

02:01:28  10       As I told you, we are on strict timelines.  There

02:01:34  11   will inevitably be things that arise in the next couple of

02:01:38  12   days that do require me to visit with the attorneys outside

02:01:41  13   the presence -- outside of your presence, for the most

02:01:45  14   part.  We will do that in the mornings or over the lunch

02:01:51  15   hour or over a break.

02:01:53  16       There will be times during the trial where I visit

02:01:55  17   with them over at the sidebar over here at the bench.  And

02:02:02  18   I will ask you just not to concern yourself about that.

02:02:07  19   Those times when we keep you waiting are inevitable in the

02:02:12  20   trial, but I can assure you, we will do our very best to

02:02:17  21   limit them as much as possible.

02:02:19  22       And, as I said, the parties have streamlined their

02:02:24  23   case, and they are prepared to put them on in a very

02:02:27  24   efficient manner.

02:02:29  25       All that is to say if anybody has any kind of a

02:02:34   1   scheduling issue in the evenings, tomorrow or Thursday, do

02:02:42   2   please let us know that, and we can work around that.  But

02:02:45   3   we will roughly go from 9:00 to 5:00 until the case is

02:02:51   4   resolved.

02:02:56   5          I think that's all that I have.  I appreciate your

02:03:00   6   attention.

02:03:01   7          And, at this time, the Plaintiff may present its

02:03:07   8   opening statement.

02:03:08   9          MR. FUSSELL:  Your Honor, if I may have a

02:03:15  10   five-minute warning.

02:03:16  11          THE COURT:  Yes.

02:03:16  12          MR. FUSSELL:  May it please the Court.

02:03:17  13          Good afternoon, ladies and gentlemen of the jury.

02:03:20  14   My name is Tripp Fussell, and it's my honor to represent

02:03:23  15   Pantech in this very important case.

02:03:24  16          Growing up right here in Texarkana, I shared the

02:03:28  17   same values of hard work and fairness that I'm sure you all

02:03:32  18   hold dear.  And we are here today to uphold those values

02:03:36  19   and ensure that Pantech receives just compensation for the

02:03:39  20   unauthorized use of its intellectual property.

02:03:41  21          I want to echo what the Judge has said about

02:03:45  22   sacrifice.  We know that it is a sacrifice for y'all to be

02:03:48  23   here today, both personally and financially, and we

02:03:52  24   appreciate your time and commitment to this case.

02:03:53  25          I would like to, again, introduce my colleagues.

02:03:57    1    With me is Mr. Kelly Tidwell and Mr. Geoff Culbertson, also

02:04:00    2    from right here in Texarkana.  And I have with me from my

02:04:03    3    firm, Ms. Tiffany Miller, Ms. Courtney Krawice, and Gray

02:04:09    4    Buccigross, back here, as well.  We're excited to present

02:04:12    5    our case.

02:04:12    6         We also have and y'all were introduced to him

02:04:15    7    earlier, Dr. Yang-Won Jung, and he's here as the VP of

02:04:20    8    Pantech, and he's come all the way from Seoul, South Korea,

02:04:23    9    to be with us here today.

02:04:24    10        We're here because Pantech's essential technology,

02:04:27    11   which is critical to the operation and the competitiveness

02:04:28    12   of modern-day smartphones is being used by OnePlus --

02:04:34    13   OnePlus Technology (Shenzhen) without their permission.

02:04:37    14        This isn't just any technology.  The patents are

02:04:40    15   foundational to 4G and 5G standards and enables smartphones

02:04:45    16   to operate and communicate over the wireless network

02:04:49    17   effectively and efficiently.  Without this technology,

02:04:52    18   OnePlus smartphones would not work properly, if at all, and

02:04:56    19   U.S. carriers, such as Verizon and AT&T, wouldn't sell

02:05:00    20   their phones because they wouldn't operate on the network.

02:05:03    21        As the Court has just informed you, it has been

02:05:07    22   determined that certain OnePlus products infringe Pantech's

02:05:10    23   valid United States patents.  So your task is only to

02:05:13    24   determine the appropriate amount of damages OnePlus must

02:05:17    25   pay for Pantech's patents -- using Pantech's patents

02:05:19    1   without permission.

02:05:20    2          The law mandates OnePlus must pay no less than a

02:05:27    3   reasonable royalty for this infringement.  Therefore, we'll

02:05:29    4   be asking you to carefully consider the evidence this week

02:05:32    5   and decide the fair amount of money that OnePlus owes

02:05:37    6   Pantech.

02:05:37    7          Imagine, if you will, a person who has been using

02:05:43    8   someone's property without permission.  If that property

02:05:46    9   owner discovers the unauthorized use, he's entitled to fair

02:05:49   10   compensation.  That is the same -- that's the same thing

02:05:51   11   that's happened here.

02:05:54   12          OnePlus has unauthorizedly used our technology,

02:05:59   13   and Pantech is entitled to compensation for that.  And

02:06:02   14   because the trial is only about damages, OnePlus is going

02:06:05   15   to try to minimize the amount that they have to pay.

02:06:08   16   Right?

02:06:08   17          They're going to come up with all these excuses,

02:06:11   18   but that's only excuses to keep from paying the fair

02:06:15   19   amount.  And ask yourself throughout this trial, if

02:06:19   20   Pantech's technology was worth so little, why are they

02:06:22   21   using it?

02:06:26   22          In this courtroom, we must remember that OnePlus's

02:06:28   23   actions have deprived our client of the fair benefits and

02:06:33   24   rewards of their intellectual property.  Just as a

02:06:35   25   landowner deserves fair compensation for the use of its

02:06:38   1   land, Pantech deserves fair compensation for the use of its

02:06:41   2   intellectual property.

02:06:41   3        We will present evidence showing the value of

02:06:46   4   Pantech's patented technology.  We will demonstrate the

02:06:48   5   fair value for the infringement.  And we will demonstrate

02:06:51   6   what -- what's necessary to uphold the principles of

02:06:54   7   justice and protect the rights of innovators and to foster

02:06:59   8   further innovation in this country.

02:07:01   9        The infringed patents in this case are part of a

02:07:04  10   large portfolio of patents that Pantech owns, about 1,800

02:07:07  11   patents.  These patents are not just pieces of paper.  They

02:07:10  12   represent years of research, development, and innovation.

02:07:15  13        The patents at issue in this case are referred to

02:07:17  14   by the last three digits.  They are the '247, the '954, the

02:07:23  15   '839, and the '654 patents.  They cover critical aspects of

02:07:28  16   wireless communication and user interface technology.

02:07:32  17        For instance, the '247, the '954, and the '839,

02:07:35  18   they are standard essential patents.  We often refer to

02:07:38  19   these as SEPs, and they relate to the 4G and 5G's

02:07:42  20   technology, meaning that phones can't comply with the

02:07:45  21   standard without using this patented technology.

02:07:47  22        The '654 patent relates to user interface and app

02:07:52  23   functionality on a smartphone.

02:07:54  24        You'll hear a lot about standards this week, so

02:07:57  25   what exactly is a standard?  Imagine a wireless network is

02:08:01   1   a highway system.  For cars to travel smoothly across our

02:08:06   2   highways, you have to have standardized rules.  We have

02:08:10   3   speed limits, traffic signs, lane markings.

02:08:13   4         In the same way, wireless standards are the rules

02:08:15   5   that allow smartphones from different manufacturers like

02:08:18   6   OnePlus, Apple, or Samsung, to communicate seamlessly with

02:08:22   7   and even across different networks.

02:08:25   8         So when you make a call or text someone, you don't

02:08:29   9   have to worry about what kind of phone they have or even if

02:08:32  10   they're on the same network as you are to know that it is

02:08:34  11   going to work properly, and without these standards, the

02:08:37  12   functionality that we take for granted in our phones would

02:08:40  13   not even exist.

02:08:41  14         The technology landscape has evolved significantly

02:08:44  15   over the years.  We started with 2G technology which

02:08:50  16   allowed your phone to just make a call or text message.

02:08:55  17         And then we progressed to 3G which introduced

02:08:55  18   Internet, although it was very slow.

02:08:57  19         And then we have 4G technology which introduced

02:09:01  20   high-speed Internet which enables video streaming and

02:09:04  21   online gaming and more.

02:09:06  22         And now we're in the era of 5G technology, which

02:09:08  23   promises even faster speeds and more reliable

02:09:11  24   communication.

02:09:11  25         Pantech's patents are integral to the 4G and 5G

02:09:17  1   advancements that are the backbone of modern wireless

02:09:20  2   communications.

02:09:20  3        Here are some other key facts to consider.  You'll

02:09:24  4   see the patent applications that ultimately led to these --

02:09:27  5   the patents-in-suit go back as far as 2004.  To put that

02:09:31  6   into context, Apple didn't even launch its first iPhone

02:09:36  7   until -- 2G phone until the end of 2007, and it didn't

02:09:43  8   launch a 4G phone until September of 2012.

02:09:46  9        And OnePlus, it did not even exist until 2013.

02:09:50  10  The inventors were investing in, working on, and developing

02:09:53  11  and notably patenting 4G and 5G technology almost a full

02:09:57  12  decade before OnePlus even existed.

02:09:59  13       These are the SEPs that OnePlus infringes.  These

02:10:04  14  improve the way phones communicate with each other and with

02:10:08  15  cell towers.  OnePlus also infringes a patent that improves

02:10:12  16  the phone's user interface, the way it communicates -- the

02:10:17  17  way users communicate and interact with the phone.  This is

02:10:18  18  the '645 (sic) patent, as I mentioned.  And we'll talk more

02:10:21  19  about that later.

02:10:21  20       But keep in mind that all these patents are part

02:10:24  21  of a larger patent portfolio that Pantech owns.

02:10:27  22       You're going to hear from Pantech's VP, Dr. Jung,

02:10:31  23  as he -- he has a Ph.D. in electrical engineering and has

02:10:36  24  assisted companies in licensing their intellectual property

02:10:38  25  for many years.  He's going to tell you about Pantech's

02:10:41  1    patent portfolio and about how they came up with their

02:10:43  2    standard licensing rate.

02:10:45  3          Mr. Jung is from Seoul, Korea, as you've heard,

02:10:48  4    and he speaks great English, but he's going to be using the

02:10:52  5    assistance of an interpreter for clarity.

02:10:53  6          Then you will hear the testimony of Mr. B.J. Kim.

02:10:58  7    Mr. Kim is the CEO of Pantech, Inc.  That is the

02:11:01  8    predecessor to Pantech.  And, unfortunately, Mr. Kim is

02:11:05  9    unable to be with us live this week, so we will be reading

02:11:08  10   his prior sworn testimony.

02:11:09  11         His testimony will cover Pantech, Inc.'s attempts

02:11:14  12   to relaunch the company and how they were simply unable to

02:11:17  13   break back into the market, unable to compete with the

02:11:21  14   behemoths, and ultimately had to shut down their

02:11:25  15   operations.

02:11:25  16         His testimony will also inform you about Pantech,

02:11:26  17   Inc., entering into agreements with Apple and Samsung to

02:11:28  18   get through this hard time.

02:11:30  19         So I've talked to you about the Plaintiff in this

02:11:34  20   case, Pantech.

02:11:35  21         Who is the Defendant?

02:11:37  22         Well, the Defendant is a company called OnePlus

02:11:42  23   Technology (Shenzhen) Company Limited.  Its headquartered

02:11:44  24   in Shenzhen, China, and imports its infringing products

02:11:48  25   into the United States, selling them through its

02:11:50   1   subsidiary, OnePlus USA.

02:11:52   2          You may not have heard of OnePlus before, but it

02:11:55   3   advertises as one of the top 50 global brands and boasts a

02:12:00   4   500 percent growth in North America just in Q3 2021 alone.

02:12:04   5   This success is not only due to their market efforts and

02:12:07   6   brand appeal, it is also a direct result of the advances in

02:12:11   7   4G and 5G technology embedded in their smartphones.

02:12:14   8          Pantech's patents play a critical role in enabling

02:12:18   9   the high-speed, reliable performance that OnePlus

02:12:22  10   advertises and that its consumers expect.

02:12:24  11          And OnePlus was very excited when it first was

02:12:28  12   able to offer 5G technology in its smartphones.  Here's a

02:12:32  13   part of a press release from OnePlus's website talking

02:12:35  14   about how great it is to put 5G technology in their

02:12:40  15   smartphones, noting that the achievement is a significant

02:12:43  16   step for bringing the power of 5G stand-alone to the United

02:12:47  17   States.

02:12:47  18          Here's another part of the website touting all the

02:12:52  19   advantages that 5G brings to consumers.  And while OnePlus

02:12:56  20   touts the technology in its advertising, you won't see or

02:12:59  21   hear anything from OnePlus that it invented, patented, or

02:13:02  22   otherwise developed any 4G or 5G technology itself.

02:13:05  23          You'll hear from two technical experts, Professor

02:13:09  24   Cooklev and Mr. Mauro.  They're here today.

02:13:12  25          If y'all don't mind standing up.

02:13:15    1          Thank you.

02:13:17    2          Professor Cooklev received his Ph.D. from Tokyo

02:13:23    3    Institute of Technology and is currently a professor of

02:13:25    4    electrical and computer science engineering at Purdue

02:13:28    5    University.  He worked in the industry for decades and

02:13:30    6    actually participated in standards setting organizations.

02:13:35    7          Professor Cooklev analyzed the standard essential

02:13:38    8    patents that we will tell you more about, and he will tell

02:13:40    9    you more about the technological value of the 4G and 5G

02:13:43   10    standards and the phones that use those.  He'll explain how

02:13:46   11    the patents increase data speed, decrease wait time, and

02:13:51   12    reduce operational costs to users so they have a better

02:13:56   13    experience with their phones.

02:13:57   14          The first patent that you see here, the '247

02:14:00   15    patent, reflects a valuable improvement to 5G technology.

02:14:04   16    It simplifies how phones know when to do or not do a

02:14:09   17    retransmission.

02:14:10   18          The next patent, the '839 patent, also helps

02:14:13   19    phones determine if they need to retransmit data, cutting

02:14:17   20    down on interference when people are in -- have a really

02:14:21   21    weak signal.

02:14:21   22          The last standard essential patent, the '954

02:14:24   23    patent, ensures that hundreds of thousands of phones

02:14:28   24    communicating with the cell tower at once are all in sync.

02:14:32   25          The cellular industry spent years developing the

02:14:35   1   4G and 5G standards, trying to use the best technology and

02:14:38   2   choose to -- chose not to incorporate these -- this

02:14:41   3   standard technology into the standard.

02:14:43   4       In addition to the SEPs, Pantech holds patents

02:14:47   5   that relate to user interface of the smartphone.  The '654

02:14:51   6   patent is one of these patents.

02:14:54   7       Mr. Charles Mauro will describe the '654 patent to

02:14:57   8   you.  Mr. Mauro has an extensive background in human

02:15:02   9   factors engineering, a field dedicated to research, design,

02:15:07  10   and the implementation of user interfaces.  He will explain

02:15:09  11   how the '654 patent improves the smart touch interface

02:15:13  12   making it more intuitive and user friendly.

02:15:17  13       The innovations claimed in this patent enhance the

02:15:19  14   user experience making smartphones more functional and

02:15:22  15   enjoyable to use.  Specifically, Mr. Mauro will describe

02:15:26  16   the problems graphical user interface designers faced prior

02:15:29  17   to the '654 patent and how the patent helped solve these

02:15:34  18   problems.

02:15:34  19       As I mentioned earlier, it has been determined

02:15:38  20   that OnePlus's most advanced phones used the technology

02:15:41  21   covered by these patents.  Your job is to determine how

02:15:44  22   much OnePlus owes Pantech.

02:15:46  23       To help you with that -- determine that amount, we

02:15:50  24   will present the expert testimony of Dr. Jonathan Putnam.

02:15:53  25       Dr. Putnam is here, I believe.

02:15:55   1          Thank you.

02:15:57   2          Dr. Putnam has a Ph.D. in economics from Yale

02:16:00   3   University, and is one of the foremost experts in licensing

02:16:04   4   intellectual property, specifically standard essential

02:16:06   5   patents like we have here.  He will explain the minimum

02:16:09   6   amount that OnePlus owes Pantech is based on established

02:16:12   7   agreements with other smartphone manufacturers who have all

02:16:15   8   agreed to similar terms.

02:16:17   9          Dr. Putnam will walk you through the methodology

02:16:21   10  used to determine the amount OnePlus owes Pantech based on

02:16:25   11  the royalty rate that Pantech's prior -- from Pantech's

02:16:28   12  prior agreements.

02:16:30   13         You may be wondering exactly what is a royalty.

02:16:33   14  Think of it like this.  If someone extracts oil from your

02:16:37   15  land, they pay you for a portion of every barrel of oil

02:16:40   16  that they take.  These payments are called royalties.

02:16:45   17         Likewise, in the context of patent infringement, a

02:16:47   18  royalty is a payment made for each product that uses the

02:16:51   19  patented technology.  This ensures that patent holders are

02:16:55   20  fairly compensated for their innovation and their

02:16:58   21  investment.

02:16:59   22         Dr. Putnam will show you how the rate is not

02:17:01   23  arbitrary but it is based on the comparable license

02:17:06   24  agreements and the value that Pantech's technology brings

02:17:08   25  to OnePlus's smartphones.

02:17:10  1          His analysis will demonstrate that the royalty

02:17:14  2   rates we are seeking is fair, reasonable, and reflects the

02:17:19  3   market value of the technology or what others are -- others

02:17:22  4   are paying.

02:17:23  5          You will also hear a lot about FRAND in this case.

02:17:27  6   FRAND stands for fair, reasonable, and non-discriminatory.

02:17:31  7   When a company like Pantech contributes its technology to

02:17:34  8   industry standards, it agrees to license its patent on

02:17:37  9   FRAND terms.  This ensures that the technology is

02:17:40  10  accessible to all manufacturers, fostering innovation and

02:17:44  11  competition.

02:17:45  12         However, FRAND is a two-way street.  Pantech

02:17:48  13  allows OnePlus to use its patented technology, and in turn,

02:17:51  14  OnePlus is expected to pay a fair and reasonable royalty --

02:17:55  15  royalty rate just like the other phone manufacturers using

02:17:58  16  Pantech's technologies that have taken a license under

02:18:01  17  similar circumstances.

02:18:02  18         OnePlus is going to offer their own damages

02:18:05  19  expert, Dr. Lopez.  Dr. Lopez and Dr. Putnam, they both

02:18:09  20  agree that OnePlus owes Pantech a fair and reasonable

02:18:13  21  royalty, but both damages experts also agree that looking

02:18:16  22  at comparable license agreements is an appropriate way to

02:18:19  23  determine the amount OnePlus owes.

02:18:22  24         There is also no dispute between the parties

02:18:24  25  regarding how much OnePlus's revenue is at issue here.

02:18:30   1   Here, you can see those sales broken out for each of

02:18:33   2   Pantech's patents.

02:18:36   3          What this whole dispute is really -- centers

02:18:39   4   around is which license agreements you should consider to

02:18:42   5   determine how much money OnePlus owes.

02:18:44   6          This process of comparing licenses is similar to

02:18:48   7   buying or renting a home.  When you're trying to determine

02:18:51   8   the value of a home, comparability is key, right?  You

02:18:56   9   wouldn't look at a comparable home for Texarkana by looking

02:18:59   10  at the price of a home in Dallas, for example.  That

02:19:03   11  wouldn't make sense.  Instead, you would look for

02:19:05   12  comparable homes in your neighborhood that sold recently.

02:19:09   13  That's the same analysis that Dr. Putnam has done here.

02:19:11   14         Dr. Putnam relies on Pantech's recent licenses

02:19:15   15  with Sony, BLU, Coolpad, and GNJ to support his royalty

02:19:21   16  rate.  These agreements cover all of Pantech's patents that

02:19:24   17  it currently owns.

02:19:26   18         Critically, these are the only license agreements

02:19:28   19  that you will hear about during this trial that cover all

02:19:30   20  the patents at issue.  And based on these agreements,

02:19:33   21  Dr. Putnam has determined the minimum royalty rate for each

02:19:36   22  of the patents at issue here.

02:19:38   23         Based on this analysis, Dr. Putnam will show that

02:19:41   24  the minimum amount that OnePlus owes Pantech, the floor, is

02:19:46   25  $1.1 million.  However, what is critical about this number

| | | |
|---|---|---|
| 02:19:50 | 1 | is it does not take into account the uncertainty discounts |
| 02:19:53 | 2 | that Pantech incorporated into its prior license |
| 02:19:58 | 3 | agreements. |
| 02:19:58 | 4 | On Thursday, when you are determining how much |
| 02:20:01 | 5 | Pantech -- how much OnePlus should pay, the Court will |
| 02:20:04 | 6 | instruct you that the case is not about infringement and |
| 02:20:06 | 7 | validity.  Those determinations have already been made. |
| 02:20:09 | 8 | But when Pantech entered into its license agreements with |
| 02:20:13 | 9 | Sony and BLU and Coolpad and GNJ, those determinations had |
| 02:20:17 | 10 | not been made.  So those agreements naturally had discounts |
| 02:20:20 | 11 | for the uncertainty. |
| 02:20:22 | 12 | This uncertainty no longer exists now.  So what |
| 02:20:26 | 13 | does -- what does OnePlus say?  OnePlus wants you to ignore |
| 02:20:31 | 14 | Pantech's recent licenses that cover Pantech's entire |
| 02:20:35 | 15 | patent portfolio, including all the patents in this case. |
| 02:20:37 | 16 | They want you to look only at two agreements that Pantech's |
| 02:20:39 | 17 | predecessor, Pantech, Inc., entered into with Apple and |
| 02:20:43 | 18 | Samsung.  But this approach is flawed. |
| 02:20:44 | 19 | As Dr. Putnam will explain to you, the Apple and |
| 02:20:48 | 20 | Samsung agreements reflect very different circumstances, |
| 02:20:51 | 21 | making them non-comparable agreements. |
| 02:20:54 | 22 | Listen to Dr. Putnam explain how these agreements |
| 02:20:56 | 23 | are different.  He'll explain how these agreements were |
| 02:21:00 | 24 | with different Pantech entity under different |
| 02:21:04 | 25 | circumstances, and the agreements do not cover all |

02:21:09   1    Pantech's patents.

02:21:10   2        You'll also hear about how Apple and Samsung, how

02:21:13   3    █████████████████████████████████████████████████████████

02:21:15   4    █████████████████████████████.

02:21:16   5        At the end of the day, OnePlus doesn't want to pay

02:21:18   6    its fair share.  OnePlus doesn't want to pay for using

02:21:21   7    Pantech's patents.  OnePlus wants to pay next to nothing.

02:21:25   8    And the best excuse that OnePlus can come up with is these

02:21:28   9    Apple and Samsung agreements.  And when you unpack it, it

02:21:32  10    just doesn't hold water.

02:21:33  11        In closing, I would like to reiterate that this is

02:21:36  12    an important case.  It is not just about numbers and

02:21:39  13    royalties.  It is about recognizing about the value of

02:21:42  14    innovation.

02:21:43  15        Thank you for your service.  And we look forward

02:21:46  16    to presenting our case.

02:21:47  17        THE COURT:  Thank you.

02:21:51  18        Defendant may present its closing -- I mean, its

02:21:55  19    opening statement at this time.

02:21:57  20        MR. THOMPSON:  Thank you, Your Honor.  May it

02:21:59  21    please the Court.

02:21:59  22        Good afternoon again.  My name is Blake Thompson,

02:22:02  23    as I told you in voir dire.  And I'm one of the lawyers

02:22:04  24    here representing OnePlus.  You're not going to hear from

02:22:07  25    me every time, so don't be worried.

02:22:09    1          I also have my partners over here, David Airan and

02:22:14    2    Paul Filbin, and they'll be helping me present OnePlus's

02:22:18    3    case over the next, you know, day and a half, two days.

02:22:20    4    And we also have here from OnePlus, Mr. Christopher Vick,

02:22:26    5    and he'll be here during the duration of the trial.

02:22:27    6          And like Mr. Fussell said, we appreciate your

02:22:30    7    attention.  I'm sure there's other things you'd rather be

02:22:33    8    doing, but this is important to us, it's important to the

02:22:35    9    parties, and we appreciate your attention as we try to put

02:22:38   10    forth our case.

02:22:38   11          Now, OnePlus is a manufacturer of phones, and I

02:22:42   12    know that probably some, if not all of you, really didn't

02:22:45   13    know who OnePlus was when you came into the courthouse this

02:22:48   14    morning.  But they are a manufacturer of smartphones, just

02:22:51   15    like Apple and Samsung and others.  And, you know, the

02:22:55   16    reality is they have a very small share of the U.S. market

02:23:00   17    at this time.  And so that's why you really haven't heard

02:23:02   18    from them.

02:23:03   19          But we anticipate at the end of this case, you're

02:23:06   20    going to be given a couple of questions from the Court, and

02:23:08   21    those are going to ask you to fill in dollar amounts of the

02:23:12   22    amount we owe to Pantech for using their patents, okay?

02:23:16   23          And so over the next couple of days, we're going

02:23:19   24    to present our side of the case, just like Pantech is going

02:23:22   25    to present theirs.  And, ultimately, this relates to

02:23:25  1    three -- or to four patents, three standard essential

02:23:28  2    patents, like you just heard, and one patent that's not a

02:23:31  3    standard essential patent.

02:23:31  4         Now, like I said, both sides are going to present

02:23:34  5    evidence, and both sides have hired what's economists or

02:23:38  6    damages experts.  You heard about Dr. Putnam, Pantech's

02:23:42  7    expert.  And we also have Dr. Lopez that's here in the back

02:23:46  8    of the courtroom who is our expert.  And both of these

02:23:48  9    gentlemen are going to go through a lengthy analysis of

02:23:51  10   what they believe to be the appropriate royalty amount that

02:23:55  11   OnePlus is supposed to pay.

02:23:56  12        And you're going to get -- you're going to get a

02:23:59  13   range, okay?  You just heard from Pantech that their number

02:24:03  14   is going to be around 1.1, $1.2 million, and you're going

02:24:07  15   to hear a much lower number from Mr. Lopez.  That's why

02:24:11  16   we're here in the courtroom in this dispute today.

02:24:12  17        And ultimately, it'll be your -- it'll be your

02:24:17  18   decision and your job to decide what that appropriate

02:24:20  19   amount of money is.

02:24:21  20        Now, as Mr. Fussell said, in order -- the way this

02:24:28  21   kind of works, in order for you to determine what the

02:24:30  22   appropriate amount is, we look at these other license

02:24:35  23   agreements.  And they're basically agreements that Pantech

02:24:37  24   has entered into with other companies to use their patents.

02:24:42  25        And both of the experts, Dr. Lopez and Dr. Putnam,

02:24:45   1   are going to go through their analysis and explain to you

02:24:47   2   why they think one is a better, more comparable license

02:24:51   3   than the other.

02:24:52   4        Now, there's three things I would like for you to

02:24:54   5   keep in mind as we go through this case and you hear about

02:24:58   6   these various licenses.

02:25:01   7        One is, all of the licenses you're going to hear

02:25:04   8   about, they're for over a thousand patents, because Pantech

02:25:09   9   has a lot more patents than what we're -- than what this

02:25:12  10   dispute is about.  We're here on four patents.  Pantech

02:25:16  11   has, I believe, maybe 1,600 patents.

02:25:18  12        So all of these licenses you're going to hear

02:25:20  13   about are for a lot more patents, over a thousand patents.

02:25:23  14   But please keep in mind, this case is just about four

02:25:26  15   patents.

02:25:27  16        All of the licenses you're going to hear about,

02:25:29  17   except I think one, are not just for here in the United

02:25:33  18   States.  They're for selling phones in other countries, as

02:25:36  19   well.  Maybe in Asia, Europe, depends on the license.

02:25:39  20        But, here, the decision you're going to make at

02:25:41  21   the end of the trial is how much is owed for U.S. sales

02:25:45  22   only.  So that's the second thing I want you to -- would

02:25:49  23   ask for you to keep in mind.

02:25:50  24        The third is all of these licenses are for past

02:25:53  25   and future sales.  So when they were entered into, they

02:25:57    1   covered all the sales that happened before and all the

02:26:00    2   sales that were to come.

02:26:02    3          In this case, we're just talking about past sales

02:26:04    4   up until the time of trial.  So those are sort of the --

02:26:08    5   sort of the three big differences in this case.  This case

02:26:10    6   is about four patents just in the United States, just for

02:26:15    7   past sales only.  And I would just ask that you keep that

02:26:17    8   in mind as you hear the evidence.

02:26:18    9          Let's look at our first slide.

02:26:22   10          Okay.  The first slide we have here is very

02:26:25   11   similar to the one you just saw.  There's four patents in

02:26:27   12   this case, three standard -- what's called standard

02:26:31   13   essential patents and one that's not standard essential.

02:26:33   14          And these patents -- these -- this technology,

02:26:37   15   these patents were not invented by the Plaintiff Pantech

02:26:40   16   here.  They purchased these patents, and that's fine.  But

02:26:43   17   that's what -- that's the way this came about.

02:26:45   18          And the law requires that all patents -- the

02:26:50   19   amount we should pay OnePlus should be reasonable, okay?

02:26:53   20          And what is a standard essential patent?  You

02:26:55   21   heard Mr. Fussell talk about that.  It's basically just a

02:26:57   22   patent that must be complied with in a certain industry,

02:27:02   23   okay?  In this case, smartphones.

02:27:03   24          So if you're going to be in this industry and do

02:27:06   25   whatever, then you have to have -- you have to use these

02:27:09   1   patents, okay, these standard essential patents.

02:27:11   2        And once you declare your patent to be standard

02:27:13   3   essential, which is what Pantech has done, then you are

02:27:17   4   obligated to provide what's called a FRAND royalty rate to

02:27:22   5   anyone in the industry, okay?

02:27:25   6        And let's go to the next slide.

02:27:26   7        What is FRAND?  Well, it stands for fair,

02:27:32   8   reasonable, and non-discriminatory.  Okay?  This is the

02:27:33   9   obligation under the law what Pantech has to offer.  And it

02:27:37   10  can't just be one of these.  It has to be all three.  All

02:27:41   11  right?  It has to be fair, reasonable, and

02:27:43   12  non-discriminatory.

02:27:43   13       And the principle is kind of simple.  If you're in

02:27:47   14  an industry and you have to use these patents, then it

02:27:50   15  should be a level playing field.  Everyone should have to

02:27:52   16  pay roughly the same amount of money.  That's the principle

02:27:55   17  behind FRAND.

02:27:58   18       And our position is and the evidence you're going

02:28:00   19  to hear from us is once you take a rate for your patents,

02:28:06   20  you've set that rate in the industry, and that's the rate

02:28:08   21  that everyone else should have to pay, too.  That's

02:28:10   22  basically the gist of the opinions you're going to be

02:28:13   23  hearing from us.

02:28:13   24       And so ███████████ do we think you should look

02:28:18   25  at?  Okay.  Well, OnePlus believes you should look at the

02:28:22  1  ████████████████████ entered into by the two biggest

02:28:26  2  players in the smartphone business.  These two companies

02:28:31  3  control over -- or have over 70 percent of the market

02:28:34  4  share.  If I asked all of you to pull your phone out and

02:28:36  5  lay it on the counter, there's a good chance that you have

02:28:40  6  a phone made by one of these two companies.

02:28:43  7       And who are they?  They're Apple and Samsung.  And

02:28:47  8  ████████████████████ that we think are the most

02:28:49  9  comparable licenses.

02:28:50  10       And we believe since they control over 70 percent

02:28:55  11  of the market, they are the market rate.  And that's the

02:28:58  12  rate that everyone should have to pay, including OnePlus.

02:29:00  13       So let's look at this slide here about the Apple

02:29:06  14  and Samsung ██████████

02:29:07  15       This is the sales for 2022.  And you can see Apple

02:29:12  16  ████████████████████ and they sold approximately $75

02:29:17  17  billion worth of phones, 73 million phones.  That's the red

02:29:21  18  bar.

02:29:22  19       The blue bar is what Dr. Lopez has calculated as

02:29:25  20  the effective rate ██████████████████████

02:29:29  21       The next row is $27 billion for approximately 39

02:29:35  22  million phones from Samsung.  Again, the blue bar next to

02:29:39  23  that is what Dr. Lopez has calculated as the effective rate

02:29:43  24  that Pantech received for ███████████████, its

02:29:46  25  portfolio.

| | | |
|---|---|---|
| 02:29:47 | 1 | And then you go over to OnePlus.  OnePlus had ████ |
| 02:29:51 | 2 | ████ in sales.  Like I told you, much smaller player in |
| 02:29:54 | 3 | the market in 2022 for ████████ , but the rate |
| 02:29:59 | 4 | that you're going to hear Dr. Putnam propose is this on the |
| 02:30:01 | 5 | right side over here. |
| 02:30:03 | 6 | Now, this is -- this is not FRAND.  This is not |
| 02:30:06 | 7 | fair and reasonable, and it's certainly not |
| 02:30:09 | 8 | non-discriminatory.  In fact, Dr. Lopez is going to have |
| 02:30:16 | 9 | calculated, and you'll hear from him, that the rate -- one |
| 02:30:19 | 10 | of the rates that Dr. Putnam proposes is over ██ times |
| 02:30:23 | 11 | what the rate for Apple and Samsung paid.  And our position |
| 02:30:26 | 12 | is that's not fair, that's not reasonable, and that's |
| 02:30:29 | 13 | certainly not non-discriminatory. |
| 02:30:31 | 14 | Now, why is it that Pantech doesn't want to use |
| 02:30:33 | 15 | these ████████████?  Well, because if you |
| 02:30:35 | 16 | calculate the per-phone price, it's much lower, and they |
| 02:30:41 | 17 | don't want to use it.  They want to find ████████ |
| 02:30:43 | 18 | where they can make the four -- the per-phone price much |
| 02:30:47 | 19 | higher. |
| 02:30:47 | 20 | Now, Mr. Fussell said -- he showed you a sign of |
| 02:30:55 | 21 | oil wells and said, you know, this is kind of like taking |
| 02:31:01 | 22 | royalties or oil from your land.  The problem is this is |
| 02:31:03 | 23 | like saying that oil closed at $75 a barrel, and we want |
| 02:31:08 | 24 | you to pay thousands of dollars a barrel.  And that's our |
| 02:31:13 | 25 | problem with Pantech's position in this case. |

| | | |
|---|---|---|
| 02:31:14 | 1 | Now, what you're going to hear from Dr. Putnam and |
| 02:31:16 | 2 | from Pantech's witnesses is that they entered into |
| 02:31:21 | 3 | Samsung -- ███████████ because of some other extraneous |
| 02:31:23 | 4 | issues, financial issues, money problems, other things like |
| 02:31:27 | 5 | that.  And that's fine.  You can listen to that.  But those |
| 02:31:30 | 6 | excuses do not excuse the FRAND obligation.  And our |
| 02:31:34 | 7 | position is once you -- once you ████████████████ |
| 02:31:36 | 8 | biggest players in the industry, that's the rate, and |
| 02:31:40 | 9 | that's the rate everybody else should get. |
| 02:31:42 | 10 | We can all think about and look and say, well, |
| 02:31:44 | 11 | there's reasons for everything you do, but when you take -- |
| 02:31:48 | 12 | ████████████ 70-plus percent of the industry, that's |
| 02:31:54 | 13 | the rate.  That's the FRAND rate.  And that's the rate that |
| 02:31:57 | 14 | we should have to pay. |
| 02:31:58 | 15 | So if they don't want to -- if Pantech doesn't |
| 02:32:00 | 16 | want to look at Apple and Samsung, who do they want to look |
| 02:32:03 | 17 | at? |
| 02:32:04 | 18 | These are the four licenses you're going to hear |
| 02:32:06 | 19 | are the comparable licenses that they want you -- that |
| 02:32:10 | 20 | Pantech wants you to look at to make your decision.  Some |
| 02:32:12 | 21 | of these companies you may not have ever heard of.  In |
| 02:32:15 | 22 | fact, Coolpad and GNJ, they're in the center, they have |
| 02:32:19 | 23 | left the U.S. market.  They don't even sell -- they don't |
| 02:32:22 | 24 | even sell phones here in the United States anymore. |
| 02:32:24 | 25 | Yeah, all right.  Next slide. |

02:32:30    1          Okay.  And so here's a market share comparison.
02:32:34    2   As you see, you got Samsung and Apple with about 72 percent
02:32:39    3   of the market share.  And you see that Coolpad and GNJ,
02:32:43    4   they did take a license from Pantech, but they left the
02:32:46    5   market, right?  And so you have the other two players that
02:32:48    6   are left selling phones, Sony and BLU in the little purple
02:32:55    7   over here, and they have a very small market share, much
02:32:59    8   like OnePlus has a very small market share.
02:33:01    9          But the reason Dr. Putnam wants to focus on these
02:33:03   10   is because it makes the per-phone rate much higher, meaning
02:33:07   11   that Pantech would get much more money.  And OnePlus's
02:33:09   12   position in this case is that's not fair.  The Samsung, the
02:33:12   13   Apple rate, the 70 plus percent of the rate is the proper
02:33:16   14   rate, and that's what we should have to pay.
02:33:18   15          Mr. Fussell gave you an example of home sales,
02:33:22   16   looking at comparable home sales.  Well, here's the problem
02:33:24   17   with this, here's the problem with Pantech's position.  It
02:33:27   18   would be sort of like going to a neighborhood of 200,000
02:33:31   19   dollar homes and somebody -- somebody puts their home for
02:33:34   20   sale, and someone comes from outside, wherever, and pays a
02:33:38   21   million dollars for that house.
02:33:39   22          The problem is that doesn't make all the other
02:33:42   23   houses worth a million dollars.  That's an aberration.  And
02:33:45   24   the reality is here we should pay the same price as Samsung
02:33:49   25   and Apple.  Samsung and Apple, the two biggest players in

02:33:53  1    the industry, shouldn't get a better deal, and then the

02:33:56  2    guys with the smaller market share get a worse deal.

02:33:59  3            That's our position, and we look forward to

02:34:01  4    presenting our case to you over the next day and a half.

02:34:03  5            Thank you.

02:34:03  6            THE COURT:  Thank you, Mr. Thompson.

02:34:08  7            Ladies and gentlemen of the jury, I think the

02:34:09  8    thing that makes the most sense is for us to go ahead and

02:34:12  9    recess at this time a little bit early from what we will

02:34:16  10   probably do tomorrow, but we'll plan to be in recess about

02:34:23  11   15 minutes, and then when we come back at 2:45, we'll plan

02:34:27  12   to go hopefully all the way until 5:00 o'clock or close to

02:34:31  13   it.

02:34:31  14           So let's go ahead and take our recess at this

02:34:35  15   time.  And as a reminder, don't discuss the case among

02:34:39  16   yourselves until all of the evidence has been presented,

02:34:41  17   and I've instructed you on the law.  Don't do any

02:34:45  18   independent research or investigation into anything you've

02:34:48  19   heard about the case, the parties, the attorneys,

02:34:51  20   witnesses, the law, anything like that.  And, finally,

02:34:55  21   don't post anything, please, about your involvement as a

02:34:58  22   juror on any social media website or app.

02:35:01  23           We'll get you back into the courtroom in about 15

02:35:04  24   minutes.

02:35:05  25           COURT SECURITY OFFICER:  All rise.

02:35:06    1              (Jury out.)

02:35:48    2              THE COURT:  I don't know if this is even

02:35:50    3    applicable, but does either party wish to invoke the Rule?

02:35:53    4    Does it even matter?

02:35:56    5              MR. FUSSELL:  No, sir.  Not for the Plaintiff,

02:36:00    6    Your Honor.

02:36:00    7              MR. THOMPSON:  No, Your Honor.

02:36:01    8              THE COURT:  Doesn't matter to y'all.

02:36:02    9              Okay.  And then have -- are you all prepared to

02:36:04   10    move exhibits in at this time, or do you want to handle

02:36:07   11    that later?

02:36:12   12              Are you ready, Ms. Miller?  Do you want to do it

02:36:14   13    now, or do you want to wait until the jury comes back?

02:36:17   14              MS. MILLER:  Now is fine with me.

02:36:19   15              THE COURT:  Okay.  Go ahead.

02:36:20   16              MS. MILLER:  Your Honor, Tiffany Miller for the

02:36:26   17    Plaintiffs.

02:36:26   18              Pantech would like to identify the following

02:36:31   19    exhibits as pre-admitted:

02:36:34   20              PX-1, 2, 4, 5, 16, 17, 18, 40, 41, 42, 43, 103,

02:36:48   21    and 104.

02:36:49   22              THE COURT:  All right.  Any objection to any of

02:36:51   23    those?

02:36:55   24              MR. SCHUBERT:  No, Your Honor.

02:36:57   25              THE COURT:  All right.  Those will be received.

| | | |
|---|---|---|
| 02:37:00 | 1 | All right.  We'll take a short break. |
| 02:37:02 | 2 | COURT SECURITY OFFICER:  All rise. |
| 02:37:04 | 3 | (Recess.) |
| 02:37:04 | 4 | (Jury out.) |
| 02:37:04 | 5 | COURT SECURITY OFFICER:  All rise. |
| 02:37:05 | 6 | THE COURT:  All right.  Mr. Goecke, if you would |
| 02:56:15 | 7 | have the jury brought down. |
| 02:56:35 | 8 | COURT SECURITY OFFICER:  Please rise for the jury. |
| 02:56:52 | 9 | (Jury in.) |
| 02:56:53 | 10 | THE COURT:  Please be seated. |
| 02:57:23 | 11 | All right.  Ladies and gentlemen, as I mentioned |
| 02:57:26 | 12 | before we broke, we will plan to go about two more hours |
| 02:57:32 | 13 | until 5:00 o'clock, and that's a little longer than we |
| 02:57:38 | 14 | normally would go without a break.  So if we get somewhere |
| 02:57:41 | 15 | along the way and anyone needs a break, just give me a |
| 02:57:44 | 16 | signal, and we will do that. |
| 02:57:45 | 17 | But my plan is for us to go until somewhere about |
| 02:57:51 | 18 | 5:00 o'clock today before we break for the evening. |
| 02:57:53 | 19 | At this time, the Plaintiffs may call their first |
| 02:57:57 | 20 | witness. |
| 02:58:00 | 21 | MR. CULBERTSON:  Your Honor, Plaintiffs call |
| 02:58:02 | 22 | Dr. Yang-Won Jung. |
| 02:58:05 | 23 | THE COURT:  All right.  We'll have the witness |
| 02:58:13 | 24 | sworn in first -- actually, let's have the interpreter |
| 02:58:17 | 25 | sworn in first, and then we'll have the witness sworn. |

| 02:58:28 | 1 | (Interpreter Ann Park sworn.) |
| 02:58:38 | 2 | THE COURT:  And, sir, if you would come forward. |
| 02:58:41 | 3 | (Witness sworn.) |
| 02:58:46 | 4 | THE COURT:  All right.  You can take a seat on the |
| 02:58:49 | 5 | witness stand. |
| 02:58:50 | 6 | And, ma'am, you're set up over there. |
| 02:58:52 | 7 | All right.  Whenever you're ready, Mr. Culbertson, |
| 02:58:55 | 8 | you may proceed. |
| 02:58:56 | 9 | MR. CULBERTSON:  Thank you, Your Honor. |
| 02:58:56 | 10 | <u>YANG-WON JUNG, PLAINTIFFS' WITNESS, SWORN</u> |
| 02:58:56 | 11 | <u>(INTERPRETED)</u> |
| 02:58:56 | 12 | <u>DIRECT EXAMINATION</u> |
| 02:58:58 | 13 | BY MR. CULBERTSON: |
| 02:58:58 | 14 | Q.  Good afternoon.  Would you introduce yourself to the |
| 02:59:00 | 15 | jury, please? |
| 02:59:01 | 16 | A.  (In English) Good afternoon.  My name is Yang-Won Jung, |
| 02:59:03 | 17 | and I'm honored to be here. |
| 02:59:05 | 18 | Q.  Where do you live, sir? |
| 02:59:07 | 19 | A.  (In English) Seoul, South Korea. |
| 02:59:10 | 20 | Q.  Do you have a family? |
| 02:59:11 | 21 | A.  (In English) My wife is a high school teacher, and I |
| 02:59:13 | 22 | have two kids, boy and girl. |
| 02:59:14 | 23 | Q.  What is your native language? |
| 02:59:17 | 24 | A.  (In English) Korean. |
| 02:59:20 | 25 | Q.  And we're speaking in English, so I take it you do |

| | | |
|---|---|---|
| 02:59:25 | 1 | understand English? |
| 02:59:26 | 2 | A.  (In English) I do.  I also speak English, but my accent |
| 02:59:29 | 3 | is strong, so I believe the jury can understand my answer |
| 02:59:33 | 4 | better through the interpreter.  It is important, so I want |
| 02:59:37 | 5 | to make sure that the jury can understand my answers. |
| 02:59:41 | 6 | Q.  Where do you work, sir? |
| 02:59:43 | 7 | A.  I work for IdeaHub and Pantech, and Pantech is a |
| 02:59:53 | 8 | subsidiary of IdeaHub. |
| 02:59:55 | 9 | Q.  Do you also work for Pantech Wireless? |
| 02:59:57 | 10 | A.  I'm not an employee of Pantech Wireless, but Pantech |
| 03:00:07 | 11 | Wireless is a subsidiary of Pantech, so I work on some |
| 03:00:10 | 12 | matters related to Pantech Wireless, as well. |
| 03:00:14 | 13 | Q.  Where are Pantech Corp and Pantech Wireless located? |
| 03:00:24 | 14 | A.  Pantech Corporation is located in Korea, and it has its |
| 03:00:31 | 15 | employees in both Korea and the United States.  Pantech |
| 03:00:38 | 16 | Wireless is located in Austin, Texas. |
| 03:00:43 | 17 | Q.  Can we refer to them today together as Pantech, unless |
| 03:00:49 | 18 | there's a reason to distinguish between the two? |
| 03:00:50 | 19 | A.  Yes. |
| 03:00:53 | 20 | Q.  What do you do for IdeaHub and Pantech? |
| 03:00:57 | 21 | A.  I oversee research activities and also manage the |
| 03:01:12 | 22 | patent portfolio.  Since I have technical background, I |
| 03:01:15 | 23 | also work on technical matters relating to licensing. |
| 03:01:18 | 24 | Q.  Do you have any degrees? |
| 03:01:22 | 25 | A.  I have bachelor's, master's, and Ph.D., electrical |

03:01:31    1    engineering.

03:01:31    2    Q.   Dr. Jung, are you a named inventor on any U.S. patents?

03:01:36    3    A.   I am listed as an inventor in over 100 U.S. patents.

03:01:50    4    And, actually, in the TV -- the LG TV in this courtroom

03:01:56    5    includes my technology that I developed.

03:01:59    6    Q.   The TV over here?

03:02:01    7    A.   That's right.

03:02:06    8    Q.   How many patents are in Pantech's portfolio?

03:02:10    9    A.   We have about 1,800 patents in our portfolio.

03:02:17   10    Q.   And when did -- is that between the Pantech Corp and

03:02:22   11    Pantech Wireless?

03:02:23   12    A.   That's correct.

03:02:25   13    Q.   Okay.  When did Pantech Corp acquire the patents in its

03:02:31   14    portfolio?

03:02:31   15    A.   We acquired those patents from Pantech, Inc., in 2020.

03:02:54   16    And Pantech Wireless acquired patents from RnB, and that

03:02:59   17    was in 2021, and those patents were originally from

03:03:03   18    InterDigital?

03:03:03   19    Q.   At a very high level, how do you describe the patents

03:03:09   20    that are in the portfolio?

03:03:10   21    A.   A lot of patents that Pantech has are included in

03:03:32   22    smartphones, and that relates to LTE or 5G communication

03:03:37   23    technologies in that these patents are referred to as

03:03:41   24    standards essential patents, or SEPs.

03:03:57   25              And we also have patents that are included in the

03:04:01  1  smartphones, such as for UI, and these are what is referred

03:04:05  2  to as feature patents or sometimes non-standards essential

03:04:10  3  patents, or non-SEPs.

03:04:14  4      MR. CULBERTSON:  And could we have, Mr. Ebersole,

03:04:16  5  Plaintiffs' Demonstrative 3-2, please?

03:04:20  6  Q.  (By Mr. Culbertson)  Does this slide identify the four

03:04:24  7  patents that have been determined to be infringed in this

03:04:26  8  case?

03:04:26  9  A.  That's right.  And '247 patent here was developed by

03:04:41  10  InterDigital.  And 9 -- the '954 and the '654, these

03:05:01  11  patents were developed by Pantech Company Limited, which is

03:05:06  12  the former entity.  And the '839 patent was developed by LG

03:05:19  13  Electronics.

03:05:19  14  Q.  Who owns the '247?

03:05:21  15  A.  Pantech Wireless does.

03:05:27  16  Q.  And who owns the other three patents?

03:05:29  17  A.  Pantech Corporation does.

03:05:32  18  Q.  Why did Pantech decide to acquire these patents and the

03:05:44  19  larger portfolios that they're in?

03:05:46  20  A.  These patents, as I mentioned before, were developed by

03:06:02  21  the companies, such as LG Electronics, InterDigital, and

03:06:07  22  the former Pantech Company Limited, and these companies are

03:06:13  23  technologically advanced companies.

03:06:19  24      And as you might know, LG Electronics is known for

03:06:23  25  their technological prowess.  And for InterDigital, they --

03:06:33    1    it is a -- they are a representative company known for

03:06:37    2    their communication technology in the United States.  And

03:06:59    3    as for Pantech Company Limited, they were the second to

03:07:05    4    Samsung Electronics, and they were known for their

03:07:10    5    excellent technological advancement, and they are known for

03:07:13    6    investing heavily in their R&D activities before they filed

03:07:18    7    bankruptcy.

03:07:23    8         So we believe that these patents were highly

03:07:26    9    valuable, which is the reason why we purchased them.

03:07:29   10    Q.  Was it Pantech's intention to monetize the patent

03:07:32   11    portfolios?

03:07:35   12    A.  That's right.

03:07:37   13         MR. CULBERTSON:  If we could call up Plaintiffs'

03:07:40   14    Demonstrative 3-3, please, Mr. Ebersole.

03:07:44   15    Q.  (By Mr. Culbertson)  I'm showing you the first page

03:07:46   16    entitled:  Pantech Intellectual Property Licensing Program.

03:07:52   17    Can you describe for the jury what this -- what this

03:07:55   18    document is?

03:07:55   19    A.  This is our presentation material that we prepared so

03:08:06   20    that we can present our licensing program to our

03:08:11   21    counterpart -- the patents of Pantech to our counterpart.

03:08:18   22    And in this material, as well, it explains this question

03:08:24   23    how we came up with our royalty rates.

03:08:26   24    Q.  And who would Pantech provide this document to?

03:08:29   25    A.  This is material that we provided to OnePlus.

03:08:38    1   Q.  Well, is it material that you would provide to any

03:08:42    2   smartphone manufacturer to whom you were introducing the

03:08:44    3   portfolio?

03:08:47    4   A.  Yes.  We also give this type of presentation material

03:08:58    5   when we work with smartphone manufacturers as well.

03:09:03    6          MR. CULBERTSON:  If we look at PDX-3-4, please,

03:09:08    7   Mr. Ebersole.

03:09:09    8   Q.  (By Mr. Culbertson)  Is this an excerpt from the same

03:09:11    9   presentation?

03:09:12   10   A.  That's right.

03:09:16   11   Q.  And it's entitled:  Standard Licensing Rates.

03:09:20   12          What is Pantech communicating in this page here?

03:09:23   13   A.  When we discuss our royalty rates with smartphone

03:09:45   14   manufacturers for SEPs, we -- the rate we suggested is

03:09:50   15   0.5 percent of the sales price, and for the feature

03:09:55   16   patents, non-SEPs, the rate we suggested was 0.25 percent.

03:10:05   17   So all together, it is -- it amounts to 0.75 percent which

03:10:11   18   is our standard royalty rates.

03:10:13   19   Q.  For the entire portfolio?

03:10:16   20   A.  That's right.

03:10:17   21   Q.  How did Pantech develop its standard rate?

03:10:24   22   A.  We used what's called a top-down approach.

03:10:28   23          MR. CULBERTSON:  If we could look at PDX-3-5.

03:10:34   24   Q.  (By Mr. Culbertson)  Can you describe at a high level,

03:10:37   25   Mr. Jung, the approach that Pantech took to developing its

03:10:42    1    SEP standard rate?

03:10:43    2    A.  When I talk about this top-down approach, first of all,

03:10:58    3    for LTE users, we would actually come up with the -- the

03:11:05    4    total royalty rates for these smartphone manufacturers.

03:11:16    5    And for those information -- for the information, we use

03:11:21    6    the information from various economists who are experts in

03:11:27    7    the industry.

03:11:42    8         And next step is that we will determine the total

03:11:46    9    number of LTE standard SEPs on a worldwide basis, and we

03:11:52    10    also look at the number of SEPs held by Pantech so that we

03:11:57    11    can come up with a royalty rate that Pantech is supposed to

03:12:01    12    receive.

03:12:12    13         And -- and for us to determine the number of LTE

03:12:26    14    standard SEPs, we use the judgment that was rendered, the

03:12:32    15    famous judgment that was rendered on the worldwide basis.

03:12:38    16         And -- and for us to come up with the number of

03:12:44    17    Pantech's SP -- SEPs, we looked at our own internal

03:12:48    18    documents.

03:12:56    19         And for us to determine the reasonable royalty

03:12:59    20    rate that we're supposed to receive, we looked at other

03:13:03    21    companies' royalty rates as well.

03:13:09    22         MR. CULBERTSON:  Can we look at PDX-3-6, please,

03:13:12    23    Mr. Ebersole?

03:13:13    24    Q.  (By Mr. Culbertson)  Is there room for negotiation in

03:13:18    25    Pantech's standard rates?

03:13:21  1    A.  Yes, for non-SEPs.  And in terms of our negotiations,

03:13:40  2    sometimes we also provided -- or provided reduction in

03:13:43  3    terms of the rate from 0.25 to 0.15 percent.

03:14:02  4           But for SEPs, it is set at 0.5 percent, which

03:14:09  5    already reflects a sufficient discount that has been given,

03:14:13  6    and also we are under the obligation of FRAND.  So we have

03:14:18  7    been trying our best to maintain the rate.

03:14:21  8    Q.  What does FRAND mean?

03:14:23  9    A.  It refers to fair, reasonable, and non-discriminatory,

03:14:39  10   and that refers to an obligation that an SEP patent holder

03:14:44  11   has.

03:14:44  12   Q.  Since Pantech acquired the SEPs, has it offered the

03:14:50  13   same .5 percent rate on its SEP patents to all smartphone

03:14:56  14   manufacturers with which it has had discussions?

03:15:00  15   A.  That's correct.

03:15:00  16   Q.  What do you mean in this demonstrative under the SEPs

03:15:07  17   that discounts are applied?

03:15:09  18   A.  When we took the top-down approach that I explained to

03:15:28  19   you about a moment ago and when we set the SEP rate based

03:15:35  20   on that, the number that we came up with was a lot bigger

03:15:40  21   than what you see here.  So the rate that we calculated was

03:15:47  22   0.71 percent.

03:15:49  23          MR. CULBERTSON:  Can we look, please, at PDX-3-7?

03:15:53  24   Q.  (By Mr. Culbertson)  Does 3-7 explain how Pantech

03:15:58  25   determined that its SEP rate should be 0.71?

03:16:06    1    A.   That's right.

03:16:06    2    Q.   And why is it that Pantech decided to discount from

03:16:24    3    what it believed its true rate to be to .5 percent as a

03:16:28    4    standard rate?

03:16:29    5    A.   So when we offer our proposal in terms of licensing, we

03:16:55    6    wanted to be conservative to the extent possible because in

03:17:01    7    case there might be some occasion where the patent might

03:17:04    8    get invalidated or found non-infringed.   So we wanted to be

03:17:10    9    prepared -- prepare for that which is the reason why we

03:17:13   10    provided the discount.

03:17:16   11    Q.   Is it a negotiation tool?

03:17:18   12    A.   It is.

03:17:21   13    Q.   And have you compared your .5 standard rate against the

03:17:36   14    rates that are published by other SEP holders?

03:17:38   15    A.   Yes.   So that we can find out if our rate is reasonable

03:18:03   16    or not, we also looked at other companies' royalty rate

03:18:08   17    that have been published.   And what we were able to find

03:18:23   18    out when we did that is that -- what we looked at is the

03:18:28   19    company's royalty rate who had similar number of SEPs as

03:18:34   20    us, and what we found out was that our rate was much lower

03:18:38   21    than theirs.

03:18:44   22    Q.   At the time that Pantech developed its .5 percent SEP

03:18:49   23    rate, how many SEP families did Pantech believe it owned?

03:18:56   24    A.   We identified that we had 21 standard patent families.

03:19:09   25    Q.   Is that still the case today?

03:19:11    1    A.  No, that is not.

03:19:14    2    Q.  How many SEP families does Pantech believe it owns

03:19:20    3    today?

03:19:20    4    A.  We have been able to identify that we have over 30 SEP

03:19:29    5    patent families.

03:19:31    6    Q.  So what changed from the time you developed your rate

03:19:34    7    until today?

03:19:44    8    A.  The year that we determined our rate was in 2020, as I

03:19:50    9    told you earlier, but we acquired patents from InterDigital

03:19:55   10    in 2021.  And we kept on our analysis work so that we were

03:20:09   11    able -- so we could identify there were some more standards

03:20:15   12    patents in the prosecution process.

03:20:19   13    Q.  Has Pantech changed or -- in any way its .5 percent

03:20:25   14    standard rate for SEPs since the number has increased from

03:20:30   15    22 to 30?

03:20:31   16    A.  No, that's not the case.  We have always maintained a

03:20:38   17    0.5 percent.

03:20:42   18    Q.  Has Pantech had any success licensing its patents at

03:20:45   19    its standard rate?

03:20:46   20    A.  Yes.

03:20:50   21         MR. CULBERTSON:  Your Honor, we're going to need

03:20:51   22    to go on the confidential record now, please.

03:20:54   23         THE COURT:  All right.  All right.  And so we will

03:20:57   24    seal the courtroom at this time.  And anyone who is not

03:21:02   25    subject to the protective order that's entered in this case

| | | |
|---|---|---|
| 03:21:06 | 1 | or an attorney working on the case or expert will need to |
| 03:21:11 | 2 | excuse themselves at this time.  We'll get you back into |
| 03:21:13 | 3 | the courtroom as quickly as we can. |
| 03:21:15 | 4 | (Courtroom sealed.) |
| 03:21:15 | 5 | (This portion of the transcript is Sealed and |
| 03:21:15 | 6 | filed under separate cover as Sealed Portion |
| 03:45:36 | 7 | No. 1.) |
| 03:45:36 | 8 | (Courtroom unsealed.) |
| 03:45:37 | 9 | THE COURT:  All right.  You may proceed. |
| 03:45:39 | 10 | Q.  (By Mr. Airan)  So as Pantech's stance today, its |
| 03:45:43 | 11 | primary business is acquiring and licensing patents, |
| 03:45:46 | 12 | correct? |
| 03:45:46 | 13 | A.  Currently, yes. |
| 03:45:47 | 14 | Q.  Okay. |
| 03:45:48 | 15 | MR. AIRAN:  Can we have DDX-16-2 up, please? |
| 03:45:51 | 16 | 16-2. |
| 03:45:51 | 17 | Q.  (By Mr. Airan)  So up on the screen, we have a summary |
| 03:46:13 | 18 | of what I believe you testified about earlier. |
| 03:46:16 | 19 | Did your company acquire 1,400 patents from |
| 03:46:20 | 20 | Pantech, Inc., and GoldPeak in the spring of 2020 for about |
| 03:46:28 | 21 | $7████████?  Does that seem accurate to you? |
| 03:46:32 | 22 | A.  That's right. |
| 03:46:33 | 23 | Q.  And you acquired about another 200 in the spring of |
| 03:46:36 | 24 | 2021 from RnB Wireless for about $████████; is that |
| 03:46:41 | 25 | correct? |

```
03:46:41    1   A.  Yes, we did.

03:46:42    2   Q.  Okay.  So you acquired about 1,600 patents for about

03:46:46    3   $████████   is that fair?

03:47:01    4   A.  When it comes to the lump-sum payment, it is as

03:47:04    5   indicated in the document.  However, we agreed to share the

03:47:09    6   licensing revenue from the -- with the patent holders, so I

03:47:15    7   don't think that is quite right.

03:47:16    8   Q.  So in -- in connection with your deal with GoldPeak,

03:47:20    9   for example, ████████ of the licensing revenue goes back

03:47:23   10   to GoldPeak or Pantech, Inc.; is that correct?

03:47:32   11   A.  Not to the Gold -- not to GoldPeak, but to Pantech,

03:47:38   12   Inc., ████████ would go to Pantech, Inc.

03:47:40   13   Q.  So there was a cash outlay of $████████, and then a

03:47:46   14   promise to pay ████████ of licensing income to Pantech,

03:47:50   15   Inc.?

03:47:50   16   A.  Pantech, Inc., yes.

03:47:51   17   Q.  Okay.  Thank you.

03:47:52   18        And in connection with the RnB Wireless deal,

03:47:56   19   there's an acquisition cost of ████████ for that entire

03:48:01   20   portfolio; is that correct?

03:48:03   21   A.  That's right.

03:48:03   22   Q.  And that was for 200 patents, right?

03:48:05   23   A.  (In English) Over 200.

03:48:09   24   Q.  Over 200, okay.

03:48:11   25        Now, Pantech has never attempted to value or have
```

| | | |
|---|---|---|
| 03:48:15 | 1 | any valuation done for any of its individual patents, |
| 03:48:22 | 2 | correct? |
| 03:48:22 | 3 | A.  When you say valuation, if you're talking about the |
| 03:48:34 | 4 | monetary value of patents, then "no" is my answer.  But if |
| 03:48:39 | 5 | you're talking about patent analysis, my answer is "yes." |
| 03:48:41 | 6 | Q.  Okay.  I'm talking about the money value.  So you've |
| 03:48:44 | 7 | never had any monetary valuation of the patents, correct? |
| 03:48:47 | 8 | A.  No.  Correct.  Correct. |
| 03:48:50 | 9 | Q.  And you acquired these approximately 1,600 patents for |
| 03:48:52 | 10 | the purpose of licensing them, right? |
| 03:48:55 | 11 | A.  Yes, that's right. |
| 03:48:59 | 12 | Q.  And did you ever attempt to determine which patent in |
| 03:49:04 | 13 | the portfolio of these 1,600 patents was the most valuable? |
| 03:49:09 | 14 | A.  No, that was not the case. |
| 03:49:24 | 15 | MR. AIRAN:  We may need to seal the courtroom, |
| 03:49:26 | 16 | Your Honor. |
| 03:49:26 | 17 | THE COURT:  Okay.  We'll seal the courtroom at |
| 03:49:28 | 18 | this time. |
| 03:49:29 | 19 | (Courtroom sealed.) |
| 03:49:29 | 20 | (This portion of the transcript is Sealed and |
| 03:49:29 | 21 | filed under separate cover as Sealed Portion |
| 03:49:29 | 22 | No. 2.) |
| 03:49:29 | 23 | (Courtroom unsealed.) |
| 04:15:05 | 24 | MR. FUSSELL:  The Plaintiffs call Mr. Byeong Jin |
| 04:15:13 | 25 | Kim.  Pantech's next witness, Mr. Byeong Jin Kim, is the |

04:15:19   1   CEO of Pantech, Inc., a third-party in this case.  Mr. Kim

04:15:21   2   was not able to testify this week, as I mentioned to you

04:15:24   3   earlier, so Pantech's lawyer will read portions from his

04:15:29   4   prior sworn testimony.

04:15:33   5          THE COURT:  All right.  Whenever you're ready.

04:15:46   6          MR. FUSSELL:  Thank you, Your Honor.

04:15:46   7          (Deposition testimony of BYEONG JIN KIM.)

04:15:46   8          (Direct Examination Questions read by Mr. Fussell;

04:15:46   9          Answers read by Ms. Krawice.)

04:15:50  10   Q.  Would you please state your full name and introduce

04:15:52  11   yourself to the jury?

04:15:54  12   A.  Yes.  My name is Byeong Jung Kim.  I'm from Korea.  I

04:15:59  13   live in the city of Sungnam, S-u-n-g-n-a-m, in Seoul,

04:16:06  14   Korea.  And currently I work as the CEO of the company,

04:16:11  15   Pantech, Inc.

04:16:11  16   Q.  How long have you been with Pantech, Inc., Mr. Kim?

04:16:15  17   A.  I've been working at Pantech, Inc., since 2015.

04:16:20  18   Q.  And, briefly, could you tell the jury why you're here

04:16:22  19   today?

04:16:23  20   A.  Yes.  The company that I am the CEO of, which is the

04:16:29  21   Pantech, Inc., sold all the patents that it held as of

04:16:33  22   March of 2020 to Pantech Corp -- Corporation.  And to my

04:16:38  23   knowledge, some of those patents that were sold are at

04:16:41  24   issue in this case.

04:16:42  25          And when the Pantech Corporation has generated

04:16:46    1    revenue based on these patents that we sold it, Pantech,

04:16:51    2    Inc., my company, is supposed to share the revenue.  So we

04:16:55    3    have some financial interest in that regard, so that's why

04:16:58    4    I'm here today.

04:17:00    5    Q.  Thank you.

04:17:00    6         Before becoming CEO of Pantech, Inc., did you have

04:17:04    7    any other positions?

04:17:05    8    A.  Yes.  I served as the CFO before I became the CEO of

04:17:12    9    Pantech, Inc.

04:17:13   10    Q.  And when did you become the CFO?

04:17:14   11    A.  That was when Pantech, Inc., was formed in 2015 that I

04:17:19   12    served as the CFO of the company.

04:17:22   13    Q.  Why was Pantech, Inc., formed?

04:17:24   14    A.  So at the time at -- in 2015, the company that I was

04:17:30   15    with inherited assets and personnel from Pantech Co

04:17:35   16    Limited, and that's how the Pantech, Inc., was formed.

04:17:38   17    Q.  And what was its purpose?

04:17:41   18    A.  This Pantech Co Limited used to be a very large cell

04:17:45   19    phone manufacturer in Korea, but at the time we took over

04:17:48   20    the business, they were in court receivership.  So if we

04:17:54   21    were to acquire the assets and the resources of the Pantech

04:17:58   22    Co Limited at the time, we thought that we'd be able to

04:18:00   23    grow in the market of smartphones that were actually

04:18:04   24    growing at the time, and also receive the brand of Pantech

04:18:09   25    Co Limited, which was the reason why Pantech, Inc., was

04:18:12   1   formed.

04:18:13   2   Q.   Who was Pantech Co Limited?

04:18:15   3   A.   Pantech Co Limited was one of the cell phone

04:18:18   4   manufacturers, like Samsung and LG in Korea, and they used

04:18:23   5   to actually sell their products to Verizon and AT&T in the

04:18:26   6   United States.  And at one point in time, actually their

04:18:32   7   sales volume was much more than that of LG Electronics.  So

04:18:36   8   it was a pretty large company.

04:18:38   9        But early 2010s, their financial situation got

04:18:43   10   worsened -- got worse, and they ended up in court

04:18:46   11   receivership.

04:18:46   12        So, ultimately, the company, Pantech, Inc., was

04:18:49   13   formed and inherited and acquired the assets that -- and

04:18:53   14   the personnel from Pantech Co Limited.

04:18:55   15   Q.   And when you say court receivership, is that like

04:18:59   16   bankruptcy?

04:18:59   17   A.   Yes, I think.  I can say it's a similar concept.

04:19:03   18   Q.   Okay.  After Pantech, Inc., acquired the assets of

04:19:07   19   Pantech Co Limited, how did that work out for Pantech,

04:19:11   20   Inc.?

04:19:11   21   A.   So after acquisition of assets and personnel from

04:19:15   22   Pantech Co Limited, although we were -- we had limited

04:19:17   23   resources, we actually worked very hard in terms of our R&D

04:19:21   24   activities.  And at the end of the day, we were able to

04:19:25   25   release a new product in the market in June of 2016.  But

04:19:29    1    it didn't sell very well.

04:19:33    2        So it was -- it was very difficult -- very

04:19:35    3    different from our expectation.  The phones didn't sell

04:19:39    4    well.  So we ran into more financial difficulties because

04:19:43    5    we were not able to get the revenue generated by selling

04:19:45    6    those phones.

04:19:46    7    Q.  And what did you do then?

04:19:48    8    A.  Actually, from the beginning of taking over the

04:19:51    9    business, we were already in financial difficulties at the

04:19:56    10    time.  So the most urgent and most important challenge for

04:19:58    11    us to get funds -- to get financing, but this company,

04:20:03    12    Pantech Co Limited had already filed bankruptcy, so we

04:20:06    13    couldn't go through the general route to get financing.  So

04:20:09    14    one of the ways that we employed for financing was to

04:20:12    15    leverage the patents that Pantech had.  And Pantech at the

04:20:16    16    time had thousands of patents.

04:20:19    17        However, we were a cell phone manufacturer selling

04:20:22    18    cell phones, so we didn't have any expertise in IP

04:20:25    19    licensing -- intellectual property licensing.  So rather

04:20:29    20    than we directly engage in licensing, we got to collaborate

04:20:33    21    with a company called GoldPeak who had expertise in that

04:20:36    22    area.

04:20:37    23    Q.  So let me make sure I understand that.  So you were --

04:20:41    24    you were setting out to license your IP as a revenue

04:20:45    25    source?

04:20:46    1    A.  So when you say "revenue," if you use a term to mean

04:20:49    2    the same thing as financing, yes.

04:20:53    3    Q.  And you said you engaged with a company called

04:20:56    4    GoldPeak; is that correct?

04:20:58    5    A.  That's correct.

04:20:59    6    Q.  And why exactly did Pantech, Inc., not handle the

04:21:02    7    licensing efforts itself?

04:21:04    8    A.  Because we were a cell phone manufacturer.  We were

04:21:07    9    selling the cell phones, and if you leverage our patents

04:21:11    10   and -- and actually file claims against another company

04:21:14    11   through licensing, actually what that meant is that we

04:21:18    12   might be able to receive that on the receiver's end.  So it

04:21:22    13   was -- we thought it was -- it would be difficult for us to

04:21:26    14   do that directly.  That was the first reason.

04:21:29    15       And the second thing is that we thought it would

04:21:31    16   be better to work with somebody who had expertise in

04:21:34    17   leveraging IPs or patents, so who had expertise in that

04:21:38    18   regard.

04:21:39    19   Q.  So were these efforts successful?

04:21:42    20   A.  It was not successful to our satisfaction -- to our

04:21:46    21   expectation.

04:21:47    22   Q.  And why do you say that?

04:21:48    23   A.  Basically, the reason why we wanted to leverage patents

04:21:51    24   so that we can get financing through this is because we

04:21:54    25   needed to cover our operation costs.  Even though we

04:22:01  1   released our phone in the market, it was not a significant

04:22:03  2   result that we were able to achieve.

04:22:05  3        So even after that, the financial situation that

04:22:08  4   the company was experiencing was getting worse, and -- but

04:22:11  5   towards the end of 2017, we were able to get some financing

04:22:15  6   to a certain degree, and I think it was only possible

04:22:18  7   because we actually applied -- you know, it was really

04:22:22  8   urgent, so we applied some pressure so that we can get

04:22:26  9   close successfully.

04:22:29  10  Q.  Was Pantech, Inc., able to license any of its

04:22:33  11  intellectual property with your efforts with GoldPeak?

04:22:35  12  A.  Yes, there was an agreement with ██████ that took place

04:22:37  13  at the end of 2017.

04:22:44  14       MR. FUSSELL:  At this point, Your Honor, I believe

04:22:46  15  we need to seal the court.

04:22:48  16       THE COURT:  All right.  We'll seal the courtroom.

04:22:50  17       (Courtroom sealed.)

04:22:50  18       (This portion of the transcript is Sealed and

04:22:50  19       filed under separate cover as Sealed Portion

04:22:50  20       No. 3.)

04:34:03  21       (Courtroom unsealed.)

04:34:03  22       THE COURT:  Let me -- before we do that, is

04:34:05  23  everybody good to go another 30 minutes?  Good to go?

04:34:09  24       MR. BUCCIGROSS:  Thank you, Your Honor.

04:34:10  25  Plaintiffs call Professor Todor Cooklev.

| | | |
|---|---|---|
| 04:34:27 | 1 | (Witness sworn.) |
| 04:35:07 | 2 | TODOR COOKLEV, Ph.D., PLAINTIFFS' WITNESS, SWORN |
| 04:35:07 | 3 | DIRECT EXAMINATION |
| 04:35:08 | 4 | BY MR. BUCCIGROSS: |
| 04:35:08 | 5 | Q.  Good afternoon, Professor Cooklev.  Will you please |
| 04:35:13 | 6 | introduce yourself to the jury? |
| 04:35:13 | 7 | A.  Good afternoon, my name is Dr. Cooklev, and I prepared |
| 04:35:19 | 8 | the set of slides that you see here on the screen. |
| 04:35:22 | 9 | I'm professor of electrical and computer |
| 04:35:25 | 10 | engineering at Purdue University in Indiana.  I teach |
| 04:35:28 | 11 | undergraduate and graduate courses in the area of |
| 04:35:31 | 12 | communication systems.  I also do research related to |
| 04:35:35 | 13 | hardware and software aspects of wireless devices and |
| 04:35:38 | 14 | radios, and I publish. |
| 04:35:39 | 15 | Q.  What is your educational background? |
| 04:35:41 | 16 | A.  I have Ph.D. in electrical engineering from Tokyo |
| 04:35:46 | 17 | Institute of Technology. |
| 04:35:47 | 18 | Q.  Are you involved in any professional activities outside |
| 04:35:49 | 19 | of your teaching and research? |
| 04:35:50 | 20 | A.  Yes, I am.  For many years, I have been involved with |
| 04:35:56 | 21 | the IEEE, which is the largest professional organization of |
| 04:36:03 | 22 | electrical and electronics engineers.  I've served on the |
| 04:36:06 | 23 | Board of Governors of the IEEE Standards Association and |
| 04:36:06 | 24 | also on the editorial board of journals in the field of |
| 04:36:11 | 25 | communications standards. |

04:36:12    1    Q.   Do you do any writing?

04:36:13    2    A.   Yes.   I am authored on more than 100 publications, and

04:36:18    3    also I have written some textbooks.

04:36:21    4    Q.   Have you received any professional recognition?

04:36:24    5    A.   Yes, I have.   For example, several years ago, I was

04:36:30    6    inducted into the Purdue Innovator Hall of Fame.   I'm also

04:36:35    7    inventor on 32 issued U.S. patents.

04:36:39    8    Q.   Have you received any research grants?

04:36:42    9    A.   I received a number of research grants.   One example,

04:36:47   10    my research was funded by the Office of Naval Research, and

04:36:51   11    several years ago, I was also a Navy fellow.

04:36:56   12          MR. BUCCIGROSS:   Your Honor, at this time, we

04:36:57   13    proffer Professor Cooklev as an expert in the field of

04:37:01   14    cellular communications.

04:37:02   15          MR. FILBIN:   No objection, Your Honor.

04:37:03   16          THE COURT:   Very well.

04:37:04   17    Q.   (By Mr. Buccigross)   What are you here to testify about

04:37:09   18    today, Professor Cooklev?

04:37:11   19    A.   I'm here to help the jury understand the technical

04:37:17   20    value of Pantech's standard essential patents that they

04:37:23   21    bring into 4G and 5G technology.

04:37:25   22    Q.   Now, let me ask you, we've seen in a few of the

04:37:29   23    documents today something called LTE, or long-term

04:37:32   24    evolution.   Does that relate to 4G or 5G technology?

04:37:35   25    A.   Yes, LTE is -- is synonymous with 4G.

| | | |
|---|---|---|
| 04:37:40 | 1 | Q.  Could you please explain to the jury from a basic level |
| 04:37:43 | 2 | what a cellular network is? |
| 04:37:45 | 3 | A.  Here on the slide, we see a relatively large geographic |
| 04:37:52 | 4 | area.  That's divided into a number of smaller areas called |
| 04:37:59 | 5 | cells.  And, generally speaking, in each cell, there is a |
| 04:38:04 | 6 | base station, and phones communicate with these base |
| 04:38:08 | 7 | stations.  The base stations coordinate everything. |
| 04:38:11 | 8 | Q.  And is a base station also known as a cell tower? |
| 04:38:16 | 9 | A.  That's correct. |
| 04:38:17 | 10 | Q.  Will you please explain what cellular standards are? |
| 04:38:20 | 11 | A.  So cellular standards are basically sets of published |
| 04:38:26 | 12 | technical -- technical specifications that define how a |
| 04:38:32 | 13 | network operates. |
| 04:38:34 | 14 |          So the goal is to ensure interoperability.  In |
| 04:38:38 | 15 | this way, different types of phones can communicate on a |
| 04:38:41 | 16 | cellular network. |
| 04:38:43 | 17 | Q.  We've been calling three of Pantech's patents that are |
| 04:38:46 | 18 | at issue in this case standards essential.  Will you please |
| 04:38:50 | 19 | explain what that means? |
| 04:38:51 | 20 | A.  This means that Pantech's patents have been |
| 04:38:58 | 21 | incorporated into the standards.  So a phone cannot comply |
| 04:39:04 | 22 | with the standards unless it uses Pantech's patents. |
| 04:39:09 | 23 | Q.  What if a phone doesn't comply with a 4G or 5G |
| 04:39:13 | 24 | standards? |
| 04:39:14 | 25 | A.  It cannot be sold in the United States.  Service |

04:39:18  1   providers do not allow phones that do not comply with the

04:39:22  2   standards on their networks.

04:39:24  3   Q.  Could you please give us a little bit of background on

04:39:27  4   how cellular standards are made?

04:39:29  5   A.  There is an organization called 3GPP.  It's made up of

04:39:38  6   industry partners that work together to identify the best

04:39:46  7   technical improvements and solutions and develop the

04:39:50  8   standards.

04:39:51  9   Q.  Have you participated yourself in 3GPP standards

04:39:56  10  setting activities?

04:39:57  11  A.  Yes, I have.  I participated during the time

04:40:02  12  improvements to 4G were considered by 3GPP.

04:40:06  13  Q.  We've heard that there are different standards with

04:40:09  14  names like 4G and 5G.  Would you please provide an overview

04:40:14  15  of how cellular technology has evolved?

04:40:19  16  A.  Yes.  There have been so far five generations of

04:40:25  17  cellular technology.  And shown on this slide, G stands for

04:40:30  18  generation.

04:40:32  19        Well, up to 3G, you couldn't connect to the

04:40:37  20  Internet using a cell phone.  With 3G, you could do that,

04:40:43  21  but at the very low data rate.

04:40:45  22        Now, things really started speeding up when we got

04:40:51  23  to 4G.

04:40:55  24        At the bottom of the slide, I'm showing the data

04:40:59  25  rates here.  And we see that 4G, generally speaking,

04:41:04    1    achieves a data rate that's a hundred times larger than the

04:41:09    2    data -- data rate of 3G.

04:41:12    3        Well, now we are in the 5G era, and 5G, again,

04:41:18    4    generally speaking, achieves a data rate that is 10 times

04:41:21    5    greater than the data rate of 4G, which means it's a

04:41:24    6    thousand times greater than 3G.  So now we have really

04:41:28    7    high-speed Internet, and in addition, we have low power

04:41:31    8    consumption.

04:41:32    9    Q.  Can you summarize what the main benefits of 4G and 5G

04:41:36    10   are compared to 3G?

04:41:37    11   A.  So the first main benefit is data rate.  That's the

04:41:45    12   speed of a connection.  So this relates to how fast you can

04:41:49    13   download a movie or how fast you can just access different

04:41:54    14   websites.

04:41:56    15       The second benefit -- second main benefit is

04:42:01    16   latency, which is synonymous with the delay.  So that's

04:42:05    17   like the delay to connect to a website before even you

04:42:08    18   download anything there.  And while data rate has been

04:42:13    19   going up, the latency has been going down.

04:42:18    20       And the third main benefit is due -- is the cost

04:42:22    21   to operate the network, and that has been going down, as

04:42:25    22   well.  And so this is why we, as consumers, have been

04:42:29    23   getting better services and normal applications.

04:42:36    24   Q.  Do the inventions reflected in the standards essential

04:42:39    25   patents in this case contribute to the benefits that you

04:42:41    1    just told us about?

04:42:43    2    A.   Yes, they do, absolutely.

04:42:47    3         So all of the three patents here contribute to the

04:42:53    4    increased data rate.

04:42:56    5         Well, there are two main ways to increase the data

04:42:59    6    rate.   The first one is by providing more bandwidth.

04:43:05    7         Well, the second one, and equally important or

04:43:10    8    very important, is how is this expensive bandwidth used?

04:43:16    9    And these patents help tremendously with the efficient use

04:43:20   10    of bandwidth.   They also contribute to the reduced latency.

04:43:27   11         And the '954 patent contributes to the cost

04:43:29   12    effective operation of a cellular network.

04:43:33   13    Q.   Which OnePlus phones use Pantech's standards essential

04:43:37   14    patents in this case?

04:43:38   15    A.   I have slides that summarizes which phones use which

04:43:45   16    patents.

04:43:49   17    Q.   I'd like to talk about each patent now.   Could you

04:43:52   18    please introduce the '839 patent?

04:43:57   19    A.   Here is the title page of the '839 patent, which is

04:44:03   20    Plaintiff Exhibit 005.

04:44:05   21         So this patent helps reduce the interference at

04:44:10   22    the edge of a cell where service isn't that good.

04:44:15   23    Q.   Which standard is the '839 patent essential to?

04:44:18   24    A.   And this -- this patent is essential to 4G.

04:44:23   25    Q.   Say I'm using my phone and I want to post a picture on

04:44:26   1    Facebook, is the entire picture just sent all at once the

04:44:29   2    way we might put a picture in the U.S. mail?

04:44:32   3    A.  No.  It is broken down into relatively small data

04:44:40   4    blocks.  I'm showing here two pieces of data, Data 1 and

04:44:46   5    Data 2.

04:44:46   6    Q.  Does the phone need to know if the base station

04:44:49   7    actually gets those data blocks?

04:44:51   8    A.  Yes.  This is very important.

04:44:53   9    Q.  How does the phone know that?

04:44:54   10   A.  Well, when the phone sends the first data block, if the

04:45:03   11   base station receives it successfully, the base station

04:45:08   12   will respond with something that's called an ACK, or a

04:45:11   13   positive acknowledgement.  And then the phone can proceed

04:45:17   14   with the second data block that's Data Block 2.

04:45:23   15        But now suppose that the base station does not get

04:45:26   16   Data Block 2 successfully, then it will respond with what

04:45:30   17   is called a NACK, or a negative acknowledgement.  So the

04:45:34   18   phone knows that it has to retransmit Data Block 2.

04:45:37   19   Q.  And this is in the 4G standard?

04:45:39   20   A.  And this is how the 4G standard operates.

04:45:44   21   Q.  What improvements does the '839 patent contribute to 4G

04:45:48   22   technology?

04:45:52   23   A.  Well, a base station has to send these ACKs and NACKs

04:45:58   24   to thousands of different phones.  And so to accomplish

04:46:01   25   this, it uses what is called a PHICH, which is like a

04:46:08  1  supply line with shipping containers.

04:46:11  2      And there is one precise mathematical formula in

04:46:20  3  the patent which helps the phones find these shipping

04:46:25  4  containers and find the ACKs and the NACKs that are aimed

04:46:30  5  for the phone.

04:46:31  6  Q.  How often is this invention used in 4G?

04:46:33  7  A.  Well, every time the phone sends data.

04:46:38  8  Q.  Will you please introduce the '247 patent now?

04:46:42  9  A.  Here is the title page of the '247 patent.

04:46:47  10      From the title page, we -- we can see that the

04:46:54  11  earliest applications from which this patent issued were

04:46:57  12  filed in 2003 and 2004.  And the '247 patent is essential

04:47:07  13  to 5G.

04:47:07  14  Q.  Is this Plaintiffs' Exhibit 1, the '247?

04:47:11  15  A.  Yes, that's correct.  It is Plaintiff Exhibit 1.

04:47:14  16  Q.  What improvements does the '247 patent provide to --

04:47:20  17  provide?

04:47:21  18  A.  Well, remember that 4G was using these ACKs and NACKs.

04:47:30  19  Well, in 5G, the phone decides to retransmit based on

04:47:38  20  scheduling information.  This scheduling information

04:47:42  21  contains what is called an NDI, or a new data indicator.

04:47:53  22  So this is how the phone decides to help perform the

04:48:04  23  transmission.

04:48:04  24  Q.  And why is this a better solution?

04:48:07  25  A.  Well, first, a phone isn't allowed to send anything to

04:48:13   1   a base station without receiving basically an authorization

04:48:18   2   from the base station as scheduling information.

04:48:22   3          And so the '247 patent gets rid of the ACK, NACK,

04:48:28   4   and the PHICH, which is like an entirely different

04:48:31   5   signaling, and instead, uses the scheduling information,

04:48:37   6   which is required anyway.  So this -- this is simpler and

04:48:45   7   reduces overhead.

04:48:46   8          And, second, the base station performs scheduling

04:48:48   9   over the good channels.  And this -- this increases the

04:48:54  10   likelihood of successful transmission.

04:48:56  11   Q.  How often is the patented invention of the '247 patent

04:48:59  12   used in 5G?

04:49:00  13   A.  It's used every time the phone sends data.

04:49:05  14   Q.  Will you please introduce the '954 patent now?

04:49:09  15   A.  The '954 patent is the title page that's Plaintiff

04:49:15  16   Exhibit 004.  And this patent helps phones and base

04:49:29  17   stations synchronize when an improvement to 4G is used

04:49:35  18   called carrier aggregation.

04:49:37  19          So this patent is essential to the improved

04:49:41  20   version of 4G, and it's also essential to 5G.

04:49:44  21   Q.  So I'd like to talk a little bit about the background

04:49:47  22   technology to help the jury understand.

04:49:49  23          Can you please explain what carrier aggregation

04:49:55  24   is?

04:49:55  25   A.  So a carrier here is a frequency band that's used for

04:50:02    1    cellular communication.  So carrier aggregation groups

04:50:06    2    several of these carriers or frequency bands just like

04:50:13    3    multiple narrow roads are grouped into one multi-lane

04:50:24    4    highway.  This increases the bandwidth and increases speed.

04:50:26    5    Q.  Can you also explain a concept called timing advance?

04:50:31    6    A.  Yes.  So a base station requires that all signals from

04:50:40    7    all phones arrive at the same time at the base station.

04:50:45    8    Well -- but some phones are closer to the base station, and

04:50:48    9    some phones are further away.

04:50:51   10         So, for example, suppose that we all needed to get

04:50:55   11    to the courthouse at the same time.  Well, those that live

04:51:02   12    close to the courthouse can leave a little bit later, but

04:51:08   13    those that live further away from the courthouse, they

04:51:13   14    should leave earlier.  Well, phones do something similar

04:51:17   15    when they transmit.

04:51:19   16    Q.  Now that we have that background, can you summarize the

04:51:22   17    invention of the '954 patent?

04:51:25   18    A.  Well, suppose that -- I will use an analogy.  Suppose

04:51:30   19    that lots of people need to get to the courthouse at the

04:51:33   20    same time.  Instead of each one driving separately to the

04:51:41   21    courthouse, those that live close together carpool.

04:51:51   22         Well, in the '954 patent, there is something

04:51:53   23    that's called a "delegate," which is like every carpool

04:52:00   24    having a driver that picks people up.  And this

04:52:06   25    accomplishes synchronization, and it does it in an

04:52:11    1    efficient way.

04:52:12    2    Q.  So how often is this phone used when carrier

04:52:16    3    aggregation is used?

04:52:17    4    A.  Well, when carrier aggregation is used, this is used

04:52:21    5    all the time.

04:52:23    6    Q.  Switching gears, can you explain the concept of patent

04:52:27    7    forward citations, for the jury?

04:52:29    8    A.  Yes.  So forward citations is essentially the number of

04:52:37    9    times a patent has been cited by later issued patents.

04:52:44   10    Q.  Can the number of forward citations that a patent

04:52:47   11    receives indicate the technical quality of that patent?

04:52:50   12    A.  Well, it's much more complicated than that.  It's not

04:52:59   13    just -- it's not just counting.  And there are people who

04:53:03   14    really do that.  But, generally speaking, the number of

04:53:08   15    citations is -- is related to the technical value.

04:53:15   16    Q.  And when you say there are people who really do that,

04:53:18   17    what do you mean by people who really do that?

04:53:20   18    A.  Well, I mean that there are people who specialize in

04:53:25   19    this type of analysis.

04:53:27   20    Q.  Have Pantech's standards essential patents in this case

04:53:31   21    received forward citations?

04:53:33   22    A.  Yes, they have.  They've received numerous citations,

04:53:37   23    including from leading companies in the cellular business,

04:53:42   24    such as Ericsson, Nokia, and Qualcomm.

04:53:44   25    Q.  Does that indicate to you anything about the

04:53:48  1  correctness of the technical analysis that you did when you

04:53:51  2  went through and analyzed Pantech's patents and the

04:53:54  3  standards in detail?

04:53:56  4  A.  Well, yes.  I rely primarily on my detailed technical

04:54:01  5  analysis, but the forward citation analysis supports my

04:54:07  6  analysis about the technical value of Pantech's standard

04:54:16  7  essential patents.

04:54:16  8  Q.  Thank you, Professor Cooklev.

04:54:21  9        MR. BUCCIGROSS:  Your Honor, we'll pass the

04:54:23  10  witness.

04:54:38  11        MR. FILBIN:  Thank you, Your Honor.

04:54:40  12                    CROSS-EXAMINATION

04:54:41  13  BY MR. FILBIN:

04:54:41  14  Q.  Good afternoon, Dr. Cooklev.  How are you?

04:54:47  15  A.  Good afternoon.

04:54:48  16  Q.  You're an electrical engineer, correct?

04:54:50  17  A.  Yes.

04:54:51  18  Q.  And with respect to assigning money value to the SEPs,

04:54:54  19  you would defer to the economic experts; is that fair?

04:54:57  20  A.  Yes, I think that's fair.

04:55:04  21        MR. FILBIN:  Could we show PDX-4.5, please?

04:55:08  22  Q.  (By Mr. Filbin)  This is your slide presentation that

04:55:10  23  you prepared, correct, sir?

04:55:12  24  A.  That's correct.

04:55:13  25  Q.  And 3G, 4G, and 5G, they each have their own standards,

| | | |
|---|---|---|
| 04:55:19 | 1 | correct? |
| 04:55:19 | 2 | A.  Yes. |
| 04:55:20 | 3 | Q.  And they all operate differently; is that right? |
| 04:55:25 | 4 | A.  Yes. |
| 04:55:25 | 5 | Q.  Now, in the 4G standard, there are thousands of patents |
| 04:55:32 | 6 | relating to that standard; is that correct? |
| 04:55:35 | 7 | A.  Well, I -- it depends what do you mean by related.  I |
| 04:55:46 | 8 | don't think that's -- that's accurate, and I don't know how |
| 04:55:49 | 9 | many patents. |
| 04:55:50 | 10 | Q.  You don't know how many -- that there are no patents |
| 04:55:53 | 11 | related to 4G standards; is that right? |
| 04:55:56 | 12 | A.  Well, I didn't say that there are no patents. |
| 04:56:03 | 13 | Q.  So there are some?  There are -- there are patents that |
| 04:56:06 | 14 | are related to the 4G standard? |
| 04:56:09 | 15 | A.  No, I -- I do have an understanding that there are |
| 04:56:16 | 16 | patents.  And, I mean, you use the word "relate" that I |
| 04:56:21 | 17 | think is -- I think is not that precisely defined.  It's a |
| 04:56:30 | 18 | little unclear.  But, yeah, I could agree that there are a |
| 04:56:32 | 19 | number of patents. |
| 04:56:34 | 20 | Q.  Okay.  Thank you. |
| 04:56:34 | 21 | So there's -- you would agree there are thousands |
| 04:56:37 | 22 | of patents related to the 4G standard, correct? |
| 04:56:40 | 23 | A.  I don't know that there are necessarily thousands and |
| 04:56:45 | 24 | thousands. |
| 04:56:46 | 25 | Q.  Uh-huh.  There are thousands of patents declared to be |

04:56:50    1    essential to the 4G standard, correct?

04:56:55    2    A.  I don't know how many have been declared.

04:57:00    3    Q.  Would you agree that there are many?

04:57:03    4    A.  I would agree that there are many.

04:57:05    5    Q.  And that applies to the 5G standard, correct?  There

04:57:08    6    are many hundreds, thousands of patents that are related to

04:57:15    7    the 5G standard, correct?

04:57:16    8    A.  Well, again, I don't know how many, but, yes, there

04:57:25    9    are -- there are many patents.

04:57:28    10   Q.  And, I mean, there's -- there's more than two, right?

04:57:35    11   A.  I think I would agree with that.

04:57:37    12   Q.  Okay.  And then there's -- and with respect to 5G,

04:57:40    13   there's more than one patent related to 5G, correct?

04:57:46    14   A.  I think that that's true.

04:57:51    15   Q.  Okay.

04:58:01    16         MR. FILBIN:  Let's go to -- let's go to PDX-4.8,

04:58:10    17   please.

04:58:10    18   Q.  (By Mr. Filbin)  So you would say that the '247 is

04:58:13    19   directed to 5G, correct?

04:58:16    20   A.  No, I think I said that the '247 is essential to 5G.

04:58:21    21   Q.  Okay.  And the '839 patent, in your opinion, is

04:58:23    22   essential to 4G?

04:58:24    23   A.  Yes.

04:58:25    24   Q.  And the '954 is essential, in your opinion, to 4G, as

04:58:30    25   well, correct?

236

04:58:31  1   A.  It's related I said to an improvement of 4G.  So

04:58:37  2   that's -- the technical name is LTE-Advanced, and also

04:58:44  3   essential to 5G.

04:58:46  4   Q.  You would agree that the asserted patents here, the

04:58:53  5   '247, the '839, and the '954 patents, they're not written

04:58:58  6   for a general audience of folks, right?

04:59:00  7   A.  Excuse me, general audience of what?

04:59:06  8   Q.  They're not easily understandable; is that correct?

04:59:13  9   A.  I think that that's -- I would agree with that, that

04:59:19  10  many patents are not that easily understandable.

04:59:23  11  Q.  And particularly in this technology, you would need

04:59:27  12  some technical training in order to read and understand

04:59:30  13  these documents, correct, the '247, the '839, and the '954?

04:59:34  14  A.  I think -- I think, yes.

04:59:38  15  Q.  And often it's referred to as somebody who -- the skill

04:59:43  16  level would be somebody of having ordinary skill in the

04:59:45  17  art; are you familiar with that term?

04:59:47  18  A.  I am familiar with that term, yes.

04:59:50  19  Q.  Okay.  And so you understand that patents are normally

04:59:53  20  read from that perspective, of somebody who has ordinary

04:59:56  21  skill in the art or industry in which the subject matter

05:00:02  22  rests, correct?

05:00:06  23  A.  Yes.

05:00:07  24  Q.  Okay.  So let's just take the case of the '247 patent.

05:00:11  25       Would you agree that a person of ordinary skill in

05:00:15   1   the art would have this kind of technical background, at

05:00:18   2   least a bachelor's degree in electrical engineering,

05:00:22   3   telecommunications engineering, or related field, with at

05:00:25   4   least two years of experience in the field of networking

05:00:28   5   and wireless devices?

05:00:30   6   A.   That sounds to me about right.

05:00:41   7   Q.   Okay.

05:00:43   8            MR. FILBIN:   Could we go to Slide 4 -- PDX-4.13,

05:00:50   9   please?

05:00:50   10   Q.   (By Mr. Filbin)   And so I believe you just stated, it's

05:00:57   11   your view that the '247 patent is standard essential to 5G,

05:01:06   12   correct?

05:01:06   13   A.   Yes.

05:01:06   14   Q.   And as you're explaining your slide here, 4.13, one

05:01:13   15   aspect of the '247 patent is that it doesn't use a negative

05:01:16   16   acknowledgement, or a NACK signal; is that correct?

05:01:18   17   A.   Well, the -- the determination whether to retransmit is

05:01:25   18   done based on scheduling information.

05:01:27   19   Q.   And not a NACK, correct?

05:01:29   20   A.   And not a NACK.

05:01:30   21   Q.   Okay.   Now, a NACK signal is used in the 3G standard,

05:01:36   22   correct?

05:01:36   23   A.   If we -- I mean, we will have to really look at some

05:01:47   24   documents.   I think I -- it's -- I haven't reviewed the

05:01:57   25   documents that maybe you are talking about.

| | | |
|---|---|---|
| 05:02:01 | 1 | Q.  Well, let's look at PDX-4.11. |
| 05:02:10 | 2 | You agree that the '839 patent includes using an |
| 05:02:17 | 3 | ACK and a NACK, correct? |
| 05:02:18 | 4 | A.  Of the '839 patent is essential to 4G. |
| 05:02:24 | 5 | Q.  So you would agree? |
| 05:02:28 | 6 | A.  Yes. |
| 05:02:28 | 7 | Q.  And that is one way the 5G standard is different from |
| 05:02:34 | 8 | the 4G standard, correct? |
| 05:02:36 | 9 | A.  Yes. |
| 05:02:39 | 10 | Q.  Okay.  So you have not formed an opinion that the '247 |
| 05:02:47 | 11 | patent is essential to the 3G standard, correct? |
| 05:02:59 | 12 | A.  I don't think I have offered an opinion about that. |
| 05:03:05 | 13 | Q.  Okay.  And in order for you to do that, you would need |
| 05:03:10 | 14 | to under -- undertake other study that you haven't done; is |
| 05:03:15 | 15 | that correct? |
| 05:03:15 | 16 | A.  Well, yes, I would need to do similar analysis that I |
| 05:03:23 | 17 | have done. |
| 05:03:24 | 18 | Q.  And you haven't done that analysis, correct? |
| 05:03:36 | 19 | A.  At the moment, I do not recall having done that |
| 05:03:39 | 20 | analysis. |
| 05:03:47 | 21 | Q.  Okay. |
| 05:03:48 | 22 | MR. FILBIN:  Let's look at Slide 3. |
| 05:03:51 | 23 | Q.  (By Mr. Filbin)  Let's look at the '247 patent. |
| 05:03:53 | 24 | On the left-hand side of the cover page, there's a |
| 05:04:01 | 25 | section titled:  Related U.S. Application Data. |

05:04:07    1              Do you see that, sir?

05:04:08    2    A.  Yes, I do.

05:04:12    3    Q.  Okay.  And that section describes other related patents

05:04:16    4    and patent applications that are part of the same family as

05:04:21    5    the '247 patent; is that your understanding?

05:04:23    6    A.  Yes, that's generally my understanding of that section.

05:04:28    7    Q.  Okay.  So in the case of the '247, that information

05:04:32    8    starts on the first page, and it carries over to the second

05:04:34    9    page.

05:04:35   10              MR. FILBIN:  So if we could go to the next slide,

05:04:40   11    please.

05:04:40   12    Q.  (By Mr. Filbin)  We've put it together here on the

05:04:42   13    right-hand side.  Do you see that it's from Page 1 and

05:04:44   14    Page 2, and it's collected?

05:04:46   15    A.  Yes, I do.

05:04:50   16    Q.  Do you see that, sir?

05:04:51   17              And so these are all the different family members

05:04:54   18    of the '247 patent, correct?

05:04:58   19    A.  I think we can call them as different -- we can call

05:05:03   20    them different family members.

05:05:05   21    Q.  Okay.  And so how many do we have, one, two, three,

05:05:08   22    four, five, six, seven, eight, eight different family

05:05:14   23    members?  Is that right?

05:05:15   24    A.  I haven't counted, but I will take your word.

05:05:21   25    Q.  And these earlier members of the '247 patent family,

05:05:26    1    they were declared essential to 3G's standard, correct?

05:05:30    2           MR. BUCCIGROSS:  Objection, Your Honor.  If we

05:05:32    3    could have a sidebar.

05:05:33    4           THE COURT:  Sure.

05:05:36    5           (Bench conference.)

05:05:49    6           MR. BUCCIGROSS:  I'm going to object, Your Honor,

05:05:50    7    to the relevance of this.  And, also, it appears that it's

05:05:53    8    going to violate a MIL about infringement and validity.

05:05:55    9           And I think where we're going with this is

05:05:57   10    basically Mr. Filbin is trying to make the point that some

05:06:01   11    family member was declared essential to 3G.  And that, to

05:06:04   12    me, seems like it's going to waste a lot of time and

05:06:08   13    mislead and confuse the jury on that inference.

05:06:11   14           MR. FILBIN:  It's not a waste of time.  It's true

05:06:13   15    that they are related to 3G technology, and it has to do

05:06:16   16    with his forward citation analysis that he just said was

05:06:19   17    indicative of quality.

05:06:21   18           THE COURT:  Okay.  I gave you all fairly broad

05:06:27   19    leeway into getting into the background of the patents.  So

05:06:30   20    I'm going to give him the same amount of leeway.

05:06:33   21           MR. BUCCIGROSS:  Okay.

05:06:34   22           MR. FILBIN:  Thank you, Your Honor.

05:06:35   23           (Bench conference concluded.)

05:06:49   24    Q.  (By Mr. Filbin)  Dr. Cooklev, the earlier members of

05:06:54   25    the '247 patent family were declared essential to the 3G

05:06:57    1   standard, correct, not the 5G standard?

05:07:07    2   A.  But I think you -- we were just discussing that I do

05:07:16    3   not recall making that analysis at all.

05:07:23    4   Q.  So you are not aware that the earlier family members in

05:07:27    5   the '247 patent family were declared to be essential to 3G,

05:07:32    6   not 5G; is that correct?

05:07:39    7   A.  I mean, I think the -- I do not recall undertaking this

05:07:45    8   analysis and providing that opinion.

05:07:50    9   Q.  Is TS 25.309 one of the 3G standards, sir?

05:07:56   10   A.  Excuse me, which document?

05:08:00   11   Q.  Standard TS 25.309, is that one of the 3G standards?

05:08:10   12   A.  I mean, based on -- it seems right based on some -- my

05:08:25   13   recollection of the numbering system and the documents.

05:08:30   14   Obviously, it's a very large number of documents.  So

05:08:33   15   occasionally, I could be wrong, but I think that's --

05:08:38   16   that's right.

05:08:39   17   Q.  Thank you, sir.

05:08:40   18       And are you aware that Pantech stated in a sworn

05:08:44   19   interrogatory response that both U.S. Patent Application

05:08:51   20   No. 11/434,330, which is one, two -- the fourth row from

05:08:57   21   the bottom, and Patent No. 7,046,648, which is the last row

05:09:10   22   at the bottom -- at the bottom were both declared essential

05:09:13   23   to TS 25.309?  Were you aware of that?

05:09:21   24   A.  I do not recall.

05:09:32   25   Q.  So sitting here today, you have no memory of ever being

05:09:36    1    apprised of that information; is that correct?

05:09:39    2    A.  Yeah, I -- I mean, it seems it's something that's not

05:09:47    3    going to change my opinion, but I do not recall at the

05:09:55    4    moment about this.

05:09:59    5    Q.  Okay.  Thank you.

05:09:59    6         So you understand that Pantech is not seeking

05:10:03    7    damages from OnePlus in this lawsuit for any of these other

05:10:06    8    family members of the '247 patent, correct?

05:10:12    9    A.  You're asking whether my understanding is that Pantech

05:10:18   10    is not seeking damages.

05:10:22   11    Q.  And that's -- that's true.  The other two SEPs, the

05:10:26   12    '839 and the '954, it's your understanding that Pantech is

05:10:30   13    not seeking damages in this lawsuit for those family

05:10:35   14    members, the family members -- the other family members of

05:10:38   15    the '839 patent and the '954 patent, correct?

05:10:44   16    A.  Excuse me.  Maybe the question got a little bit too

05:10:47   17    long for me, and I am not exactly sure what...

05:10:52   18    Q.  Sure.  I'll do it in pieces.

05:10:53   19         So Pantech is not seeking damages from OnePlus in

05:10:57   20    this lawsuit for any of the other family members of the

05:11:02   21    '839 patent; isn't that correct?

05:11:06   22         MR. BUCCIGROSS:  Object, Your Honor.  This is

05:11:07   23    beyond the scope of a role of a technical witness --

05:11:12   24         THE COURT:  This is beyond the scope of what?

05:11:14   25         MR. BUCCIGROSS:  Beyond the role -- a scope of a

05:11:15   1   technical witness and calls for speculation.

05:11:19   2          THE COURT:   Overruled.

05:11:31   3   A.   Whether Pantech is seeking -- seeking damages for other

05:11:38   4   family members belonging to the '839 family is -- is -- in

05:12:00   5   short, I don't know at the moment.

05:12:02   6   Q.   (By Mr. Filbin)   And do you understand whether or not

05:12:07   7   Pantech is seeking damages from OnePlus in this lawsuit for

05:12:10   8   any of the other family members in the '954 patent?

05:12:14   9   A.   I don't know.   As a technical expert, I analyze the

05:12:21   10  '839, the '954, as well as the '247 patents.

05:12:24   11  Q.   And so as part of your work in this lawsuit, it was not

05:12:28   12  your assignment to assess whether or not OnePlus is using

05:12:32   13  the technology in the other family members of the '247

05:12:36   14  patent, correct?

05:12:50   15  A.   I do not recall investigating this.

05:12:56   16  Q.   And the same question for the '839.   As part of your

05:13:01   17  assignment in this lawsuit, were you tasked with

05:13:04   18  determining whether or not OnePlus uses the technology of

05:13:07   19  the other families in the '839 patent family?

05:13:17   20  A.   I do not recall investigating this, to answer your

05:13:31   21  question.

05:13:33   22  Q.   Okay.   And the same question for the '954 patent

05:13:37   23  family.   As part of your assignment in this lawsuit, were

05:13:39   24  you tasked with determining whether or not OnePlus uses the

05:13:43   25  technology of the other family members in the '954 patent

| | | |
|---|---|---|
| 05:13:47 | 1 | family? |
| 05:13:47 | 2 | A.  Well, here, you -- you used the word "use" multiple |
| 05:14:00 | 3 | times.  So what do you mean by "use"? |
| 05:14:09 | 4 | Q.  That they were practicing the technology claimed in |
| 05:14:11 | 5 | those respective family members, sir. |
| 05:14:13 | 6 | A.  I do not recall this -- this being my assignment. |
| 05:14:26 | 7 | Q.  So you are unable today to offer any opinions as to |
| 05:14:29 | 8 | whether or not OnePlus uses the technology of any of the |
| 05:14:33 | 9 | other family members in the three SEP patent families that |
| 05:14:39 | 10 | we're talking about, the '247, the '839, and the '954; is |
| 05:14:43 | 11 | that correct? |
| 05:14:43 | 12 | A.  I think I already answered to the best of my ability. |
| 05:14:54 | 13 | Q.  Okay.  Fair enough. |
| 05:14:57 | 14 | So you discussed talk -- forward patent citations? |
| 05:15:04 | 15 | A.  Yes. |
| 05:15:04 | 16 | Q.  And you conducted a patent citation analysis.  Is that |
| 05:15:16 | 17 | your testimony? |
| 05:15:20 | 18 | A.  No, not quite.  My testimony is that the -- as I said, |
| 05:15:32 | 19 | the -- it's fairly complicated, the patent citation |
| 05:15:37 | 20 | analysis.  And I said that there are people that specialize |
| 05:15:45 | 21 | in this analysis.  But, generally speaking, the number of |
| 05:15:50 | 22 | citations is -- is an indication of technical value. |
| 05:15:57 | 23 | MR. FILBIN:  Could we display PX-1 at Page 2, |
| 05:16:06 | 24 | please? |
| 05:16:06 | 25 | Q.  (By Mr. Filbin)  So it may be helpful to just amplify |

05:16:12    1  what this is exactly that we're referring to with this

05:16:15    2  forward patent citations.

05:16:17    3          You see the -- on the left-hand column at PX-1.002

05:16:27    4  the second page where it says references cited?

05:16:29    5  A.  Yes.

05:16:31    6  Q.  Okay.  So that's what we're talking about, right, it's

05:16:36    7  when the later filed patent applications cites earlier

05:16:41    8  filed applications; is that correct?

05:16:42    9  A.  Yes.

05:16:43   10  Q.  And then if we could just -- you can see that in the

05:16:48   11  '247, for example, there are -- I mean, it starts in the

05:16:52   12  left-hand column on Page 2, and it just goes -- carries

05:16:55   13  over.  If you can toggle through, you can see it's on

05:16:58   14  Page 3, Page 4, and Page 5.  Correct?

05:17:02   15  A.  That's correct.  Of those pages, it cites other

05:17:06   16  publications there, not just patents.

05:17:09   17  Q.  Right.  So we're talking about U.S. patent documents

05:17:12   18  are cited, foreign patent documents are cited, and then

05:17:15   19  this category other, right?

05:17:17   20  A.  That's correct.

05:17:17   21  Q.  Okay.  And so you looked -- you stated that the '247

05:17:29   22  patent was cited multiple times by Nokia, Ericsson, and

05:17:35   23  Qualcomm; is that right?

05:17:39   24  A.  The '247, I said that for all of the -- so all three of

05:17:46   25  the -- of Pantech's standard essential patents have been

05:17:52   1   cited.

05:17:52   2   Q.  Okay.  So your testimony is that each of the asserted

05:17:55   3   patents is referenced multiple times by patents -- or owned

05:17:59   4   by Nokia, Ericsson, and Qualcomm; is that correct?

05:18:04   5   A.  Well, I think that's not entirely correct.  Not

05:18:08   6   necessarily that each one is being cited by each one of

05:18:11   7   these companies.  But, generally speaking, these patents

05:18:20   8   have been cited by patents owned by leading companies.

05:18:28   9   Q.  Okay.  And in preparing -- you prepared an expert

05:18:30  10   report in this case, right, that contained your opinions?

05:18:34  11   A.  Yes.

05:18:36  12   Q.  And when you did that, you were -- you didn't provide

05:18:39  13   any materials that showed where these patents were cited;

05:18:48  14   is that right?

05:18:48  15   A.  I did not provide any materials?

05:18:52  16   Q.  You didn't identify the other patents that we're

05:18:56  17   citing, say, the '247, the '839, or the '954.  Isn't that

05:18:56  18   correct?

05:19:03  19   A.  Well, it's -- it's been -- it's been a long time since

05:19:09  20   I submitted the expert report.  So I wouldn't necessarily

05:19:14  21   remember everything that I did, but I have checked since

05:19:19  22   then, and I can testify that these patents have been cited

05:19:26  23   by a number of -- by a number of patents.

05:19:33  24   Q.  And you're aware that the materials provided to us by

05:19:39  25   Pantech's damages expert show that the 8 --

05:19:45    1            MR. FILBIN:  Could you show that?  Slide 6,

05:19:49    2    please.

05:19:49    3    Q.  (By Mr. Filbin)  -- that the -- that the material --

05:19:55    4    the information provided by Pantech shows that the actual

05:20:00    5    number of citations for the '247 patent are two, and the

05:20:05    6    actual number of citations for the '839 patent are five,

05:20:09    7    and that the actual number of citations for the '954 are

05:20:13    8    zero.  Are you aware of that?

05:20:15    9    A.  No, I'm -- why would I be aware?  Who's -- I'm not

05:20:28   10    aware of this slide.  I am not sure where even it comes

05:20:32   11    from.  And not only that, but, I mean, based on my

05:20:41   12    understanding, I -- I'm not sure these numbers are correct.

05:20:47   13    Q.  And as you sit here today, you cannot identify the

05:20:51   14    other patents that have actually cited the '247 patent; is

05:20:58   15    that correct?

05:20:58   16    A.  I don't think I can agree.  That I cannot identify?

05:21:12   17            I think the -- first, regarding citations, I think

05:21:16   18    I said that it's more complicated than just counting.  I

05:21:25   19    mean, I think you need to -- there is some counting, but

05:21:29   20    that counting needs to be done taking into account patent

05:21:34   21    families, it's more complicated than just counting.

05:21:40   22            So I think in response to your last question, I

05:21:47   23    don't think I can agree.

05:21:49   24    Q.  So as you sit here today, you cannot say whether or not

05:21:54   25    the actual patents-in-suit here, the '247 patent, the '839

05:22:00    1    patent, and the '954 patent, you cannot say how many times

05:22:05    2    those three actual patents have been cited by other

05:22:09    3    patents, correct?

05:22:20    4    A.  Well, these -- I don't think that I can agree with

05:22:28    5    that.

05:22:30    6    Q.  Okay.  Let's switch topics.  Let's go to another point.

05:22:34    7         In performing your work in this litigation, you

05:22:37    8    only provided opinions regarding the three SEPs, correct?

05:22:46    9    A.  As I said, I submitted my report a long time ago to

05:22:55   10    recall everything in it, but to the extent that I recall,

05:22:57   11    yes.

05:22:57   12    Q.  And you did not offer any opinion regarding the value

05:23:01   13    of the '654 NEP, correct?

05:23:08   14    A.  I don't think I analyzed that patent.

05:23:10   15    Q.  At the time you formed your opinions relating to this

05:23:15   16    matter, you had not read the '654 patent; is that correct?

05:23:18   17    A.  I don't -- I don't -- I never said that my analysis

05:23:30   18    extends to the '654 patent, I think.

05:23:33   19    Q.  And as you sit here today, you do not recall ever

05:23:35   20    having read the '654 patent, correct?

05:23:40   21    A.  I think -- I think that's correct.

05:23:46   22    Q.  And you have not provided any opinion that compares the

05:23:49   23    technology of the '247 patent to that of the '654 patent,

05:23:55   24    correct?

05:23:55   25    A.  But why would I have even done that?  That's not --

| | | |
|---|---|---|
| 05:24:00 | 1 | that has not been part of my assignment. |
| 05:24:02 | 2 | Q.  So it was not part of your assignment, right? |
| 05:24:04 | 3 | A.  Excuse me, I did not hear. |
| 05:24:07 | 4 | Q.  So you're agreeing that that was not part of your |
| 05:24:10 | 5 | assignment, correct? |
| 05:24:11 | 6 | A.  I think I explained my assignment.  I think it wasn't. |
| 05:24:19 | 7 | Q.  Okay.  And so because that was not part of your |
| 05:24:22 | 8 | assignment, you didn't review any technical documents or |
| 05:24:25 | 9 | internal patent -- Pantech documents, market reports, any |
| 05:24:29 | 10 | materials that compare the '247 patent with the '654 |
| 05:24:34 | 11 | patent, correct? |
| 05:24:40 | 12 | A.  I mean, again, my analysis does not extend to the '654 |
| 05:24:46 | 13 | patent.  I mean, you are asking me about a patent that was |
| 05:24:51 | 14 | never mentioned in -- during my direct testimony. |
| 05:24:54 | 15 | Q.  Okay.  So that's a "yes"? |
| 05:24:58 | 16 | A.  Well, yes. |
| 05:24:58 | 17 | Q.  You agree? |
| 05:24:59 | 18 | A.  It wasn't mentioned during my direct testimony, so I |
| 05:25:02 | 19 | did not analyze the '654 patent. |
| 05:25:04 | 20 | Q.  Okay.  And you never spoke with Dr. Putnam in |
| 05:25:06 | 21 | connection with his work in this litigation, correct? |
| 05:25:11 | 22 | A.  I may have spoken with him. |
| 05:25:40 | 23 | Q.  Sorry, sir.  Sorry, Dr. Cooklev. |
| 05:25:50 | 24 | Do you recall giving a deposition in this |
| 05:25:51 | 25 | litigation? |

| | | |
|---|---|---|
| 05:25:52 | 1 | A.  Generally, yes. |
| 05:25:58 | 2 | Q.  Okay.  And it was in November of '23, does that sound |
| 05:26:07 | 3 | right? |
| 05:26:08 | 4 | A.  It sounds about right. |
| 05:26:10 | 5 | Q.  So do you recall being asked this question and giving |
| 05:26:14 | 6 | this answer: |
| 05:26:15 | 7 |         Have you spoken with any of the other experts in |
| 05:26:18 | 8 | this case? |
| 05:26:19 | 9 |         Answer:  I have not. |
| 05:26:21 | 10 |         Do you recall that? |
| 05:26:25 | 11 | A.  I mean, it's -- it was -- I'm confident it was the |
| 05:26:36 | 12 | truth.  I have known Dr. Putnam for -- for a while now. |
| 05:26:45 | 13 | And now you asked me about my recollection, and so when |
| 05:26:54 | 14 | I -- when I gave that answer, that's -- that's the correct |
| 05:26:58 | 15 | answer. |
| 05:26:59 | 16 | Q.  Okay.  So that helps refresh your -- |
| 05:27:02 | 17 | A.  That helps refresh my recollection. |
| 05:27:04 | 18 | Q.  So we can confirm that you never spoke with Dr. Putnam |
| 05:27:07 | 19 | in connection with his work in this litigation, right? |
| 05:27:11 | 20 | A.  Well, thank you for essentially refreshing my |
| 05:27:17 | 21 | recollection. |
| 05:27:18 | 22 | Q.  Thank you, Dr. Cooklev. |
| 05:27:21 | 23 |         MR. FILBIN:  Pass the witness. |
| 05:27:23 | 24 |         THE COURT:  Redirect? |
| 05:27:37 | 25 |                 REDIRECT-EXAMINATION |

| | | |
|---|---|---|
| 05:27:40 | 1 | BY MR. BUCCIGROSS: |
| 05:27:40 | 2 | Q.  Professor Cooklev, based on your experience, can |
| 05:27:46 | 3 | aspects of the different standards be incorporated into |
| 05:27:51 | 4 | subsequently developed standards? |
| 05:27:53 | 5 | A.  Yes. |
| 05:27:53 | 6 | Q.  So, in other words, could -- there is some -- is there |
| 05:27:57 | 7 | some overlap between the different standards? |
| 05:28:01 | 8 | A.  That is possible -- entirely possible, yes. |
| 05:28:05 | 9 | Q.  Would you need to actually take a look through the |
| 05:28:07 | 10 | standard -- at the particular standards section and do an |
| 05:28:11 | 11 | analysis on that? |
| 05:28:12 | 12 | A.  Of course. |
| 05:28:16 | 13 | Q.  And so is it possible that aspects of 3G could be |
| 05:28:20 | 14 | incorporated into 4G? |
| 05:28:23 | 15 | A.  Yes. |
| 05:28:24 | 16 | Q.  Is it possible that some of the technology in 3G could |
| 05:28:27 | 17 | be moved forward from 4G and into 5G? |
| 05:28:31 | 18 | A.  That is possible, yes. |
| 05:28:32 | 19 | Q.  Are you familiar with the concept of a patent |
| 05:28:37 | 20 | specification? |
| 05:28:39 | 21 | A.  Yes, I am. |
| 05:28:40 | 22 | Q.  Okay.  Can you just briefly explain to the jury |
| 05:28:42 | 23 | what's -- what's a patent specification? |
| 05:28:49 | 24 | A.  Well, clearly I'm not -- I'm not a lawyer, but as a |
| 05:28:55 | 25 | technical expert, I have some understanding. |

05:29:00    1          So the patent specification is the text that
05:29:08    2    describes the -- in short, the problem that is solved by
05:29:12    3    the patent, describes the prior art.  It doesn't describe
05:29:22    4    details that are known, but in describing the problem, then
05:29:29    5    it -- the goal is to support the claims of that patent.
05:29:38    6          And the claims of a patent, which is the other
05:29:41    7    major part of a patent, they should be read given the
05:29:48    8    specification.
05:29:49    9    Q.  So when we're talking about different family members,
05:29:53   10    related family members of a patent, do related continuation
05:29:57   11    family members share the same written specification?
05:30:03   12    A.  Yes, it's -- again, my understanding is that the
05:30:12   13    so-called family members -- so it's -- which is sometimes
05:30:20   14    the case, family members share specifications.  So these
05:30:27   15    are patents that have the same specification -- and
05:30:31   16    basically the same specification, but different claims.
05:30:35   17    Q.  And can family members also, therefore, share forward
05:30:46   18    citations?
05:30:46   19    A.  Yes, yes.  That is an important aspect actually of
05:30:48   20    forward citation analysis, and it's one reason why I said
05:30:51   21    it's not just about counting, but it's a much more
05:30:59   22    complicated analysis.
05:31:00   23    Q.  And could a patent that was declared, meaning -- so
05:31:03   24    when a patent is declared essential to something, does that
05:31:07   25    just mean someone writes a letter and says, I think this is

| | | |
|---|---|---|
| 05:31:10 | 1 | essential? |
| 05:31:10 | 2 | A.  I mean, that's -- that's basically what it is, yes. |
| 05:31:13 | 3 | Q.  And, in this case, with Pantech's three standards |
| 05:31:16 | 4 | essential patents, you've gone through and done the |
| 05:31:22 | 5 | analysis and confirmed they are, in fact, essential? |
| 05:31:24 | 6 | A.  That's correct. |
| 05:31:25 | 7 | Q.  Is it possible that a patent that someone had just |
| 05:31:28 | 8 | simply made a good-faith effort to declare as essential to |
| 05:31:29 | 9 | 3G actually be essential to 5G? |
| 05:31:32 | 10 | THE COURT:  Hold on just a moment. |
| 05:31:32 | 11 | MR. FILBIN:  Objection, calls for speculation. |
| 05:31:36 | 12 | THE COURT:  Can you rephrase the question and not |
| 05:31:38 | 13 | lead the witness? |
| 05:31:41 | 14 | MR. BUCCIGROSS:  Yeah. |
| 05:31:41 | 15 | Q.  (By Mr. Buccigross)  Is -- is it possible that a patent |
| 05:31:47 | 16 | that was declared essential to 3G, in fact, be essential to |
| 05:31:55 | 17 | 5G? |
| 05:31:55 | 18 | MR. FILBIN:  Objection, leading. |
| 05:31:56 | 19 | THE COURT:  Sustained. |
| 05:31:57 | 20 | Q.  (By Mr. Buccigross)  Professor Cooklev, is it -- is |
| 05:32:01 | 21 | it -- have you had experience where a patent might be |
| 05:32:04 | 22 | declared essential to one standard but actually is |
| 05:32:06 | 23 | essential to a different standard? |
| 05:32:08 | 24 | A.  Yes. |
| 05:32:08 | 25 | Q.  Have you spoken with Professor -- with Dr. Putnam since |

| | | |
|---|---|---|
| 05:32:13 | 1 | your deposition in this case? |
| 05:32:19 | 2 | A.  And I said, I've known Dr. Putnam for a while.  I don't |
| 05:32:26 | 3 | specifically recall the dates, but, yes, I have, I think. |
| 05:32:29 | 4 | Q.  Thank you. |
| 05:32:31 | 5 | THE COURT:  Recross? |
| 05:32:49 | 6 | MR FILBIN:  Can we show PX-1, please?  Go to |
| 05:32:54 | 7 | Figure 3, if you would.  Yeah, just toggle through, I'll |
| 05:33:03 | 8 | find it -- you can find it.  There you go.  You passed it. |
| 05:33:08 | 9 | One more.  One more back.  There you go.  Can you rotate |
| 05:33:11 | 10 | it? |
| 05:33:11 | 11 | RECROSS-EXAMINATION |
| 05:33:14 | 12 | BY MR. FILBIN: |
| 05:33:14 | 13 | Q.  Dr. Cooklev, we've displayed PX-1.  That's the '247 |
| 05:33:21 | 14 | patent and Figure 3.  It's your opinion that Figure 3 of |
| 05:33:24 | 15 | the '247 patent describes a system that uses a NACK, |
| 05:33:45 | 16 | correct? |
| 05:33:45 | 17 | MR. BUCCIGROSS:  I'm going to object, Your Honor. |
| 05:33:46 | 18 | THE COURT:  What's the objection? |
| 05:33:47 | 19 | MR. BUCCIGROSS:  I think we're getting a little |
| 05:33:49 | 20 | far afield into issues that might touch on things that are |
| 05:33:55 | 21 | the subject of the motion in limine. |
| 05:33:55 | 22 | THE COURT:  I'll overrule that.  I think based on |
| 05:33:58 | 23 | the redirect, this is fair game. |
| 05:34:03 | 24 | A.  So, counsel, the question is whether there is a NACK in |
| 05:34:07 | 25 | Figure 3? |

05:34:08  1  Q.  (By Mr. Filbin)  The question is, it's your opinion

05:34:11  2  that Figure 3 of the '247 patent describes a system that

05:34:14  3  uses a NACK; isn't that correct?

05:34:58  4  A.  Well, first, my testimony today was about the technical

05:35:07  5  value of Pantech's standard essential patents, including

05:35:14  6  the '247 patent.  It was not about issues of infringement

05:35:23  7  or validity.  And, if I may, counsel, I sense that your

05:35:32  8  question is directed to those two technical issues.

05:35:39  9  Q.  Can you answer the question?  I'll take your silence as

05:36:00  10  a "no" just in the interest of time, sir.

05:36:06  11  A.  Well, as I said, it seems to me the question is -- is

05:36:34  12  related to technical issues that were not part of my direct

05:36:43  13  testimony.

05:37:08  14  Q.  All right, sir.  Let's -- you understand that the

05:37:10  15  claims of the '247 require that there is no NACK, correct?

05:37:16  16  A.  That the determination whether to retransmit is based

05:37:21  17  on scheduling information and not NACK, yes.

05:37:22  18  Q.  Okay.  And do you recall that your prior opinion in

05:37:26  19  your expert report states:  The embodiment corresponding to

05:37:29  20  Figure 3 describes a system that uses an ACK/NACK to

05:37:34  21  determine whether to re -- to retransmit the data block?

05:37:37  22        Do you remember that?

05:37:38  23        MR. BUCCIGROSS:  I'll object, Your Honor.  Can we

05:37:40  24  have a sidebar on this?

05:37:41  25        THE COURT:  Yes.

05:37:52   1          MR. FILBIN:  Your Honor, I'll withdraw the

05:37:53   2    question.

05:37:54   3          THE COURT:  All right.

05:37:54   4          MR. FILBIN:  Pass the witness.

05:37:55   5          THE COURT:  Anything further, Mr. Buccigross?

05:37:57   6          MR. BUCCIGROSS:  No, Your Honor.

05:37:57   7          THE COURT:  All right.  You may step down.

05:37:59   8          All right.  Ladies and gentlemen of the jury, we

05:38:01   9    went quite a bit past the time I had planned for us to

05:38:05  10    stop.  So we are moving along very nicely.

05:38:10  11          I hope you all have a nice evening.  I'm going to

05:38:13  12    ask you to be back just a few minutes before 9:00 o'clock

05:38:16  13    so you can get upstairs to the jury room, get settled, and

05:38:20  14    we'll have you down here in the courtroom as close to 9:00

05:38:24  15    o'clock as possible and be ready to go.

05:38:25  16          Based on the time we have spent today, we

05:38:31  17    definitely will finish all of the testimony tomorrow.  So,

05:38:35  18    as I said, we're moving along quite nicely, and I

05:38:39  19    anticipate we'll have this in your hands on Thursday

05:38:42  20    morning.

05:38:42  21          So as a reminder, don't discuss the case with

05:38:46  22    anyone, family members, friends, including among

05:38:50  23    yourselves, until all of the evidence has been presented

05:38:52  24    and I've instructed you on the law.

05:38:55  25          Don't do any independent research or investigation

| | | |
|---|---|---|
| 05:38:57 | 1 | this evening or in the morning about any matter associated |
| 05:39:01 | 2 | with this case, the parties, the witnesses, the attorneys, |
| 05:39:06 | 3 | the law, anything of that nature. |
| 05:39:08 | 4 | And, finally, don't post anything on any social |
| 05:39:11 | 5 | media website or app about your involvement as a juror in |
| 05:39:14 | 6 | this case. |
| 05:39:14 | 7 | You all have a nice evening, and we'll see you |
| 05:39:17 | 8 | back about 9:00 o'clock in the morning. |
| 05:39:19 | 9 | COURT SECURITY OFFICER:  Please rise for the jury. |
| 05:39:21 | 10 | (Jury out.) |
| 05:39:22 | 11 | THE COURT:  Okay.  Be seated.  I think there were |
| 05:40:06 | 12 | some remaining issues with respect to maybe Dr. Putnam's |
| 05:40:09 | 13 | slides that we need to resolve, and I'm happy to stay as |
| 05:40:13 | 14 | long as you all want to to get that resolved.  It probably |
| 05:40:17 | 15 | would be better to do tonight, I think, would it not? |
| 05:40:21 | 16 | Why don't we take a short restroom break, and |
| 05:40:24 | 17 | we'll come back and handle that. |
| 05:40:26 | 18 | Anybody else who's not involved in that is welcome |
| 05:40:29 | 19 | to leave. |
| 05:40:32 | 20 | COURT SECURITY OFFICER:  All rise. |
| 05:40:33 | 21 | (Recess.) |
| 05:40:33 | 22 | COURT SECURITY OFFICER:  All rise. |
| 05:40:34 | 23 | THE COURT:  Please be seated. |
| 05:50:39 | 24 | All right.  First off, we're going to try to do a |
| 05:50:46 | 25 | little better on the cool -- cooler air tomorrow.  I don't |

05:50:49   1    know if y'all are as stuffy -- if it feels as stuffy for

05:50:53   2    you as it does for me.  But it's downright warm in here.

05:50:57   3         All right.  I'm not sure where we are on

05:51:01   4    Dr. Putnam's slides.

05:51:05   5         Mr. Filbin, maybe you can redirect our attention.

05:51:07   6         MR. FILBIN:  Thank you, Your Honor.  We had

05:51:12   7    discussed this morning Slides 2, 7, 8, and 28, and that was

05:51:19   8    with the adding certainty premium, and I believe the

05:51:25   9    resolution was that was going to be removed.

05:51:28   10        The next item, Slide 6, has been resolved; which

05:51:37   11   takes us to Slide 9.

05:51:38   12        THE COURT:  Could I ask you to get a copy of the

05:51:40   13   slides back?  I think I had it, and I gave it back to you.

05:51:50   14        MR. FILBIN:  Yes, Your Honor.  So I've been

05:52:02   15   informed that there may have been a new deck that I haven't

05:52:05   16   seen since -- that was exchanged to someone.

05:52:08   17        THE COURT:  The one that you just handed me says

05:52:11   18   updated.

05:52:12   19        MR. FILBIN:  Yes, Your Honor.

05:52:13   20        THE COURT:  Is that the one maybe that's new?

05:52:17   21   Okay.

05:52:18   22        MR. FILBIN:  No, Your Honor, I believe it's been

05:52:19   23   updated.  Maybe we're on rev 3 here, or 4.

05:52:25   24        THE COURT:  All right.  How about the person with

05:52:26   25   the most knowledge about the slides who can make the

| | |
|---|---|
| 05:52:31 | 1 |
| 05:52:33 | 2 |
| 05:52:36 | 3 |
| 05:52:42 | 4 |
| 05:52:44 | 5 |
| 05:52:51 | 6 |
| 05:52:53 | 7 |
| 05:52:55 | 8 |
| 05:52:56 | 9 |
| 05:53:03 | 10 |
| 05:53:06 | 11 |
| 05:53:14 | 12 |
| 05:53:18 | 13 |
| 05:53:23 | 14 |
| 05:53:34 | 15 |
| 05:53:41 | 16 |
| 05:53:50 | 17 |
| 05:53:51 | 18 |
| 05:53:52 | 19 |
| 05:53:56 | 20 |
| 05:53:58 | 21 |
| 05:54:00 | 22 |
| 05:54:04 | 23 |
| 05:54:14 | 24 |
| 05:54:18 | 25 |

1   objections from your side, Mr. Filbin?

2        MR. FILBIN:  That's me, that's me.  Yes.  So let's

3   go -- let's go with Slides 9 and 18.  And we object under

4   402 and 403.

5        This is basically a backdoor of unwilling

6   licensee.

7        THE COURT:  Okay.  So I see that with respect to

8   9.  What about 18?

9        MR. FILBIN:  So -- so they go hand in glove.  So

10  Slide 9 sets up this Factor 2 royalties, which is -- by the

11  way, that's a delta -- compared to last -- last trial, this

12  slide had indicated Factor 15.

13       So it's been changed to royalties paid by the

14  licensee, and the trap is sprung in Slide 18, which sets up

15  one OnePlus license.  So the ███, PX-173 license, described

16  on PDX-6.18 is a ███████████████████████ ███, not --

17  and has nothing to do with the patents-in-suit.

18       THE COURT:  Okay.

19       MR. FILBIN:  So it's clearly there to depict or

20  color OnePlus as --

21       THE COURT:  All right.  So let's go back to the --

22  to the -- to 9, though.  Is there an objection to 9?

23       MR. FILBIN:  Well, to the extent that it's related

24  to 18.  I believe that's the -- the language has been

25  changed to licensee.  But it's only there in order to

| | |
|---|---|
| 05:54:21 | 1 |

05:54:21   1   discuss what's on Slide 18.

05:54:24   2        THE COURT:  Well, I mean, I think probably

05:54:26   3   something along the lines of what is listed on 9 is going

05:54:31   4   to be in the instructions.  Maybe I'm -- but let's go ahead

05:54:36   5   and deal with the problematic one, which is 18.

05:54:39   6        Mr. Tidwell, are you prepared to address it?

05:54:42   7        MR. TIDWELL:  I am, Your Honor.

05:54:49   8        And if I could just address 9 because it goes --

05:54:52   9   it's a -- Factor 2 is a Georgia-Pacific factor.  It was in

05:54:56   10  the Court's last instructions.  It's in the Court's draft

05:55:00   11  instructions.  Although the Court hadn't accepted them,

05:55:04   12  it's a standard --

05:55:05   13       THE COURT:  The parties have proposed it.

05:55:07   14       MR. TIDWELL:  The parties have proposed it.  This

05:55:10   15  is simple.  This is one of the factors you look at in

05:55:12   16  determining -- in fact, it's the instruction of what is a

05:55:17   17  reasonable royalty.  That is actually the issue at hand in

05:55:21   18  this case.  What is a reasonable royalty?

05:55:23   19       And what the licensee pays for this type of

05:55:31   20  technology, Your Honor, is, in fact, relevant.

05:55:33   21       THE COURT:  Okay.  Let's get to 18, though.

05:55:36   22       MR. TIDWELL:  And so what Dr. Putnam did is he

05:55:39   23  looked at every license that OnePlus has that they

05:55:46   24  produced.  And in his analysis, he decided there's only one

05:55:50   25  that deals with standard essential patents, and it's not

| | | |
|---|---|---|
| 05:55:54 | 1 | comparable. |
| 05:55:56 | 2 | Dr. Lopez renders an opinion -- he looks at the |
| 05:56:04 | 3 | ███████████. He's -- he's hired to render an opinion |
| 05:56:09 | 4 | about what is a reasonable royalty. And on Page 190 -- I'm |
| 05:56:15 | 5 | sorry, Page 960 of his trial testimony, he talks about the |
| 05:56:20 | 6 | concerns with royalty stacking and the burden that gets |
| 05:56:25 | 7 | placed on SEPs, and he -- his argument is that it should |
| 05:56:32 | 8 | never be more than a single-digit number. |
| 05:56:34 | 9 | So let me just break it down. He's supposed to be |
| 05:56:40 | 10 | rendering an opinion on what is a reasonable royalty rate, |
| 05:56:45 | 11 | and the fact that he has no licenses from OnePlus that he |
| 05:56:51 | 12 | analyzes is at least relevant to cross-examination of him, |
| 05:56:57 | 13 | in my opinion, to establish a reasonable royalty. |
| 05:57:01 | 14 | THE COURT: So I don't want to interrupt you, but |
| 05:57:03 | 15 | you're talking about an ███████████, and what's on Slide |
| 05:57:06 | 16 | 18 is a ██████████. Why -- why -- I'm confused. |
| 05:57:11 | 17 | MR. TIDWELL: Oh, yeah. I didn't do a very good |
| 05:57:13 | 18 | job. |
| 05:57:13 | 19 | What's on 18 is a OnePlus license that Dr. Putnam |
| 05:57:18 | 20 | found. What he's doing is trying to analyze licenses that |
| 05:57:23 | 21 | fit Factor 2 under Georgia-Pacific, which is licenses that |
| 05:57:29 | 22 | OnePlus has and what is the reasonable royalty that they |
| 05:57:32 | 23 | have paid. That's what he's doing here. And his analysis |
| 05:57:37 | 24 | is, well, I only found one, and it is -- that is SEPs, and |
| 05:57:46 | 25 | it is not applicable to the technology here. |

| 05:57:49 | 1 | So the point is there is no license from OnePlus |

05:57:49    1        So the point is there is no license from OnePlus

05:57:57    2    that fits his definition of technology, nor does Dr. Lopez

05:58:01    3    say that.

05:58:03    4        We do know that they use 4G and 5G.  I believe

05:58:09    5    that we're entitled to, under the Georgia-Pacific factors,

05:58:12    6    both Dr. Putnam and my ability to cross Dr. Lopez, is what

05:58:19    7    royalties have OnePlus paid.

05:58:21    8        THE COURT:  Can you not do that without getting

05:58:24    9    into what the license is?  I don't understand why the

05:58:27   10    license has to come in?  You can --

05:58:30   11        MR. TIDWELL:  The ███

05:58:32   12        THE COURT:  Yeah.

05:58:33   13        MR. TIDWELL:  Here's -- our position is I think

05:58:35   14    it's relevant for background to the jury that he looked at

05:58:38   15    every license that OnePlus had.  And this is the closest --

05:58:46   16    this is the closest one that came to the technology at

05:58:49   17    issue, and it is not comparable.

05:58:51   18        THE COURT:  And so to introduce the license to

05:58:54   19    show that I think is -- by introducing the license to show

05:58:57   20    that there's no license, that's incredibly confusing to me.

05:59:02   21        MR. TIDWELL:  No, there is a license.  We're

05:59:05   22    introducing --

05:59:06   23        THE COURT:  To say there's no comparable license.

05:59:08   24        MR. TIDWELL:  Yes.

05:59:10   25        THE COURT:  Yeah, I don't -- I -- I don't -- I

| | | |
|---|---|---|
| 05:59:13 | 1 | mean, we'll see what happens with respect to cross-exam, |
| 05:59:17 | 2 | but I think with Dr. Putnam, that's a bridge too far. |
| 05:59:21 | 3 | MR. TIDWELL:  Can I get some clarification?  Can I |
| 05:59:23 | 4 | elicit testimony that he attempted to do a Georgia-Pacific |
| 05:59:28 | 5 | Factor 2, and he found no license that matched the |
| 05:59:31 | 6 | technology?  I would hope that he could at least say that, |
| 05:59:35 | 7 | and we'd pull that slide. |
| 05:59:36 | 8 | THE COURT:  Did he provide that opinion in his |
| 05:59:39 | 9 | report? |
| 05:59:41 | 10 | MR. TIDWELL:  That's what 18 is all about, |
| 05:59:43 | 11 | Your Honor. |
| 05:59:43 | 12 | THE COURT:  I guess what I'm struggling with is |
| 05:59:47 | 13 | why can't he just say there's no OnePlus license that's |
| 05:59:51 | 14 | technologically comparable without, you know, introducing |
| 05:59:58 | 15 | this idea of OnePlus's license?  Can you -- |
| 06:00:04 | 16 | MR. TIDWELL:  Let me see if I'm tracking. |
| 06:00:07 | 17 | Under Factor 2, we're willing to pull the slide |
| 06:00:11 | 18 | and not talk about this license -- or is it 18 that we're |
| 06:00:15 | 19 | talking -- |
| 06:00:16 | 20 | THE COURT:  It's 18. |
| 06:00:17 | 21 | MR. TIDWELL:  But I believe for him to have done a |
| 06:00:22 | 22 | proper analysis is to say under Georgia-Pacific Factor 2, I |
| 06:00:27 | 23 | looked for comparable licenses that OnePlus had signed, and |
| 06:00:31 | 24 | I found none.  Can he do that? |
| 06:00:35 | 25 | THE COURT:  Mr. Filbin? |

06:00:36    1           MR. FILBIN:  Your Honor, Mr. Tidwell is tilting at

06:00:44    2    windmills here.  This is not a dispute between the experts.

06:00:49    3    It's not like that Dr. Lopez is saying look at the OnePlus

06:00:53    4    licenses.  They both agree don't look at them.

06:00:56    5           The purpose of that cross-examination is to elicit

06:01:02    6    unwilling licensee testimony however it can be had.  And

06:01:09    7    that's -- highly prejudicial, breaks the MIL.  There's no

06:01:12    8    value in presenting for the sake of thoroughness that both

06:01:16    9    experts agree that's a dry well.  There's just nothing

06:01:19   10    there.

06:01:19   11           THE COURT:  I mean, if there's some magic bean

06:01:22   12    here that's really important, I just -- I don't understand

06:01:24   13    why you can't say that I looked at OnePlus's license --

06:01:27   14    licenses and none of them are technically comparable.  I

06:01:32   15    mean, as long as he disclosed that in his report.

06:01:34   16           MR. TIDWELL:  I'm sorry, Your Honor, he did.

06:01:36   17           THE COURT:  As long as he disclosed that in his

06:01:39   18    report, I think that's two questions.  Move on.

06:01:42   19           MR. TIDWELL:  Okay.  And we'll pull the slide deck

06:01:44   20    and address this issue, I suppose, with cross of Lopez.

06:01:49   21    But we don't need to address it now.

06:01:51   22           THE COURT:  Right.  Correct.

06:01:53   23           MR. TIDWELL:  Okay.

06:01:58   24           MR. FILBIN:  Your Honor, the only connector with

06:02:02   25    that is that the license itself that is objected to isn't

| | | |
|---|---|---|
| 06:02:07 | 1 | in evidence. |
| 06:02:08 | 2 | THE COURT:  I don't think he's asking to put the |
| 06:02:11 | 3 | license in. |
| 06:02:11 | 4 | Are you? |
| 06:02:12 | 5 | MR. FILBIN:  That will be pulled? |
| 06:02:13 | 6 | THE COURT:  I don't think you're asking to put the |
| 06:02:15 | 7 | license in, are you? |
| 06:02:16 | 8 | MR. TIDWELL:  I am not -- with the Court's |
| 06:02:18 | 9 | instruction, I'm no longer asking that. |
| 06:02:20 | 10 | THE COURT:  Good.  Move along, Mr. Filbin. |
| 06:02:23 | 11 | MR. FILBIN:  I'm through, sir -- Your Honor. |
| 06:02:26 | 12 | THE COURT:  Move along, Mr. Filbin.  Do you have |
| 06:02:29 | 13 | another objection? |
| 06:02:29 | 14 | MR. FILBIN:  No, Your Honor, I'm done. |
| 06:02:31 | 15 | THE COURT:  All right.  Good.  Very well. |
| 06:02:35 | 16 | Mr. Fussell, you have something? |
| 06:02:37 | 17 | MR. FUSSELL:  Yes, Your Honor.  I don't want to |
| 06:02:39 | 18 | speak out of turn, but I was informed just this evening |
| 06:02:42 | 19 | that they don't -- they will not be calling Dr. Kakaes as a |
| 06:02:45 | 20 | witness.  I think we might have some outstanding |
| 06:02:48 | 21 | objections, so the Court doesn't waste any time on those. |
| 06:02:48 | 22 | THE COURT:  Okay. |
| 06:02:52 | 23 | MR. FUSSELL:  And they may not call Dr. Kia |
| 06:02:54 | 24 | either, so as it relates to our objections to their slides |
| 06:02:57 | 25 | on -- |

| | | |
|---|---|---|
| 06:02:57 | 1 | THE COURT:  And doctor who -- Dr. Kia? |
| 06:03:00 | 2 | MR. FUSSELL:  Kia. |
| 06:03:03 | 3 | THE COURT:  So how much time had you all allocated |
| 06:03:06 | 4 | for that, Mr. Filbin?  Do you know? |
| 06:03:07 | 5 | MR. FILBIN:  Your Honor, we were thinking each one |
| 06:03:08 | 6 | of those was going to be no more than 15 minutes, so that |
| 06:03:12 | 7 | would trim 15 minutes from our expected presentation, |
| 06:03:15 | 8 | although sometimes it gets gobbled up elsewhere. |
| 06:03:17 | 9 | THE COURT:  Okay.  Okay.  Good enough.  Thank you |
| 06:03:20 | 10 | all. |
| 06:03:20 | 11 | MR. FILBIN:  Yes, Your Honor. |
| 06:03:21 | 12 | THE COURT:  What else?  Anything else? |
| 06:03:23 | 13 | MR. FUSSELL:  Not from the Plaintiff, Your Honor. |
| 06:03:24 | 14 | THE COURT:  All right.  Thank you all. |
| 06:03:25 | 15 | MR. FILBIN:  Oh, I'm sorry, Your Honor. |
| 06:03:28 | 16 | Mr. Schubert wants to read exhibits. |
| 06:03:30 | 17 | THE COURT:  Okay. |
| 06:03:31 | 18 | MR. SCHUBERT:  To enter -- we propose DTX-5, 7, |
| 06:03:41 | 19 | 187, 225, 226, 227, 228, and 229. |
| 06:03:52 | 20 | THE COURT:  All right.  And are those without |
| 06:03:55 | 21 | objection, Ms. Miller? |
| 06:03:57 | 22 | MS. MILLER:  No objection. |
| 06:03:58 | 23 | THE COURT:  All right.  Those will be received. |
| 06:03:59 | 24 | MR. FILBIN:  I have one new item.  And it's just |
| 06:04:03 | 25 | a -- I think it's for -- both sides would be interested to |

06:04:06    1    know that as far as -- we're rolling right along here.  We

06:04:10    2    should be done.  Are we going to schedule closing for

06:04:12    3    Thursday?

06:04:14    4         THE COURT:  What other day would we do it?  I

06:04:17    5    don't think we can do it tomorrow.

06:04:18    6         MR. FILBIN:  We can't do it tomorrow.  Okay.  Very

06:04:19    7    good.

06:04:20    8         THE COURT:  No, I wouldn't -- y'all can't do that.

06:04:22    9         MR. FILBIN:  Okay.  If we --

06:04:23   10         THE COURT:  But I think given where we are on the

06:04:25   11    clock and the fact that you all are not calling these

06:04:29   12    additional witnesses, no doubt we'll be ready to go, you

06:04:32   13    know, 9:00 o'clock in the morning.

06:04:34   14         I need to take a look at the instructions.  I know

06:04:37   15    the parties worked out a verdict form that came real close

06:04:44   16    to agreement, and I just don't know where the -- how many

06:04:47   17    disagreements are left on the verdict -- on the

06:04:51   18    instructions.  But if it's anything like the verdict form,

06:04:55   19    you all have worked well on narrowing those, so we may

06:04:58   20    visit for just a few minutes tomorrow night about the

06:05:02   21    instructions and be ready to go with instructions and

06:05:06   22    closings Thursday at 9:00.

06:05:08   23         MR. FILBIN:  Very good.

06:05:09   24         THE COURT:  Okay.  See you all in the morning.

06:05:11   25         MR. FILBIN:  Thank you.

06:05:12     1              COURT SECURITY OFFICER:  All rise.

06:05:14     2              (Court adjourned at 6:05 p.m.)

             3

             4

             5

             6

             7

             8

             9

            10

            11

            12

            13

            14

            15

            16

            17

            18

            19

            20

            21

            22

            23

            24

            25

1                         CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                      10/15/2024
      SHELLY HOLMES, CSR, TCRR               Date
10    CERTIFIED SHORTHAND REPORTER
      State of Texas No.: 7804
11    Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25