# EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                     TEXARKANA DIVISION

 4   PANTECH CORPORATION AND      )(
     PANTECH WIRELESS, LLC,       )(   CIVIL ACTION NO.
 5        PLAINTIFFS,             )(   5:22-CV-69-RWS
                                  )(
 6   VS.                          )(   TEXARKANA, TEXAS
                                  )(
 7   ONEPLUS TECHNOLOGY (SHENZHEN))(
     COMPANY LIMITED,             )(   OCTOBER 16, 2024
 8        DEFENDANT.              )(   8:37 A.M.

 9

10                   JURY TRIAL TRANSCRIPT

11       BEFORE THE HONORABLE ROBERT W. SCHROEDER III

12               UNITED STATES DISTRICT JUDGE

13

14   FOR THE PLAINTIFFS:      Mr. James A. (Tripp) Fussell, III
                              Ms. Tiffany A. Miller
15                            Ms. Courtney Krawice
                              Mayer Brown, LLP
16                            1999 K Street, NW
                              Washington, DC 20006
17
                              Mr. Geoffrey P. Culbertson
18                            Mr. Kelly Tidwell
                              Patton Tidwell & Culbertson, LLP
19                            2800 Texas Boulevard
                              Texarkana, TX 75503
20
                              Mr. Graham (Gray) M. Buccigross
21                            Mayer Brown, LLP
                              Two Palo Alto Square
22                            3000 El Camino Real
                              Suite 300
23                            Palo Alto, CA 94306

24

25
```

```
 1  FOR THE DEFENDANT:        Mr. David M. Airan
                              Mr. Wesley O. Mueller
 2                            Mr. Paul J. Filbin
                              Mr. Christopher J. Gass
 3                            Mr. Michael J. Schubert
                              Mr. James W. Sanner
 4                            Leydig Voit & Mayer, Ltd.
                              Two Prudential Plaza
 5                            180 North Stetson
                              Suite 4900
 6                            Chicago, IL 60601

 7                            Mr. Kevin Collins
                              Mr. Justin Burnam
 8                            Mr. Matthew Kudzin
                              Covington & Burling LLP
 9                            One CityCenter
                              850 Tenth Street NW
10                            Washington, DC 20001

11                            Mr. G. Blake Thompson
                              Mann Tindel & Thompson
12                            112 E. Line Street
                              Suite 304
13                            Tyler, TX 75702

14
    COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
15                            Official Court Reporter
                              Honorable Robert W. Schroeder III
16                            United States District Judge
                              Eastern District of Texas
17                            Texarkana Division
                              500 North State Line Avenue
18                            Texarkana, TX 75501
                              shelly_holmes@txed.uscourts.gov
19

20  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
21

22

23

24

25
```

```
                      P R O C E E D I N G S
08:16:21
08:16:36    2         (Jury out.)

08:16:36    3         COURT SECURITY OFFICER:  All rise.

08:16:38    4         THE COURT:  Please be seated.

08:37:27    5         All right.  Good morning, everyone.

08:37:30    6         It looks like there were a few overnight disputes

08:37:40    7    that were raised.  There may be others, but I know there

08:37:44    8    are objections to the demonstratives and exhibits to be

08:37:50    9    used with Dr. Lopez.  I don't know if there's anything else

08:37:55   10    that's more critical that needs to be raised this morning.

08:37:59   11         MR. FILBIN:  Your Honor, this issue with

08:38:01   12    Dr. Putnam's demonstrative, as well.

08:38:04   13         THE COURT:  Okay.  Let's address it now then.

08:38:06   14         MR. FILBIN:  Thank you, Your Honor.  Paul Filbin

08:38:14   15    on behalf of OnePlus.

08:38:15   16         There are three issues with the demonstratives.

08:38:19   17    I'll just give the overview, and we can take them how you

08:38:23   18    want.

08:38:23   19         THE COURT:  So can I understand, I -- we discussed

08:38:25   20    this late yesterday after the jury went home, and you went

08:38:29   21    through everything.  So what's new?  I mean, why is

08:38:33   22    something new?

08:38:34   23         MR. FILBIN:  Well, there -- it's a continuation of

08:38:37   24    the -- of what we discussed yesterday.  They haven't been

08:38:39   25    resolved correctly, in our view.
```

08:38:44    1            THE COURT:  Okay.

08:38:48    2            MR. FILBIN:  So it's with respect to the

08:38:49    3    uncertainty, the "adding the certainty premium."  We're

08:38:53    4    still not in agreement as far as the final language that

08:39:00    5    Pantech is proposing to use in their slides.

08:39:03    6            THE COURT:  Okay.

08:39:03    7            MR. FILBIN:  Is it okay if we give you a copy of

08:39:09    8    the --

08:39:10    9            THE COURT:  Of course.

08:39:11   10            MR. FILBIN:  Thank you.

08:39:24   11            So, Your Honor, Slide 2 is representative of the

08:39:28   12    first issue with respect to this "adding the premium"

08:39:33   13    issue.  The headline is the particular issue.  Pantech

08:39:38   14    damages before adjusting for invalidity and infringement

08:39:41   15    uncertainty discount.  This is just another -- this is

08:39:46   16    going to be the springboard for this unbounded

08:39:50   17    multiplier --

08:39:51   18            THE COURT:  Sure.

08:39:51   19            MR. FILBIN:  -- untethered to the facts.  There's

08:39:54   20    no number -- there's still no number from Pantech as far as

08:39:58   21    what they're going to argue what this -- what this extra --

08:40:01   22    removing the discount could possibly be.  There's no

08:40:05   23    number.  This is really just another way to argue

08:40:07   24    willfulness, which is, again, in violation of the MIL.

08:40:10   25            You know, they've -- they keep splashing

| | | |
|---|---|---|
| 08:40:13 | 1 | infringement in front of the jury, and they're going to |
| 08:40:15 | 2 | argue that OnePlus is an infringer, and so, therefore, |
| 08:40:23 | 3 | punish them.  That same issue is in -- that same kind of |
| 08:40:24 | 4 | language is in Slides 2, 7, 8, and 27. |
| 08:40:33 | 5 | THE COURT:  Okay. |
| 08:40:33 | 6 | MR. FILBIN:  So we think it should be removed. |
| 08:40:33 | 7 | THE COURT:  Is that -- |
| 08:40:40 | 8 | MR. FILBIN:  That's one issue.  I can keep going |
| 08:40:45 | 9 | if you want to hear all the issues. |
| 08:40:45 | 10 | THE COURT:  May let's hear a response from |
| 08:40:46 | 11 | Plaintiffs on that. |
| 08:40:47 | 12 | MS. KRAWICE:  Your Honor, I'm just going to note |
| 08:40:50 | 13 | that this is the first time that we're hearing that there |
| 08:40:53 | 14 | isn't total agreement on this, but I'm going to address it |
| 08:40:59 | 15 | ad hoc right now. |
| 08:41:00 | 16 | We sent them slides multiple times last night, |
| 08:41:05 | 17 | including this language.  This language was changed.  I |
| 08:41:05 | 18 | think this language may have been even included in a 3:00 |
| 08:41:10 | 19 | p.m. exchange yesterday. |
| 08:41:11 | 20 | THE COURT:  Which language are you talking about? |
| 08:41:13 | 21 | MS. KRAWICE:  Sorry, Your Honor.  On Slide 2, this |
| 08:41:14 | 22 | Pantech damages before adjusting for invalidity and |
| 08:41:15 | 23 | infringement uncertainty discount. |
| 08:41:17 | 24 | THE COURT:  Well, they did raise the issue |
| 08:41:20 | 25 | yesterday. |

08:41:21   1          MS. KRAWICE:  Yes, Your Honor.  We just have never

08:41:24   2    heard back from them whether it was agreed or not.  And

08:41:28   3    this is the first time that we're hearing that they don't

08:41:30   4    agree to this language, this specific language that was

08:41:33   5    changed during your rulings yesterday.

08:41:34   6          But I just want to emphasize that this is being

08:41:36   7    used, and the reason why there's no number on this slide

08:41:40   8    about the uncertainty discount itself is because we are

08:41:45   9    honoring Your Honor's previous ruling that the number

08:41:48  10    provided by Dr. Putnam was struck.

08:41:51  11          He is not going to be putting a number to this

08:41:54  12    uncertainty discount.  He's going to be talking about it in

08:41:57  13    a high level, the same way he did at the last trial, just

08:42:01  14    discussing the fact that when you have pre-suit -- excuse

08:42:05  15    me, when you have other licenses that were entered into

08:42:09  16    prior to findings of infringement and validity, there's

08:42:12  17    that natural uncertainty surrounding the validity and

08:42:16  18    infringement of the patents that you're licensing.

08:42:19  19          That uncertainty doesn't exist after a finding of

08:42:24  20    infringement and validity.  There will be no number put

08:42:29  21    forth specifically.  That is why this slide is simply his

08:42:33  22    base number of what the damages should be, and then he's

08:42:39  23    offering the opinion of this is the minimum or the floor

08:42:42  24    because this isn't accounting for those discounts, and

08:42:45  25    that's directly in line with Your Honor's ruling.

08:42:48   1        The discussion that we talked about yesterday as
08:42:50   2   to what that value or what that number of the discount will
08:42:54   3   be came from a different witness.  That came from our fact
08:42:58   4   witness yesterday, the base of that.
08:43:02   5        And if Your Honor would like us to, you know,
08:43:05   6   enter into a discussion of previewing what that effect of
08:43:08   7   that number would be that comes from Pantech's -- I believe
08:43:14   8   its Rog Response 10 where we disclosed it prior, then
08:43:21   9   Yang-Won came to the stand and talked about that exact same
08:43:24  10   thing yesterday in front of the jury, but Dr. Putnam is not
08:43:27  11   putting those numbers.  He's simply saying that you can
08:43:31  12   include an adjustment --
08:43:32  13        THE COURT:  He's not saying you have to, and he's
08:43:34  14   not saying what the number would be if you do; is that
08:43:38  15   right?
08:43:38  16        MS. KRAWICE:  Correct.  And that's why this slide,
08:43:40  17   this number, this SEP, NEP, and total, that's his base.
08:43:43  18   That does not include any numbers from the discount.  We
08:43:47  19   previewed this number that's on this slide here, this 1.13
08:43:52  20   million to them last week.  That's based on the stipulated
08:43:56  21   bases, and then the application of Dr. Putnam's royalty
08:44:00  22   rate, which were previously disclosed.  That's where this
08:44:02  23   number on this slide comes from.
08:44:04  24        THE COURT:  So here's what I'm going to say.  I
08:44:06  25   think that the -- that the slide needs to be changed to

08:44:12  1   something more neutral, unless he's going to give the

08:44:19  2   opinion that the jury should adjust a discount that he

08:44:26  3   gives an opinion for, which I don't think he's going to do.

08:44:29  4   I don't think that's been disclosed.  That's not been any

08:44:31  5   of the discussion that was yesterday.

08:44:33  6        I think we should change this slide to remove all

08:44:37  7   of that information, and we'll deal with it on a

08:44:41  8   question-by-question basis.

08:44:44  9        MS. KRAWICE:  Okay.

08:44:48  10        MR. FILBIN:  Your Honor, just a clarification on

08:44:50  11   that.

08:44:51  12        THE COURT:  My concern is that it -- the slide --

08:44:53  13   based on what you're telling me, I think the slide itself

08:44:56  14   is somewhat misleading.

08:44:58  15        MR. FILBIN:  Your Honor, I want to just focus on

08:45:02  16   Slide 7, which is --

08:45:04  17        THE COURT:  Okay.  Let's go to Slide 7, because we

08:45:06  18   haven't addressed it yet.

08:45:07  19        MR. FILBIN:  It's of a piece, but it's something

08:45:10  20   Your Honor just said about Dr. Putnam should not be

08:45:13  21   testifying that you have to increase.  Slide 7 makes it

08:45:17  22   that that is what the jury must do, and that's -- Bullet 5

08:45:22  23   must be deleted.

08:45:23  24        THE COURT:  All right.  Ms. Krawice --

08:45:26  25        MR. FILBIN:  I'm sorry, it's Slide 8.

| | | |
|---|---|---|
| 08:45:29 | 1 | THE COURT:  It's 8 or 7? |
| 08:45:31 | 2 | MR. FILBIN:  It's the one displayed on your |
| 08:45:34 | 3 | screen, Your Honor. |
| 08:45:35 | 4 | THE COURT:  All right.  Ms. Krawice? |
| 08:45:37 | 5 | MS. KRAWICE:  All right.  I think we're talking |
| 08:45:42 | 6 | about Slide 7.  Correct, Your Honor? |
| 08:45:44 | 7 | THE COURT:  I think we are. |
| 08:45:45 | 8 | MS. KRAWICE:  Okay.  So I assume that -- I want to |
| 08:45:50 | 9 | emphasize that this is just a flow of how Dr. Putnam deems |
| 08:45:54 | 10 | the process of calculating damages should go.  This final |
| 08:45:58 | 11 | bullet point here is the last point where he doesn't say |
| 08:46:02 | 12 | you must.  That doesn't say -- there's no word that says |
| 08:46:07 | 13 | "must." |
| 08:46:07 | 14 | He says that you can adjust upward to account for |
| 08:46:10 | 15 | the fact that there are discounts regarding the uncertainty |
| 08:46:12 | 16 | for invalidity and infringement that existed in the prior |
| 08:46:16 | 17 | licenses.  He's not going to say "must."  It's that once |
| 08:46:19 | 18 | you get to this step, that discount no longer applies in |
| 08:46:23 | 19 | this analysis. |
| 08:46:24 | 20 | THE COURT:  Well, it says "make."  Could we change |
| 08:46:30 | 21 | it to "may make" or "can make" or "consider making"? |
| 08:46:33 | 22 | MS. KRAWICE:  If that would be okay with -- we're |
| 08:46:35 | 23 | okay with that, Your Honor. |
| 08:46:36 | 24 | THE COURT:  Mr. Filbin? |
| 08:46:37 | 25 | MR. FILBIN:  Your Honor, I don't know if that |

| | | |
|---|---|---|
| 08:46:44 | 1 | subtlety is going to be appreciated by the jury once you |
| 08:46:47 | 2 | show this operation of you go through these five steps.  I |
| 08:46:50 | 3 | don't know that anyone is going to fully appreciate -- |
| 08:46:52 | 4 | THE COURT:  Well, that's why it's going to be |
| 08:46:54 | 5 | really important for your cross to be effective, |
| 08:46:57 | 6 | Mr. Filbin. |
| 08:46:57 | 7 | MR. FILBIN:  Thank you.  I agree.  I agree. |
| 08:46:59 | 8 | All right.  This is something that he can say, but |
| 08:47:04 | 9 | I don't think it should be part of his -- |
| 08:47:07 | 10 | THE COURT:  I agree, and I've asked Ms. Krawice to |
| 08:47:09 | 11 | change it to make it -- you know, "may make," "consider |
| 08:47:14 | 12 | making." |
| 08:47:14 | 13 | MR. FILBIN:  Okay.  Your Honor. |
| 08:47:15 | 14 | THE COURT:  "Could make."  It's just a |
| 08:47:17 | 15 | demonstrative. |
| 08:47:18 | 16 | MS. KRAWICE:  "Can make." |
| 08:47:20 | 17 | THE COURT:  "Can make." |
| 08:47:22 | 18 | MR. FILBIN:  Okay.  Thank you, Your Honor. |
| 08:47:23 | 19 | So the second issue is Slide 22 -- 23, it must be. |
| 08:47:33 | 20 | I'm sorry, Slide 29. |
| 08:47:35 | 21 | THE COURT:  Mr. Filbin? |
| 08:47:37 | 22 | MR. FILBIN:  It's the one with the pie chart.  22. |
| 08:47:46 | 23 | It's not 22.  It's the pie chart.  Thank you. |
| 08:48:04 | 24 | I have it up there now, Your Honor.  So the issue |
| 08:48:13 | 25 | is with respect to the 29 in the orange section.  That |

08:48:20    1    is -- again, this is the -- with Mr. Jung's concept of

08:48:24    2    the -- there were a certain group of patents, and then

08:48:27    3    there are -- then they bought more, and they're going to

08:48:29    4    increase based on this issue -- or the fact that the pie is

08:48:33    5    now bigger.

08:48:34    6         That was not part of Dr. Putnam's analysis when he

08:48:38    7    did his apportionment.  When he looked at apportionment, he

08:48:41    8    looked at 22 families.  So this chart is inconsistent with

08:48:45    9    how he actually made the apportionment analysis.

08:48:49    10        So we would be okay if it just simply said "other

08:48:53    11   SEPs" and didn't give the number.  This is a way to

08:48:55    12   backdoor in facts that -- through -- through this expert in

08:49:00    13   order to get a new -- new multiplier.

08:49:06    14        MS. MILLER:  Good morning, Your Honor.

08:49:09    15        THE COURT:  Good morning.

08:49:09    16        MS. MILLER:  First, this was an objection raised

08:49:13    17   on Monday night, and he chose not to argue it yesterday.

08:49:16    18   So we thought they had dropped the objection.

08:49:18    19        Second, I am surprised by his statement.  At the

08:49:25    20   deposition of Dr. Putnam, Mr. Filbin himself asked:  So to

08:49:29    21   understand this, then, you're saying that the three patent

08:49:32    22   families that you list in Exhibit 12, those are three of

08:49:36    23   the 32 families that you identified in Putnam Exhibit 1.

08:49:39    24   Is that correct?

08:49:39    25        Yes.

| | | |
|---|---|---|
| 08:49:40 | 1 | So 29 plus 3 is 32.  So he's aware of the number |
| 08:49:46 | 2 | being 29.  So I don't know what he's saying now for the 22 |
| 08:49:51 | 3 | or how this is a new fact. |
| 08:49:53 | 4 | THE COURT:  Mr. Filbin? |
| 08:49:54 | 5 | MR. FILBIN:  Dr. Putnam explained he had 32, and |
| 08:50:00 | 6 | he reduced that set down to the 4G.  So he wound up with |
| 08:50:05 | 7 | 22.  So when he did the actual calculation, he was at 22. |
| 08:50:13 | 8 | THE COURT:  Okay. |
| 08:50:13 | 9 | MR. FILBIN:  Okay? |
| 08:50:14 | 10 | THE COURT:  I'm not sure I follow. |
| 08:50:18 | 11 | MR. FILBIN:  So when he did his actual calculation |
| 08:50:21 | 12 | to get to 21 and 79, he wasn't using 3 and -- 3 and 29, he |
| 08:50:26 | 13 | was using a set of 22.  So he didn't -- so ordinarily this |
| 08:50:32 | 14 | would be just something you'd address on cross, except for |
| 08:50:35 | 15 | the concern that they're going to use these facts as their |
| 08:50:40 | 16 | multiplier. |
| 08:50:40 | 17 | THE COURT:  Okay.  Well, I'm going to let you |
| 08:50:42 | 18 | address that on cross. |
| 08:50:43 | 19 | MR. FILBIN:  Okay.  The third issue is we were |
| 08:50:45 | 20 | informed that Mr. Tidwell plans to display exhibits from |
| 08:50:50 | 21 | Dr. Putnam's report during direct testimony that weren't |
| 08:50:53 | 22 | disclosed to us according to the pretrial order. |
| 08:50:55 | 23 | THE COURT:  All right.  Well, then -- |
| 08:50:57 | 24 | MR. FILBIN:  And so we think that's improper. |
| 08:50:59 | 25 | THE COURT:  When -- when that happens, if they try |

| | | |
|---|---|---|
| 08:51:02 | 1 | to do that, you can object and I'll hear from the parties, |
| 08:51:05 | 2 | unless, Mr. Tidwell, you're prepared to address it now. |
| 08:51:09 | 3 | MR. TIDWELL:  Your Honor, it's an issue of just |
| 08:51:17 | 4 | late in the evening.  I -- they're exhibits.  They're part |
| 08:51:23 | 5 | of his report.  I probably can get by without them.  If I |
| 08:51:28 | 6 | need to, I'll address the Court so they know what I'm |
| 08:51:31 | 7 | doing. |
| 08:51:32 | 8 | THE COURT:  Fair enough. |
| 08:51:36 | 9 | All right.  What else? |
| 08:51:38 | 10 | MR. AIRAN:  Just one housekeeping matter, |
| 08:51:41 | 11 | Your Honor.  At the end of Plaintiffs' close -- the close |
| 08:51:45 | 12 | of their case-in-chief, we expect to make a Rule 50 motion. |
| 08:51:49 | 13 | Obviously, we don't want to do that in the presence of the |
| 08:51:51 | 14 | jury. |
| 08:51:52 | 15 | I don't know how that's going to line up.  I'm |
| 08:51:53 | 16 | expecting -- it looks like we have some deposition |
| 08:51:56 | 17 | testimony this morning.  We have Dr. -- Mr. Mauro and then |
| 08:52:00 | 18 | Dr. Putnam, I think, will complete their case-in-chief. |
| 08:52:03 | 19 | And, at that time, we would like to present our Rule 50 |
| 08:52:06 | 20 | motions. |
| 08:52:06 | 21 | THE COURT:  Sure.  Do you intend to -- do you |
| 08:52:15 | 22 | intend to make it orally, or do you intend to file |
| 08:52:19 | 23 | something? |
| 08:52:19 | 24 | MR. AIRAN:  We can do whatever your preference is. |
| 08:52:21 | 25 | My colleague is going to be handling that. |

08:52:25  1          THE COURT:  I don't have a preference.  I just --

08:52:27  2  I would rather you do one or the other.

08:52:30  3          MR. AIRAN:  Do you have a preference?

08:52:34  4          MR. COLLINS:  One second.

08:52:53  5          MR. AIRAN:  So there's an instruction that we're

08:52:55  6  going to ask for.  We'll do that orally at the close of

08:52:58  7  their case-in-chief.  And then we'll file a 50.

08:53:01  8          THE COURT:  Okay.  And I mean, I'm certainly open

08:53:02  9  to a brief summary of what's filed on the docket.  But I

08:53:06  10 just -- I think it works better to do one or the other --

08:53:10  11 make a short oral motion and file something on the docket

08:53:16  12 if you want to do it that way.

08:53:18  13         MR. AIRAN:  Sure.

08:53:24  14         THE COURT:  Okay.  Good.

08:53:25  15         MR. AIRAN:  Thank you, Your Honor.

08:53:25  16         THE COURT:  So we still do have these objections

08:53:27  17 to the Lopez demonstratives that we need to address if

08:53:31  18 we -- I mean, we can do that for a few minutes.

08:53:35  19         MS. KRAWICE:  Your Honor, I am ready to address

08:53:47  20 those right now if you want --

08:53:50  21         THE COURT:  Excellent.

08:53:51  22         MS. KRAWICE:  Great.  A couple of these have been

08:53:53  23 streamlined based on some agreements we reached.  I'll

08:53:56  24 mention them as we reach them because I think that's most

08:53:59  25 effective.

08:54:00    1          But as a general point for the ones that remain,

08:54:00    2    I'd just like to flag upfront that there are instances

08:54:05    3    where, you know, we have raised objections and we even note

08:54:07    4    that there are opinions in Dr. Lopez's report that go to

08:54:11    5    one or the other or one subset of info on the slides, but

08:54:17    6    our real objections -- and I want to just frame these -- is

08:54:21    7    that it's the comparisons that are made in the slides about

08:54:25    8    facts that are not found in Dr. Lopez's report.

08:54:27    9          So that leads us right into the first slide that

08:54:32   10    we've objected to.  And, Your Honor, I have a copy of their

08:54:35   11    updated one.  Would you like that?

08:54:37   12          THE COURT:  Yeah, that would be helpful.

08:54:39   13          MS. KRAWICE:  All right.  So the first slide at

08:54:48   14    issue is Slide 4, and this is going directly to what I kind

08:54:52   15    of previewed before.  There are bits and pieces of this

08:54:57   16    slide that Dr. Lopez has put in his report, you know,

08:55:02   17    specifically about phones using certain functionalities.

08:55:07   18    However, what this slide does that we believe is beyond the

08:55:11   19    opinions that he offered is tying it directly to OnePlus.

08:55:14   20          And we did offer a compromise of we would not

08:55:17   21    object to this slide if they made it broader and followed

08:55:20   22    the wording in the report as mentioned in Paragraphs 38,

08:55:24   23    222, and 247.  However, those opinions about specific

08:55:30   24    functionalities was never tied to OnePlus phones.

08:55:35   25          They say in a separate paragraph that like most

| | | |
|---|---|---|
| 08:55:39 | 1 | smartphones and tablets, OnePlus's accused products include |
| 08:55:42 | 2 | a multiple -- a multitude of feature -- features customers' |
| 08:55:47 | 3 | value.  That's not thousands as listed on this slide.  And |
| 08:55:50 | 4 | the general tying nature of specific features was not made |
| 08:55:55 | 5 | by Dr. Lopez.  So that is the basis of our objection on |
| 08:55:58 | 6 | this slide. |
| 08:56:03 | 7 | MR. THOMPSON:  Good morning, Your Honor. |
| 08:56:06 | 8 | THE COURT:  Good morning. |
| 08:56:06 | 9 | MR. THOMPSON:  This is basically -- I mean, as you |
| 08:56:09 | 10 | can sort of see looking at it -- I mean, it's just -- it's |
| 08:56:12 | 11 | just an effort to show that OnePlus's phones have many |
| 08:56:15 | 12 | features, like any other smartphone. |
| 08:56:17 | 13 | Ms. Krawice just read one part of Dr. Lopez's |
| 08:56:21 | 14 | report saying that OnePlus's products have a multitude of |
| 08:56:26 | 15 | features.  That's what we're trying to get at here.  If the |
| 08:56:28 | 16 | question is thousands of features versus many -- I don't |
| 08:56:31 | 17 | know what the -- I don't know one term is better than the |
| 08:56:33 | 18 | other, but the point of this slide is just to show that |
| 08:56:36 | 19 | there's -- you know, like every other smartphone on the |
| 08:56:38 | 20 | market, they have a lot of features.  And I don't really |
| 08:56:43 | 21 | see anything improper about that, Your Honor. |
| 08:56:44 | 22 | THE COURT:  Ms. Krawice, does the report -- does |
| 08:56:49 | 23 | the report not use the phrase "thousands and tens of |
| 08:56:54 | 24 | thousands of other patented features"? |
| 08:56:57 | 25 | MS. KRAWICE:  No, Your Honor. |

| | | |
|---|---|---|
| 08:56:57 | 1 | THE COURT:  It does not? |
| 08:56:58 | 2 | MS. KRAWICE:  It says many, or it makes other |
| 08:57:00 | 3 | statements.  What we're really seeking here in a bunch of |
| 08:57:02 | 4 | these slides is to be more accurate to what's in his |
| 08:57:07 | 5 | report. |
| 08:57:07 | 6 | THE COURT:  Okay. |
| 08:57:09 | 7 | MR. THOMPSON:  Your Honor, in Paragraph 36 of |
| 08:57:15 | 8 | Dr. Lopez's report, he says thousands of patented |
| 08:57:18 | 9 | technologies are in these phones.  So, I mean, I'm not |
| 08:57:24 | 10 | sure... |
| 08:57:25 | 11 | THE COURT:  Ms. Krawice? |
| 08:57:27 | 12 | MR. THOMPSON:  It seems like it's |
| 08:57:28 | 13 | cross-examination. |
| 08:57:29 | 14 | MS. KRAWICE:  Your Honor, it's tying it to OnePlus |
| 08:57:30 | 15 | and saying that the number of features in OnePlus's phones |
| 08:57:32 | 16 | are in the thousands.  We're just seeking to be more |
| 08:57:35 | 17 | accurate to what's in the report. |
| 08:57:36 | 18 | THE COURT:  I'm going to overrule the objection. |
| 08:57:38 | 19 | I think -- I don't think it's something that's hugely |
| 08:57:47 | 20 | objectionable.  I think it's -- you can cross him on it if |
| 08:57:50 | 21 | you want to. |
| 08:57:51 | 22 | MS. KRAWICE:  Okay.  The very next slide is where |
| 08:57:54 | 23 | the parties have other disputes. |
| 08:57:58 | 24 | THE COURT:  This is the slide with the two green |
| 08:58:00 | 25 | bars? |

08:58:01    1            MS. KRAWICE:  Correct, Your Honor.

08:58:01    2            THE COURT:  Okay.

08:58:02    3            MS. KRAWICE:  So there were agreements made this

08:58:03    4    morning where a lot of our objections to this slide were

08:58:06    5    removed.  However, one remains particularly as to this bar.

08:58:10    6            Dr. Lopez does not draw a specific comparison in

08:58:14    7    his report between the total standard patents and Pantech's

08:58:19    8    asserted SEPs.  Rather, the discussion is about the number

08:58:25    9    of total SEPs was part and parcel of his discussion of

08:58:29   10    considerations for calculating reasonable royalty for

08:58:32   11    complex devices, and now there's this line on this slide

08:58:36   12    making a direct comparison to Pantech, and that comparison

08:58:41   13    is not in his report.

08:58:41   14            THE COURT:  Let me hear from the Defendant.

08:58:43   15            MR. THOMPSON:  Your Honor, I don't think there's

08:58:48   16    any dispute that Dr. Lopez discusses these -- that there

08:58:55   17    are multiple families.  So I'm not really understanding

08:58:58   18    what the -- what the -- I mean, if she doesn't like the

08:59:02   19    comparison, it seems like that's proper for

08:59:04   20    cross-examination.  But there's not a -- I mean, he

08:59:07   21    discusses the various families, and so I'm not sure, you

08:59:11   22    know, comparing that from Pantech --

08:59:12   23            THE COURT:  I'm going to -- I'm going to sustain

08:59:14   24    her objection.  I think it is misleading.

08:59:16   25            MR. THOMPSON:  Okay.

288

| | | |
|---|---|---|
| 08:59:21 | 1 | THE COURT:  I mean, I -- it seems to compare the |
| 08:59:24 | 2 | number of SEPs to the patents -- the asserted patents.  I |
| 08:59:32 | 3 | think you can make the argument you want to make during, |
| 08:59:37 | 4 | you know, in argument. |
| 08:59:37 | 5 | But I'll sustain that objection. |
| 08:59:39 | 6 | MS. KRAWICE:  Thank you, Your Honor. |
| 08:59:44 | 7 | For the sake of housekeeping, the next objection |
| 08:59:47 | 8 | was to Slide 8.  However, that one has been resolved. |
| 08:59:50 | 9 | THE COURT:  All right. |
| 08:59:51 | 10 | MS. KRAWICE:  So we can move right along to Slide |
| 08:59:56 | 11 | 13 and 27 -- or 26. |
| 08:59:58 | 12 | Oh, the numbers should still be the same, I |
| 09:00:01 | 13 | believe, in that one that you're holding, Your Honor, |
| 09:00:04 | 14 | Slide 13 and 26. |
| 09:00:05 | 15 | THE COURT:  Okay. |
| 09:00:05 | 16 | MS. KRAWICE:  I believe they're nearly identical. |
| 09:00:08 | 17 | THE COURT:  Okay. |
| 09:00:09 | 18 | MS. KRAWICE:  So I'm going to try to be as clear |
| 09:00:15 | 19 | as I can because this does get a little confusingly in the |
| 09:00:19 | 20 | weeds. |
| 09:00:19 | 21 | The argument that's being made is about these |
| 09:00:23 | 22 | numbers, that $90,000 that you see on that slide and these |
| 09:00:27 | 23 | conclusions that Dr. Lopez has now drawn for the first |
| 09:00:31 | 24 | time. |
| 09:00:32 | 25 | Their argument is that this is a goose/gander |

| | | |
|---|---|---|
| 09:00:37 | 1 | situation because this is based on the new stipulated base |
| 09:00:41 | 2 | sales for each patent. |
| 09:00:45 | 3 | However, there's a really big distinction that's |
| 09:00:47 | 4 | important between what Dr. Putnam did and what we actually |
| 09:00:51 | 5 | in good faith previewed to them last week in an email |
| 09:00:55 | 6 | discussion and what Dr. Lopez is now doing for the first |
| 09:00:58 | 7 | time here that they just alerted us to for the first time |
| 09:01:01 | 8 | last night when we saw these slides. |
| 09:01:03 | 9 | So awhile ago, Dr. Lopez's apportionment was |
| 09:01:11 | 10 | stricken, and he wasn't allowed to provide a final number. |
| 09:01:16 | 11 | They're now seeking to use the stipulation to circumvent |
| 09:01:21 | 12 | that decision and just take the base sales, multiply it by |
| 09:01:25 | 13 | the number for the royalty rate that he provides in his |
| 09:01:29 | 14 | report, extracted from the Apple/Samsung agreements that he |
| 09:01:33 | 15 | believes are comparable, and then come to this new final |
| 09:01:36 | 16 | number.  But that basis of the royalty base was struck from |
| 09:01:41 | 17 | Dr. Lopez's report. |
| 09:01:42 | 18 | Conversely, Dr. Putnam did provide his calculation |
| 09:01:48 | 19 | of apportionment so that when the parties entered into the |
| 09:01:52 | 20 | stipulation, he had a one-to-one switching in his formula |
| 09:02:00 | 21 | where Dr. Putnam did provide his account -- his calculation |
| 09:02:04 | 22 | of the apportioned sales bases. |
| 09:02:07 | 23 | He can just swap that for the number that the |
| 09:02:10 | 24 | parties then agreed to, to kind of streamline his analysis |
| 09:02:13 | 25 | so he could skip a step that he put in his report.  And |

| | | |
|--|--|--|
| 09:02:16 | 1 | then he applied his rates, I'm talking about Dr. Putnam, |
| 09:02:20 | 2 | Dr. Putnam can do a one-for-one of switching with the |
| 09:02:24 | 3 | stipulated number with what he deemed the apportioned |
| 09:02:27 | 4 | number which came out last time at trial. |
| 09:02:29 | 5 | Dr. Lopez does not have an apportioned number that |
| 09:02:33 | 6 | remains in this case, and now they're using this -- these |
| 09:02:38 | 7 | bases to circumvent that flaw. |
| 09:02:41 | 8 | In the same way that Dr. Putnam isn't allowed to |
| 09:02:44 | 9 | go past his general overview of a multiplier to offer a |
| 09:02:48 | 10 | number now here, and we don't intend to do that, the same |
| 09:02:51 | 11 | should apply to Dr. Lopez, should not be allowed to do new |
| 09:02:56 | 12 | math for the first time where we just learned that he's now |
| 09:03:00 | 13 | going to say $90,000, for the first time last night. |
| 09:03:04 | 14 | THE COURT:  All right. |
| 09:03:06 | 15 | MR. THOMPSON:  I mean, Your Honor, as I understand |
| 09:03:10 | 16 | this, I mean, I don't think there's any dispute that this |
| 09:03:14 | 17 | is Dr. Lopez's royalty rate he calculated, and all he's |
| 09:03:19 | 18 | done is multiply this by the IDC sales data that we |
| 09:03:22 | 19 | stipulated to.  That's what Dr. Putnam did.  That's what |
| 09:03:25 | 20 | he's doing.  So it's just math.  I'm not sure -- I don't |
| 09:03:29 | 21 | understand I guess exactly what the dispute is. |
| 09:03:31 | 22 | But we stipulated to the sales data.  He has a |
| 09:03:34 | 23 | royalty rate.  He just multiplied by it and made a total. |
| 09:03:37 | 24 | THE COURT:  I think her objection is that it's a |
| 09:03:39 | 25 | new opinion that's never been disclosed before. |

09:03:43    1           MR. THOMPSON:  This is his methodology just

09:03:45    2   applied to the new IDC sales data.  That's all.

09:03:48    3           THE COURT:  All right.  And so address why it's

09:03:51    4   not a new opinion --

09:03:52    5           MR. THOMPSON:  Well, it's not a new opinion --

09:03:55    6           THE COURT:  -- that's not been disclosed.

09:03:58    7           MR. THOMPSON:  Are you talking about the number

09:03:59    8   itself?

09:03:59    9           THE COURT:  Correct.

09:04:01   10           MR. THOMPSON:  Well, because it's just like

09:04:02   11   Dr. Putnam's number, it's math.  His number wasn't

09:04:05   12   disclosed either.

09:04:06   13           THE COURT:  So you're saying OnePlus is doing the

09:04:08   14   same thing it agreed Pantech could do?

09:04:12   15           MR. THOMPSON:  It's math.  Yes, it's just taking

09:04:14   16   his methodology times the sales data.

09:04:17   17           THE COURT:  All right.  Can you direct me to a

09:04:20   18   paragraph or a page reference in the report where it's

09:04:23   19   disclosed?

09:04:54   20           I'll tell you what, you all go ahead and look at

09:04:57   21   it.  I think all of our jurors are here.  We'll go ahead

09:04:59   22   and start, and we'll take this up at the morning break.

09:05:04   23           MR. THOMPSON:  Thank you.

09:05:05   24           THE COURT:  Is there anything that must be -- that

09:05:09   25   we've not discussed that needs to be raised before we begin

| | | |
|---|---|---|
| 09:05:12 | 1 | with the jury this morning? |
| 09:05:14 | 2 | MR. FUSSELL:  Your Honor, just as it relates to |
| 09:05:16 | 3 | another housekeeping matter.  We intend to make a proffer |
| 09:05:20 | 4 | of the evidence that's been excluded.  We can do that |
| 09:05:23 | 5 | similarly with a filing on the record, if that's cleaner |
| 09:05:26 | 6 | for you. |
| 09:05:27 | 7 | THE COURT:  I have no objection to that. |
| 09:05:28 | 8 | MR. FUSSELL:  Thank you, Your Honor. |
| 09:05:29 | 9 | THE COURT:  Does the Defendant have any objection |
| 09:05:30 | 10 | to handling the offer of proof that way? |
| 09:05:33 | 11 | MR. THOMPSON: (Shakes head no.) |
| 09:05:43 | 12 | THE COURT:  That will be fine, Mr. Fussell. |
| 09:05:47 | 13 | All right.  Anything else? |
| 09:05:47 | 14 | Let's have the jury brought down. |
| 09:05:50 | 15 | COURT SECURITY OFFICER:  Please rise for the jury. |
| 09:06:09 | 16 | (Jury in.) |
| 09:06:10 | 17 | THE COURT:  Please be seated. |
| 09:06:31 | 18 | Ladies and gentlemen of the jury, good morning and |
| 09:06:36 | 19 | welcome back.  I hope you all had a pleasant evening. |
| 09:06:40 | 20 | Thanks for being here on time so that we could start |
| 09:06:45 | 21 | promptly. |
| 09:06:45 | 22 | At this time, the Plaintiffs may call their next |
| 09:06:48 | 23 | witness. |
| 09:06:48 | 24 | MS. KRAWICE:  Yes, Your Honor.  Plaintiffs call |
| 09:06:58 | 25 | Mr. Charles Mauro. |

09:07:09   1          (Witness sworn.)

09:07:20   2          THE COURT:  You can have a seat on the witness

09:07:21   3   stand.  The chair won't move, but once you get settled, you

09:07:26   4   can pull that microphone toward you.

09:07:27   5          THE WITNESS:  Thank you, sir.

09:07:42   6          MS. KRAWICE:  May I proceed?

09:07:43   7          THE COURT:  You may.

09:07:44   8          CHARLES MAURO, PLAINTIFFS' WITNESS, SWORN

09:07:44
09:07:44   9                   DIRECT EXAMINATION

09:07:45  10   BY MS. KRAWICE:

09:07:45  11   Q.  Good morning.  Can you please introduce yourself to the

09:07:47  12   jury?

09:07:47  13   A.  Yes.  Pardon me.  My name is Charles Mauro.

09:07:52  14   Q.  Mr. Mauro, what do you do for a living?

09:07:56  15   A.  Yes.  I'm president and founder of Mauro Usability

09:08:00  16   Science, a consulting firm based in New York.  We offer

09:08:04  17   consulting services -- excuse me -- to clients in the field

09:08:09  18   of human factors engineering science.  I have over 50 years

09:08:14  19   of experience.

09:08:15  20          I'm a research consultant to many leading

09:08:19  21   corporations.  I've managed over 3,000 research programs.

09:08:22  22   I'm an invited lecturer at many leading academic

09:08:28  23   institutions, including MIT, and have spoken at Government

09:08:31  24   agencies, NASA and FDA, and I'm a recipient of many leading

09:08:35  25   research awards in the field of human factors engineering.

09:08:37   1        And I do personally hold important patents in the

09:08:41   2   field of graphical user interface design, which is the

09:08:44   3   subject matter of the '654 patent.

09:08:46   4   Q.  Mr. Mauro, before we go any further, there is a

09:08:50   5   plethora, I think, of water on the stand.  Please feel free

09:08:54   6   to use some of it if you need to.

09:08:59   7   A.  Thank you.  Sorry about that.

09:09:00   8   Q.  You mentioned that your field is called human factors

09:09:04   9   engineering.  Can you describe what that is, to the jury?

09:09:07   10  A.  Sure.  Human factors engineering is an actual formal

09:09:13   11  educational discipline.  Many universities offer either a

09:09:18   12  master's or Ph.D. in human factors engineering.

09:09:21   13       And it's basically the study of the human mind and

09:09:24   14  body, both from a physiological and neuroscience point of

09:09:27   15  view, and utilizing that understanding to design technology

09:09:32   16  to be easy to use and safe.  So there are human factors

09:09:39   17  engineers on many projects today.

09:09:42   18  Q.  Can you describe some of the projects in human factors

09:09:45   19  engineering that you've personally handled?

09:09:48   20  A.  Sure.  Well, I personally managed many, many projects

09:09:52   21  over my career.  A typical project would be -- excuse me --

09:09:56   22  the design of operator cabs, for example, for John Deere

09:10:01   23  tractors or International Harvester.

09:10:03   24       For NASA, I designed a master control room for the

09:10:07   25  space shuttle.  I've done many, many projects, even in the

09:10:10    1    consumer space.  For example, looking at why cell phones

09:10:13    2    happen to be addictive, studies of that nature.

09:10:17    3             I've also worked directly for all of the four

09:10:21    4    major manufacturers of smartphones, Apple, Samsung, Google,

09:10:26    5    Motorola, and Huawei.

09:10:30    6             MS. KRAWICE:  Your Honor, at this time, we'd

09:10:31    7    proffer Mr. Mauro as an expert in the field of mobile

09:10:35    8    devices and their user interfaces, which is relevant to the

09:10:40    9    '654 patent.

09:10:40   10             MR. AIRAN:  No objection, Your Honor.

09:10:41   11             THE COURT:  Very well.

09:10:42   12    Q.  (By Ms. Krawice)  Mr. Mauro, what were you asked to do

09:10:44   13    in this case?

09:10:44   14    A.  Specifically, I was asked to examine the '654 patent

09:10:49   15    and discuss the problem solved by that patent, to help the

09:10:53   16    jury understand what the innovations are that are present

09:10:57   17    that are beneficial in that patent.

09:10:58   18    Q.  Can you introduce the '654 patent to the jury?

09:11:01   19    A.  Sure.  The name of this patent is:  Terminal Apparatus

09:11:09   20    and Method For Supporting Smart Touch Operation.

09:11:12   21             It was issued -- the invention itself came into

09:11:15   22    being in September 9th, 2011.  And this is a patent

09:11:18   23    basically optimized around the idea that on a smartphone,

09:11:23   24    which has a very small screen, this technology in this

09:11:28   25    patent or these asserted claims, if you will, make it

09:11:31   1   possible for different hand sizes, different finger sizes

09:11:35   2   to make selections with a reduced error.

09:11:37   3          So prior to the smartphone, when we had other

09:11:40   4   types of handheld devices, I was very active in the

09:11:44   5   development of those systems.  You had to have a very small

09:11:48   6   finger or you had to have a stylist in order to make

09:11:52   7   selections -- to make the selections accurate.

09:11:54   8          And what this patent does essentially is it allows

09:11:57   9   a region of selection by the finger, and it helps you --

09:12:01   10  the machine helps you select the proper input and then

09:12:05   11  reduces the corresponding error rate.  The invention also

09:12:10   12  pops up a display, and then has a timeout feature as well.

09:12:14   13  Q.  At a high level, can you describe the invention of the

09:12:18   14  '654 patent?

09:12:18   15  A.  Sure.  This is taken essentially from the patent.  This

09:12:23   16  patent starts with the premise that users make imprecise

09:12:28   17  user touch actions, which we know from a very large body of

09:12:31   18  human factor science is quite accurate.

09:12:35   19         This patent identifies an area overlapped by the

09:12:39   20  touch.  It then generates objects in a new area based away

09:12:46   21  from the touch.  So the object brought up is never left

09:12:48   22  under the object itself that you selected, so it increases

09:12:52   23  your ability to see the object.

09:12:54   24         And once the object is displayed if it's selected,

09:12:57   25  then it performs an operation with respect to the object.

| | | |
|---|---|---|
| 09:13:02 | 1 | And if the time -- certain amount of time proceeds |
| 09:13:06 | 2 | without selection of the object, then the pop-up is |
| 09:13:09 | 3 | removed.  So it leaves you back in your original state, and |
| 09:13:13 | 4 | it eliminates the need for a backup function that is common |
| 09:13:18 | 5 | in some types of user interfaces of these devices. |
| 09:13:20 | 6 | Q.  What field of art does the '654 patent apply to? |
| 09:13:25 | 7 | A.  Yeah, the '654 is -- applies to the field of art known |
| 09:13:31 | 8 | in -- in my field and in general at the USPTO where these |
| 09:13:36 | 9 | patents are issued as graphical user interface. |
| 09:13:39 | 10 | Q.  Can you describe what a graphical user interface is, to |
| 09:13:41 | 11 | the jury? |
| 09:13:42 | 12 | A.  Sure.  Yeah, very simply, the way computers started |
| 09:13:46 | 13 | out, maybe some of you remember this, you had to type |
| 09:13:50 | 14 | commands into a computer, and this was basically the way |
| 09:13:53 | 15 | that they worked for many years. |
| 09:13:55 | 16 | Then in the 1980s, an individual by the name of |
| 09:14:02 | 17 | Douglas Engelbart invented what is called the graphical |
| 09:14:06 | 18 | user interface, and the keyboard was replaced by the mouse. |
| 09:14:09 | 19 | So you gripped a mouse, and then you can select |
| 09:14:13 | 20 | various features of, you know, whatever action it is you |
| 09:14:16 | 21 | want to have, drag or drop or click or print, and this was |
| 09:14:19 | 22 | a massive change whereas some feel was probably one of the |
| 09:14:25 | 23 | most important inventions of the last 50 years because it |
| 09:14:28 | 24 | gave access to literally billions of users where before the |
| 09:14:32 | 25 | computer was very small in terms of its access. |

09:14:34    1          So what this patent, the '654, about is the next

09:14:40    2    generation after the desktop GUI which is the mobile GUI

09:14:41    3    which is based -- it replaces the mouse, if you will.

09:14:45    4    Simple way to think of it, replaces all of those mouse

09:14:48    5    functions with finger actions.

09:14:50    6          And in this transition, was, you know, some

09:14:54    7    interesting issues.  I'm sorry.

09:14:56    8    Q.  What was the state of the art for smartphone graphical

09:15:02    9    user interfaces in 2011?

09:15:03   10    A.  Yeah.  Some of you may remember the conventional flip

09:15:07   11    phones which were the precursors to the smartphone.  And

09:15:10   12    this chart, the orange bars are the sale of conventional

09:15:14   13    flip phones, and the purple bars are the sale of modern

09:15:20   14    smartphones, single surface glass smartphones.

09:15:23   15          And indicated in the gray box here in 2011, this

09:15:25   16    is the period of the invention.  And this particular

09:15:29   17    patent, the '654, is right at the nexus where they were

09:15:32   18    transitioning from this -- from the flip phone or the old

09:15:36   19    traditional phones to the modern smartphones.  So it was

09:15:39   20    positioned perfectly in the transition time period.

09:15:43   21    Q.  Did this transition period create any problems for GUI

09:15:48   22    designers?

09:15:49   23    A.  Yes, it did.  I was very active in the field at this

09:15:53   24    point working on various types of user interfaces, almost

09:15:56   25    all of them mobile, and we knew that the development of a

09:16:00  1  smartphone of this configuration with a glass screen was

09:16:04  2  going to lead to certain difficult problems in GUI design,

09:16:09  3  how to accommodate certain user behaviors, and there was

09:16:13  4  also new business requirements that the carriers were

09:16:16  5  pulling forward that had to be met in order to increase the

09:16:20  6  profitability of these devices.

09:16:22  7  Q.  Mr. Mauro, before we go any further, I just want to

09:16:26  8  slow down a bit and ask where did this list of nine factors

09:16:29  9  come from?

09:16:29  10  A.  Yes.  Thank you.

09:16:31  11      As a licensed human factors engineering

09:16:37  12  professional, when I proffer information for clients or in

09:16:40  13  a manner like this, it's important to always have base

09:16:45  14  peer-reviewed literature on which to refer.

09:16:47  15      So these variables were culled from my personal

09:16:52  16  experience based on the peer-reviewed literature.

09:16:55  17  Underlying each one of these specific elements here is

09:17:00  18  human factors research science.

09:17:02  19      So it's a compilation of my examination of the

09:17:06  20  literature and my personal experience in terms of

09:17:09  21  organizing the list.

09:17:11  22  Q.  Did the invention of the '654 patent help solve any of

09:17:17  23  these nine problems?

09:17:18  24  A.  Oh, in a major way.  It's important to think about the

09:17:23  25  '654 as a --

09:17:25    1    Q.  Mr. Mauro, I hate to interrupt, but please, you can

09:17:29    2    slow down and take a sip of water.

09:17:33    3    A.  Excuse me.  I'm over a cold, but not completely over

09:17:36    4    the cough there.

09:17:39    5         Okay.  So the way to think about the '654

09:17:42    6    basically is as follows:  It's a number of claims, and each

09:17:47    7    of these claims are grouped together as a process.  So this

09:17:54    8    is a way of enhancing the functionality of mobile

09:18:00    9    smartphones by addressing the problem of small screen size

09:18:05   10    versus finger, hand size.

09:18:08   11         This problem of small target size and low

09:18:12   12    tolerance to errors and spacing of objects and the smooth

09:18:15   13    screen.

09:18:15   14         If you had an old cell phone before, you realize

09:18:19   15    you always had physical buttons, and you knew when you

09:18:21   16    pushed the button, an action had taken place.  But in this

09:18:24   17    environment, with the new phones, that wasn't possible.

09:18:27   18         So you probably notice that these first three

09:18:29   19    elements here under GUI design problems, those are all

09:18:33   20    related to the size of both the human finger and the

09:18:38   21    spacing and size of objects on the screen.

09:18:39   22         And what the '654 patent does essentially is it --

09:18:42   23    by allowing you to select a region instead of the exact

09:18:46   24    target itself, it gives you a reduction in the error rate

09:18:50   25    with respect to making selections.

09:18:53  1     And what is particularly important is in the

09:18:55  2  design of the user interface for the modern smartphone, we

09:18:59  3  for the very first time were faced with the problem of

09:19:03  4  differences in finger size.  That is not the case when

09:19:06  5  you -- when you use a mouse.  For example, any hand size

09:19:10  6  can operate a mouse.

09:19:11  7     So that -- what we realized very quickly was that

09:19:14  8  a small woman has a very small finger obviously, and a

09:19:19  9  large male has a very large finger.  This turned out to be

09:19:23  10  an extremely limiting problem in trying to figure out how

09:19:27  11  to make these devices usable, and the '654 addresses that

09:19:29  12  core human engineering problem and these others as well.

09:19:31  13     Let's talk about some of these others.  The second

09:19:34  14  category you have here is user behavior problems.

09:19:38  15     Can you describe how the '654 patent addresses

09:19:42  16  these issues?

09:19:43  17  A.  Yes.  We know from a large body of human factors

09:19:47  18  research literature that how users actually interact with

09:19:50  19  smartphones is much different than desktop computers that

09:19:54  20  came before them.

09:19:55  21     And we know specifically in low light conditions,

09:19:58  22  wet conditions, or when it's cold out, users make even less

09:20:02  23  likely accurate selections of their targets on the screen.

09:20:07  24     So this patent, by increasing the area of

09:20:09  25  selection and improving the reliability of the selection,

09:20:13    1    was a big improvement in the environmental factors and

09:20:17    2    related concerns for these devices.

09:20:19    3    Q.  What about wide variation and user habits?

09:20:24    4    A.  Yeah.  Users -- it turned out, when we started

09:20:28    5    conducting the actual human factors research on these

09:20:32    6    devices, what we realized very quickly was that compared to

09:20:35    7    a desktop mouse, for example, which you basically can only

09:20:39    8    use in one way, users of modern smartphones use their

09:20:43    9    thumbs, two thumbs, index finger, combinations thereof,

09:20:47    10   they hold them in one hand, two hands.

09:20:49    11         And this wide range of variation in terms of how

09:20:52    12   users actually hold and interact with the device had a very

09:20:56    13   big impact on the accuracy with which they can make

09:20:59    14   selections on the screen.

09:21:00    15         So some users are very accurate and very fast,

09:21:04    16   others are much slower.  And the '654 patent -- again, this

09:21:08    17   idea of selection of an area of interaction and pulling

09:21:12    18   forward to select an object reduced the error rate on this

09:21:16    19   particular problem as well.

09:21:18    20   Q.  I want to ask you about this final category, variation

09:21:22    21   in business and phone functionality.  How does the '654

09:21:26    22   patent contribute to these issues?

09:21:27    23   A.  Yeah, that's a particularly interesting area.  Because

09:21:31    24   as I was working on these types of products at this time,

09:21:35    25   it was made clear by the carriers -- and those are the cell

09:21:40  1  phone companies, if you will -- that there was going to be

09:21:43  2  a need to change their business model.

09:21:45  3       And what they wanted to do was offer to customers

09:21:49  4  a much wider range of apps or applications which they could

09:21:52  5  monetize against the devices.

09:21:54  6       So we knew in the -- excuse me again -- we knew in

09:21:59  7  the old phones they were very constrained in terms of the

09:22:02  8  number of apps you could develop.  And so we saw the

09:22:05  9  smartphone, with its ability to gang together a large

09:22:11  10  number of apps, as a possible business solution for that

09:22:14  11  problem.

09:22:15  12       And then the second point there, wide variation in

09:22:20  13  app functionality, making the assumption that you could

09:22:24  14  load hundreds of apps on a typical smartphone.

09:22:28  15       The problem from a human factors science point of

09:22:31  16  view actually becomes how do you make all of those apps

09:22:34  17  useable in a way that makes sense?  Because if each app

09:22:38  18  behaves differently, users very quickly reject them.

09:22:43  19       So what the '654 patent does essentially is it

09:22:47  20  provides an interaction behavior set, all of these claims

09:22:50  21  together.  It's a standard behavior that can be applied

09:22:56  22  across a wide range of apps.

09:22:58  23       So it standardizes the learning, if you will.  And

09:23:02  24  in human factor science, this idea is called transfer of

09:23:05  25  learning.  It's extremely powerful.  A reason why users

| | | |
|---|---|---|
| 09:23:09 | 1 | today on average have around 80 apps, and the Google App |
| 09:23:13 | 2 | Store offers around 5 and a half million apps for sale or |
| 09:23:17 | 3 | download. |
| 09:23:18 | 4 | Q.  Now, shifting gears, what are the specific OnePlus |
| 09:23:22 | 5 | products subject to damages in this case? |
| 09:23:24 | 6 | A.  Yes.  I have a chart here.  These are -- these are |
| 09:23:27 | 7 | basically the products covered by the asserted claims. |
| 09:23:29 | 8 | Q.  What are these products? |
| 09:23:31 | 9 | A.  These are all smartphones by OnePlus. |
| 09:23:34 | 10 | Q.  At a high level, can you explain how the asserted |
| 09:23:39 | 11 | claims implement the benefits of the '654 patent? |
| 09:23:41 | 12 | A.  Sure.  I've taken the simplest example here and -- just |
| 09:23:46 | 13 | to demonstrate to you, here you have the OnePlus -- OnePlus |
| 09:23:52 | 14 | phone. |
| 09:23:52 | 15 | The user touches next to the settings icon, not |
| 09:23:57 | 16 | directly on the icon.  That generates a pop-up on the |
| 09:23:59 | 17 | screen.  This happens to be search.  If the user selects |
| 09:24:02 | 18 | the search pop-up, the search is delivered.  If the user |
| 09:24:08 | 19 | does not select the search pop-up, then they return back to |
| 09:24:12 | 20 | the screen. |
| 09:24:12 | 21 | Q.  Is there any way that the jury can see this |
| 09:24:14 | 22 | functionality for themselves? |
| 09:24:15 | 23 | A.  Yes, absolutely.  I prepared two very short videos. |
| 09:24:19 | 24 | They're about 30 seconds long, PX-103 and PX-104.  You can |
| 09:24:24 | 25 | run those videos and see exactly how the patent is |

| | | |
|---|---|---|
| 09:24:27 | 1 | implemented in this particular example. |
| 09:24:31 | 2 | Q.  Thank you. |
| 09:24:34 | 3 | MS. KRAWICE:  I pass the witness. |
| 09:24:54 | 4 | MR. AIRAN:  May I approach the witness, |
| 09:24:55 | 5 | Your Honor? |
| 09:24:56 | 6 | THE COURT:  Yes. |
| 09:25:00 | 7 | CROSS-EXAMINATION |
| 09:25:03 | 8 | BY MR. AIRAN: |
| 09:25:03 | 9 | Q.  Good morning, Mr. Mauro. |
| 09:25:07 | 10 | A.  Good morning, sir. |
| 09:25:08 | 11 | Q.  My name is David Airan.  We've met before? |
| 09:25:10 | 12 | A.  Yes, we have. |
| 09:25:11 | 13 | Q.  You were just testifying about -- that the '654 patent |
| 09:25:15 | 14 | produces solutions to nine problems, correct? |
| 09:25:18 | 15 | A.  Yes, sir, it does. |
| 09:25:19 | 16 | Q.  Okay.  And most of those problems relate to rapid |
| 09:25:22 | 17 | information display to allow a user to complete a task; is |
| 09:25:22 | 18 | that fair? |
| 09:25:28 | 19 | A.  That's one aspect of them, yes.  The invention is |
| 09:25:30 | 20 | primarily focused on data entry error reduction. |
| 09:25:36 | 21 | Q.  Okay.  If we could take a look at two of your problems, |
| 09:25:39 | 22 | if we can. |
| 09:25:39 | 23 | MR. AIRAN:  If we can have PDX-18-2 up, please? |
| 09:25:43 | 24 | Q.  (By Mr. Airan)  So in your expert report, you describe |
| 09:25:51 | 25 | Problems 2 and 3 as relating to the rapid display of |

09:25:54    1    actions; is that correct?

09:25:56    2           For example, when we're looking at Problem 2, you

09:25:59    3    state that this problem is solved by displaying secondary

09:26:03    4    actions resulting from the user's input rapidly.

09:26:06    5           Correct?

09:26:07    6    A.  Yes, that's correct, sir.

09:26:08    7    Q.  Okay.  And in Problem 3, you state:  A smartphone GUI

09:26:12    8    must provide rapid and very clear display of all actions.

09:26:16    9           Correct?

09:26:16   10    A.  Yes, sir, that's correct.  In order to be effective and

09:26:20   11    to produce a user experience that's going to lead to high

09:26:24   12    levels of engagement, that's correct.

09:26:26   13    Q.  So Problems 2 and 3 and the solutions thereto relate to

09:26:31   14    rapid display of actions?

09:26:33   15    A.  In general terms, yes.

09:26:34   16    Q.  If we can take a look at Problems 4 and 5, please.

09:26:38   17    Problem 4 states:  This problem is solved by rapid display

09:26:38   18    of secondary information.

09:26:41   19           Do you see that?

09:26:42   20    A.  Yes, I do.

09:26:43   21    Q.  And Problem 5, again, which relates to lighting and

09:26:47   22    contrast, you say:  The resolution of this problem is the

09:26:50   23    rapid display of secondary information.

09:26:52   24           Correct?

09:26:52   25    A.  Yes, sir, I do.

09:26:53    1   Q.  So Problems 4 and 5 also relate to rapid display of

09:26:59    2   information, correct?

09:27:00    3   A.  In part.  In the rapid display of information, the

09:27:02    4   accurate rapid display of information and its uptake by the

09:27:03    5   user is a primary means for reducing errors and increasing

09:27:07    6   engagement.

09:27:08    7   Q.  Okay.  Thank you.

09:27:09    8           MR. AIRAN:  And if we could have the next slide,

09:27:11    9   please.  Let's take a look at Problems 6 and 8.

09:27:14   10   Q.  (By Mr. Airan)  Problem 6 you state that smartphone GUI

09:27:17   11   must rapidly and clearly display information along the

09:27:20   12   pathway to task completion, correct?

09:27:23   13   A.  Yes, sir.

09:27:24   14   Q.  And so that, again, is rapid display of information?

09:27:27   15   A.  Yes.

09:27:27   16   Q.  And if we look at Problem 8, you talk about an

09:27:30   17   element-by-element interaction sequence design that allows

09:27:33   18   for rapid error correction, correct?

09:27:35   19   A.  Yes, sir, that's correct.

09:27:36   20   Q.  So Problems 6 and 8 also relate to the rapid display of

09:27:39   21   information along the pathway to task completion?

09:27:43   22   A.  In general terms, yes.

09:27:45   23   Q.  And you summarized your problems, I believe, in your

09:27:48   24   expert report?

09:27:50   25           MR. AIRAN:  Put that up on the screen at Paragraph

09:27:53  1   77.

09:27:53  2   Q.  (By Mr. Airan)  You talk about the problem solved is

09:27:55  3   how to design interactive sequences which means first

09:27:59  4   elements, second elements -- secondary elements, pop-ups,

09:28:03  5   and timeout screen clearance procedures.  Is that fair?

09:28:06  6   A.  In general terms, that's correct, yes, that's my

09:28:08  7   summary.

09:28:09  8   Q.  Okay.  So timeout screen clearance procedures is what

09:28:12  9   you talked about at the end of your direct examination,

09:28:15  10  right?

09:28:15  11  A.  Yes, there was a timeout example there, and the claims

09:28:18  12  of the '654 include the timeout function.

09:28:21  13  Q.  Okay.  And that, in your view, makes the use of the

09:28:25  14  phones more efficient?

09:28:25  15  A.  Oh, absolutely.  Because it eliminates the secondary

09:28:29  16  action required on the part of the user to clear the screen

09:28:31  17  and backup.

09:28:32  18  Q.  All right.  And you mentioned that you prepared some

09:28:34  19  videos; is that right?

09:28:35  20  A.  Yes, sir, I have.

09:28:36  21  Q.  All right.

09:28:36  22       MR. AIRAN:  Let's take a look at those videos.  If

09:28:39  23  we can have PX-103 played, please.

09:28:43  24  Q.  (By Mr. Airan)  And you can voice over narrate what

09:28:46  25  you're doing here.

| | | |
|---|---|---|
| 09:28:48 | 1 | A.  Yes.  That's selection.  That's the pop-up -- selection |
| 09:28:51 | 2 | of the pop-up.  And that's the search function. |
| 09:28:57 | 3 | Q.  So I think that's the end of 103? |
| 09:28:59 | 4 | A.  Yes, correct. |
| 09:29:00 | 5 | Q.  So what -- what happened there is when you clicked on |
| 09:29:03 | 6 | the settings button, a search bar popped up, right? |
| 09:29:06 | 7 | A.  That's correct. |
| 09:29:07 | 8 | Q.  Okay. |
| 09:29:08 | 9 | A.  This was an early video.  In fact, the video that I |
| 09:29:11 | 10 | believe we prepared shows the user not selecting the icon |
| 09:29:16 | 11 | directly. |
| 09:29:17 | 12 | Q.  Okay. |
| 09:29:17 | 13 | A.  So this may have been an earlier video that we had |
| 09:29:20 | 14 | produced. |
| 09:29:20 | 15 | Q.  All right.  And if we can take a look at your second |
| 09:29:24 | 16 | video, 104. |
| 09:29:25 | 17 | MR. AIRAN:  If we can play that, please. |
| 09:29:33 | 18 | A.  User selecting again.  I believe in this video, they do |
| 09:29:37 | 19 | not select the search, and it's going to time out and go |
| 09:29:40 | 20 | back to the main screen. |
| 09:30:07 | 21 | Q.  (By Mr. Airan)  So that's the end of the video? |
| 09:30:09 | 22 | A.  That's the end of this video, yes. |
| 09:30:10 | 23 | Q.  So let's see if we can break that down a little bit. |
| 09:30:14 | 24 | What happened is to start -- |
| 09:30:16 | 25 | MR. AIRAN:  Can you put the first part up, please? |

09:30:19    1    Just the first -- yeah, just leave that up.  You can pause

09:30:22    2    it there.

09:30:22    3    Q.  (By Mr. Airan)  So -- well, let's walk through this.

09:30:25    4         MR. AIRAN:  Go ahead and hit play, Mr. Carrillo,

09:30:30    5    please.  So if you can pause there.

09:30:31    6    Q.  (By Mr. Airan)  So the first step in this -- as you say

09:30:37    7    OnePlus uses the phone, right?  This is a OnePlus phone and

09:30:40    8    how OnePlus uses the technology, correct?

09:30:43    9    A.  This is a video from that examination -- from an

09:30:47    10   examination of those functions, yes.

09:30:49    11   Q.  Okay.  And so you click on the settings button, right?

09:30:51    12        MR. AIRAN:  If we could advance to that, please.

09:30:55    13   And then hit pause, please.

09:30:59    14   Q.  (By Mr. Airan)  There's a search pop-up that occurs,

09:31:01    15   right?

09:31:01    16   A.  Yes, it does.

09:31:02    17   Q.  And that's part of how you say OnePlus uses the phone,

09:31:05    18   correct?

09:31:05    19   A.  Correct.

09:31:05    20   Q.  All right.  Now, one of the objectives here of the

09:31:09    21   patent and the technology is to clear that pop-up, right?

09:31:11    22   A.  That's one function of the '654, yes.

09:31:15    23   Q.  Okay.  And the way in which you say the OnePlus phone

09:31:18    24   clears that pop-up is through the lock screen, correct?

09:31:21    25   A.  It clears the -- I don't make a specific requirement --

311

09:31:27　1　statement as to what it clears to.  It clears the -- it

09:31:30　2　clears the -- it clears the pop-up.

09:31:33　3　Q.  There's a timer associated with the inactivity screen,

09:31:36　4　right?

09:31:36　5　A.  Yes, there is.

09:31:38　6　Q.  So when you stop using your phone, for example, you can

09:31:41　7　set that timer, right?  And if you stop using your phone,

09:31:44　8　it goes to lock, right?

09:31:45　9　A.  In general terms, yes, that's correct.

09:31:48　10　Q.  And for the Android phones, do you know the minimum

09:31:52　11　time that you have to set it there?

09:31:53　12　A.  I don't know what the minimum time is, no.

09:31:55　13　Q.  You set it to 15 seconds in this video?

09:31:58　14　A.  I believe it was set for around that time, yes.  We did

09:32:01　15　a large number of videos.  I'm not sure how much time this

09:32:05　16　one was set for.

09:32:06　17　Q.  We can count it, but it is 15 seconds.

09:32:08　18　　　　　So the advantage that you're talking about here is

09:32:12　19　you click the settings button, it does this pop-up search,

09:32:16　20　and then after that, you wait 15 seconds, and that pop-up

09:32:19　21　goes away, correct?

09:32:22　22　A.  If that's the time that's been set for the pop-up, yes,

09:32:22　23　correct.

09:32:25　24　Q.  Yes.  And so let's look at that video again now that

09:32:28　25　we've kind of oriented the jury on what's happening here.

| | | |
|---|---|---|
| 09:32:33 | 1 | MR. AIRAN:  So if you can hit play, please? |
| 09:32:35 | 2 | Q.  (By Mr. Airan)  So there, the screen goes into lockout, |
| 09:32:49 | 3 | right, after 15 seconds? |
| 09:32:51 | 4 | A.  Yes. |
| 09:32:52 | 5 | Q.  And now the user is unlocking the phone? |
| 09:33:00 | 6 | A.  And the pop-up is removed. |
| 09:33:01 | 7 | Q.  Right.  So the advantage, again, is removing the pop-up |
| 09:33:05 | 8 | after waiting that 15 seconds, the phone goes into lockup |
| 09:33:10 | 9 | mode, and then you have to unlock the phone by using your |
| 09:33:13 | 10 | passcode, and then you've figured out that the pop-up is |
| 09:33:15 | 11 | gone.  Correct? |
| 09:33:16 | 12 | A.  I don't remember the exact structure within Android, |
| 09:33:19 | 13 | whether you can -- whether the timing related to a lockout |
| 09:33:24 | 14 | and dismiss of the pop-up are interrelated.  I don't recall |
| 09:33:29 | 15 | at this time. |
| 09:33:29 | 16 | Q.  As you've shown in your video here -- this is a video |
| 09:33:33 | 17 | that you produced, just to be clear, right? |
| 09:33:34 | 18 | A.  Yes, early video.  One of the videos, yes. |
| 09:33:37 | 19 | Q.  All right.  And so you're saying the advantages of the |
| 09:33:39 | 20 | pop-up goes away when the screen goes into lockout mode, |
| 09:33:43 | 21 | right? |
| 09:33:43 | 22 | A.  It does, yes. |
| 09:33:44 | 23 | Q.  All right.  Wouldn't it be faster -- |
| 09:33:47 | 24 | MR. AIRAN:  If we can hit the play, please, again |
| 09:33:50 | 25 | on the video? |

09:33:50    1              (Video played.)

09:33:51    2    Q.  (By Mr. Airan)  So here you hit settings, the pop-up

09:34:01    3    happens.

09:34:01    4              MR. AIRAN:  And if you can hit pause, please,

09:34:04    5    Mr. Carrillo?

09:34:05    6    Q.  (By Mr. Airan)  Wouldn't it be faster if you wanted to

09:34:07    7    just get rid of that search pop-up, just to click anywhere

09:34:11    8    else on the screen?  Wouldn't that also remove the pop-up?

09:34:14    9    A.  Possibly.

09:34:18   10    Q.  Have you done that yourself?

09:34:19   11    A.  I have not.  I looked -- I examined only the interface

09:34:24   12    with respect to the context of the claims asserted in the

09:34:28   13    '654 patent.  I didn't examine other procedures for removal

09:34:32   14    of the pop-up.

09:34:33   15    Q.  Okay.  So if the user wanted to clear that pop-up and

09:34:36   16    that's how you say OnePlus is using this technology, they

09:34:39   17    could click anywhere else on that screen most likely and

09:34:42   18    that pop-up would go away, right?

09:34:43   19              MS. KRAWICE:  Objection, Your Honor.  Can we

09:34:45   20    sidebar?

09:34:45   21              THE COURT:  Yes.

09:34:47   22              (Bench conference.)

09:34:57   23              MS. KRAWICE:  Your Honor, I very much appreciated

09:34:59   24    that I talked a little bit about what the infringement read

09:35:01   25    was, but I think we're getting a little far afield and

09:35:03   1   we're talking about alleged values of non-infringing

09:35:06   2   alternatives, and I think it's misleading at this point.

09:35:09   3         MR. AIRAN:   There's no value to this patent.

09:35:11   4   There's no value to this patent.  That's what I'm trying to

09:35:15   5   establish.  Waiting for the lockout screen as opposed to

09:35:15   6   clicking anywhere else on the screen.  This is about the

09:35:15   7   value of the patent.  They're saying it's driving sales.

09:35:15   8   It's doing all this stuff.

09:35:20   9         The pop-up -- the way they are asserting the

09:35:23   10   patent is of no economic -- it's of no economic value

09:35:29   11   whatsoever, and that's our position here.  We're just

09:35:30   12   demonstrating that --

09:35:30   13         THE COURT:   As long as you stay away from

09:35:33   14   non-infringing alternative.

09:35:34   15         MR. AIRAN:   Yeah, for sure.

09:35:35   16         MS. KRAWICE:   Okay.

09:35:35   17         (Bench conference concluded.)

09:35:44   18   Q.  (By Mr. Airan)  So, Mr. Mauro, you would agree that it

09:35:46   19   would be faster and more useful if your objective was to

09:35:50   20   just disappear the pop-up, to click anywhere else on the

09:35:53   21   screen, right?

09:35:54   22         MS. KRAWICE:   Objection, Your Honor.

09:35:55   23         THE COURT:   I'm sorry?

09:35:56   24         MS. KRAWICE:   Objection, Your Honor.

09:35:57   25         THE COURT:   What's the objection?

09:35:58    1              MS. KRAWICE:  I believe this is almost nearly the

09:36:00    2    same question that was previously asked.

09:36:02    3              THE COURT:  I'll overrule it.

09:36:05    4    Q.  (By Mr. Airan)  You can answer.

09:36:06    5    A.  Can you repeat the question, please?

09:36:07    6    Q.  Sure.  If you wanted to use your phone in a normal way

09:36:12    7    to remove that pop-up, you could click anywhere else on the

09:36:14    8    screen, right?

09:36:15    9    A.  I didn't examine that behavior.  I'm not sure about --

09:36:18   10              MS. KRAWICE:  Objection, Your Honor.

09:36:19   11              THE COURT:  Same objection?

09:36:20   12              MS. KRAWICE:  Similar, but can I explain further?

09:36:22   13              THE COURT:  Yeah, of course.  Come up.  Come

09:36:25   14    around.

09:36:25   15              (Bench conference.)

09:36:33   16              MS. KRAWICE:  I think I just wasn't clear last

09:36:35   17    time.

09:36:36   18              THE COURT:  Okay.  Fair enough.

09:36:37   19              MS. KRAWICE:  The infringement read ended once the

09:36:41   20    screen was removed.  Now, if you remember that we did have

09:36:43   21    a source code expert here to talk about when that happens.

09:36:47   22    Now they're talking about that you can click on other parts

09:36:49   23    of the areas of the thing.

09:36:51   24              That's not an infringement read.  That wouldn't,

09:36:54   25    like, read on the claims of this patent.  That would be a

| | |
|---|---|
| 09:36:56 | 1 |
| 09:36:59 | 2 |

09:36:56   1   non-infringing alternative to talk about tapping in other

09:36:59   2   areas.  That's not what this patent covers at all.

09:37:01   3        MR. AIRAN:  This is not about non-infringing

09:37:03   4   alternatives.  It's about the value.  They say the value is

09:37:05   5   waiting for this timer to expire, then the pop-up goes

09:37:08   6   away.  That's what he testified to is that the -- what I'm

09:37:12   7   pointing out is that when you wait for a lock screen timer

09:37:16   8   to expire, that's not a value.  You could do something else

09:37:18   9   if you wanted the pop-up to go away.

09:37:21   10       That's the only point we're making.  He's

09:37:21   11   testified all day about the ergonomics and human factors

09:37:24   12   and how great it is.  And we're just pointing out that it's

09:37:27   13   not that great.

09:37:28   14       THE COURT:  As long as you stay away from

09:37:31   15   discussions about non-infringing alternatives, I'll --

09:37:33   16       MR. AIRAN:  Sure.

09:37:34   17       MS. KRAWICE:  Your Honor, I believe that this

09:37:34   18   question does go to that.  Because tapping outside is not

09:37:35   19   part of -- that would not read on the patent.  To tap

09:37:39   20   outside, that's a different thing than what the patent is

09:37:42   21   claiming.  If you want me to bring you the patent claims, I

09:37:45   22   can but...

09:37:45   23       MR. AIRAN:  It's about the value of the patent.

09:37:47   24   That's what we're talking about.

09:37:48   25       THE COURT:  As long as you clarify your question

09:37:52   1   is about the value of the patent.

09:37:54   2          You've made your record.  I'm going to overrule

09:37:56   3   your objection.

09:37:57   4          MS. KRAWICE:  Thanks.

09:37:58   5          (Bench conference concluded.)

09:38:00   6   Q.  (By Mr. Airan)  Thank you, Mr. Mauro.  So what I'm

09:38:06   7   trying to understand is the value to a user of this

09:38:08   8   technology.  Do you understand that?

09:38:10   9   A.  Yes, sir, I do.

09:38:11   10  Q.  And so if the user wanted the pop-up to go away, they

09:38:15   11  wouldn't have to wait for the screen to time out, correct?

09:38:19   12  A.  I haven't examined that feature.

09:38:21   13  Q.  Okay.  Do you know if you clicked anywhere else on the

09:38:23   14  screen if that pop-up would go away on its own?

09:38:25   15  A.  I've not examined that functionality.  Only with the --

09:38:31   16  the functions as they apply to the '654 claims as asserted.

09:38:36   17  Q.  So the way you examined it, you waited for -- in order

09:38:39   18  to get that pop-up to go away, you waited for the 15

09:38:42   19  seconds at least, and then the screen to lockout, and then

09:38:46   20  to put your lock -- your unlock code in and then for

09:38:50   21  that -- then to determine that the pop-up had gone away,

09:38:52   22  right?

09:38:52   23  A.  In that example, yes.

09:38:54   24  Q.  And that was the only example that you pointed to,

09:38:56   25  correct?

| | | |
|---|---|---|
| 09:38:56 | 1 | A.  I believe so, but I'm not sure. |
| 09:38:59 | 2 | Q.  Okay.  Let's turn to a different topic. |
| 09:39:01 | 3 | MR. AIRAN:  If I could have PDX-18-6, please. |
| 09:39:07 | 4 | Q.  (By Mr. Airan)  Would you agree that there are millions |
| 09:39:11 | 5 | of interactive features and functions that are unique on |
| 09:39:15 | 6 | modern smartphones? |
| 09:39:16 | 7 | A.  Well, from a human factors science point of view, you |
| 09:39:22 | 8 | have to be very specific about what is a feature and what |
| 09:39:25 | 9 | is an interaction behavior.  Pardon me.  One might think by |
| 09:39:37 | 10 | simply -- simple examination of a smartphone that all |
| 09:39:41 | 11 | feature -- all functions are features, but they're not. |
| 09:39:45 | 12 | From the standpoint of human factors and the |
| 09:39:49 | 13 | benefit of the '654, the '654, together, those features |
| 09:39:56 | 14 | together form an interaction behavior.  And in my field of |
| 09:39:59 | 15 | science, that is not a feature.  A feature would be an app. |
| 09:40:04 | 16 | For example, let's say TikTok would be a feature embedded |
| 09:40:07 | 17 | under the functionality of the claims as asserted by the |
| 09:40:13 | 18 | '654. |
| 09:40:13 | 19 | The '654 is a set of functions that sit on top of |
| 09:40:18 | 20 | the features that allow access to many different features. |
| 09:40:21 | 21 | Q.  Okay.  Do you have a smartphone, Mr. Mauro? |
| 09:40:23 | 22 | A.  Sure. |
| 09:40:24 | 23 | Q.  When you have a pop-up come up, do you rely on the |
| 09:40:27 | 24 | inactivity timer or screen lockup to clear out your |
| 09:40:34 | 25 | pop-ups? |

| | | |
|---|---|---|
| 09:40:34 | 1 | A.  It depends on what I'm doing.  If I get distracted then |
| 09:40:37 | 2 | I will allow it to time out, sure. |
| 09:40:40 | 3 | Q.  But, ordinarily, when you're using your smartphone, |
| 09:40:43 | 4 | would you want to wait for the lockout screen to clear a |
| 09:40:46 | 5 | pop-up? |
| 09:40:46 | 6 | A.  Well, that's completely determined by how the user |
| 09:40:49 | 7 | interacts with their phone.  And one of the things that |
| 09:40:52 | 8 | human factors science makes totally clear is that it's |
| 09:40:55 | 9 | extremely difficult to predict exact behaviors with respect |
| 09:41:00 | 10 | to how users interact with their phones.  We have billions |
| 09:41:05 | 11 | of cell phone users now, smartphone users on the planet. |
| 09:41:09 | 12 | Q.  So we talked about six of your nine problems being the |
| 09:41:12 | 13 | rapid display of information and the rapid clearance of |
| 09:41:16 | 14 | objects in order to complete a task.  Do you recall that? |
| 09:41:19 | 15 | A.  Yeah, well, that's what you've chosen to highlight. |
| 09:41:24 | 16 | But the claims of the '654 also offer other benefits which |
| 09:41:30 | 17 | are important to the usability of the device. |
| 09:41:33 | 18 | Q.  So I want to focus on rapid now. |
| 09:41:35 | 19 | A.  Sure. |
| 09:41:36 | 20 | Q.  Six of your nine problems are directed to rapid.  If |
| 09:41:40 | 21 | you wanted to rapidly use your phone, you would not wait 15 |
| 09:41:44 | 22 | seconds for a screen to go into lockout and then unlock |
| 09:41:48 | 23 | your phone in order to complete the task, right? |
| 09:41:50 | 24 | A.  No, likely you wouldn't if the task you were involved |
| 09:41:54 | 25 | in was related to a specific objective that was very |

09:41:59    1   time-dependent.  On the other hand, might have other tasks
09:42:04    2   that you're interacting with that would be appropriate to
09:42:07    3   allow that time to extend.
09:42:08    4        So when a human factors engineer looks at a use
09:42:15    5   case or how the user interacts with the phone, you always
09:42:18    6   look at a combination of frequency and criticality.  So the
09:42:22    7   criticality issue may come into play where you left the
09:42:28    8   phone time out and the frequency of selection may be, for
09:42:32    9   example, in a task like scrolling TikTok.
09:42:35   10        So you can't partition very discretely the
09:42:40   11   behavior of high-level interaction patterns like the '654
09:42:44   12   and the underlying features of something like scrolling
09:42:49   13   TikTok.
09:42:50   14   Q.  Again, if we focus on just six of your nine problems
09:42:53   15   dealing with the rapid presentation of information, a user
09:42:57   16   who wanted to use the phone in a way that solves six of
09:43:00   17   those nine problems would not want to wait 15 seconds to
09:43:04   18   clear a pop-up; isn't that correct?
09:43:07   19   A.  I don't think that's necessarily true.  It depends on
09:43:09   20   what the task is.  When you look at the design of the user
09:43:14   21   interface for these types of products and you're creating
09:43:18   22   apps, there are certain times when maybe the user is
09:43:22   23   distracted doing another task.
09:43:25   24        One of the great benefits of the modern smartphone
09:43:27   25   is that you can multi-task.  So if they started on a

09:43:32    1   procedure and then got interrupted by a phone call, then

09:43:35    2   having a timeout is fine.

09:43:39    3   Q.   Okay.  You've not offered an opinion on whether there's

09:43:41    4   any specific value associated with waiting 15 seconds for a

09:43:46    5   pop-up to be cleared, correct?

09:43:48    6   A.   I have not.

09:43:50    7   Q.   Okay.  And would you agree that the removal of pop-ups

09:43:54    8   upon expiration of the inactivity timer is not a

09:43:57    9   commercially essential feature?

09:44:00   10   A.   I absolutely would not agree with that.

09:44:02   11   Q.   That's -- you're saying -- so removal of pop-ups after

09:44:06   12   15 seconds -- are you with me -- is a commercially

09:44:10   13   essential feature?

09:44:11   14   A.   I would say that the removal -- the function of being

09:44:14   15   able to remove a pop-up after a period of time which can be

09:44:19   16   set or is determined is a feature that is in the core

09:44:27   17   functionality of the high-level operation of the modern

09:44:31   18   smartphone that can then be used to design apps that are

09:44:36   19   consistent in terms of behavior.  So from the standpoint of

09:44:39   20   usability, it's a -- it's an essential feature, yes.

09:44:44   21         Now, the essential feature question, again,

09:44:48   22   relates to what are the priorities that the user places on

09:44:53   23   their specific interaction with the phone itself.  That's

09:44:56   24   what determines, you know, on a discrete level.

09:45:00   25         That's why designing a smartphone is so difficult

09:45:03    1    because you can't predict the exact behaviors that users

09:45:08    2    are going to interact with -- with respect to the phone and

09:45:12    3    their apps and their objectives.

09:45:14    4    Q.  Mr. Mauro, my time is limited, so I'd appreciate it if

09:45:17    5    you could listen to my question and try to answer my

09:45:19    6    question.  Is that fair?

09:45:21    7    A.  Sure, yeah.

09:45:21    8    Q.  Okay.  So have you seen any evidence that -- well,

09:45:25    9    let's -- let's set the -- let's set the stage again.

09:45:29   10         What you're saying is when a user uses his phone

09:45:32   11    and a pop-up appears and it's unwanted, it goes away after

09:45:36   12    15 seconds because of the lock screen, and that's an

09:45:39   13    advantage.  Correct?

09:45:39   14    A.  That's one use case.

09:45:41   15    Q.  Okay.  Is it also a possibility that it's an advantage

09:45:43   16    to have that pop-up remain after the lockup -- lockout

09:45:50   17    screen comes into play after 15 seconds?

09:45:53   18    A.  That's a possibility.  There might be a use case where

09:45:57   19    that applies, but I can't recall one.

09:45:59   20    Q.  Okay.  So sometimes the pop-up will stay on at lockout

09:46:02   21    when you unlock the phone, and other times it will be

09:46:05   22    clear, right?

09:46:05   23    A.  I believe so.

09:46:06   24    Q.  And there's advantages to both of those use cases,

09:46:10   25    right?

09:46:10  1   A.  Yes, there is.

09:46:12  2   Q.  Have you seen any evidence in this case that the

09:46:14  3   clearance of a pop-up after a lockup screen -- lockout

09:46:17  4   screen is driving sales of any OnePlus phones?

09:46:21  5   A.  No, of course.  And you wouldn't see that because the

09:46:25  6   type of research that my clients do relates to high-level

09:46:32  7   business objectives that relate to functionality that users

09:46:36  8   find particularly important in their interaction with the

09:46:39  9   apps.

09:46:39  10          So the modern smartphone today is driven by apps.

09:46:43  11  The market research that I've seen does not look at

09:46:47  12  discrete, specific features.  It takes the whole

09:46:50  13  interaction of the phone into account and values that.

09:46:55  14  Q.  So the sales of the smartphones, as we have here up on

09:46:59  15  the screen, are driven by apps basically, right, by the

09:47:02  16  apps that are available and that you can put onto your

09:47:05  17  phone, correct?

09:47:06  18  A.  No, that's not correct.  The sale of modern smartphones

09:47:09  19  are driven overwhelmingly by the overall usability of the

09:47:13  20  device itself, the user's ability to interact with it in a

09:47:17  21  way that is consistent across many different types of

09:47:21  22  applications.  And no individual app ever drives a sale of

09:47:26  23  a smartphone, nor do groups of apps.

09:47:28  24  Q.  Nor do features, right?

09:47:30  25  A.  Apps are features.  The same -- same answer.

09:47:33   1   Q.  Okay.  Let's move to a different subject.

09:47:35   2       You are aware that Pantech has asserted more than

09:47:38   3   one patent in this case?

09:47:40   4   A.  Yes, sir, I am.

09:47:41   5   Q.  And you heard Dr. Cooklev yesterday talk about the '247

09:47:45   6   patent?

09:47:45   7   A.  Yes, sir, I have.

09:47:46   8   Q.  Did you hear Dr. Cooklev testify that forward citation

09:47:49   9   is a way of determining the value of the patent?

09:47:51   10  A.  I did hear that.

09:47:52   11  Q.  Have you performed a forward citation analysis for the

09:47:56   12  '654 patent?

09:47:56   13  A.  I have not, and that wouldn't be a common practice in

09:48:00   14  the field of human factors engineering.

09:48:02   15  Q.  Would it surprise you to learn that the '654 patent has

09:48:06   16  been cited only once by another patent?

09:48:09   17  A.  No, I wouldn't -- we don't -- as -- in the field of

09:48:14   18  human factors engineering, we don't use forward citations

09:48:17   19  as a measure of the importance of a patent or the

09:48:20   20  applicability of a patent.

09:48:22   21      Clients come to me every day with patents written

09:48:26   22  in dense legalese like '654, and they ask me very

09:48:30   23  specifically, does this patent have value in terms of human

09:48:34   24  factors engineering benefits to our product?  I do for my

09:48:37   25  clients exactly what I did for the jury.  I list the

09:48:40    1    benefits.

09:48:41    2           And under that situation, I don't proffer actual

09:48:46    3    financial impact.  That's the -- they have economists who

09:48:52    4    can do that, but I always proffer a list of benefits or

09:48:56    5    lack of benefits from the reading of the patent.

09:48:59    6    Q.  Sure.  And so, just to be clear, forward citation

09:49:02    7    analysis is a way to value patents, and you did not do that

09:49:05    8    for the '654 patent, correct?

09:49:06    9    A.  No, it's not a way to value GUI patents.  It certainly

09:49:10   10    is not.  No one in the field does that, no.  You look at

09:49:14   11    the claims, and you look at the benefits.

09:49:16   12    Q.  All right.  Fair enough.

09:49:17   13           And is there any metric that the jury could look

09:49:21   14    at to determine the value of the '654 patent, a

09:49:25   15    quantitative measurement?

09:49:27   16    A.  Well, I think you have to think about the behaviors

09:49:35   17    that the device is providing to the user and how it's

09:49:40   18    impacting their ability to use the product.  So -- well,

09:49:45   19    let me finish.

09:49:47   20           So prior to the modern smartphone, we had the flip

09:49:52   21    phones which were highly error prone and very

09:49:55   22    time-consuming to use.  And this is a feature set combined

09:49:59   23    into a behavior that improves the usability of these phones

09:50:04   24    at the core operational level -- at the high level of

09:50:08   25    Android where it makes access to apps and their

09:50:11  1   functionality possible.

09:50:13  2   Q.  So do you remember my question?

09:50:15  3   A.  Can you repeat it?

09:50:17  4   Q.  Is there a quantitative measurement that you can

09:50:20  5   present to the jury, quantitative, that would assess the

09:50:24  6   value of the '654 patent?

09:50:26  7   A.  No, there is not.

09:50:27  8   Q.  Okay.  Thank you.  Thank you for answering that

09:50:29  9   question.

09:50:30  10          You're not qualified to offer opinions about the

09:50:33  11  '247 patent that Dr. Cooklev testified about; is that

09:50:35  12  correct?

09:50:35  13  A.  No, sir.  I've not looked at that patent.

09:50:38  14  Q.  And you're only here to offer opinions about the '654

09:50:43  15  patent, correct?

09:50:43  16  A.  Yes, sir, that's correct.

09:50:44  17  Q.  Did you review any technical documents that compared

09:50:47  18  the '654 patent, about which you're testifying, to the '247

09:50:52  19  patent?

09:50:52  20  A.  No, sir, I did not.

09:50:53  21  Q.  Did you review any internal Pantech documents that

09:50:56  22  compared the '654 patent, about which you're testifying, to

09:51:01  23  the '247 patent that Dr. Cooklev testified about?

09:51:03  24  A.  No, sir, I did not.

09:51:04  25  Q.  Same question for market reports, did you review any

09:51:08    1    market reports that would compare the '654 patent to the

09:51:11    2    '247 patent?

09:51:11    3    A.   What do you mean by market reports?

09:51:14    4    Q.   Market reports that compare the '654 patent -- any type

09:51:18    5    of market report whatsoever that compared the '654 patent,

09:51:21    6    the value of it, to the '247 patent?

09:51:23    7    A.   No, sir, I didn't.

09:51:24    8    Q.   Did you review any scientific reports that compared the

09:51:28    9    value of the '654 patent to the '247 patent?

09:51:30   10    A.   No, sir.

09:51:32   11    Q.   You understand that Pantech has retained Dr. Putnam as

09:51:39   12    an economic expert?

09:51:40   13    A.   Yes, sir, I do.

09:51:42   14    Q.   And you've spoken with him; is that correct?

09:51:44   15    A.   I have spoken with Dr. Putnam, yes.

09:51:46   16    Q.   Okay.  Have you ever spoken with Dr. Putnam about the

09:51:49   17    value of the '247 patent?

09:51:51   18    A.   No, sir, I have not.

09:51:52   19    Q.   Have you ever offered or communicated any opinions

09:51:55   20    about the value of the '247 patent with respect to the '654

09:52:00   21    patent to Dr. Putnam?

09:52:01   22    A.   As a comparison?

09:52:02   23    Q.   Yes.

09:52:04   24    A.   No, sir.

09:52:04   25    Q.   You have no opinion on that point, correct?

| | | |
|---|---|---|
| 09:52:06 | 1 | A.  I do not. |
| 09:52:06 | 2 | Q.  Thank you. |
| 09:52:07 | 3 | MR. AIRAN:  Pass the witness. |
| 09:52:08 | 4 | THE COURT:  Redirect? |
| 09:52:11 | 5 | MS. KRAWICE:  Briefly, Your Honor. |
| 09:52:12 | 6 | REDIRECT-EXAMINATION |
| 09:52:12 | 7 | BY MS. KRAWICE: |
| 09:52:17 | 8 | Q.  Mr. Mauro, is the functionality in the video that was |
| 09:52:20 | 9 | shown in your opinion an example of the claimed invention? |
| 09:52:23 | 10 | A.  No, it's not.  The video that -- the animation that I |
| 09:52:29 | 11 | have is a more accurate depiction of the -- of the product. |
| 09:52:34 | 12 | Q.  I believe you may be confused. |
| 09:52:37 | 13 | MS. KRAWICE:  Mr. Ebersole, can you pull up the |
| 09:52:39 | 14 | last slide of... |
| 09:52:47 | 15 | A.  Oh, excuse me, I thought you meant the video showed by |
| 09:52:51 | 16 | counsel. |
| 09:52:55 | 17 | Q.  (By Ms. Krawice)  Mr. Mauro, this slide was derived |
| 09:52:59 | 18 | from the videos that counsel showed you, correct? |
| 09:53:02 | 19 | A.  I believe so, yes. |
| 09:53:03 | 20 | Q.  And this functionality was shown in your opinion as an |
| 09:53:08 | 21 | example of the claimed invention? |
| 09:53:09 | 22 | A.  Yes, -- yes, ma'am, it was. |
| 09:53:12 | 23 | MS. KRAWICE:  No further questions. |
| 09:53:14 | 24 | MR. AIRAN:  No recross, Your Honor. |
| 09:53:15 | 25 | THE COURT:  All right.  You may step down. |

| | | |
|---|---|---|
| 09:53:27 | 1 | All right.  Plaintiffs may call their next |
| 09:53:29 | 2 | witness. |
| 09:53:34 | 3 | MS. KRAWICE:  At this time, Pantech calls Yori |
| 09:53:38 | 4 | Xiao by video deposition. |
| 09:53:38 | 5 | YORI XIAO, PLAINTIFFS' WITNESS |
| 09:53:38 | 6 | PRESENTED BY VIDEO DEPOSITION |
| 09:53:38 | 7 | (Videoclip played.) |
| 09:54:12 | 8 | Q.  Good morning, Mr. Xiao.  Would you please state your |
| 09:54:18 | 9 | name for the record? |
| 09:54:18 | 10 | A.  Yori Xiao. |
| 09:54:19 | 11 | Q.  Who is your employer? |
| 09:54:21 | 12 | A.  OnePlus. |
| 09:54:22 | 13 | Q.  What is your title at OnePlus? |
| 09:54:25 | 14 | A.  Senior IP attorney or counsel. |
| 09:54:25 | 15 | Q.  And what is your role as senior IP attorney at OnePlus? |
| 09:54:29 | 16 | A.  Okay.  So my responsibilities are mainly categorized in |
| 09:54:32 | 17 | three areas.  First is license or -- license or |
| 09:54:40 | 18 | permit-related.  That means if a claim -- a person who asks |
| 09:54:46 | 19 | for the claim or my license, like a Pantech -- Pantech, the |
| 09:54:51 | 20 | companies like Pantech would like to obtain a claim, and |
| 09:54:55 | 21 | then I would negotiate with the other party on the |
| 09:55:01 | 22 | license-related issue on behalf of Pantech -- on behalf of |
| 09:55:08 | 23 | OnePlus. |
| 09:55:09 | 24 | The second part is -- is involved in litigation, |
| 09:55:18 | 25 | especially in patent litigations, and, for instance, with |

09:55:20    1    the U.S. and India and Spain, if any litigations occurred,

09:55:28    2    I would work with the external counsels as an internal

09:55:37    3    counsel as well as our internal employees to work on those

09:55:40    4    litigations.

09:55:41    5    Q.  And then the third part is the daily -- day-to-day job

09:55:50    6    responsibility involving the policy study and internal

09:55:57    7    employee IP awareness training and education.  So this is

09:56:05    8    the third part.

09:56:06    9         And among all three parts of the responsibilities,

09:56:10   10    the first part, which is license-related responsibility, is

09:56:15   11    the -- it takes more -- takes the most amount.  That is my

09:56:24   12    answer.

09:56:24   13    Q.  ███████████████████████████████████████████████

09:56:27   14    ███████████████████████████████████

09:56:31   15    A.  ████████████████████████████████

09:56:38   16    ████████████████████████████████████████████████████

09:56:42   17    ██████████████████████████████████████████████████

09:56:50   18    █████████████████   ██████████████████████████████

09:56:57   19    ███████████████████████████████████████████

09:57:03   20    ███████████

09:57:04   21       ████████████████████████████████████

09:57:13   22    ████████████████████████████████████████████████████

09:57:17   23    ████████████████████████

09:57:22   24         (Videoclip ends.)

09:57:28   25         MS. KRAWICE:  I'd just like to read a couple of

09:57:29   1   stipulations into the record at this time.

09:57:31   2          THE COURT:  All right.  Does that complete the

09:57:32   3   video?

09:57:32   4          MS. KRAWICE:  Yes, Your Honor.

09:57:33   5          THE COURT:  All right.  And have you all allocated

09:57:35   6   between the Plaintiffs and the Defendant how much time is

09:57:39   7   to be allotted to each?

09:57:41   8          MS. KRAWICE:  Yes.  That's actually fully our

09:57:44   9   time.

09:57:44  10          THE COURT:  Okay.  All of that is Pantech time.

09:57:47  11          MS. KRAWICE:  Yes.

09:57:47  12          THE COURT:  All right.  Very good.

09:57:48  13          MS. KRAWICE:  Got to start the stopwatch at some

09:57:51  14   point.

09:57:51  15          THE COURT:  All right.  Good enough.

09:57:53  16          MS. KRAWICE:  I'll just continue reading some

09:57:54  17   stipulations.  There's a lot of numbers.  I'm going to try

09:57:57  18   to go slow here.

09:57:58  19          With respect to the '839 patent, licensable sales

09:58:02  20   of the accused products began on January 21st, 2021, which

09:58:07  21   is the date on which Pantech gave notice to OnePlus.

09:58:10  22          The licensable sales revenue base of the accused

09:58:15  23   products with respect to the '839 patent is $1,251,157,275.

09:58:29  24          With respect to the '247 patent, licensable sales

09:58:33  25   of the accused products began on July 9th, 2021, which is

| | | |
|---|---|---|
| 09:58:37 | 1 | the date on which Pantech gave notice to OnePlus. |
| 09:58:39 | 2 | The licensable sales revenue base of the accused |
| 09:58:44 | 3 | products with respect to the '247 patent is $889,723,598. |
| 09:58:56 | 4 | With respect to the '954 and '654 patents, |
| 09:59:01 | 5 | licensable sales of the accused products began on June 3rd, |
| 09:59:06 | 6 | 2022, which is the date Pantech filed the complaint in this |
| 09:59:09 | 7 | action. |
| 09:59:09 | 8 | The licensable sales revenue base of the accused |
| 09:59:13 | 9 | products with respect to the '954 patent is $294,551,910. |
| 09:59:26 | 10 | The licensable sales revenue base of the accused |
| 09:59:30 | 11 | products with respect to the '654 patent is $392,511,428. |
| 09:59:43 | 12 | That's all. |
| 09:59:45 | 13 | THE COURT:  Very good.  Thanks. |
| 09:59:46 | 14 | All right.  And that was stipulated to between the |
| 09:59:49 | 15 | parties? |
| 09:59:50 | 16 | MS. KRAWICE:  Yes, Your Honor. |
| 09:59:50 | 17 | THE COURT:  All right.  Okay.  I think before we |
| 09:59:52 | 18 | take the next witness, now would be a good time for us to |
| 09:59:55 | 19 | take our morning break just a few minutes early.  So we'll |
| 09:59:59 | 20 | be in recess about 15 minutes. |
| 10:00:01 | 21 | COURT SECURITY OFFICER:  All rise. |
| 10:04:19 | 22 | (Recess.) |
| 10:04:20 | 23 | (Jury out.) |
| 10:04:20 | 24 | COURT SECURITY OFFICER:  All rise. |
| 10:21:27 | 25 | THE COURT:  Mr. Grigsby, if you would have the |

| | | |
|---|---|---|
| 10:21:37 | 1 | jury brought down. |
| 10:22:01 | 2 | (Jury in.) |
| 10:22:01 | 3 | THE COURT:  Please be seated. |
| 10:22:23 | 4 | At this time, the Plaintiffs may call their next |
| 10:22:27 | 5 | witness. |
| 10:22:28 | 6 | MR. TIDWELL:  May it please the Court. |
| 10:22:33 | 7 | Your Honor, Plaintiffs call Dr. Jonathan Putnam. |
| 10:22:46 | 8 | (Witness sworn.) |
| 10:22:59 | 9 | THE COURT:  You may have a seat. |
| 10:23:14 | 10 | MR. TIDWELL:  May I proceed, Your Honor? |
| 10:23:16 | 11 | THE COURT:  You may. |
| 10:23:17 | 12 | JONATHAN PUTNAM, PH.D., PLAINTIFFS' WITNESS, SWORN |
| 10:23:17 10:23:17 | 13 | DIRECT EXAMINATION |
| 10:23:18 | 14 | BY MR. TIDWELL: |
| 10:23:18 | 15 | Q.  Good morning. |
| 10:23:22 | 16 | A.  Good morning. |
| 10:23:23 | 17 | Q.  If you would, Dr. Putnam, state your full name. |
| 10:23:26 | 18 | A.  My name is Jonathan Douglas Putnam. |
| 10:23:26 | 19 | Q.  What is your occupation? |
| 10:23:31 | 20 | A.  I'm an economist. |
| 10:23:31 | 21 | Q.  If you would, tell the jury a little bit about your |
| 10:23:33 | 22 | educational background. |
| 10:23:33 | 23 | A.  Sure.  I graduated from high school in Seattle, |
| 10:23:38 | 24 | Washington, at the public school.  My parents were |
| 10:23:41 | 25 | teachers. |

| | | |
|---|---|---|
| 10:23:42 | 1 | For college, I went to Yale University.  I studied |
| 10:23:45 | 2 | agricultural economics and wrote my senior thesis on |
| 10:23:53 | 3 | improving crop yields in agriculture. |
| 10:23:57 | 4 | I then worked at Yale for several years on a |
| 10:24:00 | 5 | project designed to measure the output of agricultural |
| 10:24:07 | 6 | experiment output stations, like the one in College |
| 10:24:09 | 7 | Station. |
| 10:24:09 | 8 | Reenrolled at Yale as a graduate student, received |
| 10:24:13 | 9 | my master's degree in economics, and then eventually |
| 10:24:14 | 10 | received my Ph.D. on the economics of the patent system. |
| 10:24:18 | 11 | Q.  How did -- how did you transition from agricultural |
| 10:24:27 | 12 | economics to studying patents? |
| 10:24:28 | 13 | A.  Well, I've always been interested in how you get more |
| 10:24:32 | 14 | out of something, how you improve something.  So in |
| 10:24:36 | 15 | agriculture, that means how you increase crops yields, how |
| 10:24:39 | 16 | you get more crops per acre. |
| 10:24:40 | 17 | But it really applies to a wide variety of fields, |
| 10:24:42 | 18 | like how do you get better gas mileage out of a car or how |
| 10:24:45 | 19 | do you make a safer drug.  And the way you do that is you |
| 10:24:50 | 20 | invest in R&D.  You have to learn about the thing you're |
| 10:24:53 | 21 | studying and how to get more output per unit of input. |
| 10:24:57 | 22 | And reason you invest in R&D -- or the way you |
| 10:24:59 | 23 | invest in R&D is because the patent system offers you a |
| 10:25:02 | 24 | reward for doing that. |
| 10:25:03 | 25 | So when you invest in R&D, you get a patent, you |

10:25:06  1  get an invention, and that allows you to prevent other

10:25:10  2  people from copying your invention, and so you get a return

10:25:13  3  on your investment.  And I wanted to understand how the

10:25:17  4  patent system induced people to invest in R&D in a wide

10:25:22  5  variety of fields, not just agriculture.

10:25:24  6  Q.  After you graduated with a Ph.D., just take the jury

10:25:26  7  forward as far as your education -- your work experience,

10:25:32  8  I'm sorry.

10:25:32  9  A.  Sure.  So after my Ph.D., I joined a firm called

10:25:36  10  Charles River Associates which is located in Boston near

10:25:40  11  where I live.  And there, I worked on merger analysis.

10:25:44  12          So when two firms come together, they have to

10:25:48  13  explain to the Government why they should be allowed to

10:25:50  14  merge, and that requires a whole bunch of Government

10:25:54  15  filings and that sort of thing.  I did that for a few

10:25:56  16  years.

10:25:56  17          And I continued to work as an expert witness in

10:26:00  18  trials like this one.

10:26:01  19          Then I was promoted to vice president of that

10:26:06  20  consulting firm and became a professor at the University of

10:26:09  21  Toronto in the law school there.  They had a chair in the

10:26:13  22  law and economics of intellectual property, which was

10:26:16  23  really the field that I specialized in.

10:26:18  24          So I was at the University of Toronto for five

10:26:21  25  years.  Returned back to Charles River Associates at the

10:26:25   1   end of that time.  And then in 2012, I formed my own

10:26:29   2   consulting firm called Competition Dynamics.  And that's

10:26:32   3   where I'm employed today.

10:26:34   4   Q.  What would you describe as your area of expertise in

10:26:40   5   economics?

10:26:41   6   A.  It's really the economics of intellectual property.  I

10:26:43   7   focus on the patent system, and so anything having to do

10:26:47   8   with the patents, copyright, trade secrets, trademark, what

10:26:53   9   economists call intangible rights, the value of those

10:26:57  10   things and how you determine their value in the marketplace

10:26:59  11   is what I do.

10:27:00  12   Q.  Have you ever testified in a case where the patent or

10:27:04  13   the patents at issue were standard essential patents or

10:27:09  14   essential to a standard?

10:27:10  15   A.  Yes.  I've worked on many of those cases, maybe 30 or

10:27:14  16   35 times.

10:27:15  17   Q.  Okay.  Have you testified not only in the U.S. but

10:27:19  18   elsewhere on standard essential patents?

10:27:23  19   A.  Yes, I've testified in the U.K., Germany, India, China,

10:27:31  20   Singapore, really around the world.

10:27:33  21   Q.  In this case, Dr. Putnam, what were you asked to do

10:27:40  22   to -- as far as your work project?  What was asked of you

10:27:44  23   to do?

10:27:45  24   A.  Well, this case is relatively simple in the following

10:27:48  25   sense:  There's -- there's four patents at issue in this

| | | |
|---|---|---|
| 10:27:50 | 1 | case.  And OnePlus has told us how many infringing sales it |
| 10:27:57 | 2 | has made or how many sales it's made that infringe each one |
| 10:28:00 | 3 | of those patents. |
| 10:28:02 | 4 | So what we really have to do in this case is find |
| 10:28:04 | 5 | a royalty rate for each one of those patents and then |
| 10:28:09 | 6 | multiply it by the sales that OnePlus has told us, in order |
| 10:28:12 | 7 | to determine the total damages that OnePlus should pay to |
| 10:28:16 | 8 | Pantech for its infringement. |
| 10:28:19 | 9 | Q.  So before you reached that conclusion or before you're |
| 10:28:25 | 10 | able to make that decision, can you give the jury some |
| 10:28:30 | 11 | examples of materials that you would look at, things that |
| 10:28:33 | 12 | you would do before you reach your conclusion? |
| 10:28:36 | 13 | A.  Sure.  There's a wide variety of documents that are at |
| 10:28:40 | 14 | issue -- produced in this case, as in every case.  There's |
| 10:28:44 | 15 | a complaint and an answer.  The parties have to answer |
| 10:28:47 | 16 | questions back and forth to each other.  Of course, I pay |
| 10:28:51 | 17 | special attention to the economic documents, like sales |
| 10:28:54 | 18 | documents and the way the products are marketed, which ones |
| 10:28:58 | 19 | infringe which patents, when they were sold, that sort of |
| 10:29:02 | 20 | thing. |
| 10:29:02 | 21 | The most important category of documents that's |
| 10:29:04 | 22 | produced in a case like this is the licenses because the |
| 10:29:08 | 23 | licenses tell you how much people pay for technology that |
| 10:29:13 | 24 | is used in the products that OnePlus sells and that Pantech |
| 10:29:17 | 25 | licenses.  And so we're going to pay most of our attention |

| | | |
|---|---|---|
| 10:29:20 | 1 | to the license documents. |
| 10:29:21 | 2 | Q.  Let's work a little backwards if you don't mind. |
| 10:29:31 | 3 | Have you, after considering all the things you've |
| 10:29:33 | 4 | just talked about, have you reached an opinion as to the |
| 10:29:36 | 5 | appropriate amount of damages? |
| 10:29:37 | 6 | A.  Yes. |
| 10:29:40 | 7 | Q.  And did you prepare a PowerPoint presentation that you |
| 10:29:45 | 8 | believe would assist the jury in understanding your |
| 10:29:49 | 9 | testimony? |
| 10:29:49 | 10 | A.  I did. |
| 10:29:50 | 11 | MR. TIDWELL:  Okay.  Let's put up Slide No. 2. |
| 10:29:54 | 12 | Q.  (By Mr. Tidwell)  Looking at PDX-6.2, can you explain |
| 10:30:01 | 13 | this calculation to the jury? |
| 10:30:03 | 14 | A.  Yes.  So I mentioned that there were four patents at |
| 10:30:06 | 15 | issue in this case.  Three of them are what are called |
| 10:30:09 | 16 | SEPs, or standard essential patents.  You have to use them |
| 10:30:13 | 17 | in order to sell a phone.  And one of them is an NEP, or |
| 10:30:16 | 18 | non-essential patent. |
| 10:30:17 | 19 | The damages for the three essential patents shown |
| 10:30:22 | 20 | on the top line are $836,591. |
| 10:30:26 | 21 | The damages for the non-essential patent, the |
| 10:30:29 | 22 | '654, are $294,383. |
| 10:30:35 | 23 | For a total of $1,130,974, based on the existing |
| 10:30:42 | 24 | licenses. |
| 10:30:43 | 25 | Q.  Okay.  And that's -- that's the calculations that you |

| | | |
|---|---|---|
| 10:30:47 | 1 | actually made, correct? |
| 10:30:49 | 2 | A.  That's right. |
| 10:30:49 | 3 | Q.  Let's look at Slide 3. |
| 10:30:53 | 4 | And if you would, sort of take us through what you |
| 10:30:57 | 5 | did to ultimately reach your opinions. |
| 10:31:02 | 6 | A.  Yes, so it's really a five-step process, and we'll go |
| 10:31:05 | 7 | through them briefly here, and then obviously implement |
| 10:31:07 | 8 | each one of the steps. |
| 10:31:09 | 9 | So the first step is valuing a license or what |
| 10:31:14 | 10 | we're trying to do is imagine that instead of being in |
| 10:31:17 | 11 | court here, that Pantech and OnePlus had negotiated a |
| 10:31:21 | 12 | license for the right to use Pantech's patents.  That's |
| 10:31:25 | 13 | sometimes called a hypothetical license because it didn't |
| 10:31:28 | 14 | really exist.  If it did exist, there wouldn't be a |
| 10:31:31 | 15 | lawsuit. |
| 10:31:32 | 16 | So it's like valuing a house where you don't know |
| 10:31:35 | 17 | the value, you have to look at similar houses and see how |
| 10:31:37 | 18 | they sell in the marketplace. |
| 10:31:41 | 19 | So the key part of that process is picking things |
| 10:31:43 | 20 | that are comparable.  So the first step is to select |
| 10:31:46 | 21 | licenses that are comparable to the hypothetical license |
| 10:31:52 | 22 | between the parties. |
| 10:31:52 | 23 | Q.  Okay.  And then just keep walking us through Step |
| 10:31:58 | 24 | No. 2. |
| 10:31:58 | 25 | A.  Sure.  So once you have the licenses, then you have to |

10:32:01  1  determine how much people paid in the marketplace for

10:32:04  2  Pantech's entire portfolio of patents; in other words, how

10:32:07  3  much did the house sell for in the real world.

10:32:10  4  Q.  Okay.  And after that, what would you look for?

10:32:12  5  A.  Well, so a portfolio of patents is an entire collection

10:32:15  6  of patents, and that's how firms like Pantech and OnePlus

10:32:21  7  negotiate for the right to use patents in the marketplace.

10:32:24  8        But in this case, we're not negotiating over an

10:32:27  9  entire portfolio.  We're only negotiating over four patents

10:32:31  10  within the portfolio.

10:32:32  11        So, obviously, you don't get the entire value of

10:32:35  12  your portfolio.  You only get the value of those four

10:32:38  13  patents in the portfolio.  So we've got to find shares of

10:32:42  14  the portfolio that are attributable to the three SEPs and

10:32:45  15  the one NEP.

10:32:47  16  Q.  Let me pause here for a minute.

10:32:49  17        So for No. 2, you're trying to identify like a

10:32:55  18  portfolio rate; is that right?

10:32:56  19  A.  Yes, that's -- yes, exactly.  A portfolio is the

10:33:00  20  collection of all the patents.

10:33:01  21  Q.  And because we don't have that full collection, we have

10:33:06  22  four patents in this case --

10:33:10  23        MR. FILBIN:  Objection, leading.

10:33:13  24        THE COURT:  Is there an objection?

10:33:14  25        MR. FILBIN:  Yes, Your Honor.  Leading.

10:33:17   1          THE COURT:  Why don't you just rephrase the
10:33:18   2   question?
10:33:19   3          MR. TIDWELL:  Okay.
10:33:20   4   Q.  (By Mr. Tidwell)  Why is -- I'm trying to understand
10:33:22   5   the importance of No. 3.  Once you have the portfolio rate,
10:33:27   6   what's the importance of getting the royalty rate for the
10:33:31   7   patents that are in this lawsuit?
10:33:32   8   A.  Well, anytime that you have a rate for a whole thing
10:33:40   9   but you only have to pay for part of that thing, then
10:33:43   10  you've got to figure out how to shrink it down.
10:33:45   11         So if I tell you the rate for a hotel room for an
10:33:48   12  entire week but you're only using it for three days, then
10:33:52   13  we have to shrink that rate down just for the three days
10:33:55   14  you're actually going to be in the hotel.
10:33:57   15         So in the same way here, we've got an entire
10:34:02   16  portfolio of patents that Pantech has.  For example,
10:34:05   17  they've got over 30 standard essential patents that people
10:34:08   18  pay for, but there's only three of them that are at issue
10:34:11   19  in this case.
10:34:11   20         So we have to shrink that down and figure out how
10:34:15   21  much should OnePlus pay for the three patents that are
10:34:20   22  actually at issue in this case, and the same thing for the
10:34:23   23  one NEP in this case.
10:34:24   24  Q.  Let's look at the next question you're trying to
10:34:27   25  answer, which is No. 4.  Can you explain that one to us?

10:34:31  1   A.  Sure.  Well, that's actually the easy part of this.

10:34:35  2   Because, remember, as we discussed previously, Pantech has

10:34:39  3   told us for each one of the patents how much it actually

10:34:43  4   sold.  It ranges from a few hundred million dollars to over

10:34:49  5   a billion dollars, depending on the patent.

10:34:51  6        So we need a royalty rate for each one of the

10:34:54  7   individual patents.  We're going to multiply that royalty

10:34:58  8   rate by the sales for each patent that infringe, and that

10:35:03  9   comes up with damages.  We add it together, and then that's

10:35:06  10  the check that OnePlus has to write to Pantech.

10:35:11  11  Q.  Okay.  And what's the next step, No. 5?  Can you

10:35:15  12  explain that to us?

10:35:17  13  A.  Sure.  So one of the things that's true -- it's

10:35:20  14  important to understand about these proceedings -- is that

10:35:22  15  we're going to be working from real-world licenses.  And in

10:35:25  16  a real-world license, no one knows in a real-world license

10:35:29  17  whether the patents are actually valid and infringed.

10:35:32  18        So we work out a deal and you tell me that you've

10:35:36  19  got a valid patent and you're going to sue me.  And I say,

10:35:40  20  well, I don't want you to sue me, but I also think there's

10:35:43  21  reasons why your patent might not be valid and infringed.

10:35:46  22  And so I'm going to ask you to offer me a discount because

10:35:49  23  you might be wrong.  I'm not going to pay the full rate

10:35:52  24  because I don't know your patent is valid and infringed.

10:35:55  25        So in the real world, licenses reflect a discount

| | | |
|---|---|---|
| 10:35:57 | 1 | that reflect uncertainty about whether a patent is valid |
| 10:36:00 | 2 | and infringed.  And that's true for every license. |
| 10:36:02 | 3 | Now, what's different about these proceedings is |
| 10:36:05 | 4 | that it's been determined that the patent -- Pantech |
| 10:36:09 | 5 | patents that are at issue in this case are, in fact, valid |
| 10:36:12 | 6 | and infringed.  No license had the benefit of that |
| 10:36:17 | 7 | knowledge.  But we in court here have the benefit of |
| 10:36:20 | 8 | knowing that these patents are valid and infringed. |
| 10:36:23 | 9 | So you pay more, if you know the patent is valid |
| 10:36:26 | 10 | and infringed, than if you don't know it's valid and |
| 10:36:29 | 11 | infringed.  So the last step is to increase the payment for |
| 10:36:33 | 12 | the fact that we're in court -- |
| 10:36:35 | 13 | MR. FILBIN:  Objection, Your Honor. |
| 10:36:36 | 14 | A.  -- having -- |
| 10:36:37 | 15 | THE COURT:  Hold on. |
| 10:36:38 | 16 | THE WITNESS:  I'm sorry. |
| 10:36:39 | 17 | THE COURT:  What's the objection? |
| 10:36:40 | 18 | MR. FILBIN:  Can we sidebar, please? |
| 10:36:46 | 19 | THE COURT:  Yes. |
| 10:36:47 | 20 | (Bench conference.) |
| 10:36:55 | 21 | MR. FILBIN:  Your Honor, the testimony is coming |
| 10:36:59 | 22 | in as not -- you may, it's a you are.  It should all be |
| 10:37:02 | 23 | stricken. |
| 10:37:03 | 24 | THE COURT:  I think that's what we agreed to. |
| 10:37:06 | 25 | MR. TIDWELL:  Yeah, I wasn't trying to get -- I |

10:37:08   1   can clean it up.  I mean...

10:37:11   2          THE COURT:  Okay.  You'll need to.

10:37:13   3          MR. TIDWELL:  Okay.

10:37:19   4          (Bench conference concluded.)

10:37:23   5   Q.  (By Mr. Tidwell)  Dr. Putnam, just to clean something

10:37:27   6   up, this last category is something that a jury can make an

10:37:34   7   adjustment but is not required to make an adjustment; is

10:37:34   8   that fair?

10:37:37   9   A.  Well, if you're asking me if it's a legal requirement,

10:37:40   10  then the answer is no.  It's a financial requirement in the

10:37:43   11  same way that if you know land has oil on it --

10:37:45   12         MR. FILBIN:  Your Honor, objection.  Move to

10:37:49   13  strike.

10:37:49   14         THE COURT:  Yeah, I'm going to strike that.  I'll

10:37:54   15  strike that answer and instruct the jury to disregard it.

10:37:59   16  Q.  (By Mr. Tidwell)  Let me try and rephrase it.

10:38:01   17         From the standpoint of the questions that are

10:38:04   18  asked to the jury, is it -- you understand that is an

10:38:09   19  option that the jury can add, correct?

10:38:14   20  A.  Sure.

10:38:16   21  Q.  Okay.  Let me -- let's move from beyond the steps to

10:38:34   22  discuss some of the guidelines that you as an economist

10:38:41   23  have to operate under.  And what I'd like to do is look at

10:38:44   24  Slide No. 8, and let's discuss what's called this

10:38:54   25  hypothetical license.

10:38:55   1         And, if you can, explain to the jury why this is

10:38:59   2  even relevant or why it's important.

10:39:00   3  A.  Well, you've heard the idea that patents are analogous

10:39:06   4  to valuing a house or getting a house appraisal.  And so

10:39:09   5  when you get a house appraisal, you write down certain

10:39:12   6  characteristics of the house, and then you try to find

10:39:14   7  other houses that are like your house.

10:39:16   8         Like if it's a four-bedroom house, then you look

10:39:19   9  for other four-bedroom houses.  And if it's located in

10:39:22  10  Texarkana, then you look for houses in Texarkana and that

10:39:25  11  sort of thing.

10:39:25  12         So we're looking for characteristics of the

10:39:28  13  license between Pantech and OnePlus, and then we're going

10:39:31  14  to look for other licenses in the real world that have the

10:39:34  15  same characteristics.

10:39:35  16         So on the slide that I've shown right here are

10:39:39  17  nine characteristics that are true of the hypothetical

10:39:45  18  license between Pantech and OnePlus and that should also be

10:39:48  19  true of the actual licenses that we're going to be

10:39:53  20  examining to determine which of those licenses are

10:39:54  21  comparable.

10:39:56  22  Q.  So on the far left, you have something called technical

10:40:01  23  comparability and economic comparability.  Can you explain

10:40:07  24  the difference in those two to the jury?

10:40:10  25  A.  Yes.  So for a license to be useful, it has to be

10:40:13  1  useful in two broad categories.

10:40:15  2          One is it's got to convey the rights to the same

10:40:19  3  or similar technology.  Because if the technology is

10:40:22  4  different, then you can't learn anything from the price in

10:40:25  5  the license.  So that is technically -- technical

10:40:29  6  comparability.

10:40:30  7          And then you have to look at the economic

10:40:32  8  circumstances that the parties are involved in, as well as

10:40:34  9  the terms of the license.  And those have to be comparable

10:40:38 10  also.

10:40:38 11          So we have these two broad categories, and then

10:40:42 12  we'll go through the individual details to make sure that

10:40:44 13  the actual licenses conform to the hypothetical license.

10:40:50 14  Q.  So let's start with the first one.  It says standards.

10:40:52 15  What is it that -- as you're looking for comparable

10:40:56 16  licenses, what about the standards is it that you're

10:40:59 17  looking for?

10:41:00 18  A.  Well, the Pantech products that are at issue in this

10:41:03 19  case and the -- I mean, the Pantech patents that are at

10:41:06 20  issue in this case and the OnePlus products are products

10:41:10 21  that practice the LTE or 4G and the 5G standards.

10:41:16 22          So those are standards that are used so that

10:41:19 23  phones can talk to each other.  It wouldn't do any good to

10:41:22 24  look at an earlier generation license because that wouldn't

10:41:26 25  tell us about the correct standards.

10:41:28    1    Q.  If I'm understanding, are you looking for standards

10:41:33    2    that's 2G?

10:41:34    3    A.  No.  So, for example, the iPhone when it originally

10:41:37    4    came out in 2007 was a 2G device.  The licenses covering

10:41:45    5    the iPhone wouldn't be useful to us today in analyzing

10:41:50    6    OnePlus's 4 and 5G use of Pantech's 4 and 5G patents.

10:41:55    7    Q.  The next category under technical comparability, it

10:42:00    8    says licensed patents.  What's the purpose of that?

10:42:05    9    A.  Well, again, we're looking for licenses where the --

10:42:10   10    one of two things is true, either the licensor, the person

10:42:13   11    who did the licensing, actually owned the same patents that

10:42:17   12    are at issue in this case, the four patents, or they own

10:42:20   13    patents that are similar enough that we can say, well, we

10:42:23   14    can learn something about the value of the technology even

10:42:26   15    though it's not identically the same.

10:42:30   16    Q.  Let's move over to economic comparability.  And I want

10:42:36   17    to spend a little time on this slide because I think what

10:42:40   18    you're -- what's happening here is you're setting up sort

10:42:43   19    of the comparability if you were looking for houses.  Is

10:42:49   20    that fair?

10:42:50   21            MR. FILBIN:  Objection, leading.

10:42:52   22            THE COURT:  I'll sustain that.

10:42:55   23    Q.  (By Mr. Tidwell)  What I'd like to do, if you don't

10:42:56   24    mind, is spend a little time looking at this slide because

10:43:03   25    I think it will be important.  So I'm going to ask you some

10:43:07    1    more questions about it, okay?

10:43:08    2    A.   Sure.

10:43:08    3    Q.   Can you explain under the economic comparability the

10:43:12    4    importance of having something identified as patent

10:43:17    5    licensor?

10:43:18    6    A.   Sure.   Remember, in the -- our overall goal is to say

10:43:24    7    how much should OnePlus pay for Pantech's patents.   Okay.

10:43:30    8         So in that hypothetical license, Pantech is the

10:43:35    9    licensor and OnePlus is the licensee.   And so in trying to

10:43:37    10   figure out that explanation, we want to look for other

10:43:40    11   licenses ideally where Pantech is the licensor because what

10:43:46    12   people behave similarly from contract to contract.

10:43:50    13        And so if you want to say a license is comparable,

10:43:53    14   we want to look for licenses where Pantech has already

10:44:00    15   licensed its patents.   And we're going to assume that it

10:44:03    16   would do the same thing when it's licensing with OnePlus.

10:44:06    17   In fact, as it turns out, it's obligated to do that.

10:44:08    18   Q.   When you identified the licensor, can you identify the

10:44:14    19   two entities that you said that you were looking for?

10:44:17    20   A.   Yes.   The two entities are Pantech Corp and Pantech

10:44:23    21   Wireless, and that is distinguished from earlier versions

10:44:26    22   of Pantech -- we heard some about this yesterday --

10:44:31    23   Pantech, Inc., which is what's called a predecessor, and

10:44:36    24   Pantech Co or Company Limited, which is an even earlier

10:44:41    25   predecessor.

10:44:42   1              So we're going to be focused ideally on finding

10:44:45   2    licenses where Pantech Corp and Pantech Wireless, the folks

10:44:49   3    who are actually sitting in this courtroom, were the

10:44:51   4    licensors.

10:44:54   5    Q.  What about the payment structure, can you explain what

10:44:57   6    you mean by running royalty?

10:45:03   7    A.  Yes.  As a broad category, there's two types of

10:45:06   8    licenses.  There's a running royalty license where you've

10:45:08   9    got to pay for every phone that you sell.  You pay a

10:45:11  10    royalty for the use of the technology.  And then there's

10:45:13  11    lump-sum licenses where you pay a fixed fee, and then you

10:45:17  12    can sell as many phones as you want.

10:45:20  13              Like when you go to a restaurant, you can either

10:45:23  14    pay a-la-carte, you pay for every single item on the menu

10:45:28  15    or you pay for a buffet, you pay a fixed amount and you can

10:45:31  16    order off the buffet as much as you want and go back as

10:45:37  17    many times as you want.

10:45:38  18              We're looking for a running royalty license

10:45:39  19    because OnePlus has to pay for every single phone that it

10:45:44  20    sold for every patent that it used.  And so that's going to

10:45:47  21    be the easiest way to measure the damages that OnePlus

10:45:50  22    should pay to Pantech.

10:45:51  23    Q.  What about the geographic scope, what's the

10:45:55  24    significance of having a limitation on that?

10:45:57  25    A.  Well, the only point is we want to look for licenses

| | | |
|---|---|---|
| 10:46:04 | 1 | where there were U.S. patent rights conveyed.  We don't |
| 10:46:07 | 2 | want to look for what they paid in France or Uganda where |
| 10:46:11 | 3 | they might have different patent rights, so we're going to |
| 10:46:14 | 4 | look for U.S. licenses. |
| 10:46:16 | 5 | Q.  Can you explain what you mean by license type?  When |
| 10:46:21 | 6 | you say one-way, bare patent license, what does that mean? |
| 10:46:27 | 7 | A.  Sure.  Licenses sound like they could be simple.  Like |
| 10:46:30 | 8 | I sell a phone, I pay you a dollar.  But licenses can |
| 10:46:35 | 9 | actually be complicated. |
| 10:46:40 | 10 | So, for example, it's often the case that we'll |
| 10:46:42 | 11 | enter into a deal where we're both selling phones, we both |
| 10:46:46 | 12 | have patents, and we have to pay each other money.  That's |
| 10:46:50 | 13 | called a cross-license. |
| 10:46:51 | 14 | But in a cross-license, it's hard to figure out |
| 10:46:54 | 15 | how much is being paid from one side to the other, because |
| 10:46:57 | 16 | all you see is the net that they're paying each other.  So |
| 10:46:57 | 17 | that's confusing. |
| 10:47:00 | 18 | Other times, when people are entering into a |
| 10:47:03 | 19 | license, it's costly to negotiate and they do it as part of |
| 10:47:06 | 20 | a larger deal.  Maybe they're selling patents or maybe |
| 10:47:09 | 21 | there's technical collaboration between them.  They're |
| 10:47:12 | 22 | learning know-how or they're exchanging other things. |
| 10:47:15 | 23 | So we're looking ideally for those licenses that |
| 10:47:18 | 24 | are one-way, the patents are only going one way and the |
| 10:47:21 | 25 | money is only going the other way, and there's no other |

10:47:24    1    side deals or complications involving other payments that

10:47:30    2    make it hard to figure out what's the royalty per patent

10:47:34    3    that's being paid.

10:47:37    4    Q.  Okay.  The licensed product, it says handsets.  I think

10:47:41    5    we know, I just want to make sure.  What is that?

10:47:43    6    A.  A handset is just another common word for a smartphone.

10:47:47    7    Q.  Okay.  And the negotiation circumstances, it says fair

10:47:53    8    market value.  Can you explain that?

10:47:54    9    A.  Yes.  So as an economist, I want to focus on the real

10:48:02   10    world, what do people actually do in the real world.

10:48:05   11         But just because something occurs in the real

10:48:08   12    world doesn't mean that it's fair market value.  And we'll

10:48:10   13    talk about this a little bit more down the road in more

10:48:13   14    detail because it's actually quite important, and there's

10:48:17   15    several criteria that determine whether a transaction that

10:48:20   16    we observe in the real world is a fair market value

10:48:23   17    transaction.

10:48:24   18         So if we're going to be fair to both sides, we

10:48:27   19    want to use fair market value transactions and not just any

10:48:31   20    transaction.

10:48:32   21    Q.  Okay.  So let me -- let's move forward past sort of the

10:48:36   22    comparability items that you've set out here.

10:48:43   23         MR. TIDWELL:  Let's move to PDX-6.9.

10:48:46   24    Q.  (By Mr. Tidwell)  And I want to ask you about that.

10:48:48   25    Can you -- we're looking at PDX-6-9.  Can you explain what

10:48:53   1   the Georgia-Pacific factors are and why we're even talking

10:48:58   2   about it here?

10:48:59   3   A.   Sure.   The -- so Georgia-Pacific is a company

10:49:03   4   located -- headquartered in Georgia, and they're a forest

10:49:06   5   products company.   They sell a lot of paper.   They were

10:49:09   6   involved in a patent suit back in the '70s with a company

10:49:12   7   called U.S. Plywood.

10:49:13   8        And there was a judge who had to figure out the

10:49:17   9   damages.   And he said:   Well, I don't know how to figure

10:49:19   10  out damages, but I'm going to go look at previous cases and

10:49:24   11  I'm going to list all the things that I think I should

10:49:26   12  think about in order to figure out damages.

10:49:30   13       And so he listed 15 categories of evidence that he

10:49:33   14  thought were important in analyzing patent damages.   And so

10:49:37   15  those became known over time as the Georgia-Pacific

10:49:42   16  factors, okay?   There's 15.

10:49:45   17       The most important of these factors are the first

10:49:46   18  two, which are, again, the real world.   How much did the

10:49:53   19  patentee actually get for the patents that it's suing on in

10:49:59   20  this case?   And that's Factor 1.

10:50:01   21       And Factor 2 is how much did the infringer pay for

10:50:10   22  technology that is similar to the patents that it's being

10:50:13   23  sued on in this case?   So it's a focus on the real world.

10:50:17   24  And that's really the point.

10:50:19   25  Q.   Okay.   And sort of back to where you set up the

10:50:25  1   hypothetical.  What's the importance of the hypothetical

10:50:30  2   negotiation in the Georgia-Pacific factors?

10:50:32  3   A.  Well, Factor 15 asked the following question:  If the

10:50:35  4   parties had been bargaining instead of suing each other,

10:50:39  5   what would they have agreed to if they are both being

10:50:43  6   reasonable and prudent?

10:50:44  7        And so the assumption that we're making is that

10:50:48  8   under Factor 15, when we ask how much would they have

10:50:52  9   agreed to, is they would have agreed to the same thing that

10:50:56  10  people in the real world did agree to, which is what we're

10:50:58  11  going to discuss under Factors 1 and 2.

10:51:05  12       MR. TIDWELL:  Let's move to PDX-No. 10.

10:51:08  13  Q.  (By Mr. Tidwell)  And one more item I want you to sort

10:51:11  14  of explain to the jury before we get started in the

10:51:13  15  comparison, can you explain in a little more detail what

10:51:17  16  are the considerations you take into place when trying to

10:51:22  17  analyze fair market value?

10:51:25  18  A.  Yes.  So I mentioned the importance of real-world

10:51:28  19  transactions, but it's important that they be fair market

10:51:31  20  value transactions.  So there are things that can occur in

10:51:34  21  the real world that are not fair and that are un -- make

10:51:38  22  the transaction unreliable.

10:51:39  23       So the overall criteria -- the overall rule is the

10:51:44  24  following, given at the bottom of the slide.  It says that

10:51:47  25  fair market value is the price at which a property would

10:51:51  1  change hands between a willing buyer and a willing

10:51:54  2  seller -- seller, neither being under any compulsion to buy

10:51:59  3  or to sell and both having reasonable knowledge of relevant

10:52:03  4  facts.

10:52:03  5       So if we break that down, there's really four

10:52:07  6  criteria that a fair market value transaction has to meet.

10:52:11  7       First of all, the parties have to be willing.

10:52:14  8  Okay.  There can't be coercion.  And so I can't say sell me

10:52:19  9  your house, and by the way, I'm pointing a gun at your head

10:52:23  10  because the price that you would sell it to me for is not

10:52:26  11  the right price.  Obviously, that's a ridiculous example,

10:52:29  12  but you can think of more realistic examples.

10:52:33  13       For example, the folks in North Carolina whose

10:52:37  14  houses just got flooded.  The price they would sell their

10:52:40  15  house for now when they are desperate and don't have money

10:52:43  16  and their house has been ruined is not the fair market

10:52:45  17  value price.

10:52:46  18       Second, both parties have to be informed.  So if

10:52:49  19  I'm selling you my house, and I know that it's been riddled

10:52:53  20  with termites and it's going to fall down next week, but

10:52:57  21  you don't know that, the price that you pay for my house is

10:53:00  22  not the right price because I'm informed that it's got

10:53:03  23  termites but you're not informed.  So both parties have to

10:53:06  24  have reasonable knowledge of the facts.  That's why you get

10:53:12  25  your house inspected.

| | | |
|---|---|---|
| 10:53:14 | 1 | Third, it has to be arm's length, and that means |
| 10:53:17 | 2 | there's no sweetheart deal.  So, for example, if I sell my |
| 10:53:19 | 3 | house and I sell it to my daughter and I say, sweetheart, |
| 10:53:19 | 4 | you can have it for just a dollar, then you as an |
| 10:53:24 | 5 | accountant wouldn't look at that and say, well, I guess |
| 10:53:27 | 6 | Dr. Putnam's house is worth a dollar.  You would say, no, |
| 10:53:32 | 7 | he gave it to his daughter because he loves her.  That's a |
| 10:53:36 | 8 | sweetheart deal.  They weren't bargaining at arm's length. |
| 10:53:39 | 9 | So the parties can't be related.  They can't have side |
| 10:53:42 | 10 | relationships. |
| 10:53:42 | 11 | And then the last point is there has to be an |
| 10:53:45 | 12 | actual exchange.  The property has to change hands.  So if |
| 10:53:48 | 13 | I sell you my house, I have to -- I can't just say, well, |
| 10:53:49 | 14 | I'm offering you my house for a hundred thousand dollars. |
| 10:53:52 | 15 | That's an offer.  But if you don't accept and the house |
| 10:53:55 | 16 | doesn't change hands, the price isn't a hundred thousand |
| 10:54:00 | 17 | dollars.  We have to agree on a price.  The house has to |
| 10:54:03 | 18 | change hands, and then that's the price that is fair market |
| 10:54:06 | 19 | value. |
| 10:54:06 | 20 | So these are the criteria that you have to apply |
| 10:54:08 | 21 | to these various licenses to determine that just because |
| 10:54:11 | 22 | they occurred in the actual world, are they actually fair |
| 10:54:14 | 23 | market value. |
| 10:54:15 | 24 | Q.  Did you attempt to look at licenses that Pantech Corp |
| 10:54:25 | 25 | or Pantech Wireless, the Plaintiffs in this case, had |

10:54:27   1   entered into with other companies?

10:54:29   2   A.  I did.

10:54:35   3        MR. TIDWELL:  Let's look at Slide No. 11.

10:54:37   4   Q.  (By Mr. Tidwell)  And I'll ask you to -- first, is this

10:54:41   5   a summary of sort of those licenses that you had reviewed?

10:54:44   6   A.  Yes.

10:54:44   7   Q.  And I just want to be clear, did you review -- did you

10:54:51   8   read each one of these contracts?

10:54:52   9   A.  Each one, yes.

10:54:54  10   Q.  Okay.  And so what is -- as we're looking at PDX-6-11,

10:55:01  11   can you first describe to us what this document is

10:55:04  12   attempting to do?

10:55:05  13   A.  Yes.  So we went through the criteria in a fair amount

10:55:09  14   of detail, but the nice thing about a slide like this is it

10:55:14  15   actually explains the summary of the results in a pretty

10:55:18  16   succinct fashion.

10:55:19  17        So just for the record, the rows of this matrix

10:55:23  18   are the eight criteria that I've described previously for

10:55:30  19   technical and economic comparability.  And then the columns

10:55:33  20   are the five Pantech Corp licenses that I read and analyzed

10:55:40  21   and --

10:55:40  22   Q.  Hold on just a second --

10:55:42  23   A.  Sure.

10:55:42  24   Q.  -- because we're about to go into these licenses.

10:55:46  25        MR. TIDWELL:  Your Honor, I think it's probably

| | | |
|---|---|---|
| 10:55:48 | 1 | appropriate that we seal the courtroom. |
| 10:55:49 | 2 | THE COURT:  All right.  We'll seal the courtroom |
| 10:55:52 | 3 | at this time. |
| 10:55:53 | 4 | Anyone not subject to the protective order or an |
| 10:55:56 | 5 | attorney or expert witness working on the case will need to |
| 10:55:59 | 6 | excuse themselves. |
| 10:56:00 | 7 | (Courtroom sealed.) |
| 10:56:00 | 8 | (This portion of the transcript is Sealed and |
| 10:56:00 | 9 | filed under separate cover as Sealed Portion |
| 11:35:35 | 10 | No. 4.) |
| 11:35:35 | 11 | (Courtroom unsealed.) |
| 11:35:37 | 12 | Q.  (By Mr. Tidwell)  How do you go about determining |
| 11:35:39 | 13 | the -- or breaking down the portfolio rate and reaching a |
| 11:35:44 | 14 | decision about what the royalty rate is for these patents |
| 11:35:47 | 15 | in this case?  How do you do that? |
| 11:35:50 | 16 | A.  Well, this process is something called apportionment, |
| 11:35:57 | 17 | okay?  And -- which sounds like a $64 word for something |
| 11:36:02 | 18 | that you do each Thanksgiving when you carve up a turkey. |
| 11:36:06 | 19 | You've got a whole turkey, and you got to figure out the |
| 11:36:09 | 20 | pieces that go to each one of the people at your |
| 11:36:12 | 21 | Thanksgiving dinner, okay? |
| 11:36:15 | 22 | And you do that because you follow an algorithm |
| 11:36:17 | 23 | and you say, well, I've got a teenage son, he's going to |
| 11:36:20 | 24 | get a big piece.  I've got, you know, my granddaughter, |
| 11:36:25 | 25 | she's three months old.  She's just going to get a taste. |

11:36:28    1        And so we're going to go through the same kind of

11:36:31    2    process here.   The process involves something called

11:36:33    3    citation analysis.

11:36:35    4    Q.  So looking at PDX-6-22, is this sort of the

11:36:40    5    introduction of what you're trying to do?

11:36:42    6    A.  Yes.  So we know that Pantech's entire portfolio of

11:36:46    7    SEPs is 0.50 percent.   That's the portfolio rate that we've

11:36:51    8    determined from the four agreements.   But we want to figure

11:36:56    9    out what the value for the three SEPs is, which is only a

11:37:01   10    portion of that .50 percent rate.

11:37:04   11    Q.  And so why did you use the number 29 in relationship to

11:37:10   12    three?

11:37:11   13    A.  Because we determined on a patent family basis that

11:37:19   14    there are 29 other families that are considered SEPs that

11:37:26   15    Pantech owns for which it receives royalties that -- for

11:37:30   16    which OnePlus is not paying in these proceedings.

11:37:35   17              MR. TIDWELL:   Let's look at PDX-6-23.

11:37:39   18    Q.  (By Mr. Tidwell)  Does this explain at a high level how

11:37:44   19    you went about this?

11:37:45   20    A.  Yes.

11:37:46   21    Q.  Can you explain in general what this is and what you're

11:37:49   22    doing?

11:37:50   23    A.  Right.  So in -- just for the record, in Column 1,

11:37:56   24    we've listed the three SEP families, the '839, the '954,

11:38:01   25    and the '247 families.  And we've analyzed each one of

| | | |
|---|---|---|
| 11:38:04 | 1 | those families. |
| 11:38:08 | 2 | Let me just explain for a second what a family is. |
| 11:38:13 | 3 | A family consists of the same documents that |
| 11:38:18 | 4 | protect the same invention in multiple countries. |
| 11:38:22 | 5 | MR. FILBIN:  Objection, Your Honor. |
| 11:38:23 | 6 | THE COURT:  What's the objection? |
| 11:38:24 | 7 | MR. FILBIN:  Dr. Putnam's testifying outside the |
| 11:38:27 | 8 | scope of his expertise. |
| 11:38:28 | 9 | THE COURT:  All right. |
| 11:38:30 | 10 | MR. TIDWELL:  Maybe I can set the stage. |
| 11:38:33 | 11 | THE COURT:  All right. |
| 11:38:34 | 12 | Q.  (By Mr. Tidwell)  Dr. Putnam, do you -- have you done |
| 11:38:38 | 13 | citation rankings in the past? |
| 11:38:43 | 14 | A.  Yes. |
| 11:38:43 | 15 | Q.  And is that something an economist with special |
| 11:38:47 | 16 | training to do, does in citation ranking dealing with |
| 11:38:54 | 17 | patents? |
| 11:38:55 | 18 | A.  Yes. |
| 11:38:56 | 19 | Q.  And do those citation rankings help value a patent? |
| 11:39:01 | 20 | A.  Yes. |
| 11:39:03 | 21 | Q.  Okay. |
| 11:39:03 | 22 | MR. TIDWELL:  Your Honor, may I proceed? |
| 11:39:05 | 23 | THE COURT:  Any further objection? |
| 11:39:06 | 24 | MR. FILBIN:  Your Honor, as long as Dr. Putnam |
| 11:39:09 | 25 | doesn't testify about legal matters, then it's fine. |

| | | |
|---|---|---|
| 11:39:12 | 1 | THE COURT:  All right.  So no legal opinions. |
| 11:39:17 | 2 | Q.  (By Mr. Tidwell)  So, if you would, you were explaining |
| 11:39:23 | 3 | that for -- let's just take the '839.  Do you just count |
| 11:39:26 | 4 | the '839, or do you count the '839 family of patents? |
| 11:39:32 | 5 | A.  It's -- well, for multiple reasons, you count the |
| 11:39:35 | 6 | family of patents. |
| 11:39:36 | 7 | Q.  Can you explain why, as an economist, that you would |
| 11:39:39 | 8 | want to do that? |
| 11:39:41 | 9 | A.  Well, in the -- for two reasons. |
| 11:39:47 | 10 | First of all, the FRAND commitment -- remember, |
| 11:39:49 | 11 | the promise that you made not to jack up your price -- |
| 11:39:53 | 12 | applies to every member of a family.  So the family is |
| 11:39:57 | 13 | treated as a whole for the purposes of this commitment. |
| 11:40:01 | 14 | Secondly, multiple documents in that family may |
| 11:40:07 | 15 | contain the same specification, which is the description of |
| 11:40:12 | 16 | how to make the invention.  That's what you have to |
| 11:40:15 | 17 | disclose to the Patent Office in order to -- |
| 11:40:19 | 18 | MR. FILBIN:  Objection, Your Honor.  He's |
| 11:40:22 | 19 | continuing to testify as a legal expert. |
| 11:40:25 | 20 | MR. TIDWELL:  Your Honor, I don't believe he's |
| 11:40:26 | 21 | rendering legal opinion.  He's testifying as an economist, |
| 11:40:30 | 22 | how he goes about doing the work. |
| 11:40:32 | 23 | THE COURT:  Well, I think the answer to the last |
| 11:40:34 | 24 | question sort of suggests what you -- what you have to do, |
| 11:40:41 | 25 | which suggests some requirement that you comply with, you |

| | | |
|---|---|---|
| 11:40:43 | 1 | know, a regulatory framework or a legal requirement. |
| 11:40:48 | 2 | So let's clarify the question, and maybe break it |
| 11:40:51 | 3 | up so that we don't get such a narrative answer. |
| 11:40:54 | 4 | Q.  (By Mr. Tidwell)  Dr. Putnam, let me phrase the |
| 11:41:00 | 5 | question from the sense of as an economist, what is the |
| 11:41:08 | 6 | purpose of the forward citations, and we'll try and stick |
| 11:41:11 | 7 | to your opinions as an economist and why that's important |
| 11:41:16 | 8 | to you. |
| 11:41:17 | 9 | If you could, can you give us the history of how |
| 11:41:22 | 10 | forward citations even came about? |
| 11:41:25 | 11 | A.  Yes.  So let's just, again, review what a citation is. |
| 11:41:33 | 12 | When a patent examiner examines an application, |
| 11:41:44 | 13 | the examiner has to determine whether the application |
| 11:41:48 | 14 | represents an invention that is -- |
| 11:41:50 | 15 | MR. FILBIN:  Your Honor, objection.  It's the same |
| 11:41:52 | 16 | issue. |
| 11:41:53 | 17 | MR. TIDWELL:  Can I explain, Your Honor?  I |
| 11:41:55 | 18 | think -- |
| 11:41:55 | 19 | THE COURT:  Can you explain what?  I mean -- |
| 11:41:57 | 20 | MR. TIDWELL:  I think he's trying to give the |
| 11:41:59 | 21 | historical background of how forward citations came about |
| 11:42:04 | 22 | for economists. |
| 11:42:05 | 23 | THE COURT:  Okay. |
| 11:42:05 | 24 | MR. TIDWELL:  And we'll try and keep it at a high |
| 11:42:08 | 25 | level, but that's what he's trying to explain. |

| | | |
|---|---|---|
| 11:42:10 | 1 | THE COURT:  All right.  So if you can sort of |
| 11:42:14 | 2 | cabin the question a little bit and make it clear he's not |
| 11:42:20 | 3 | talking about what any patentee's requirement is under the |
| 11:42:28 | 4 | law to obtain a patent or -- just make it clear he's |
| 11:42:32 | 5 | discussing this from an economist's point of view. |
| 11:42:35 | 6 | MR. TIDWELL:  I will. |
| 11:42:36 | 7 | Q.  (By Mr. Tidwell)  Dr. Putnam, I want to make clear what |
| 11:42:38 | 8 | I'd like for you to describe is, as an economist, how it is |
| 11:42:46 | 9 | y'all decided as economists to even use this concept |
| 11:42:49 | 10 | forward citations, explaining sort of the history of it and |
| 11:42:55 | 11 | how it occurred without giving sort of legal implications. |
| 11:42:58 | 12 | A.  There's a thing called citations.  Sounds like it's a |
| 11:43:09 | 13 | magic word.  An examiner in examining the application gives |
| 11:43:15 | 14 | a citation to earlier patents.  We see citations in many |
| 11:43:24 | 15 | contexts.  You see them at the end of scientific papers. |
| 11:43:28 | 16 | What's happened before, what else should you go read. |
| 11:43:33 | 17 | Economists got the idea back about 1990 that if |
| 11:43:40 | 18 | you count the number of citations that an earlier patent |
| 11:43:45 | 19 | receives, that might be an indicator of how important it is |
| 11:43:49 | 20 | or how valuable it is. |
| 11:43:53 | 21 | And so they did many, many studies, hundreds of |
| 11:43:57 | 22 | studies to look up and see, is the number of citations that |
| 11:44:02 | 23 | are received by an earlier patent correlated with the value |
| 11:44:06 | 24 | of that patent?  More citations, higher value.  The answer |
| 11:44:12 | 25 | to that question is yes, and confirmed hundreds of times. |

11:44:20   1           The purpose of this table is based on that

11:44:24   2  research to count the number of citations and translate

11:44:33   3  that to the share of Pantech's portfolio value that's

11:44:37   4  accounted for by the three SEPs in this case.

11:44:43   5           I can go through that if you want.

11:44:46   6  Q.  We can -- so you -- looking at PDX-6-23, did you reach

11:44:53   7  a share percentage for all three of those?

11:44:58   8  A.  Yes.

11:44:58   9  Q.  And is that circled here, .21?

11:45:02   10  A.  That's the total for the three.

11:45:04   11  Q.  For the three.

11:45:05   12  A.  And then the individuals are shown immediately above

11:45:07   13  that.  So the share of the total Pantech portfolio is

11:45:12   14  2 percent for the '839 family, 3 percent for the '954

11:45:17   15  family, 15 percent for the '247 family, for a total of 21

11:45:23   16  percent for the three SEPs in this case out of the total

11:45:29   17  Pantech portfolio.

11:45:31   18          MR. TIDWELL:  Let's look at PDX-6-25.

11:45:34   19  Q.  (By Mr. Tidwell)  Does this summarize sort of where you

11:45:36   20  landed after doing the citation analysis?

11:45:43   21  A.  Yes.  So let's take, for example, the '247 patent,

11:45:47   22  which is the second patent shown here.  The Pantech

11:45:52   23  portfolio is the -- the rate is .50 percent.  We said that

11:45:59   24  the '247 patent was 15 percent of that value.  15 percent

11:46:06   25  of .5 percent is 0.75 percent royalty rate for the '247

11:46:17  1  patent, and the same for the other four patents.

11:46:21  2      So all this to say is that we have gotten the

11:46:24  3  result that we need, which is what's the royalty rate for

11:46:28  4  the four patents at issue in this case based on the fair

11:46:31  5  market value of Pantech's entire portfolio.

11:46:34  6  Q.  Okay.

11:46:36  7      MR. TIDWELL:  Let's look at PDX-6-26.

11:46:40  8  Q.  (By Mr. Tidwell)  We're sort of back to where we were

11:46:42  9  at the beginning.  Does this slide represent your damages

11:46:49  10 for the SEPs and damages for the NEPs?

11:46:53  11 A.  Yes.

11:46:56  12     MR. TIDWELL:  And -- and let's go to the next

11:46:58  13 slide.

11:46:59  14 Q.  (By Mr. Tidwell)  And this is where we are.  This is

11:47:01  15 where we started, correct?

11:47:03  16 A.  That's correct.

11:47:07  17 Q.  Okay.  And, to be clear, the additional damages, if

11:47:12  18 any, to remove the uncertainty discounts is not something

11:47:19  19 that you're calculating here, correct?

11:47:22  20 A.  That's correct.

11:47:24  21 Q.  Okay.

11:47:24  22     MR. TIDWELL:  Pass the witness.

11:47:26  23     MR. FILBIN:  Your Honor, sidebar?

11:47:28  24     THE COURT:  Yes.

11:47:29  25     (Bench conference.)

11:47:43    1          MR. FILBIN:  Your Honor, we move to strike

11:47:45    2    Dr. Putnam's testimony in its entirety regarding the NEP

11:47:49    3    damages.  He offered no basis for his number.  He just

11:47:55    4    flashed up a number.

11:48:02    5          MR. TIDWELL:  He testified this is how he got to

11:48:04    6    the NEPs.  I can clarify it if the Court wants me to.

11:48:07    7          THE COURT:  I'll let you deal with it on cross.

11:48:10    8    I'm not going to strike it until you've gone through the

11:48:14    9    cross.  And Mr. Tidwell will be entitled to redirect.

11:48:16   10          But -- now, I think you should just handle it

11:48:18   11    however you think you should on cross.

11:48:23   12          MR. FILBIN:  Okay.

11:48:25   13          THE COURT:  How much time do you have?  Would now

11:48:27   14    be a better time to take a break?

11:48:29   15          MR. FILBIN:  Yes, Your Honor.

11:48:29   16          THE COURT:  Okay.  Let's go ahead and take our

11:48:31   17    break.

11:48:35   18          (Bench conference concluded.)

11:48:35   19          THE COURT:  Ladies and gentlemen of the jury,

11:48:36   20    given the hour, I think it makes sense for us to go ahead

11:48:42   21    and have lunch now before we proceed to the

11:48:47   22    cross-examination of the witness.  So we'll be in recess

11:48:49   23    about an hour, perhaps a little bit longer.

11:48:53   24          As a reminder, don't discuss the case among

11:48:56   25    yourselves.  Don't permit it to be discussed in your

| | | |
|---|---|---|
| 11:48:58 | 1 | presence.  Don't do any research about any matter |
| 11:49:01 | 2 | associated with the case on your own, and don't post |
| 11:49:07 | 3 | anything about your involvement as a juror in this case. |
| 11:49:10 | 4 | Enjoy your lunch.  And we'll get you back into the |
| 11:49:15 | 5 | courtroom probably about 1:00 o'clock, maybe a little bit |
| 11:49:17 | 6 | before. |
| 11:49:18 | 7 | COURT SECURITY OFFICER:  All rise. |
| 11:49:21 | 8 | (Jury out.) |
| 11:49:24 | 9 | THE COURT:  All right.  You may step down, sir. |
| 11:49:56 | 10 | THE WITNESS:  Thank you. |
| 11:49:56 | 11 | THE COURT:  We'll recess for lunch. |
| 11:49:58 | 12 | How long do you expect your cross to take, |
| 11:50:00 | 13 | Mr. Filbin? |
| 11:50:05 | 14 | MR. AIRAN:  We've got a hook at 40 minutes. |
| 11:50:08 | 15 | MR. FILBIN:  40 minutes. |
| 11:50:09 | 16 | THE COURT:  You've got a hook at 40 minutes.  All |
| 11:50:10 | 17 | right.  Good enough. |
| 11:55:31 | 18 | (Recess.) |
| 12:11:01 | 19 | (Jury out.) |
| 12:52:19 | 20 | COURT SECURITY OFFICER:  All rise. |
| 12:52:20 | 21 | THE COURT:  Mr. Goecke, if you would have the jury |
| 12:52:25 | 22 | brought down, please. |
| 12:52:32 | 23 | COURT SECURITY OFFICER:  Please stand for the |
| 12:54:25 | 24 | jury. |
| 12:54:25 | 25 | (Jury in.) |

| | | |
|---|---|---|
| 12:54:26 | 1 | THE COURT:  Please be seated. |
| 12:55:02 | 2 | Mr. Filbin, at this time, you may cross-examine |
| 12:55:04 | 3 | the witness. |
| 12:55:16 | 4 | MR. FILBIN:  Thank you, Your Honor.  May I |
| 12:55:18 | 5 | proceed? |
| 12:55:20 | 6 | THE COURT:  You may. |
| 12:55:20 | 7 | MR. FILBIN:  Thank you. |
| 12:55:28 | 8 | CROSS-EXAMINATION |
| 12:55:28 | 9 | BY MR. FILBIN: |
| 12:55:28 | 10 | Q.  Welcome back, Dr. Putnam, from lunch. |
| 12:55:28 | 11 | A.  Thank you, Mr. Filbin. |
| 12:55:28 | 12 | Q.  Good to see you. |
| 12:55:28 | 13 | A.  Likewise. |
| 12:55:32 | 14 | Q.  So before we broke for lunch, you concluded your direct |
| 12:55:33 | 15 | examination, right? |
| 12:55:34 | 16 | A.  Yes. |
| 12:55:35 | 17 | Q.  And you didn't offer any analysis or discussion |
| 12:55:39 | 18 | concerning your royalty rate for the '654 patent, correct? |
| 12:55:44 | 19 | A.  It's analogized to the '247 patent, that's right. |
| 12:55:49 | 20 | Q.  Pardon me. |
| 12:55:54 | 21 | MR. FILBIN:  Move to strike, Your Honor. |
| 12:55:56 | 22 | THE COURT:  Well, I mean, he can -- I will -- I'll |
| 12:56:04 | 23 | grant that motion and strike the answer. |
| 12:56:06 | 24 | Just ask the question again and see what the |
| 12:56:11 | 25 | answer is. |

| | | |
|---|---|---|
| 12:56:13 | 1 | Q.  (By Mr. Filbin)  Dr. Putnam, yes or no, you didn't |
| 12:56:15 | 2 | offer any analysis or discussion concerning your royalty |
| 12:56:17 | 3 | rate for the '654 patent, correct? |
| 12:56:20 | 4 | A.  I presented the rate as being the same as the rate for |
| 12:56:23 | 5 | the '247 patent. |
| 12:56:31 | 6 | Q.  Okay.  Now, we -- you discussed quite a few items, but |
| 12:56:36 | 7 | let's just talk about the FRAND obligation for a moment. |
| 12:56:39 | 8 | You understand the FRAND obligation does not go |
| 12:56:42 | 9 | away when an SEP patent is sold to another company, |
| 12:56:46 | 10 | correct? |
| 12:56:46 | 11 | A.  Yes. |
| 12:56:47 | 12 | Q.  So Pantech has to honor the FRAND obligation attached |
| 12:56:51 | 13 | to each one of the SEPs in this lawsuit, correct? |
| 12:56:53 | 14 | A.  Of course. |
| 12:56:54 | 15 | Q.  And that's an irrevocable undertaking, the FRAND |
| 12:57:01 | 16 | obligation, correct? |
| 12:57:01 | 17 | A.  That's my understanding, yes. |
| 12:57:03 | 18 | Q.  Okay.  So under the FRAND obligation, you can't ignore |
| 12:57:09 | 19 | what happened before you acquired a patent, correct, with |
| 12:57:15 | 20 | respect to its licensing activity? |
| 12:57:17 | 21 | A.  It's a general question, but in general, no. |
| 12:57:27 | 22 | MR. FILBIN:  Your Honor, I think we -- for most of |
| 12:57:31 | 23 | this duration, we need to go under seal. |
| 12:57:33 | 24 | THE COURT:  All right.  We'll seal the courtroom |
| 12:57:35 | 25 | at this time. |

12:57:38    1              (Courtroom sealed.)

12:57:38    2              (This portion of the transcript is Sealed and

12:57:38    3         filed under separate cover as Sealed Portion

01:41:36    4         No. 5.)

01:41:36    5              (Courtroom unsealed.)

01:41:38    6              THE COURT:  Mr. Airan.

01:41:38    7              MR. AIRAN:  Yes, Your Honor.  This motion will be

01:41:40    8    handled by my colleague Justin, introduce him to the Court,

01:41:44    9    Mr. Burnam is my colleague.  He has not appeared before

01:41:49   10    you.  I believe he's filed his pro hac vice, so he'll be

01:41:53   11    presenting the motion today.

01:41:54   12              THE COURT:  Happy to hear from you, Mr. Burnam.

01:41:57   13              MR. BURNAM:  Thank you, Your Honor.

01:42:02   14              Your Honor, may it please the Court.  Justin

01:42:06   15    Burnam on behalf of OnePlus.  There are two items I'd like

01:42:08   16    to raise in light of the close of Plaintiffs' case and the

01:42:13   17    close of Dr. Putnam's testimony.

01:42:13   18              The first is to give you highlights of our JMOL

01:42:17   19    motion and the second is to introduce a related instruction

01:42:19   20    that we're seeking.

01:42:20   21              Starting with the first item, we move for JMOL of

01:42:24   22    no damages in this retrial.  It is Pantech's burden to

01:42:29   23    prove damages and Pantech has failed to present sufficient

01:42:32   24    evidence from which a reasonable jury could arrive at a

01:42:36   25    legally supported damages award.  This is so at least

01:42:39   1   because the damages theory set forth by Pantech's damages

01:42:42   2   expert, Dr. Putnam, is legally flawed.

01:42:45   3       What I want to highlight now is that Dr. Putnam's

01:42:50   4   theory fails to apportion to the incremental value added by

01:42:54   5   the patented inventions.

01:42:57   6       There are multiple ways Dr. Putnam fails to

01:43:00   7   apportion, but I'm just going to highlight two of those now

01:43:03   8   and leave the others for the submission that we're filing

01:43:07   9   later.

01:43:07   10       First is that Dr. Putnam's forward citation

01:43:10   11   analysis attributes value to the asserted patents based not

01:43:14   12   only on citations to those patents but also to other

01:43:18   13   patents in their families.

01:43:19   14       And the second I want to highlight is that

01:43:22   15   Dr. Putnam violates the entire market value rule by relying

01:43:27   16   on the entire market value of the accused products without

01:43:29   17   showing that the patented feature is what creates the basis

01:43:33   18   for consumer demand.

01:43:35   19       Now, like I said, there are further apportionment

01:43:38   20   points in our motion, but now I'd like to turn to our

01:43:41   21   proposed related instruction.

01:43:43   22       I want to raise to Your Honor a case from the

01:43:47   23   Federal Circuit called Ericsson, 773 F.3d 1201.  That's a

01:43:55   24   case authored by Judge O'Malley on behalf of a unanimous

01:44:00   25   panel, and it discusses the entire market value rule.

01:44:04  1        I'd like to read a quote from that case.  I have a

01:44:08  2   copy that I can hand up in just a moment.  In Ericsson

01:44:16  3   after discussing the entire market value rule, the Federal

01:44:19  4   Circuit states:  When licenses -- I'm quoting here -- when

01:44:22  5   licenses based on the value of a multi-component product

01:44:25  6   are admitted or even referenced in expert testimony, the

01:44:30  7   Court should give a cautionary instruction regarding the

01:44:33  8   limited purposes for which such testimony is proffered if

01:44:37  9   the accused infringer requests the instruction.

01:44:40  10        The Court should also ensure that the instructions

01:44:43  11   fully explain the need to apportion the ultimate royalty

01:44:47  12   award to the incremental value of the patented feature from

01:44:51  13   the overall product.

01:44:52  14        We ask that you give such an instruction here, and

01:44:57  15   we've prepared a proposed instruction that I'm happy to

01:44:59  16   hand up for your consideration along with a copy of the

01:45:03  17   case with the highlighted -- highlight of the language that

01:45:07  18   I just read.

01:45:08  19        THE COURT:  Sure.

01:45:08  20        And have you -- on this issue of the requested

01:45:11  21   instruction, have you conferred with opposing counsel?

01:45:14  22        MR. BURNAM:  No.  We don't think that this

01:45:17  23   instruction was ripe until Dr. Putnam's testimony concluded

01:45:20  24   and he relied on the entire market value in front of the

01:45:24  25   jury as part of his damages calculation.

| | | |
|---|---|---|
| 01:45:27 | 1 | THE COURT:  All right. |
| 01:45:28 | 2 | MR. BURNAM:  But we're happy to hand it over to |
| 01:45:30 | 3 | them and confer with them about it, if you wish. |
| 01:45:33 | 4 | THE COURT:  I do wish. |
| 01:45:34 | 5 | MR. BURNAM:  Yes. |
| 01:45:50 | 6 | One last thing I'd like to emphasize about this |
| 01:45:53 | 7 | instruction is that we think it's timely now that |
| 01:45:57 | 8 | Dr. Putnam's testimony just occurred.  The jury just heard |
| 01:46:01 | 9 | the entire market value being used. |
| 01:46:05 | 10 | THE COURT:  Okay. |
| 01:46:06 | 11 | MR. BURNAM:  And that's all I have. |
| 01:46:09 | 12 | THE COURT:  Okay. |
| 01:46:10 | 13 | MR. BURNAM:  I was just going to note that we |
| 01:46:12 | 14 | intend to submit the written motion.  There will be a few |
| 01:46:14 | 15 | more details in cases, a few more flaws in Dr. Putnam's |
| 01:46:20 | 16 | testimony that we'd point out.  We ask the Court grant our |
| 01:46:23 | 17 | JMOL motion. |
| 01:46:24 | 18 | THE COURT:  So let me ask you, Mr. Burnam, and you |
| 01:46:30 | 19 | may -- you may not be familiar, but do you recall whether |
| 01:46:31 | 20 | this issue came up in the first trial? |
| 01:46:33 | 21 | MR. BURNAM:  I was not involved in the first trial |
| 01:46:35 | 22 | so I don't have a recollection of that.  I know that |
| 01:46:38 | 23 | Dr. Putnam similarly relied on the entire market value rule |
| 01:46:42 | 24 | in that trial.  I became involved during the post-trial |
| 01:46:45 | 25 | briefing, and I believe in our JMOL motion there, we made a |

01:46:47    1    similar argument.

01:46:49    2         THE COURT:  Okay.  And was this theory disclosed

01:46:52    3    in Dr. Putnam's expert report?

01:46:53    4         MR. BURNAM:  The theory of the entire -- yes.

01:46:57    5         THE COURT:  It was?

01:46:58    6         MR. BURNAM:  He multiplied the full royalty base

01:47:01    7    by a rate.

01:47:01    8         THE COURT:  Right.  Okay.  And so can you cite for

01:47:04    9    me -- and I certainly understand you can't give me page and

01:47:07   10    line number -- but can you cite for me generally the

01:47:10   11    testimony that you think compels this instruction?

01:47:12   12         MR. BURNAM:  So I can cite a slide for you that I

01:47:16   13    took down as he was speaking.  That was, I believe,

01:47:21   14    PDX-6-26, which had the full royalty base shown on the

01:47:27   15    slide.

01:47:27   16         For what it's worth, the jury also heard the full

01:47:31   17    royalty base read into the record by Pantech's counsel and

01:47:34   18    saw it on Pantech's opening slide.

01:47:37   19         So this would also offset some of that -- the --

01:47:42   20    whatever impact that could have on skewing the damages

01:47:45   21    horizon for the jury.

01:47:46   22         THE COURT:  Right.  And so -- and this number was

01:47:48   23    not a number that was disclosed in his expert report?

01:47:51   24         MR. BURNAM:  That's not what I'm arguing.  The

01:47:54   25    concern underlying the entire market value rule is that

01:47:57    1  hearing such a number presented to the jury could skew the

01:48:01    2  damages horizon for the jury.  And the instructions that

01:48:06    3  you're going to later give to the jury include an

01:48:08    4  instruction on apportionment.

01:48:09    5       But based on the Ericsson case, we think there's a

01:48:13    6  basis to also give a cautionary instruction now before

01:48:16    7  Defendants start their case to caution the jury to consider

01:48:19    8  only the incremental value of the patented features.

01:48:22    9       THE COURT:  My concern is that you're not telling

01:48:25   10  me this number was not disclosed, correct?

01:48:29   11       MR. BURNAM:  Correct.

01:48:29   12       THE COURT:  But you're saying it just came up.  So

01:48:33   13  if this is -- if this was a number that was previously

01:48:36   14  disclosed, it seems like this request for an instruction at

01:48:40   15  this point comes a little late.

01:48:43   16       MR. BURNAM:  I understand Your Honor's concern.

01:48:45   17  It's not that we're surprised by this number.  It's just

01:48:48   18  that after the theory has been presented to the jury, we

01:48:51   19  want the effect of the number on the jury to be addressed

01:48:56   20  by this kind of instruction, which is what the Federal

01:48:59   21  Circuit recommended in that case.

01:49:01   22       THE COURT:  All right.

01:49:02   23       MR. BURNAM:  That's all we're asking for.

01:49:03   24       THE COURT:  All right.  Let me hear from the

01:49:05   25  Plaintiff.

01:49:05    1          MS. KRAWICE:  Talk about ambush today.

01:49:12    2          All right.  So just on the JMOL issue, I'd first

01:49:16    3   like to say that obviously Pantech opposes the JMOL of no

01:49:21    4   damages.

01:49:21    5          As to incremental value and failure to apportion

01:49:24    6   forward citations based on family and I think entire market

01:49:28    7   value were all mentioned, we believe there's ample evidence

01:49:31    8   in the record to award Pantech damages in this retrial.

01:49:35    9          You've heard from the technical experts that

01:49:38   10   Pantech put forward, Dr. Cooklev and Mr. Mauro, about the

01:49:42   11   different features that are claimed in the patents and

01:49:45   12   those values that they contribute from a technical

01:49:47   13   standpoint.

01:49:48   14          And then you heard it from Dr. Putnam just now

01:49:54   15   about the economic value that these patents have,

01:49:56   16   performing a proper analysis of comparable licenses which

01:49:59   17   does take into account the apportionment of only the

01:50:02   18   patented features.

01:50:02   19          We believe JMOL at this time would be improper.

01:50:07   20          Would you like me to also address their stip

01:50:13   21   now -- oh, I'm sorry, not stip, instruction?

01:50:16   22          THE COURT:  Please.

01:50:17   23          MS. KRAWICE:  Okay.  Your Honor, I say ambush

01:50:19   24   earlier because we have not heard of this proposed

01:50:22   25   instruction at all until -- just now I received what seems

01:50:25    1    to be a pretty official looking motion that someone must

01:50:28    2    have had time to write today.

01:50:29    3         This instruction from Ericsson we believe -- first

01:50:32    4    of all, these issues seem like -- and the instruction

01:50:37    5    here -- I'm looking at the first page of what I was just

01:50:40    6    handed by opposing counsel that says:  The law requires

01:50:44    7    that the damages in this case be tailored to compensate

01:50:46    8    Pantech only for OnePlus's use of the features covered by

01:50:50    9    the Pantech patents at issue in this case.

01:50:54    10        Two issues I see here is that if they had problems

01:50:57    11   with Dr. Putnam's analysis of damages in this case, the

01:51:01    12   time to raise a Daubert is well behind us.

01:51:04    13        Second, his analysis did a comparable license

01:51:09    14   analysis which itself takes into account the apportionment

01:51:13    15   of only to the patented features.  That was taken into

01:51:17    16   account in Dr. Putnam's analysis that he put forth.  And we

01:51:21    17   don't believe this instruction is timely or proper at this

01:51:24    18   time.

01:51:27    19        THE COURT:  All right.  Anything else on that?

01:51:30    20   Anything else -- anything else on the JMOLs, for example?

01:51:33    21        MS. KRAWICE:  We believe that there has been

01:51:38    22   evidence put forth from both technical and an economical

01:51:43    23   value that should afford Pantech damages in this case.

01:51:46    24        THE COURT:  All right.  Mr. Burnam, anything else?

01:51:54    25        MR. BURNAM:  I'd just say that this JMOL motion

01:51:56   1   isn't ripe until now, so that's why we're presenting this

01:52:00   2   now.  And then the timing for the instruction recommended

01:52:03   3   by the Federal Circuit case appears to be now, as well,

01:52:06   4   which is why we're raising it now.

01:52:11   5        And we disagree that Dr. Putnam's methodology

01:52:13   6   accounts for the incremental value of the patented

01:52:17   7   features, but I won't belabor that now.  There'll be a

01:52:20   8   submission later that walks through the reasons why.

01:52:23   9        THE COURT:  Okay.  Fair enough.  That's fine.

01:52:26   10  And -- and you can file that.

01:52:30   11       I, of course, am generally familiar with the

01:52:33   12  Ericsson-D-Link case.  It's been a long time since I've

01:52:40   13  looked at it.  Mr. Burnam has drawn my attention to a

01:52:46   14  citation on Page 17, at least in the copy that's been

01:52:49   15  handed to me about a cautionary instruction.

01:52:53   16       I really don't think there's much surprise here.

01:52:55   17  I think the parties could have raised this as an issue for

01:53:00   18  us.  It certainly could have come up multiple times in the

01:53:03   19  cross-examination.

01:53:05   20       So I think the request, not to fuss at you, but I

01:53:10   21  think the request for a cautionary instruction mid-trial is

01:53:16   22  out of proportion to the testimony.

01:53:19   23       I'll certainly consider the appropriateness after

01:53:22   24  the parties have met and conferred about the instruction

01:53:25   25  for inclusion in the final instructions, but at least at

01:53:29    1    this point in terms of your request for a cautionary

01:53:33    2    instruction, I am going to deny that.

01:53:35    3            With respect to the JMOLs, is there anything else

01:53:40    4    you want to say about the JMOLs?

01:53:41    5            MR. BURNAM:  No, we'll just follow up later with a

01:53:44    6    written submission.

01:53:45    7            THE COURT:  All right.  So you're going to --

01:53:47    8    you're going to file a written motion for judgment as a

01:53:47    9    matter of law.

01:53:51   10            Just for purposes of the record, I do want to make

01:53:54   11    a couple comments about your oral motion.  When considering

01:54:02   12    a motion for judgment as a matter of law, of course, I'm

01:54:04   13    required to review all of the evidence that's been

01:54:07   14    submitted.  I have to draw all reasonable inferences in

01:54:10   15    favor of the non-movant.  I have to give credence to

01:54:14   16    evidence that supports the movant that's not contradicted

01:54:17   17    or impeached, and I have to avoid making any kind of

01:54:22   18    credibility determinations or weighing the evidence as

01:54:27   19    that's a function for the jury.

01:54:28   20            A JMOL should be granted when there's no legally

01:54:33   21    sufficient evidentiary basis for a reasonable jury to find

01:54:38   22    on an issue on which that party has been fully heard.  And

01:54:45   23    that normally happens in one of two types of situations,

01:54:50   24    where there's a complete absence of pleading or proof on an

01:54:54   25    issue that is material to a claim or defense, or where

01:54:58  1  there are no controverted issues of fact on which

01:55:04  2  reasonable people could disagree.

01:55:05  3          So if the evidence having been construed in the

01:55:11  4  light most favorable to the non-moving party allows only

01:55:15  5  one reasonable conclusion, then judgment as a matter of law

01:55:18  6  is proper.

01:55:19  7          But if reasonable minds can differ on the

01:55:26  8  importance or the effect of the evidence, a JMOL should be

01:55:31  9  denied and the case submitted to the jury.

01:55:34  10          So on the basis of the testimony I've heard and

01:55:37  11  the arguments that you have presented, I'm going to carry

01:55:39  12  the motion for judgment as a matter of law on these issues

01:55:44  13  and allow the case to proceed at this point.

01:55:46  14          MR. BURNAM:  Thank you, Your Honor.

01:55:47  15          THE COURT:  All right.  Anything else?

01:55:51  16          MS. KRAWICE:  Yes, Your Honor.  I believe this

01:55:56  17  morning we left with outstanding issues to be resolved

01:55:58  18  on --

01:55:59  19          THE COURT:  We did and there's just a couple, so

01:56:01  20  can we handle those quickly?

01:56:05  21          MS. KRAWICE:  I hope so, Your Honor.  And just to

01:56:07  22  preview, we are going to drop our objection to the

01:56:10  23  Exhibit PX-183, so we are just down to this discussion of

01:56:13  24  Slide --

01:56:13  25          THE COURT:  All right.  Which one is it?  Is it

| | | |
|---|---|---|
| 01:56:15 | 1 | the last one?  No, 183 is the last one. |
| 01:56:18 | 2 | MS. KRAWICE:  Yes.  The objection to exhibit, we |
| 01:56:21 | 3 | are going to withdraw that objection now. |
| 01:56:23 | 4 | THE COURT:  So which is the last one to resolve? |
| 01:56:25 | 5 | MS. KRAWICE:  So we need to resolve the |
| 01:56:27 | 6 | outstanding one from this morning, which is to Slides 13 |
| 01:56:29 | 7 | and 26 regarding that $90,000. |
| 01:56:33 | 8 | THE COURT:  Right.  And I think what I had asked |
| 01:56:34 | 9 | the Defendants to do was to show where those royalty rates |
| 01:56:38 | 10 | in Dr. Lopez's report were disclosed. |
| 01:56:41 | 11 | MR. THOMPSON:  That's right.  Yes, Your Honor. |
| 01:56:42 | 12 | If we can pull up the expert report of Dr. Lopez |
| 01:56:47 | 13 | at 71, Mr. Carrillo. |
| 01:57:06 | 14 | Okay.  Here it is, Your Honor, if you'll look at |
| 01:57:09 | 15 | Table 3 here, and he'll highlight where the royalty rate |
| 01:57:12 | 16 | is, the ███████████. |
| 01:57:16 | 17 | So just as a background, as best I can explain it, |
| 01:57:20 | 18 | this was his rate before apportionment.  And, you know, |
| 01:57:23 | 19 | during the Daubert process, you struck his apportionment |
| 01:57:27 | 20 | but you didn't strike obviously the rate -- the beginning |
| 01:57:30 | 21 | rate.  So that's where that rate comes from. |
| 01:57:32 | 22 | THE COURT:  Where is this exhibit from? |
| 01:57:35 | 23 | MR. THOMPSON:  This is on Page 17 -- Page 71 of |
| 01:57:40 | 24 | his expert report. |
| 01:57:41 | 25 | THE COURT:  Okay. |

01:57:41    1        MR. THOMPSON:  And so I think you also asked for

01:57:43    2   the math.  So -- so what happened is, Your Honor, if you'll

01:57:47    3   look -- we'll pull up Exhibit 1A to his report.  If you're

01:57:59    4   satisfied with this, what you've seen here.

01:58:01    5        THE COURT:  Well, I'd like to hear from her.

01:58:04    6   Really what I want to know is exactly -- let me hear from

01:58:06    7   you.

01:58:08    8        This paragraph, this section was not stricken, was

01:58:11    9   it, Ms. Krawice?

01:58:13   10        MS. KRAWICE:  Sorry, I was handed a document that

01:58:20   11   has lines through it that leads me to believe that it is

01:58:23   12   based on a stricken portion.  And, actually, yes, it has.

01:58:27   13   Because in Paragraphs 172 to his report, Dr. Lopez's

01:58:30   14   report, it says:  At a minimum, this requires some

01:58:34   15   apportionment of the value of the portfolio down to the

01:58:37   16   patents-in-suit.

01:58:37   17        The apportionment was stricken from Dr. Lopez's

01:58:42   18   report, and the issues with these specific numbers is

01:58:45   19   they're not apportioned.  So he is offering unapportioned

01:58:51   20   royalty rates, and his apportionment was struck.

01:59:00   21        THE COURT:  Okay.

01:59:01   22        MS. KRAWICE:  Further, these are not apportioned

01:59:03   23   for any particular patent as well.

01:59:07   24        THE COURT:  Okay.  So I'm not sure I followed

01:59:09   25   that.  But let me hear from --

382

01:59:12   1        MS. KRAWICE:  It's just that at best, this would

01:59:15   2   be SEP versus non-SEP.  So it's even further not

01:59:19   3   apportioned.

01:59:20   4        THE COURT:  Exactly what is the complaint here?

01:59:22   5   Because it sounds to me like you're saying he's offering a

01:59:26   6   higher royalty rate; is that not right?

01:59:27   7        MS. KRAWICE:  To an extent.  It's a little bit

01:59:29   8   more confusing than that.

01:59:31   9        THE COURT:  Well, it's confusing enough as it is.

01:59:33  10        MS. KRAWICE:  Your Honor, damages.

01:59:36  11        This rate is based on unapportioned numbers.  The

01:59:43  12   basis of these two numbers that they've highlighted here

01:59:45  13   before you are unapportioned numbers.

01:59:48  14        THE COURT:  Okay.

01:59:49  15        MS. KRAWICE:  That's inappropriate.  We should be

01:59:51  16   apportioning.  However, Dr. Lopez's analysis of how to do

01:59:55  17   apportionment was struck.  So now they have unapportioned

02:00:04  18   data that they cannot apportion because it was struck.

02:00:09  19        THE COURT:  Okay.

02:00:10  20        MS. KRAWICE:  Does that make sense?

02:00:13  21        THE COURT:  Let me -- I'm hoping Mr. Thompson can

02:00:16  22   clear it up for us.

02:00:17  23        MR. THOMPSON:  Well, Your Honor, this is the

02:00:19  24   unapportioned rate, that's correct.  This is also the rate

02:00:21  25   that was presented in the first trial by Mr. Lopez, okay?

02:00:26    1          And so my -- I guess I misunderstood the

02:00:29    2   objection.  I thought that the ████ was fine, that it was

02:00:32    3   the math that we were -- the numbers we were coming up with

02:00:35    4   that is where the complaint was, but this was not stricken.

02:00:39    5          THE COURT:  I'm going to let you handle this on

02:00:42    6   cross.  I think you can handle it on cross, and I think

02:00:44    7   that's the place to do it.

02:00:47    8          MR. THOMPSON:  Thank you, Your Honor.

02:00:48    9          THE COURT:  Okay.  Anything else?

02:00:50   10          We'll take a short break before we come back.

02:00:53   11          Anything else from either side?

02:00:56   12          COURT SECURITY OFFICER:  All rise.

02:00:59   13          (Recess.)

02:06:17   14          (Jury out.)

02:06:20   15          COURT SECURITY OFFICER:  All rise.

02:14:58   16          THE COURT:  Mr. Goecke, if you would have the jury

02:15:09   17   brought down, please?

02:15:11   18          COURT SECURITY OFFICER:  Please stand for the

02:16:07   19   jury.

02:16:07   20          (Jury in.)

02:16:08   21          THE COURT:  Please be seated.

02:16:33   22          All right.  Ladies and gentlemen, welcome back.

02:16:39   23   Before we broke, you heard that the Plaintiffs had rested

02:16:44   24   on their case.  And as you will recall, the Defendant will

02:16:51   25   now have an opportunity to present any evidence it wishes

| | | |
|---|---|---|
| 02:16:55 | 1 | to.  And then following that, if the Plaintiff has rebuttal |
| 02:16:59 | 2 | evidence and any time remaining, they may present any |
| 02:17:07 | 3 | rebuttal evidence that they have. |
| 02:17:08 | 4 | But at this time, subject to some legal arguments |
| 02:17:12 | 5 | that will be made later on, the Defendant may proceed to |
| 02:17:16 | 6 | call its first witness. |
| 02:17:17 | 7 | MR. THOMPSON:  Thank you, Your Honor. |
| 02:17:20 | 8 | OnePlus calls Dr. Mario Lopez. |
| 02:17:39 | 9 | (Witness sworn.) |
| 02:17:58 | 10 | MR. THOMPSON:  May I proceed? |
| 02:17:59 | 11 | THE COURT:  You may. |
| 02:18:01 | 12 | MR. THOMPSON:  Thank you. |
| 02:18:01 | 13 | MARIO LOPEZ, PH.D., DEFENDANT'S WITNESS, SWORN |
| 02:18:01 | | |
| 02:18:01 | 14 | DIRECT EXAMINATION |
| 02:18:02 | 15 | BY MR. THOMPSON: |
| 02:18:02 | 16 | Q.  Dr. Lopez, would you introduce yourself to the jury? |
| 02:18:05 | 17 | A.  Yes.  My name is Mario Lopez.  I am a Ph.D. economist |
| 02:18:10 | 18 | and a vice president at Charles River Associates.  That's a |
| 02:18:14 | 19 | financial and economic consulting firm. |
| 02:18:18 | 20 | Q.  And, Dr. Lopez, have you prepared some slides to assist |
| 02:18:21 | 21 | with your testimony today? |
| 02:18:22 | 22 | A.  I have. |
| 02:18:24 | 23 | Q.  And what is your role in this case? |
| 02:18:26 | 24 | A.  So I was retained by counsel for OnePlus to assess |
| 02:18:36 | 25 | reasonable royalty damages and reasonable royalty rates for |

02:18:38    1    the infringement of the four patents-in-suit in this

02:18:41    2    matter.  I was also asked to review and respond to

02:18:47    3    Dr. Putnam's economic analysis in this matter.

02:18:51    4    Q.  And can you briefly tell us what your educational

02:18:53    5    background is?

02:18:54    6    A.  So I have a BA and a Ph.D. in economics from the

02:18:59    7    University of California at Berkeley.  My specializations

02:19:05    8    at Berkeley and my Ph.D. studies were industrial

02:19:08    9    organization.  That's business economics and something

02:19:11    10   called analysis of institutions.

02:19:14    11   Q.  And could you describe for us your professional career?

02:19:17    12   A.  So I've worked in economic consulting for about 18

02:19:22    13   years now, and I've done a variety of work.  Some of that

02:19:25    14   work is related to antitrust issues.  So if you think about

02:19:30    15   a monopoly case in which companies are price fixing, I've

02:19:34    16   analyzed those issues.

02:19:35    17        During those 18 years, I've spent a considerable

02:19:39    18   amount of my time working on patent valuations or the

02:19:44    19   valuations of patents for both SEPs and what we're

02:19:49    20   referring to here as NEPs, so non-standard essential

02:19:53    21   patents.

02:19:53    22   Q.  And we've heard in this case that three of the four

02:19:56    23   patents are standard essential patents.  Do you have any

02:19:59    24   experience with standard essential patents?

02:20:00    25   A.  Yes, I do.

02:20:03    1    Q.  Can you tell us?

02:20:04    2    A.  Yes.  So about one-third of my work as a consultant is

02:20:10    3    in licensing negotiations.  So I assist companies during

02:20:14    4    the licensing negotiations, particularly for SEPs, which

02:20:19    5    tend to be worldwide licenses, and assist them in

02:20:23    6    developing FRAND royalty rates.

02:20:26    7         The other two-thirds of my work is in expert work

02:20:30    8    like this in court cases as expert testimony to help

02:20:36    9    educate juries and judges on these issues of FRAND

02:20:42   10    royalties.

02:20:43   11         I've been an expert witness at the -- in the U.K.,

02:20:46   12    in Germany, the New Delhi High Court, as well as the U.S.

02:20:53   13    International Trade Commission, and in jury trials, such as

02:20:57   14    this one.

02:20:57   15    Q.  Can you explain what information you've reviewed in

02:21:00   16    doing your work in this case?

02:21:02   17    A.  Yes.  So I reviewed the financial information,

02:21:08   18    particularly those that are related to these licenses.

02:21:11   19    I've read the depositions of OnePlus and Pantech employees.

02:21:21   20    I've looked at the licenses in this matter, and I've also

02:21:25   21    conducted my own economic research and performed those

02:21:27   22    calculations that you'll see in this -- in this analysis

02:21:30   23    here.

02:21:32   24         MR. THOMPSON:  Your Honor, at this time, we would

02:21:33   25    offer Dr. Lopez as an expert in economics and specifically

02:21:37    1    patent royalty and damage analysis.

02:21:38    2         THE COURT:  Any objection?

02:21:39    3         MR. TIDWELL:  No objection, Your Honor.

02:21:41    4         THE COURT:  Very well.

02:21:46    5    Q.  (By Mr. Thompson)  What were you asked to do

02:21:49    6    specifically in this case, Dr. Lopez?

02:21:50    7    A.  So I was asked to evaluate a reasonable royalty.  And

02:21:55    8    so at a high level a reasonable royalty, the idea is, is

02:21:57    9    that it's meant to compensate a patent holder for the use

02:22:00   10    of their patented technology.  And so Pantech deserves to

02:22:04   11    be compensated.  But the particular issue here or the

02:22:09   12    particular patents here relate to complex smartphones.

02:22:15   13         So one of the issues that we're going to have to

02:22:17   14    take into account is, how do we account for all of the

02:22:20   15    complexity of these smartphones while still compensating

02:22:23   16    Pantech for the use of its technologies?

02:22:28   17    Q.  Now, three of the patents-in-suit, as we've said, are

02:22:32   18    these standard essential patents.  What does that mean?

02:22:34   19    What is a standard essential patent?

02:22:38   20    A.  So as we've seen, the standard essential patents, if

02:22:41   21    you pull up your phone right now and it will say 5G, there

02:22:45   22    are thousands of patents that have been declared essential

02:22:50   23    to that standard.

02:22:51   24         So part of the purpose of a standard is to bring

02:22:54   25    all of those technologies together so that they

02:22:56    1    interoperate seamlessly, so you don't know what

02:23:00    2    technologies are there but they're interoperating

02:23:03    3    seamlessly.

02:23:04    4         So that creates an issue in the context of

02:23:07    5    licensing negotiations.  Once the standard is set, all of

02:23:13    6    those technologies get locked into the standard.  And by

02:23:16    7    extension, the patents that are essential to the standard

02:23:20    8    are also locked in.  And so that can affect licensing

02:23:25    9    negotiations.

02:23:27    10        So, in effect, if you have an SEP, one of the

02:23:29    11   thousands that are then determined to be essential, you

02:23:33    12   have to take a license.  And so that can give bargaining

02:23:37    13   power to patent holders.

02:23:38    14        And so what the FRAND commitment does is helps

02:23:43    15   guarantee that those royalties remain reasonable and

02:23:47    16   affordable, particularly in the context of these complex

02:23:52    17   devices.

02:23:53    18   Q.  Now, what does this word, FRAND, mean?

02:23:56    19   A.  So we've seen it a couple of times, and I'll give my

02:24:02    20   interpretation, which is the economic interpretation that's

02:24:07    21   broken into two pieces.

02:24:08    22        So there is the FR prong, which is the fair and

02:24:11    23   reasonable, and that is what I said before, which is that

02:24:13    24   royalties need to be kept in proportion to the contribution

02:24:20    25   that patented technology brings, accounting for the

02:24:23    1    complexity of the device.

02:24:25    2    Q.  Okay.  So if that's the FR part, what's the ND

02:24:28    3    component?

02:24:28    4    A.  So the ND component is non-discriminatory, and it means

02:24:34    5    exactly as it sounds.  It means that you cannot

02:24:38    6    discriminate against potential licensees by charging

02:24:43    7    substantially different royalty rates, and there's a

02:24:45    8    purpose for that in order to ensure that the playing field

02:24:49    9    is level.

02:24:51   10    Q.  Now, you were here in the -- you were here when

02:24:54   11    Dr. Putnam testified, correct?

02:24:56   12    A.  Yes, I was.

02:24:57   13    Q.  Okay.  And did you hear his testimony regarding the --

02:25:02   14    specifically the size of certain licensees and volume

02:25:05   15    discounts and that sort of thing?

02:25:06   16    A.  Yes, I did.

02:25:07   17    Q.  Did you -- do you agree with the opinions he gave?

02:25:09   18    A.  So, no.  So -- and this is an important factor.  What

02:25:14   19    we're going to see here is that there are two companies

02:25:18   20    which make up the majority of the market.  There's no

02:25:20   21    dispute about that.

02:25:22   22         They ███████████████████████████████, the

02:25:26   23    SEPs, except for the '247 patent, and the NEPs.  So they

02:25:32   24    █████████████████████████████████████████████████████

02:25:36   25    ████████████████████.

| | | |
|---|---|---|
| 02:25:37 | 1 | And so the entire purpose is to -- to keep the |
| 02:25:44 | 2 | playing field level is for other companies to be able to |
| 02:25:48 | 3 | not be discriminated against.  So Pantech can't |
| 02:25:52 | 4 | discriminate -- discriminate based on the size of the |
| 02:25:56 | 5 | company that would -- an example of this might be Walmart. |
| 02:26:02 | 6 | If you're a small grocer, you're going to pay more |
| 02:26:05 | 7 | for bread, you might pay 10 percent more or 20 percent |
| 02:26:10 | 8 | more, but we wouldn't expect them to pay 10 times more or |
| 02:26:17 | 9 | 200 times more.  That would be clearly discriminatory. |
| 02:26:18 | 10 | Q.  Now, what happens if someone transfers their patents, |
| 02:26:23 | 11 | does this FRAND obligation go with the patents? |
| 02:26:25 | 12 | A.  Yes, I think that that's agreed upon.  And that's an |
| 02:26:28 | 13 | important factor here.  It wouldn't make any sense |
| 02:26:31 | 14 | otherwise.  Otherwise, you would have these patents, and |
| 02:26:35 | 15 | then you could transfer them, and then that obligation |
| 02:26:38 | 16 | would go away, and then you would lose the whole meaning of |
| 02:26:40 | 17 | FRAND. |
| 02:26:41 | 18 | So you could just transfer the patents, and then |
| 02:26:43 | 19 | the FRAND obligation wouldn't -- wouldn't hold anymore.  So |
| 02:26:46 | 20 | even -- even when the patents are transferred, that |
| 02:26:52 | 21 | obligation goes with it. |
| 02:26:54 | 22 | Q.  Now, on this slide, you've got OnePlus's smartphones |
| 02:26:57 | 23 | and thousands of features.  Can you explain what you're |
| 02:27:00 | 24 | trying to illustrate here? |
| 02:27:02 | 25 | A.  So if you're a smartphone company, it's important that |

02:27:05  1   you think about the issue of royalty stacking, and that is

02:27:10  2   the total royalties that you may have to eventually pay on

02:27:15  3   your phone for all the technologies that are included.

02:27:20  4        So what is royalty stacking?  It's just the

02:27:22  5   potential of the accumulation of royalties as patent

02:27:27  6   holders come and demand royalties for you.  And so even a

02:27:30  7   small royalty, if you pay -- pay an excessive amount, if it

02:27:36  8   accumulates, it can be unprofitable to produce your

02:27:41  9   products.

02:27:42  10  Q.  And so do you know about how many patent families there

02:27:46  11  are for 4G and 5G technology?

02:27:50  12  A.  So even before we get to 4G and 5G, we have to consider

02:27:55  13  all the other complexities of the -- of the smartphone.

02:28:01  14  And so when we're thinking about what it takes to bring a

02:28:04  15  smartphone to market, we have OnePlus's contributions.  It

02:28:08  16  invests R&D.  It has marketing.  It has brand value.  And

02:28:13  17  it has to incur its marketing costs.

02:28:16  18       There's -- when you look at a smartphone, there's

02:28:19  19  hardware and software.  You have processors, touchscreen

02:28:25  20  displays, very, very sophisticated cameras that 20 years

02:28:29  21  ago you were carrying around as a separate camera.  And

02:28:32  22  then you have the operating system, like Android, and that

02:28:34  23  enables a lot of the apps that we're seeing, like TikTok

02:28:37  24  and Facebook.  You have GPS, accelerometers, and other

02:28:43  25  hardware in those devices.

| | | |
|---|---|---|
| 02:28:45 | 1 | And then we get to the standards.  Your phone has |
| 02:28:48 | 2 | WiFi on it.  None of you would probably buy a phone if it |
| 02:28:52 | 3 | didn't have WiFi in it.  And these patents do not relate to |
| 02:28:55 | 4 | WiFi. |
| 02:28:56 | 5 | There's Bluetooth.  There's NFC, if you use your |
| 02:29:00 | 6 | phone for payments.  There are these standards, the HEVC |
| 02:29:05 | 7 | and AVC standards, which take video files and compress them |
| 02:29:08 | 8 | down so that they can be sent over your cellular -- |
| 02:29:11 | 9 | cellular network.  And there are -- there are thousands of |
| 02:29:13 | 10 | patents worldwide on those standards. |
| 02:29:16 | 11 | And so we're just talking about one slice of the |
| 02:29:20 | 12 | features of the phone that is the 4G and 5G, which then |
| 02:29:24 | 13 | we're going to be talking specifically about the patented |
| 02:29:27 | 14 | technologies are only a component of those. |
| 02:29:29 | 15 | Q.  And do you know how many patent families exist for the |
| 02:29:35 | 16 | 5G and 4G technology? |
| 02:29:36 | 17 | A.  So for the 4G standard, there have been approximately |
| 02:29:41 | 18 | 20,000 patents that have been declared essential to that |
| 02:29:43 | 19 | standard. |
| 02:29:43 | 20 | For the 5G standard, which is even more complex, |
| 02:29:49 | 21 | 30,000 patents have been declared essential to that |
| 02:29:51 | 22 | standard. |
| 02:29:53 | 23 | Q.  Okay.  Okay.  Can you describe for us your approach to |
| 02:29:59 | 24 | your calculation of a reasonable royalty? |
| 02:30:02 | 25 | A.  Yes.  So there's a variety of ways in which you can |

02:30:06   1   calculate reasonable royalties or FRAND royalties, and one

02:30:11   2   of them is a comparable license approach.

02:30:13   3        Dr. Putnam and I agree on this approach, and we --

02:30:16   4   we agree on the analogy when we're buying a home, we're

02:30:19   5   looking at comparable homes in the neighborhood of

02:30:26   6   comparable features, looking at two bedroom homes with two

02:30:36   7   baths.

02:30:37   8        There is -- what we're looking for here is

02:30:39   9   specifically what other companies are paying to use

02:30:42   10  Pantech's patented technologies.  And one of the most

02:30:47   11  important features here is that the comparable must

02:30:51   12  represent the actual market price.

02:30:54   13       So Dr. Putnam frequently talked about real-world

02:30:57   14  evidence.  And so while we agree at this very high level,

02:31:02   15  I'm going to talk about some very specific missing pieces

02:31:05   16  of Dr. Putnam's analysis that fundamentally alter some of

02:31:10   17  his calculations and some of the conclusions that we should

02:31:13   18  be drawing ████████████████████.

02:31:16   19  Q.  Okay.

02:31:16   20       MR. THOMPSON:  Your Honor, at this moment, I think

02:31:18   21  we need to go ahead and seal the courtroom for a little

02:31:20   22  bit.

02:31:21   23       THE COURT:  All right.  The courtroom will be

02:31:22   24  sealed at this time.

02:31:23   25       (Courtroom sealed.)

02:31:23    1          (This portion of the transcript is Sealed and

02:31:23    2          filed under separate cover as Sealed Portion

02:41:16    3          No. 6.)

02:41:16    4          (Courtroom unsealed.)

02:41:22    5    Q.   (By Mr. Thompson)  Okay.  Looking at your next slide

02:41:45    6    here, now, what does Dr. Putnam rely on?

02:41:47    7    A.   So Dr. Putnam ignores the Apple and Samsung agreement.

02:41:53    8    He places those -- he places those aside despite the

02:41:59    9    non-discriminatory obligation, and he only looks at four

02:42:02   10    licenses in the end that he deems as comparable.

02:42:05   11          And what we can see here, that they are very minor

02:42:08   12    players in the market.  Coolpad and GNJ don't have any

02:42:12   13    sales in the market, and Sony and BLU are very minor

02:42:18   14    players.

02:42:20   15    Q.   Okay.  Can you tell us what -- did you analyze the BLU

02:42:22   16    license?

02:42:23   17    A.   Yes, I did.

02:42:23   18    Q.   Can you walk us through your analysis?

02:42:26   19    A.   So the first factor here is that the BLU license is the

02:42:31   20    settlement of litigation.  So there was a litigation that

02:42:34   21    Pantech had sued BLU, and they ended up settling that

02:42:40   22    litigation through this -- through this license.

02:42:42   23          If we look at this license, it is one license with

02:42:47   24    a very tiny market share, and that does not equate.  So

02:42:53   25    this one license cannot equate to a market rate given --

02:42:56   1   given their size.

02:42:57   2   Q.  And does -- in your calculation, does BLU end up paying

02:43:01   3   Dr. Putnam's ███████████████

02:43:03   4   A.  So we have to look at here the royalty rate on past

02:43:08   5   sales.  And so this gives you a magnitude -- a sense of the

02:43:13   6   magnitude when we're limiting to past sales for BLU, it's

02:43:19   7   ██████████.  And, again, that's a portfolio rate, and it

02:43:22   8   covers sales outside of the U.S.  And so I've gone through

02:43:29   9   and I've performed a calculation, which is what is the

02:43:32   10  effective royalty rate that BLU paid?  What was the value

02:43:36   11  of that ██████████ compared to its sales?  And that effective

02:43:42   12  royalty rate calculation comes out to be ████ percent.

02:43:46   13          So we know that they got a discount on part of

02:43:51   14  their sales.  So they're not paying ████████████████████

02:43:55   15  ██████████.

02:43:56   16  Q.  Okay.

02:43:57   17          MR. THOMPSON:  Let's go to the next one.

02:44:00   18  A.  And just to -- I'm going to add one more thing, and

02:44:03   19  that is -- so just to make this clear, they paid the

02:44:09   20  ███████████████████████████████ on ongoing sales, but received

02:44:15   21  █████████████████████████████.

02:44:17   22          This would be the equivalent of if you have a

02:44:20   23  basket of oranges at 10 cents and you have another basket

02:44:23   24  of oranges at 50 cents, but the key is you have to buy

02:44:27   25  those baskets together, then you're going to consider the

| | | |
|---|---|---|
| 02:44:31 | 1 | overall average of those prices. |

02:44:33    2    Dr. Putnam is only considering the high price

02:44:36    3    basket.  He's only considering the higher rate for the

02:44:41    4    future sales.

02:44:43    5    Q.  (By Mr. Thompson)  Okay.  On this, did you look at the

02:44:45    6    Coolpad license and do an analysis of it?

02:44:48    7    A.  Yes.

02:44:49    8    Q.  Can you explain that to us?

02:44:50    9    A.  Yes.  So it's a settlement of litigation.  Again, we

02:44:54    10    can see that the actual payment on past sales is ██████.

02:45:02    11    Just less than ██████.  And, again, that is a portfolio

02:45:06    12    rate.  When we're looking at past sales for a portfolio,

02:45:09    13    it's very limited in terms of -- in terms of their

02:45:12    14    royalties.

02:45:13    15    But an important factor here is that Coolpad has

02:45:17    16    exited the market, and it was known at the time they

02:45:19    17    entered the license that they were exiting the market.  So

02:45:23    18    they have never written a check for any sales at the rate

02:45:29    19    ██████████.  It's a rate that exists on a paper, but

02:45:37    20    it is not a rate Coolpad has ever paid.  So it is just a

02:45:41    21    paper rate.

02:45:42    22    MR. THOMPSON:  Your Honor, I'm told that we should

02:45:43    23    seal the courtroom for this, too, so let's do that.

02:45:46    24    THE COURT:  All right.

02:45:46    25    MR. THOMPSON:  If you're okay with it.

| | | |
|---|---|---|
| 02:45:48 | 1 | THE COURT:  The courtroom will need to be sealed |
| 02:45:50 | 2 | at this time. |
| 02:45:51 | 3 | (Courtroom sealed.) |
| 02:45:51 | 4 | (This portion of the transcript is Sealed and |
| 02:45:51 | 5 | filed under separate cover as Sealed Portion |
| 03:28:00 | 6 | No. 7.) |
| 03:28:00 | 7 | (Courtroom unsealed.) |
| 03:28:01 | 8 | THE COURT:  Ladies and gentlemen of the jury, |
| 03:28:02 | 9 | you've heard that the Defendant have now rested.  Do the |
| 03:28:06 | 10 | Plaintiffs have any rebuttal witnesses? |
| 03:28:08 | 11 | MR. FUSSELL:  No, Your Honor, the Plaintiff rests. |
| 03:28:11 | 12 | THE COURT:  All right.  Does the Plaintiff rest on |
| 03:28:12 | 13 | its entire case? |
| 03:28:13 | 14 | MR. FUSSELL:  Yes, Your Honor. |
| 03:28:14 | 15 | THE COURT:  And does the Defendant rest on its |
| 03:28:16 | 16 | entire case? |
| 03:28:17 | 17 | MR. THOMPSON:  Yes, Your Honor. |
| 03:28:17 | 18 | THE COURT:  All right.  Very well. |
| 03:28:20 | 19 | Ladies and gentlemen of the jury, you recall from |
| 03:28:21 | 20 | yesterday morning that what remains to be done in -- in |
| 03:28:27 | 21 | this trial is the instructions that I will give you about |
| 03:28:31 | 22 | the law that you must follow in your deliberations, and |
| 03:28:37 | 23 | then following that, the parties' closing arguments about |
| 03:28:42 | 24 | what they believe the appropriate verdict is. |
| 03:28:44 | 25 | All of the testimony has now been presented to |

| | | |
|---|---|---|
| 03:28:48 | 1 | you.  We have some legal arguments that we will need to |
| 03:28:55 | 2 | work through this afternoon after you have left, and then |
| 03:29:00 | 3 | we'll do that again in the morning. |
| 03:29:02 | 4 | But I do think, given the hour and what remains to |
| 03:29:06 | 5 | be done, that we can handle everything and be ready to go |
| 03:29:10 | 6 | here in the courtroom with you at 9:00 o'clock in the |
| 03:29:13 | 7 | morning, beginning with the closing -- or the final |
| 03:29:17 | 8 | instructions and then with the parties' closing arguments. |
| 03:29:21 | 9 | So I'll ask you to be here just a little bit |
| 03:29:24 | 10 | before 9:00 o'clock so that you can get up to the jury room |
| 03:29:27 | 11 | and get settled and situated.  And then we will look |
| 03:29:31 | 12 | forward to having you here in the courtroom as close to |
| 03:29:34 | 13 | 9:00 a.m. as possible for the final instructions and |
| 03:29:40 | 14 | closing arguments. |
| 03:29:41 | 15 | So as a reminder, don't talk to anyone about the |
| 03:29:46 | 16 | case.  Don't allow anyone to talk about the case in your |
| 03:29:49 | 17 | presence.  Don't do any independent research or |
| 03:29:54 | 18 | investigation into anything associated with the case. |
| 03:29:57 | 19 | And, finally, don't post anything about your |
| 03:30:01 | 20 | involvement as a juror on any -- any social media website |
| 03:30:04 | 21 | or app. |
| 03:30:04 | 22 | Hope you all have a pleasant evening, and we'll |
| 03:30:09 | 23 | see you back in the morning at 9:00 a.m. |
| 03:30:13 | 24 | COURT SECURITY OFFICER:  Please stand for the |
| 03:30:16 | 25 | jury. |

| | | |
|---|---|---|
| 03:30:16 | 1 | (Jury out.) |
| 03:30:20 | 2 | THE COURT:  Please be seated. |
| 03:30:53 | 3 | Okay.  I just have a couple of brief comments |
| 03:31:02 | 4 | about the instructions.  And anything else anybody wishes |
| 03:31:07 | 5 | to raise, I'll be glad to hear. |
| 03:31:10 | 6 | Is there anything we need to talk about before we |
| 03:31:12 | 7 | talk about instructions? |
| 03:31:13 | 8 | MR. AIRAN:  Your Honor, I'm not sure if my |
| 03:31:16 | 9 | colleague is going to come up again, Justin, and renew our |
| 03:31:21 | 10 | Rule 50 motion. |
| 03:31:22 | 11 | THE COURT:  Fair enough. |
| 03:31:33 | 12 | MR. BURNAM:  Your Honor, may it please the Court. |
| 03:31:37 | 13 | We just renew the same JMOL motion that I |
| 03:31:41 | 14 | discussed earlier.  We'll be shortly filing it on the |
| 03:31:45 | 15 | docket. |
| 03:31:46 | 16 | The JMOL is for no damages because Pantech has not |
| 03:31:49 | 17 | carried its burden, at least because Dr. Putnam's |
| 03:31:53 | 18 | methodology presented to the jury is fundamentally flawed. |
| 03:31:56 | 19 | THE COURT:  All right.  Very good. |
| 03:31:58 | 20 | Ms. Krawice? |
| 03:32:02 | 21 | MR. BURNAM:  There's one particular issue that I |
| 03:32:04 | 22 | wanted to raise is, in particular, we think there should be |
| 03:32:08 | 23 | JMOL of no damages for the '654 non-essential patent |
| 03:32:12 | 24 | because of lack of evidence presented to the jury tying |
| 03:32:17 | 25 | Dr. Putnam's royalty rate for that non-essential patent to |

03:32:20    1    the value of that non-essential patent.

03:32:24    2           THE COURT:  Ms. Krawice, what evidence was there

03:32:30    3    related to the '654, Ms. Krawice?

03:32:34    4           MS. KRAWICE:  Your Honor, there was first the --

03:32:36    5    from the technological standpoint, there was the evidence

03:32:39    6    provided by Mr. Mauro, and then Dr. Putnam explained how he

03:32:43    7    heard that it was commercially essential so that he

03:32:48    8    afforded it a similar rate to one of the SEP patents when

03:32:52    9    he was determining a rate.

03:32:55   10           There was -- further then, Dr. Putnam provided

03:33:00   11    that rate before the jury based on the sales basis that

03:33:04   12    were stipulated to, and those numbers were presented to the

03:33:07   13    jury.

03:33:11   14           MR. BURNAM:  Your Honor, there's a few points on

03:33:14   15    this I'd like to make.

03:33:15   16           So, first of all, in direct, Dr. Putnam didn't at

03:33:20   17    all talk about any analysis he did for what the value of

03:33:26   18    the '654 patent should be.  On cross, he did equate it with

03:33:29   19    the value of the 24 --

03:33:31   20           THE COURT:  Did it really even come up on direct?

03:33:34   21           MR. BURNAM:  It didn't come up on direct at all.

03:33:37   22           THE COURT:  At all.

03:33:37   23           MR. BURNAM:  No.  That's -- I think -- I wasn't

03:33:38   24    there -- but I assume that's what the sidebar was about.

03:33:40   25    It didn't come up on direct.

03:33:42   1          And on cross, Mr. Filbin asked if he had given any

03:33:47   2    discussion analysis about it, something like that, and his

03:33:50   3    answer was not responsive to the yes or no question.

03:33:55   4          THE COURT:  Yeah, Ms. Krawice, that's kind of how

03:33:57   5    it happened, isn't it?

03:33:59   6          MS. KRAWICE:  Your Honor, I was here for the

03:34:00   7    direct examination, and as the person who also was putting

03:34:04   8    forth Mr. Mauro's testimony, I was carefully listening to

03:34:08   9    mentions of the non-SEP during the direct examination.

03:34:12   10          There were references to the -- the calculation

03:34:17   11   being performed between the non-SEP and the essential

03:34:22   12   patent, and if you put evidence all together, you had

03:34:26   13   Mr. Mauro who testified how this was a commercially

03:34:29   14   essential patent.  You had Dr. Putnam talking about

03:34:34   15   standard essential patents and essentiality in that regard,

03:34:37   16   as well as the fact that he was here for Mauro's testimony

03:34:40   17   and --

03:34:41   18          THE COURT:  Right.  But he -- it is accurate that

03:34:43   19   Dr. Putnam didn't specifically address the '654, is it not?

03:34:47   20          MS. KRAWICE:  He did, Your Honor.

03:34:48   21          THE COURT:  Oh, he did, okay.

03:34:50   22          MS. KRAWICE:  Yes.  He presented his numbers to

03:34:52   23   the jury.  It's just unfortunate that it was mixed in with

03:34:55   24   a conversation with the SEPs as well.

03:34:57   25          THE COURT:  Oh, okay.

03:35:01    1              MR. BURNAM:  So, Your Honor, to clarify, I was

03:35:03    2    here for the direct, just not the sidebar.  But during the

03:35:06    3    direct, it may have been on a slide, but I don't remember

03:35:08    4    any actual analysis comparing the '247 and the '654, which

03:35:13    5    is the opinion he gave.

03:35:15    6              And, also, Dr. Mauro and Dr. Cooklev both

03:35:15    7    testified that neither of them did that analysis and indeed

03:35:22    8    neither of them is qualified to do a comparison of a patent

03:35:26    9    that they were not assigned to analyze with the patent that

03:35:29   10    they were assigned to analyze.

03:35:31   11              Furthermore, even if the 2 -- the '654 patent is

03:35:36   12    commercially essential, the VirnetX case from the Federal

03:35:40   13    Circuit, I don't have the citation with me right now, but

03:35:42   14    says that it does not matter if a patent is important,

03:35:48   15    valuable, or, quote, "even essential," that does not -- and

03:35:53   16    now I'm not quoting -- but that does not satisfy the

03:35:56   17    obligation of apportionment.  That will be in the motion we

03:35:59   18    file later.

03:36:00   19              So regardless of whether it's commercially

03:36:02   20    essential, that wouldn't even be enough.  But there's no

03:36:05   21    evidence that any of the experts is qualified to do the

03:36:08   22    comparison.

03:36:09   23              MS. KRAWICE:  Your Honor, further, Dr. Putnam

03:36:15   24    extensively discussed this on redirect where I believe the

03:36:18   25    door was opened for him to opine on the '654 patent.

03:36:21   1        There was a lengthier discussion in the redirect

03:36:23   2   of Dr. Putnam regarding the '654 methodology in particular,

03:36:27   3   and that was specifically tied to the fact that he did a

03:36:32   4   comparison between the essentiality in regards to

03:36:35   5   commercially essential versus an SEP essentiality, and

03:36:39   6   that's how he reached his apportioned number of a

03:36:43   7   reasonable royalty rate for those patents.

03:36:44   8        They are the same because he opined that the

03:36:47   9   essentiality in a commercial standpoint as explained to him

03:36:51   10  by Mr. Mauro, who they've had conversations with before of

03:36:56   11  reaching his opinions in this case, was then tied to the

03:37:01   12  largest value he assigned it for one of the SEPs.

03:37:04   13       THE COURT:  Okay.  All right.  So Mr. Burnam, what

03:37:08   14  I'm going to do on this is the same thing I've done on the

03:37:12   15  other issues, I'm going to carry it.  You know, the

03:37:14   16  transcript will reveal, you know, what came out.  And I

03:37:24   17  obviously know Mr. Filbin brought it up on cross.  I'm not

03:37:27   18  sure that it was raised before that, and I don't know that

03:37:29   19  the -- the extent to which it came up in redirect.

03:37:32   20       But, obviously, depending on, you know, how the

03:37:35   21  verdict turns out, the parties can file renewed motions for

03:37:39   22  judgment as a matter of law under 50(b), and at that point,

03:37:43   23  we'll have, you know, the final transcript and a more

03:37:47   24  careful scrutiny of that and the full record will be --

03:37:51   25  will be possible.

03:37:52    1          MR. BURNAM:  Understood.  Thank you, Your Honor.

03:37:53    2          THE COURT:  All right.  All right.  Instructions.

03:37:57    3    It looked like there was just really one dispute, as I

03:38:01    4    understood it, and that had to do with the date the damages

03:38:05    5    period begins.  And I'm wondering if based on the

03:38:08    6    stipulations the parties made and that were read into the

03:38:13    7    record earlier, that issue has been totally resolved?

03:38:16    8          MR. FUSSELL:  Yes, Your Honor.  From our

03:38:17    9    standpoint, I believe it has been resolved now.

03:38:19   10          MR. SANNER:  James Sanner for OnePlus, Your Honor.

03:38:23   11    Just to be clear, what is the resolution that should come

03:38:25   12    out or stay in?

03:38:30   13          MR. FUSSELL:  Sorry.  Obviously, we have not had

03:38:33   14    that -- had -- not had it resolved.  I thought since we had

03:38:36   15    the notice language from the stipulation, it would stay in.

03:38:40   16          MR. SANNER:  So our position -- sorry, I don't

03:38:43   17    want to --

03:38:43   18          THE COURT:  Let me suggest this.  You all see if

03:38:45   19    you can meet and confer.  There was a stipulation that was

03:38:49   20    agreed to about a part -- the parties here on an issue

03:38:54   21    that -- an enormous amount of time was spent by both sides

03:38:58   22    arguing about.  It's a very, very straightforward issue.  I

03:39:01   23    truly don't know why it took the parties such effort to get

03:39:05   24    to a resolution on that.

03:39:07   25          So I'm going to give you 15 minutes to see if you

| | | |
|---|---|---|
| 03:39:10 | 1 | can't work this out, too.  I think it's unlikely you can't. |
| 03:39:16 | 2 | So let's take about a 15-minute break and see if |
| 03:39:19 | 3 | you all can work something out. |
| 03:39:22 | 4 | MR. SANNER:  Appreciate it, Your Honor. |
| 03:39:24 | 5 | COURT SECURITY OFFICER:  All rise. |
| 03:39:25 | 6 | (Recess.) |
| 03:39:25 | 7 | COURT SECURITY OFFICER:  All rise. |
| 03:46:52 | 8 | THE COURT:  Please be seated. |
| 03:46:54 | 9 | All right.  Did you all have an opportunity to |
| 03:46:56 | 10 | visit? |
| 03:46:57 | 11 | MR. SANNER:  Yes, Your Honor.  We have reached an |
| 03:46:58 | 12 | agreement on the instruction. |
| 03:46:59 | 13 | THE COURT:  Okay.  Good. |
| 03:47:00 | 14 | MR. SANNER:  I can read it into the record for |
| 03:47:02 | 15 | you. |
| 03:47:02 | 16 | THE COURT:  That'll be fine. |
| 03:47:03 | 17 | MR. SANNER:  All right.  The parties have |
| 03:47:05 | 18 | stipulated as to notice and amounts of licensable sales for |
| 03:47:08 | 19 | each patent which you heard read into the record as |
| 03:47:12 | 20 | stipulations. |
| 03:47:14 | 21 | THE COURT:  All right.  Is that good for the |
| 03:47:16 | 22 | Plaintiff? |
| 03:47:16 | 23 | MR. FUSSELL:  Yes, Your Honor. |
| 03:47:17 | 24 | THE COURT:  Good.  Okay. |
| 03:47:18 | 25 | MR. SANNER:  Thank you. |

03:47:19   1          THE COURT:  As far as I know, that resolves all

03:47:21   2    objections regarding instructions, correct?

03:47:25   3          MR. FUSSELL:  Yes, Your Honor, from our side, that

03:47:26   4    resolves everything.

03:47:27   5          MR. AIRAN:  Yes, correct, Your Honor.

03:47:30   6          THE COURT:  It does?

03:47:31   7          All right.  What else?

03:47:33   8          MR. CULBERTSON:  Your Honor, Mr. Tidwell promised

03:47:40   9    that we would preview for the Court --

03:47:44  10          THE COURT:  We're all on pins and needles.

03:47:47  11          MR. CULBERTSON:  What we're proposing in terms of

03:47:49  12    adding back the discounts that were testified to, and we've

03:47:52  13    shared it with the other side.  They're digesting it and

03:47:55  14    are going to get back to us.  I think we agree on the math.

03:47:58  15    I think we have a disagreement about whether it is an

03:48:01  16    appropriate thing to include.

03:48:02  17          THE COURT:  Sure.

03:48:03  18          MR. CULBERTSON:  What I thought I would do is just

03:48:05  19    leave the Court a copy and --

03:48:07  20          THE COURT:  Right.  Why don't you just tell me

03:48:09  21    what it is, and then leave me a copy?

03:48:12  22          MR. CULBERTSON:  Sure.  For the SEPs, the

03:48:14  23    multiplier becomes 1.42.  And for the non-essential patent,

03:48:22  24    the multiplier becomes 1.67.  And those calculations are

03:48:28  25    made based on the factual testimony that Mr. Jung provided

03:48:34  1  from the stand.

03:48:35  2       THE COURT:  Okay.

03:48:37  3       MR. CULBERTSON:  And it's the discounts that they

03:48:39  4  made -- you know, it's how they calculated their standard

03:48:42  5  rate, the discount that they made to -- excuse me, they

03:48:45  6  calculated their true SEP rate.  They applied a discount

03:48:49  7  when they would offer it to licensees.  They also offered a

03:48:52  8  discount on the NEPs.  And we're just adding that back in

03:48:56  9  due to the lack of uncertainty at this point.

03:48:59  10       THE COURT:  And is what you're going to provide

03:49:01  11  me, does it provide the math that you're --

03:49:04  12       MR. CULBERTSON:  It provides the math.

03:49:04  13       THE COURT:  The math is there, as well?

03:49:06  14       MR. CULBERTSON:  Yes, Your Honor.

03:49:07  15       THE COURT:  And the -- you all had indicated that

03:49:09  16  was a theory that was disclosed in response to an

03:49:15  17  interrogatory?  I never actually saw the interrogatory.

03:49:17  18       MR. CULBERTSON:  I'm happy to provide the Court

03:49:18  19  with all the materials.  There's an interrogatory response,

03:49:21  20  there's Mr. Putnam's report, there's Mr. Jung's deposition,

03:49:25  21  there was the testimony that came in yesterday, there was

03:49:28  22  the slide that showed the discounts.  So this is -- this is

03:49:31  23  just putting -- this is just doing the math to put it back

03:49:35  24  in.

03:49:36  25       THE COURT:  Right.  Okay.  Thank you.

03:49:37    1          MR. CULBERTSON:  Thank you, Your Honor.

03:49:41    2          And I'm going to hand this up.

03:49:42    3          THE COURT:  Yes, please.

03:49:44    4          MR. CULBERTSON:  And we can email it as well.

03:49:48    5          THE COURT:  Have you had an opportunity -- thank

03:49:51    6  you.

03:49:51    7          Have you had an opportunity to review it yet?

03:49:53    8          MR. AIRAN:  Not yet, Your Honor.

03:49:55    9          THE COURT:  All right.  Well, I'll be glad to hear

03:49:56   10  what you say, but...

03:49:57   11          MR. AIRAN:  We're just seeing it now, so we're

03:49:59   12  taking it under advisement.  What I would say, though, is

03:50:02   13  that fundamentally we would disagree with this approach.

03:50:06   14  It's not a disclosed damages theory.  When you look at what

03:50:07   15  was described in the interrogatory, it was an explanation

03:50:09   16  for how they achieve the standard rate.

03:50:12   17          The standard rate is what applies here, not some

03:50:14   18  kicker.  And for the same reason you kicked out the

03:50:17   19  multiplier for Dr. Putnam, I would -- the same type of

03:50:20   20  logic applies here.  There's no basis for this kicker that

03:50:24   21  they're putting in because there's an adjudication of

03:50:27   22  infringement and -- and validity now.

03:50:29   23          This was -- under Georgia-Pacific, you're supposed

03:50:32   24  to assume that the patents are valid and infringed.  And

03:50:35   25  the notion that way back when in 2018 or 2019, whenever

03:50:41  1  Pantech developed their rate, they somehow said, well,

03:50:44  2  let's go to people that we're going to license and pretend

03:50:47  3  there's this big discount, there's no discount there

03:50:51  4  whatsoever.

03:50:52  5      As we explained in connection with generating that

03:50:54  6  rate, it's not a solid rate.  There's no basis for that

03:50:56  7  rate economically.  And so saying there's a discount in

03:50:59  8  their program rate, it's a fantasy.  It's a fiction.  It's

03:51:05  9  not reality.  And so then for them to come in now --

03:51:05  10      THE COURT:  I mean, is that really -- is that an

03:51:08  11  accurate description?

03:51:09  12      MR. AIRAN:  It is, Your Honor, because, again,

03:51:11  13  when you look at -- you look at their interrogatory rate,

03:51:16  14  for example, you look at the Plaintiffs' Exhibit 37, it's

03:51:19  15  this whole problem with Unwired Planet, they're using U.K.

03:51:23  16  data, U.K. patents, outdated stack, outdated patents that

03:51:27  17  are owned for the numerator.  It's this -- this concoction

03:51:32  18  of the royalty rate that's at issue here.

03:51:34  19      No expert has signed on to that.  So it's out of

03:51:37  20  this royalty rate presentation that they give to potential

03:51:40  21  licensees that they say, look, you're getting a deal.  We

03:51:43  22  could be charging you this higher rate, but you're actually

03:51:46  23  getting this deal.

03:51:47  24      And what the evidence was for Mr. Jung is that

03:51:50  25  they have never charged anybody more than the 0.5.  That's

03:51:54    1    the FRAND rate that they said that they've put out there

03:51:56    2    for every single licensee, even if they sue them.

03:52:00    3            So this idea that now they can -- now that there's

03:52:02    4    been a trial and that there's been an adjudication, they

03:52:05    5    can kick that up, that's just not -- not correct.

03:52:07    6            THE COURT:  Well, I mean, most of the arguments --

03:52:10    7    I mean, I -- if this wasn't disclosed or there's something

03:52:13    8    that's been hidden and, you know, they're springing this on

03:52:16    9    you during the trial, that's -- that's a very compelling

03:52:22   10    argument.  They say that's not the case.  We'll see what

03:52:25   11    they provide me.

03:52:27   12            But I think what you've told me so far, and,

03:52:30   13    again, you haven't had an opportunity to review it, and you

03:52:32   14    may have additional objections that you've not made at this

03:52:36   15    point, but based on what you've told me so far, Mr. Airan,

03:52:40   16    I think that all of those are issues that should be

03:52:43   17    addressed in closing.

03:52:44   18            MR. AIRAN:  Sure.  And, to be clear, that is --

03:52:47   19    their theory of how they came up with the 0.5 standard

03:52:54   20    essential rate is in the interrogatory.  We're not

03:52:55   21    disputing that part of it.

03:52:56   22            THE COURT:  Okay.  Fair enough.  All right.  Good.

03:52:59   23            Exhibits, does anybody need to read in exhibits?

03:53:03   24            Ms. Miller?

03:53:05   25            MS. MILLER:  Yes, Your Honor.  I do.

| | | |
|---|---|---|
| 03:53:07 | 1 | For October 15th, the admitted exhibits as agreed |
| 03:53:12 | 2 | by the parties were PX-1, 4, 5, 40 through 43, DTX-5, and |
| 03:53:23 | 3 | DTX-7.  And the parties are also in the process of |
| 03:53:26 | 4 | discussing proposed redactions to PX-37 to find an agreed |
| 03:53:33 | 5 | upon set, and once we get there, we will move that exhibit |
| 03:53:36 | 6 | in evidence, but we're not trying to do so at this time. |
| 03:53:39 | 7 | THE COURT:  Okay.  And that was agreed?  I don't |
| 03:53:44 | 8 | know, who's speaking for -- |
| 03:53:48 | 9 | MR. SANNER:  Yes, Your Honor. |
| 03:53:49 | 10 | THE COURT:  Okay.  Good. |
| 03:53:50 | 11 | Okay.  What else?  It's just whack-a-mole this |
| 03:53:58 | 12 | afternoon. |
| 03:53:59 | 13 | MS. KRAWICE:  I'm having a great day, Your Honor. |
| 03:54:01 | 14 | THE COURT:  You're doing a great job. |
| 03:54:02 | 15 | MS. KRAWICE:  Thank you. |
| 03:54:03 | 16 | I just wanted to raise just a point of, I don't |
| 03:54:06 | 17 | know, procedure, I guess I'll call it.  I just noticed that |
| 03:54:10 | 18 | OnePlus has filed a sealed motion for judgment as a matter |
| 03:54:15 | 19 | of law on the docket.  I haven't seen it yet.  We haven't |
| 03:54:18 | 20 | been served just quite yet, but I just wanted Your Honor to |
| 03:54:23 | 21 | bless the fact that we believe that the parties similar to |
| 03:54:25 | 22 | last time should agree to a post-trial briefing schedule |
| 03:54:28 | 23 | that should then be followed.  I didn't have a chance to |
| 03:54:31 | 24 | raise this before they filed this. |
| 03:54:33 | 25 | THE COURT:  Yeah, sure.  I mean, I'm going to ask |

03:54:34   1   the parties to agree on a post-trial briefing schedule just

03:54:38   2   like last time.

03:54:39   3          To the extent you want to file something on the

03:54:41   4   docket in response to that now, you're more than welcome to

03:54:44   5   do that, and I'm certainly not going to give you legal

03:54:49   6   advice about whether you have to or not.  But definitely

03:54:54   7   if -- depending on how the verdict comes down, the parties

03:54:57   8   will, you know, have an opportunity to file post-trial

03:55:01   9   briefs, and I'll ask you to agree on a schedule that --

03:55:05   10  that accomplishes that.

03:55:08   11         MS. KRAWICE:  Your Honor, is it possible to get an

03:55:12   12  extension to file a response to this motion?

03:55:14   13         THE COURT:  Is there any objection to an

03:55:15   14  extension?

03:55:16   15         MR. BURNAM:  Your Honor, this is just the

03:55:18   16  submission I discussed with you earlier about our 50(a)

03:55:21   17  motion.

03:55:21   18         THE COURT:  Right.  And when do you plan to serve

03:55:23   19  it on the Plaintiffs?

03:55:25   20         MR. BURNAM:  I mean, today, yeah.  Now.  I mean,

03:55:31   21  it's filed.

03:55:32   22         MS. KRAWICE:  It's filed, but it hasn't been

03:55:34   23  served yet.

03:55:35   24         THE COURT:  Right, of course.  Well, I mean, I can

03:55:36   25  tell you this about the post-trial briefing, I'm going to

03:55:40   1   expect it to occur very quickly.  That won't come as a

03:55:45   2   surprise to you all.  But we will have a very short fuse on

03:55:49   3   when opening briefs will have to be submitted, and I don't

03:55:54   4   expect to accommodate extensions once that's done.

03:55:58   5            But with respect to this motion, if there's not

03:56:04   6   any objection, you can have an extension as far as I'm

03:56:07   7   concerned.

03:56:11   8            MR. FILBIN:  No objection.  No objection.

03:56:13   9            THE COURT:  No objection?

03:56:14   10           MR. FILBIN:  No.

03:56:14   11           THE COURT:  Very good.

03:56:15   12           All right.  How much time would you like?

03:56:19   13           MR. FUSSELL:  We haven't seen the motion yet,

03:56:22   14   Your Honor.  I think it would be premature to --

03:56:25   15           THE COURT:  All right.  File your motion on the

03:56:26   16   docket once you've reviewed it.

03:56:28   17           MR. FUSSELL:  Thank you.  Thank you very much.

03:56:29   18           THE COURT:  Very good.

03:56:30   19           Okay.  All right.  What else?

03:56:35   20           Closings?  Y'all are more than welcome to split up

03:56:38   21   your closings however you want.  Each side will have 30

03:56:42   22   minutes.  You all know my practice about using two-thirds

03:56:46   23   of your time in your initial closing, and I do expect you

03:56:50   24   to open fully on all issues, including damages in the -- in

03:56:54   25   the initial closing.

| | | |
|---|---|---|
| 03:56:59 | 1 | What else?  Anything else? |
| 03:57:01 | 2 | MR. AIRAN:  Not from the Defendants. |
| 03:57:02 | 3 | THE COURT:  All right.  The instructions are |
| 03:57:05 | 4 | agreed at this point, so I would say as long as y'all are |
| 03:57:08 | 5 | here by 8:45 ready to go straight up at 9:00 o'clock, I |
| 03:57:14 | 6 | don't expect any -- have you all exchanged closing slides? |
| 03:57:18 | 7 | When do you intend to do that, or have you agreed |
| 03:57:20 | 8 | not to exchange them? |
| 03:57:23 | 9 | MR. FUSSELL:  We have a 6:30 deadline today. |
| 03:57:26 | 10 | THE COURT:  All right.  Why don't we plan to be |
| 03:57:27 | 11 | here at 8:30 to address -- given the trend. |
| 03:57:36 | 12 | All right.  See you all at 8:30 in the morning. |
| 03:57:39 | 13 | COURT SECURITY OFFICER:  All rise. |
| 03:57:41 | 14 | (Trial adjourned at 3:57 p.m.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

CERTIFICATION

    I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


 /S/ Shelly Holmes          10/16/2024
SHELLY HOLMES, CSR, TCRR    Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2025

04:11:16