# EXHIBIT C

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE EASTERN DISTRICT OF TEXAS

3                         TEXARKANA DIVISION

4    PANTECH CORPORATION AND        )(
     PANTECH WIRELESS, LLC,          )(    CIVIL ACTION NO.
5         PLAINTIFFS,                )(    5:22-CV-69-RWS
                                     )(
6    VS.                             )(    TEXARKANA, TEXAS
                                     )(
7    ONEPLUS TECHNOLOGY (SHENZHEN)   )(
     COMPANY LIMITED,                )(    OCTOBER 17, 2024
8         DEFENDANT.                 )(    8:30 A.M.

9

10                     JURY TRIAL TRANSCRIPT

11          BEFORE THE HONORABLE ROBERT W. SCHROEDER III

12                 UNITED STATES DISTRICT JUDGE

13

14   FOR THE PLAINTIFFS:      Mr. James A. (Tripp) Fussell, III
                              Ms. Tiffany A. Miller
15                            Ms. Courtney Krawice
                              Mayer Brown, LLP
16                            1999 K Street, NW
                              Washington, DC 20006
17
                              Mr. Geoffrey P. Culbertson
18                            Mr. Kelly Tidwell
                              Patton Tidwell & Culbertson, LLP
19                            2800 Texas Boulevard
                              Texarkana, TX 75503
20
                              Mr. Graham (Gray) M. Buccigross
21                            Mayer Brown, LLP
                              Two Palo Alto Square
22                            3000 El Camino Real
                              Suite 300
23                            Palo Alto, CA 94306

24

25

```
 1   FOR THE DEFENDANT:        Mr. David M. Airan
                               Mr. Wesley O. Mueller
 2                             Mr. Paul J. Filbin
                               Mr. Christopher J. Gass
 3                             Mr. Michael J. Schubert
                               Mr. James W. Sanner
 4                             Leydig Voit & Mayer, Ltd.
                               Two Prudential Plaza
 5                             180 North Stetson
                               Suite 4900
 6                             Chicago, IL 60601

 7                             Mr. Kevin Collins
                               Mr. Justin Burnam
 8                             Mr. Matthew Kudzin
                               Covington & Burling LLP
 9                             One CityCenter
                               850 Tenth Street NW
10                             Washington, DC 20001

11                             Mr. G. Blake Thompson
                               Mann Tindel & Thompson
12                             112 E. Line Street
                               Suite 304
13                             Tyler, TX 75702

14
     COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
15                             Official Court Reporter
                               Honorable Robert W. Schroeder III
16                             United States District Judge
                               Eastern District of Texas
17                             Texarkana Division
                               500 North State Line Avenue
18                             Texarkana, TX 75501
                               shelly_holmes@txed.uscourts.gov
19

20   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            (Jury out.)
 3            COURT SECURITY OFFICER:  All rise.
 4            THE COURT:  Please be seated.
 5            Good morning, everyone.  All right.  We are in the
 6    final stretch.  We have distributed the jury instructions
 7    and the verdict form to the parties.  Have you all had a
 8    chance to look at those one last time?
 9            MR. FUSSELL:  Yes, Your Honor.
10            THE COURT:  Acceptable to the Plaintiffs?
11            MR. FUSSELL:  Yes, Your Honor.
12            MR. AIRAN:  Acceptable, Your Honor.
13            THE COURT:  All right.  Acceptable to the
14    Defendants, as well.
15            Disputes related to closing slides, whoever wishes
16    to go first.
17            MS. KRAWICE:  I can start, Your Honor.  Courtney
18    Krawice for Pantech.
19            THE COURT:  Good morning.
20            MS. KRAWICE:  Good morning.
21            So we have objected to two slides in Defendant's
22    proposed demonstratives for closings.  Do you have a copy
23    of them in front of you, or would you like this one?
24            THE COURT:  I don't have a full-size copy, but
25    I've got little images.
```

```
 1              MS. KRAWICE:  Okay.  Well --
 2              THE COURT:  I think I can --
 3              MS. KRAWICE:  It's kind of a big-picture idea I
 4    guess.
 5              THE COURT:  I can follow along.
 6              MS. KRAWICE:  So the first one is on Slide 13
 7    where there's a reference to the GNJ license, a woman who
 8    clearly is frustrated with getting a parking ticket, it
 9    seems, with a thousand dollars, which comes as no surprise
10    is what GNJ paid for this license.
11              We don't really understand how this slide is going
12    to be used, and there's a couple of issues with that.
13              First, we believe that comparing a license that
14    Pantech believes to be comparable to something like a
15    parking ticket, which is a known nuisance to nearly
16    everyone, is prejudicial.
17              We are concerned that there also might be an
18    implication that if Pantech is the one issuing these
19    parking tickets, that it could potentially make -- to make
20    people pay it, could go to holdup.  Or the fact that if
21    they're saying that Pantech is the one issuing these
22    parking tickets, again, that's inflammatory, and we don't
23    believe that's necessary.
24              THE COURT:  Mr. Airan.
25              MR. AIRAN:  Your Honor, I think this is fairly
```

```
 1   within closing.  We've heard GNJ paid ████████
 2   for the license.  This is no more than, you know, a
 3   nuisance for them.  They were getting out of the market.
 4   They paid a thousand dollars.  I think this is fairly
 5   within closing to explain that concept to the jury.
 6          THE COURT:  All right.  I'm going to overrule the
 7   objection to this slide.
 8          MS. KRAWICE:  Yes, Your Honor.
 9          The second slide is the following one.  It's just
10   a photo of the Baldwin family.  The other side was fairly
11   forthcoming during the meet-and-confer last night and
12   shared that they intend to use this for an analogy for
13   patent families.
14          A couple of issues with that.
15          First, I'm not quite sure if Your Honor is aware
16   of the legal implications of invoking Alec Baldwin on this
17   slide, but I think it wouldn't come as a surprise to the
18   jury.  We think then for that reason if they're to compare
19   either Pantech or one of Pantech's patents or a member of a
20   patent family that's asserted here, to Alec Baldwin, we
21   think that's unnecessarily inflammatory.  We don't need the
22   Baldwin family to be the connection.
23          But in further of that, it's confusing to
24   represent any one particular patent as the Baldwin family
25   tree because that evidence hasn't been entered here
```

1   regarding what is the scope of these patent families?  Is

2   it just, you know, parent/child relationships?  Does it go

3   beyond that?  To compare any particular license to the

4   Baldwin family tree in particular would be misleading and

5   confusing, as well as inflammatory.

6         We did offer a compromise that, you know, if we

7   can maybe genericize this or even maybe pull the actual

8   patent families tree in some way, that would at least be a

9   little bit closer.  But as it is right now, this is just

10  unnecessarily inflammatory and confusing to the jury.

11        THE COURT:  Mr. Airan.

12        MR. AIRAN:  Yes, thank you, Your Honor.  Again,

13  this is I think fairly within closing.  Not all Baldwins

14  are equal.  And when they did their patent family analysis,

15  they did a family analysis.

16        And what we're simply doing is drawing attention

17  to the jury that not all patent family members are the

18  same.  Alec is not William who is not Daniel who is not

19  Stephen.  That's all we're saying.  We think that's going

20  to be something the jury would understand.

21        THE COURT:  Well, I mean, I think there's a fair

22  point that's been raised here.  Why use the Baldwin family?

23  Why not use the Brady Bunch?

24        MR. AIRAN:  We could have used the Brady Bunch.

25  We thought this was something more timely, more that the

1   jury would understand, that Alec Baldwin -- thought that

2   was a more appropriate analogy that Alec Baldwin is closer

3   to Stephen Baldwin is closer to Billy Baldwin.  That's

4   something the jury would be able to understand, more so

5   than the Brady Bunch.  We have a younger bunch of jurors on

6   this case, so we thought we would like to explain that to

7   the jury.

8            THE COURT:  Yeah, I mean, is there going to be any

9   discussion at all about Mr. Baldwin's legal troubles?

10           MR. AIRAN:  No, no, not at all.  We're just going

11  to say Alec Baldwin is not -- if you count up the number of

12  movie references that Alec Baldwin, you can't attribute

13  them to Stephen Baldwin and vice versa.  That's all we're

14  going to say about it.

15           THE COURT:  What about the compromise that Pantech

16  has offered here that you just use some sort of a generic

17  family tree?

18           MR. AIRAN:  Again, I don't think that would convey

19  to the jury what we're trying to convey, that not all

20  Baldwins are equal.  They're likely -- the jury is likely

21  to know Stephen Baldwin, they're likely to know Alec --

22  maybe we could do a football analogy, if you did the

23  Manning family or something like that, because then, again,

24  the jury might understand the Manning family between

25  Peyton.

```
 1              THE COURT:  How about the Manning family,
 2   Ms. Krawice?
 3              MS. KRAWICE:  I recently met Archie and he's
 4   really nice.  I'm -- I think we'd be okay with that if we
 5   could just see it before it's being used to see how it's
 6   being displayed.
 7              I guess the concern is still slightly that there
 8   hasn't been evidence as to what the family trees of these
 9   asserted patents actually look like here.  And, you know,
10   to say that this patent, like, for example, the '247, is
11   the Manning family, and it has these cousins or nephews,
12   you know, that are --
13              THE COURT:  Yeah.
14              MS. KRAWICE:  It's kind of confusing and
15   misleading when none of that has been brought up in court.
16              THE COURT:  Let's see if we can get a slide that
17   would represent the Manning family.  I think maybe they
18   might be more currently relevant than the Brady Bunch, but
19   I am concerned about the implication raised by, you know,
20   recent legal issues related to the Baldwin family.
21              MR. AIRAN:  Okay.  We'll provide them with a
22   Manning family tree.
23              THE COURT:  All right.
24              MS. KRAWICE:  That's all, Your Honor, for us.
25              THE COURT:  Okay.
```

```
 1            MR. THOMPSON:  Good morning, Your Honor.

 2            THE COURT:  Good morning.

 3            MR. THOMPSON:  So we have -- there's three slides

 4    that there are objections to of their closing slides.  The

 5    first is 7-2, if we can pull it up.

 6            Can you pull up -- he doesn't have that.  Can you

 7    pull up --

 8            And just to preview while he's pulling that up,

 9    Your Honor, the objection to this is -- slide -- when he

10    gets it up is it illustrates ███████████████████████

11    ████ -- and No. 2, yeah.

12            And the objection here is, Your Honor, Dr. Putnam

13    testified he did -- that Sony, there is no such rate.  They

14    ████████████████████████████.  So this ████ is

15    misleading.

16            Here it is on the far-left corner, Your Honor.  So

17    our objection to this, it's misleading and prejudicial.

18    It's not disclosed.

19            Dr. Putnam testified that they didn't pay a

20    running royalty rate, correct?

21            That's right.  For ████ there is no such rate.

22            So that's our objection to that slide, Your Honor.

23            THE COURT:  All right.

24            MS. MILLER:  Your Honor, I have been informed that

25    we are willing to withdraw this slide.
```

1          MR. THOMPSON:  Oh, okay.

2          THE COURT:  All right.  Solves that.

3          MR. THOMPSON:  The next slide, Your Honor, is

4   Slide 3, and our objection to this, this is an apparent

5   attempt to I guess apply Dr. -- some apportionment from

6   Dr. Putnam to our -- to Dr. Lopez's royalty rate, but this

7   is beyond the scope.

8          Dr. Putnam's apportionment was not -- this was not

9   disclosed to us.  He said that he could not unpack the

10   ██████████████  and he didn't disclose any sort of

11   apportionment.  So this is the first time we're seeing

12   this.  So that's obviously beyond the scope, prejudicial,

13   and misleading.

14          MR. CULBERTSON:  Your Honor, I think there may be

15   some misunderstanding.  This is not an effort to say that

16   Dr. Putnam apportioned the ████████.  Because Dr. Lopez

17   performed no apportionment to come up with his royalty

18   number, we used the actual numbers that Dr. Putnam used to

19   apportion the patents-in-suit.

20          So if -- if Dr. Lopez had done that appropriately,

21   there'd actually be a different calculation.  So that's all

22   we're doing here.  We're going to point out, one, that

23   Dr. Lopez hasn't performed any apportionment, and that if

24   he had, this is what the royalties would look like.

25          It is absolutely fair game in closing argument to

1    identify -- because he admitted yesterday he did not

2    perform any apportionment.

3                THE COURT:  He did?

4                MR. CULBERTSON:  Dr. Lopez admitted that.

5                THE COURT:  Okay.  All right.

6                MR. THOMPSON:  Well, Dr. Lopez's apportionment was

7    struck by you, Your Honor, and I think the problem with

8    this is, is what just happened.  I don't understand the

9    slide, so it's confusing to me.  I feel like it maybe --

10   it's going to be confusing to the jury.

11               THE COURT:  Well, go ahead.

12               MR. CULBERTSON:  I'm going to explain it to the

13   jury.  I -- we explained it to them last night.  This is

14   easy stuff.  We're just applying the math that should have

15   been applied to see what the royalty rate actually would be

16   if he had performed apportionment.

17               THE COURT:  I'm going to overrule the objection to

18   this.

19               MR. CULBERTSON:  Thank you, Your Honor.

20               MR. THOMPSON:  Okay.  Moving on, Your Honor, our

21   last objection is to No. 5.

22               Okay.  You saw this yesterday, Your Honor --

23               THE COURT:  Yes.

24               MR. THOMPSON:  -- which we did, too, for the first

25   time.  And, as you know, the jury has never seen this.

1    They've never seen this multiplier or these total numbers.

2    It was never put forth in this case.

3          We're going to have to rebut this in closing

4    argument, which you've already instructed the jury and will

5    again, that closing argument is not evidence.  So we're

6    going to have to rebut this for the first time.

7          And one of two things have happened here,

8    Your Honor.  Either Pantech knew about this number all

9    along and just chose to tell us yesterday, or they didn't

10   know about it and just came up with it yesterday, both of

11   which are untimely and highly prejudicial to us.

12         Your Honor, you were here obviously the first

13   trial.  We never saw this multiplier and these numbers.

14   It's never been used.  This number has never been given to

15   us.  And it's highly prejudicial for us to have to rebut it

16   now.

17         THE COURT:  Yeah.  My concern is if -- if you

18   don't have some number from Pantech, the jury's not going

19   to know what Pantech's request is.

20         MR. THOMPSON:  Well, that's a --

21         THE COURT:  And we're back in the same position we

22   were at the first trial.

23         MR. THOMPSON:  I understand, Your Honor.  But

24   that's a problem of Pantech's own creating.  We could have

25   had this number given to us long ago.

1          If this was their intention and they base it on

2     this rog -- interrogatory which does not have this number,

3     by the way, then it could have been given to us all along.

4          And if they didn't want to use it, okay, maybe

5     they wanted to try something else.  But we've never seen

6     this.  We're now on the second trial on damages in this

7     case, and we've never seen these multipliers, and we've

8     never seen these numbers.

9          And there's nothing fair about us getting hit with

10    this the day before closing arguments and we have to

11    address it the first time on closing argument.

12          So we have to rebut this in front of the jury in

13    closing.  The jury never saw this number.  I mean, if they

14    wanted to use this number, Your Honor, Dr. Jung could

15    have -- they could have done it through him.  This is where

16    they claim that these numbers come from -- you know, these

17    percentages, but they didn't do that.

18          THE COURT:  Right.

19          MR. THOMPSON:  So they shouldn't get to do it now.

20          THE COURT:  Well, I mean, we did discuss what

21    these numbers potentially could be and the discounts could

22    be at the pretrial conference, and the Defendant could have

23    done the math itself, could it not have?

24          MR. THOMPSON:  I guess we could have tried to

25    guess what they were going to do.  If that was the case,

1    why didn't they just say go back and do these multipliers

2    and this number, and that may be where we come down on

3    this, and at least we wouldn't have seen it for the first

4    time the day before closing argument.

5           I mean, sort of putting the onus on us for their

6    damages number, I don't see how that's fair.  I mean, if

7    this was this simple, Your Honor, it could have been given

8    to us long ago, a long time -- I'm talking about before the

9    first trial.  And if they chose not to use it, okay, I

10   understand that.  You know, decisions are made.

11          But we're seeing this and this multiplier, and I

12   still think the biggest problem is the jury never saw it.

13   They've never seen this in evidence.

14          Nobody put a slide up with these multipliers on

15   it.  Nobody put a slide up with these numbers and said you

16   may be asked to consider this as part of your award of

17   damages in this case.

18          And, to me, Your Honor, that's just -- that's

19   beyond highly prejudicial.  And that's our objection to

20   that slide.

21          THE COURT:  Well, let me ask you this.  What --

22   what if -- I mean, I guess my concern is, you know, we let

23   the Plaintiffs, in their closing, discuss, you know, the

24   testimony that came in, Mr. Jung's testimony, the discounts

25   that he -- that he testified, but not actually do the math.

1          MR. THOMPSON:  Well, I mean, again, Your Honor, I

2    think that's the -- they've created this problem.  So they

3    could have had Dr. Jung do this math, and at least we would

4    have known and the jury would have had a number.

5          THE COURT:  They couldn't have let -- I mean,

6    there is no Dr. Jung.

7          MR. THOMPSON:  Isn't he a doctor, Mr. Jung?

8          THE COURT:  Oh, perhaps he is but...

9          MR. THOMPSON:  Mr. Jung?

10         THE COURT:  The fact witness, not the expert.

11         MR. THOMPSON:  Well, they -- I mean, they -- if

12   this is -- if that's where he's -- if we're using his

13   testimony for this, which is what they're saying, then that

14   would have been the place to do the math.

15         I mean, if we're using his testimony, maybe that's

16   the problem from the get-go is we're using a fact witness's

17   alleged numbers to create damages.  But, regardless, my

18   point is, when Mr. Jung was testifying, if this was the

19   plan, he could have at least walked us through that, right?

20         But they chose not to do that.  They chose --

21   basically, Pantech has chosen to never give a number for

22   this discount issue up until yesterday.  And that's

23   their -- they created this problem.

24         So we should not have to suffer because of that.

25   I mean, this is the second time we've went through this,

1    and so it seems like there's been plenty of time to give a

2    number, or a range of numbers for that matter, that they

3    were looking to ask the jury for.

4           And here we are again, and we're going to have to

5    get up and tell the jury, well, this is the first we've

6    seen of this number, too, and that's -- that's not fair,

7    Your Honor.  It's just not in any stretch of the

8    imagination.

9           THE COURT:  He's got a point, Mr. Culbertson.  Why

10   couldn't have this number -- why could this number not have

11   been disclosed weeks ago?

12          MR. CULBERTSON:  Because we didn't know for

13   certain how the factual testimony would come in.  And until

14   Dr. Jung testified and was allowed to testify about the

15   discounts, Your Honor, we'd be guessing.

16          But we all had an informed basis to know what it

17   was because we have disclosed to them through interrogatory

18   responses, through deposition testimony, through argument,

19   through testimony in this case exactly what the discounts

20   are.

21          All we're doing here is math.  They would have

22   gone crazy if we'd asked Dr. Jung to perform that

23   calculation.  He was allowed to testify to the discounts.

24          Dr. Putnam has testified that discounts are

25   allowed to be put back in, but he was, of course, not

1  allowed to do that calculation.

2          I think I just heard Mr. Thompson suggest that we

3  should have done it through Dr. Putnam, but he didn't

4  render that opinion.  He had a different multiplier that

5  you took away last time because it wasn't tied to the facts

6  of the case.

7          This is absolutely rooted in the facts of the

8  case.  They've known this.  I mean, they could have done

9  the math, you're right.  But until -- until the testimony

10 came in the way it did, the math to perform the multiplier

11 wasn't known precisely.

12         I mean, they could have known it.  We could have

13 known it -- I guess what I'm saying is this:  We could have

14 done this math, you're right, but there is absolutely no

15 prejudice because it has been disclosed --

16         THE COURT:  It does seem to me there is some

17 prejudice here.  I mean, you all -- you know, we had a

18 pretrial conference two, three weeks ago.  We started this

19 case on Monday -- on Tuesday.  You all, you know -- you had

20 how long was it after his testimony that you produced the

21 document that you produced last night for the first time in

22 this case?

23         MR. CULBERTSON:  I gave it to them yesterday after

24 the lunch break.  So when Mr. Airan stood up and said we

25 just got that, he was off by a few hours.

1          When I handed it to him, we had a discussion, they

2     looked at it.  Are we going to have any disagreement about

3     the math?  No.  We have a disagreement about the theory.

4     We understood that, we all knew that.  There's no

5     disagreement about the math.  That is wildly overblown the

6     way they're describing this.

7          And I'll add this, Your Honor, that $90,000 that

8     Dr. Lopez was allowed to testify to yesterday, never

9     disclosed before yesterday, never.  And we objected, and it

10    was allowed to come in.  That was a surprise, that was a

11    true surprise.  This, everyone has known.

12         And, you know, I recognize it in the Court's

13    questioning of counsel, everyone knows where this was

14    headed.  This data has been out there.  This is just math.

15    It is just dividing the original rate by the discounted

16    rate to get the multiplier, and it is laid out for them.

17         THE COURT:  So, Mr. Thompson, that's a valid point

18    about Mr. Lopez.  Mr. Culbertson accurately describes, at

19    least as I understand it, how the testimony came in.  That

20    was some last-minute math that the Defendant was allowed to

21    do.  Isn't that correct?

22         MR. THOMPSON:  That's right, but there's a big

23    difference.

24         THE COURT:  What's the difference?

25         MR. THOMPSON:  The jury saw it, and he got to be

1    crossed on it.  And that's where the fairness comes in,

2    Your Honor.  The jury got to see the number, and

3    Mr. Tidwell got to cross him on that number.

4         This number, the jury never saw it, and we never

5    got to cross anybody on.  And if they just decided they

6    were going to use this number based on the testimony this

7    week, then it's a new theory, it's a new theory during the

8    trial of the case, which also makes it untimely and

9    prejudicial.

10        The whole problem with this is the jury never saw

11   it, we didn't get to cross anybody on it, and we're now

12   going to take it up in closing argument, which is not

13   evidence.

14        THE COURT:  Well, I mean, if I were you, I would

15   stand up and say not one single witness ever testified to

16   this number.  You've never heard that from a single

17   witness's mouth on the stand.

18        MR. THOMPSON:  I think that's exactly what we

19   should say, but the problem is we shouldn't have to do

20   that.  Why should they get to throw this in, a skunk in the

21   jury box, during closing statement.  This is the definition

22   of skunk in the jury box.  We're going to throw in a number

23   that no one's ever seen, in closing argument, and hope the

24   jury bites on it.

25        And then the fairness to us is, oh, well, you guys

1   get to get up and rebut it when no witness testified about

2   it.  We didn't get to cross-examine -- we didn't even get

3   to explore this in any way with any witness.

4        THE COURT:  The problem is we are where we are,

5   Mr. Thompson.  And we had this problem before in the first

6   trial, and that resulted in a new trial.  And so, you know,

7   I'm going to overrule the objection.  I think the -- I

8   think that this is something that can adequately be dealt

9   with in the parties' closings.

10       And, you know, we'll see what the verdict is.  You

11  know, we -- you know, we'll have full briefing on that.

12  We'll see what the -- what the jury comes back with.

13       I think there's a fairly compelling argument

14  candidly, Mr. Culbertson, that this is too late, but I'm

15  going to let it go, and we'll see what the jury does with

16  it.

17       I am concerned about the term "uncertainty."  I'm

18  not sure where that term -- if that term was used with -- I

19  just -- I'm not sure what the source of that term is.

20       MR. THOMPSON:  Your Honor, I think it would be

21  fair to just take the title off of the slide.  Obviously, I

22  stand on our objection, but I do think it's misleading, the

23  title.

24       THE COURT:  Did any fact witness use this term?

25       MR. CULBERTSON:  Dr. Jung used the term that they

```
1   made these discounts to address uncertainties for
2   invalidity and non-infringement.
3          THE COURT:  Can you cite me to a page and line?
4          MR. CULBERTSON:  Yes, Your Honor.  It may take
5   just a moment.  Yes, we can.
6          So two things I'll cite you to, Your Honor.  The
7   first was Dr. Putnam's -- the slide that he used for PDX-7,
8   and there was discussion about this one where the fifth
9   step was that the jury can make upward adjustment to
10  account for discount reflecting uncertainty regarding
11  invalidity or infringement.
12         When Dr. Jung was testifying:  Why is it that
13  Pantech decided to discount from what it believed to be its
14  true rate to the .5 percent as a standard rate?
15         So when we offer our proposal -- I'm sorry, you
16  asked for page and line.  It's Page 221.
17         THE COURT:  Could you put it on the ELMO?
18         MR. CULBERTSON:  I'll try.
19         So when we offer our proposal in terms of
20  licensing, we wanted to be conservative to the extent
21  possible because in case there might be some occasion where
22  the patent might get invalidated or found non-infringed.
23  So we wanted to be prepared -- prepare for that, which is
24  the reason why we provided the discount.
25         Is it a negotiation tool?
```

437

1           It is.

2           So what he's talking about there is the

3   uncertainty for infringement or invalidity.

4           THE COURT:  All right.  Well, how about we just

5   change it to adjustment for discount or something like that

6   instead of the -- it's the phrase that --

7           MR. CULBERTSON:  Understood, Your Honor.

8           THE COURT:  -- concerns me.

9           MR. CULBERTSON:  Thank you.

10          MR. THOMPSON:  Your Honor --

11          THE COURT:  Mr. Thompson, is that -- I'm not

12   asking you to agree with it, but I think that -- that

13   helps.

14          MR. THOMPSON:  It does help, Your Honor.  And if

15   I just -- just for the record -- if it's -- if you'll

16   indulge me, I'd also just like to say this litigation

17   kicker or this adjustment, sort of the flip side of

18   discount contravenes the Georgia-Pacific factors and

19   analysis.  That's part of our objection, Your Honor.

20          THE COURT:  I understand.  I understand.

21          MR. THOMPSON:  Thank you.

22          THE COURT:  Okay.  Any other objections?  Is that

23   the last one?

24          MR. THOMPSON:  I think -- is there -- there may be

25   an exhibit objection.

```
1              THE COURT:  But as to the slides?

2              MR. THOMPSON:  Yeah, that's it.  That's all I'm

3    doing, Your Honor.

4              THE COURT:  All right.

5              All right.  Okay.  Who is handling the exhibit

6    objection?

7              MR. SCHUBERT:  Mike Schubert for OnePlus.  Good

8    morning.

9              THE COURT:  Good morning.

10             MR. SCHUBERT:  All right.  At issue is PX-37,

11   particularly the page Pantech-OnePlus 0012283.  Do you have

12   that in front of you?

13             THE COURT:  I do.

14             MR. SCHUBERT:  Excellent.

15             So kind of confused why we're arguing about this.

16   This exact page was stricken as a demonstrative from

17   Dr. Jung's slide deck.  If this can't pass muster as a

18   demonstrative, it can't pass muster as evidence that goes

19   back to the jury.  And, really, this seems like this is an

20   inappropriate motion for reconsideration.

21             THE COURT:  All right.  Let me hear from the

22   Plaintiff on this.

23             MR. CULBERTSON:  Your Honor did not allow it as a

24   demonstrative with Mr. Jung.  The reason for sustaining the

25   objection was not entirely clear.
```

439

1          What we're asking for now is for this page to not

2    be redacted from Exhibit 37.  And the basis for that is

3    that Mr. Jung testified -- he laid a foundation for

4    Exhibit 37 as a presentation that OnePlus offers to all

5    potential -- excuse me, that Pantech offers to all

6    potential licensees.

7          And he specifically testified that as they

8    developed their rate and they got to what they considered

9    their .5 standard SEP rate, that they surveyed published

10   rates in the industry and -- to determine this as a check

11   of reasonableness.

12         And that's what this is.  So this corroborates his

13   testimony, and it's supported by his testimony that he

14   offered from the stand a couple days ago.

15         There are hearsay objections.  The parties have a

16   stipulation that documents that they produced are business

17   records under 803(6).  That's what this is.  That gets us

18   through the first level.

19         The second level of the hearsay objection speaks

20   to the data in there.

21         I will say, Your Honor, at first -- as an initial

22   matter, we're not really offering it for the truth of that.

23   What we're trying to do is demonstrate that Pantech did go

24   through this process that he described of developing their

25   rate.

1          But even if they were -- even if we were offering

2     it for its truth, these are commercial publications with --

3     of objective data, and they're cited.

4          They've analogized to a case that Judge Bryson

5     handled in the Marshall Division where he disallowed an

6     analyst report in full.  But what he said was an -- parts

7     of it can be appropriate.  Parts of it can be admitted if

8     you're pulling out the objective data versus the subjective

9     analysis.

10          None of this falls into the latter category.  This

11     is just excerpted -- the data that's published, and it's --

12     you know, it honestly is nothing I'm going to spend a lot

13     of time on, but he's testified about this presentation, and

14     it's now pretty much a black box of everything that's been

15     redacted from it.

16          And I think it's entirely appropriate that the

17     jury have in their hands during their deliberations

18     documents which are -- were confirmed by his deposition --

19     excuse me, were confirmed by his testimony because they're

20     going to say they made this rate up out of thin air.  I

21     mean, they've been telling you that.  And it's just not --

22     it's just not so.

23          THE COURT:  So anything further?

24          MR. SCHUBERT:  Yes.

25          THE COURT:  Go ahead.

```
 1              MR. SCHUBERT:   Okay.   Couple points.

 2         First, this is a basis for the so-called

 3    methodology that Dr. Jung relied on.  And as we discussed

 4    before when we were discussing this as a demonstrative,

 5    that's a grievously flawed methodology.

 6         He's pointing at all kinds of extremely old

 7    data -- information, so these are rates from 2008/2009 on

 8    the left and a study from 2013, years before the patents

 9    become relevant in this case.  And we -- because of all of

10    these issues with the methodology, it's extremely confusing

11    for the jury to look at this.

12         And then on top of that, there's hearsay issues.

13    So this market records exception that he's pointing to is

14    really directed towards objective information such as stock

15    market closings, currency exchange rates, bank and interest

16    rates, weights and measurements, things where there's an

17    objective indicia of reliability.

18         These royalty rates, there's no citation to where

19    these came from.  They just came out of thin air in this

20    article on the left-hand side.

21         On the right-hand side, these are estimated

22    numbers of essential patents.  Dr. Putnam himself testified

23    that it's extremely unclear what's a truly essential patent

24    anyway.  So this is subjective analysis on the right side.

25         And so between these things, this is all hearsay.
```

1    There is no objective indicia of reliability.  These are

2    not market records, and, therefore, this slide should be

3    excluded for hearsay and for being confusing for being

4    directed towards this -- it's essentially a Frankenstein

5    methodology where he's pointing at things he likes and

6    trying to combine them together.  The jury would be

7    extremely confused to have this back in the jury room.

8              THE COURT:  Anything else?

9              MR. CULBERTSON:  Only that I don't see a basis for

10   juror confusion with this, Your Honor.  It lines up

11   directly with what he testified to.  They've criticized it.

12   That's okay.  They take issue with it.  There's conflicting

13   testimony among the experts about the number of SEPs.  But

14   what it proves is that they didn't pull it out of thin air.

15   They did analysis, and that's how they developed their

16   rate, and then they checked it against the industry

17   standards, and they felt like it was reasonable.

18             That's all, Your Honor.  Thank you.

19             THE COURT:  All right.  I'm going to sustain the

20   objection to the slide.  To the extent the record is not

21   clear about why it was not allowed into evidence or allowed

22   to be used before, my recollection is we didn't allow it

23   because I determined that it had essentially crossed over

24   into what would have amounted to expert testimony.  That

25   was my concern.

1          So I think, at the end of the day, this is not

2     anything that the jury has seen before, and so to use it in

3     closing for the first time, I think, would not be

4     appropriate.

5          So I'm going to sustain the objection to that.

6          All right.

7          MR. CULBERTSON:  Your Honor, just one

8     clarification.  We'll redact that page.  And then otherwise

9     I understand Exhibit 37 is not objected to?

10          MR. SCHUBERT:  Correct.

11          THE COURT:  Is that right?

12          Okay.  Good.  All right.  Any final exhibits that

13     we need to read into the record?  Is there anything?

14          Ms. Miller, were there others?

15          MS. MILLER:  There were a few exhibits entered

16     into evidence yesterday on October 16th.

17          They are PX-2, 103, 104, 183, 186, 189, and that's

18     just -- as just discussed, we move PX-37 into evidence.

19          THE COURT:  All right.  And those came in without

20     objection?

21          MR. SCHUBERT:  That's correct, Your Honor.

22          THE COURT:  All right.  Those will be admitted.

23          All right.  Mr. Fussell, did you have something?

24          MR. FUSSELL:  Yes, sir, Your Honor.

25          Out of abundance of caution, we would like to

1  present our offer of proof at this time before the matter

2  goes to the jury.

3        THE COURT:  All right.

4        MR. FUSSELL:  We intend to submit a filing on the

5  record that's more -- that's more robust, if you will, but

6  I wanted to preserve the record and present this.

7        If allowed to present the testimony of Dr. Jung

8  that was not allowed, he would testify that prior -- about

9  the prior negotiations between the parties.  We believe

10 this goes to the weight and credibility of Pantech's

11 comparable license agreement methodology that's been

12 presented at this trial.

13       Also, if allowed to testify, Mr. Jung would

14 present the evidence of the LG agreement that he was not

15 allowed to testify.  This would go to show and support

16 Pantech's comparable license agreements.

17       It was an agreement with a large, well-known

18 electronics company in the United States.  The

19 consideration for that agreement was ██████████  and an

20 additional consideration that supports Pantech's comparable

21 license agreements.

22       In addition, if allowed to testify -- present the

23 testimony of Mr. Yori Xiao, Pantech would have presented

24 the testimony to show that Mr. Xiao has testified that

25 OnePlus has license agreements with ████████████████████

1    related to the 4G and 5G technology.

2        Specifically, Mr. Xiao's testimony could have been

3    used to impeach the testimony of Dr. Lopez who testified

4    from the stand that he was not aware of any other

5    agreements that OnePlus has with -- related to 4G and 5G

6    technology, which is simply false.

7        Also, if allowed to testify, Dr. Putnam would have

8    presented his analysis of the LG Electronics comparable

9    license agreement, which was the subject of our motion to

10   supplement, which was -- which was denied.

11       Thank you, Your Honor.

12       THE COURT:  Thank you.

13       Anything from the Defendants?

14       MR. AIRAN:  No, Your Honor.

15       THE COURT:  All right.  Very good.

16       All right.  Anything else we need to address?

17   We'll take a short recess before we have the jury brought

18   down?

19       Anything from the Plaintiffs?

20       MR. CULBERTSON:  No, Your Honor.

21       THE COURT:  Anything from the Defendant?

22       MR. THOMPSON:  No, Your Honor.

23       THE COURT:  All right.  We will take a very short

24   recess, and we'll get started.

25       COURT SECURITY OFFICER:  All rise.

```
 1          (Recess.)

 2          COURT SECURITY OFFICER:  All rise.

 3          THE COURT:  Mr. Grigsby, can you have the jury

 4   brought down.

 5          COURT SECURITY OFFICER:  Please rise for the jury.

 6          (Jury in.)

 7          THE COURT:  Please be seated.

 8          Good morning, ladies and gentlemen of the jury.

 9   Welcome back.  Thanks for being here on time.  We did have

10   matters to discuss this morning.  It took a little longer

11   than I expected, so we're getting just a slightly late

12   start, but pretty close to time.  I hope you all had a good

13   evening.

14          As you know, all of the testimony has been

15   presented in the case, and what remains before you begin

16   your deliberations on your verdict is the reading of the

17   final jury instructions, which I am about to do.  And then

18   following that, the parties will present their closing

19   arguments to you.

20          You've now heard all of the evidence in the case,

21   and I'm going to instruct you on the law that you must

22   apply.  Each of you will have a copy of these final jury

23   instructions that I'm about to give you orally.  You're

24   welcome to take whatever notes you want to take as I'm

25   giving those instructions, but I do want you to know that
```

1   each of you will have a -- your own written copy to review

2   when you get to the jury room.

3        It's your duty to follow the law as I give it to

4   you now.  As I have told you -- or told you on Tuesday, on

5   the other hand, you, the jury, are the sole judges of the

6   facts in the case.

7        You should not consider any statement I may have

8   made during the course of the trial or may make during the

9   course of these instructions as any indication that I have

10  an opinion about the facts in the case.

11       You'll hear from the closing arguments -- you'll

12  hear the closing arguments from the attorneys following

13  these jury instructions, and you should recall and remember

14  that statements and arguments of the attorneys, both in the

15  opening statements on Tuesday and today, are not evidence,

16  and they are not instructions on the law.  They are

17  intended only to assist you in understanding what the

18  evidence was and what the parties' contentions are.

19       A verdict form has been prepared for you, and you

20  will take this with you to the jury room.

21       When you've reached a unanimous agreement as to

22  the verdict, whoever you have selected to serve as your

23  foreperson should fill in the blanks on the form, date it,

24  and sign it.  You should answer the questions as directed

25  in the verdict form from the facts as you find them to be.

1    You should not decide who you think should win and then

2    answer the questions to reach that result.  As I said, your

3    answers and your verdict must be unanimous.

4             In determining whether any fact has been proven in

5    the case, you may, unless otherwise instructed, consider

6    the testimony of all of the witnesses, regardless of who

7    may have called them, and the stipulations by the parties.

8             You may also consider the exhibits that were

9    admitted into evidence, regardless of who may have

10   introduced them.

11            You, the jurors, are the sole judges of the

12   credibility of all of the witnesses and the weight and the

13   effect of the evidence.

14            In deciding the facts, you may have to decide

15   which testimony to believe and which testimony not to

16   believe.  You alone are to determine questions of

17   credibility or truthfulness of the witnesses.

18            In weighing the testimony of a witness, you may

19   consider his or her manner and demeanor on the stand, any

20   feelings or interest they may have in the case, any

21   prejudice or bias about the case the witness may have, and

22   the consistency or the inconsistency of their testimony

23   considered in the light of the circumstances.

24            Has the witness been contradicted by other

25   evidence?  Has he or she made statements at other times and

1  places contrary to what he or she said on the witness

2  stand?

3       You must give the testimony of each witness the

4  amount of credibility you think it deserves.

5       You also must keep in mind that a simple mistake

6  does not mean that the witness is not telling the truth.

7  You must consider whether any misstatement was an

8  intentional falsehood or simply a lapse in memory and what

9  significance should be attached to that testimony.

10      The attorneys in the case are advocates for their

11  competing clients, and they have a duty to object when they

12  believe that evidence is offered that should not be

13  admitted under the rules of the court.

14      If I sustained an objection to a question that was

15  addressed to a witness, you must disregard the question

16  entirely, and you must not draw any inference from its

17  wording or speculate about the witness -- what the witness

18  would have said if he or she had been permitted to answer.

19      If the objection was overruled, you may treat the

20  answer to the question just as you would treat the answer

21  to any other question, as if the objection had not been

22  made.

23      By allowing testimony or other evidence to be

24  admitted or introduced over the objection, I did not

25  indicate any opinion as to the weight or the effect of such

1    evidence.

2           At times during the trial, I've had to talk with

3    the lawyers outside of your hearing up here at the bench or

4    by calling a recess and talking to them when you were out

5    of the courtroom.  And this happens often during a trial

6    because sometimes things come up that don't involve the

7    jury, and you should not speculate about what was said

8    during those discussions outside your presence.

9           There are two types of evidence you may consider

10   in finding the truth as to the facts in the case.

11          One is direct evidence, such as the testimony of

12   an eyewitness.

13          And the other is indirect or circumstantial

14   evidence, which is proof of a chain of circumstances that

15   indicates the existence or non-existence of certain other

16   facts.

17          As a general rule, the law makes no distinction

18   between direct or circumstantial evidence.  It only

19   requires that you find the facts on the basis of the -- all

20   of the evidence presented.

21          The parties have stipulated or agreed to certain

22   facts in the case.  And when lawyers on both sides of a

23   case stipulate as to the existence of a fact, you must,

24   unless otherwise instructed, accept that stipulation as

25   evidence and regard that fact as having been proven.

1          These facts which have been read to you throughout

2    the trial are not in dispute.

3          Certain testimony has been presented to you

4    through depositions or prior trial testimony.  A deposition

5    is the sworn, recorded answers to questions asked of a

6    witness in advance of the trial.  And prior trial testimony

7    is similarly sworn testimony, recorded answers to questions

8    asked to a witness in advance of the trial.

9          If a witness cannot be present to testify in the

10   courtroom, then the witness's testimony may be presented

11   under oath in the form of a deposition or prior trial

12   testimony.

13         Deposition testimony and prior trial testimony is

14   entitled to the same consideration by you as testimony that

15   was given by a witness in person from the witness stand in

16   open court.

17         So you should judge the credibility and the

18   importance of the deposition testimony and the prior trial

19   testimony to the best of your ability, just as if the

20   witness had been here in the courtroom testifying.

21         Now, you should consider only the evidence in the

22   case, but you are permitted to draw reasonable inferences

23   from the testimony and the exhibits if you feel they are

24   justified in light of common experience.  In other words,

25   you may make deductions and reach conclusions that reason

1   and common sense leads you to draw from the facts that have

2   been established by the testimony and evidence in the case.

3          You should not base your decision on any evidence

4   that was not presented by the parties during the case,

5   including your own personal experience with any products at

6   issue in the case.

7          Unless I instruct you otherwise, you may properly

8   determine that the testimony of a single witness may be

9   sufficient to prove any fact, even if a greater number of

10  witnesses have testified to the contrary, if after

11  considering all of the evidence you believe that single

12  witness.

13         When knowledge of a technical subject matter may

14  be helpful to the jury, a person who has special training

15  or experience in that technical field, called an expert

16  witness, is permitted to state his or her opinion on those

17  technical matters.

18         However, you are not required to accept that

19  opinion.  As with any other witness, it is solely up to you

20  to decide whether to rely upon it or not.

21         Certain exhibits shown to you during the trial

22  were illustrations, and we call these demonstratives.

23  Demonstratives are a party's description or picture or

24  model used to describe something involved in the trial.

25         If your recollection of the evidence differs from

1    the demonstratives, you should rely on your recollection.

2    Demonstratives are sometimes called jury aids.  They are

3    not evidence.

4         A witness's testimony concerning a demonstrative

5    exhibit is evidence.  The demonstratives will not be

6    available for you to view during your deliberations.

7         In any legal action, facts must be proven by a

8    required amount of evidence that's known as the burden of

9    proof.

10        The Plaintiffs in this case, Pantech Corporation

11   and Pantech Wireless, LLC, have been referred to as

12   Pantech, or the Plaintiffs, and they have the burden of

13   proving damages for OnePlus Technology (Shenzhen) Company

14   Limited's patent infringement by a preponderance of the

15   evidence.

16        OnePlus Technology has been referred to as

17   OnePlus, or the Defendant, throughout the trial.

18        A preponderance of the evidence means that the

19   evidence persuades you that a claim is more likely true

20   than not true, and sometimes this is talked about as being

21   the greater weight and degree of credible testimony.

22        This burden of proof is not to be confused with

23   the burden of proof known as beyond a reasonable doubt,

24   which is the burden applied in a criminal case, not in a

25   civil case like this.

 1            Beyond a reasonable doubt is a higher standard

 2    than the preponderance of the evidence standard.

 3            In determining whether any fact has been proved by

 4    a preponderance of the evidence, you may, unless otherwise

 5    instructed, consider the stipulations, the testimony of the

 6    witnesses, regardless of who may have called them, and all

 7    of the evidence, including all of the exhibits received

 8    into evidence during the course of the trial, regardless of

 9    who may have produced them.

10            As I did at the start of the case, I'm now going

11    to give you a summary of each side's contentions, and then

12    I will provide detailed instructions on what each side must

13    prove to win each of its contentions.

14            As you know, this is an action to assess the fair

15    and reasonable compensation for established patent

16    infringement.  It has been determined that certain OnePlus

17    products infringe Claim 1 of U.S. Patent No. 10,869,247;

18    Claims 6 and 9 of U.S. Patent No. 11,012,954; Claims 9 and

19    11 of U.S. Patent No. 9,548,839; and Claims 1, 6, and 10 of

20    U.S. Patent No. 9,063,654.

21            Together, these patents are referred to as the

22    asserted patents or the patents-in-suit.

23            Pantech is entitled to damages for this

24    infringement, but the parties disagree on the amount of

25    those damages.

1          The amount of damages for the infringement is the

2     only issue you must decide.

3          I want to talk to you about the measure of

4     damages.  You must determine the amount of money damages to

5     be awarded to Pantech to compensate it for OnePlus's

6     infringement.  The damages must be adequate to compensate

7     Pantech for the infringement of the asserted patents.

8          You must not award Pantech more damages than are

9     adequate to compensate for the infringement nor should you

10    include any additional amount for the purpose of

11    compensating Pantech for its litigation cost or for

12    punishing OnePlus.

13         Damages are not meant to punish an infringer or to

14    set an example.  Your damages award should put Pantech in

15    approximately the final -- financial position it would have

16    been in had the infringement not occurred; that is, the

17    payment of a reasonable royalty for OnePlus's sales of the

18    accused products.

19         Pantech has the burden to establish the amount of

20    its damages by a preponderance of the evidence.  In other

21    words, you should award only those damages that Pantech

22    establishes it more likely than not suffered.

23         While Pantech is not required to prove the amount

24    of its damages with mathematical precision, it must prove

25    them with reasonable certainty.  You may not award damages

1    that are speculative, damages that are only possible, or

2    damages that are based on guesswork.

3           Pantech seeks damages in the form of a reasonable

4    royalty, and you must be careful to ensure that the award

5    is no more or no less than the value of the patented

6    invention.

7           A reasonable royalty is defined as the money

8    amount that Pantech and OnePlus would have agreed to in a

9    hypothetical negotiation taking place at the time

10   infringement first began.

11          In considering this hypothetical negotiation, you

12   should focus on what the expectations of the patent owner

13   and OnePlus would have been had they entered into an

14   agreement at that time and had they acted reasonably in

15   their negotiations.

16          In determining this, you must assume that both

17   parties believed that the patent was valid and infringed

18   and that both parties were willing to enter into an

19   agreement.

20          The reasonable royalty you determine must be a

21   royalty that would have resulted from the hypothetical

22   negotiation and not simply a royalty either party would

23   have preferred.

24          Evidence of things that happened after the

25   infringement first began can be considered in evaluating

1    the reasonable royalty only to the extent that the evidence

2    aids in assessing what royalty would have resulted from the

3    hypothetical negotiation.

4            With respect to the '839, '247, and '954 SEPs, any

5    reasonable royalty must reflect that Pantech is obligated

6    to license those patents on fair, reasonable, and

7    non-discriminatory terms.  You've heard this referred to as

8    FRAND terms.

9            Therefore, a reasonable royalty as to the '839,

10   '247, and '954 SEPs cannot exceed the amount permitted

11   under Pantech's FRAND obligations.

12           The parties have stipulated as to notice and

13   amounts of licensable sales for each patent, which you

14   heard read into the record as stipulations.

15           The amount you find as damages must be based on

16   the value attributable to the patented invention as

17   distinct from unpatented features of the accused product or

18   other factors such as marketing or advertising, or

19   Pantech's size or market position.

20           A royalty compensating the patent owner -- holder

21   for damages must reflect the value attributable to the

22   infringing features of the product and no more.

23           The process of separating the value of the

24   allegedly infringing features from the value of all other

25   features is called apportionment.

1          And when the accused products have both patented

2  and unpatented features, damages must be apportioned so

3  that it is based only on the value of the -- of the

4  patented features and no more.

5          With respect to the '839, '247, and '954 SEPs, any

6  royalty for the patented technology must be apportioned

7  from the value of the standard as a whole, and the royalty

8  must be based on the value of the invention, not any value

9  added by standardization of that invention.

10          In deciding what is a reasonable royalty that

11  would have resulted from this hypothetical negotiation, you

12  may consider the factors that the patent owner at the time

13  and the alleged infringer would consider in setting the

14  amount the alleged infringer should pay.

15          Some of the factors -- some of the kinds of

16  factors that you may consider in making this determination

17  include:

18          1, the royalties received by the patentee for the

19  licensing of the patent, proving or tending to prove an

20  established royalty;

21          2, the rates paid by the licensee for the use of

22  other patents comparable to the patent;

23          3, the nature and scope of the license as

24  exclusive or non-exclusive or as restricted or

25  non-restricted in terms of territory or with respect to

1    whom the manufactured product may be sold;

2            4, the licensor's established policy and marketing

3    program to maintain his or her patent monopoly by not

4    licensing others to use the invention or by granting

5    licenses under special conditions designed to preserve that

6    monopoly;

7            5, the commercial relationship between the

8    licensor and licensee, such as whether they are competitors

9    in the same territory, in the same line of business, or

10   whether they are inventor and promoter;

11           6, the effect of selling the patented specialty

12   and promoting sales of other products of the licensee, the

13   existing value of the invention to the licensor as a

14   generator of sales of his non-patented items, and the

15   extent of such derivative or convoyed sales;

16           7, the duration of the patent and the term of the

17   license;

18           8, the established profitability of the product

19   made under of the patents, its commercial success, and its

20   current popularity;

21           9, the utility and advantages of the patented

22   property over the old modes or devices, if any, that have

23   been used for working out similar results;

24           10, the nature of the patented invention, the

25   character of the commercial embodiment of it as owned and

1    produced by the licensor, and the benefits to those who

2    have used the invention;

3          11, the extent to which the infringer has made use

4    of the invention and any evidence probative of the value of

5    that use;

6          12, the portion of the profit or of the selling

7    price that may be customary in the particular business or

8    in comparable businesses to allow for the use of the

9    invention or analogous inventions;

10          13, the portion of the realizable profits that

11   should be credited to the invention as distinguished from

12   non-patent elements, the manufacturing process, business

13   risks, or significant features or improvements added by the

14   infringer;

15          14, the opinion and testimony of qualified

16   experts; and

17          15, the amount that a licensor, such as the

18   patentee, and a licensee, such as the infringer, would have

19   agreed upon at the time the infringement began if both had

20   been reasonably and voluntarily trying to reach an

21   agreement; that is, the amount which a prudent licensee who

22   desired as a business proposition to obtain a license to

23   manufacture and sell a particular article embodying the

24   patented invention would have been willing to pay as a

25   royalty and yet be able to make a reasonable profit and

1  which amount would have been acceptable by a prudent

2  patentee who was willing to grant a license.

3        You may have heard all these factors referred to

4  as the Georgia-Pacific factors.

5        The '247, '954, and '839 patents are standard

6  essential patents and, that is, the LTE and/or 5G standards

7  cannot be practiced without infringing the patents.

8        Pantech agreed to grant an irrevocable license for

9  the '247, '954, and '839 standards essential patents on

10  FRAND terms and conditions.

11        Accordingly, you must ensure that your damages

12  award with respect to these patents reflects only the value

13  of the patented invention and not the additional value that

14  resulted from the patented -- from the patents' inclusion

15  in one of the standards.

16        In other words, you may not consider the success

17  of the standard itself in determining a reasonable royalty

18  for the asserted essential patents.

19        In addition, because Pantech committed to grant

20  licenses on terms that are fair, non-discriminatory, and

21  reasonable when assessing any royalty rate to be applied to

22  the standard essential '247, '954, and '839 patents, you

23  should not consider Georgia-Pacific Factors 4, 5, 8, 9, and

24  10.

25        A reasonable royalty with respect to the '247,

```
 1   '954, and '839 standards essential patents cannot exceed

 2   the amount permitted under Pantech's FRAND obligations.

 3          No one factor is dispositive, and you can and

 4   should consider the evidence that has been presented to you

 5   in this case on each of these factors.

 6          You may also consider any other factors which in

 7   your mind would have increased or decreased the royalty

 8   that OnePlus would have been willing to pay and the patent

 9   holder would have been willing to accept, acting as

10   normally prudent business people.

11          When determining a reasonable royalty, you may

12   consider evidence concerning the amounts that other parties

13   have paid for rights to the patents in question or for

14   rights to similar technologies.

15          Comparable license agreements are one factor that

16   may inform your decision as to the proper amount and form

17   of the reasonable royalty award similar to the way in which

18   the value of a house is determined relative to comparable

19   houses sold in the same neighborhood.

20          Whether a license agreement is comparable to the

21   license under the hypothetical license scenario depends on

22   many factors, such as whether they involve comparable

23   technologies, comparable economic circumstances, comparable

24   structure, and comparable scope.

25          A license agreement need not be perfectly
```

1  comparable to a hypothetical license that would be

2  negotiated between the patent owner and accused infringer

3  in order for you to consider it.

4       If there are differences between a license

5  agreement and a hypothetical license, you must take those

6  into account when you make your reasonable royalty

7  determination.

8       You must perform your duties as jurors without

9  bias or prejudice as to any party.  The law does not permit

10 you to be controlled by sympathy, prejudice, or public

11 opinion.

12      All parties expect that you will carefully and

13 impartially consider all of the evidence, follow the law as

14 I am now giving it to you, and reach a just verdict,

15 regardless of the consequences.

16      It will be your duty to deliberate and to consult

17 with one another in an effort to reach a verdict.  Each of

18 you must decide the case for yourself but only after an

19 impartial consideration of the evidence with your fellow

20 jurors.

21      During your deliberations, do not hesitate to

22 re-examine your own opinions and change your mind if you

23 are convinced that you were wrong, but do not give up on

24 your honest beliefs because the other jurors think

25 differently or just to finish the case.

1          As I said, your verdict must be unanimous.

2          When you retire to the jury room following the

3    closing arguments of the parties to begin deliberating on

4    your verdict, you will take this -- these instructions with

5    you, as well as the exhibits that were admitted into

6    evidence.

7          The first thing you should do is select a

8    foreperson to guide you and direct you in your

9    deliberations.

10         If at any point during your deliberations you want

11   to recess, you should follow all of the instructions that I

12   have previously given to you about your conduct during the

13   trial.

14         And after you have reached your verdict, your

15   foreperson is to fill in the verdict form your answers to

16   the questions.  You should not reveal your answers until

17   such time as you are discharged, unless otherwise directed

18   by me.

19         I will give you further instructions after the

20   conclusion of your service, but I will tell you that once

21   you are discharged, you're under no obligation to talk to

22   anyone about the case.

23         Any notes that you've taken during the course of

24   the trial are only aids to your memory, and if your memory

25   should differ from your notes, you should rely on your

1   memory and not on your notes.

2          Your notes are not evidence.  And a juror who has

3   not taken notes should rely on his or her own independent

4   recollection of the evidence and should not be unduly

5   influenced by the notes of other jurors.  Notes are not

6   entitled to any greater weight than the recollection or

7   impression of each individual juror about what the

8   testimony was.

9          If for any reason you need to communicate with me

10  at any time during your deliberations, you should give a

11  written message or question to the Court Security Officer,

12  who will bring it to me.

13         I will then respond as promptly as possible either

14  in writing or by having you brought back into the courtroom

15  so that I can address you orally.

16         I will always first disclose to the attorneys what

17  your question was and my response before I answer your

18  question.

19         All right.  That completes the final jury

20  instructions.

21         At this time, the parties will present their

22  closing arguments to you.

23         We will begin with the Plaintiff, and they will

24  present the first part of their closing argument.  Then the

25  Defendant will present its closing argument.  And then,

1    finally, at the end, the Plaintiffs will have a very short

2    opportunity to present some final words.

3           All right.  Mr. Fussell.

4           MR. FUSSELL:  Thank you, Your Honor.

5           We would like to reserve 10 minutes of our time

6    for rebuttal.  And if I could get a two-minute warning.

7           THE COURT:  All right.  Did you say two or 10?

8           MR. FUSSELL:  Two.

9           THE COURT:  Two.

10          MR. FUSSELL:  Thank you.  Sorry.

11          May it please the Court.

12          Ladies and gentlemen of the jury, I'd like to

13   start where I started on Tuesday and just give you a

14   sincere thank you.  We appreciate your attentiveness and --

15   and time and commitment that you've made to this case.

16          Today, we stand at a crossroads where your

17   decision will not only impact the parties in this case but

18   will also impact the principles of equity and fairness as

19   it relates to the marketplace, the value of Pantech's

20   patents, and the FRAND commitment.

21          You've heard from both parties and the evidence of

22   the case, and this morning I would like to go through some

23   of that key evidence.

24          At the beginning of this trial, I told you that

25   comparability was going to be key.  I showed you a

1    comparison based on, like, a house when you're comparing

2    the price of a house.  And you've heard that reference

3    throughout the trial now.

4            I want to come back to that analogy and show you

5    where we are now -- where we are on our street now.  Each

6    of these houses --

7            If I could get the next slide, please?

8            Each of these houses represents each of the

9    license agreements that you've heard about throughout this

10   case and each of the license agreements that have been

11   analyzed to show comparability.

12           But before we dive into that comparison, I want to

13   go back and talk a little bit more about the technology.

14           Let's recall that this case revolves around four

15   specific patents.  Pantech is not merely claiming value of

16   its inventions.  It is asserting its rights to reasonable

17   compensation for the essential technology that its patents

18   cover.

19           Dr. Lopez, if you recall, he said that patents

20   aren't all equal.  He said some are super.  Some are

21   foundational.

22           And you heard the testimony of Professor Cooklev.

23   He's the only technical expert you heard from that

24   addressed the standard essential patents.  And he explained

25   to you how these patents are fundamental to wireless

1   communication.

2        You heard from -- Mr. Cooklev explain, for

3   example, the '247 patent and how every time a phone

4   receives data on the 5G network, that patent is used.  And

5   that patent, if you recall, is not even in the license

6   agreements that Dr. Lopez used for his comparability

7   analysis.

8        Like Professor -- likewise, Professor Cooklev

9   explained that the '839 patent is also used every time a

10  phone sends data in the 4G network.

11       And the '954 patent, it is used every time -- in

12  every case to increase band rate -- bandwidth in both the

13  4G and 5G networks.

14       But, remember, this is also Pantech's asserting

15  the '654 patent, the UI patent, if you recall.  This patent

16  is not subject to FRAND, and it is commercially essential,

17  as you heard from the evidence.

18       Mr. Mauro, a leading human factors engineer,

19  explained how the '654 patent is commercially essential by

20  solving nine problems in the field of GUI design.  The

21  invention of the '654 patent is used across various apps on

22  your phone in multiple dimensions.  It's not limited to

23  some single feature, as the Defendants would like you to

24  believe.

25       OnePlus ignores the technology that makes these

469

1   phones successful and attempts to decrease the amount that

2   it owes Pantech for infringing its patents without

3   permission.

4        Dr. Lopez believes that this technology is only

5   worth -- you heard him on the stand -- this fundamental

6   technology is only worth $90,000.  90K for years of

7   infringing these foundational patents, these patents that

8   your phone wouldn't even operate properly if it wasn't for

9   the technology in these patents.

10        But Dr. Lopez didn't even follow all the steps

11   that he told you were necessary.  Everyone agrees that the

12   licenses that we've looked at are portfolio licenses.  But

13   you need to apportion the rate for each of the patents out

14   of those portfolio licenses.

15        This is Dr. Lopez's slide here.  He admitted that

16   he didn't do any apportionment on the Apple and Samsung

17   agreements for any of the patents.  And, remember, this

18   '247 patent that he provides a rate for from the Apple

19   agreement, that patent is not even covered by the Apple or

20   Samsung agreement.

21        Instead, he just used the rates for the whole

22   portfolio to calculate these rates that you see here on the

23   screen.  But this is wrong.  Dr. Lopez ignores this

24   critical step -- this critical step of apportionment that

25   the Judge just instructed you is required to get the rate

1    that's required in this case.

2            Instead, Dr. Putnam, he calculated apportionment

3    for you using his forward citation analysis, which you see

4    here.  He explained that this methodology goes back to the

5    1990s to value patents.  He told you that economists have

6    conducted many studies, hundreds of studies, he said, to

7    confirm that the number of forward citations correlate to

8    value in patents.

9            Further, Dr. Putnam told you that for the forward

10   citation analysis, you should consider the families, not

11   the patents themselves.  And the reason for that is because

12   the forward citation analysis relates directly to the

13   specification.  And family members in patents all share the

14   same specification.

15           So you may ask yourself, why aren't they

16   apportioning the rate?  Why aren't they following the

17   rules?  OnePlus came into this trial with one goal, to

18   minimize what they should pay Pantech for infringing on

19   their patents.

20           So with that goal in mind, OnePlus pieced together

21   an argument to support this narrative.  They put blinders

22   on every time they looked at the evidence, even when it was

23   uncontested facts.

24           One thing they overlooked was the top-down

25   approach.  OnePlus criticizes Pantech for its top-down

1   approach.

2          If you recall from Dr. Jung's testimony, that was

3   the approach that Pantech used to come up with their truly

4   essential rate, the .71 percent.  He looked at each of the

5   factors that are consistent with the methodology for the

6   top-down approach.  This is widely accepted.

7   ████████████████████████████████████████████████████

8   ██████████████.

9          If we could show the testimony here from Mr. Xiao.

10          (Videoclip played.)

11  Q.  ██████████████████████████████████████████████████

12      ███████████████████████████████████

13  A.  ██  ███████████████████████████████████████████████

14      ████████████████████████████████████████████████████

15      ███████████████████████████████████████████████████

16      █████████████

17      ███████████████████████████████████████████████████

18      █████████████████████████████████████████████

19      █████████████  ████████████████████████████████████

20      ████████████████████████████████████████████████████

21      ███████████████████████

22          (Videoclip ends.)

23          MR. FUSSELL:  So you heard it right from Mr. Xiao,

24      ████████████████████████████████████████   But did

25  you hear any top-down approach from OnePlus in this case?

1    Did you hear Mr. Lopez perform a top-down approach?  Did he

2    even criticize Pantech's approach or methodology?  No.

3           Dr. Lopez ignored that analysis.  He overlooked

4    these facts.

5           Dr. Lopez also overlooked other critical facts.

6    The agreements with Apple and Samsung encompass only those

7    Pantech, Inc., patents.  There were over 200 patents that

8    Pantech owns that are not even covered by the Apple and

9    Samsung agreements, and he completely ignores that.

10          He doesn't even address the fact that the '247

11   patent was part of that 200 and not covered by the Apple

12   and Samsung agreements.

13          And what else?  You heard these agreements were

14   negotiated under different circumstances.

15          Go to the next slide, please.

16          These agreements were under different

17   circumstances with a different scope, making them

18   fundamentally different than what Pantech is seeking here.

19          You heard testimony from Mr. B.J. Kim.  At the

20   time, Pantech, Inc., a different Pantech company, had owned

21   the patents, they were under financial duress.

22          They were --

23          If you go to the house slide, please.

24          They were like the houses on the far left here

25   that you see.  These houses were in foreclosure.  You heard

1    from Mr. Kim, he said that they were on the verge of

2    bankruptcy.  That situation is completely different from

3    the hypothetical arm's length negotiation that you're

4    required to do to come up with your established rate in

5    this case.

6          Now, let's look specifically at that Samsung

7    agreement that Dr. Lopez relies on.

8          Dr. Lopez agrees in his analysis that he ignored

9    the $45 million that Samsung invested in Pantech.  He

10   doesn't even think ownership doesn't get you a sweetheart

11   deal.  Even worse, neither ███████████████████████████

12   ███████  to Pantech's patents when they entered into that

13   agreement.

14         Do you recall, ██████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ██████████████████████████████████.

19         This was disclosed specifically in this -- in the

20   agreements that you saw, and so Apple and Samsung knew when

21   they entered into those agreements they ███████████████

22   ████████████████████████████████████████████████████

23   █████████████████████.

24         What you should be asking yourself is why did

25   Dr. Lopez overlook these critical facts?

1          But that's not all.  There's also another thing he

2    overlooked.

3          You heard the importance of some of the factors to

4    be considered when you come up with your royalty rate.

5          Now, ask yourself, what is one of the things that

6    you would like to see when you're asking yourself, what is

7    this royalty rate we should come up with?  How about how

8    much OnePlus has paid for similar technology?

9          You know, when we asked Dr. Lopez if he had ever

10   seen any OnePlus license agreements covering 4G and 5G

11   technology, do you remember what he said?  His excuse was,

12   well, first of all, it was -- OnePlus is a new company.

13         But we know that's not the case.  OnePlus was

14   started in 2013.  They're not new.  And when he's pressed

15   on that, when Mr. Tidwell pressed him on that, what did he

16   say?  He said, oh, well, it's complicated.  There's

17   confidentiality issues.

18         Well, as we pointed out about that, too, all these

19   license agreements are complicated.  We had to seal the

20   room.  Everybody had to leave because of confidentiality

21   restrictions.  That's just an excuse.

22         And one more important thing.  Did you ever hear

23   Dr. Lopez say that he talked to anybody at OnePlus?  Did he

24   say he talked to anybody at OnePlus to ask them if they had

25   any additional license agreements to cover the same

1   technology?  Don't you think that would be an important

2   thing to ask?

3            Now, let's go back to that house slide again.

4            Dr. Lopez only wants you to focus on these two

5   foreclosed houses over here on the far-left side.  But

6   let's take a look at these houses in the middle, the more

7   recent agreements made by the relevant Pantech entity in

8   this case.  These agreements represent the reality of our

9   current market and provide more accurate reflection of the

10  licensed landscape of these infringed patents.

11           The agreements with GNJ, Coolpad, BLU, and Sony

12  are the only relevant agreements that cover all the patents

13  that are at issue in this case.  Those are the only

14  agreements that cover all the patents.

15           Those are the comparable license agreements that

16  you should be considering when coming up with your royalty

17  rate.

18           Let's take these one-by-one.  I want to start

19  first with GNJ.

20           You heard from Mr. Jung Pantech believes that GNJ

21  was selling a large number of 4G phones when they

22  approached them.  It turns out they were mistaken.  They

23  weren't.

24           So what did Pantech do?  They did the fair thing.

25  They went to them and said, look, give us ███████████

1    and we'll give you a license to our patents.  And you know

2    what, if you start selling 4G and 5G, you're going to have

3    to pay our royalty rate.  That's just being fair.

4         Turns out, they aren't doing that right now.  If

5    they choose to, they bought the option, and they'll have to

6    start paying the rate.

7         The same thing goes for Coolpad.  Pantech didn't

8    know Coolpad's future plans were to leave the U.S. market

9    when it entered into the agreement with them.

10        Again, this agreement was reached where they would

11   pay, and if they wanted to start using 4G and 5G, they

12   agreed.  They have a contract.  They start using that,

13   start selling in the United States, they got to start

14   paying the royalty rate.

15        Dr. Lopez tried to compare this to putting your

16   house for sale for $5 million, if you will -- if you will,

17   like a list price.  But that's not a fair comparison

18   because if I put my house for sale for $5 million, that

19   doesn't mean anybody has to pay it.

20        But GNJ and Coolpad, they have a contract.  They

21   have a contract for that house.  If they want to move into

22   that house, they got to pay.

23        Then there's the BLU agreement.  Dr. Lopez takes

24   issue with the BLU agreement and says it's not a fair

25   market rate.  But BLU is actually paying the royalty rate

 1   now.  They are pay -- they've paid ████████████████
 2   ███████████████, and they're continuing to pay that rate.
 3   That's -- it's definition of fair market value right there.
 4          Finally, let's look at the ████ agreement.  Sony
 5   is no small player, and it paid ███████████████████
 6   ████████████████████████████████████████████████████████
 7   ████████████████████████████  You just can't ignore
 8   this.
 9          And, in fact, Dr. Putnam, he analyzed this.  He
10   told you, you look at ████████████████████████████████
11   ████████████████████████████████  But Dr. Lopez,
12   he attempts to just sweep this under the rug.
13          He says, well, ████████████████████████████████
14   ███████████  So they must not have been worth much.
15          Well, that's not exactly the full truth, though,
16   because you heard from Mr. Jung, they submitted five --
17   they submitted 10 patent families.  And Dr. Jung has a
18   Ph.D. in electrical engineering.  He got to review those 10
19   patent families and pick the five best.  So it's not true
20   that they -- that ████ had all the input in those patents.
21          Dr. Lopez also tries to downplay this agreement by
22   saying, well, it covers all of ████████████████  Maybe it
23   covers -- maybe they'll start making a ████████████ or a TV
24   that has -- has cell communication in it.
25          But did you hear any evidence -- any evidence from

1    that witness stand that says anything about a ████████

2    that practices any of Pantech's patents?  No, you didn't.

3              Let's go to the house slide again.

4              So that leaves us with one house left on our

5    street.  This house on the far right you see here.  This

6    one is all prettied up.  It's been renovated a little bit.

7    Those are the updates that reflect the discounts that

8    Pantech has provided in its license agreements.

9              We know that OnePlus must pay no less than a

10   reasonable royalty.  That's the bottom.  That's the floor.

11   I talked to you about that in the opening statement.

12             But we also know that the license agreements that

13   are at issue here, those license agreements had uncertainty

14   built in.  They had discounts built in.  And those

15   discounts don't apply anymore.  Those discounts -- there

16   has been a determination that OnePlus infringes, and,

17   therefore, those discounts no longer apply.

18             Next slide, please.

19             What we've done here is we've done the math for

20   you.  We assessed those discounts for you that you heard

21   about from Dr. Jung and you heard about from Dr. Putnam.

22             THE COURT:  Mr. Fussell --

23             MR. FUSSELL:  Yes.

24             THE COURT:  -- you have two minutes remaining.

25             MR. FUSSELL:  Thank you, Your Honor.

1          Simply put, if you take the top-down rate that
2     they came up with, the .71 percent, and you divided it by
3     their established rate, the .5 percent, you get a 1.42
4     multiplier.  It's simple math.  And that multiplier takes
5     out the discount.  And when you apply that to the rate
6     here, the 836,000, the true amount that they should pay is
7     1.187 million.
8          The same is true with respect to the non-SEP.
9     That rate, if you recall, was -- the established rate was
10    .25 percent, and they discounted that for their early
11    adopters at .15 percent.  That comes to a multiplier of
12    1.67, and that's the amount you should -- you should tack
13    on to the -- to the rate, as well, to go from 294,000 to
14    490,000.  Giving you a grand total of 1.678 million.
15         So we're at the end of the street now.  It's up to
16    you to decide the fair value of the house.
17         I want to thank you for your time.  We'll reserve
18    the rest of our time.  You'll hear from my colleague,
19    Mr. Culbertson.  But I want to thank you again.  Thank you
20    for your attention.  Thank you for indulging us.  And thank
21    you for your service.
22         MR. AIRAN:  Your Honor, may I have a five-minute
23    warning, please?
24         THE COURT:  Yes, you may.
25         MR. AIRAN:  May I proceed?

1           THE COURT:  You may.

2           MR. AIRAN:  Your Honor, ladies and gentlemen of

3   the jury, good morning.

4           This is a case about what OnePlus owes Pantech for

5   the use of its patents.  You are being asked to determine

6   the fair, reasonable, and non-discriminatory rate that

7   OnePlus should pay in this case.

8           There are only two questions that you'll have to

9   answer today.  The first is the SEP rate.  The second

10  relates to the non-SEP patent.

11          Now, when it comes to the SEP rate, the Court has

12  instructed you as follows.  You heard that.  It was a very

13  long list of instructions that the Court gave you, but

14  you're going to have those instructions back in the jury

15  room.

16          And I want you to pay specific attention to

17  Section 5.1, and this is repeated in a couple of different

18  places in the jury instruction.  But that says:  A

19  reasonable royalty as to the '839, '247, and '954 standard

20  essential patents cannot exceed the amount permitted under

21  Pantech's FRAND obligations.

22          So that sets your bar right there.  You can't go

23  above that.  That's what the Court is instructing you here.

24          And there's a reason that Pantech is obligated to

25  license on FRAND terms.  This is a slide here that they put

1  up -- that Pantech put up on opening.  It's a two-way

2  street, fair, reasonable, and non-discriminatory.  We agree

3  with that.  That's what FRAND is.

4       Pantech asserts that these patents are standard

5  essential, and that must mean they're used for 4G and 5G.

6  When you read through the instructions again, what

7  Judge Schroeder instructed you is do not take into account

8  the fact that the standards are successful.

9       The job here is to figure out the value of the

10  patents that make up the standard, and there are thousands

11  upon thousands of these patents.

12       Here, we're talking about three SEP patents.

13       FRAND is important because it keeps the playing

14  field level.  Everybody pays the same rate.  When Pantech

15  bought these patents, and you heard about that through

16  Mr. Jung, when Pantech bought these patents, they were

17  already encumbered.  They already had ████████████ and

18  ████████████ stick with the patents.  They're sticky.

19  They go along with the patents.

20       And what FRAND means is that every player that

21  enters the market gets the same rate.

22       Again, when I asked Mr. Jung about that, he

23  said -- I asked him:  So you understand that the patents

24  when you bought them were encumbered ████████████████

25  ████████████████; is that correct?

1          He answered:  Yes, that's correct.

2          Pantech wants to retrade that deal.  That deal was

3     done before Pantech even bought the patents.  Now wants to

4     say I don't want to pay any attention to what happened

5     before.  I don't want to consider these ██████████████

6     █████.

7          And one thing that occurred to me when I was

8     sitting here listening to Mr. Fussell in his opening is he

9     put up that picture of houses.  Remember that?  Again and

10    again he put that up.

11         Well, if you look at the houses on the end, that's

12    supposed to indicate Apple and Samsung.  Does anybody think

13    that Apple and Samsung are those raggedy old houses on the

14    block?  Of course not.  Those are the best houses on the

15    block, and they were ███████████████████.  That's the

16    fact here.

17         So Pantech here wants to retrade on the deal that

18    they already did.

19         Now, we're here today because we need your help.

20    We need your help to decide what the FRAND rate is.

21    Pantech owes well over -- owns well over a thousand

22    patents, but only four are at issue here.  We agree that we

23    should pay for use, but Pantech is seeking in this case a

24    rate that is higher than FRAND.

25         There are two theories of damages in this case.

1    Both parties have highly-educated and skilled economists.

2    You saw them.  Their credentials are impressive on both

3    sides.  But these experts have set the bracket.  They've

4    set the bracket.  That's the evidence you've heard.

5          You've got 90,000 on the one hand.  You've got

6    1.13 million on the other.  These royalty amounts may seem

7    low given what you've heard in this trial, but you need to

8    keep in mind that we're talking about smartphones that have

9    thousands upon thousands of features.  There are thousands

10   upon thousands of SEP patents.

11         And what we're talking about here is damages or

12   calculation of payments for the amount due for just U.S.

13   patents for only past sales, and we're only talking about

14   three SEP patents and one non-essential patent.

15         When you ignore the arguments made by the

16   attorneys, this is the -- that is the only economic range

17   that is supported by the evidence.  Again, the instruction

18   at 5.1 tells you that the reasonable royalties cannot

19   exceed the amount permitted by Pantech's FRAND obligations.

20         Let's turn now to Pantech's theory.

21         Pantech points to these four licenses, to BLU,

22   GNJ, Sony, and Coolpad.  And it attempts to confirm its

23   desired 0.65 program rate by pointing to these licenses.

24         Starting first with Sony, we're talking about a

25   license to all of Sony's patents.  Right?  This is all of

484

1    them, all 1,600 patents.  It's now up to 1,800 patents.

2    Sony has that.  Sony has all of those patents.  And they

3    paid ████████████     for it.

4         Now, one thing I -- it may have gone over pretty

5    quick when you were listening to the testimony, but

6    Mr. Jung agreed that the Sony license has this clause:

7         ████████████████████████████████████

8    ██████████████████████████████████████████

9    ██████████████████████████████████████████

10   ██████████████████████████████████████

11   ████████████████████████████████████████

12   ███████

13        That's a contract.  That's what they agreed to.

14   And it says ████████████████████████████████

15   ████████████     But that's what they're doing here.  You

16   heard Mr. Fussell just moments ago saying look at how great

17   this Sony license is.  But they agreed in that contract

18   that they wouldn't do that.

19        Remember when I asked Mr. Jung about that, he

20   said, well, I'm not a lawyer.  I don't understand that.

21   That's plain.  That tells you he shouldn't be doing it.

22   They know they shouldn't be doing it.  Mr. Jung doesn't

23   like his number.  He doesn't like the number he's stuck

24   with.  That's why he's ignoring the Sony agreement.

25        If you do consider this agreement, though, let's

```
 1   take a look at the ████████████████ that Mr. Fussell
 2   was mentioning.
 3        If you're trading cards and someone says to you,
 4   hey, I'd like to have five of your cards, but you've got to
 5   pick them out of 10, are you going to give them your best
 6   10 and say, here, pick from among my best 10?  Of course
 7   not.  You're going to look through your playing cards and
 8   give them the ones that are the worst 10, and then they can
 9   pick the five out of that, and that's what happened here.
10        ████████████████████████████████
11   ████████████████████████████████████████
12   ████████████████████████████████████████
13   ████████████████████████████████████████████
14   ██████████████████.
15        The only concrete value here is cash.  Cash talks,
16   right?  Everybody knows cash talks.  That's the only thing
17   that mattered here.  And it was ████████████ for a license
18   to use every patent in Pantech's portfolio, which is around
19   1,800 patents.
20        Let's take a look at BLU.  Like Sony, Pantech also
21   sued BLU.  It sued them, and BLU settled that litigation in
22   2021 by paying ████████, in addition to a ████████ future
23   license agreement.
24        The back payment that they're talking about, the
25   ████████████████████████████████████████
```

1    So they didn't use their standard rate when it came to BLU.

2         In fact, I asked Mr. Jung about this again.

3    ███████████████████████████████████████████████████████

4    ███████████████████████████████████████████

5    ███████████████████████████████████████████████████████████

6    ████████████████████████████

7    █████████████████████████████████████████████

8    ███████████████████████████

9    ██████████████████████████████████████████

10        That's what he answered.

11        Now, neither Pantech nor Dr. Putnam calculated

12   that discount, but Dr. Lopez did.

13        He calculated the actual rate for the BLU license

14   to be ███ percent.  That's more than ███ times less than

15   their program rate.  This is like going to buy fireworks at

16   a fireworks stand.  They give you a buy 1 get 5 free.

17        But to determine the actual price of a firework,

18   you have to add up your cost and then divide by six.

19   That's the price you're paying.  You're not paying the

20   standard rate.  You're getting five free.  You're getting

21   six fireworks for one price, and that's what happened with

22   BLU.

23        Next is the Coolpad license.  We know Coolpad left

24   the market.

25        Now, Coolpad, what did they pay?  Well, like Sony

487

1  and BLU, Coolpad was sued by Pantech.  And what Dr. -- or

2  Mr. Jung, I'm sorry, admitted is that Coolpad paid less

3  than ███████ for its license.

4      Now, Coolpad going forward, Mr. Fussell said,

5  well, they -- they'll have to pay if they go forward.

6  There's no indication that Coolpad is going forward here.

7  They're not going forward.  They agreed to pay less than

8  ███████ in order to get out of this lawsuit.  They said

9  we're done.  We're exiting the market.

10      Finally, let's take a look at the GNJ license.

11  GNJ paid ████████████ for its license.  It's like a

12  parking ticket when you're talking about companies like

13  that.  That's it.  They paid ██████████ and they,

14  too, got out of the market.  There's no significance to

15  this GNJ license whatsoever.

16      And, again, it's important that GNJ was leaving

17  the market at the time that they agreed to these licensing

18  rates.  They were -- they never intended to pay those

19  rates.  So they say, okay, well -- you know, they agreed to

20  pay the rates.  Well, they were never going to pay them so

21  that's completely irrelevant.

22      So how did Mr. Jung determine his rate?  Well,

23  when I asked him that question, I said:  You set aside the

24  Apple and Samsung rates and then moved forward with your

25  own rate after you bought the patents; is that fair?

1    Answer:  I think that would be fair.

2    What Mr. Jung wanted was a reset.  He wanted to

3  retrade the deal.  He wanted to ignore everything that

4  happened before, ignore everything that happened with Apple

5  and Samsung, and then just do his own deal, and that's what

6  he did here.

7    Now, no licensing expert would ignore ███████████

8  75 percent of the market, but that's exactly what Mr. Jung

9  and Pantech did.  The program rate here is supposed to be

10  for all of the portfolio license, but this case only

11  involves three patents.

12    So what did Dr. Putnam do?  Well, Dr. Putnam did

13  his family citation, right?  We heard about that, heard

14  about that through several witnesses.

15    So what he did is he counted members of the

16  family, and then he said the '247 patent, well, that's

17  worth the greatest number of citations.

18    Think about that for a minute, if you're counting

19  families.  Some of you may know wealthy relatives, right?

20  Does that make you wealthy?  If I count my wealthy

21  grandpa's wealth, does that make me wealthy?  Of course

22  not.  Everybody knows someone that's wealthy that's in your

23  family.  But that doesn't mean that the poor relations are

24  worth the same amount as the wealthy relations.

25    But that is exactly what Dr. Putnam's analysis

1    was.  He counted up all the wealth of the family and then

2    assigned it to the '247 patent.  That's not a good

3    methodology.

4          Using the result of his counting, he did some math

5    and he came up with some rates, .075 percent rate that he

6    said should be applied for the '247 patent.

7          He did a similar kind of family analysis for the

8    '839 and '954 patents.  And then he determined some rates.

9          But that's where his analysis really stopped.  He

10   showed you these four licenses and then created this rate

11   and said, look, based on these four licenses, everybody --

12   everybody should be paying that.

13         But this approach does not account for Apple and

14   Samsung.  What did they do with Apple and Samsung?  Well,

15   they put their head in the sand.

16         Again, Mr. Jung said he wanted to forget about

17   what happened in the past.  He wanted to set his new rate

18   going forward.  He didn't like -- he bought the patents,

19   they didn't like the rates, so they just ignored them.

20         So Apple and Samsung, they account for about 50

21   percent of the market.  That's -- that's what we're talking

22   about here.  That is the market rate.  Probably most of you

23   have either an Apple or Samsung phone.  You've probably

24   never even heard of OnePlus.

25         But that's the rate.  The rate is set by more

1   than -- more than 75 -- about 75 percent of the market.  I

2   shouldn't say more.  It's about -- it's about 75 percent of

3   the market.  But that is the market rate.  That's what

4   people pay.  That's what Apple and Samsung paid.  And

5   they're the best houses on the block.

6          Everyone agrees that Apple and Samsung were not

7   considered when Pantech negotiated the four licenses that

8   we're talking about here.

9          For the first time, you, as a jury, will determine

10  what effect the ███████████████████████ have on the

11  Pantech rate.  That's your job to determine.

12         And when Apple and Samsung are considered, the

13  picture changes dramatically.  You can think about it.  We

14  put this up thinking, you know, maybe this will help you

15  understand what's going on here.

16         You got these big ole magnets on this side for

17  Apple and Samsung pulling the number down to the left side.

18  And then you've got these four little magnets on this side

19  that they want to point to.  And they say -- they're

20  pulling that number way up to 1.13 and even higher, but

21  that's not reality here.

22         The reality is the market rate was set by Apple

23  and Samsung.  When you take everything into account, and

24  you should take into account Apple and Samsung, ██████████

25  ████████████████████

1          And when you tally up the damages, as you're going

2     to do later today, the total damages amount should be in

3     the neighborhood of $100,000, not more than 1 million.

4          Now, Pantech is in the business of buying and

5     licensing patents.  I asked Mr. Jung about that.  He said

6     yes.

7          Is your primary business in acquiring and

8     licensing patents.

9          He said:  Currently, yes.

10         Now, I want to be clear.  There's nothing wrong

11    with that.  You can buy patents, and you can license them.

12    That's not a problem.  But a savvy corporation like Pantech

13    that buys and licenses patents knows what it's doing.  It

14    knows that it's buying these patents subject to prior

15    licenses.

16         Mr. Jung testified that when he bought this patent

17    portfolio, they were already aware of ██████████████████

18    ████████████   they knew about them.  Again, they just want to

19    ignore them.  They want to retrade the deal.

20         Now, Dr. Putnam saw what Apple and Samsung did in

21    his work on this case, and he offered several excuses for

22    why they ignored them.

23         First was economic duress.  But as the Judge

24    instructed you, that FRAND obligation is irrevocable.

25    There's no way to get out of that.  Even if there was some

```
 1   duress, there was no way to get out of it.  They signed

 2   that deal.  That first excuse of duress doesn't hold water.

 3   These are sophisticated companies.  They knew what they

 4   were doing.  ███████████████████████████████

 5        Next Dr. Putnam said that Apple and Samsung did

 6   █████████████████████████████████████████.  You

 7   heard that on opening again.

 8        But that argument makes no sense.  Why would ██████

 9   ███████████████████████████ that they didn't need?  In fact,

10   that ██████████████ expired.  Apple knew it.  Pantech

11   knew it.  ████████████████████████████████████████

12   ██████.  That second excuse also doesn't hold water.

13        And the third excuse is that they weren't an arm's

14   length transaction.

15        But Pantech and Samsung were embroiled in a

16   lawsuit.  They sued -- Pantech sued Samsung just like they

17   sued OnePlus.  ███████████████████████████████████

18   ██████████████████ why would they sue them?  Of course, █████

19   ████████████████.  So that final excuse is no better than

20   the other two.

21        So let's talk about the Apple and Samsung rate for

22   a moment.  Dr. Putnam did not calculate a rate for Apple

23   and Samsung.  But Dr. Lopez did the work.  Dr. Lopez

24   actually did the work.

25        And he unpacked these deals.  He determined that
```

1   the effective rate for Samsung is this ████- or, I'm

2   sorry, ██ for Samsung and ████ for Apple.  And it's worth

3   recalling that ███████████████████████████████████████

4   ██████████████████████

5           So if we're talking about their houses at the end

6   of the block, the ones that they want you to believe are

7   the raggedy old houses, this is more than a year after the

8   fact, and they also did their deal with Samsung at about

9   the same rate.

10          You can see the rate difference there.  It's ████

11  percent difference.  That's the market rate.  That's what

12  they gave Apple.  That's what they gave Samsung.  That's

13  the established rate in this case.

14          Now, again, retrading the deal.  What's going on

15  here?  Well, when we look at Apple and Samsung, you can see

16  that, on this demonstrative, my colleague, Mr. Thompson,

17  showed you this demonstrative on opening, and you can see

18  that the rate that's charged for the sales of Apple and

19  Samsung versus the rate that they're seeking for OnePlus is

20  a huge, huge mismatch.

21          They're seeking a rate, as Dr. Lopez explained,

22  that's ████ times greater, ████ times greater is what they

23  want from OnePlus than what they acquired when they bought

24  the patents from what Pantech had done.

25          They want to retrade the deal.

1          Now, Mr. Fussell, when he was wrapping up his part

2     of the opening, he brought in this slide, and I want to

3     talk about that for minute.

4          This slide was never shown to you during -- during

5     testimony.  No expert testified about this.  No fact

6     witness testified about this.  You're seeing this slide for

7     the very first time right now.

8          Why is that?  Ask yourself that question when

9     you're deliberating.  Why did they pop this slide in in

10    closing argument?  This is what the attorneys want you to

11    see.  This is not what any expert has bought on to.

12         Dr. Putnam was on the stand.  He was probably the

13    longest witness on the stand.  Did he present this slide?

14    No.  Why do you think he didn't present that slide?  He

15    doesn't believe in it.  No economic expert believes in this

16    slide.

17         This is attorney argument.  These are the

18    attorneys saying you ought to pay more.  You don't have to

19    pay attention, as Judge Schroeder explained, to attorney

20    argument.

21         Let's keep focused on what the economic reality is

22    here.  The economic reality is what the experts testified

23    to.

24         So Dr. Putnam gave us his highest number.  They

25    don't like it.  And now they want you to jack up the rate.

```
 1              And you might remember that Dr. Putnam actually
 2     said repeatedly in his testimony that one of the purposes
 3     of FRAND is not to jack up the rate.  He said -- he said
 4     that, right, you remember that?  He didn't want you to jack
 5     up the rate.  But that's exactly what the lawyers now want
 6     you to do.  Dr. Putnam said you shouldn't do it.  The
 7     lawyers are saying you should do it.
 8              Now, this is where it gets interesting.
 9     Dr. Putnam testified yesterday, you heard him, so this is
10     still probably fresh in your mind, but when he was
11     explaining FRAND, it's that last sentence there that really
12     caught my eye.  He said non-discriminatory means that you
13     treat similarly situated people similarly.
14              Let's think about that for a minute, this is the
15     very definition of discrimination.  Treating the big guys
16     in the market one way because they're big and then treating
17     the little guys in the market a different way because
18     they're little.  That is discrimination.
19              The non-discrimination principle is that you treat
20     everybody the same way, whether they're big, whether
21     they're small.  That's non-discrimination.  But that's not
22     the way Dr. Putnam sees it.  He's got discrimination
23     exactly backwards.  Discrimination is equal treatment for
24     all people.  And I know that's a loaded word, but that's
25     what's going on here.
```

1          The new Pantech wants to take advantage of OnePlus

2   because they're smaller.

3          Let's move on now to the specific questions that

4   you have to answer.

5          So Question 1 on your verdict form asked for a

6   dollar amount.  And we're here because we need your help on

7   that.  OnePlus is willing to pay a fair, reasonable, and

8   non-discriminatory rate to license these patents, but it

9   should not have to pay a rate that's ███████   times more

10  than what the predecessor licensed Apple and ███████  for.

11  That's just not fair.

12         So when you look at all of the evidence and you go

13  back and consider all of the evidence, what Dr. Lopez

14  explained is that about $78,000, if you apply Apple and

15  Samsung, that's the rate -- that's the number you ought to

16  put in for Question No. 1.

17         You should not take into account this evidence

18  based on GNJ, BLU, Coolpad, and Sony to the exclusion of

19  Apple and Samsung.  And that's what they want you to do.

20  Ignore the left side entirely.  Just focus on this right

21  side and give us that number.

22         And then they're asking for more.  That's the

23  crazy part.  They're saying that's not even enough.  Let's

24  give it some kicker, and that's not appropriate.

25         Again, the jury instructions tell you FRAND is the

497

 1    maximum.  These are the guideposts.  These are the economic

 2    experts.  These are the brackets.  This is what the

 3    economic experts say.

 4           So you're not -- you shouldn't go above what

 5    they're asking here for, 836,591.  And you shouldn't ignore

 6    Apple and Samsung.  Those are very powerful magnets pulling

 7    that number down -- all the way down.

 8           Now, let's -- just real briefly I want to touch on

 9    what Mr. Fussell said about Dr. Cooklev.  One thing that

10    occurred to me, and you may have forgotten this already.

11    It was late in the day on Tuesday when Dr. Cooklev

12    testified.  But at the end of the day, he just wouldn't

13    answer direct questions.

14           You might remember my colleague, Mr. Filbin,

15    asking him a simple technical question, and he paused.  He

16    went on tilt or something.  He wouldn't answer the

17    question.

18           And so my colleague Mr. Filbin said:  I'll take

19    your silence as a no.

20           He said:  Well, as I said, it seems to me the

21    question is related to technical issues that were not part

22    of my direct testimony.

23           So he wouldn't answer a technical question unless

24    his lawyer asked him that question.  Think about that for a

25    minute.  What does that say about their technical -- about

1  the technical value of the patents and whether they're

2  worth more than what -- than what they licensed Apple and

3  Samsung for?

4       So if you add up all the royalties for the SEP

5  patents, as I said earlier, that number comes to 78,000.

6  And, remember, this is only -- again, that seems small.  I

7  know that seems small.  Remember what we're talking about

8  is just U.S. sales, only for past damages, and only for

9  three patents.

10      So that's the right number here.

11      Turning to the second question that you're going

12 to be asked, this is a difficult question to parse out.

13 That's because it's not a standard essential patent.  It's

14 never been valued before.

15      And they produced an expert, Mr. Mauro, to testify

16 about that.  He had a video -- they didn't show you on

17 direct.  I showed you the video on cross-examination.

18      And you may remember that what he said the use

19 case was here is when you use your phone and you click on

20 a -- on the search -- or the settings button, that pop-up

21 came up.  And he said the advantage was when the screen

22 locks out, that pop-up goes away.  That's what they claim

23 to be the valuable patent here, that pop-up going away on

24 lockup screen.

25      Well, if you clicked anywhere else on the screen

1    when the phone was active, that pop-up would have gone away

2    anyway.  Right?  There's no particular advantage.

3          He talked about the problem -- or the patent

4    solving nine problems.  These involved rapid display of

5    information.  Remember that?  I took you through that.

6    There's nothing rapid about waiting for your lock screen to

7    clear a pop-up.  So this patent isn't very valuable either.

8          And we have to keep this in mind.  You have to

9    keep in mind what's going on here with the '654 patent.

10   This is one feature.  Dr. Lopez explained that there are

11   thousands of features in -- in any smartphone.

12         Mr. Mauro explained that there are millions of

13   features in these applications.  That's why people buy

14   phones.  You're not buying a phone.  You're not buying a

15   OnePlus phone because if you don't use it, a pop-up that

16   was previously on the screen goes away.  That's not why

17   you're buying a OnePlus phone.  There's no evidence in this

18   case whatsoever that that feature, that that '654 patent,

19   is in any way driving any sales of OnePlus phones.

20         Indeed, Mr. Mauro admitted when I asked him --

21   after awhile, he finally admitted it:  Is there a

22   quantitative measurement that you can present to the

23   jury -- quantitative, meaning numbers -- that would assess

24   the value of the '654 patent?

25         And he said:  No, there's not.

1           So what are we talking about for the value of the

2      '654 patent?  Well, what Dr. Putnam finally got around to

3      saying -- he didn't say this on direct.  What he finally

4      got around to saying on cross-examination was:  Well, he

5      equated the '654 patent with the '247.

6           How did he get there?  Did anyone say that?

7           You heard from Dr. Cooklev.  Dr. Cooklev said:  I

8      didn't talk to Dr. Putnam about the '247 patent and the

9      '654 patent or do any comparison.

10          You heard from Mr. Mauro.  Mr. Mauro said:  I

11     didn't talk to Dr. Putnam about the -- equating the '654

12     and the -- and the '247 patents.  Neither of those experts

13     talked to Dr. Putnam.

14          So where did he get this number from?  Where did

15     he get this number?  I'm just going to say the '654 patent,

16     which relates to lockout screens and a pop-up, that I'm

17     going to equate that to the most valuable standard

18     essential patent.

19          THE COURT:  Mr. Airan, you have five minutes

20     remaining.

21          MR. AIRAN:  Thank you, Your Honor.

22          So that -- that's unsupported testimony.  That's

23     not a rigorous analysis.  That's no analysis at all.  He

24     just made that up.  He said:  I'm going to take the '654

25     patent and say it's the same thing as the most valuable

1    '247 patent in this case.

2            That's not a reasonable analysis.

3            So, again, when we take a look at what's going on

4    here for the '654 patent, which is a non-essential patent,

5    we think it's appropriate to look at the Apple and Samsung

6    licenses, again, as part of a whole.

7            Take a look -- we're going to tell you, take a

8    look at their licenses, take a look at BLU, GNJ, Coolpad,

9    and Sony, but don't ignore Apple and Samsung.  These are

10   the licenses that were in effect at the time that Pantech

11   bought those patents.  They knew they were encumbered by

12   it.  They can no longer retrade that deal.

13           And so when you look at that -- when you look at

14   all of this evidence in totality, Dr. Lopez did a

15   calculation there for the '654 patent, and he concluded

16   that if you apply these rates, these Apple and Samsung

17   rates, to the OnePlus sales base, you get a $12,508 amount

18   for the use of the '654 patent.

19           So, in conclusion, one thing I want to point out

20   is that these rates, Mr. Fussell mentioned this, he said

21   they didn't do a further apportionment down.  That's --

22   he's complaining that these rates are too high, that this

23   number should actually have gone down.  And what Dr. Lopez

24   did was conservative.

25           So he said, fine, I'm just going to give you the

1  whole value.  I'm not even going to try to apportion down.

2  I could, I could knock those numbers down.  I'm not going

3  to do it.  I'm just going to give you the ██████████████

4  for Apple and Samsung for each patent.

5        And that's summarized here on this screen.  And

6  when you add them up, it's about $78,000 for the SEPs, and

7  it's about $12,500 for the non-essential patents.  And

8  those are the numbers we're going to ask you to put into

9  the jury verdict form.

10        As we bring this case to a close on behalf of the

11  entire OnePlus team, we thank you for your time and

12  attention.  You're doing important work here, and both

13  parties appreciate your time and attention to this matter.

14  We need your help to get to a resolution of this.  That's

15  what you're doing.  That's what you're going to go back and

16  deliberate on.

17        And we thank you for your time here today.

18        THE COURT:  Thank you, Mr. Airan.

19        MR. CULBERTSON:  Your Honor, may I have a

20  three-minute warning, please?

21        THE COURT:  Yes.

22        MR. CULBERTSON:  Thanks very much.  May it please

23  the Court.

24        Ladies and gentlemen, the good news for you is I'm

25  batting clean-up, and I don't have much time.  So the case

 1   is going to be in your hands very quickly.

 2          Before I run out of time, and I will, I want to

 3   thank you one last time.  We appreciate your work.  We

 4   appreciate your commitment to this in helping us get this

 5   case resolved.

 6          Mr. Airan is a tough act to follow.  He's -- he's

 7   quite a speaker, but what I can tell you is there were

 8   several things that just struck me because it makes me

 9   wonder if we were in the same courtroom the last couple of

10   days.

11          I heard him say that Samsung sued Pantech.  That's

12   not the evidence.  It was exactly -- or, excuse me, that

13   Pantech sued Samsung.  That's -- it was just the opposite,

14   okay?  Samsung sued Pantech, ladies and gentlemen.  That

15   was the testimony from Mr. Kim.

16          I heard him say that we're picking on OnePlus

17   because they're smaller.  You heard that Pantech has nine

18   employees.  We're talking about a company that has more

19   than a billion dollars in sales just over the brief damage

20   period that we're talking about, just in the United States.

21   We're not picking on a small company here.  We're going

22   after someone that's using our intellectual property.

23          You heard him say that there are thousands and

24   thousands of SEP patents.  If that's true, and they're

25   selling 4G and 5G phones, how come they can't show us one

1    single license agreement where they are paying to use SEP

2    patents?  It just doesn't add up.

3           Don't you know if they had one that was anywhere

4    close to the Apple or Samsung agreement with Pantech, Inc.,

5    that they keep beating their chest about, it would have

6    been front and center?

7           Don't you know that if Apple or Samsung's

8    agreements with Pantech, Inc., set the rate, as he said,

9    that we'd have a briefcase full of them to talk about in

10   this case?  And you haven't seen a single one.

11          Now, if we could have PDX-7-29, please?

12          They're telling you that a reasonable royalty rate

13   is $90,000.  We heard that for the first time yesterday,

14   folks.  That's based on a portfolio rate they say that

15   Apple got.

16          You've heard from day one, this is not a portfolio

17   case.  It's a four-patent case, and the Judge instructed

18   you that damages are to be apportioned down, to the patent

19   level.

20          Dr. Lopez didn't do that.  So we added the math

21   here in the last two columns using appropriate

22   apportionment provided by Dr. Putnam, who did do the

23   appropriate analysis.  And if you -- if you -- if you

24   apportion down the damages in this case according to

25   Dr. Lopez, it would be $7,200.

```
 1            So why didn't he do that?  Because neither he nor
 2   any of these lawyers can stand up here with a straight face
 3   and say that this case is worth $7,000 when they've been
 4   using our intellectual property for up to three years and
 5   generated over a billion dollars in sales in infringing
 6   phones.  It doesn't add up.
 7            And if you can't trust them to be straight with
 8   you about that, to just put this artificial number that is
 9   created contrary to the Court's instructions, how can you
10   rely on anything that they've told you throughout this
11   trial?
12            He just told you the BLU license isn't at the
13   standard rate.  Go read it.  It's Plaintiffs' 40, 41 or 42.
14   And it says ███████████  and the testimony is that not only
15   did they pay past damages, they've paid more than ████████
16   in future royalties at the ███████   They're just --
17   they're just monkeying with the numbers.
18            If these patents are such low value, why are they
19   using them, okay?  They know these patents are important.
20   They're important to improve their phones and the way they
21   perform on the networks.
22            They know that these patents allow them to compete
23   in the marketplace, and they've been competing with a
24   competitive advantage now for years because they're selling
25   the phones without paying for the technology that they're
```

1  using.  And they like that advantage.  They've been

2  boasting about their growth and are enjoying great success.

3  That's why they don't want to pay what's fair.

4         And so if you think about phones these days,

5  right, you think about how important these are.  We don't

6  just talk on them.  We sit here and we work on them.  We do

7  email.  We download entertainment.  We communicate through

8  different forms of texts.  We pay our bills.  We bank.

9  It's an endless amount of things that we do.

10        So think about how important connectivity is.  How

11  important is connectivity to these wireless networks?

12  That's what connects us to the world.  That's what connects

13  us to our jobs.  It's what connects us to the things we

14  like to do, and it's what connects us to our loved ones.

15        If your device wasn't compliant with the 4G or 5G

16  standard, you'd lose all of those connections.  That's the

17  importance of the SEPs.

18        And the '654 patent's importance, it's much more

19  than this feature that he focused on in the

20  cross-examination.  It's because we spend all of those

21  activities -- all the things that we do with our phone now,

22  we need user interface functionality that serves our

23  purposes.  It's critically important.

24        You heard Dr. Putnam say that a commercially

25  essential patent is just as valuable and perhaps more

507

```
 1   valuable than an SEP.  And keep in mind the non-essential

 2   patent is not limited by the FRAND obligation.

 3        I want you also to think about the competitive

 4   disadvantage that Pantech -- excuse me, that OnePlus would

 5   be at if they weren't using these patents.  Who would buy

 6   these -- their phones if they weren't operating on the 5 --

 7   5G or 4G networks properly?

 8        The only reason that they're succeeding is because

 9   their phones do operate there.  These patents are

10   foundational to those network standards.  They're using it

11   because they need it.  And now they need to pay for what's

12   fair.

13        So they're going to tell you what's fair are the

14   Apple and Samsung licenses, right?  But Dr. Putnam told

15   you, neither one of those parties needed a license.  What

16   they bought, at best, was an insurance policy.

17        And so, again, what they're suggesting to you is

18   that an insurance policy to -- an insurance policy for a

19   portfolio of patents, it's different than this one,

20   smaller -- smaller by hundreds of patents, sets the rate

21   for the rest of the industry?  They're telling you that

22   what's effectively an insurance policy from another company

23   sets the rate for companies that aren't licensed through

24   Qualcomm.

25        If that were true, again, we'd see a stack of
```

1    licenses for these SEP patents at the Apple rate.  And you

2    haven't seen a single one.

3              So what does your common sense tell you about

4    that?  Does that make sense?

5              THE COURT:  Mr. Culbertson, you have three minutes

6    remaining.

7              MR. CULBERTSON:  Thank you, Your Honor.

8              If we could go to PDX-7-31, please?

9              Dr. Putnam described to you what was FRAND, and

10   his base number -- what he described as the floor, $836,591

11   for the SEPs, and $294,383 for the non-SEPs.  That's before

12   the discounts can be added back in.

13             Recall, he said those discounts can be added back

14   in because now we have certainty.  We have certainty that

15   these patents are valid.  We have certainty that these

16   patents are infringed.  And we have certainty about the

17   infringing sales.  All of that is known.

18             So if you think about -- if you think about it

19   this way, if I made a bet in June that the Cowboys were

20   going to win the Super Bowl in February, I'd get some

21   pretty good odds, right?  I'd bet 10 bucks, and I could

22   probably win a thousand because we have so many unknowns.

23   We don't know who the players are, et cetera.

24             Fast forward to February, and they've made it.

25   Now if I make that $25 bet, all I'm going to win is 25

1    bucks, right?  The time for the generous odds are gone

2    because everything is known; all the certainties are there.

3           And it's the same thing here.  The time for the

4    discounted rate is gone.  It's appropriate at this point --

5    if we could go to PDX-7-26, please -- to remove those

6    discounts per this chart.

7           And, folks, you heard Mr. Jung talk about these

8    figures.  He talked about these discounts, and we've

9    demonstrated the math here for you in order to get back to

10   the undiscounted rate.

11          So if we could go, please, to Slide PDX-32,

12   please, Mr. Ebersole?

13          This was what we suggest is the appropriate

14   undiscounted measure of damages here because we do know the

15   patents are infringed, we do know they're valid, and we do

16   know the measure of sales.

17          For the SEPs, it's $1,187,960, and for the user

18   interface patent, the '654, it's $490,639.

19          That, ladies and gentlemen, is what is fair, and

20   that's all that we're asking you to award.

21          Thank you very much.

22          THE COURT:  Thank you, Mr. Culbertson.

23          All right.  Ladies and gentlemen of the jury, it's

24   now time for you to return to the jury room to begin your

25   deliberations in this case.  You'll have a copy of the

1   final jury instructions that I reviewed with you, as well

2   as one copy of the verdict form.

3          The exhibits admitted into evidence will be

4   brought up shortly.

5          The first thing you should do is select one among

6   your number to serve as the foreperson who will guide and

7   direct your deliberations.

8          As a reminder, if at any time during your

9   deliberations you want to recess, you're welcome to do

10  that.  We're on your schedule at this point.  But I would

11  ask that you follow all of the instructions and the

12  cautions about your conduct that I have previously given

13  you.

14         After you have reached a unanimous verdict, your

15  foreperson should fill in, date, and sign the verdict form.

16         And, finally, if for any reason you need to

17  communicate with me at any time during your deliberations,

18  there is note paper in the jury room for that purpose.

19         If the foreperson would just fill out whatever the

20  communication is and hand it to the CSO, he'll bring it

21  directly to me.

22         All right.  We will await your verdict.

23         COURT SECURITY OFFICER:  All rise.

24         (Jury out.)

25         THE COURT:  Okay.  Make sure each side has given a

1   cell phone number to Ms. Combs so we can reach you in the

2   event of a note or a verdict.  And don't get too terribly

3   far from the courthouse.

4           Anything either party wishes to address?

5           MR. THOMPSON:  Nothing from Defendant, Your Honor.

6           MR. FUSSELL:  Nothing from the Plaintiff,

7   Your Honor.

8           THE COURT:  Okay.  We'll be in recess.

9           (Recess.)

10          COURT SECURITY OFFICER:  All rise.

11          THE COURT:  All right.  We have received two

12  notes.  The first indicated that Mr. Gonzalez is the

13  foreperson.  And the second indicated at 12:12 that the

14  jury had reached a verdict.

15          Is there anything we need to discuss before we

16  have the jury brought into the courtroom?

17          MR. FUSSELL:  Not from the Plaintiff, Your Honor.

18          MR. AIRAN:  Not from the Defendant.

19          THE COURT:  All right.  Mr. Goecke, if you would

20  have the jury brought in.

21          COURT SECURITY OFFICER:  Please stand for the

22  jury.

23          (Jury in.)

24          THE COURT:  Please be seated.

25          Mr. Gonzalez, I understand that you are our

```
 1   foreperson; is that correct?

 2          THE FOREPERSON:  Yes, sir.

 3          THE COURT:  All right.  And has the jury reached a

 4   verdict?

 5          THE FOREPERSON:  Yes, sir.

 6          THE COURT:  Is the verdict unanimous?

 7          THE FOREPERSON:  Yes, sir.

 8          THE COURT:  All right.  I'm going to ask you to

 9   hand the verdict form to Mr. Goecke, and he will bring it

10   around to Ms. Combs so that she can read it.

11          And I'm going to review it before she does that.

12          All right.  Now, ladies and gentlemen of the jury,

13   as Ms. Combs reads the verdict, at this time, I'm going to

14   ask all of you to listen very carefully to her as she does

15   that, because as she finishes, I'm going to ask each of you

16   if that is your verdict so that we can confirm its

17   unanimity.

18          Ms. Combs?

19          COURTROOM DEPUTY:  Question No. 1:  What damages,

20   if any, expressed as a total dollar amount, has Pantech

21   proven by a preponderance of the evidence would fairly and

22   reasonably compensate Pantech for its damages resulting

23   from OnePlus's infringement of the SEPs, '247, '839, and/or

24   '954?

25          And the answer filled in is $739,708.43.
```

```
 1            Question No. 2, what damages, if any, expressed as
 2   a total dollar amount, has Pantech proven by a
 3   preponderance of the evidence would fairly and reasonably
 4   compensate Pantech for its damages resulting from OnePlus's
 5   infringement of the '654 patent?
 6            The answer filled in is $260,291.57.
 7            All right.  Thank you, Ms. Combs.
 8            Ladies and gentlemen of the jury, let me poll you
 9   at this time and make sure that this is the unanimous
10   verdict of the entire eight members of the jury.
11            Will all of you who voted for this verdict as
12   Ms. Combs has read it please stand?
13            (Jury polled.)
14            THE COURT:  All right.  Please be seated.
15            And let the record reflect that all twelve -- all
16   eight members of the jury immediately rose and stood in
17   response to my request to poll the jury.
18            The verdict will be filed with the Clerk of Court.
19            Ladies and gentlemen of the jury, this now
20   completes the trial of this case.  From the very beginning,
21   I repeatedly asked you not to discuss the case with anyone,
22   including among yourselves, until you retired to begin your
23   deliberations and then to only discuss it among yourselves.
24            I'm now releasing you from those obligations.  You
25   are free to talk about the case among yourselves, your
```

1  friends, your family, anybody you want.  And by the same

2  token, you are free not to say another word to any --

3  anybody about it.  You're no -- under no obligation one way

4  or the other.

5       I have a practice in my court that I will ask you

6  to wait for me after I have excused you for a few minutes.

7  I need to visit with you briefly, but I would like to come

8  in and talk to you about our operations and how we conduct

9  trials and -- and the like to see if there are anything --

10  anything -- to see if there's anything we can do to improve

11  our operations and to enhance and improve upon your

12  experience as jurors.

13       It's really just an opportunity for us to visit

14  about whether there is anything I can do to be a better

15  judge and if there's anything that we can do as a public

16  institution to function better and to serve the public more

17  effectively.

18       So Mr. Goecke and Mr. McKinnie are going to take

19  you upstairs to the jury room, and I will be up in just a

20  few minutes to visit with you and thank you for your

21  service and to ask you for any suggestions you all may have

22  about how we do our jobs.

23       I do want to thank you on behalf of the Eastern

24  District of Texas for your dedicated service as jurors in

25  this case.  I and the parties and the attorneys deeply

1   appreciate your willingness to give up three days of your

2   lives of -- this week to devote your attention to getting

3   this case resolved.  The parties have not been able to

4   resolve the case without the assistance of a jury, and if

5   you were not here, we would not be getting this matter

6   resolved.  So I appreciate your time and your effort in

7   that regard.

8           I say this in every trial that I have, and I

9   believe it more and more in every trial that I have, I

10  think there are three pillars to good citizenship in

11  America.  The first is answering the call of military

12  service when your nation needs you.  The second is being an

13  active and informed voter.  And the third is by serving as

14  a juror.  And all eight of you have clearly responded to

15  that call by serving as jurors in this case.

16          Our Constitution and in particular the Seventh

17  Amendment to the Constitution depends upon having active

18  citizens like each of you who are willing to participate

19  in -- in trials so that disputes just like this one can be

20  resolved.  And I can't tell you how important this service

21  is and how much the Court appreciates it.

22          So on behalf of the parties and the attorneys

23  involved in the case and the Eastern District of Texas,

24  thank you again for your service in this matter.

25          At this time, you'll be excused, and Mr. Goecke

1  and Mr. McKinnie will escort you upstairs.

2          COURT SECURITY OFFICER:  Please stand for the

3  jury.

4          (Jury out.)

5          THE COURT:  All right.  Please be seated.

6          All right.  Anything about the verdict from the

7  Plaintiffs?

8          MR. FUSSELL:  No, Your Honor.

9          THE COURT:  Anything from the Defendants?

10          MR. AIRAN:  No, Your Honor.

11          THE COURT:  Okay.  I gave you a little warning

12  yesterday that I was going to ask for fairly quick briefing

13  for any post-trial motions, and I meant that.

14          I am going to ask that you all have your opening

15  briefs -- any opening motion -- briefing filed by October

16  30th, which is two weeks, roughly, from today.

17          And I'm going to go ahead and give you a couple of

18  dates for a post-trial motion hearing, and I don't know

19  exactly which day, but it'll either be December 16th or

20  December 17th.  I would like to have the motions fully

21  briefed by December the 5th, and I'll ask the parties to

22  meet and confer on what those interim deadlines are.

23          So I think you all can work that out as long as

24  everything is fully briefed by December the 5th with a view

25  toward having a hearing on December the 16th or 17th and

1  with the opening motions or opening briefs filed on October

2  the 30th.

3          Is that acceptable to the Plaintiffs?

4          MR. FUSSELL:  Yes, Your Honor.  I would just have

5  one comment.  With the brief that has been filed already,

6  can we align it with the schedule that the Court --

7          THE COURT:  I think that makes sense.

8          Any objection?

9          MR. AIRAN:  No objection, Your Honor.

10         THE COURT:  All right.  Good enough.

11         MR. FUSSELL:  Thank you.

12         THE COURT:  Does the schedule I'm suggesting to

13  the Defendant make sense, as well?

14         MR. AIRAN:  Yes, Your Honor.

15         THE COURT:  Okay.  What else?

16         Okay.  Thank you all for a good trial.

17         MR. AIRAN:  Thank you, Your Honor.

18         COURT SECURITY OFFICER:  All rise.

19         (Trial concluded at 12:42 p.m.)

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                    10/17/2024
     SHELLY HOLMES, CSR, TCRR             Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25